IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 25–1644**

_____

**BETTE EAKIN,** *et al.*

**v.**

**ADAMS COUNTY BOARD OF ELECTIONS,** *et al.*

**Appeal of: REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and REPUBLICAN PARTY OF PENNSYLVANIA**

_____

**EMERGENCY MOTION FOR A STAY OF THE
DISTRICT COURT'S ORDER PENDING APPEAL**

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ENTERED ON MARCH 31, 2025 AT NO. 1:22–CV–340

DAVID W. SUNDAY, JR.
*Attorney General*

Office of Attorney General          BY:      BRETT GRAHAM
1600 Arch Street, Suite 300                  *Deputy Attorney General*
Philadelphia, PA 19103
Phone: (267) 530-0886                        SEAN A. KIRKPATRICK
bgraham@attorneygeneral.gov                  *Chief Deputy Attorney General*
                                             *Chief, Appellate Litigation Section*

DATE: April 25, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................1

PROCEDURAL HISTORY....................................................................2

REASONS FOR GRANTING THE STAY ..............................................6

I.    APPELLANTS HAVE A REASONABLE POSSIBILITY OF SUCCESS ON THE MERITS ...................................................................................7

    A.    The *Anderson-Burdick* Framework Does Not Apply ..........................8

    B.    Even If the *Anderson-Burdick* Framework Applied, Speculative Government Interests Are Sufficient to Pass Constitutional Muster...............................................................................14

II.    THE COMMONWEALTH WILL SUFFER IRREPARABLE HARM ABSENT A STAY...................................................................................17

III.    PLAINTIFFS WILL NOT SUFFER EVEN GREATER HARM AS THE RESULT OF A STAY.......................................................................20

IV.    THE PUBLIC INTEREST IN THE ORDERLY ADMINISTRATION OF ELECTIONS WEIGHS IN FAVOR OF A STAY .....................................22

CONCLUSION .................................................................................24

# TABLE OF AUTHORITIES

## Statutes

23 Pa. C.S. § 5331 ................................................................................15

25 P.S. § 3146.6(a) ........................................................................ 1, 7, 8

25 P.S. § 3150.16(a) ...................................................................... 1, 7, 8

42 P.S. § 6206 .....................................................................................15

42 Pa. C.S. § 8316.2(b) .......................................................................15

52 U.S.C. § 10101 ....................................................................... 1, 3, 13

57 Pa. C.S. § 316 .................................................................................15

73 P.S. § 201-7(j.1)(iii)(3)(ii) ..............................................................15

73 P.S. § 2186(c) .................................................................................15

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
    Reauthorization and Amendments Act, 120 Stat. 577 .........................13

Fed. R. App. P. 8(a)(1)(A) .....................................................................5

## Cases

*Abbott v. Perez*, 585 U.S. 579 (2018) .....................................................18

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................9

*Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988
    (Pa. Cmwlth. Jan. 17, 2024) .............................................................23

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01–CV–485,
    2010 WL 817519 (M.D. Pa. Mar. 9, 2010) ..........................................7

*Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) .................................................7

*Baxter v. Philadelphia Bd. of Elections*, 325 A.3d 645 (Pa. Nov. 1, 2024)
    (*per curiam*) ......................................................................................2

*Baxter v. Philadelphia Bd. of Elections*, No. 1305 C.D. 2024,
    2024 WL 4614689, at *18 (Pa. Cmwlth. Oct. 30, 2024) ............... 19, 22

*Baxter v. Philadelphia Bd. of Elections*, No. 395–96 EAL 2024 (Pa. Jan. 17, 2025) (*per curiam*) .................................................. 19, 23

*Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004) .......................................... 13

*Burdick v. Takushi*, 504 U.S. 428 (1992) ...................................... 9, 10, 14

*Bush v. Gore*, 531 U.S. 98 (2000) (*per curiam*) ...................................... 12

*Cabrera v. Att'y Gen. of U.S.*, 921 F.3d 401 (3d Cir. 2019) .................................... 17

*Common Cause Indiana v. Lawson*, 978 F.3d 1036 (7th Cir. 2020) ............... 18, 23

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Hum. Servs.*, No. 13–1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) .......................... 6

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209 (3d Cir. 2013) ............................ 17

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ......................... 11, 16

*Dunn v. Blumstein*, 405 U.S. 330 (1972) .................................................. 12

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) .................................... 14

*Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366 (9th Cir. 2016) ...................... 11

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) .................................... 11

*In re Citizens Bank, N.A.*, 15 F.4th 607 (3d Cir. 2021) .................................... 6, 20

*In re Revel AC, Inc.*, 802 F.3d 558 (3d Cir. 2015) ........................................ 7, 8, 20

*In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693 (3d Cir. 1989) .................. 20, 21

*Kawecki Berylco Indus., Inc. v. Fansteel, Inc.*, 517 F. Supp. 539 (E.D. Pa. 1981) ... 6

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) ............................ 6

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ......... 12

*Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) ........................................ 19

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................ 18

*Mazo v. Sec'y of State of New Jersey*, 54 F.4th 124 (3d Cir. 2022) ............. 9, 10, 13

*McDonald v. Bd. of Election Comm'rs of Chic.*, 394 U.S. 802, 807–08 (1969) ..... 11

*McLinko v. Dep't of State*, 279 A.3d 539 (Pa. 2022) ................................... 10

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) ........................................ 15

*New Georgia Project v. Raffensberger*, 976 F.3d 1278 (11th Cir. 2020) .. 18, 22, 23

*Newark Cab Ass'n v. City of Newark*, 901 F.3d 146 (3d Cir. 2018) ......................17

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................6, 7

*Ohio Council 8 Am. Fed. of State v. Husted*, 814 F.3d 329 (6th Cir. 2016)............14

*Parker v. Conway*, 581 F.3d 198 (3d Cir. 2009) ...................................14

*Pennsylvania State Conf. of the NAACP v. Schmidt*, No. 24–363,
 2025 WL 247452 (Jan. 21, 2025) ............................................................4

*Powell v. PS Bank*, No. 23–CV–1755, 2023 WL 7302061 (M.D. Pa.
 Nov. 6, 2023) ...................................................................................20

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ...............................................22

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2020) .........22

*Ritter v. Migliori*, 143 S. Ct. 297 (2022)...............................................15

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................11

*Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982) ..................................10

*S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763
 (3d Cir. 2019) ..................................................................................7

*Sampson v. Murray*, 415 U.S. 61 (1974) ...............................................20

*Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223 (3d Cir. 2011) ..............7

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)..............................10

*Wilmoth v. Sec'y of New Jersey*, 731 Fed. Appx. 97 (3d Cir. 2018) ......................10

# INTRODUCTION

In 2019, the General Assembly enacted Act 77, a sweeping package of reforms to Pennsylvania's Election Code. The Code now provides for universal, no-excuse mail-in and absentee voting. And it instructs Pennsylvanians availing themselves of that option to "fill out, *date*, and sign" a pre-printed declaration on the outer return envelope in which their ballot will travel to their county board of elections. 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added).

The District Court's analysis of the federal constitutional claims at issue is both novel and puzzling. It recognized that the requirement that voters sign and date an envelope is facially nondiscriminatory, (*see* Dist. Ct. ECF 438 at 16) (the requirement "applies to <u>all</u> vote-by-mail voters … [and] draws no distinctions") (emphasis in original); that compliance with the Election Code's instructions represents a "minimal" or "slight" burden on the franchise, (*see id.* at 10, 15–16, 20); and that neither core political speech nor equal protection rights are implicated, (*see id.* at 13).[1] Nonetheless, perhaps shaded by distinct claims under the federal Civil Rights Act, *see* 52 U.S.C. § 10101, the District Court determined that enforcement of this requirement is "not justified by any state interest"—or, more accurately, that those interests were not supported by sufficient evidence—and declared it a violation

---

[1] A copy of the District Court's memorandum opinion is attached hereto for the Court's convenience. The phrase "equal protection" does not appear in the District Court's memorandum opinion.

of the "First Amendment right to vote." (*Id.* at 8, 17–18). In short, there is significant friction within the District Court's rationale.

With a statewide primary election less than 4 weeks away, the Commonwealth of Pennsylvania, by its Attorney General, respectfully requests a stay of the judgment pending appeal.[2] Enforcing this provision of the Election Code does not offend any federal constitutional protection of the right to vote, and the public interest favors allowing the Commonwealth to enforce its duly-enacted election laws before final resolution of this important question.

## PROCEDURAL HISTORY

In the six years that have elapsed since the enactment of Act 77, one of its provisions has been the subject of near-constant legal challenges. Nevertheless, it has been continuously enforced over that time period, consistent with the decisions of this Court and the Pennsylvania Supreme Court.[3] Here, the District Court enjoined

---

[2] This Court granted a request by the Republican Intervenors to expedite this appeal. *See* 3d Cir. ECF 35, 38. But the basis for that request was the need "to ensure clear and stable rules in advance of Pennsylvania's 2025 general election," which will take place in approximately "five months." 3d Cir. ECF 35–1 at 2. The Republican Intervenors did not acknowledge the more urgent question of the primary elections, which will be held next month.

