No. 25-1644

In the United States Court of Appeals for the Third Circuit

BETTE EAKIN, *et al.*,

*Plaintiff-Appellees*

*v.*

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

*Defendant-Appellees*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenor-Defendant-Appellants.*

**On Appeal from the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-340 (Baxter, J.)**

**BRIEF OF INTERVENOR-APPELLANTS**

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

John M. Gore
(D.C. Bar No. 502057)
*Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Benjamin P. Daus
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
bdaus@jonesday.com

*Counsel for Intervenor-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Intervenor-Appellants disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of their stock.  Further, no publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated:  May 6, 2025

*/s/* John M. Gore
John M. Gore
*Counsel for Intervenor-Appellants*

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ...................................................... 6

STATEMENT OF THE ISSUES ........................................................... 7

STATEMENT OF RELATED CASES ................................................... 7

STATEMENT OF THE CASE .............................................................. 8

    A.    Pennsylvania Enacts Universal Mail Voting ........................ 8

    B.    Courts Rebuff Challenges To The Date Requirement ......... 12

    C.    The District Court Invalidates The Date Requirement Again. ................................................................................. 14

SUMMARY OF ARGUMENT ............................................................ 16

STANDARD OF REVIEW .................................................................. 21

I.    VOTING RULES IMPOSING THE USUAL BURDENS OF VOTING DO NOT IMPLICATE THE CONSTITUTIONAL RIGHT TO VOTE. .................................................................... 22

    A.    The Constitutional Right To Vote Does Not Exempt Voters From Minimally Burdensome Ballot-Casting Rules ................................................................................... 23

    B.    The Date Requirement Is A Minimally Burdensome Ballot-Casting Rule That Does Not Implicate The Constitutional Right To Vote .............................................. 30

    C.    The District Court's Approach Has Untenable Consequences .................................................................... 36

II.    THE CONSTITUTIONAL RIGHT TO VOTE DOES NOT EXTEND TO VOTING BY MAIL ................................................ 40

III.    EVEN IF THE DATE REQUIREMENT IS SUBJECT TO JUDICIAL BALANCING, IT EASILY PASSES MUSTER ......... 46

A.    Under *Anderson-Burdick*, The Court Must Apply Rational-Basis Review To The Date Requirement.............. 49

B.    The Date Requirement Imposes Only A "Minimal" Burden On Voters ................................................. 50

C.    The Date Requirement Easily Satisfies Rational-Basis Review ..................................................... 52

D.    The District Court Erred In Rejecting Pennsylvania's Interests ................................................... 57

CONCLUSION ........................................................ 62

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agostini v. Felton,*
521 U.S. 203 (1997)..................................................................... 44

*Alexander v. S.C. State Conf. of NAACP,*
602 U.S. 1 (2024)......................................................................... 38

*American Party of Texas v. White,*
415 U.S. 767 (1974)..................................................................... 45

*Anderson v. Celebrezze,*
460 U.S. 780 (1983)............................................... 7, 15, 24, 26

*Baker v. Carr,*
369 U.S. 186 (1962)..................................................................... 28

*Ball v. Chapman,*
284 A.3d 1189 (Pa. 2022) (per curiam)............................... 14

*Ball v. Chapman,*
289 A.3d 1 (Pa. 2023).......................................................... *passim*

*Baxter v. Phila. Bd. of Elections,*
325 A.3d 645 (Pa. 2024) (per curiam).......................... 3, 8, 14

*Baxter v. Phila. Bd. of Elections,*
No. 395 EAL 2024, 2025 WL 224388 (Pa. Jan. 17, 2025)
(per curiam).......................................................................... 14, 40

*Black Pol. Empowerment Project v. Schmidt,*
2024 WL 4002321 (Pa. Commw. Ct. Aug. 30, 2024) .......... 9, 40, 55, 61

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021).............................................................. *passim*

*Buckley v. Am. Const. L. Found.*,
525 U.S. 182 (1999)........................................................................ 37

*Burdick v. Takushi*,
504 U.S. 428 (1992). App.48–58 ................................. *passim*

*Burson v. Freeman*,
504 U.S. 191 (1992)........................................................................ 27

*Carrington v. Rash*,
380 U.S. 89 (1965)................................................................... 1, 25

*Citizens in Charge, Inc. v. Husted*,
810 F.3d 437 (6th Cir. 2016) ...................................................... 37

*Clingman v. Beaver*,
544 U.S. 581 (2005)........................................................... 1, 18, 24

*Common Cause Ind. v. Lawson*,
977 F.3d 663 (7th Cir. 2020)....................................................... 41

*Council of Alt. Pol. Parties v. Hooks*,
179 F.3d 64 (3d Cir. 1999) .................................................... 18, 24

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)................................................................ *passim*

*Davis v. G N Mortg. Corp.*,
244 F. Supp. 2d 950 (N.D. Ill. 2003) ........................................ 54

*DNC v. Wis. State Legislature*,
141 S. Ct. 28 (2020) ...................................................................... 34

*Dunn v. Blumstein*,
405 U.S. 330 (1972)................................................... 16, 25, 26, 29

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989)........................................................................ 56

*FCC v. Beach Comms., Inc.*,
  508 U.S. 307 (1993) ................................................................. *passim*

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ........................................... 27

*Harper v. Va. State Bd. of Elections*,
  383 U.S. 663 (1966) ............................................................. 25

*In re: Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election*,
  241 A.3d 1058 (Pa. 2020) ............................................ 53, 56

*In Re: Nov. 3, 2020 Gen. Election*,
  240 A.3d 591 (Pa. 2020) ...................................................... 56

*Lassiter v. Northampton Cnty. Bd. of Elections*,
  360 U.S. 45 (1959) .............................................................. 25

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ........................... 20, 41, 42, 53

*Mazo v. N.J. Sec'y of State*,
  54 F.4th 124 (3d Cir. 2022) ...................................... *passim*

*McDonald v. Board of Election Commissioners of Chicago*,
  394 U.S. 802 (1969) ................................................... *passim*

*McLinko v. Dep't of State*,
  279 A.3d 539 (Pa. 2022) ..................................................... 40

*Memphis A. Philip Randolph Inst. v. Hargett*,
  2 F.4th 548 (6th Cir. 2021) ................................................ 37

*Migliori v. Cohen*,
  36 F.4th 153 (2022) ........................................ 12, 20, 54, 59

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018)........................................................................ *passim*

*Molinari v. Bloomberg,*
    564 F.3d 587 (2d Cir. 2009) ............................................... 28

*Munro v. Socialist Workers Party,*
    479 U.S. 189 (1986)............................................................... 59

*N.J. Bankers Ass'n v. Att'y Gen. N.J.,*
    49 F.4th 849 (3d Cir. 2022)................................................. 21

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016)............................................... 50

*Org. for Black Struggle v. Ashcroft,*
    978 F.3d 603 (8th Cir. 2020)............................................... 41

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth
    of Pa.,*
    97 F.4th 120 (3d Cir. 2024)........................................ *passim*

*Pa. State Conf. of NAACP v. Schmidt,*
    703 F. Supp. 3d 632 (W.D. Pa. Nov. 21, 2023) ................... 53

*Parker v. Conway,*
    581 F.3d 198 (3d Cir. 2009) ...................................... *passim*

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)............................................................... 50

*Ramos v. Louisiana,*
    590 U.S. 83 (2020)................................................................. 27

*Reynolds v. Sims,*
    377 U.S. 533 (1964)............................................... 23, 25, 30

*Richardson v. Tex. Sec'y of State,*
  978 F.3d 220 (5th Cir. 2020) .............................................................. 50

*Ritter v. Migliori,*
  142 S. Ct. 1824 (2022) ................................................ 12, 14, 33, 29

*Rodriguez v. Popular Democratic Party,*
  457 U.S. 1 (1982) ........................................................................ 23, 24

*Rucho v. Common Cause,*
  588 U.S. 684 (2019) .................................................................... 38, 39

*Sackett v. EPA,*
  598 U.S. 651 (2023) ............................................................................ 27

*Snyder v. United States,*
  603 U.S. 1 (2024) ................................................................................ 62

*State v. Williams,*
  565 N.E.2d 563 (Ohio 1991) .............................................................. 54

*Storer v. Brown,*
  415 U.S. 724 (1974) ............................................................................ 24

*Tex. Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ...................................................... *passim*

*Thatcher's Drug Store of West Goshen, Inc. v. Consol.*
*Supermarkets, Inc.,*
  636 A.2d 156 (Pa. 1994) .............................................................. 54, 60

*Thomas A. Armbruster, Inc. v. Barron,*
  491 A.2d 882 (Pa. Super. Ct. 1985) .................................................. 54

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) .................................................................... *passim*

*Vote.org v. Callanen*,
  89 F.4th 459 (5th Cir. 2023) ............................................................. 55

*Waterman v. Farmer*,
  183 F.3d 208 (3d Cir. 1999) ............................................................. 21

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. art. I, § 4, cl. 1 ....................................... 1, 18, 24, 39

U.S. Const. art. II, § 1, cl. 2 .................................................... 1

18 Pa. Cons. Stat. § 4101 .......................................................... 61

23 Pa. Cons. Stat. § 5331 .......................................................... 51

25 Pa. Stat. § 2602 ............................................................ 9, 40

25 Pa. Stat. § 3050 ................................................................ 31

25 Pa. Stat. § 3146.6 ................................................................. 2

25 Pa. Stat. § 3150.16 ..................................................... *passim*

25 Pa. Stat. § 3150.11 ................................................................ 8

25 Pa. Stat. § 3527 ............................................................... 61

28 U.S.C. § 1291 ..................................................................... 6

28 U.S.C. § 1331 ..................................................................... 6

42 Pa. Cons. Stat. § 6206 ........................................................... 51

42 Pa. Cons. Stat. § 8316.2 ......................................................... 51

57 Pa. Cons. Stat. § 316 ............................................................ 51

73 Pa. Stat. § 201-7 ................................................................ 51

73 Pa. Stat. § 2186 ................................................................... 51

Act of Mar. 9, 1945, Pub. L. 29, No. 17, 1945 Pa. Laws 29, 37 ................ 8

Act of Oct. 31, 2019, Pub. L. 522, No. 77 ....................................... *passim*