[3] *See, e.g.*, *Pennsylvania State Conf. of NAACP v. Schmidt*, 3d Cir. Dkt. No. 23-3166 at ECF 43 (*per curiam*) (staying effect of District Court's order finding violation of the Civil Rights Act); *Baxter v. Philadelphia Bd. of Elections*, 325 A.3d 645, 645 (Pa. Nov. 1, 2024) (*per curiam*) (ordering that effect of Commonwealth Court opinion validating state constitutional claims "shall not be applied to the November 4, 2024 General Election").

the enforcement of that provision based on its conclusion that the First Amendment requires counting the ballots of voters who fail to follow Election Code instructions.

On November 7, 2022—Election Day eve—Plaintiffs Bette Eakin, Democratic Senate Campaign Committee, and the Democratic Congressional Campaign Committee filed an initial complaint in this matter, naming as Defendants all 67 county boards of election. (Dist. Ct. ECF 1). In that filing, as well as their Amended Complaint filed on February 9, 2023—which added as a plaintiff AFT Pennsylvania[4]—Plaintiffs alleged a violation of the Civil Rights Act of 1964, *see* 52 U.S.C. § 10101, and a violation of the First and Fourteenth Amendments.

Various individual voters as well as the Republican National Committee, the National Republican Congressional Committee, and the Republican Party of Pennsylvania (collectively, Republican Intervenors) were granted leave to intervene in support of the county boards. (Dist. Ct. ECF 35, 165). Plaintiffs, the Republican Intervenors, the Lancaster County Board of Elections and the Berks County Board of Elections all filed motions for summary judgment. (*See* Dist. Ct. ECF 280, 281, 286, 287, 377).

---

[4] The original complaint included as Plaintiffs Ines Masella, a voter, and Fetterman for PA, a political campaign. (Dist. Ct. ECF 1 ¶¶ 13–14). Because neither Masella nor Fetterman for PA were listed on the Amended Complaint, though, they were terminated from the case on February 9, 2023. Accordingly, this brief's references to "Plaintiffs," and later "Appellees" include Bette Eakin, the Democratic Senate Campaign Committee, the Democratic Congressional Campaign Committee, and AFT Pennsylvania.

On November 21, 2023, the District Court granted relief in a companion case, *Pennsylvania State Conference of the NAACP et al. v. Al Schmidt et al.*, No. 1:22–CV–339 (*NAACP*), in which separate plaintiffs had raised similar claims against the county boards of election and the Secretary of the Commonwealth. (Dist. Ct. ECF 348). In *NAACP*, the District Court determined that not counting ballots that arrive in undated or incorrectly dated outer envelopes violated the Materiality Provision of the Civil Rights Act. (*See id.*).

The District Court stayed its consideration of this matter on January 22, 2024, pending an appeal in *NAACP*. (*See* Dist. Ct. ECF 365). This Court reversed and remanded the District Court's decision in *NAACP* by memorandum dated March 27, 2024. On April 30, 2024, this Court also denied petitions for a panel rehearing or rehearing *en banc*. On January 21, 2025, the United States Supreme Court denied a petition for writ of *certiorari*. *See Pennsylvania State Conf. of the NAACP v. Schmidt*, No. 24–363, 2025 WL 247452 (Jan. 21, 2025).

Thereafter, the District Court lifted its stay and ordered the parties to supplement their motions for summary judgment. (*See* Dist. Ct. ECF 375). On March 31, 2025, the District Court granted in part and denied in part the motions for summary judgment. It granted relief on Plaintiffs' federal constitutional claims and, consistent with this Court's disposition in *NAACP*, rejected Plaintiffs' claims under the Civil Rights Act. (*See* Dist. Ct. ECF 438, 439).

Rule 8 of the Federal Rules of Appellate Procedure dictates that a party "must ordinarily move first in the district court" when seeking a stay of the judgment pending appeal. Fed. R. App. P. 8(a)(1)(A). Such relief may be sought directly from a court of appeals, however, where the movant states that "a motion having been made, the district court denied the motion … and state any reasons given by the district court for its action." *Id.* (a)(2)(A)(ii).

Consistent with Rule 8, the Commonwealth initially sought intervention in the District Court. (*See* Dist. Ct. ECF 443). The District Court denied that motion on April 24, 2025. (*See id.* Dist. Ct. ECF 445). The District Court reasoned that it had been "divested of jurisdiction in this matter" when the Republican Intervenors filed their notice of appeal, and that "the Commonwealth had an earlier opportunity to intervene and failed to do so." (*Id.*). *But see* Emergency Motion to Intervene ¶ 3 n.2. Because the District Court denied the Commonwealth's motion to intervene, it did not address the merits of the Commonwealth's motion to stay.

## REASONS FOR GRANTING THE STAY

Courts traditionally consider four factors in evaluating requests for a stay pending appeal, the first two of which are the "most critical." *In re Citizens Bank, N.A.*, 15 F.4th 607, 615–16 (3d Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).[5] A movant must demonstrate (1) a sufficient likelihood of success on the merits; (2) that they will suffer irreparable harm absent a stay; (3) that granting a stay will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *See id.*

With respect to the relief afforded by the District Court's March 31 Order (Dist. Ct. ECF 439), all four factors weigh in favor of granting the Commonwealth's motion. The purpose of a stay pending appeal is to "preserve the status quo," *see Kawecki Berylco Indus., Inc. v. Fansteel, Inc.*, 517 F. Supp. 539, 540 (E.D. Pa. 1981), which is necessary here given the impending nature of primary election contests scheduled for May 20, 2025. And far from asking this Court to conclude, at this early stage, that the decision below was incorrect, movants simply need to show that there is a "reasonably possibility" of reversal on appeal, *see Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01–CV–485, 2010 WL 817519, at *6 (M.D.

---

[5] *See also Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Hum. Servs.*, No. 13–1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013) ("[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction."); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (setting forth standard).

Pa. Mar. 9, 2010), *aff'd*, 477 Fed. Appx. 740 (Fed. Cir. 2012), and that the equities favor enforcing election laws currently in effect before their constitutionality is "conclusively determined." *Nken*, 556 U.S. at 434. The Commonwealth can demonstrate both here.

## I.    APPELLANTS HAVE A STRONG POSSIBILITY OF SUCCESS ON THE MERITS

In order to satisfy the first factor of the *Nken* analysis, a movant must show that the odds of success on appeal are "significantly better than negligible," though they need not show that the odds are "greater than 50%." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015). This Court has "embraced a 'sliding-scale' approach to determining how strong a case a stay movant must show." *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019) (citing *In re Revel AC, Inc.*, 927 F.3d at 569). Here, Appellants have more than a "reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (*en banc*).

Pennsylvania's Election Code provides that an absentee or mail-in voter must "fill out, date, and sign" the pre-printed declaration that appears on the envelope in which their ballot is transported to a county board of elections. 25 P.S. §§ 3146.6(a), 3150.16(a). The failure to do so invalidates a voter's ballot. *See Ball v. Chapman*, 289 A.3d 1, 22–23 (Pa. 2023).

The District Court recognized that the ballot-casting rule Appellees challenged—that these declarations must include a date in order for the ballot inside to be counted—is "nondiscriminatory." (Dist. Ct. ECF 438 at 16). Furthermore, it "affects only the mechanics of voting," as opposed to core political activity and imposes only a "minimal burden" on the rights of voters. (*Id.* at 13, 16).[6] Nevertheless, because "the weight of the burden on the citizens' right to vote is not counterbalanced by evidence of *any* governmental interest," the District Court concluded that enforcement of the Election Code's command could not "pass constitutional muster." (*Id.* at 21) (emphasis added).

Respectfully, the District Court's rationale evinces a significant divergence from case law regarding the right to vote and constitutional review of reasonable state election regulations. Accordingly, the possibility of obtaining relief on appeal is "significantly better than negligible." *In re Revel AC, Inc.*, 802 F.3d at 571.

## A.    The *Anderson-Burdick* Framework Does Not Apply

In *Mazo v. New Jersey Secretary of State*, this Court synthesized decades of precedent regarding constitutional challenges to state election laws. 54 F.4th 124,

---

[6] The District Court consistently referred to "the date requirement," (*see, e.g.*, Dist. Ct. ECF 438 at 8, 13), but it bears mention that at issue is a *component* of a larger *declaration* requirement—voters must "fill out, *date*, and sign" a pre-printed declaration. 25 P.S. §§ 3146.6(a); 3150.16(a) (emphasis added). In other words, to understand just how *de minimis* the burden at issue here is, it is worth remembering that the Pennsylvania voter who fails to include a handwritten date theoretically has a writing implement available and handy, as they have just provided a signature.

138 (3d Cir. 2022). *Mazo* cogently and carefully explained when it is appropriate for courts to evaluate state election regulations under the "sliding-scale approach" developed by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992) (the *Anderson-Burdick* framework)—and when it is not.

Though *Anderson* and *Burdick* concerned freedom of association claims under the First Amendment,[7] the framework extends beyond that context. *See Mazo*, 54 F.4th at 138. But this Court clearly stated that *Anderson-Burdick*:

> [c]ertainly … does **not** apply where the alleged right relates only to a statutory right, or there is otherwise no cognizable constitutional right at issue, or where the burden on a constitutional right is no more than *de minimis*.