Minn. Stat. § 203B.07 ....................................................... 31, 36

**OTHER AUTHORITIES**

2024 Presidential Election (Official Returns),
    Commonwealth of Pennsylvania (last visited Apr. 13,
    2025) .......................................................................... 11, 34

"As the Legislature Has Prescribed": Removing Presidential
    Elections from the *Anderson-Burdick* Framework,
    135 Harv. L. Rev. 1082 (2022) ............................................ 37

Jerome A. Barron, *et al.*, *Constitutional Law: Principles and
    Policy* 699 (8th ed. 2012) ................................................. 48

Delaware Voter Registration Form ........................................... 31

Directive Concerning the Form of Absentee and Mail-in
    Ballot Materials, Pa. Dep't of State (July 1, 2024) ............... 11

Edward B. Foley, *Voting Rules and Constitutional Law*, 81
    Geo. Wash. L. Rev. 1836 (2013) ........................................ 37

Daniel J. Hopkins, *et al.*, *How Many Naked Ballots Were
    Cast in Pennsylvania's 2020 General Election?* (Aug. 26,
    2021) ......................................................................... 9, 35

*How States Verify Voted Absentee/Mail Ballots*, Nat'l Conf.
    of State Legislatures (updated Jan. 21, 2025) ................... 31, 36

Derek T. Muller, *The Fundamental Weakness of Flabby Balancing Tests in Federal Election Law Litigation*, Excess of Democracy (Apr. 20, 2020)...................................................37

New Jersey Driver License Application Request Form...........................31

New Jersey Voter Registration Form .......................................................31

Pennsylvania Mail-In Voter Registration Form....................................31

Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election, Commonwealth of Pennsylvania (Jan. 24, 2025).........................11, 34

U.S. Election Assistance Comm., *Election Administration and Voting Survey 2022 Comprehensive Report: A Report: A Report from the U.S. Election Assistance Commission to the 118th Congress* (June 2023).......................................................9, 35

## INTRODUCTION

The Constitution recognizes that States wield vast authority to set the rules of elections. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Carrington v. Rash*, 380 U.S. 89, 91 (1965). In fact, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons*, 520 U.S. at 358.

"[E]very voting rule" a State adopts "imposes a burden of some sort" on voters and, thus, makes voting more difficult than it might be in the absence of that rule. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 669 (2021) ("[V]oting necessarily requires some effort and compliance with some rules."); *see also Clingman v. Beaver*, 544 U.S. 581, 593 (2005). The Constitution, however, categorically permits States to adopt and to experiment with voting rules that carry the "usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality op.); *accord Brnovich*, 594 U.S. at 669; *see also Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138–39 (3d Cir. 2022) (election rules imposing only "*de minimis*" burdens receive no judicial scrutiny under the

1

Constitution).   Accordingly, voters have no constitutional right to be exempt from such rules, and federal courts must reject claims that they violate the Constitution.  *See Crawford*, 553 U.S. at 198 (plurality op.); *Mazo*, 54 F.4th at 138–39.

This case concerns just such a rule.  When Pennsylvanians vote by mail, they must sign and date a statement on the outside of their mail-ballot return envelope.[1]  This straightforward regulation has been in place since 1945 and, unsurprisingly, attracted little controversy for decades.  That changed, however, in 2019, when Pennsylvania adopted the convenience of universal mail voting.  Nearly overnight, one aspect of this rule—the requirement to *date* the envelope—became a lightning rod for serial litigation.

For its part, the Pennsylvania Supreme Court has upheld the date requirement as a matter of state law.  *See Ball v. Chapman*, 289 A.3d 1, 28 (Pa. 2023).  And just last year, this Court rejected a claim that the requirement violates the Materiality Provision of the Civil Rights Act of 1964, on the basis that neither the requirement nor mandatory

---

[1] When addressing Pennsylvania's voting laws, this brief uses "mail voting" and "mail ballot" to refer to both absentee voting and ballots, *see* 25 Pa. Stat. § 3146.6, and mail-in voting and ballots, *see id.* § 3150.16.

enforcement of it denies any individual "the right to vote." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024).  As this Court explained, "a voter who fails to abide by state rules prescribing how to make a vote effective is not denied the right to vote when his ballot is not counted." *Id.* (cleaned up).  In accordance with these decisions, the date requirement has remained on the books and governed the 2024 General Election in which nearly 2 million Pennsylvanians cast mail ballots for President, U.S. Senator, and scores of other offices. *See Baxter v. Phila. Bd. of Elections*, 325 A.3d 645, 645–46 (Pa. 2024) (per curiam).

Nevertheless, the same District Court whose judgment this Court reversed in *Pennsylvania State Conference of NAACP Branches* has enjoined the date requirement once again.  The District Court concluded that the requirement imposes (at most) only a "minimal burden" on voters, App.22, yet held that it violates Pennsylvanians' constitutional "right to vote," App.27.

Merely to recite this holding is to refute it—and to demonstrate the District Court's departure from the Supreme Court's directives and this Court's controlling precedent.  After all, because the Constitution *permits*

States to adopt voting rules that impose only the "usual burdens of voting," such rules cannot *violate* the Constitution. *Crawford*, 553 U.S. at 198 (plurality op.); *accord Brnovich*, 594 U.S. at 669 (similar); *Mazo*, 54 F.4th at 138–39 (voting rules imposing "*de minimis*" burdens do not violate the Constitution); *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133 (date requirement does not violate "the right to vote").

That alone should have been the end of this case—and requires reversal. But there is more: On its face, the District Court's holding contravenes at least one other independent line of Supreme Court precedent. As the Supreme Court explained in *McDonald v. Board of Election Commissioners of Chicago*, restricting mail voting "do[es] not . . . deny . . . the exercise of the franchise" to anyone, unless the State has "absolutely prohibited" citizens from voting through any other method. 394 U.S. 802, 807–09 (1969). Thus, when a State provides in-person voting, as Pennsylvania does, the constitutional right to vote does not extend to mail-voting regulations at all. *See id.* For this reason as well, the District Court erred when it extended judicial scrutiny to the date requirement because any Pennsylvania voter can avoid that requirement by choosing to vote in person, as the majority of Pennsylvanians do.

Unsurprisingly, the District Court traveled a tortured path to declare the minimally burdensome date requirement a constitutional violation. Rather than acknowledging the rule in *Crawford*, *Mazo*, and *Pennsylvania State Conference of NAACP Branches*, or the rule in *McDonald*, the District Court held that "even the slightest burden" on mail voters triggers, and flunks, the *Anderson-Burdick* judicial balancing test. App.27. If allowed to stand, this radical approach would subject *all* mandatory election rules to open-ended judicial balancing and effectively transfer the States' vast authority to regulate elections to the federal judiciary.

In all events, even if the District Court were correct that the *Anderson-Burdick* balancing test applies here, the date requirement passes it with flying colors. The requirement is minimally burdensome and amply justified by at least three important state interests. In the first place, it facilitates the "orderly administration" of elections by serving as an evidentiary tool that indicates when the voter completed the ballot. *Crawford*, 553 U.S. at 196 (plurality op.). Moreover, like the signature requirement it accompanies, the date requirement preserves the solemnity of voting. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 15

5

(2018). And the date requirement helps Pennsylvania detect fraud, as demonstrated in *Commonwealth v. Mihaliak*, No. MJ-2202-CR-126-2022 (Lancaster County), *see* App.220—a case the District Court tried, but failed, to explain away.

The Court should reverse and uphold the Pennsylvania General Assembly's duly enacted date requirement. Mail voting for Pennsylvania's 2025 General Election begins on September 16. The Court should rule well in advance of that date and bring this latest attempt to interfere with Pennsylvania's electoral process to an end.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because Intervenor-Appellants timely appealed, App.1, from the District Court's final judgment, App.5.

The District Court had original jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellees' claim arises under a federal statute and the Constitution.

## STATEMENT OF THE ISSUES

1.     Whether the constitutional right to vote applies to nondiscriminatory ballot-casting rules that impose only *de minimis* burdens.  App.43–48; App.15–27.

2.     Whether the constitutional right to vote extends to nondiscriminatory mail-voting regulations when a State makes in-person voting available.  App.39–43; App.15–27.

3.     Assuming that Pennsylvania's nondiscriminatory, minimally burdensome date requirement for mail ballots implicates the constitutional right to vote, whether that requirement satisfies the balancing test articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  App.48–58; App.15–27.

## STATEMENT OF RELATED CASES

This case has not previously come before this Court.  This Court previously resolved a parallel suit challenging the date requirement under the Materiality Provision.  *See Pa. State Conf. of NAACP Branches*, 97 F.4th at 135.  A suit challenging the date requirement under the Pennsylvania Constitution is currently pending before the Pennsylvania

7

Supreme Court, which stayed a lower court order enjoining enforcement of the requirement. *See Baxter*, 325 A.3d at 645–46.

## STATEMENT OF THE CASE

### A.    Pennsylvania Enacts Universal Mail Voting.

In 2019, a bipartisan majority of the Pennsylvania General Assembly enacted universal mail voting for the first time in state history. Act of Oct. 31, 2019, Pub. L. 522, No. 77 ("Act 77"); *see* 25 Pa. Stat. § 3150.11(a).    As part of this bipartisan compromise, the General Assembly included election-integrity measures to protect mail voting, including the same ballot-casting procedures that the State had used for absentee voting since at least 1945.    *See* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a); Act of Mar. 9, 1945, Pub. L. 29, No. 17, 1945 Pa. Laws 29, 37. These rules require Pennsylvanians who vote by mail to "fill out, date and sign" a declaration on the mail-ballot return envelope.  25 Pa. Stat. §§ 3146.6(a), 3150.16(a).    The declaration states that the voter is "qualified to vote the enclosed ballot" and has not "already voted." *See* Image of Ballot Declaration, *infra*.  A ballot does not become effective until that declaration is signed and dated.  *See Ball*, 289 A.3d at 28.