---

[7] In *Anderson*, the Supreme Court invalidated an Ohio deadline for filing nomination petitions that disadvantaged "persons who wish[ed] to be independent candidates." 460 U.S. at 790. This "early" deadline prevented such candidates "from entering the … political arena … and creating new political coalitions … at any time after mid-to-late March." *Id.* Juxtaposed against the "political advantage of continued flexibility" that major parties enjoyed, the state's treatment of independent candidates interfered with "the competitive nature of the electoral process" and stifled independent voters' rights to "associate with others for political ends." *Id.* at 790–91, 788.

In *Burdick*, the Supreme Court rejected a Hawaii voter's claim of a constitutional right to cast a protest vote for Donald Duck as a write-in candidate in a state election. *See* 504 U.S. at 438. Because "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system," the state's prohibition on write-in votes did not impermissibly burden the voter's associational or expressive rights. *Id.* at 441.

*Id.* at 138–39 (emphasis added) (footnotes omitted). After all, it is "'common sense' that States must take an active role in structuring elections," and bring "order, rather than chaos" to "the democratic process." *Id.* at 136–37 (quoting *Burdick*, 504 U.S. at 433; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (cleaned up)); *Wilmoth v. Sec'y of New Jersey*, 731 Fed. Appx. 97, 101 (3d Cir. 2018) (acknowledging states' broad power to regulate elections); *see also Burdick*, 504 U.S. at 441.

Returning to the District Court's analysis, its conclusions that: (1) compliance with the dating component does *not* implicate expressive or associational rights, (Dist. Ct. ECF 438 at 13 ("It cannot be said that handwriting a date on the outer ballot envelope is core political speech.")); and (2) application of the dating component is inherently *non*-discriminatory (*id.* at 15), should have ended the inquiry.

The federal Constitution does not *per se* protect the right to vote. *See Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("[T]he Constitution does not confer the right of suffrage upon any one … [and] the right to vote, *per* se, is not a constitutionally protected right.") (quotations and citations omitted). Moreover, voting by mail-in or absentee ballot is a privilege granted by statute,[8]

---

[8] *See McLinko v. Dep't of State*, 279 A.3d 539, 543 (Pa. 2022) ("[T]he General Assembly … enacted legislation that allows for universal mail-in voting.")

which courts have not understood as a constitutional imperative. *See Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 414 (9th Cir. 2016) (Bybee, J., dissenting) ("There is no constitutional or federal statutory right to vote by absentee ballot.") (citing *McDonald v. Bd. of Election Comm'rs of Chic.*, 394 U.S. 802, 807–08 (1969); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in judgment) ("That the State accommodates some voters by permitting … the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)). These precepts confirm that this case lands squarely within *Mazo*'s guidance—*Anderson-Burdick* does not apply.

In short, there is a fundamental tension in the District Court's rationale between its recognition that handwriting a date on an outer ballot envelope is in no way core political speech and its ultimate holding that "the date requirement burdens the *First Amendment right to vote*." (Dist. Ct. ECF 438 at 13, 15 (emphasis added)); *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984) (listing activities protected by the First Amendment). There is no functional equivalent in this case to the independent voters and candidates in *Anderson*; or the protest voter in *Burdick*; or the slogan-writing candidates in *Mazo*—that is, the District Court did not conclude that voters who fail to comply with the Election Code's instructions share a

particular viewpoint, associate with one another or wish to associate with one another, or share protected characteristics.

It is true that the right to vote "includes the right to have one's vote counted *on equal terms with others*." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (emphasis added) (citing *Bush v. Gore*, 531 U.S. 98, 104 (2000) (*per curiam*)). But it is "the right to vote *as the legislature has prescribed*" that is "fundamental"—"and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Id.* (emphasis added, internal quotations omitted) (quoting *Bush*, 531 U.S. at 104); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate on an equal basis with other citizens in the jurisdiction."). As the District Court recognized, the dating component of the declaration requirement "applies to <u>all</u> vote-by-mail voters … [and] draws no distinctions." (Dist. Ct. ECF 438 at 15–16 (emphasis in original)). That some voters did not exercise the franchise as the General Assembly prescribed does not mean they are being "disenfranchise[d]," (*id.* at 20), or that their votes are being afforded different weight or dignity.

The enforcement of Pennsylvania's Election Code in this context is thus consistent with federal constitutional protections of the right to vote. The right

Appellees claim is a statutory one, any burden on its exercise is *de minimis*,[9] and no other constitutional protections are implicated.[10] Following *Mazo*, the District Court should not have conducted its analysis under the *Anderson-Burdick* framework. *See* 54 F.4th at 138–39; *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (declining to apply *Anderson-Burdick* absent First Amendment or equal protection interests).[11]

---

[9] In 2023, the Attorney General and the Department of State announced several modifications to mail-in and absentee ballot materials to promote "uniformity" and "reduce voter errors." *See Shapiro Administration Introduces Redesigned Mail Ballot Materials to Give Voters Clearer Instructions, Decrease Number of Rejected Ballots, and Ensure Every Legal Vote is Counted*, PA. DEPT. OF STATE (Nov. 29, 2023), available at https://www.pa.gov/agencies/dos/newsroom /shapiro-administration-introduces-redesigned-mail-ballot-materials-to-give-voters-clearer-instructions-decrease-number-of-rejected-ballots-and-ensure-every-legal-vote-is-counted.html. These modifications include "highlight[ing] fields the voter must complete in the voter declaration including signature and date" and "pre-fill[ing] '20' at the beginning of the year on the outer envelope to alert voters to write the current date, not their birthdate, in that field." *Id.* The only burden in this case is the burden of having to follow instructions which have been fine-tuned to be easy to follow.

[10] Following the District Court's logic, the Materiality Provision of the federal Civil Rights Act, *see* 52 U.S.C. § 10101, has essentially been extraneous since 1992, when the *Anderson-Burdick* framework was established.

If invalidating votes for failure to follow instructions *ipso facto* constitutes disenfranchisement, and thus must be subject to judicial scrutiny, Congress would have had no reason to prohibit by statute that which is already prohibited by the Constitution. This position refutes itself. Congress reauthorized the Voting Rights Act in 2006. *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act, 120 Stat. 577.

[11] In *Biener*, a non-indigent political candidate challenged the $3,000 filing fee necessary to participate in a primary for a House seat in Delaware. This Court evaluated the scheme under rational basis review, noting that it was "not the statute

**B.**    **Even If the *Anderson-Burdick* Framework Applied, Speculative Government Interests Are Sufficient to Pass Constitutional Muster**

As the District Court acknowledged, "the rigorousness of [its] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [First and Fourteenth Amendment] rights." (Dist. Ct. ECF 438 at 14–15 (quoting *Burdick*, 504 U.S. at 434)). Even under the *Anderson-Burdick* framework, then, the "minimally burdensome and nondiscriminatory" nature of Pennsylvania's reasonable regulation means that "a level of scrutiny 'closer to rational basis'" applies. *Ohio Council 8 Am. Fed. of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citations omitted). Through that capacious lens, a governmental interest need not be substantiated by evidence to be cognizable.

The District Court reasoned that it was "up to Defendants … to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote." (Dist. Ct. ECF 438 at 19). But under rational basis review, a legislature's "judgment 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 315 (1993)); (*cf.* Dist. Ct. ECF 438 at 20

---

which perforce restricts the ballot *but the candidate's decision to pay or not to pay*"—the "availability of choice" was "fatal" to the candidate's equal protection claims. *See Biener*, 361 F.3d at 215 (cleaned up, citation omitted).

(rejecting "solemnity," "voter confidence," and "fraud detection" as "unsupported by evidence of record")).[12] Rational basis review does not provide "license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (internal quotations omitted). Respectfully, that fundamental principle again should have doomed Appellees' claims.

The District Court also recognized that the orderly administration of elections constitutes a valid state interest, but dismissed the suggestion that a handwritten date could serve as a "useful backstop … if Pennsylvania's SURE system malfunctioned." (Dist. Ct. ECF 438 at 18).[13] As some jurists have acknowledged, handwritten dates on outer return envelopes would be critical to the work of county boards if the SURE system were to, "despite its name … [,] fail or freeze, or just run out of funding down the road." *See Migliori v. Cohen*, 36 F.4th 153, 165 (3d Cir. 2022) (Matey, J., concurring), *vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022). Because the District Court found that "speculative assertion" to be

---

[12] It is unclear what evidence would be necessary to support the proposition that signing and dating official documents serves an interest in "solemnity." Providing a signature and date—a jurat—is a requirement that frequently appears in Pennsylvania statutes. *See, e.g.*, 57 Pa. C.S. § 316 (notarial acts); 23 Pa. C.S. § 5331 (parenting plan); 73 P.S. § 201-7(j.1)(iii)(3)(ii) (emergency work authorization); 42 Pa. C.S. § 8316.2(b) (childhood sexual abuse settlement); 73 P.S. § 2186(c) (contract cancellation); 42 P.S. § 6206 (unsworn declarations).