As part of this bipartisan compromise, the General Assembly also included a robust nonseverability provision in the Act authorizing

8

universal mail voting.  Act 77, § 11.  It provides that if "*any* [covered] provision of this act or its application to any person or circumstance"— including the date requirement—"is held invalid, the remaining provisions or applications of this act are void." *Id.* (emphasis added); *see* 25 Pa. Stat. § 2602, Note.

In the 2020 General Election, over 99% of mail voters successfully complied with the requirement.  That compliance rate was higher than the compliance rate for other Pennsylvania ballot-casting rules, such as the secrecy-envelope requirement.  U.S. Election Assistance Comm., *Election Administration and Voting Survey 2022 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 118th Congress*, at 34, 36 (June 2023), https://perma.cc/M7JE-UX9C; Daniel J. Hopkins, *et al.*, *How Many Naked Ballots Were Cast in Pennsylvania's 2020 General Election?*, MIT Election & Science Lab, at Figure 1 (Aug. 26, 2021), https://perma.cc/RS67-2VJX.  After the 2020 election, the rate of noncompliance with the date requirement then fell from around 0.85% in 2022 to 0.56% in the 2024 Primary Elections.  *See Black Pol. Empowerment Project v. Schmidt*, 2024 WL 4002321, at *54–55 (Pa.

Commw. Ct. Aug. 30, 2024) (McCullough, J., dissenting), *vacated* 322 A.3d 221 (Pa. 2024).

Dissatisfied with even those low rates, Pennsylvania sought to make compliance with the date requirement even easier.  In the middle of 2024, the Secretary of the Commonwealth redesigned the declaration so that, in order to comply with the date requirement, the voter need only fill in the month and date in clearly marked boxes:



*See* Directive Concerning the Form of Absentee and Mail-in Ballot Materials, Pa. Dep't of State, at Appendix A (July 1, 2024), https://perma.cc/PD3N-UDTV (providing specifications for said declaration).

The redesigned declaration also makes clear that the voter should fill in "Today's date," not some other date; that the voter should use the standard American MM/DD format (with the words "Month" and "Day" each fully spelled out for the voter); and that filling in the date is "REQUIRED." *See id.*

Following the Secretary's redesign, the rate of noncompliance with the date requirement continued to dwindle. In the 2024 General Election, that rate plummeted to only *0.23%* of mail ballots, a *mere 0.064%* of all votes cast. *See* Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election, Commonwealth of Pennsylvania (Jan. 24, 2025), https://perma.cc/BVG4-X2UL; 2024 Presidential Election (Official Returns), Commonwealth of Pennsylvania (last visited Apr. 13, 2025), https://perma.cc/N6ZJ-8URF.

**B.    Courts Rebuff Challenges To The Date Requirement.**

The date requirement received little attention in the decades when it governed only absentee voting.  But when Pennsylvania made voting dramatically *easier* by adopting universal mail voting in the bipartisan Act 77, litigants immediately began a campaign against the requirement in state and federal court.

To date, both this Court and the Pennsylvania Supreme Court have rebuffed these efforts.  *See Pa. State Conf. of NAACP Branches*, 97 F.4th 120; *Ball*, 289 A.3d 1.  The first round of federal litigation involved claims brought under the Materiality Provision of the Civil Rights Act of 1964.  *See Migliori v. Cohen*, 36 F.4th 153 (2022), *vacated sub nom.*, *Ritter v. Migliori*, 143 S. Ct. 297 (2022), *and majority holding disavowed*, *Pa. State Conf. of NAACP*, 97 F.4th at 128.  While the challengers initially prevailed before this Court, the Supreme Court vacated that decision.  *See Ritter*, 143 S. Ct. at 297–98.  In stay proceedings, three Justices also wrote separately to explain why this Court's conclusion that the date requirement violated the Materiality Provision was likely incorrect.  *Ritter v. Migliori*, 142 S. Ct. 1824 (2022) (Alito, J., dissental).

12

This Court subsequently adopted those Justices' reasoning, holding that mandatory application of the date requirement does not "deny the right to vote." *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133 (cleaned up).  As the Court explained, while the Materiality Provision bars discrimination among *who* may vote, it leaves "to the States to decide *how* qualified voters must cast a valid ballot."  *Id.* at 130. Additionally, this Court held that minimally burdensome, nondiscriminatory ballot-casting rules like the date requirement cannot violate any "right to vote." *Id.* at 133.  Failure to comply with such rules might render a vote ineffective, but, the Court explained, "we know no authority that the 'right to vote' encompasses the right to have a ballot counted that is defective under state law." *Id.*  Establishing such rules, rather, was necessary "to preserve the integrity and reliability of the electoral process." *Id.* (cleaned up).

For its part, the Pennsylvania Supreme Court has rejected both state and federal statutory challenges to the date requirement.  In *Ball*, it held that the requirement is mandatory and, thus, a voter's "failure to comply with that command renders a ballot invalid as a matter of Pennsylvania law."  289 A.3d at 28.  The Pennsylvania Supreme Court

therefore prohibited Pennsylvania's election officials from counting such noncompliant ballots. *Id.* In that same case, the Pennsylvania Supreme Court also denied, on an equally divided vote, a challenge brought under the Materiality Provision. *See Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam); *Ball*, 289 A.3d 1.

Yet another challenge to the date requirement—this time brought under the Pennsylvania Constitution—is now pending before the Pennsylvania Supreme Court. *See Baxter*, 325 A.3d at 645–46. The Pennsylvania Supreme Court stayed pending its review the lower court's order enjoining the date requirement. *See id.* Among other issues, the Pennsylvania Supreme Court is considering whether invalidating the date requirement would invalidate universal mail voting under Act 77's nonseverability provision. *See Baxter v. Phila. Bd. of Elections*, No. 395 EAL 2024, 2025 WL 224388, at *1 (Pa. Jan. 17, 2025) (per curiam).

## C. The District Court Invalidates The Date Requirement Again.

Shortly after the Supreme Court vacated this Court's decision in *Ritter* and days before the 2022 General Election, Plaintiff-Appellees filed this suit alleging that the date requirement violates the Materiality Provision and the constitutional right to vote under the First and

Fourteenth Amendments. *See* App.60. The Republican National Committee, National Republican Congressional Committee, and Pennsylvania Republican Party intervened as defendants. *See* App.77.

This Court decided *Pennsylvania State Conference of NAACP Branches* while this litigation was pending in the District Court. 97 F.4th 120. In accordance with that decision, the District Court granted summary judgment to Intervenor-Appellants on Plaintiff-Appellees' Materiality Provision claim. App.15. But notwithstanding this Court's holding that the date requirement does not deny "the right to vote," *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133, the District Court went on to hold that the requirement violates the constitutional "right to vote," App.28.

The District Court ignored Intervenor-Appellants' arguments that the constitutional right to vote does not extend to mail-voting regulations or to nondiscriminatory, minimally burdensome ballot-casting rules. *See* App.15–27. Instead, the District Court reasoned that Plaintiff-Appellees' constitutional claim should be evaluated under the balancing test articulated in *Anderson*, 460 U.S. 780, and *Burdick*, 504 U.S. 428. App.15–20. Applying that test, the District Court concluded that the

15

burden the date requirement imposes on voters is only "minimal," *id.* at 22, and that the requirement is thus subject only to rational-basis review, *id.* at 23. Yet it nevertheless held that the date requirement fails rational-basis review because, in its view, the requirement is not sufficiently supported by any valid state interest. *Id.* at 27.

In reaching this conclusion, the District Court discounted the three regulatory interests that Intervenor-Appellants identified. *See* App.23–27, 50–53. The Commonwealth of Pennsylvania—represented by the Attorney General—has now intervened in this case and confirmed that the date requirement advances those interests. *See* ECF No. 65 at 14–17.

Intervenor-Appellants filed a notice of appeal on April 2, 2025. ECF No. 1. This Court granted expedited consideration on April 21, 2025. ECF No. 38.

## SUMMARY OF ARGUMENT

**I.  A.**  The Constitution gives States broad authority to regulate elections. At the same time, the Supreme Court has recognized a right to vote guaranteeing the "right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S.

330, 336 (1972). Although that right provides protection against severe burdens that block access to the franchise, the Constitution permits States—at minimum—to adopt rules that impose no more than the "usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality op.); *see id.* at 207 (Scalia, J., concurring in the judgment). Thus, as this Court has recognized, voting rules imposing only a "*de minimis*" burden receive no judicial scrutiny under the *Anderson-Burdick* test and must be upheld without any judicial scrutiny or interest balancing. *Mazo*, 54 F.4th at 138–39.

**B.** Pennsylvania's date requirement is just this sort of rule. It requires voters only to fill in the date on an envelope they also sign. *See* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a). The obligation to write information on a form is a commonplace part of any election, and this task is less burdensome than compliance with other voting rules the Supreme Court has upheld as constitutional, such as obtaining photo ID or traveling to a polling place. *See Crawford*, 553 U.S. at 198 (plurality op.); *Brnovich*, 594 U.S. at 669, 678. In this Court's parlance, filling in a date is nothing more than a "*de minimis*" burden that triggers no review under *Anderson-Burdick*. *Mazo*, 54 F.4th at 138–39.

The District Court agreed that the date requirement imposes (at most) only a "minimal burden," App.22, but it did not even *acknowledge* the rule that voting regulations imposing such burdens receive no judicial scrutiny.  That failure alone dooms its holding and warrants reversal.