[13] As the District Court explained, "the Commonwealth's Statewide Uniform Registry of Electors [is] a uniform integrated computer system that, *inter alia*, tracks mail ballots from application through final tabulation." (Dist. Ct. ECF 438 at 17 n.8).

unsupported by evidence, it found that there was no justification for the minimal burden associated with the dating requirement. (Dist. Ct. ECF 438 at 18).

Not so. It is well within the General Assembly's prerogative to factor into its enactments the potential fallibility of "Plan A," or even "Plan B" when ensuring the orderly administration of all elections in any circumstance. Legislatures need not assume that elections will be conducted without incident, or that the election infrastructure contemplated by other statutory measures will be sufficient to avoid the same. In short, legislatures may—and do—speculate.

The United States Supreme Court's holding in *Crawford* is illustrative. There, the state of Indiana required voters to present identification in order to vote at their polling stations, and justified that requirement by pointing to the risk of voter fraud. *Crawford*, 553 U.S. at 185–86 (plurality); *see also id.* at 209 (Scalia, J., concurring in judgment) ("the State's interests … are sufficient to sustain that minimal burden"). Though the record contained "*no evidence* of any such fraud actually occurring in Indiana *at any time in history*," the High Court determined that Indiana's interest in orderly elections sufficiently justified its "nonsevere" and "nondiscriminatory" identification requirement. *Id.* at 194–96 (emphases added).

In this case as much as *Crawford*, the judiciary must weigh and respect governmental interests, even when they are abstract or unproven. Such is the nature of rational basis review. *See Cabrera v. Att'y Gen. of U.S.*, 921 F.3d 401, 404 (3d

16

Cir. 2019) (a plaintiff asserting no rational basis for government classification "must negate every conceivable justification for [it] in order to prove that the classification is wholly irrational"); *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (calling rational basis review a "very deferential standard"); *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 216 (3d Cir. 2013) (courts may consider "any conceivable purpose" for government action and are "not limited to considering only the goal stated by the state actor"). Relying upon the lack of evidence supporting the various state interests asserted in this case was thus insufficient to resolve the question before the District Court.

Even assuming, *arguendo*, that *Anderson-Burdick* applies, the speculative state interests presented were sufficient to justify the *de minimis* burden associated with dating an envelope. *See supra* n.6.

## II.   THE COMMONWEALTH WILL SUFFER IRREPARABLE HARM ABSENT A STAY

As noted *supra*, primary elections throughout Pennsylvania are scheduled to take place on May 20, 2025. *See* Upcoming Elections (last accessed Apr. 15, 2025), available at https://www.pa.gov/agencies/vote/elections/upcoming-elections.html. The last day to request a mail-in or absentee ballot is one week beforehand, on May 13. *See id.* Because the District Court's judgment will necessarily prevent county boards from conducting the upcoming election pursuant to duly enacted laws, a stay pending appeal is necessary to prevent irreparable harm.

Recent guidance from the United States Supreme Court resolves this factor of the instant analysis. In *Abbott v. Perez*, 585 U.S. 579 (2018), a lower court determined that three legislative districts in Texas were invalid under Section 2 of the Voting Rights Act of 1965 as the results of racial gerrymandering. *Id.* at 592–93. When the lower court denied Texas's interlocutory request to stay its order, the High Court granted that relief instead and explained as follows:

> [T]he District Court's orders … constituted injunctions barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature. Unless that statute is unconstitutional, this would seriously and irreparably harm the State[.]

*Id.* at 602 (footnote omitted). The majority then doubled down on its conclusion in a footnote: "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Id.* at 602 n.7 (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)). Federal courts have followed suit, issuing stays pending appeal. *See, e.g.*, *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1041–42 (7th Cir. 2020) (granting stay pending appeal after district court granted injunctive relief in constitutional challenge to state election code); *New Georgia Project v. Raffensberger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (granting stay pending appeal after district court enjoined state absentee ballot deadlines).

The risk of irreparable harm is even more apparent here, given Act 77's non-severability provision. Not only would the absence of a stay "disabl[e]" Pennsylvania "from vindicating its sovereign interest in the enforcement of" *this*

*particular* election regulation, *see Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring), it would have the potential to wreak havoc across the Election Code. Section 11 of Act 77—the act which permitted universal no-excuse mail-in voting—provides that "[i]f any provision … or its application to any person or circumstance is held in valid," the remaining provisions therein "are void." *See Baxter v. Philadelphia Bd. of Elections*, No. 1305 C.D. 2024, 2024 WL 4614689, at *18 (Pa. Cmwlth. Oct. 30, 2024) (discussing severability), *allocatur granted in part*, No. 395–96 EAL 2024 (Pa. Jan. 17, 2025).[14] Absent a stay, it is at least likely if not probable that litigants will bring declaratory judgment actions to address this thorny legal question, with the result being widespread confusion, chaos, and expenditure of resources just weeks before a statewide election.[15]

---

[14] Briefing in *Baxter* has been completed as of the date of this filing, but the case has not been listed for argument.

[15] To be clear, the Attorney General is in no way conceding here that the District Court's ruling requires the invalidation of Act 77 in its entirety. Nor is the Attorney General taking the position that this Court must resolve the severability question, which is properly left to Pennsylvania's state courts.

Instead, the Attorney General merely notes that the *potential* that the District Court's ruling could trigger Act 77's non-severability clause must factor into its evaluation of irreparable harm to county boards of election and millions of Pennsylvania […] voters. Notably, the Republican National Committee and the Republican Party of Pennsylvania—as Appellants in *Baxter*—have taken the position that affirming the Commonwealth Court in that case would trigger Act 77's non-severability provision, "with exactly the disruptive consequences Appellees imagine." *See Baxter*, 1–2 EAP 2025, Reply Br. of Appellants at 2 (filed Apr. 14, 2025). Furthermore, the *Baxter* Appellants describe these consequences as both "chaotic and undesirable." *Id.* at 30.

In the context of elections, neither compensation in the form of damages nor later judicial redress can address the harms that would result absent a stay. *Cf. In re Revel AC, Inc.*, 802 F.3d at 571–72 ("'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'") (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). When balloting is completed and polls close, the die has been cast. The Commonwealth respectfully submits that irreparable harm to its sovereign interests absent a stay is both immediate and manifest. Accordingly, the first two, "most critical" factors of the instant analysis weigh in favor of granting a stay. *In re Citizens Bank, N.A.*, 15 F.4th at 615–16.

## III.    APPELLEES WILL NOT SUFFER EVEN GREATER HARM AS THE RESULT OF A STAY

When considering the third factor at issue for a stay pending appeal, courts must ask whether "harm to the movant outweighs harm to the nonmovant." *Powell v. PS Bank*, No. 23–CV–1755, 2023 WL 7302061, at *1 (M.D. Pa. Nov. 6, 2023) (quoting *In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989)). Here, on one side of the scale is the profound harm to the Commonwealth associated with the inability to enforce its duly-enacted election laws during the upcoming primary elections. That harm is plainly greater than any associated with voters following the law as it is enforced—and has been enforced for the last several elections—pending resolution of the instant appeal.

Appellees filed their initial complaint in this matter on November 7, 2022. (*See* Dist. Ct. ECF 1). Since then, three general elections and two primary elections have taken place in Pennsylvania, during which enforcement of the dating component of the declaration requirement has remained the same. *See supra* n.3. Therefore, if any question remained as to whether Appellees are aware that, under the status quo *ante*, they must follow all instructions for their ballots to be counted,[16] that question has been resolved conclusively in the affirmative.

While disenfranchisement unquestionably constitutes a serious harm, this Court must recognize that all Appellees—and for that matter, all voting Pennsylvanians—are extremely well-situated to avoid such a result. After years of litigation and guidance from election officials, they are keenly aware of the "rules of the road." Accordingly, the irreparable harm to sovereign interests discussed *supra* substantially "outweighs" any harm to Plaintiffs, *see In re Wedgewood Realty Grp., Ltd.*, 878 F.2d at 701, which is by no means inevitable. They can avoid that harm by (1) following the uncomplicated instruction of which they are acutely aware, or (2) simply casting their ballot in person.

---

[16] (*Cf.* Dist. Ct. ECF 228 ¶ 12 (Amend. Compl., filed Feb. 9, 2023) ("Ms. Eakin is concerned that her ballot will be similarly rejected in future elections" if "she forgets to include a date on her mail ballot")). At no time have Appellees requested a preliminary injunction or other relief to temper their asserted fear or concern over the enforcement of dating component of the declaration requirement.