**C.**  Holding otherwise would have staggering implications.  If filling in a date on a form is a sufficient burden to trigger constitutional scrutiny, then virtually *every* state election law would be subject to suit and placed at the mercy of an open-ended judicial balancing test.  The right to vote ensures all have an equal and fair *opportunity* to vote; it is not a mandate for "federal courts to rewrite state electoral codes," *Clingman*, 544 U.S. at 593, or to immunize voters from following simple rules.  The Constitution expressly reserves the power to the States to establish election codes in the first instance, *see* U.S. Const. art. I, § 4, cl. 1, as both the Supreme Court and this Court have repeatedly reaffirmed, *see, e.g.*, *Timmons*, 520 U.S. at 358; *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999) ("[S]tates have broad power to enact election codes that comprehensively regulate the electoral process.").  The Constitution does not require giving litigants who could not obtain election rules they wanted at the state house a second shot at

the courthouse. The District Court's flawed reasoning and decision should be reversed.

**II.** Reversal is also required for a second, independent reason. The constitutional right to vote does not extend to voting by mail, at least when a State makes in-person voting available. *See McDonald*, 394 U.S. at 807–08. Because voting by mail is a "privilege[]" and not a right, a State may *limit* it, *id.* at 810–11—or, as Pennsylvania has done, *extend* it universally, subject to rules imposing neutral, minimally burdensome regulations, *see* Part II, *infra*—without infringing the right to vote. So long as Pennsylvania preserves the right to vote in person, the requirement that voters fill in the date on the return envelope when voting by mail does not implicate the right to vote.

Contrary to Plaintiff-Appellees' arguments below, *McDonald* remains good law. *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 406 (5th Cir. 2020). And this case cannot be distinguished from *McDonald*. As in *McDonald*, Plaintiff-Appellees have failed to show that Pennsylvania has "absolutely prohibited [them] from exercising the franchise" through every other method besides mail voting. 394 U.S. at 809. That failure requires reversal.

**III.   A.**   Even if Pennsylvania's date requirement triggers judicial scrutiny, it easily passes the *Anderson-Burdick* test.   As the District Court explained, the burden the date requirement imposes is "minimal" at most.  App.22.  Filling in dates on forms is a part of day-to-day life, and it is demonstrably less burdensome than other "usual burdens of voting" that courts have upheld against challenges invoking the constitutional right to vote.  *Crawford*, 553 U.S. at 198 (plurality op.); *see Brnovich*, 594 U.S. at 669.   Finally, the date requirement applies neutrally to all classes of people and imposes no special burden on speech or association.  App.22–23; *see* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a).

**B.**   The date requirement is therefore (at most) subject only to rational-basis review, which it easily passes.  *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020); *see Mazo*, 54 F.4th at 153.  The requirement serves three important state regulatory interests.  *First*, it serves as a backstop in the event the State's other election measures fail.  *Migliori*, 36 F.4th at 165 (Matey, J., concurring in the judgment).  *Second*, it is a formality that helps preserve the solemnity of voting for Pennsylvanians who choose to vote by mail.  *See Mansky*, 585 U.S. at 15.  *Third*, it helps the State detect and deter fraud and, thus, preserve the integrity of its

elections. *See* App.227 (date requirement used in *Mihaliak* fraud prosecution).

**C.** The District Court erred in rejecting these regulatory interests. Instead of crediting the Pennsylvania General Assembly's legislative judgments as precedent required, *see Timmons*, 520 U.S. at 364, the District Court instead placed an evidentiary burden on the requirement's defenders and subjected each justification to searching empirical scrutiny, *see* App.23–27. In so doing, it blew past precedent, state prerogatives, and record evidence that the date requirement has already helped prove voter fraud. Thus, if the Court holds that the date requirement is subject to judicial scrutiny, it still should reverse.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment, as well as constitutional questions, *de novo*. *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 854 (3d Cir. 2022); *Waterman v. Farmer*, 183 F.3d 208, 211 (3d Cir. 1999).

## ARGUMENT

The Court should reverse for at least three independent reasons. *First*, the date requirement does not even implicate, let alone violate, the constitutional right to vote because it imposes only the equivalent of a

21

"usual burden[] of voting" on voters. *Crawford*, 553 U.S. at 198 (plurality op.); *see id.* at 208 (Scalia, J., concurring in the judgment); *accord Mazo*, 54 F.4th at 138–39.  *Second*, the constitutional right to vote does not extend to the date requirement or Pennsylvania's mail-voting regime because Pennsylvania makes in-person voting exempt from the requirement available to all voters. *See McDonald*, 394 U.S. at 806–08. *Third*, even if the date requirement does implicate the constitutional right to vote, it easily satisfies the *Anderson-Burdick* balancing test. *See Mazo*, 54 F.4th at 154.

## I.    VOTING RULES IMPOSING THE USUAL BURDENS OF VOTING DO NOT IMPLICATE THE CONSTITUTIONAL RIGHT TO VOTE.

Because States "inevitably must" adopt rules to effectuate the constitutional right to vote, *Timmons*, 520 U.S. at 358, non-discriminatory ballot-casting rules do not even *implicate* that right when they impose no more than the "usual burdens of voting," *Crawford*, 553 U.S. at 198 (plurality op.); *see id.* at 208 (Scalia, J., concurring in the judgment), or only "*de minimis*" inconveniences, *Mazo*, 54 F.4th at 138–39.  That is the end of the case:  The date requirement imposes nothing more than a usual burden of voting.

The District Court failed even to *acknowledge* this rule. The District Court side-stepped the inescapable conclusion that the date requirement is constitutional only by employing an intrusive, open-ended judicial balancing test to second-guess and reject the General Assembly's policy choice to adopt and maintain the requirement. Rather than transform the Constitution's right to vote into a roving judicial mandate to superintend state election rules, this Court should reaffirm binding precedent and reverse.

## A. The Constitutional Right To Vote Does Not Exempt Voters From Minimally Burdensome Ballot-Casting Rules.

Although lacking a clear textual warrant in the Constitution, the Supreme Court has inferred the existence of a constitutional right to vote. *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964). It has recognized, moreover, that this right has clear limits. *See, e.g.*, *Burdick*, 504 U.S. at 433; *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("The right to vote, *per se*, is not a constitutionally protected right." (cleaned up)). The Constitution does not guarantee voters the right to vote "in any manner" they please, or an "absolute" right to associate "for political purposes through the ballot." *Burdick*, 504 U.S. at 433. Nor does it

compel "a fixed method of choosing state or local officers or representatives." *Rodriguez*, 457 U.S. at 9.

The reason is fundamental. The Constitution expressly delegates the power to regulate the "Times, Places, and Manner" of federal elections to the States. U.S. Const. art. I, § 4, cl. 1. That authority is "broad." *Mazo*, 54 F.4th at 136. As an incident of that broad power, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons*, 520 U.S. at 358; *accord Council of Alt. Pol. Parties*, 179 F.3d at 70 ("[S]tates have broad power to enact election codes that comprehensively regulate the electoral process."). Indeed, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson*, 460 U.S. at 788 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Given this clear constitutional assignment of power and the particular competencies of state legislatures, courts must avoid treating the constitutional right to vote as an invitation "to rewrite state electoral codes." *Clingman*, 544 U.S. at 593. After all, any "sort of detailed judicial

supervision of the election process would flout the Constitution's express commitment of the task to the States." *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment).

Indeed, the Supreme Court has carefully defined and limited the constitutional right to vote in light of States' authority to set the rules of elections. The right to vote is the right to "participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336. It therefore guarantees two fundamental protections.

*First*, States may not *discriminate* against voters—for example, by violating the "one-person-one-vote rule," *see Reynolds*, 377 U.S. at 568, or imposing poll taxes that "invidiously discriminate" on the basis of race or wealth, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959) ("States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns." (cleaned up)); *accord Carrington*, 380 U.S. at 91 ("The privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State

25

may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals." (cleaned up)).

*Second*, States must ensure a fair and meaningful *opportunity* for citizens to "participate in elections." *Dunn*, 405 U.S. at 336. In that vein, the Supreme Court has recognized that the right to vote—combined with the First Amendment's right of association—limits States' ability to keep candidates off the ballot. *See Anderson*, 460 U.S. at 787–88; *Mazo*, 54 F.4th at 138 ("[A]ssociational rights have also played a central role in many of the Supreme Court's other cases applying the *Anderson-Burdick* test."). So, too, has the Supreme Court recognized that States may not impose objectively severe burdens that prevent citizens from exercising the franchise altogether. *See Crawford*, 553 U.S. at 190 (plurality op.); *id.* at 205 (Scalia, J., concurring in the judgment).