**IV.    THE PUBLIC INTEREST IN THE ORDERLY ADMINISTRATION OF ELECTIONS WEIGHS IN FAVOR OF A STAY**

A stay pending appeal would serve the public interest. The United States "Supreme Court has 'repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" *New Georgia Project*, 976 F.3d at 1284 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020)). Given the impending nature of the primary elections on May 20, 2025, this Court should similarly preserve the status quo, promote confidence in the electoral system, and prevent unnecessary voter confusion. *See id.* ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.") (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

Concerns about judicial economy and voter education weigh heavily in this instance. Absent a stay, if this appeal is successful, the District Court's March 31 order will have produced a one-off suspension of election regulations that cannot be undone.[17] By contrast, if a stay is issued and this appeal is unsuccessful, this Court

---

[17] In a cautionary tale, at least one plaintiff in *Baxter v. Philadelphia Board of Elections* did not provide a handwritten date *in reliance upon* a then-vacated Commonwealth Court opinion, which had declared that enforcement of the dating requirement offends Pennsylvania's Free and Equal Elections Clause. *See Baxter*, 2024 WL 4614689, at *3 ("[Designated Appellee] did not attempt to fix her ballot because she read the news about this Court's decision in [*Black Political Empowerment Project v. Schmidt*, No. 283 M.D. 2024].").

will have maintained the status quo *ante* and ensured that relief was granted only once the constitutional question at issue is conclusively resolved. These concerns are particularly acute where, as here, the legal question and constitutional right at stake are profoundly important and touch upon the regulation of a state's democratic process. *See, e.g.*, *Common Cause Indiana*, 978 F.3d at 1041–42; *New Georgia Project*, 976 F.3d at 1283.

Absent a stay, the way Pennsylvania structures and runs elections gives rise to particularly fertile ground for confusion. No Commonwealth entity has sole responsibility for administering elections or enjoys special authority over county and local election officials. Rather, elections are administered by 67 county boards of elections. *See Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *39 (Pa. Cmwlth. Jan. 17, 2024). Combined with the potential activation of Act 77's non-severability provision, *see supra* Section II at 18–19, and a yet-to-be-heard state constitutional challenge to the same balloting rule in Pennsylvania's highest court, *see Baxter*, No. 395–96 EAL 2024 (Pa. Jan. 17, 2025) (granting *allocatur* in part), the injection of uncertainty into this decentralized scheme shortly before polls close would invite a perfect storm.

Instead of tempting fate, this Court should preserve the status quo during this appeal. The constitutional claims in this case are important; but that fact should not overshadow how disruptive and costly it would be for the District Court's order to

go into immediate effect, less than 4 weeks before a statewide election. Confusion among voters and election officials would be widespread and inescapable. Accordingly, a stay pending appeal would serve the public interests.

## CONCLUSION

For these reasons, the Court should stay the District Court's March 31 Order pending this appeal.

Respectfully submitted,

DAVID W. SUNDAY, JR.
Attorney General

By:    /s/ Brett Graham
BRETT GRAHAM
*Deputy Attorney General*
Attorney ID: 330556

Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Phone: (267) 530-0886
bgraham@attorneygeneral.gov

SEAN A. KIRKPATRICK
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

Date: April 25, 2025

## CERTIFICATE OF SERVICE

I, Brett Graham, Deputy Attorney General, do hereby certify that on this day, a true and correct copy of the foregoing brief has been filed electronically and is available on the Court's Electronic Case Filing System.

/s/ Brett Graham
BRETT GRAHAM
Deputy Attorney General

Date: April 25, 2025

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETTE EAKIN, et al,       )
                       )

     **Plaintiffs**       )
                       )

**vs.**                    )     **C.A.No. 1:22-CV-340**
                       )

**ADAMS COUNTY BOARD OF**   )
**ELECTIONS, et al,**        )     **ECF Nos. 280, 281, 286, 287, 377**
                       )

     **Defendants.**      )

## MEMORANDUM OPINION

### I. Introduction

This case directly implicates the right of citizens of the Commonwealth of Pennsylvania to cast a vote. The Court of Appeals for the Third Circuit has delineated the strong, foundational undercurrents associated with laws and regulations which may burden that right:

> Nowhere are the First Amendment rights of free speech and association more essential, or more fiercely guarded, than in the context of free and open elections. Self-government depends on ensuring that speech intended to support, challenge, criticize, or celebrate political candidates remains unrestricted. But at the end of every hard-fought political campaign lies the ballot box, where our constitutional democracy depends equally on States fulfilling their solemn duty to regulate elections to ensure fairness and honesty, even where doing so may burden some First Amendment rights.

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 131 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023).

Presently before the Court is another legal challenge to the "vote by mail" practices established by the Commonwealth of Pennsylvania in 2019. Ms. Bette Eakin is a registered voter who resided in Erie County, Pennsylvania at all times relevant to this litigation, including during the 2022 General Election. *See* ECF No. 228, ¶ 12. She is the lone individual Plaintiff in this

case. The other Plaintiffs are organizations with varied interests in voting and elections. The Democratic Senate Campaign Committee ("DSCC") is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country, including in Pennsylvania, to the United States Senate. *Id*. at ¶ 13. Similarly, the Democratic Congressional Campaign Committee ("DCCC") is that Party's national congressional committee. Its mission is to elect candidates of the Democratic Party to the United States House of Representatives. *Id*. at ¶ 14. AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and is a union of professionals representing over twenty-five thousand members in 55 local affiliates across Pennsylvania, including 179 members across two affiliates in Erie County. *Id*. at ¶ 15.

Named as Defendants are the Commonwealth's sixty-seven county boards of elections.[1] Plaintiffs challenge the manner in which the county boards enforce certain provisions of state law which concern the rejection of incorrectly dated and undated mail ballots, particularly as was done during the 2022 General Election. No department or administrative body representing the Commonwealth has been sued. Several organizations associated with the Republican Party have intervened as Defendants. These include: the Republican National Committee ("RNC"), the National Republican Congressional Committee ("NRCC"), and the Republican Party of Pennsylvania ("RPP").

The Amended Complaint challenges a Pennsylvania law that requires a voter using a mail ballot to indicate a date on the outer return envelope. *See* 25 Pa. Cons. Stat. §§ 3146.6(a),

---

[1] According to Plaintiffs, each county board has jurisdiction over the conduct and management of primaries and general elections in their respective counties in accordance with provisions of state law. In this capacity, the county boards are charged with accepting applications for mail ballots, mailing the ballots to the requesting voter, as well as receiving, canvassing, and counting the returned mail ballots. ECF No. 228, ¶ 16.

3150.16(a). Plaintiffs argue that the date requirement violates the "Materiality Provision" of the Civil Rights Act (Count I), 52 U.S.C. §10101, and their right to vote as guaranteed by the First and Fourteenth Amendments to the Constitution. *See* ECF No. 228, pp. 14-18. Plaintiffs seek declaratory and injunctive relief as well as litigation costs. *Id.,* p. 19. Specifically, Plaintiffs request: a declaration that the "Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires counties to reject ballots contained in envelopes that do not contain a correct date violates … the First and Fourteenth Amendment to the U.S. Constitution," as well as a permanent injunction "enjoining Defendants … and all persons acting in concert with each or any of them, from rejecting or refusing to count absentee and mail-in ballots for failure to comply with the Date Instruction." *Id.*

 The Lancaster County Board of Elections has moved for summary judgment as has the Board of Elections from Berks County. ECF Nos. 280, 286. The RNC has also moved for summary judgment. ECF Nos. 281, 377. Plaintiffs have cross-moved for summary judgment. ECF No. 287. The motions have been fully briefed and are ripe for disposition.[2] Before turning to the merits of those motions, the standards which guide the Court's decision on the pending motions for summary judgment will be set out.

## II. Standard of Review

 Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[2] By Order dated May 16, 2024, the parties were granted  leave to supplement their prior motions for summary judgment following lifting of a stay that was put in place during the pendency of an appeal in the companion case of *NAACP v. Chapman*, C.A. No. 1:22-cv-339. *See* ECF No. 375.

entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) *citing Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find

for him at trial."). If the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55, n.5 (3d Cir. 1992) *quoting Celotex*, 477 U.S. at 322-23. In *Moore v. Walton*, 96 F.4th 616 (3d Cir. 2024), the Court of Appeals for the Third Circuit recently explained: "A genuine dispute exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id.* at 622 (internal punctuation and citations omitted). *See also Tatel v. Mt. Lebanon Sch. Dist.*, 2024 WL 4362459, at *19–20 (W.D. Pa. Sept. 30, 2024); *Zurn Inds., LLC v. Allstate Ins. Co.*, 2024 WL 4350271, at *1 (W.D. Pa. Sept. 30, 2024).

## III. Discussion

### A.     Background

The Commonwealth of Pennsylvania's Election Code permits voters to cast their ballots by mail. In completing such ballots, voters must "date and sign the declaration" on the outer return envelope.[3] ECF No. 228, ⁋ 19. *See also* 25 P.S. § 3150.16(a). Under current practice, if the

---

[3] The mail ballot package consists of the ballot itself, instructions, a "Secrecy Envelope," and a larger pre-addressed outer "Return Envelope" on which a voter declaration form is printed. The Election Code provides that the inner Secrecy Envelope be marked only with the words "Official Election Ballot." 25 P.S. § 3146.4. The larger outer Return Envelope is to contain "the form of declaration of the elector, and the name and address of the county board of election of the proper county." *Id.*

date on the outer envelope is incorrect or missing, the ballot is not counted. It is undisputed that

in the 2022 general election, over 10,000 mail ballots were disqualified for this reason. ECF No.

311, ⁋ 10; ECF No. 313, ⁋ 10.