The Supreme Court has never found that a non-discriminatory ballot-casting regulation imposes a severe burden or violates the right to vote. In *Crawford*, a sharply divided Supreme Court expressed fundamental disagreement about whether non-severe burdens on voting even *implicate* the right to vote. *Compare id.* at 190 n.8 (plurality op.), *with id.* at 206–08 (Scalia, J., concurring in the judgment). Writing for

three Justices, Justice Scalia argued that only severe burdens implicate the right to vote and that such burdens should be assessed using strict scrutiny. *Id.* at 206–08 (Scalia, J., concurring in the judgment). Writing for three other Justices, Justice Stevens seemed to envision some sort of sliding scale of judicial scrutiny for a range of burdens, including some non-severe ones. *Id.* at 190 n.8 (plurality op.).[2]

Fortunately, this Court need not choose between these sides because it can resolve this case on a narrower ground. As even Justice Stevens' plurality opinion recognized, some burdens imposed by election rules are simply too inconsequential to merit judicial scrutiny under the constitutional right to vote. In particular, as part of his analysis

---

[2] Appellate courts have adopted a range of interpretations of *Crawford*, with some holding that Justice Stevens' plurality governs under the *Marks* rule. *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1319 n.31 (11th Cir. 2021). But it is unclear whether the *Marks* rule applies at all given the significant theoretical differences between the plurality and Justice Scalia's opinion. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (declining to apply the *Marks* rule); *id.* at 715–16 (Kavanaugh, J., concurring in the judgment) (same). Moreover, some Justices have questioned whether a plurality opinion is binding beyond the facts of the case. *See Ramos v. Louisiana*, 590 U.S. 83, 103–05 (2020) (plurality op.). Indeed, when applying its decision in *Burson v. Freeman*, 504 U.S. 191 (1992)—which featured a division similar to the one in *Crawford*—the Supreme Court adopted the approach contained in Justice Scalia's concurrence in the judgment rather than the plurality's approach. *See Mansky*, 585 U.S. at 13, 16.

upholding the challenged Indiana voter-ID provision, Justice Stevens found that the provision imposed only a minimal burden that did not "represent a significant increase over the usual burdens of voting." *Id.* at 198. It is thus clear that the *Crawford* plurality understood that the "usual burdens of voting" do not even *implicate* the right to vote. *Id.*; *see also id.* at 203–04 (Scalia, J., concurring in the judgment).

This Court has reached the same conclusion. In *Mazo*, this Court confirmed that the *Anderson-Burdick* test does not apply to rules whose "burden on [the right to vote] is no more than *de minimis*." *Mazo*, 54 F.4th at 138–39. The Second Circuit has likewise held that "incidental" burdens on the right to vote receive no scrutiny under the *Anderson-Burdick* balancing test. *Molinari v. Bloomberg*, 564 F.3d 587, 605–06 (2d Cir. 2009); *see Mazo*, 54 F.4th at 139 (interpreting *Molinari*).

The Supreme Court and this Court have applied a similar rule when determining the scope of statutory rights to vote, which are closely related to, and best understood to be coterminous with, the constitutional right to vote. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (the "right to vote" was "protected by the judiciary long before that right received the explicit protection" in civil-rights statutes).

For example, when examining the scope of the "right to vote" in the Voting Rights Act in *Brnovich*, the Supreme Court—citing *Crawford*—reaffirmed that the "usual burdens of voting" cannot violate any right to vote. 594 U.S. at 669. Likewise, when analyzing the scope of the "right to vote" in the Materiality Provision, this Court confirmed that the date requirement itself—as well as any other ballot-casting rules carrying only the usual burdens of voting—do not "deny the right to vote" even when they require declining to count noncompliant ballots. *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133 (cleaned up). As the Court explained, "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right." *Id.* at 135 (quoting *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental)).

This rule that nondiscriminatory, minimally burdensome ballot-casting regulations trigger no scrutiny makes perfect sense. Because such regulations are neutral and generally applicable, they deny no one the opportunity to "participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336. Moreover, voting *inherently* imposes some burdens. *See Brnovich*, 594 U.S. at 669. In-

person voting entails traveling to a polling station, waiting in line, providing information to a voting official, filling out forms, and completing a ballot, often with a particular sort of pen or marker. *See id.* Such burdens and their functional equivalents are inescapable and neutral, as they fall equally on voters and political parties. Accordingly, rules imposing such minimal, unavoidable, and non-discriminatory burdens do not implicate the constitutional right to vote. *See Crawford*, 553 U.S. at 198 (plurality op.); *id.* at 205–08 (Scalia, J., concurring in the judgment); *Brnovich*, 594 U.S. at 669; *Mazo*, 54 F.4th at 138–39; *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133.

> **B.    The Date Requirement Is A Minimally Burdensome Ballot-Casting Rule That Does Not Implicate The Constitutional Right To Vote.**

The date requirement does not implicate, much less violate, the constitutional right to vote. *First*, the requirement is neutral and generally applicable. *See* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a). It "draws no classifications" and "uniformly imposes" the same burden on all mail voters. *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment); *see also Reynolds*, 377 U.S. at 568 (rules that do not deliberately disadvantage one group over another do not implicate the

right to vote); App.23 (District Court acknowledging the date requirement is nondiscriminatory).

*Second*, filling in a date on a form is merely a "usual burden[] of voting" and, at most, a "*de minimis*" inconvenience. *Crawford*, 553 U.S. at 198 (plurality op.); *id.* at 204–09 (Scalia, J., concurring in the judgment); *Mazo*, 54 F.4th at 138–39. Every State requires voters to write information on voting papers for both in-person and mail voting. *See, e.g.*, 25 Pa. Stat. §§ 3146.6(a), 3150.16(a) (signature requirement); *id.* § 3050 (requirement to maintain in-person voting poll books); *How States Verify Voted Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures (updated Jan. 21, 2025), https://perma.cc/N6PD-HJDA. That is true even for States with the most generous voting regimes. *See, e.g.*, Minn. Stat. § 203B.07, subdiv. 2. Indeed, States require voters to sign and date a broad range of documents. *See, e.g.*, Delaware Voter Registration Form, https://perma.cc/UP5R-KZMX; New Jersey Voter Registration Form, https://perma.cc/4T2C-SMXJ; New Jersey Driver License Application Request Form, https://perma.cc/828D-PNTN; Pennsylvania Mail-In Voter Registration Form, https://perma.cc/K7LP-THTJ.

Moreover, the obligation to fill in a date on a preprinted form is even less burdensome than compliance with many other rules that entail the "usual burdens of voting" and, thus, do not violate any right to vote. *Crawford*, 553 U.S. at 198 (plurality op.). Filling in a date is obviously less burdensome than finding one's polling place, traveling to that polling place, waiting in line to vote, and providing the various pieces of information required to vote. *See Brnovich*, 594 U.S. at 669; *Crawford*, 553 U.S. at 198 (plurality op.).

The District Court did not dispute these points—and it even *agreed* that the date requirement imposes only a "minimal burden." App.22. But it missed the bottom line because it completely ignored Intervenor-Appellants' explanation that the "usual burdens of voting" do not receive constitutional right-to-vote scrutiny. App.43–48. Its failure to adhere to that rule alone requires reversal.

Plaintiff-Appellees have never explained—and cannot explain— how filling in a date on a preprinted form imposes anything more than a usual burden of voting. Rather, they focused in the District Court, and likely will focus again in this Court, on the rejection rates due to noncompliance with the date requirement in prior Pennsylvania

elections.  The Supreme Court, however, has made clear that the burden inquiry assesses *objective* burdens on voting, not the consequences of noncompliance.  *See Crawford*, 553 U.S. at 198 (plurality op.) (deeming the burden imposed by a voter ID law slight, even though noncompliance would result in rejection at the polling place); *accord id.* at 209 (Scalia, J., concurring in the judgment).

After all, if the burden inquiry turned on whether the challenged rule results in noncompliant ballots not being counted, then *all* mandatory voting rules would trigger judicial scrutiny under the *Anderson-Burdick* framework.  But States "inevitably must" enact such rules, *Timmons*, 520 U.S. at 358, and the Constitution categorically permits them to adopt any mandatory rules imposing no more than the "usual burdens of voting," *Crawford*, 553 U.S. at 198 (plurality op.); *see id.* at 204–09 (Scalia, J., concurring in the judgment); *Mazo*, 54 F.4th at 138–39.

Moreover, when a ballot-casting rule is objectively easy to comply with, the "failure to follow" that rule "constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *see Pa. State Conf. of NAACP Branches*, 97 F.4th at 135;

33

*accord DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral) ("[A] State's election [rule] does not disenfranchise voters who are capable of [following it] but fail to do so.").

But even if the noncompliance rate under the date requirement is legally relevant, evidence of that rate *disproves* Plaintiff-Appellees' claim because it shows the requirement is minimally burdensome and constitutional. The rejection rate due to noncompliance with the date requirement in the 2024 General Election was only 0.23% of mail ballots. *See* Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election, Department of State (Jan. 27, 2025), https://perma.cc/BVG4-X2UL; 2024 Presidential Election (Official Returns), Commonwealth of Pennsylvania (last visited Apr. 13, 2025), https://perma.cc/N6ZJ-8URF. Thus, only 0.064% percent of all ballots cast were rejected under the date requirement. And because the 2024 General Election is the only relevant election *after* the Secretary redesigned the ballot declaration and made the date requirement *even easier* to comply with, prior rejection rates are inapt.

Even so, Plaintiff-Appellees will likely rely on rejection rates from the 2020 and 2022 elections, when a prior design of the envelope

declaration and date field was in use.  Even then, however, the rejection rate under the date requirement has never been higher than 1%, and it has been consistently lower than the rejection rate due to noncompliance with other mail-ballot-casting rules in Pennsylvania, such as the requirement that mail ballots be placed in secrecy envelopes.  U.S. Election Assistance Comm., *Election Administration and Voting Survey 2022 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 118th Congress*, at 34, 36 (June 2023), https://perma.cc/M7JE-UX9C; Daniel J. Hopkins, *et al.*, *How Many Naked Ballots Were Cast in Pennsylvania's 2020 General Election?*, MIT Election & Science Lab, at Figure 1 (Aug. 26, 2021), https://perma.cc/RS67-2VJX.

Thus, even if rejection rates can be used to show objective burdens on the right to vote, the rejection rates under the date requirement are so small that they *confirm* the requirement does not implicate, let alone violate, any right to vote.  Indeed, as the Supreme Court explained in *Brnovich*, "[a] policy that appears to work for 98% or more of voters to whom it applies . . . is unlikely to" violate the right to vote.  *Brnovich*, 594 U.S. at 680.  Thus, the date requirement—which works for over *99%* or

more of even mail voters, and growing—cannot violate the constitutional right to vote.  The Court should reverse.

### C.    The District Court's Approach Has Untenable Consequences.

The core premise of the District Court's holding—that all mandatory election rules, "even" those imposing only the "slightest burden," App.27, must be subjected to an open-ended judicial balancing test—is stunning and would seriously disrupt the constitutional order.