In challenging the requirement that a voter date the outer return envelope, Plaintiffs bring

two claims: first, they contend that requiring voters to date the outer envelope violates the

Materiality Provision of the Civil Rights Act (Count I). And second, Plaintiffs assert that the

county boards' enforcement of the dating provisions violates their rights under the First and

Fourteenth Amendments by impermissibly burdening the fundamental right to vote (Count II).

*See* ECF No. 228. [4]

---

[4] The Lancaster County Board, joined by the Berks County Board, raises a justiciability concern, that while important, is resolved without difficulty. The Boards argue that these Plaintiffs lack standing to pursue their claims <u>against them</u> because none of Plaintiffs' injuries were caused <u>by them</u> or resulted from any action <u>they</u> took. ECF No. 280 (Lancaster County), page 3; ECF No. 286 (Berks County).

Of course, standing is necessary for subject matter jurisdiction (*see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014)), and part of the standing inquiry is whether a plaintiff has shown that it has an injury that is fairly traceable to the defendant's conduct. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[S]tanding to sue each defendant … requires a showing that each defendant caused [the plaintiff's] injury…" *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) *citing Lujan*, 504 U.S. at 560-61. The evidence of record demonstrates that the AFT, DCCC, and DSCC each have standing against the Berks and Lancaster Boards.

These Plaintiff organizations claim direct or organizational standing. An entity has direct organizational standing when it suffers harm due to the defendant's allegedly unlawful conduct, particularly when it must divert resources to address the issue. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). For example, standing exists when the defendant's actions significantly impair the organization's ability to provide services, forcing it to expend substantial resources to counteract the harm. *See id.*; *Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016) (finding standing where an organization's mission was frustrated because it had to allocate resources to investigate and challenge the alleged misconduct). The actions of the Berks and Lancaster Boards, along with all sixty-five other boards of elections, hindered the AFT, DCCC, and DSCC from fulfilling their respective missions. *See* ECF No. 290 (Exhibit D, Declaration of Arthur Steinberg, President of AFT Pennsylvania), pages 18-19, at ⁋⁋ 5-7; ECF No. 290 (Exhibit C, Declaration of Erik Ruselowski,

Chief Operating Officer of DCCC), pages 13-14, at ¶¶ 2-5; ECF No. 290 (Exhibit B, Declaration of Devan Barber, Senior Advisor of DSCC), pages 8-9, at ¶¶ 2-5. The evidence reflects that the county boards' enforcement of the Date Provision compels each Plaintiff organization to redirect resources from other initiatives in Pennsylvania and other states to voter education and assistance efforts aimed at preventing disenfranchisement or curing misdated and undated ballots in Pennsylvania. *See* ECF No. 290, pages 19-20, at ¶¶ 10-11 (AFT); ECF No. 290, pages 14-16, at ¶¶ 6-10 (DCCC); and ECF No. 290, pages 9-11, at ¶¶ 6-12 (DSCC).

All three Plaintiff organizations also claim associational or representative standing because they satisfy the three requirements for such: each organization's members have standing in their own right, the interests the organization seeks to protect in the lawsuit are germane to the organization's purpose, and the individual members' participation in the lawsuit is unnecessary to resolve the legal claims. *See Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc.,* 280 F.3d 278, 283 (3d Cir. 2002) *quoting Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Examining the three requirements in reverse order, resolution of the constitutional claims in this case does not depend on, nor would it benefit from, the participation of the individual AFT members or the individual DCCC and DSCC constituents. Next, the record evidence demonstrates that the interests sought to be protected in this lawsuit, the enfranchisement of their voters, are highly germane to the DCCC's and DSCC's purposes of electing Democratic candidates to both houses of Congress. ECF No. 290 (Exhibit C-DCCC), page 13, ¶ 3; ECF No. 290 (Exhibit B-DSCC), page 8, ¶ 3. And the AFT's interest of electing candidates who support the policies for which AFT advocates is also germane to the enfranchisement of its members. ECF No. 290 (Exhibit D-AFT Declaration), ¶ 11. Finally, the evidence reveals that the dues-paying members of the AFT, would have standing in their own right because they will have or have had mail ballots rejected due to the enforcement of the Date Provision. ECF No. 290 (Exhibit D-AFT Declaration), ¶ 9. However, the same cannot be said of the DCCC and the DSCC as no evidence has been presented to show that the constituents of either organization have had their mail ballots rejected. Instead, the evidence set forth by the committees focuses only on diversion of resources rather than on disenfranchisement of individual constituents.

Accordingly, in summary, all three Plaintiff organizations have organizational standing and the AFT has representative standing on behalf of its members.

While the Plaintiff organizations have established standing to proceed against each of the sixty-seven county boards, the same cannot be said for Eakin. The record contains no evidence to support her standing against the Lancaster or Berks County Boards—or any other board aside from her own. Any harm she experienced due to the initial rejection of her 2022 mail ballot is directly linked only to the actions of the Erie County Board of Elections. ECF No. 290 (Exhibit A, Declaration of Bette Eakin), pages 4-6. As a result, summary judgment will be granted in favor of the Lancaster and Berks Boards in this regard. Furthermore, because Eakin has not demonstrated standing against any county board other than Erie County, judgment will be entered in favor of those sixty-four boards and against her.

The first claim—whether the outer envelope date requirement violates the Materiality Provision of the Civil Rights Act—has been decided. An identical claim has already been litigated before this Court in *Pennsylvania State Conf. of NAACP v. Schmidt ("NAACP v. Schmidt")*, 703 F. Supp. 3d 632, 645 (W.D. Pa. 2023), *rev'd and remanded sub nom. Pennsylvania State Conf. of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024). On appeal from this Court's decision, on March 27, 2024, the Court of Appeals held that the date requirement did not violate the Materiality Provision. *See* 97 F.4th 120. This Court is bound by that holding regarding the Materiality Provision of the Civil Rights Act.[5] Accordingly, Plaintiffs' similar claim here lacks merit and judgment will be granted in favor of Defendants on that claim.

The Court of Appeals' decision in that case did not, however, resolve the constitutional claim alleged herein. Specifically, Plaintiffs maintain that the county boards' enforcement of the dating provisions violates the First Amendment by imposing impermissible burdens on Pennsylvanians' fundamental right to vote—burdens that are not justified by any state interest.

## B.    First Amendment Right to Vote Claims and the Appropriate Legal Tests

Elections and, concomitantly, election laws "occupy a special place in our constitutional system." *Mazo,* 54 F.4th at 136. States have the authority under the Constitution to set rules for the time, place, and manner of federal elections. U.S. Const. Art. I, § 4, cl. 1; Art. II, § 1, cl. 2. Given this, the individual states have historically maintained "comprehensive, and in many respects complex, election codes regulating ... the time, place, and manner of holding primary and general elections." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This authority over federal

---

[5] A petition for Writ of Certiorari was denied by the United States Supreme Court. *See* 2025 WL 247452 (Jan. 21, 2025).

elections is broad and encompasses "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). This authority is expansive because, if elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process," (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)), it is "[c]ommon sense, as well as constitutional law," that States must take an "active role in structuring elections." *Mazo v. Way*, 551 F.Supp.3d 478, 500 (D.N.J. 2021) (cleaned up). Since individual states "comprehensively regulate the electoral process," their election laws "inevitably affect[,] at least to some degree[,]" certain fundamental rights, including the right to vote and First Amendment rights of free expression and association. *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999).

To assess whether restrictions or regulations related to voting rights are constitutionally valid, courts must utilize one of two possible tests. In some cases, a traditional First Amendment test which applies strict scrutiny to any such regulation is used. But that test does not take into account the reality that "for elections to run smoothly, some restrictions on expression and association are necessary." *Mazo*, 54 F.4th at 137. In recognition of that omission, the Supreme Court developed a balancing test for courts to use when reviewing "[c]onstitutional challenges to specific provisions of a state's election laws." *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983). *See also Burdick v. Takushi*, 504 U.S. 428, 433 (1992). This "*Anderson-Burdick*" test is "more flexible" than the rigid tiers of scrutiny under a traditional First Amendment analysis, *Burdick*, 504 U.S. at 434, reflecting the reality that there is no " 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789. The test directs a reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on

constitutional rights, and (2) apply the level of scrutiny corresponding to that burden. *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 789. If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, the court may use *Anderson-Burdick's* sliding scale approach under which a state need only show that its "legitimate interests ... are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440. *See also Mazo*, 54 F.4th at 137. No matter the test utilized, some sort of balancing is always required.

Courts have applied *Anderson-Burdick* to a wide range of state election laws covering nearly every aspect of the electoral process. *See, e.g., Belitskus v. Pizzingrilli*, 343 F.3d 632, 643-47 (3d Cir. 2003) (applying *Anderson-Burdick* in challenge to Pennsylvania ballot access law requiring candidates to pay filing fee to have their names placed on the general election ballot); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626-36 (6th Cir. 2016) (applying *Anderson-Burdick* to a challenge to Ohio law that changed the first day of early absentee voting from 35 days before election day to the day after the close of voter registration). In other cases, however, the Supreme Court has declined to apply *Anderson-Burdick's* balancing test and has reverted instead to a traditional First Amendment analysis. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting application of *Anderson-Burdick* in challenge to ban on anonymous leafletting of political materials as it constituted the "regulation of pure speech"); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (declining to apply *Anderson-Burdick* to free expression challenge to ban on paying petition circulators for ballot initiatives). The Supreme Court has never laid out a clear rule to distinguish between these two categories of election laws,

nor has any Court of Appeals to our knowledge.  So, to decide the category in which the outer envelope date requirement falls, the Court must first identify its defining characteristics.