*First*, this approach would upend election codes nationwide.  As noted, *every* State requires voters to write some information when voting.  *See generally How States Verify Voted Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures (updated Jan. 21, 2025), https://perma.cc/N6PD-HJDA; *see also, e.g.*, Minn. Stat. § 203B.07, subdiv. 2.  If merely requiring a voter to write information on paper is sufficiently burdensome to trigger open-ended balancing under a constitutional right-to-vote claim, litigants could challenge *all of these rules* and force States to satisfy searching judicial scrutiny to preserve them.  The resulting disruption to voting laws and cost to States would be substantial.

*Second*, the District Court's approach would force courts to routinely referee thinly-disguised political disputes using an

36

indeterminate balancing test.  As both courts and commentators have recognized, the *Anderson-Burdick* test is indeterminate and malleable. *See, e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 561–62 (6th Cir. 2021) (Readler, J., concurring); *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (Sutton, C.J.) ("The distinction between 'severe burdens' and 'lesser' ones is often murky." (quoting *Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring))); Derek T. Muller, *The Fundamental Weakness of Flabby Balancing Tests in Federal Election Law Litigation*, Excess of Democracy (Apr. 20, 2020) (characterizing *Anderson-Burdick* as an "ad hoc totality-of-the-circumstances" test), https://perma.cc/CSN6-9HJN; Note, "As the Legislature Has Prescribed": Removing Presidential Elections from the *Anderson-Burdick* Framework, 135 Harv. L. Rev. 1082, 1085, 1099 (2022) (describing *Anderson-Burdick* as a "frustratingly vague" "judicial morass"); Edward B. Foley, *Voting Rules and Constitutional Law*, 81 Geo. Wash. L. Rev. 1836, 1859 (2013) ("*Anderson-Burdick* balancing is such an imprecise instrument that it is easy for the balance to come out one way in the hands of one judge, yet come out in the exact opposite way in the hands of another.").

The District Court's approach would make matters even worse because it would render the *Anderson-Burdick* test truly unworkable. *See* App.15–27. Under the District Court's approach, a court could find even the most innocuous requirement to be a constitutional violation. *Id.* Partisans who failed to obtain their preferred election laws through the legislative process would thus have every incentive to turn around and try their luck in the courts instead. *See Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 11 (2024) ("We must be wary of plaintiffs who seek to transform the federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." (cleaned up)). That, in turn, would regularly enmesh courts in inherently political fights—with only an open-ended and amorphous balancing test to guide them. With such "uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." *Rucho v. Common Cause*, 588 U.S. 684, 704 (2019) (cleaned up).

*Third*, the District Court's approach would further upend the constitutional order because it would entangle the federal judiciary in the mechanics of voting, an area of quintessential state regulation and

primacy. The Constitution assigns the responsibility for establishing voting regulations to the States in the first instance. U.S. Const. art. I, § 4, cl. 1. And for good reason. Setting election laws involves sensitive political disputes, and such political matters are the domain of legislatures, not the courts. *Cf. Rucho*, 588 U.S. at 707.

In the hands of legislators, the States have also been engines of innovation in the voting arena, gradually transforming the character of the Nation's elections. In the early days of the Republic, polling places could be boisterous, even "chaotic," "akin to entering an open auction." *Mansky*, 585 U.S. at 7 (citations omitted). Voters also generally voted on ballots printed by parties instead of the government. *Id.* at 6. Within about a century, however, States had begun "implementing reforms to address these vulnerabilities and improve the reliability of elections." *Id.* at 7. The reforms that they implemented are now fundamental—voting in private using state- rather than party-printed ballots. *Id.*

And these innovations continue today. Indeed, Pennsylvania's General Assembly enacted universal mail voting for the first time in the State's history only six years ago. *See* Act 77. As part of the legislative compromise that created mail voting, the General Assembly insisted that

voters date their mail-ballot declarations. The General Assembly even included an absolute nonseverability clause that voids universal mail voting if courts strike down its attendant integrity measures, including the date requirement. 25 Pa. Stat. § 2602, Note.[3] And if courts insist on routinely second-guessing such measures, States will hesitate to innovate in the voting arena.

The District Court offered no rejoinder to these concerns because it ignored them. The Court should reverse.

## II.    THE CONSTITUTIONAL RIGHT TO VOTE DOES NOT EXTEND TO VOTING BY MAIL.

Reversal is required for a second independent reason: Plaintiff-Appellees have asserted a right to vote by mail—a right that the Supreme Court has held does not exist. *McDonald*, 394 U.S. at 807–11; *see* Order Granting Stay Pending Appeal, *United States v. Paxton*, No. 23-50885,

---

[3] Justices on the Pennsylvania Supreme Court have recognized the import of the General Assembly's nonseverability provision in Act 77. *See McLinko v. Dep't of State*, 279 A.3d 539, 609–10 (Pa. 2022) (Brobson, J., dissenting); *see also Black Pol. Empowerment*, 2024 WL 4002321, at *62 (McCullough, J., dissenting). When the Pennsylvania Supreme Court agreed to review a state-court decision striking down the date requirement under the Pennsylvania Constitution, it asked the parties to brief whether affirming would activate that provision and void universal mail voting. *See Baxter*, 2025 WL 224388, at *1.

40

ECF No. 80-1, at 5 (5th Cir. Dec. 15, 2023) (per curiam) ("Paxton Stay Order").  Like Intervenor-Appellants' first argument, the District Court disregarded this argument entirely.  *Compare* App.39–43, *with* App.8–27.

As the Fifth Circuit recently reiterated, "voting by mail is a privilege that can be limited without infringing the right to vote."  Paxton Stay Order, at 5; *see Tex. Democratic Party*, 961 F.3d at 403–05 (citing *McDonald*, 394 U.S. at 807–11).  Other circuits agree.  *See, e.g.*, *Mays*, 951 F.3d at 792 ("[T]here is no constitutional right to an absentee ballot."); *Common Cause Ind. v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) ("[A]s long as the state allows voting in person, there is no constitutional right to vote by mail."); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (same).  Under this rule, a State does not "deny anyone the right to vote" when it enacts laws that "only affect the ability of some individuals to vote by mail," so long as it preserves the right to vote in person.  Paxton Stay Order, at 5.

The Supreme Court recognized that there is no constitutional right to vote by mail in *McDonald*, 394 U.S. 802.  There, pretrial detainees challenged a Cook County, Illinois absentee-voter ordinance, arguing

that the ordinance's extension of absentee voting to some voters but not to them violated their constitutional right to vote. *Id.* at 804–06. The Supreme Court unanimously rejected the challenge because the constitutional "right to vote" does not encompass "a claimed right to receive absentee ballots." *Id.* at 807. In particular, "absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny . . . the exercise of the franchise." *Id.* at 807–08.

Thus, the Supreme Court explained, to establish that a State's mail-voting regime denies the right to vote, an individual must show that he was "absolutely prohibited from exercising the franchise" *through any other method including in-person voting. Id.* at 809. In other words, the individual must first show that mail voting was the only option the State made available to him. *Id.* Because the *McDonald* plaintiffs did not make that showing, their claim failed. *Id.* at 808 & n.6. *McDonald* thus established that a State does not infringe the right to vote when it adopts restrictions on mail voting, so long as it leaves in-person voting available and free from the challenged restriction. *Id.* at 807–08.

*Crawford* affirmed that principle. 553 U.S. at 201 (plurality op.). The *Crawford* plaintiffs argued that Indiana's voter-ID requirement for in-person voting placed particular burdens on elderly voters. *Id.* The defendants responded that "the elderly and disabled are adequately accommodated through their option to cast absentee ballots" without complying with the voter-ID requirement, "and so any burdens on them" from that requirement "are irrelevant." *Id.* at 212 n.4 (Souter, J., dissenting). The Court agreed, explaining that the voter-ID requirement did not violate elderly voters' constitutional right to vote in part because "the elderly in Indiana are able to vote absentee without presenting photo identification." *Id.* at 201 (plurality op.). Even one of the *Crawford* dissenters suggested that the opportunity to vote by mail would defeat a right-to-vote challenge to an in-person voting rule. *See id.* at 239–40 (Breyer, J., dissenting). In any event, *Crawford* makes clear that a rule cannot impose a severe burden on the right to vote where the State makes available another method of voting exempt from the rule. *See id.* at 201 (plurality op.); *accord id.* at 209 (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting . . . the casting

of absentee or provisional ballots, is an indulgence—not a constitutional imperative.").

That principle, articulated in *McDonald* and affirmed in *Crawford*, slams the door shut on Plaintiff-Appellees' claim. Pennsylvanians who are unwilling or unable to fill in the date on the ballot-return envelope can simply vote in person instead—as most Pennsylvania voters do. And because Pennsylvania "permits [voters] to vote in person"—the "exact opposite of 'absolutely prohibit[ing]' them from doing so"—Plaintiff-Appellees' constitutional right-to-vote claim fails. *Tex. Democratic Party*, 961 F.3d at 404 (quoting *McDonald*, 394 U.S. at 808 n.7); *cf. Pa. State Conf. of NAACP Branches*, 97 F.4th at 135 (date requirement does not deny the "right to vote").

Plaintiff-Appellees advanced three counter-arguments below, but all lack merit. *First*, Plaintiff-Appellees suggested that the *Anderson-Burdick* framework has supplanted *McDonald*. App.108–09. But only the Supreme Court can overrule its precedents, *Agostini v. Felton*, 521 U.S. 203, 237 (1997), and the Supreme Court has neither overruled *McDonald* nor cast doubt on it. To the contrary, the Supreme Court cited *McDonald* favorably in *Burdick*. *See Burdick*, 504 U.S. at 434.