A survey of the Supreme Court's case law both before and after the *Anderson* and *Burdick* decisions reveals two principal characteristics of the laws to which the *Anderson-Burdick* test applies. First, the law must burden a relevant constitutional right, such as the right to vote or the First Amendment rights of free expression and association. Second, the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech.

1.     Does the Pennsylvania date requirement burden a fundamental right?

Plaintiffs ground their claim in the First Amendment to the Constitution. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The United States Supreme Court has held that "the right to vote, as the citizen's link to h[er] laws and government, is protective of all fundamental rights and privileges. And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." *Evans v. Cornman*, 398 U.S. 419, 422 (1970). *See also Jones v. United States Postal Serv*., 488 F. Supp. 3d 103, 138 (S.D.N.Y. 2020), *order clarified*, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020). It is well established that voting implicates First Amendment rights. *See, e.g., Yang v. Kosinski*, 960 F.3d 119, 130 (2d Cir. 2020) ("[Plaintiffs'] interest ... 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment."). And the right to vote necessarily includes the right to have that vote counted. This principle has been affirmed by the  Supreme Court. *See e.g., Reynolds v. Sims*, 377 U.S. 533 (1964) (finding that the right to vote would be meaningless without ensuring that every legally cast vote is counted). Disenfranchising voters for defects in their ballots imposes significant burdens on voting rights even if the effort needed for a voter to complete the ballot

correctly appears slight when considered in isolation. *See Ne. Ohio Coal. for the Homeless*, 837

F.3d at 631 ("Requiring boards of elections to reject the ballots of absentee and provisional

voters who fail to accurately complete birthdate and address fields directly and measurably

disenfranchise some voters."). The first part of the test is met because the Pennsylvania date

requirement similarly burdens the fundamental right to vote by disenfranchising some voters for

defects in the envelope holding their ballots.

      2.     Does Pennsylvania's outer envelope date requirement primarily regulate
the mechanics of the electoral process, as opposed to core political
speech?

The second inquiry asks whether Pennsylvania's requirement that a voter place a date on

the outer envelope of their ballot is a law primarily concerned with the mechanics of the electoral

process, or whether it implicates core political speech. As the Court of Appeals noted, "[t]he

distinction between 'pure speech' and the mechanics of the electoral process is not always easy

to ascertain." *Mazo*, 54 F.4th at 142. In resolving such questions, there are "two distinguishing

factors" to be considered: "the location and timing (the 'where and when') and the nature and

character ('the how and what') of the regulated speech." *Id.*

      a.     Location and Timing of the Regulated Speech

Speech which occurs "on the ballot or within the voting process will typically trigger

application of the *Anderson-Burdick* balancing test." *Id.*, *citing Burdick*, 504 U.S. at 437-38.  In

contrast, "speech that relates to an election but occurs nowhere near the ballot or any other

electoral mechanism is treated as core political speech entitled to the fullest First Amendment

protection." *Id. citing McIntyre*, 514 U.S. at 347 (applying strict scrutiny where the speech being

regulated was leafletting that occurred far from the polling place and potentially weeks or

months before Election Day). Here, the requirement that voters date the outer envelope of their

ballot is speech that occurs within the voting process, as opposed to core political speech.

b.        Nature and Character of the Regulated Speech

Next, the Court must consider the nature and character of the regulated speech. Here, the

Court considers "what is being said and how it is communicated." *Mazo*, 54 F.4th at 142. The

Supreme Court has characterized "core political speech" as "interactive communication

concerning political change." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186

(1999) (citation omitted). *Anderson-Burdick* balancing is not applied to regulations which burden

such interactive communication between individuals. *Meyer*, 486 U.S. at 421-22.  Of import,

such a regulation must have the potential to "spark direct interaction and conversation." *Mazo*,

54 F. 4th at 143. Here, there is no evidence to suggest that the placing of a date on the outer

envelope of a mail ballot sparks interaction or political conversation with other individuals.

Indeed, no litigant has suggested that the signing and dating of a mail ballot by a Pennsylvania

voter is anything other than a solitary act. It is not a social occasion. It cannot be said that

handwriting a date on the outer ballot envelope is core political speech. The regulation affects

only the mechanics of voting.

So then, because the date requirement burdens the fundament right to vote but concerns

only the mechanics of voting, the Court will utilize *Anderson-Burdick's* balancing test to

determine whether the date requirement passes constitutional muster.

**C. Application of the *Anderson-Burdick* Test – Defendants' motion for summary judgment[6]**

Having determined that the *Anderson-Burdick* test is the appropriate analytical framework for reviewing Plaintiffs' constitutional challenge, the Court now applies that standard to Pennsylvania's ballot date requirement. *Anderson-Burdick* involves a "two track approach." *Mazo*, 54 F.4th at 145, *citing Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring). "[O]ur scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006); *see also Burdick*, 504 U.S. at 434 ("Under this standard, the rigorousness of our inquiry into the propriety

---

[6] Alternative to the application of the constitutional framework, the RNC submits that recent decisions by state courts preclude any action from this Court. *See* ECF No. 411, p. 2. This Court disagrees. The RNC points to the recent litigation in *Black Pol. Empowerment Project v. Schmidt*, as a reason for this Court to refrain from issuing a decision. *Id.* In that case, the Pennsylvania Commonwealth Court held that enforcement of the state's requirement that voters date the outer envelope of their mail ballot violates the Free and Equal Elections clause of the Pennsylvania Constitution. *See* 2024 WL 4002321, at *1 (Pa. Commw. Ct. Aug. 30, 2024); PA. CONST. art. I, § 5. The decision of the Commonwealth Court concerned the state constitution's "Free and Fair Elections" clause; not the federal constitution. Two weeks later, in a one paragraph Order, the Supreme Court of Pennsylvania vacated that decision, concluding that the Commonwealth Court lacked original jurisdiction because Plaintiffs failed to name all of the Commonwealth's sixty-seven counties. *See Black Pol. Empowerment Project v. Schmidt*, 2024 WL 4181592, at *1 (Pa. Sept. 13, 2024). As such, the Pennsylvania Supreme Court's order cannot be seen as a decision on the merits of the Commonwealth Court's holding. It simply vacated that decision because the Commonwealth Court lacked the proper jurisdictional foundation. Because the challenge before this Court is one brought exclusively under the federal constitution, these decisions by the state courts have little relevance here. And as the RNC acknowledges, this Court would not be bound by those decisions in any event. *See* ECF No. 411, p. 2 ("The Commonwealth Court's (now-appealed) ruling, of course, does not bind this Court. This Court remains bound by the rulings of the U.S. Supreme Court and Third Circuit …"). Accordingly, the Court sees no reason to stay this matter or delay a decision on the pending motions.

of a state election law depends upon the extent to which a challenged regulation burdens [constitutional] rights."). Where the law or regulation imposes a "severe" burden, the Court will employ "[s]trict scrutiny" in reviewing the regulation. *See Crawford*, 553 U.S. at 205 (Scalia, J., concurring) *quoting Clingman v. Beaver*, 544 U.S. 581, 592 (2005). But if a burden is not severe and "imposes only 'reasonable, nondiscriminatory restrictions' " on constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 788. *See also Mazo*, 54 F.4th at 145–46.

### 1. The burden on First Amendment rights

Having already recognized that the date requirement burdens the First Amendment right to vote, the Court now must determine to what extent. Although there is no "litmus test" for doing so, this Court concludes that the burden imposes only a minimal burden on Plaintiffs' rights. *Mazo*, 54 F.4th at 146, *quoting Crawford*, 553 U.S. at 191. First, the date requirement is non-discriminatory. Election laws discriminate by "limit[ing] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* Such laws impose severe burdens and will be "especially difficult for the State to justify." *Id. quoting Anderson*, 460 U.S. at 793. As concerns discrimination against voters, such cases "focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id. citing Clements v. Fashing*, 457 U.S. 957, 964 (1982). Put another way, the relevant inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity. *Id.* (citation and internal quotation marks omitted). Burdens that apply to all voters, on the other hand, are less likely to be severe. *Mazo*, 54 F.4th at 147. Pennsylvania's

requirement that voters who wish to submit a ballot by mail date the outer envelope applies to <u>all</u> vote-by-mail voters. The requirement draws no distinctions. Thus, it is nondiscriminatory.

>    2.    As identified, Pennsylvania's interests are insufficient to justify the requirements of this minimal burden.

Where a state election law imposes only minimal burdens, the State's " 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358, *quoting Burdick*, 504 U.S. at 434. But here, the Commonwealth has not identified what specific regulatory interest is furthered. Indeed, despite formal notification, the Commonwealth has not defended the constitutionality of the dating requirement.[7] In other words, the Commonwealth has not identified any interests that are served by imposing even this minimal burden on the right to vote. Nor, for that matter, have most of the Defendant county boards of elections identified an interest in requiring a voter to date the outer envelope of their ballot.