44

*Second*—and relatedly—Plaintiff-Appellees claimed that *American Party of Texas v. White*, 415 U.S. 767 (1974), established that *McDonald* is no longer good law. App.109. Not so. *American Party of Texas* concerned the denial of absentee ballots to a political party that had met the statutory requirement for obtaining them. 415 U.S. at 794–95. Texas's unexplained failure to follow its own laws was "obviously discriminatory" and had nothing to do with the *McDonald* principle. *Id.* at 795. In fact, *American Party of Texas* reaffirmed that declining to offer absentee voting is constitutional when a State "afford[s] a comparable alternative means to vote." *Id.* To quote the Fifth Circuit when it rejected this very argument in another case, "*McDonald* lives." *Tex. Democratic Party*, 961 F.3d at 406; *see* Paxton Stay Order, at 5.

*Third*, Plaintiff-Appellees attempted to distinguish *McDonald* by pointing out that the *McDonald* plaintiffs lost due to a failure of proof. App.109. Possibly true, but irrelevant. The *McDonald* plaintiffs' failure of proof was their failure to show that other methods of voting were unavailable to them and, thus, that they were "in fact absolutely prohibited from voting by the State." 394 U.S. at 808 n.7. Plaintiff-Appellees' claim suffers from precisely the same failure. Pennsylvania

45

has made in-person voting available to all voters—so, unsurprisingly, Plaintiff-Appellees have not shown that they were or are "in fact absolutely prohibited from voting by the State." *Id.* Their claim therefore fails for this independent reason as well. *See Crawford*, 553 U.S. at 201 (plurality op.); *Tex. Democratic Party*, 961 F.3d at 404; Paxton Stay Order, at 5.

## III. EVEN IF THE DATE REQUIREMENT IS SUBJECT TO JUDICIAL BALANCING, IT EASILY PASSES MUSTER.

Finally, even if *Anderson-Burdick* requires subjecting the date requirement to a judicial balancing test, the District Court got the balancing act wrong. App.15–27. The District Court properly concluded that the date requirement is non-discriminatory and imposes only a minimal burden. App.22–23. It was also correct in rejecting application of any scrutiny more stringent than rational-basis review. App.21–23. It erred, however, in holding that the requirement flunks that highly deferential form of review. App.23–27.

The District Court arrived at this holding only by concluding that the requirement does not serve important state interests. App.23–27. At the threshold, this holding rested on a reversible legal error. The District Court believed that it was "up to Defendants . . . to point to evidence that

46

a governmental interest is furthered by the burden the date requirement imposes on the right to vote." App.26. But rational-basis review imposes no such burden of proof. To the contrary, a party defending a state law against rational-basis scrutiny need not adduce *any evidence at all*. *See, e.g.*, *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993); *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009). Rather, when rational-basis scrutiny applies, a legislature's judgment "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202; *see Timmons*, 520 U.S. at 364 (The *Anderson-Burdick* test does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications").

This makes perfect sense: Rational-basis review is "quite deferential," and "where States enact politically neutral regulations of the mechanics of the electoral process itself, deference is both appropriate and necessary." *Mazo*, 54 F.4th at 153–154 (cleaned up). In other words, rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Comms.*, 508 U.S. at 313; *Parker*, 581 F.3d at 202; *see McDonald*, 394 U.S. at 809 ("Legislatures are

presumed to have acted constitutionally.").  Indeed, rational-basis review is one of the most deferential standards of review known to American law, and holdings that a law flunks this standard are quite rare.  *See, e.g.*, Erwin Chemerinsky, *The Rational Basis Test Is Constitutional (and Desirable)*, 14 Geo. J.L. & Pub. Pol'y 401, 402 (2016) ("The rational basis test is enormously deferential to the government and only rarely has the Supreme Court invalidated laws as failing rational basis review."); Jerome A. Barron, *et al.*, *Constitutional Law: Principles and Policy* 699 (8th ed. 2012) (The doctrine is so deferential that it is "more often a statement of a conclusion that the law is constitutional than a standard of actual evaluation.").

The District Court thus erred when it imposed on the date requirement's defenders the burden "to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote."  App.26.  That error alone warrants reversal.  *See Beach Comms.*, 508 U.S. at 313–315; *Parker*, 581 F.3d at 202.

If more were somehow required, the District Court's interest analysis was erroneous in yet another respect.  The date requirement

48

serves at least three important state interests, *see* App.50–53, as the Commonwealth agrees, ECF No. 65, at 14–17.

Accordingly, even if the Court concludes that the *Anderson-Burdick* framework applies, it still should reverse.

### A.    Under *Anderson-Burdick*, The Court Must Apply Rational-Basis Review To The Date Requirement.

The date requirement does not burden any constitutional right. *See* Parts I & II, *supra*. Even if it did, however, the *Anderson-Burdick* test prescribes rational-basis review. *See* App.21–23.

Under the *Anderson-Burdick* test, courts weigh the burden, if any, that a law places on protected constitutional rights against the State's interests in the law. *Crawford*, 553 U.S. at 189–91 (plurality op.). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," while those imposing "lesser burdens trigger less exacting review, and the State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (cleaned up); *accord Mazo*, 54 F.4th at 153.

When determining a law's burden, a court must assess its objective impact on the ordinary voter, not specific subgroups or individuals.

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235–36 (5th Cir. 2020); *see Crawford*, 553 U.S. at 198 (plurality op.); *id.* at 205 (Scalia, J., concurring in the judgment); *Burdick*, 504 U.S. at 436–37; *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016). After all, allowing plaintiffs to prove right-to-vote claims through a showing of disparate impact on a subgroup would allow them to circumvent the strict legal standards—including the burden to show discriminatory intent—that govern claims under the Equal Protection Clause. *See Crawford*, 553 U.S. at 207–08 (Scalia, J., concurring in the judgment); *see also, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

On the interest side of the scale, rational-basis scrutiny is highly deferential to States. Where such scrutiny applies, the defendant need not adduce *any evidence at all* to demonstrate the state interests advanced by the challenged law. Instead, federal courts must accept "rational speculation unsupported by evidence or empirical data." *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202.

## B.    The Date Requirement Imposes Only A "Minimal" Burden On Voters.

The District Court properly concluded that the date requirement "imposes only a minimal burden" on voters. App.22.

50

Filling in a date on a preprinted form is self-evidently not burdensome.  Doing so is a regular part of dozens of day-to-day activities, from writing a date on homework as a student to completing a release at a doctor's office or filing out a government form.  Pennsylvania asks individuals to date documents in dozens of contexts,[4] and every State requires voters to write information on voting papers before casting a ballot.  *See* Part I.B., *supra*.  Nor is there any meaningful distinction between filling in a date and signing a name.  Pennsylvania requires mail voters to do both, but Plaintiff-Appellees attack only the date requirement, even though both requirements are part and parcel of the same rule and appear *in the same statutory phrase*.  App.114; *see* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a).  If signing a mail-ballot envelope is not a significant burden, filling in a date *on the same declaration* cannot be either.

---

[4] The circumstances where Pennsylvania requires a date and signature are too numerous to list in full.  Here are a few.  57 Pa. Cons. Stat. § 316 (short form certificates of notarial acts); 23 Pa. Cons. Stat. § 5331 (parenting plan); 73 Pa. Stat. § 201-7(j.1)(iii)(3)(ii) (emergency work authorization form); 42 Pa. Cons. Stat. § 8316.2(b) (childhood sexual abuse settlement form); 73 Pa. Stat. § 2186(c) (cancellation form for certain contracts); 42 Pa. Cons. Stat. § 6206 (unsworn declaration).

As explained above, complying with the date requirement is trivially easy. *See* Part I.B., *supra*. That point becomes even clearer when compliance with the date requirement is contrasted with the "usual burdens" of voting in person—including "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering . . . required documents, and posing for a photograph." *Crawford*, 553 U.S. at 198 (plurality op.). Yet the Supreme Court *upheld* those burdens as minimal and constitutional in *Crawford*. *Id.* So too with the burden of "[h]aving to identify one's own polling place and then travel there to vote." *Brnovich*, 594 U.S. at 678. Compared to obtaining an ID, driving to a polling station, waiting in line, and casting a ballot on a voting machine, adding a date to an envelope from the comfort of one's home can hardly be characterized as a burden at all. *See Crawford*, 553 U.S. at 198 (plurality op.); *Brnovich*, 594 U.S. at 678.

## C.    The Date Requirement Easily Satisfies Rational-Basis Review.

The District Court's recognition that the date requirement "imposes only a minimal burden" on voters should have effectively resolved any *Anderson-Burdick* analysis. App.22. Such regulations are subjected only

to "rational basis review," *Mays*, 951 F.3d at 784; *see Mazo*, 54 F.4th at 153, as the District Court acknowledged, App.21–23.

The date requirement easily satisfies such review because it furthers at least three "important regulatory interests." *Timmons*, 520 U.S. at 358 (cleaned up). *First*, the date requirement "provides proof of when an elector actually executed a ballot in full." *In re: Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1090 (Pa. 2020) (Dougherty, J., concurring and dissenting op.) (cleaned up). By aiding the "orderly administration" of elections, that information undoubtedly furthers legitimate state interests. *Crawford*, 553 U.S. at 196 (plurality op.). True, that date is not the primary source election officials rely on to determine when a ballot was cast. Election officials are also supposed to stamp ballots upon receipt and enter that information into Pennsylvania's Statewide Uniform Registry of Electors ("SURE") system. *See Pa. State Conf. of NAACP v. Schmidt*, 703 F. Supp. 3d 632, 666–67 (W.D. Pa. Nov. 21, 2023), *rev'd sub nom. Pa. State Conf. of NAACP Branches v. Schmidt*, 97 F.4th 120. But the handwritten date serves as a useful backstop if an official fails to timestamp a ballot, or, as

53

Judge Matey has warned, if the SURE system malfunctions. *See Migliori*, 36 F.4th at 165 (Matey, J., concurring in the judgment).