Only two Defendants have identified state interests which they assert are furthered by the envelope date requirement: the RNC and Berks County. First, they argue that the dating requirement furthers the Commonwealth's interest in detecting voter fraud. ECF No. 378, p. 25 (RNC); ECF No. 379, p. 10 (Berks County). Absent from the record, however, is any evidence demonstrating how this requirement furthers that purported interest. Instead, the RNC points to a <u>single</u> criminal case where the daughter of a deceased voter was charged with fraud after she

---

[7] Pursuant to Federal Rule of Civil Procedure 5.1, the Court notified the Commonwealth of Plaintiffs' challenge to the constitutionality of 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a) and instructed the state that it could intervene for the presentation of evidence and argument on the question of the date requirements' constitutionality. *See* ECF No. 383 (Certification dated June 18, 2024). To date, the Commonwealth has not intervened to defend the enforcement of the ballot dating requirement. So then, this Court must proceed without benefit of the Commonwealth's participation here.

allegedly completed, backdated, and returned her deceased mother's mail ballot. ECF No. 378, p. 24-25, *citing Commonwealth v. Mihaliak*, CR126-22 (June 3, 2022). But in *Mihaliak*, the fraudulent ballot was first detected through use of the Commonwealth's SURE system, which was cross-referenced with Pennsylvania Department of Health records, not by any error in dating on the outer envelope.[8] The evidentiary record reflects that the County Board (here, Lancaster) admitted that it removed the deceased woman from the voter rolls before the mail ballot was received. *See* ECF No. 290, p. 156 (deposition of Christa Miller). Record evidence from the Board's own Rule 30(b)(6) designee indicates that the fraudulent ballot was first detected by way of the SURE system and Department of Health records, not by review of the date on the return envelope. *Id*. The County Board acknowledges that it recognized that the ballot was invalid as soon as it was scanned into the SURE system because the voter had been removed from the rolls due to her death. *Id*. at 157. Importantly, the Lancaster County Board admits that an outer envelope that is missing a hand-written date is no reason to suspect voter fraud. *Id*. at 175.

The RNC and the Berks County Board of Elections point to other interests of the Commonwealth which they claim are advanced by the date requirement, but these are not supported by any evidence of record. For example, these Defendants suggest that the Commonwealth has an interest in promoting or preserving "solemnity" in the act of voting,

---

[8] The SURE system is the Commonwealth's Statewide Uniform Registry of Electors, a uniform integrated computer system that, inter alia, tracks mail ballots from application through final tabulation. ECF No. 290 (deposition of Jonathan Marks), pages 23-65. The outer return envelope of a mail ballot is printed with a unique barcode associated with the individual voter. That unique barcode is used to track the ballot through the SURE system. *Id*. at page 33. Upon the county board's receipt of the ballot envelope, the board stamps or otherwise marks it with the date of receipt to confirm its timeliness and log its receipt into the SURE system. *Id*. at pages 29, 32-33. The Election Code requires that county boards of elections track the date that every mail ballot was received and make that information available for public inspection. 25 P.S. § 3146.9(b)(5), 3150.17(b)(5).

which they define as "ensuring that voters contemplate their choices and reach considered decisions about their government and laws." ECF No. 378, p. 23 (RNC); ECF No. 379, p. 11 (Berks County). They argue that requiring voters to sign and date the outer envelope of a mail ballot is a formality which fosters thoughtful deliberation. This argument is based solely on supposition. And even if Defendants could articulate examples of how dating the outer envelope makes the act of voting more solemn, they have not pointed to any evidence in this record to support their position. They are left only with their nebulous contention that requiring a voter to date their ballot somehow makes it a solemn occasion, which of course is not evidence which could support summary judgment.

Additionally, the RNC contends that the state has an interest in the "orderly administration of elections." ECF No. 378, p. 22. This, of course, is a valid state interest. Nevertheless, the RNC admits that Pennsylvania election officials are required to time stamp a ballot upon receiving it and the officials rely on that date when entering the information into the SURE system. The RNC supposes that while "there is every reason to think this ordinarily happens," "the handwritten date serves as a useful backstop, and it would become quite important if a county failed to timestamp a ballot upon receiving it or if Pennsylvania's SURE system malfunctioned." *Id*. That requiring a voter to handwrite a date serves as a safeguard is a speculative assertion because, again, the RNC has failed to point this Court to any evidence regarding potential failures in the timestamp process or in the SURE system.

Similarly, the Berks County Board claims that enforcing the dating provisions enhances voter "confidence," yet this assertion is also based on conjecture. *See* ECF No. 379, p. 14. The Berks County Board provides no evidence which connects the date requirement to an increase in voter confidence in the electoral process.

None of the potential state interests suggested by the RNC or the Berks County Board are supported by any evidence. Suggestions and legal arguments are not a sufficient ground upon which to base summary judgment, which is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, it is up to Defendants, who are asking for summary judgment, to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote. Since Defendants have not met this requirement, their motions for summary judgment will be denied.

### D. Application of the *Anderson-Burdick* Test: Plaintiffs' motion for summary judgment

When a court is faced with cross-motions for summary judgment, the standard of review remains the same. *Jacobs v. City of Philadelphia*, 2023 WL 11904070, at *1 (E.D. Pa. May 8, 2023) *citing Allah v. Ricci*, 2013 WL 3816043 (3d Cir. July 24, 2013). The fact that one party fails to satisfy the burden on its own Rule 56 motion does not automatically mean that the opposing party has satisfied its burden and should be granted summary judgment on the cross motion. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (4th ed. 2020). Instead, "[w]hen confronted with cross-motions for summary judgment, […] the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (cleaned up). In other words, the fact that Defendants have failed to meet their burden does not mean that Plaintiffs have necessarily met theirs.

As explained above, the *Anderson-Burdick* balancing test is the appropriate framework for determining whether Pennsylvania's outer envelope date requirement violates the Plaintiffs'

right to vote under the First Amendment. *See discussion*, *supra*. For the Court to find the date requirement unconstitutional, Plaintiffs must point to evidence that even the limited burden imposed by the date requirement outweighs any valid governmental interest. *See Burdick*, 504 U.S. at 440. Plaintiffs contend that Pennsylvania has no legitimate interest which justifies the outer envelope date requirement. *See* ECF No. 288, p. 24. Instead, they submit that the date requirement is nothing more than a "compliance test" put in place to determine "how well [Pennsylvania voters] can follow written instructions." *Id.*

Plaintiffs discredit the Defendants' suggested state interests of fraud detection, solemnity, and voter confidence. Plaintiffs highlight the lack of evidence in the record to support Defendants' purported state interests, as did the Court above. Ultimately, solemnity and voter confidence are nebulous and are unsupported by evidence, and fraud detection, while less ambiguous of an interest, is similarly unsupported by evidence of record in this case.

Since there is no evidence that the date requirement serves any state interest, even a slight burden on voting rights cannot withstand constitutional scrutiny. Put another way, even the slightest burden that results from the enforcement of the date provision is too much when there is no counterbalance. The evidence of record demonstrates that county boards across the Commonwealth discarded 10,657 otherwise valid ballots in the 2022 general election solely because voters either forgot to date them or used an incorrect date. ECF No. 311, ⁋ 10; ECF No. 313, ⁋ 10; ECF No. 290, p. 246-782. Such disenfranchisement burdens the right to vote and there is no valid state interest to weigh this against. Accordingly, Plaintiffs' motion for summary judgment will be granted in this regard.[9]

---

[9] As discussed *supra*, the evaluation of the constitutionality of the date provisions is complicated by the fact that the state is not present to articulate its own interests. In order to leave no stone

## IV.    Conclusion

Constitutional analysis always requires the balancing of interests – i.e., weighing one thing against another. In the context of the First Amendment right to vote, a court must weigh the individual's right to vote, which includes the right to have their vote counted, against the government interest. In this case, the weight of the burden on the citizens right to vote is not counterbalanced by evidence of any governmental interest. Accordingly, the enforcement of the date provisions does not pass constitutional muster.

---

unturned, this Court looked to the Commonwealth's filings in the companion case of *NAACP v. Schmidt*, in search of an identified governmental interest in the enforcement of the date provisions. The Secretary of the Commonwealth's position there solidifies the result here. In that case, the Secretary notes that he filed his brief in order "to aid the Court's performance of this [*Anderson-Burdick*] balancing by explaining why rejecting timely mail ballots from qualified voters who failed to correctly write a meaningless date does not advance any state election interest and why it, in fact, undermines sound election administration." *See* C.A. No. 1:22-cv-339, ECF No. 440, p. 5-6. Instead of identifying and defending any Commonwealth interest in the enforcement of the dating provisions, the Secretary explains that: 1) the date requirement provisions are a vestige of a different era; 2) the date requirement has no election function; and 3) "requiring officials to review declaration dates impedes effective election administration." *Id*. By way of conclusion, the Secretary succinctly states "**there is no state interest** in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return-envelope declaration." *Id*. at 20 (emphasis added).