*Second*, the date requirement serves the State's interest in marking the casting of a vote as a serious and solemn act. Imposing a signature-and-date requirement ensures that voters "contemplate their choices" and "reach considered decisions about their government and laws." *Mansky*, 585 U.S. at 15. As multiple courts have recognized, formalities like signature-and-date requirements serve a "cautionary function." *Davis v. G N Mortg. Corp.*, 244 F. Supp. 2d 950, 956 (N.D. Ill. 2003). They "impress[] the parties with the significance of their acts and their resultant obligations," *id.*, and "guard against ill-considered action," *Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 883–84 (Pa. Super. Ct. 1985) (cleaned up). That is why such requirements appear on instruments ranging from "wills" to "transfer[s] of real property." *State v. Williams*, 565 N.E.2d 563, 565 (Ohio 1991). When such formalities are absent, parties may fail to "exercis[e] the caution demanded by a situation in which each ha[s] significant rights at stake." *Thatcher's Drug Store of West Goshen, Inc. v. Consol. Supermarkets, Inc.*, 636 A.2d 156, 161 (Pa. 1994).

The Fifth Circuit affirmed this principle only two years ago in *Vote.org v. Callanen*, 89 F.4th 459, 467 (5th Cir. 2023). The plaintiffs in that case challenged a Texas law that made voter registration less convenient by requiring applicants to submit voter registration forms with wet signatures rather than digital ones. *Id.* at 467–68. The Fifth Circuit rejected the challenge, relying in part on the fact that an "original signature to a voter registration form carries 'solemn weight.'" *Id.* at 489 (cleaned up).

In short, "[c]asting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Mansky*, 585 U.S. at 15. If States can require the formalities of signing and dating for wills and property transactions, then surely Pennsylvania can do the same for voting. *See Black Pol. Empowerment*, 2024 WL 4002321, at *53 (McCullough, J., dissenting) ("The requirement to sign and date documents is deeply rooted in legal traditions that prioritize clear and consensual agreements.").

*Third*, the date requirement furthers Pennsylvania's interest in "deterring and detecting voter fraud" and "protecting the integrity and reliability of the electoral process." *Crawford*, 553 U.S. at 191 (plurality

55

op.); *see Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *In re Canvass*, 241 A.3d at 1091 (Dougherty, J., concurring and dissenting op.). The State does not have to endure fraud before acting to prevent and combat it. *Brnovich*, 594 U.S. at 686. "[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected." *Id.* As an anti-fraud measure, the date requirement therefore satisfies rational-basis scrutiny. *See, e.g., id.*

Moreover, the date requirement *has* already helped Pennsylvania detect and deter fraud. In 2022, the State used the date requirement to detect voter fraud committed by a deceased individual's daughter in *Commonwealth v. Mihaliak*, No. MJ-2202-CR-126-2022 (Lancaster County). App.220, 227. Because Pennsylvania law prohibits county boards of elections from comparing the signature on the ballot envelope with one in the official record, *see In Re: Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 595 (Pa. 2020), the handwritten date—which was twelve days after the supposed voter had passed away—was the only evidence of third-party fraud on the face of the envelope, App.227. It therefore served

as a key piece of evidence in the investigation and ultimate conviction and criminal sentence of the fraudster. *See id.*

Each of these three interests is sufficient to sustain the date requirement under rational-basis scrutiny—so in combination, all three obviously are. *Timmons*, 520 U.S. at 358. The date requirement is constitutional under the *Anderson-Burdick* framework.

### D. The District Court Erred In Rejecting Pennsylvania's Interests.

The District Court's contrary conclusion that the date requirement flunks rational-basis scrutiny suffers from two flaws, each of which warrants reversal.

*First*, the District Court wrongly held that it was "up to Defendants . . . to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote." App.26. Rational-basis review imposes no such burden. Instead, when rational-basis scrutiny applies, a legislature's judgment "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202; *see also Timmons*, 520 U.S. at

364 (The *Anderson-Burdick* test does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications").

Such "rational speculation" more than bears out the State's interests in the date requirement, as explained above. *See* Part III.C., *supra.* Moreover, Intervenor-Appellants *did* "point to evidence that [the] governmental interest" in preventing and detecting fraud *was* "furthered by the . . . date requirement" in *Mihaliak.* App.26; *see* Part III.C., *supra.* The District Court's error in imposing a burden of proof on the date requirement's defenders alone requires reversal. *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202; *see also Timmons*, 520 U.S. at 364; *Mazo*, 54 F.4th at 153–54.

*Second*, the District Court erred in its examination of the State interests supporting the date requirement. Instead of deferring to the State, the District Court wrongly wielded rational-basis scrutiny as "a license . . . to judge the wisdom, fairness, or logic of" the General Assembly's "legislative choice[]" to adopt the requirement. *Beach Comms.*, 508 U.S. at 313; *Parker*, 581 F.3d at 202; *see also McDonald*, 394 U.S. at 809 ("Legislatures are presumed to have acted constitutionally."). In fact, the District Court dismissed these interests

out of hand while barely even engaging with Intervenor-Appellants' arguments. *See* App.23–27. Its analysis thus fell far short of the judicial "deference" that is "appropriate and necessary" when "States enact politically neutral regulations of the mechanics of the electoral process itself." *Mazo*, 54 F.4th at 154.

In the first place, the District Court brushed off as "speculative" the idea that the date requirement furthers the State's interest in the "orderly administration of elections." App.25. But it should have *deferred* to the "rational speculation" regarding this interest, not used it to *reject* this interest. *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202. And in all events, legislatures are "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986); *see, e.g.*, *Timmons*, 520 U.S. at 364. Just because Pennsylvania's SURE system has not to date malfunctioned in a manner that has required use of the handwritten date as a backstop does not mean that the State cannot maintain such a backstop—especially one that imposes as slender a burden as this. *See Munro*, 479 U.S. at 195; *Migliori*, 36 F.4th at 165 (Matey, J., concurring the in judgment) (identifying risk). Such

59

rationales easily survive rational-basis review. *See Beach Comms.*, 508 U.S. at 313, 315; *Parker*, 581 F.3d at 202.

The District Court's rejection of the State's interest in preserving solemnity suffered similar flaws. The District Court rejected the idea that the date requirement furthered that interest as nothing more than "supposition" unsupported by record evidence, App.25, but such "supposition" is more than enough to demonstrate this interest, *Beach Comms.*, 508 U.S. at 315; *Parker*, 581 F.3d at 202; *see also Timmons*, 520 U.S. at 364.

Moreover, the District Court did not engage with or even cite a single one of the Supreme Court, federal Courts of Appeals, Pennsylvania and Ohio Supreme Court, or lower state court precedents that Intervenor-Appellants put before it. App.15–27; App.50–58. It erred by failing to recognize what multiple courts have affirmed: Just like raising one's right hand when swearing an oath, signature-and-date requirements ensure that parties "exercis[e] the caution demanded by a situation in which each ha[s] significant rights at stake." *Thatcher's Drug Store*, 636 A.2d at 161. Such formalities have a deeply established

place in our legal tradition. *Black Pol. Empowerment*, 2024 WL 4002321, at *53 (McCullough, J., dissenting).

Finally, the District Court erred when it rejected the State's interest in preventing voter fraud—an interest *actually borne out* by *Mihaliak*. The District Court downplayed *Mihaliak*, noting that because the deceased voter had already been removed from the rolls, her vote would not have been counted anyway. App.23–24. But election officials not counting the ballot is not the only consequence of third-party voter fraud: Such fraud is also criminally punishable. *See* 25 Pa. Stat. § 3527; 18 Pa. Cons. Stat. § 4101. And in *Mihaliak*, the fraudster's handwritten date—a date *after* her mother had passed away—was the *only* evidence of third-party fraud on the face of the ballot-return envelope. *See* App.226–27. Without that date, the State would have lacked a reason or a basis to initiate an investigation into possible voter fraud, since it would have been plausible that Ms. Mihaliak's mother filled out the ballot and died before it was received. *Id.* The handwritten date was thus proof of fraud, and prosecutors pointed to it to secure a guilty plea from the fraudster, who was criminally sentenced. *See Black Pol. Empowerment*,

2024 WL 4002321, at *15 n.33; *Commonwealth v. Mihaliak*, MJ-2202-CR-126-2022 (Lancaster County); App.220, 227.

Pennsylvania had an important—indeed compelling—interest in "tak[ing] action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686.  The date requirement serves important evidentiary and deterrence purposes, and nothing prevents a State from employing overlapping means to combat fraud.  *Cf., e.g., Snyder v. United States*, 603 U.S. 1, 19 (2024). The District Court thus erred when it failed to defer to that interest— and only compounded that error when it disregarded the record evidence that the date requirement *has actually detected* fraud.  *See, e.g., Beach Comms.*, 508 U.S. at 313, 315; *Parker*, 581 F.3d at 202; *Mazo*, 54 F.4th at 154; *see also McDonald*, 394 U.S. at 809; *Timmons*, 520 U.S. at 364.

## CONCLUSION

The Court should reverse.

Dated:  May 6, 2025

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

Respectfully submitted,

*/s/* John M. Gore
John M. Gore
(D.C. Bar No. 502057)
*Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Benjamin P. Daus
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
bdaus@jonesday.com

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.     I am  a member in good standing of the Bar of this Court.

2.     This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,104 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3,     This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Times New Roman) in the text and the footnotes.

4.     The text of the electronic Brief is identical to the text in the paper copies.

5.     The electronic file containing the Brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.


Dated: May 6, 2025                   */s/* John M. Gore_____
                                     John M. Gore
                                     *Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2025, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in this appeal has been accomplished via notice filed through the CM/ECF system attaching a copy of this filing.

Dated: May 6, 2025          /s/ John M. Gore
                            John M. Gore
                            *Counsel for Appellants*