No. 25-1644

In the United States Court of Appeals for the Third Circuit

BETTE EAKIN, *et al.*,

*Plaintiff-Appellees*

*v.*

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

*Defendant-Appellees*

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenor-Defendant-Appellants.*

**On Appeal from the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-340 (Baxter, J.)**

**INTERVENOR-APPELLANTS' APPENDIX VOLUME 1 OF 2**

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

John M. Gore
(D.C. Bar No. 502057)
*Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Benjamin P. Daus
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
bdaus@jonesday.com

*Counsel for Intervenor-Appellants*

# TABLE OF CONTENTS

Page

**Volume 1**

DKT. 411: NOTICE OF APPEAL (APR. 2, 2025)......................................... APP.1

DKT. 439: ORDER (MAR. 31, 2025)............................................... APP.3

DKT. 440: JUDGMENT (APR. 1, 2025) ........................................ APP.5

DKT. 438: OPINION (MAR. 31, 2025)........................................ APP.8

DKT. 378: MEMORANDUM IN SUPPORT OF INTERVENOR-
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (JUN. 5,
2024) ............................................................................. APP.29

DKT. 1: COMPLAINT (NOV. 11, 2022) ..................................... APP.60

DKT. 165: ORDER GRANTING MOTION TO INTERVENE (JAN. 6,
2023) ............................................................................. APP.77

DKT. 318: PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO
DEFENDANTS' AND INTERVENORS' MOTIONS FOR
SUMMARY JUDGMENT (MAY 5, 2023)........................................ APP.86

DKT. 304: INTERVENOR-DEFENDANTS' CONCISE STATEMENT OF
MATERIAL FACTS (APR. 28, 2023)............................................ APP.117


**Volume 2**

DISTRICT COURT DOCKET SHEET (APR. 29, 2025) ............... APP.150

MIHALIAK DOCKET  ................................................................... APP.220

MIHALIAK AFFIDAVIT................................................................. APP.224

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETTE EAKIN, *et al.*,  )
                                                      )
                 Plaintiffs,  )   Civil Action No.: 1:22-cv-00340
                                                      )
      v.                                        )
                                                      )   Judge Susan P. Baxter
ADAMS COUNTY BOARD OF  )
ELECTIONS, *et al.*,  )
                                                      )
              Defendants.  )

## INTERVENOR-DEFENDANTS' NOTICE OF APPEAL

Notice is hereby given that Intervenor-Defendants the Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania appeal to the United States Court of Appeals for the Third Circuit from the Order and Judgment (ECF No. 440) entered in this case on April 1, 2025.

This appeal is taken under 28 U.S.C. § 1291.

Dated:  April 2, 2025

Respectfully submitted,

/s/ Kathleen A. Gallagher
Kathleen A. Gallagher
PA I.D. #37950
THE GALLAGHER FIRM, LLC
436 Seventh Avenue, 30th Floor
Pittsburgh, PA 15219
Phone: (412) 308-5512
kag@gallagherlawllc.com

John M. Gore *
E. Stewart Crosland
Louis J. Capozzi III*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

Thomas W. King, III
Thomas E. Breth
DILLON, McCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
Phone: (724) 283-2200
tking@dmkcg.com
tbreth@dmkcg.com

Counsel for Intervenor-Defendants

* Admitted pro hac vice

2

App.2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BETTE EAKIN, et al,                    )
                                       )
     **Plaintiffs**                     )
                                       )
vs.                                    )          **C.A.No. 1:22-CV-340**
                                       )
**ADAMS COUNTY BOARD OF**              )
**ELECTIONS, et al,**                  )          **ECF Nos. 280, 281, 286, 287, 377**
                                       )
     **Defendants.**                    )

**O R D E R**

AND NOW, this 31st day of March 2025;

IT IS HEREBY ORDERED that judgment is granted in favor of all Defendants and

against all Plaintiffs on the claim that 25 Pa. Con. Stat. § § 3146.6(a) and 3150.16(a) violated the

Materiality Provision of the Civil Rights Act ("the statutory claim"). *See Pennsylvania State*

*Conference of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir.

2024).

IT IS FURTHER ORDERED that the motion for summary judgment filed by Plaintiffs

[ECF No. 287] is granted in part and denied in part. The motion is granted insofar as a

declaratory judgment is entered in favor of Plaintiffs declaring that the date instruction, as it

appears in 25 Pa. Con. Stat. § § 3146.6(a) and 3150.16(a), and any other provision that requires

county boards to reject ballots contained within envelopes without a correct date violates the

First and Fourteenth Amendments to the U.S. Constitution. IT IS FURTHER ORDERED that all

County Boards of Elections of the Commonwealth, their respective agents, officers, employees,

and successors, and all persons acting in concert with each or any of them, from rejecting or

<span style="color:red;">**App.3**</span>

refusing to count otherwise valid mail ballots due to a missing or incorrect date. IT IS FURTHER ORDERED that Plaintiffs' motion is denied with respect to the statutory claim.

IT IS FURTHER ORDERED that the motions for summary judgment filed by the RNC [ECF No. 281, 377] are granted in part and denied in part. The motions are granted insofar as judgment is entered in favor of the RNC on the statutory claim as noted above, but denied as to Plaintiffs' constitutional claim under the First and Fourteenth Amendments.

IT IS FURTHER ORDERED that the motion for summary judgment filed by the Lancaster County Board of Elections [ECF No. 280] is granted in part and denied in part. The motion is granted insofar as Plaintiff Bette Eakin's claims against it are dismissed for lack of standing and judgment is entered in favor of the Lancaster County Board on the statutory claim as noted above, but denied as to Plaintiffs' constitutional claim under the First and Fourteenth Amendments.

IT IS FURTHER ORDERED that the motion for summary judgment filed by the Berks County Board of Elections [ECF No. 286] is granted in part and denied in part. The motion is granted insofar as Plaintiff Bette Eakin's claims against it are dismissed for lack of standing and judgment is entered in favor of the Lancaster County Board on the statutory claim as noted above, but denied as to Plaintiffs' constitutional claim under the First and Fourteenth Amendments.

The Clerk of Court is directed to close this case. A Rule 58 judgment shall be entered separately.

_Susan Paradise Baxter_
SUSAN PARADISE BAXTER
United States District Judge

**App.4**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETTE EAKIN,                      )
DSCC, DCCC, and             )
AFT PENNSYLVANIA,       )
      Plaintiffs,           )
                            )
vs.                             )
                            )
ADAMS COUNTY BOARD OF ELECTIONS,  )   **C.A.No. 1:22-CV-340**
ALLEGHENY COUNTY BOARD OF      )
ELECTIONS, ARMSTRONG COUNTY    )
BOARD OF ELECTIONS, BEAVER COUNTY )  **Judge Susan Paradise Baxter**
BOARD OF ELECTIONS,  BEDFORD      )
COUNTY BOARD OF ELECTIONS, BERKS  )
COUNTY BOARD OF ELECTIONS,       )
BRADFORD COUNTY BOARD OF        )
ELECTIONS, BLAIR COUNTY BOARD OF  )
ELECTIONS,  BUCKS COUNTY BOARD OF  )
ELECTIONS, BUTLER COUNTY BOARD OF )
ELECTIONS, CAMBRIA COUNTY BOARD  )
OF ELECTIONS, CAMERON COUNTY     )
BOARD OF ELECTIONS,  CARBON COUNTY)
BOARD OF ELECTIONS, CENTRE COUNTY )
BOARD OF ELECTIONS, CHESTER       )
COUNTY BOARD OF ELECTIONS,       )
CLARION COUNTY BOARD OF         )
ELECTIONS,  CLEARFIELD COUNTY    )
BOARD OF ELECTIONS, CLINTON COUNTY)
BOARD OF ELECTIONS, COLUMBIA     )
COUNTY BOARD OF ELECTIONS,       )
CRAWFORD COUNTY BOARD OF       )
ELECTIONS, CUMBERLAND COUNTY    )
BOARD OF ELECTIONS, DAUPHIN COUNTY)
BOARD OF ELECTIONS,  DELAWARE    )
COUNTY BOARD OF ELECTIONS, ELK    )
COUNTY BOARD OF ELECTIONS, ERIE   )
COUNTY BOARD OF ELECTIONS, FAYETTE)
COUNTY BOARD OF ELECTIONS, FOREST )
COUNTY BOARD OF ELECTIONS,       )
FRANKLIN COUNTY BOARD OF        )
ELECTIONS, FULTON COUNTY BOARD OF )
ELECTIONS, GREENE COUNTY BOARD   )
OF ELECTIONS, HUNTINGDON COUNTY  )

BOARD OF ELECTIONS, INDIANA COUNTY )
BOARD OF ELECTIONS, JEFFERSON )
COUNTY BOARD OF ELECTIONS, )
JUNIATA COUNTY BOARD OF ELECTIONS, )
LACKAWANNA COUNTY BOARD OF )
ELECTIONS, LANCASTER COUNTY )
BOARD OF ELECTIONS, LAWRENCE )
COUNTY BOARD OF ELECTIONS, )
LEBANON COUNTY BOARD OF )
ELECTIONS, LEHIGH COUNTY BOARD OF )
ELECTIONS, LUZERNE COUNTY BOARD )
OF ELECTIONS, LYCOMING COUNTY )
BOARD OF ELECTIONS, MCKEAN )
COUNTY BOARD OF ELECTIONS, MERCER )
COUNTY BOARD OF ELECTIONS, MIFFLIN )
COUNTY BOARD OF ELECTIONS, MONROE )
COUNTY BOARD OF ELECTIONS, )
MONTGOMERY COUNTY BOARD OF )
ELECTIONS, MONTOUR COUNTY BOARD )
OF ELECTIONS, NORTHAMPTON COUNTY )
BOARD OF ELECTIONS, )
NORTHUMBERLAND COUNTY BOARD OF )
ELECTIONS, PERRY COUNTY BOARD OF )
ELECTIONS, PHILADELPHIA COUNTY )
BOARD OF ELECTIONS, PIKE COUNTY )
BOARD OF ELECTIONS, POTTER COUNTY )
BOARD OF ELECTIONS, SCHUYLKILL )
COUNTY BOARD OF ELECTIONS, SNYDER )
COUNTY BOARD OF ELECTIONS, )
SOMERSET COUNTY BOARD OF )
ELECTIONS, SULLIVAN COUNTY BOARD )
OF ELECTIONS, SUSQUEHANNA COUNTY )
BOARD OF ELECTIONS, TIOGA COUNTY )
BOARD OF ELECTIONS, UNION COUNTY )
BOARD OF ELECTIONS, VENANGO )
COUNTY BOARD OF ELECTIONS, )
WARREN COUNTY BOARD OF ELECTIONS,)
WASHINGTON COUNTY BOARD OF )
ELECTIONS, WAYNE COUNTY BOARD OF )
ELECTIONS, WESTMORELAND COUNTY )
BOARD OF ELECTIONS, WYOMING )
COUNTY BOARD OF ELECTIONS, YORK )
COUNTY BOARD OF ELECTIONS, )
      Defendants. )

**O R D E R**

AND NOW, this 1st day of April 2025;

Pursuant to Rule 58 of the Federal Rules of Civil Procedure,

IT IS HEREBY ORDERED that in regard to Count I, judgment is granted in favor of all Defendants and Intervenor-Defendants and against all Plaintiffs. *See Pennsylvania State Conference of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024).

IT IS FURTHER ORDERED that in regard to Count II, judgment is granted in favor of Plaintiff Bette Eakin and against the Erie County Board of Elections. Eakin's constitutional claim against all other Defendants and Intervenor-Defendants has been dismissed for lack of standing.

IT IS FURTHER ORDERED that in regard to Count II, judgment is granted in favor of Plaintiffs DCCC, DSCC, and AFT Pennsylvania and against all Defendants and all Intervenor-Defendants.

SUSAN PARADISE BAXTER
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETTE EAKIN, et al, | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| vs. | ) | **C.A.No. 1:22-CV-340** |
| | ) | |
| ADAMS COUNTY BOARD OF | ) | |
| ELECTIONS, et al, | ) | **ECF Nos. 280, 281, 286, 287, 377** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

This case directly implicates the right of citizens of the Commonwealth of Pennsylvania to cast a vote. The Court of Appeals for the Third Circuit has delineated the strong, foundational undercurrents associated with laws and regulations which may burden that right:

> Nowhere are the First Amendment rights of free speech and association more essential, or more fiercely guarded, than in the context of free and open elections. Self-government depends on ensuring that speech intended to support, challenge, criticize, or celebrate political candidates remains unrestricted. But at the end of every hard-fought political campaign lies the ballot box, where our constitutional democracy depends equally on States fulfilling their solemn duty to regulate elections to ensure fairness and honesty, even where doing so may burden some First Amendment rights.

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 131 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023).

Presently before the Court is another legal challenge to the "vote by mail" practices established by the Commonwealth of Pennsylvania in 2019. Ms. Bette Eakin is a registered voter who resided in Erie County, Pennsylvania at all times relevant to this litigation, including during the 2022 General Election. *See* ECF No. 228, ¶ 12. She is the lone individual Plaintiff in this

<span style="color:red">**App.8**</span>

case. The other Plaintiffs are organizations with varied interests in voting and elections. The Democratic Senate Campaign Committee ("DSCC") is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country, including in Pennsylvania, to the United States Senate. *Id*. at ⁋ 13. Similarly, the Democratic Congressional Campaign Committee ("DCCC") is that Party's national congressional committee. Its mission is to elect candidates of the Democratic Party to the United States House of Representatives. *Id*. at ⁋ 14. AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and is a union of professionals representing over twenty-five thousand members in 55 local affiliates across Pennsylvania, including 179 members across two affiliates in Erie County. *Id*. at ⁋ 15.

Named as Defendants are the Commonwealth's sixty-seven county boards of elections.[1] Plaintiffs challenge the manner in which the county boards enforce certain provisions of state law which concern the rejection of incorrectly dated and undated mail ballots, particularly as was done during the 2022 General Election. No department or administrative body representing the Commonwealth has been sued. Several organizations associated with the Republican Party have intervened as Defendants. These include: the Republican National Committee ("RNC"), the National Republican Congressional Committee ("NRCC"), and the Republican Party of Pennsylvania ("RPP").

The Amended Complaint challenges a Pennsylvania law that requires a voter using a mail ballot to indicate a date on the outer return envelope. *See* 25 Pa. Cons. Stat. §§ 3146.6(a),

---

[1] According to Plaintiffs, each county board has jurisdiction over the conduct and management of primaries and general elections in their respective counties in accordance with provisions of state law. In this capacity, the county boards are charged with accepting applications for mail ballots, mailing the ballots to the requesting voter, as well as receiving, canvassing, and counting the returned mail ballots. ECF No. 228, ⁋ 16.

3150.16(a). Plaintiffs argue that the date requirement violates the "Materiality Provision" of the Civil Rights Act (Count I), 52 U.S.C. §10101, and their right to vote as guaranteed by the First and Fourteenth Amendments to the Constitution. *See* ECF No. 228, pp. 14-18. Plaintiffs seek declaratory and injunctive relief as well as litigation costs. *Id.,* p. 19. Specifically, Plaintiffs request: a declaration that the "Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires counties to reject ballots contained in envelopes that do not contain a correct date violates … the First and Fourteenth Amendment to the U.S. Constitution," as well as a permanent injunction "enjoining Defendants … and all persons acting in concert with each or any of them, from rejecting or refusing to count absentee and mail-in ballots for failure to comply with the Date Instruction." *Id*.

The Lancaster County Board of Elections has moved for summary judgment as has the Board of Elections from Berks County. ECF Nos. 280, 286. The RNC has also moved for summary judgment. ECF Nos. 281, 377. Plaintiffs have cross-moved for summary judgment. ECF No. 287. The motions have been fully briefed and are ripe for disposition.[2] Before turning to the merits of those motions, the standards which guide the Court's decision on the pending motions for summary judgment will be set out.

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[2] By Order dated May 16, 2024, the parties were granted  leave to supplement their prior motions for summary judgment following lifting of a stay that was put in place during the pendency of an appeal in the companion case of *NAACP v. Chapman*, C.A. No. 1:22-cv-339. *See* ECF No. 375.

entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) *citing Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find

for him at trial."). If the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co*., 972 F.2d 53, 55, n.5 (3d Cir. 1992) *quoting Celotex*, 477 U.S. at 322-23. In *Moore v. Walton*, 96 F.4th 616 (3d Cir. 2024), the Court of Appeals for the Third Circuit recently explained: "A genuine dispute exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id*. at 622 (internal punctuation and citations omitted). *See also Tatel v. Mt. Lebanon Sch. Dist.*, 2024 WL 4362459, at *19–20 (W.D. Pa. Sept. 30, 2024); *Zurn Inds., LLC v. Allstate Ins. Co*., 2024 WL 4350271, at *1 (W.D. Pa. Sept. 30, 2024).

## III. Discussion

### A.    Background

The Commonwealth of Pennsylvania's Election Code permits voters to cast their ballots by mail. In completing such ballots, voters must "date and sign the declaration" on the outer return envelope.[3] ECF No. 228, ⁋ 19. *See also* 25 P.S. § 3150.16(a). Under current practice, if the

---

[3] The mail ballot package consists of the ballot itself, instructions, a "Secrecy Envelope," and a larger pre-addressed outer "Return Envelope" on which a voter declaration form is printed. The Election Code provides that the inner Secrecy Envelope be marked only with the words "Official Election Ballot." 25 P.S. § 3146.4. The larger outer Return Envelope is to contain "the form of declaration of the elector, and the name and address of the county board of election of the proper county." *Id*.

date on the outer envelope is incorrect or missing, the ballot is not counted. It is undisputed that in the 2022 general election, over 10,000 mail ballots were disqualified for this reason. ECF No. 311, ⁋ 10; ECF No. 313, ⁋ 10.

In challenging the requirement that a voter date the outer return envelope, Plaintiffs bring two claims: first, they contend that requiring voters to date the outer envelope violates the Materiality Provision of the Civil Rights Act (Count I). And second, Plaintiffs assert that the county boards' enforcement of the dating provisions violates their rights under the First and Fourteenth Amendments by impermissibly burdening the fundamental right to vote (Count II). *See* ECF No. 228. [4]

---

[4]  The Lancaster County Board, joined by the Berks County Board, raises a justiciability concern, that while important, is resolved without difficulty. The Boards argue that these Plaintiffs lack standing to pursue their claims <u>against them</u> because none of Plaintiffs' injuries were caused <u>by them</u> or resulted from any action <u>they</u> took. ECF No. 280 (Lancaster County), page 3; ECF No. 286 (Berks County).

Of course, standing is necessary for subject matter jurisdiction (*see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014)), and part of the standing inquiry is whether a plaintiff has shown that it has an injury that is fairly traceable to the defendant's conduct. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[S]tanding to sue each defendant … requires a showing that each defendant caused [the plaintiff's] injury…" *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) *citing Lujan*, 504 U.S. at 560-61. The evidence of record demonstrates that the AFT, DCCC, and DSCC each have standing against the Berks and Lancaster Boards.

These Plaintiff organizations claim direct or organizational standing. An entity has direct organizational standing when it suffers harm due to the defendant's allegedly unlawful conduct, particularly when it must divert resources to address the issue. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). For example, standing exists when the defendant's actions significantly impair the organization's ability to provide services, forcing it to expend substantial resources to counteract the harm. *See id.*; *Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016) (finding standing where an organization's mission was frustrated because it had to allocate resources to investigate and challenge the alleged misconduct). The actions of the Berks and Lancaster Boards, along with all sixty-five other boards of elections, hindered the AFT, DCCC, and DSCC from fulfilling their respective missions. *See* ECF No. 290 (Exhibit D, Declaration of Arthur Steinberg, President of AFT Pennsylvania), pages 18-19, at ⁋⁋ 5-7; ECF No. 290 (Exhibit C, Declaration of Erik Ruselowski,

Chief Operating Officer of DCCC), pages 13-14, at ⁋⁋ 2-5; ECF No. 290 (Exhibit B, Declaration of Devan Barber, Senior Advisor of DSCC), pages 8-9, at ⁋⁋ 2-5. The evidence reflects that the county boards' enforcement of the Date Provision compels each Plaintiff organization to redirect resources from other initiatives in Pennsylvania and other states to voter education and assistance efforts aimed at preventing disenfranchisement or curing misdated and undated ballots in Pennsylvania. *See* ECF No. 290, pages 19-20, at ⁋⁋ 10-11 (AFT); ECF No. 290, pages 14-16, at ⁋⁋ 6-10 (DCCC); and ECF No. 290, pages 9-11, at ⁋⁋ 6-12 (DSCC).

All three Plaintiff organizations also claim associational or representative standing because they satisfy the three requirements for such: each organization's members have standing in their own right, the interests the organization seeks to protect in the lawsuit are germane to the organization's purpose, and the individual members' participation in the lawsuit is unnecessary to resolve the legal claims. *See Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc.,* 280 F.3d 278, 283 (3d Cir. 2002) *quoting Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Examining the three requirements in reverse order, resolution of the constitutional claims in this case does not depend on, nor would it benefit from, the participation of the individual AFT members or the individual DCCC and DSCC constituents. Next, the record evidence demonstrates that the interests sought to be protected in this lawsuit, the enfranchisement of their voters, are highly germane to the DCCC's and DSCC's purposes of electing Democratic candidates to both houses of Congress. ECF No. 290 (Exhibit C-DCCC), page 13, ⁋ 3; ECF No. 290 (Exhibit B-DSCC), page 8, ⁋ 3. And the AFT's interest of electing candidates who support the policies for which AFT advocates is also germane to the enfranchisement of its members. ECF No. 290 (Exhibit D-AFT Declaration), ⁋ 11. Finally, the evidence reveals that the dues-paying members of the AFT, would have standing in their own right because they will have or have had mail ballots rejected due to the enforcement of the Date Provision. ECF No. 290 (Exhibit D-AFT Declaration), ⁋ 9. However, the same cannot be said of the DCCC and the DSCC as no evidence has been presented to show that the constituents of either organization have had their mail ballots rejected. Instead, the evidence set forth by the committees focuses only on diversion of resources rather than on disenfranchisement of individual constituents.

Accordingly, in summary, all three Plaintiff organizations have organizational standing and the AFT has representative standing on behalf of its members.

While the Plaintiff organizations have established standing to proceed against each of the sixty-seven county boards, the same cannot be said for Eakin. The record contains no evidence to support her standing against the Lancaster or Berks County Boards—or any other board aside from her own. Any harm she experienced due to the initial rejection of her 2022 mail ballot is directly linked only to the actions of the Erie County Board of Elections. ECF No. 290 (Exhibit A, Declaration of Bette Eakin), pages 4-6. As a result, summary judgment will be granted in favor of the Lancaster and Berks Boards in this regard. Furthermore, because Eakin has not demonstrated standing against any county board other than Erie County, judgment will be entered in favor of those sixty-four boards and against her.

The first claim—whether the outer envelope date requirement violates the Materiality Provision of the Civil Rights Act—has been decided. An identical claim has already been litigated before this Court in *Pennsylvania State Conf. of NAACP v. Schmidt ("NAACP v. Schmidt")*, 703 F. Supp. 3d 632, 645 (W.D. Pa. 2023), *rev'd and remanded sub nom. Pennsylvania State Conf. of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024). On appeal from this Court's decision, on March 27, 2024, the Court of Appeals held that the date requirement did not violate the Materiality Provision. *See* 97 F.4th 120. This Court is bound by that holding regarding the Materiality Provision of the Civil Rights Act.[5] Accordingly, Plaintiffs' similar claim here lacks merit and judgment will be granted in favor of Defendants on that claim.

The Court of Appeals' decision in that case did not, however, resolve the constitutional claim alleged herein. Specifically, Plaintiffs maintain that the county boards' enforcement of the dating provisions violates the First Amendment by imposing impermissible burdens on Pennsylvanians' fundamental right to vote—burdens that are not justified by any state interest.

**B.    First Amendment Right to Vote Claims and the Appropriate Legal Tests**

Elections and, concomitantly, election laws "occupy a special place in our constitutional system." *Mazo,* 54 F.4th at 136. States have the authority under the Constitution to set rules for the time, place, and manner of federal elections. U.S. Const. Art. I, § 4, cl. 1; Art. II, § 1, cl. 2. Given this, the individual states have historically maintained "comprehensive, and in many respects complex, election codes regulating ... the time, place, and manner of holding primary and general elections." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This authority over federal

---

[5] A petition for Writ of Certiorari was denied by the United States Supreme Court. *See* 2025 WL 247452 (Jan. 21, 2025).

elections is broad and encompasses "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). This authority is expansive because, if elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process," (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)), it is "[c]ommon sense, as well as constitutional law," that States must take an "active role in structuring elections." *Mazo v. Way*, 551 F.Supp.3d 478, 500 (D.N.J. 2021) (cleaned up). Since individual states "comprehensively regulate the electoral process," their election laws "inevitably affect[,] at least to some degree[,]" certain fundamental rights, including the right to vote and First Amendment rights of free expression and association. *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999).

To assess whether restrictions or regulations related to voting rights are constitutionally valid, courts must utilize one of two possible tests. In some cases, a traditional First Amendment test which applies strict scrutiny to any such regulation is used. But that test does not take into account the reality that "for elections to run smoothly, some restrictions on expression and association are necessary." *Mazo*, 54 F.4th at 137. In recognition of that omission, the Supreme Court developed a balancing test for courts to use when reviewing "[c]onstitutional challenges to specific provisions of a state's election laws." *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983). *See also Burdick v. Takushi*, 504 U.S. 428, 433 (1992). This "*Anderson-Burdick*" test is "more flexible" than the rigid tiers of scrutiny under a traditional First Amendment analysis, *Burdick*, 504 U.S. at 434, reflecting the reality that there is no " 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789. The test directs a reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on

constitutional rights, and (2) apply the level of scrutiny corresponding to that burden. *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 789. If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, the court may use *Anderson-Burdick's* sliding scale approach under which a state need only show that its "legitimate interests ... are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440. *See also Mazo*, 54 F.4th at 137. No matter the test utilized, some sort of balancing is always required.

Courts have applied *Anderson-Burdick* to a wide range of state election laws covering nearly every aspect of the electoral process. *See, e.g., Belitskus v. Pizzingrilli*, 343 F.3d 632, 643-47 (3d Cir. 2003) (applying *Anderson-Burdick* in challenge to Pennsylvania ballot access law requiring candidates to pay filing fee to have their names placed on the general election ballot); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626-36 (6th Cir. 2016) (applying *Anderson-Burdick* to a challenge to Ohio law that changed the first day of early absentee voting from 35 days before election day to the day after the close of voter registration). In other cases, however, the Supreme Court has declined to apply *Anderson-Burdick's* balancing test and has reverted instead to a traditional First Amendment analysis. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting application of *Anderson-Burdick* in challenge to ban on anonymous leafletting of political materials as it constituted the "regulation of pure speech"); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (declining to apply *Anderson-Burdick* to free expression challenge to ban on paying petition circulators for ballot initiatives). The Supreme Court has never laid out a clear rule to distinguish between these two categories of election laws,

App.17

nor has any Court of Appeals to our knowledge.  So, to decide the category in which the outer envelope date requirement falls, the Court must first identify its defining characteristics.

A survey of the Supreme Court's case law both before and after the *Anderson* and *Burdick* decisions reveals two principal characteristics of the laws to which the *Anderson-Burdick* test applies. First, the law must burden a relevant constitutional right, such as the right to vote or the First Amendment rights of free expression and association. Second, the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech.

   1.      Does the Pennsylvania date requirement burden a fundamental right?

Plaintiffs ground their claim in the First Amendment to the Constitution. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The United States Supreme Court has held that "the right to vote, as the citizen's link to h[er] laws and government, is protective of all fundamental rights and privileges. And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." *Evans v. Cornman*, 398 U.S. 419, 422 (1970). *See also Jones v. United States Postal Serv*., 488 F. Supp. 3d 103, 138 (S.D.N.Y. 2020), *order clarified*, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020). It is well established that voting implicates First Amendment rights. *See, e.g., Yang v. Kosinski*, 960 F.3d 119, 130 (2d Cir. 2020) ("[Plaintiffs'] interest ... 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment."). And the right to vote necessarily includes the right to have that vote counted. This principle has been affirmed by the  Supreme Court. *See e.g., Reynolds v. Sims*, 377 U.S. 533 (1964) (finding that the right to vote would be meaningless without ensuring that every legally cast vote is counted). Disenfranchising voters for defects in their ballots imposes significant burdens on voting rights even if the effort needed for a voter to complete the ballot

correctly appears slight when considered in isolation. *See Ne. Ohio Coal. for the Homeless*, 837

F.3d at 631 ("Requiring boards of elections to reject the ballots of absentee and provisional

voters who fail to accurately complete birthdate and address fields directly and measurably

disenfranchise some voters."). The first part of the test is met because the Pennsylvania date

requirement similarly burdens the fundamental right to vote by disenfranchising some voters for

defects in the envelope holding their ballots.

    2.    Does Pennsylvania's outer envelope date requirement primarily regulate the mechanics of the electoral process, as opposed to core political speech?

The second inquiry asks whether Pennsylvania's requirement that a voter place a date on

the outer envelope of their ballot is a law primarily concerned with the mechanics of the electoral

process, or whether it implicates core political speech. As the Court of Appeals noted, "[t]he

distinction between 'pure speech' and the mechanics of the electoral process is not always easy

to ascertain." *Mazo*, 54 F.4th at 142. In resolving such questions, there are "two distinguishing

factors" to be considered: "the location and timing (the 'where and when') and the nature and

character ('the how and what') of the regulated speech." *Id.*

    a.    Location and Timing of the Regulated Speech

Speech which occurs "on the ballot or within the voting process will typically trigger

application of the *Anderson-Burdick* balancing test." *Id.*, *citing Burdick*, 504 U.S. at 437-38.  In

contrast, "speech that relates to an election but occurs nowhere near the ballot or any other

electoral mechanism is treated as core political speech entitled to the fullest First Amendment

protection." *Id. citing McIntyre*, 514 U.S. at 347 (applying strict scrutiny where the speech being

regulated was leafletting that occurred far from the polling place and potentially weeks or

months before Election Day). Here, the requirement that voters date the outer envelope of their ballot is speech that occurs within the voting process, as opposed to core political speech.

### b.     Nature and Character of the Regulated Speech

Next, the Court must consider the nature and character of the regulated speech. Here, the Court considers "what is being said and how it is communicated." *Mazo*, 54 F.4th at 142. The Supreme Court has characterized "core political speech" as "interactive communication concerning political change." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999) (citation omitted). *Anderson-Burdick* balancing is not applied to regulations which burden such interactive communication between individuals. *Meyer*, 486 U.S. at 421-22.  Of import, such a regulation must have the potential to "spark direct interaction and conversation." *Mazo*, 54 F. 4th at 143. Here, there is no evidence to suggest that the placing of a date on the outer envelope of a mail ballot sparks interaction or political conversation with other individuals. Indeed, no litigant has suggested that the signing and dating of a mail ballot by a Pennsylvania voter is anything other than a solitary act. It is not a social occasion. It cannot be said that handwriting a date on the outer ballot envelope is core political speech. The regulation affects only the mechanics of voting.

So then, because the date requirement burdens the fundament right to vote but concerns only the mechanics of voting, the Court will utilize *Anderson-Burdick's* balancing test to determine whether the date requirement passes constitutional muster.

### C. Application of the *Anderson-Burdick* Test – Defendants' motion for summary judgment[6]

Having determined that the *Anderson-Burdick* test is the appropriate analytical framework for reviewing Plaintiffs' constitutional challenge, the Court now applies that standard to Pennsylvania's ballot date requirement. *Anderson-Burdick* involves a "two track approach." *Mazo*, 54 F.4th at 145, *citing Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring). "[O]ur scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006); *see also Burdick*, 504 U.S. at 434 ("Under this standard, the rigorousness of our inquiry into the propriety

---

[6] Alternative to the application of the constitutional framework, the RNC submits that recent decisions by state courts preclude any action from this Court. *See* ECF No. 411, p. 2. This Court disagrees. The RNC points to the recent litigation in *Black Pol. Empowerment Project v. Schmidt*, as a reason for this Court to refrain from issuing a decision. *Id.* In that case, the Pennsylvania Commonwealth Court held that enforcement of the state's requirement that voters date the outer envelope of their mail ballot violates the Free and Equal Elections clause of the Pennsylvania Constitution. *See* 2024 WL 4002321, at *1 (Pa. Commw. Ct. Aug. 30, 2024); PA. CONST. art. I, § 5. The decision of the Commonwealth Court concerned the state constitution's "Free and Fair Elections" clause; not the federal constitution. Two weeks later, in a one paragraph Order, the Supreme Court of Pennsylvania vacated that decision, concluding that the Commonwealth Court lacked original jurisdiction because Plaintiffs failed to name all of the Commonwealth's sixty-seven counties. *See Black Pol. Empowerment Project v. Schmidt*, 2024 WL 4181592, at *1 (Pa. Sept. 13, 2024). As such, the Pennsylvania Supreme Court's order cannot be seen as a decision on the merits of the Commonwealth Court's holding. It simply vacated that decision because the Commonwealth Court lacked the proper jurisdictional foundation. Because the challenge before this Court is one brought exclusively under the federal constitution, these decisions by the state courts have little relevance here. And as the RNC acknowledges, this Court would not be bound by those decisions in any event. *See* ECF No. 411, p. 2 ("The Commonwealth Court's (now-appealed) ruling, of course, does not bind this Court. This Court remains bound by the rulings of the U.S. Supreme Court and Third Circuit …"). Accordingly, the Court sees no reason to stay this matter or delay a decision on the pending motions.

of a state election law depends upon the extent to which a challenged regulation burdens [constitutional] rights."). Where the law or regulation imposes a "severe" burden, the Court will employ "[s]trict scrutiny" in reviewing the regulation. *See Crawford*, 553 U.S. at 205 (Scalia, J., concurring) *quoting Clingman v. Beaver*, 544 U.S. 581, 592 (2005). But if a burden is not severe and "imposes only 'reasonable, nondiscriminatory restrictions' " on constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 788. *See also Mazo*, 54 F.4th at 145–46.

### 1.    The burden on First Amendment rights

Having already recognized that the date requirement burdens the First Amendment right to vote, the Court now must determine to what extent. Although there is no "litmus test" for doing so, this Court concludes that the burden imposes only a minimal burden on Plaintiffs' rights. *Mazo*, 54 F.4th at 146, *quoting Crawford*, 553 U.S. at 191. First, the date requirement is non-discriminatory. Election laws discriminate by "limit[ing] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.*  Such laws impose severe burdens and will be "especially difficult for the State to justify." *Id. quoting Anderson*, 460 U.S. at 793. As concerns discrimination against voters, such cases "focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id. citing Clements v. Fashing*, 457 U.S. 957, 964 (1982). Put another way, the relevant inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity. *Id.* (citation and internal quotation marks omitted). Burdens that apply to all voters, on the other hand, are less likely to be severe. *Mazo*, 54 F.4th at 147. Pennsylvania's

requirement that voters who wish to submit a ballot by mail date the outer envelope applies to <u>all</u> vote-by-mail voters. The requirement draws no distinctions. Thus, it is nondiscriminatory.

        2.     As identified, Pennsylvania's interests are insufficient to justify the requirements of this minimal burden.

Where a state election law imposes only minimal burdens, the State's " 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358, *quoting Burdick*, 504 U.S. at 434. But here, the Commonwealth has not identified what specific regulatory interest is furthered. Indeed, despite formal notification, the Commonwealth has not defended the constitutionality of the dating requirement.[7] In other words, the Commonwealth has not identified any interests that are served by imposing even this minimal burden on the right to vote. Nor, for that matter, have most of the Defendant county boards of elections identified an interest in requiring a voter to date the outer envelope of their ballot.

Only two Defendants have identified state interests which they assert are furthered by the envelope date requirement: the RNC and Berks County. First, they argue that the dating requirement furthers the Commonwealth's interest in detecting voter fraud. ECF No. 378, p. 25 (RNC); ECF No. 379, p. 10 (Berks County). Absent from the record, however, is any evidence demonstrating how this requirement furthers that purported interest. Instead, the RNC points to a <u>single</u> criminal case where the daughter of a deceased voter was charged with fraud after she

---

[7] Pursuant to Federal Rule of Civil Procedure 5.1, the Court notified the Commonwealth of Plaintiffs' challenge to the constitutionality of 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a) and instructed the state that it could intervene for the presentation of evidence and argument on the question of the date requirements' constitutionality. *See* ECF No. 383 (Certification dated June 18, 2024). To date, the Commonwealth has not intervened to defend the enforcement of the ballot dating requirement. So then, this Court must proceed without benefit of the Commonwealth's participation here.

allegedly completed, backdated, and returned her deceased mother's mail ballot. ECF No. 378, p. 24-25, *citing Commonwealth v. Mihaliak*, CR126-22 (June 3, 2022). But in *Mihaliak*, the fraudulent ballot was first detected through use of the Commonwealth's SURE system, which was cross-referenced with Pennsylvania Department of Health records, not by any error in dating on the outer envelope.[8] The evidentiary record reflects that the County Board (here, Lancaster) admitted that it removed the deceased woman from the voter rolls before the mail ballot was received. *See* ECF No. 290, p. 156 (deposition of Christa Miller). Record evidence from the Board's own Rule 30(b)(6) designee indicates that the fraudulent ballot was first detected by way of the SURE system and Department of Health records, not by review of the date on the return envelope. *Id*. The County Board acknowledges that it recognized that the ballot was invalid as soon as it was scanned into the SURE system because the voter had been removed from the rolls due to her death. *Id*. at 157. Importantly, the Lancaster County Board admits that an outer envelope that is missing a hand-written date is no reason to suspect voter fraud. *Id*. at 175.

The RNC and the Berks County Board of Elections point to other interests of the Commonwealth which they claim are advanced by the date requirement, but these are not supported by any evidence of record. For example, these Defendants suggest that the Commonwealth has an interest in promoting or preserving "solemnity" in the act of voting,

---

[8] The SURE system is the Commonwealth's Statewide Uniform Registry of Electors, a uniform integrated computer system that, inter alia, tracks mail ballots from application through final tabulation. ECF No. 290 (deposition of Jonathan Marks), pages 23-65. The outer return envelope of a mail ballot is printed with a unique barcode associated with the individual voter. That unique barcode is used to track the ballot through the SURE system. *Id*. at page 33. Upon the county board's receipt of the ballot envelope, the board stamps or otherwise marks it with the date of receipt to confirm its timeliness and log its receipt into the SURE system. *Id*. at pages 29, 32-33. The Election Code requires that county boards of elections track the date that every mail ballot was received and make that information available for public inspection. 25 P.S. § § 3146.9(b)(5), 3150.17(b)(5).

which they define as "ensuring that voters contemplate their choices and reach considered decisions about their government and laws." ECF No. 378, p. 23 (RNC); ECF No. 379, p. 11 (Berks County). They argue that requiring voters to sign and date the outer envelope of a mail ballot is a formality which fosters thoughtful deliberation. This argument is based solely on supposition. And even if Defendants could articulate examples of how dating the outer envelope makes the act of voting more solemn, they have not pointed to any evidence in this record to support their position. They are left only with their nebulous contention that requiring a voter to date their ballot somehow makes it a solemn occasion, which of course is not evidence which could support summary judgment.

Additionally, the RNC contends that the state has an interest in the "orderly administration of elections." ECF No. 378, p. 22. This, of course, is a valid state interest. Nevertheless, the RNC admits that Pennsylvania election officials are required to time stamp a ballot upon receiving it and the officials rely on that date when entering the information into the SURE system. The RNC supposes that while "there is every reason to think this ordinarily happens," "the handwritten date serves as a useful backstop, and it would become quite important if a county failed to timestamp a ballot upon receiving it or if Pennsylvania's SURE system malfunctioned." *Id*. That requiring a voter to handwrite a date serves as a safeguard is a speculative assertion because, again, the RNC has failed to point this Court to any evidence regarding potential failures in the timestamp process or in the SURE system.

Similarly, the Berks County Board claims that enforcing the dating provisions enhances voter "confidence," yet this assertion is also based on conjecture. *See* ECF No. 379, p. 14. The Berks County Board provides no evidence which connects the date requirement to an increase in voter confidence in the electoral process.

None of the potential state interests suggested by the RNC or the Berks County Board are supported by any evidence. Suggestions and legal arguments are not a sufficient ground upon which to base summary judgment, which is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, it is up to Defendants, who are asking for summary judgment, to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote. Since Defendants have not met this requirement, their motions for summary judgment will be denied.

## D. Application of the *Anderson-Burdick* Test: Plaintiffs' motion for summary judgment

When a court is faced with cross-motions for summary judgment, the standard of review remains the same. *Jacobs v. City of Philadelphia*, 2023 WL 11904070, at *1 (E.D. Pa. May 8, 2023) *citing Allah v. Ricci*, 2013 WL 3816043 (3d Cir. July 24, 2013). The fact that one party fails to satisfy the burden on its own Rule 56 motion does not automatically mean that the opposing party has satisfied its burden and should be granted summary judgment on the cross motion. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (4th ed. 2020). Instead, "[w]hen confronted with cross-motions for summary judgment, [...] the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (cleaned up). In other words, the fact that Defendants have failed to meet their burden does not mean that Plaintiffs have necessarily met theirs.

As explained above, the *Anderson-Burdick* balancing test is the appropriate framework for determining whether Pennsylvania's outer envelope date requirement violates the Plaintiffs'

right to vote under the First Amendment. *See discussion*, *supra*. For the Court to find the date requirement unconstitutional, Plaintiffs must point to evidence that even the limited burden imposed by the date requirement outweighs any valid governmental interest. *See Burdick*, 504 U.S. at 440. Plaintiffs contend that Pennsylvania has no legitimate interest which justifies the outer envelope date requirement. *See* ECF No. 288, p. 24. Instead, they submit that the date requirement is nothing more than a "compliance test" put in place to determine "how well [Pennsylvania voters] can follow written instructions." *Id.*

Plaintiffs discredit the Defendants' suggested state interests of fraud detection, solemnity, and voter confidence. Plaintiffs highlight the lack of evidence in the record to support Defendants' purported state interests, as did the Court above. Ultimately, solemnity and voter confidence are nebulous and are unsupported by evidence, and fraud detection, while less ambiguous of an interest, is similarly unsupported by evidence of record in this case.

Since there is no evidence that the date requirement serves any state interest, even a slight burden on voting rights cannot withstand constitutional scrutiny. Put another way, even the slightest burden that results from the enforcement of the date provision is too much when there is no counterbalance. The evidence of record demonstrates that county boards across the Commonwealth discarded 10,657 otherwise valid ballots in the 2022 general election solely because voters either forgot to date them or used an incorrect date. ECF No. 311, ⁋ 10; ECF No. 313, ⁋ 10; ECF No. 290, p. 246-782. Such disenfranchisement burdens the right to vote and there is no valid state interest to weigh this against. Accordingly, Plaintiffs' motion for summary judgment will be granted in this regard.[9]

---

[9] As discussed *supra*, the evaluation of the constitutionality of the date provisions is complicated by the fact that the state is not present to articulate its own interests. In order to leave no stone

## IV.    Conclusion

Constitutional analysis always requires the balancing of interests – i.e., weighing one thing against another. In the context of the First Amendment right to vote, a court must weigh the individual's right to vote, which includes the right to have their vote counted, against the government interest. In this case, the weight of the burden on the citizens right to vote is not counterbalanced by evidence of any governmental interest. Accordingly, the enforcement of the date provisions does not pass constitutional muster.

---

unturned, this Court looked to the Commonwealth's filings in the companion case of *NAACP v. Schmidt*, in search of an identified governmental interest in the enforcement of the date provisions. The Secretary of the Commonwealth's position there solidifies the result here. In that case, the Secretary notes that he filed his brief in order "to aid the Court's performance of this [*Anderson-Burdick*] balancing by explaining why rejecting timely mail ballots from qualified voters who failed to correctly write a meaningless date does not advance any state election interest and why it, in fact, undermines sound election administration." *See* C.A. No. 1:22-cv-339, ECF No. 440, p. 5-6. Instead of identifying and defending any Commonwealth interest in the enforcement of the dating provisions, the Secretary explains that: 1) the date requirement provisions are a vestige of a different era; 2) the date requirement has no election function; and 3) "requiring officials to review declaration dates impedes effective election administration." *Id*. By way of conclusion, the Secretary succinctly states "**there is no state interest** in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return-envelope declaration." *Id*. at 20 (emphasis added).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETTE EAKIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 1:22-cv-00340 |
| | ) | |
| v. | ) | |
| | ) | Judge Susan P. Baxter |
| ADAMS COUNTY BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF INTERVENOR-DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD ................................................................................................. 2

ARGUMENT .............................................................................................................. 3

    I.    THE CONSTITUTION'S RIGHT TO VOTE DOES NOT ENCOMPASS
        A RIGHT TO VOTE BY MAIL WHERE A STATE ALLOWS IN-
        PERSON VOTING. ........................................................................................ 4

    II.    "USUAL BURDENS OF VOTING" LIKE THE DATE REQUIREMENT
        CANNOT VIOLATE THE RIGHT TO VOTE. ............................................. 8

    III.    EVEN IF THE COURT APPLIES SCRUTINY UNDER THE
        *ANDERSON-BURDICK* TEST, THE DATE REQUIREMENT EASILY
        PASSES MUSTER. ....................................................................................... 13

CONCLUSION ......................................................................................................... 23

App.30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Party of Tex. v. White,*
    415 U.S. 767 (1974).................................................................7

*Alexander v. S.C. State Conf. of NAACP,*
    144 S. Ct. 1221 (2024)..........................................................11

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983).............................................................10

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................2

*Baker v. Carr,*
    369 U.S. 186 (1962)...............................................................3

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023)..........................................................22

*Brnovich v. DNC,*
    594 U.S. 647 (2021)....................................................... *passim*

*Burdick v. Takushi,*
    504 U.S. 428 (1992).....................................................7, 13, 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...............................................................2

*Clingman v. Beaver,*
    544 U.S. 581 (2005).............................................................11

*Commonwealth v. Mihaliak,*
    No. CR-126-22 (June 3, 2022).......................................17, 18, 22, 23

*Council of Alt. Pol. Parties v. Hooks,*
    179 F.3d 64 (3d Cir. 1999)....................................................10

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008)....................................................... *passim*

i

App.31

*Davis v. G N Mortg. Corp.*,
    244 F. Supp. 2d 950 (N.D. Ill. 2003) ................................................................16

*DNC v. Wis. State Legislature*,
    141 S. Ct. 28 (2020) ..........................................................................................9

*Doe v. Lower Merion Sch. Dist.*,
    665 F.3d 524 (3d Cir. 2011)..............................................................................20

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ..........................................................................................17

*Goosby v. Osser*,
    409 U.S. 512 (1973) ............................................................................................7

*In re: Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election*,
    241 A.3d 1058 (Pa. 2020) ..................................................................15, 17, 22

*In re Nat'l Football League Players Concussion Inj. Litig.*,
    775 F.3d 570 (3d Cir. 2014)..............................................................................22

*In Re: Nov. 3, 2020 Gen. Election*,
    240 A.3d 591 (Pa. 2020) ...................................................................................17

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020) .........................................................................2, 14

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ........................................................................ *passim*

*McDonald v. Bd. of Election Comm'rs*,
    394 U.S. 802 (1969)..................................................................................... *passim*

*Memphis A. Philip Randolph Inst. v. Hargett*,
    2 F.4th 548 (6th Cir. 2021) ...............................................................................11

*Migliori v. Cohen*,
    36 F.4th 153 (2022)................................................................................16, 22, 23

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018)...............................................................................................16

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).................................................................................................7

App.32

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ................................................13, 20

*Ne. Ohio Coal. for the Homeless v. Larose,*
    2024 WL 83036 (N.D. Ohio Jan. 8, 2024)................................20

*O'Brien v. Skinner,*
    414 U.S. 524 (1974)................................................................8

*Ohio Democratic Party v. Husted,*
    834 F.3d 620 (6th Cir. 2016) ..................................................8

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.,*
    97 F.4th 120 (3d Cir. 2024) ........................................... *passim*

*Pa. State Conf. of NAACP v. Schmidt,*
    2023 WL 8091601 (W.D. Pa. Nov. 21, 2023) ..................15, 16

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)..............................................................20

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020) ............................................13, 20

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022)........................................................1, 9

*Ritter v. Migliori,*
    143 S. Ct. 297 (2022)......................................................................

*Rucho v. Common Cause,*
    588 U.S. 684 (2019)..............................................................11

*Shalala v. Ill. Council on Long Term Care, Inc.,*
    529 U.S. 1 (2000)....................................................................7

*State v. Williams,*
    565 N.E.2d 563 (Ohio 1991)................................................16

*Storer v. Brown,*
    415 U.S. 724 (1974)..............................................................10

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ........................................ *passim*

App.33

*Thatcher's Drug Store v. Consol. Supermarkets*,
    636 A.2d 156 (Pa. 1994) ........................................................................16

*Thomas A. Armbruster, Inc. v. Barron*,
    491 A.2d 882 (Pa. Super. Ct. 1985) ....................................................16

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ..............................................................10, 13, 15

*United States v. Paxton*,
    No. 23-50885 (5th Cir. Dec. 15, 2023) ......................................4, 5, 7, 8

*Vote.Org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ............................................................17, 22

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..............................................................................7

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. art. I, § 4, cl. 1 ......................................................................10

U.S. Const. amend. XIV ........................................................................6, 14

U.S. Const. amend. XV ..............................................................................6

25 P.S. § 3527 ..........................................................................................18

73 P.S. § 201-7 ........................................................................................14

73 P.S. § 2186 ..........................................................................................14

57 Pa. C.S. § 316 ......................................................................................14

23 Pa. C.S. § 5331 ....................................................................................14

42 Pa. C.S. § 6206 ....................................................................................14

42 Pa. C.S. § 8316.2 ................................................................................14

25 Pa. Cons. Stat. § 3050 ........................................................................12

25 Pa. Cons. Stat. § 3146.6 ..............................................................12, 14

25 Pa. Cons. Stat. § 3150.16 ............................................................12, 14

App.34

Pa. Crimes Code § 4101 ..................................................................................18

Minn. Stat. § 203B.07 ...................................................................................13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 .............................................................................................2

App.35

## INTRODUCTION

The Third Circuit has rejected Plaintiffs' principal claim in this case: that Pennsylvania's date requirement for absentee and mail-in ballots violates the federal Materiality Provision. *See Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120 (3d Cir. 2024). Among other things, the Third Circuit held that mandatory application of the date requirement does not deny any individual's "right to vote" because the date requirement is a ballot-casting rule that regulates *how* an individual exercises that right. *Id.* at 135 (citing *Ritter v. Migliori*, 142 S.Ct. 1824, 1824 (2022) (Alito, J., dissental)).

This holding that the date requirement does not infringe the "right to vote" logically forecloses Plaintiffs' remaining constitutional "right-to-vote" claim. But if this Court somehow deems the question open, Plaintiffs' right-to-vote claim suffers from at least three fatal defects that warrant summary judgment dismissing it.

*First*, the Constitution's right to vote does not guarantee a right to mail voting, so it does not limit a State's nondiscriminatory ballot-casting rules for mail voting where the State provides other methods to vote. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969). Pennsylvania allows all voters to vote in person without complying with the date requirement—so its date requirement for mail voting does not even implicate, let alone violate, anyone's constitutional right to vote. *See id.* To the contrary, if anything, Pennsylvania has generously *accommodated*, not violated, the right to vote through its voluntary provision of the convenience of mail voting.

*Second*, because the date requirement imposes, at most, only a "usual burden[]" on voting, it is immune from federal constitutional scrutiny under the *Anderson/Burdick* framework. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (opinion of Stevens, J.); *see also*

App.36

*id.* at 204-09 (Scalia, J., concurring in judgment); *accord Brnovich v. DNC*, 594 U.S. 647, 669 (2021).

*Third,* even if the Court concludes that such *de minimis* burdens are subject to judicial scrutiny under the Supreme Court's *Anderson-Burdick* framework, the date requirement easily passes muster. The date requirement imposes no more than the usual burdens of voting and is amply justified by several compelling state interests: facilitating election administration, promoting solemnity in voting, and detecting fraud. Therefore, the date requirement is subject only to "rational basis review," *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020), which is of course "quite deferential," *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 153 (3d Cir. 2022) (cleaned up), and which it passes with flying colors. The Court should grant summary judgment, uphold the General Assembly's duly enacted, longstanding, and constitutional date requirement, and bring this case to an end.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A plaintiff opposing summary judgment "may not rest upon mere allegation or denials of his pleading" or a "scintilla of evidence" in support of an essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986). Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* Indeed, Rule 56 "mandates" entry of summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, summary judgment is warranted against any plaintiff who pursues a legally deficient theory of liability. *See, e.g.*, *id.*; Fed. R. Civ. P. 56(a).

2

## ARGUMENT

The Third Circuit has already rejected Plaintiffs' contention that the date requirement violates the "right to vote."  As the Third Circuit explained, "a voter who fails to abide by state rules prescribing how to make a vote effective is not 'denied the right to vote' when his ballot is not counted." *Pa. State Conf. of NAACP*, 97 F.4th at 133 (cleaned up).  The Third Circuit "kn[e]w no authority" supporting the theory "that the 'right to vote' encompasses the right to have a ballot counted that is defective under state law" such as for noncompliance with a ballot-casting rule like the date requirement.  *Id.*

It is now the law of the Third Circuit that the date requirement does not violate "the right to vote."  *See id.* at 133-35.  To be sure, the Third Circuit was discussing the statutory "right to vote" in the Materiality Provision.  But Plaintiffs here (two of whom intervened in the Third Circuit appeal in the parallel *Pennsylvania State Conference of the NAACP* case, *see* CA3 ECF No. 129) and the dissenting judge argued that the "right to vote" in the Materiality Provision is *broader* than the constitutional right to vote.  *Compare id.* at 138-39, *with* CA3 ECF No. 97 at 26-27.  Moreover, there is no authority suggesting the right to vote protected by the Constitution is broader than the statutory right to vote recognized by Congress in the civil rights laws.  *See Brnovich*, 594 U.S. at 669-70, (consulting "standard practice" at the time "when § 2 [of the Voting Rights Act] was amended" to determine what "furnish[es] an equal 'opportunity' to vote in the sense meant by § 2"); *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (the "right to vote" was "protected by the judiciary long before that right received [] explicit protection" in civil-rights statutes).  *A fortiori*, the Third Circuit's conclusion that the date requirement does not violate the statutory right to vote means that it does not violate the constitutional right to vote either.

Plaintiffs' constitutional right-to-vote claim fails for this reason alone.  But even if the Court believes that claim survives the Third Circuit's decision, it still should grant summary

3

App.38

judgment dismissing that claim for at least three reasons. *First*, the Constitution's right to vote does not guarantee the right to mail voting Plaintiffs claim here. *Second*, the date requirement imposes, at most, only a usual burden of voting, so it is immune from federal constitutional scrutiny under the *Anderson/Burdick* framework. *Third*, even if the *Anderson/Burdick* framework applies, the date requirement easily satisfies it.

## I. THE CONSTITUTION'S RIGHT TO VOTE DOES NOT ENCOMPASS A RIGHT TO VOTE BY MAIL WHERE A STATE ALLOWS IN-PERSON VOTING.

Plaintiffs' right-to-vote claim fails right out of the gate because they assert a constitutional right to vote by mail—a right which the Supreme Court has held does not exist, as the Fifth Circuit recently reiterated. *See* Order Granting Stay Pending Appeal, *United States v. Paxton*, No. 23-50885, ECF No. 80-1 (5th Cir. Dec. 15, 2023) ("*Paxton* Stay Order"), at 5. Because there is no constitutional right to vote by mail, States that offer in-person voting do not "deny anyone the right to vote" when they enact laws regulating mail voting because such laws "only affect the ability of some individuals to vote by mail" while leaving intact the option to vote in person. *Id.* In States with in-person voting, "voting by mail is a privilege that can be limited without infringing the right to vote." *Id.*; *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403-05 (5th Cir. 2020) (citing *McDonald*, 394 U.S. at 807-11).

Indeed, the Supreme Court's decision in *McDonald v. Board of Election Commissioners* dooms Plaintiffs' claim. In *McDonald*, pretrial detainees claimed Illinois was violating their right to vote by prohibiting them from voting by mail. *See* 394 U.S. at 803-06. The Supreme Court unanimously rejected that argument, holding that "absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny . . . the exercise of the franchise." *Id.* at 807-08. After all, the Court observed, there is no constitutional "right to receive absentee ballots." *Id.* at 807. Thus, in order to establish a right-to-

App.39

vote claim, the Court held, a litigant must show he is "absolutely prohibited from exercising the franchise" through *any* method.  *Id.* at 809.  The *McDonald* litigants could not meet that burden because Illinois made in-person voting available, and the plaintiffs had failed to prove Illinois would "in fact" bar them from voting in person.  *Id.* at 808 & n.6.

The Supreme Court's conclusion that States which offer in-person voting do not deny the right to vote when they *decline to offer* mail voting, *see id.* at 807-08, necessarily means that States with in-person voting do not deny the right to vote when they *offer* and regulate mail voting, *Tex. Democratic Party*, 961 F.3d at 403-05; *Paxton* Stay Order 5.  Indeed, laws regulating mail voting *accommodate* the right to vote by facilitating a "privilege" for voters to complete and cast ballots without voting in person.  *Paxton* Stay Order at 5; *Tex. Democratic Party*, 961 F.3d at 403-05.

The Supreme Court's decision in *Crawford* reaffirms that States do not violate the constitutional right to vote when they regulate one method of voting—even if the regulation severely burdens some voters' use of that method—but provide another method of voting exempt from that regulation.  553 U.S. at 201 (opinion of Stevens, J.).  The *Crawford* plaintiffs argued that elderly voters were severely burdened by the photo-identification requirement for in-person voting.  *Id.*  One of Indiana's counterarguments was that "the elderly and disabled are adequately accommodated through their option to cast absentee ballots, and so any burdens on them are irrelevant."  *Id.* at 212 n.4 (Souter, J., dissenting).  Unlike the dissent, the Court accepted Indiana's argument, concluding that one reason the requirement did not violate elderly voters' constitutional right to vote was that "the elderly in Indiana are able to vote absentee without presenting photo identification."  *Id.* at 201 (opinion of Stevens, J.).  *Crawford* thus reiterates that, even if a voting rule imposes a severe burden on the use of one method of voting, a constitutional right-to-vote claim is defeated if the State provides another method of voting exempt from that rule.  *See id.*;

App.40

*accord id.* at 209 (Scalia, J., concurring in judgment) ("That the State accommodates some voters by permitting . . . the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative . . . ."). Indeed, even one of the *Crawford* dissenters suggested that the opportunity to vote by mail would defeat a right-to-vote challenge to an in-person voting rule. *Id.* at 239-240 (Breyer, J., dissenting). After all, in a situation where multiple voting options exist, voters are not "absolutely prohibited" from voting even if one option is burdensome. *McDonald*, 394 U.S. at 809; *Crawford*, 553 U.S. at 201.

So too here. Pennsylvanians unable or unwilling to write a date on their mail-ballot carrier envelopes can vote in person without having to comply with the date requirement. In other words, Pennsylvania "permits [voters] to vote in person; that is the exact opposite of 'absolutely prohibiting' them from doing so." *Tex. Democratic Party*, 961 F.3d at 404 (quoting *McDonald*, 394 U.S. at 808 n.7). Accordingly, Pennsylvania's provision and regulation of mail voting, including through the date requirement, does not violate any individual's constitutional right to vote. *See id.*; *Crawford*, 553 U.S. at 201; *McDonald*, 394 U.S. at 807-08. Instead, in Pennsylvania, as elsewhere, mail voting is a voluntary *accommodation* of the right to vote, which traditionally was exercised in person—so neither a State's voluntary "indulgence" in establishing mail voting nor its rules facilitating and regulating mail voting can *violate* the right to vote. *Crawford*, 553 U.S. at 209 (Scalia, J., concurring in judgment); *see McDonald*, 394 U.S. at 807-08; *cf. Pa. State Conf. of NAACP Branches*, 97 F.4th at 135 (date requirement does not deny the "right to vote").

Moreover, Plaintiffs' assertion of a constitutional right to mail voting is simply untenable. If Plaintiffs were correct that the Fourteenth and Fifteenth Amendment guarantee such a right, then Pennsylvania (and every other State) has been *required* to provide mail voting at least since ratification of those Amendments. But Pennsylvania did not provide universal mail voting until

6

2019, and many States do not provide it at all. That no court has ever held that States violate the Constitution when they choose not to provide mail voting underscores that there is no constitutional right to that method of voting. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022) (instructing that scope of constitutional rights must be discerned from "history"); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (cautioning against recognition of new constitutional protection not "deeply rooted in this Nation's history and tradition").

Plaintiffs have previously suggested that *McDonald* is not good law because it predates the *Anderson-Burdick* framework. ECF No. 318 at 17-18. But only the Supreme Court can overrule its own precedents, *see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."), and it has never cast doubt upon—let alone overruled—*McDonald*. In fact, the Supreme Court favorably cited *McDonald* in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). And the case Plaintiffs previously cited to suggest *McDonald* is no longer good law, ECF No. 318 at 18—*Am. Party of Tex. v. White*, 415 U.S. 767 (1974)—reaffirmed that declining to offer absentee voting is constitutional where a State "afford[]s a comparable alternative means to vote." *Id.* at 795. As the Fifth Circuit held when rejecting the same arguments Plaintiffs advance in this case, "*McDonald* lives." *Tex. Democratic Party*, 961 F.3d at 406; *see Paxton* Stay Order at 5.

Plaintiffs have also attempted to distinguish *McDonald* by asserting that the plaintiffs in that case lost due to a failure of proof. *See* ECF No. 318 at 8. That may be true, but the point does not help Plaintiffs. As the Supreme Court explained in *Goosby v. Osser*, the *McDonald* plaintiffs' failure of proof was their failure to show that they were "in fact absolutely prohibited from voting by the State." 409 U.S. 512, 521 (1973) (quoting *McDonald*, 409 U.S. at 808 n.7). In *Goosby*, by

App.42

"sharp contrast," pretrial detainees *did* establish that Pennsylvania "absolutely prohibit[ted] them from voting." *Id.* at 521-22. The same was true in *O'Brien v. Skinner*, 414 U.S. 524 (1974). *See id.* at 529-30. By contrast, in *Crawford*, the Court refused to find that the identification requirement for in-person voting violated elderly voters' constitutional right to vote because they had the option to vote absentee without complying with the requirement. *See Crawford*, 553 U.S. at 201. And multiple lower courts have likewise held that the availability of alternative voting options precludes, or at least strongly weighs against, constitutional right-to-vote claims premised on a single method of voting, such as Plaintiffs' claim tied to mail voting. *See, e.g.*, *Tex. Democratic Party*, 961 F.3d at 404; *Paxton* Stay Order at 5; *see also Ohio Democratic Party v. Husted*, 834 F.3d 620, 628-29 (6th Cir. 2016).

Here, as in *McDonald* and *Crawford* and unlike in *Goosby*, Pennsylvania provides ample opportunities for individuals like Bette Eakin to vote without complying with the date requirement. Plaintiffs' right-to-vote claim, therefore, is foreclosed by *McDonald* and *Crawford*, and the Court should grant summary judgment dismissing it.

## II. "USUAL BURDENS OF VOTING" LIKE THE DATE REQUIREMENT CANNOT VIOLATE THE RIGHT TO VOTE.

Even if *McDonald* did not control, Plaintiffs' claim still fails because they object only to the "usual burdens of voting"—which are not subject to judicial scrutiny under the Constitution's right-to-vote guarantee and, thus, do not trigger any judicial balancing analysis under the *Anderson/Burdick* framework. *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *accord Brnovich*, 594 U.S. at 669.

Voting inherently requires voters to take steps that they may view as inconvenient. *See, e.g.*, *Brnovich*, 594 U.S. at 669. Traditionally, in order to vote, individuals have had to drive to a polling place, provide information to a voting official, wait in line, and fill out the ballot. *Id.* at

670.  Such ordinary inconveniences—and state election rules imposing such burdens—have never been understood to implicate, let alone violate, any right to vote.  *Id.* at 669 (holding that "[m]ere inconvenience" cannot establish a violation of the Voting Rights Act).  After all, "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right."  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).  That is true of mail voting as well, where states must adopt rules, including deadlines and paperwork requirements, to make mail voting possible.  *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral) ("[A] State's election [rule] does not disenfranchise voters who are capable of [following it] but fail to do so."); *accord Pa. State Conf. of NAACP*, 97 F.4th at 135.

State laws imposing these "usual burdens of voting" have never been subject to judicial scrutiny under the Constitution's right-to-vote guarantee—and no binding authority has *ever* invalidated such a law under the *Anderson/Burdick* balancing framework.  *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *id.* at 204-09 (Scalia, J., concurring); *accord Brnovich*, 594 U.S. at 669; *Pa. State Conf. of NAACP*, 97 F.4th at 135.

Moreover, the Third Circuit's holding that the date requirement cannot violate the Materiality Provision's statutory "right to vote" underscores that rules imposing the usual burdens of voting cannot violate the constitutional right to vote.  *Pa. State Conf. of NAACP*, 97 F.4th at 133.  As the Third Circuit explained, "a voter who fails to abide by state rules prescribing how to make a vote effective is not 'denied the right to vote' when his ballot is not counted."  *Id.*  Indeed, "[i]f state law provides that ballots completed in different colored inks, or secrecy envelopes containing improper markings, or envelopes missing a date, must be discounted, that is a legislative choice that federal courts might review if there is unequal application, but they have no power to

9

review under" a theory that the right to vote has been denied. *Id.* The Third Circuit reached this conclusion that neutral, nondiscriminatory ballot-casting rules do not violate the "right to vote" without conducting any balancing of the burdens imposed, and state interests served, by those rules. *See id.*

The reasons federal courts cannot wield the statutory or constitutional "right to vote" to second-guess state election rules that impose only the usual burdens of voting are fundamental. The Constitution expressly delegates to the States the power to regulate the "Times, Places, and Manner" of federal elections. U.S. Const. art. I, § 4, cl. 1. Using that power, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *accord Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999) ("[S]tates have broad power to enact election codes that comprehensively regulate the electoral process."). Indeed, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Federal courts therefore must *defer* to—not deploy the open-ended *Anderson/Burdick* balancing test to assess—state voting laws like the date requirement that impose the usual burdens of voting incident to the State's necessary and "substantial regulation of elections." *Id.* The "sort of detailed judicial supervision of the election process" that subjecting such rules to the *Anderson/Burdick* framework would entail "would flout the Constitution's express commitment of th[at] task to the States," which must "weigh the costs and benefits of possible changes to their election codes." *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in judgment). That approach

App.45

would also enmesh federal courts in a host of sensitive political disputes, forcing them to make judgments that frequently appear "political, not legal." *Rucho v. Common Cause*, 588 U.S. 684, 707 (2019); *see Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1236 (2024) ("[W]e must be wary of plaintiffs who seek to transform [the] federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." (cleaned up)); *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 561-62 (6th Cir. 2021) (Readler, J., concurring) (highlighting risks of overly broad application of *Anderson-Burdick* test).

As applied to ordinary election regulations that impose only the usual burdens of voting, such an approach cannot be right. Unsurprisingly, the Supreme Court and Third Circuit have already made that point clear. *See Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (instructing courts to avoid standard of review in right-to-vote cases that would "compel federal courts to rewrite state electoral codes"); *PA State Conf. of NAACP*, 97 F.4th at 133-35.

Plaintiffs may offer two arguments to support their position that nondiscriminatory ballot-casting rules that impose nothing more than the usual burdens of voting can nonetheless violate the right to vote. Both fail. *First*, Plaintiffs may argue that the Third Circuit's opinion is inapposite because the constitutional right to vote is *broader* than the statutory right to vote in the Materiality Provision. But that argument would invert and contradict their prior position that the "right to vote" in the Materiality Provision is broader than the constitutional right to vote. *See* CA3 ECF No. 97 at 26-27. It also makes no sense. The Supreme Court has never suggested that the constitutional "right to vote" is broader than that in the civil rights statutes. To the contrary, in *Brnovich*, the Court drew from constitutional-right-to-vote precedents to reject arguments that the "right to vote" in the Voting Rights Act should be interpreted more broadly. *See Brnovich*, 594 U.S. at 669 (extending "usual burdens of voting" rule from *Crawford*). That helps explain why

App.46

the Third Circuit found it "implausible that federal law bars a State from enforcing vote-casting rules that it has deemed necessary to administer its elections." *Pa. State Conf. of NAACP*, 97 F.4th at 135.

*Second*, Plaintiffs may point to the *Crawford* plurality's statement that "[h]owever slight [a] burden may appear . . . it must be justified by relevant and legitimate state interests." 553 U.S. at 191 (opinion of Stevens, J.). But the plurality's analysis makes clear that it was referring to burdens beyond the "usual burdens of voting." *Id.* at 198. After all, the Court concluded that Indiana's voter identification requirement was not a "substantial burden on the right to vote," meaning it triggered minimal scrutiny, and did not "represent a significant increase over the usual burdens of voting." *Id.* That the plurality applied only "minimal scrutiny" to a law that imposed a marginal "increase over the usual burdens of voting," indicates that a law imposing *only* the usual burdens of voting is subject to *no* judicial scrutiny. *Id.*

At an absolute maximum, the *Crawford* plurality opinion demonstrates that any judicial scrutiny of laws that impose the usual burdens of voting is so deferential as to effectively foreclose *Anderson/Burdick* challenges. *See id.*; *see also id.* at 209 (Scalia, J., concurring). That explains why Plaintiffs have not cited even a single binding *Anderson/Burdick* case striking down a law that imposed only the usual burdens of voting.

Here as well, Plaintiffs' right-to-vote challenge to the date requirement fails because writing a date on a piece of paper is the quintessential example of the "usual burdens of voting." *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *id.* at 204-09 (Scalia, J., concurring). Every State requires voters to write pieces of information on voting papers—both for in-person and mail voting. *See, e.g.*, 25 Pa. Cons. Stat. §§ 3146.6(a), 3150.16(a) (signature requirement); 25 Pa. Cons. Stat. § 3050 (requirement to maintain in-person voting poll books); *Electronic Poll Books*,

App.47

National Conference of State Legislatures (Oct. 25, 2019), ncsl.org/elections-and-campaigns/electronic-poll-books; *How States Verify Voted Absentee/Mail Ballots*, National Conference of State Legislatures (Jan. 22, 2024), ncsl.org/elections-and-campaigns/table-14-how-states-verify-voted-absentee-mail-ballots. Anyone who has voted in-person or by mail knows this. This is true even for States with the most generous voting regimes. *See, e.g.*, Minn. Stat. § 203B.07, subdiv. 2.

Because the date requirement imposes nothing more than the usual burdens of voting, it does not violate the right to vote. For this reason as well, the Court should grant summary judgment dismissing Plaintiffs' constitutional right-to-vote claim.

## III. EVEN IF THE COURT APPLIES SCRUTINY UNDER THE *ANDERSON-BURDICK* TEST, THE DATE REQUIREMENT EASILY PASSES MUSTER.

Finally, even if the Court accepts Plaintiffs' invitation to engage in balancing under the *Anderson-Burdick* test, the date requirement easily passes muster. That framework requires courts to weigh the character and magnitude of the burden, if any, imposed by the law on protected rights against the State's interests in and justifications for the law. *Crawford*, 553 U.S. at 189-91 (opinion of Stevens, J.). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," while those imposing "[l]esser burdens … trigger less exacting review, and [the] State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358-59 (1997) (cleaned up); *accord Mazo*, 54 F.4th at 153.

In determining a law's burden, courts can only consider the burden that the date requirement places on "voters as a whole"—not specific subgroups. *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235-36 (5th Cir. 2020); *see Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *id.* at 205 (Scalia, J., concurring in judgment); *Burdick*, 504 U.S. at 436-37; *Ne. Ohio Coal. for*

13

*the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016).  Claims of disparate impact must, instead, be brought under the Equal Protection Clause.  *See Crawford*, 553 U.S. at 207-08 (Scalia, J., concurring in judgment).

**A. *The Date Requirement Imposes, At Most, Only Minor Burdens Warranting Rational-Basis Review.***

Even if the Court rejects the showing that the date requirement imposes only the usual burdens of voting, *see supra* Part II, the date requirement is, at most, a minor burden subject to "rational basis review," *Mays*, 951 F.3d at 784; *see also Mazo*, 54 F.4th at 153.

Writing a date on a piece of paper is not burdensome.  Signing and dating documents has been a regular and ordinary part of life for a long time.  The forms provided in Pennsylvania statutes which provide spaces for both a signature and a date are too numerous to list here.[1]  And as discussed above, every State requires individuals to write pieces of information on voting papers before casting a ballot.  *See supra* at 12-13.  Moreover, Plaintiffs have defended the legality of Pennsylvania's signature requirement for absentee and mail-in ballots—*which appears in the same statutory phrase as the date requirement*.  ECF No. 318 at 23; *see* 25 P.S. §§ 3146.6(a), 3150.16(a).  If it is not a significant burden to sign the mail-ballot envelope, it cannot be a significant burden to require voters to write a date *on the same declaration*.

Precedent reinforces the date requirement's *de minimis* burden.  Writing a date on a document is far less onerous than "the inconvenience of making the trip to the [Bureau of Motor Vehicles], gathering . . . required documents, and posing for a photograph" upheld as minimal and constitutional in *Crawford*.  553 U.S. at 198 (opinion of Stevens, J.).  It is also substantially less

---

[1] To name a few, see 57 Pa. C.S. § 316 (short form certificates of notarial acts); 23 Pa. C.S. § 5331 (parenting plan); 73 P.S. § 201-7(j.1)(iii)(3)(ii) (emergency work authorization form); 42 Pa. C.S. § 8316.2(b) (childhood sexual abuse settlement form); 73 P.S. § 2186(c) (cancellation form for certain contracts); 42 Pa. C.S. § 6206 (unsworn declaration).

burdensome than "[h]aving to identify one's own polling place and then travel there to vote," which "does not exceed the usual burdens of voting." *Brnovich*, 594 U.S. at 678 (internal quotation marks omitted).

Plaintiffs therefore cannot prove, and have not proven, that the date requirement imposes a meaningful burden in any case—let alone that the date requirement "lacks a plainly legitimate sweep" in order to maintain their facial challenge. *Mazo*, 54 F.4th at 152 (cleaned up).

### B. *The Date Requirement Easily Satisfies Rational-Basis Review.*

Because Pennsylvania's date requirement imposes, at most, only modest burdens on voters, the Court must uphold it because it is supported by the "State's important regulatory interests." *Timmons*, 520 U.S. at 358-59. The Court's review of the State's interests is "quite deferential" and courts cannot "require elaborate, empirical [justification] of the weightiness of . . . asserted justifications." *Mazo*, 54 F.4th at 153 (cleaned up).

As a majority of the Pennsylvania Supreme Court has already held, the date requirement serves several weighty interests and an "unquestionable purpose." *In re: Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1090 (Pa. 2020) (opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy); *see also id.* at 1087 (opinion of Justice Wecht) (noting that "colorable arguments … suggest [the date requirement's] importance"). *First*, the date requirement "provides proof of when [an] 'elector actually executed [a] ballot in full.'" *Id.* at 1090 (opinion of Dougherty, J.). Such information facilitates the "orderly administration" of elections and is undoubtedly a legitimate state interest. *Crawford*, 553 U.S. at 196 (opinion of Stevens, J.). Admittedly, Pennsylvania election officials are required to timestamp a ballot upon receiving it, and they rely on that date when entering information into Pennsylvania's Statewide Uniform Registry of Electors ("SURE") system. *See Pa. State Conf. of NAACP v. Schmidt*, 2023

WL 8091601, at *21 (W.D. Pa. Nov. 21, 2023), *rev'd*, 97 F.4th 120. And there is every reason to think that *ordinarily* happens. *See id.* But the handwritten date serves as a useful backstop, and it would become quite important if a county failed to timestamp a ballot upon receiving it or if Pennsylvania's SURE system malfunctioned—a possibility Judge Matey has highlighted. *See Migliori v. Cohen*, 36 F.4th 153, 165 (2022) (Matey, J., concurring in judgment), *vacated Ritter v. Migliori*, 143 S. Ct. 297 (2022), *and majority holding disavowed*, Pa. State Conf. of NAACP, 97 F.4th at 128.

*Second*, the date requirement serves the State's interest in solemnity—*i.e.*, in ensuring that voters "contemplate their choices" and "reach considered decisions about their government and laws." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 15 (2018). Signature-and-date requirements serve a "cautionary function" by "impressing the parties with the significance of their acts and their resultant obligations." *Davis v. G N Mortg. Corp.*, 244 F. Supp. 2d 950, 956 (N.D. Ill. 2003). Such formalities "guard[] against ill-considered action," *Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 883-84 (Pa. Super. Ct. 1985), and the absence of formalities "prevent[s] … parties from exercising the caution demanded by a situation in which each ha[s] significant rights at stake," *Thatcher's Drug Store v. Consol. Supermarkets*, 636 A.2d 156, 161 (Pa. 1994). Traditional signing and dating requirements aid persons "to appreciate the seriousness of their actions," *id.*, and for that reason are required in a range of instruments, including "wills" and "transfer[s] of real property," *State v. Williams*, 565 N.E.2d 563, 565 (Ohio 1991).

Pennsylvania can surely require its citizens to exercise the same caution when engaging in the solemn civic exercise of voting. "Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Minn. Voters All.*, 585 U.S. at 15. If States can require the formalities of signing and dating for wills and property transactions, they

App.51

most certainly can do the same for voting.

The Fifth Circuit recently recognized this point when it upheld Texas's wet signature requirement for voter registration forms. *Vote.Org v. Callanen*, 89 F.4th 459, 467 (5th Cir. 2023). The law at issue made voter registration more inconvenient because it required an applicant to submit a voter registration form with a wet signature rather than a digital one. *Id.* at 467-68. The Fifth Circuit upheld the challenged law, relying in part on the fact that an "original signature to a voter registration form carries 'solemn weight.'" *Id.* at 489.

*Third*, the date requirement advances the State's interests in "deterring and detecting voter fraud" and "protecting the integrity and reliability of the electoral process." *Crawford*, 553 U.S. at 191 (opinion of Stevens, J.); *see also Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *In re Canvass*, 241 A.3d at 1091 (opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy). Of course, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686. And here, the date requirement's advancement of the interest in preventing fraud is actual, not hypothetical: in 2022, the date requirement was used to detect voter fraud committed by a deceased individual's daughter in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022). *See* ECF No. 304, SOF ¶¶ 45-50. In fact, because current Pennsylvania Supreme Court precedent precludes county boards of elections from comparing the signature on the ballot envelope with one in the official record, *see In Re: Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 595 (Pa. 2020), the *only* evidence of third-party fraud on the face of the fraudulent ballot in *Mihaliak* was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away, *see* ECF No. 304, SOF ¶¶ 45-50. The date requirement clearly serves—at the very least—the interest of detecting election fraud.

App.52

Plaintiffs have previously attempted to explain away the *Mihaliak* case, insisting that the ballot would not have been counted even without the date requirement. ECF No. 288 at 24. But election officials not counting the ballot is not the only consequence of third-party ballot fraud; such fraud is also criminally punishable. *See, e.g.*, 25 P.S. § 3527; Pa. Crimes Code § 4101. Plaintiffs cannot dispute that the *only* evidence of third-party fraud on the face of the fraudulent ballot in *Mihaliak* was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away. *See* ECF No. 304, SOF ¶¶ 45-50; ECF No. 282 at 19-20. In other words, there would have been no reason or basis to launch an investigation into voter fraud in that case but for the date requirement. *See* ECF No. 282 at 19-20. The date requirement thus demonstrably serves—and already has served—the State's interest in "deterring and detecting voter fraud." *Crawford*, 553 U.S. at 191 (opinion of Stevens, J.).

### C. *Plaintiffs' Likely Arguments Are Wrong.*

Plaintiffs are likely to advance several contrary arguments, but all are erroneous. *First*, Plaintiffs will likely exaggerate the date requirement's burdens, ECF No. 288 at 19, but the record does not support such claims. The only individual identified by Plaintiffs in their Amended Complaint is Bette Eakin. *See* ECF No. 304, SOF ¶¶ 1-2. But Ms. Eakin was able to vote in the November 2022 election with her husband's assistance, *see id.* ¶ 2, and there is no reason to think she will be unable to vote in the future.

Plaintiffs have also proffered the testimony of a putative expert witness, Dr. Hopkins. *See id.* ¶¶ 116-140. But Dr. Hopkins admitted that he did not measure or analyze the cost to any voter of complying with the date requirement. *See id.* ¶¶ 118-121, 127. He therefore offered no probative evidence on the question whether the date requirement imposes a "burden" on voters for purposes of the *Anderson/Burdick* framework. *See Crawford*, 553 U.S. at 198 (opinion of Stevens,

18

J.) (burden on voters is the cost of complying with the challenged rule, such as "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph" to comply with a photo-ID requirement).

Furthermore, Plaintiffs will likely highlight that "10,657" ballots were not counted in the 2022 general election due to noncompliance with the date requirement, *see* ECF No. 288 at 18, but that also does not establish "a substantial burden on the right to vote, or even [indicate] a significant increase over the usual burdens of voting," *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.). According to Plaintiffs, the individuals who submitted those ballots complied with all other requirements for absentee or mail-in ballots, including the secrecy-envelope requirement and the signature requirement. ECF No. 288 at 18. Yet Plaintiffs never explain how compliance with the date requirement can be unconstitutionally burdensome for voters who have complied with the secrecy-envelope requirement and the signature requirement, which is part of the same voting rule as the date requirement, *see id.*; *see also* ECF No. 282 at 19, particularly when Pennsylvania allows all voters to vote in person without complying with the date requirement.

In any event, the 10,657 figure represents 0.93% of all absentee and mail-in ballots returned statewide, a lower noncompliance rate than under the secrecy-envelope requirement. *See* ECF No. 304, SOF ¶ 139. A requirement that over 99% of mail voters complied with cannot be unconstitutionally burdensome.

Moreover, the 10,657 figure pales in comparison to the estimated "43,000" Indiana citizens who lacked a photo ID in *Crawford*, where the Supreme Court upheld the photo-ID requirement for in-person voting against an *Anderson/Burdick* challenge—and did so even though Indiana did not allow the majority of voters to vote by any other method. 553 U.S. at 202 n.20 (opinion of Stevens, J.). And considering Plaintiffs' claims that they are investing substantial resources to

App.54

educate voters on how to write the date on the carrier envelope, ECF No. 289, ¶¶ 100, 111, 122, there is good reason to think that the rejection rate will only drop going forward.

*Second*, unable to reasonably claim the date requirement burdens all voters, Plaintiffs will likely argue that the date requirement disproportionately affects "older, Black, and Hispanic voters." ECF No. 304, SOF ¶¶ 121-125. Precedent forecloses this argument. Courts cannot engage in subgroup analysis under the *Anderson-Burdick* framework. *See, e.g.*, *Crawford*, 553 U.S. at 199-200 (opinion of Stevens, J.); *id.* at 204-09 (Scalia, J., concurring in judgment); *Burdick*, 504 U.S. at 436-37; *Richardson*, 978 F.3d at 235-36 (finding error where district court did not analyze burden with respect to "voters as a whole"); *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 631 ("Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst."). Unsurprisingly, a federal court recently rejected a near-identical attempt to import subgroup analysis into the *Anderson-Burdick* framework. *See Ne. Ohio Coal. for the Homeless v. Larose*, 2024 WL 83036, at *7 (N.D. Ohio Jan. 8, 2024). Indeed, any attempt to shoehorn a challenge based upon racial or ethnic subgroups such as African-American or Hispanic voters into the *Anderson/Burdick* framework is particularly problematic because it would require the Court to circumvent the rigorous requirements for proving racial discrimination enshrined in the Fourteenth Amendment. *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 551 (3d Cir. 2011). Plaintiffs cannot satisfy those requirements because they do *not* claim that the date requirement—which was reaffirmed in the bipartisan Act 77 by both Republicans and Democrats—was enacted with racially discriminatory intent, or that it has been applied in a discriminatory manner.

In any event, Plaintiffs have not provided through Dr. Hopkins or any other source any evidence to prove that any subgroup of voters experiences a heightened burden to comply with the

App.55

date requirement, much less an unconstitutional one. At most, Dr. Hopkins opines that "older, Black, and Hispanic voters" were "disproportionately likely" not to comply with the date requirement. ECF No. 304, SOF ¶¶ 121-122, 124-125. But that is evidence of the rate and attendant consequences of noncompliance, not the "burden" on voters of complying with the date requirement. *See Crawford*, 553 U.S. at 198 (opinion of Stevens, J.). Even then, the effect Dr. Hopkins reports for "older" voters is that a 60-year-old voter is 0.2 percentage points more likely to fail to comply with the date requirement than a 20-year-old voter, ECF No. 304, SOF ¶ 138—a minor disparity hardly suggestive of anything more than the "usual burdens of voting," *see Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *see also id.* at 197-98 (burdens arising from "life's vagaries" not cognizable). Indeed, the Supreme Court recently warned against attributing significance to the exact same statistical disparity identified by Dr. Hopkins: 0.2%. *See Brnovich*, 594 U.S. at 680.

Dr. Hopkins, moreover, offers no evidence at all regarding any "Black" or "Hispanic" voter for the simple reason that he *never* determined the race or ethnicity of any voter. *See* ECF No. 304, SOF ¶ 126. Rather, he performed regression analyses regarding the expected rate of noncompliance with the date requirement in *counties* or *census block groups* with certain demographic characteristics. *See id.* ¶¶ 129, 136. In particular, Dr. Hopkins attempted to analyze how the rate of noncompliance would change in a hypothetical county or block group that experienced a change in population from either 0% to 100% Black or 0% to 100% Hispanic. *See id.* ¶ 136. But even Dr. Hopkins conceded that it is not possible from those analyses to determine whether a Black or Hispanic voter is more likely not to comply with the date requirement than a white voter. *See id.* ¶ 137. Plaintiffs have failed to show that the date requirement imposes an unconstitutional burden on any voter. Their *Anderson/Burdick* claim therefore fails.

21

*Third*, Plaintiffs will likely minimize Pennsylvania's interests in the maintenance of the General Assembly's date requirement. ECF No. 288 at 22. That argument contradicts the Pennsylvania Supreme Court, which has concluded that the date requirement serves "unquestionable purpose[s]." *Ball v. Chapman*, 289 A.3d 1, 10 (Pa. 2023); *see also In re Canvass*, 241 A.3d at 1090 (opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy); *Migliori*, 36 F.4th at 165 (Matey, J., concurring in judgment). It also requires ignoring the recent *Mihaliak* case in which the date requirement was used to help detect and prosecute an election fraudster. *See supra* at 17-18. And, most importantly, Plaintiffs' argument requires this Court to second-guess the General Assembly's judgment that the date requirement is important. But as the Third Circuit recently explained, judicial "review of [a State's] interests" under the *Anderson-Burdick* test "is quite deferential." *Mazo*, 54 F.4th at 153 (cleaned up). Similarly, the Fifth Circuit recently reaffirmed that federal courts owe "considerable deference" to States' "election procedures so long as they do not constitute invidious discrimination." *Vote.Org*, 89 F.4th at 481.

Plaintiffs do not contend that the General Assembly enacted the date requirement with discriminatory intent, or that it has been applied in a discriminatory manner. Therefore, rather than second-guessing the Pennsylvania Supreme Court and the General Assembly, the Court should uphold the date requirement. *See Mazo*, 54 F.4th at 153; *Vote.Org*, 89 F.4th at 481.

*Finally*, Plaintiffs likely will point to the Third Circuit's statement that the "date requirement . . . serves little apparent purpose." *Pa. State Conf. of NAACP*, 97 F.4th at 125. But this statement is merely passing dictum, as it was irrelevant to the Third Circuit's holding. *See, e.g.*, *In re Nat'l Football League Players Concussion Inj. Litig.*, 775 F.3d 570, 583 n.18 (3d Cir. 2014). Indeed, it is apparent the Third Circuit did not give "full and careful consideration" to this point. *Id.* After all, it did not address the State's interests in documenting the date the voter

App.57

completed the ballot as part of trustworthy election administration or as a back-up safeguard where a county fails to scan the ballot or the SURE system malfunctions. *See Migliori*, 36 F.4th at 165 (Matey, J., concurring in judgment). It also did not address the State's interest in solemnity. *See supra* at 16-17. And it did not address the State's interest in deterring and detecting fraud or even mention the *Mihaliak* case. *See supra* at 17-18. That the date requirement may not be used for the "purpose" of "confirm[ing] timely receipt of the ballot or … determin[ing] when the voter completed it" for the mine-run of mail ballots, *Pa. State Conf. of NAACP*, 97 F.4th at 125, in no way undermines that the date requirement advances important State interests that this Court must defer to and uphold, *see supra* at 22.

## CONCLUSION

The Court should grant summary judgment dismissing Plaintiffs' right-to-vote claim.

App.58

Dated: June 5, 2024

Respectfully submitted,

/s/ Kathleen A. Gallagher
Kathleen A. Gallagher
PA I.D. #37950
THE GALLAGHER FIRM, LLC
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
Phone: (412) 308-5512
kag@gallagherlawllc.com

John M. Gore (*pro hac vice*)
E. Stewart Crosland (*pro hac vice*)
Louis J. Capozzi III (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

Thomas W. King, III
Thomas E. Breth
DILLON, McCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
Phone: (724) 283.2200
tking@dmkcg.com
tbreth@dmkcg.com

*Counsel for Intervenor-Defendants*

App.59

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION**

| | |
|---|---|
| BETTE EAKIN, INES MASSELLA, FETTERMAN FOR PA, DSCC, and DCCC, | Civil Action |
| *Plaintiffs*, | Case No. 1:22-CV-340 |
| v. | |
| ADAMS COUNTY BOARD OF ELECTIONS, ALLEGHENY COUNTY BOARD OF ELECTIONS, BEAVER COUNTY BOARD OF ELECTIONS, BEDFORD COUNTY BOARD OF ELECTIONS, BERKS COUNTY BOARD OF ELECTIONS, BLAIR COUNTY BOARD OF ELECTIONS, BRADFORD COUNTY BOARD OF ELECTIONS, BUCKS COUNTY BOARD OF ELECTIONS, BUTLER COUNTY BOARD OF ELECTIONS, CAMBRIA COUNTY BOARD OF ELECTIONS, CAMERON COUNTY BOARD OF ELECTIONS, CARBON COUNTY BOARD OF ELECTIONS, CENTRE COUNTY BOARD OF ELECTIONS, CHESTER COUNTY BOARD OF ELECTIONS, CLARION COUNTY BOARD OF ELECTIONS, CLEARFIELD COUNTY BOARD OF ELECTIONS, CLINTON COUNTY BOARD OF ELECTIONS, COLUMBIA COUNTY BOARD OF ELECTIONS, CRAWFORD COUNTY BOARD OF ELECTIONS, CUMBERLAND COUNTY BOARD OF ELECTIONS, DAUPHIN COUNTY BOARD OF ELECTIONS, DELAWARE COUNTY BOARD OF ELECTIONS, ELK COUNTY BOARD OF ELECTIONS, FAYETTE COUNTY BOARD OF ELECTIONS, FOREST COUNTY BOARD OF ELECTIONS, FRANKLIN COUNTY BOARD OF ELECTIONS, FULTON COUNTY BOARD OF ELECTIONS, HUNTINGDON COUNTY BOARD OF ELECTIONS, INDIANA COUNTY BOARD OF ELECTIONS, JEFFERSON COUNTY BOARD OF ELECTIONS, JUNIATA COUNTY BOARD OF ELECTIONS, LACKAWANNA COUNTY BOARD OF ELECTIONS, LANCASTER COUNTY BOARD OF ELECTIONS, LAWRENCE COUNTY BOARD OF ELECTIONS, LEBANON COUNTY BOARD OF ELECTIONS, LEHIGH COUNTY BOARD OF | |

App.60

ELECTIONS, LUZERNE COUNTY BOARD OF
ELECTIONS, LYCOMING COUNTY BOARD OF
ELECTIONS, MCKEAN COUNTY BOARD OF
ELECTIONS, MERCER COUNTY BOARD OF
ELECTIONS, MIFFLIN COUNTY BOARD OF
ELECTIONS, MONROE COUNTY BOARD OF
ELECTIONS, MONTGOMERY COUNTY BOARD
OF ELECTIONS, MONTOUR COUNTY BOARD
OF ELECTIONS, NORTHAMPTON COUNTY
BOARD OF ELECTIONS, NORTHUMBERLAND
COUNTY BOARD OF ELECTIONS, PERRY
COUNTY BOARD OF ELECTIONS, PIKE
COUNTY BOARD OF ELECTIONS, POTTER
COUNTY BOARD OF ELECTIONS, SNYDER
COUNTY BOARD OF ELECTIONS, SOMERSET
COUNTY BOARD OF ELECTIONS, SULLIVAN
COUNTY BOARD OF ELECTIONS, TIOGA
COUNTY BOARD OF ELECTIONS, UNION
COUNTY BOARD OF ELECTIONS, VENANGO
COUNTY BOARD OF ELECTIONS, WARREN
COUNTY BOARD OF ELECTIONS,
WASHINGTON COUNTY BOARD OF
ELECTIONS, WAYNE COUNTY BOARD OF
ELECTIONS, WESTMORELAND COUNTY
BOARD OF ELECTIONS, and WYOMING
COUNTY BOARD OF ELECTIONS,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND EMERGENCY INJUCTIVE RELIEF

Plaintiffs Bette Eakin, Ines Massella, Fetterman for PA, DSCC, and DCCC, by and through undersigned counsel, file this Complaint for Declaratory and Emergency Injunctive Relief against Defendants, which consist of Pennsylvania's 67 county boards of elections (full list recited in caption), and allege as follows:

### NATURE OF THE CASE

1. The constitutional right to vote is fundamental and "preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). To secure its free exercise, the Civil Rights Act of

- 2 -

App.61

1964 prohibits election officials from denying any individual access to the franchise because of an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"). In essence, the Materiality Provision prohibits the use of needless technical requirements to deny citizens their most fundamental right.

2.     A week ago, the Pennsylvania Supreme Court—for the first time—ordered election officials to *not count* qualified voters' mail-in and absentee ballots (collectively, "mail ballots") due to an immaterial omission of a written date, or the entry of an incorrect date, on the outside of the ballot envelope. That decision was based on an interpretation of a Pennsylvania Election Code provision that directs voters to "fill out, date and sign the declaration" provided on the envelope in which they place their ballot. 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Instruction").

3.     Counties have since followed suit. In the few days following the Pennsylvania Supreme Court order, county boards of elections have already identified thousands of mail ballots that will not be counted because a missing or incorrect date on the ballot envelope, rejecting qualified voters who accidentally failed to write the date on their ballot envelope, and more still will be rejected when voters enter an incorrect date, such as their birthdate, instead of the date they completed or signed their ballot. Election officials have been ordered to reject such ballots even when there is no question that they were timely received and properly signed by a qualified voter.

4.     The Date Instruction has no relevance to determining whether an individual is qualified to vote under Pennsylvania law. Pennsylvania residents are eligible to vote so long as, on the date of the election, they (1) are at least 18 years of age, (2) have been a citizen of the United States for at least one month, (3) have resided in the Commonwealth for at least 90 days, (4) have

App.62

resided in the district they intend to vote in for at least 30 days, and (5) have not been confined for a felony within the last five years. *See* 25 P.S. §§ 2811, 2602(t); 25 Pa. C.S. § 1301.

5.      To the extent any date is relevant to a voter's qualifications to participate in a particular election under Pennsylvania law, it is the date of that *election*, not the date that the voter completed, signed, or mailed their ballot. *See* 25 P.S. § 2602(t); 25 Pa. C.S. § 1301. Moreover, a mail ballot's timeliness depends not on the day that the voter completed, signed, and submitted it, but instead solely on the date and time the board of elections receives it. 25 P.S. §§ 3146.6(c), 3150.16(c) (requiring mail ballots to be received by 8 p.m. on Election Day).

6.      The date on a mail ballot envelope thus has no bearing on a voter's qualifications and serves no purpose other than to erect barriers to qualified voters exercising their fundamental constitutional right to vote. This unnecessary impediment violates the Civil Rights Act and the First and Fourteenth Amendments to the U.S. Constitution.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action under 52 U.S.C. § 10101 and 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the federal Civil Rights Act and the U.S. Constitution.

8.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States and involve the assertion of deprivation, under color of state law, of rights under the U.S. Constitution and federal law.

9.      This Court has personal jurisdiction over Defendants, who are government entities in Pennsylvania.

10.     Venue is proper in this Court, and in the Erie Division specifically, because a

- 4 -

App.63

substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this Division. *See* 28 U.S.C. § 1391(b)(2). Plaintiffs Eakin and Massella both reside—and submitted their mail ballots—in Erie County, and Defendants Crawford, Elk, Erie, Forest, McKean, Venango, and Warren County Boards of Elections are located in the Erie Division. *See* W.D. Pa. LCvR 3. Furthermore, of the 2,992,341 mail ballots received in Pennsylvania for the 2020 General Election, over 28% (839,493) were sent from counties located in this District.[1] Venue is therefore appropriate in the Erie Division of the Western District of Pennsylvania.

11.     This Court has the authority to enter declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

12.     Plaintiff Bette Eakin is a registered Democratic voter in Eerie County whose ballot for the 2022 General Election was undated and therefore will not be counted. Ms. Eakin, a veteran, is currently undergoing care for a condition that has made her blind and, as a result, she will be unable to cast an in-person ballot.

13.     Plaintiff Ines Massella is a registered Democratic voter in Eerie County whose ballot for the 2022 General Election was undated and therefore will not be counted.

14.     Plaintiff Fetterman for PA is a duly organized political campaign in support of Lieutenant Governor John Fetterman's election to the United States Senate, representing the Commonwealth of Pennsylvania.

15.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party across the

---

[1] *Report on the 2020 General Election*, PA. DEP'T OF STATE (May 14, 2021), *available at* https://www.dos.pa.gov/VotingElections/Documents/2020-General-Election-Report.pdf, at 18 (last visited Nov. 4, 2022).

App.64

country, including in Pennsylvania, to the U.S. Senate. DSCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Pennsylvania, and mobilizing and supporting voters. In 2022, DSCC has and will continue to provide millions of dollars in contributions and expenditures to persuade and mobilize voters to support U.S. Senate candidates who affiliate with the Democratic Party. For the 2022 election for U.S. Senate in Pennsylvania, DSCC has worked (and will continue to work) to elect the Democratic candidate, Lt. Gov. John Fetterman, and has made (and will continue to make) substantial contributions and expenditures to support Lt. Gov. Fetterman in his candidacy.

16.     Plaintiff DCCC is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party from across the country, including those running in Pennsylvania's congressional districts, to the U.S. House of Representatives. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Pennsylvania, and assisting and mobilizing voters. In 2022, DCCC has and will continue to provide millions of dollars in contributions and expenditures to persuade and mobilize voters to support congressional candidates who affiliate with the Democratic Party.

17.     Defendants are the county boards of elections for the 67 counties of the Commonwealth of Pennsylvania as set forth in 25 P.S. § 2641. They "have jurisdiction over the conduct of primaries and elections in such count[ies], in accordance with the provision of [the Election Code]." *Id.* § 2641(a); *see generally id.* § 2642. In this capacity, they are charged with accepting applications for mail ballots and mailing these ballots to the requesting voter. *Id.* §§ 3146.2(a), 3150.12(a), 3150.15; 25 Pa.C.S. § 3302. They also receive the mail ballots that voters return, 25 P.S. §§ 3146.6(a), 3150.16(a), which are held until Election Day and then opened

- 6 -

App.65

and canvassed, *id.* § 3146.8. On the third day following the election, each Defendant combines its count of mail ballots with its count of in-person votes received from each election district, and then enters the results on a tabulation sheet. *Id.* § 3154. For statewide elections, Defendants send a certificate showing the totals of the returns cast to the Secretary of the Commonwealth, who, in turn, combines each of the certified counts she receives in order to determine the election winner. *Id.* §§ 3158, 3159. Defendants are sued for the manner in which they enforce the Date Instruction.

## STATEMENT OF FACTS AND LAW

18.    Under Pennsylvania law, a resident qualifies to vote if, on the date of the election, she (1) is at least 18 years old, (2) has been a citizen of the United States for at least one month, (3) has resided in the Commonwealth for at least 90 days, (4) has resided in the district she intends to vote in for at least 30 days, and (5) has not been confined for a felony within the last five years. *See* 25 P.S. §§ 2811, 2602(t); 25 Pa. C.S. § 1301.

19.    Before 2019, only limited categories of qualified voters were permitted to vote by mail. This changed in 2019 when the Pennsylvania General Assembly enacted Act 77, which made sweeping changes to pre-existing Pennsylvania election law, and for the first time in the Commonwealth's history allowed any qualified and registered Pennsylvania voter to vote by mail.[2]

20.    The Election Code instructs voters casting mail ballots to (1) mark their ballot "on or before eight o'clock p.m. the day of the primary or election"; (2) use only "black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen"; (3) "fold the ballot, enclose and securely seal the same in the envelope on which it is printed, stamped or endorsed 'official election ballot'"; (4) place their completed ballot in a blank, secrecy envelope;

---

[2] House Republican Caucus, Historic Election Reform, https://www.pahousegop.com/electionreform (last visited Nov. 2, 2022); *see also* 25 P.S. § 3150.11.

App.66

(5) place the secrecy envelope into a separate, outer envelope, "on which is printed the form of declaration of the elector"; and (6) "fill out, date and sign the declaration printed on such envelope" before returning it to the voter's county board of elections. 25 P.S. §§ 3150.16(a), 3146.6(a).

21. The Date Instruction serves no meaningful purpose and is immaterial to whether a voter is qualified to vote under Pennsylvania law, as has been shown by ample evidentiary records developed through extensive litigation since the 2020 election. The Pennsylvania Supreme Court initially considered the effect of a voter's failure to comply with the Date Instruction on a Petition for Discretionary Review in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058, 1062 (Pa. 2020) (opinion announcing judgment) (hereinafter "*In re Canvass*"). There, the court was asked to determine whether the Date Instruction should be read as a directory or mandatory provision under Pennsylvania law.

22. Three of the court's seven justices concluded that the Date Instruction was "a directory, rather than a mandatory, instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting." *Id.* at 1076. These three justices reasoned that the Date Instruction did not serve any "weighty interest," and that an interpretation of the Pennsylvania Election Code requiring that mail ballots be rejected any time a voter does not strictly comply with official directions when filling out the envelope would likely violate the Materiality Provision of the Civil Rights Act. *Id.* at 1074 n.5 (citing 52 U.S.C. § 10101(a)(2)(B)).

23. Three other justices, dissenting in relevant part, concluded that the Date Instruction was mandatory, and that the Pennsylvania Code prohibited counties from counting any ballots if they were contained in envelopes that did not comply with the Date Instruction. *Id.* at 1090 (Dougherty, J., concurring and dissenting). The dissenting opinion did not address whether reading Pennsylvania law in this way conflicted with the Materiality Provision of the Civil Rights Act.

- 8 -

24.     Concurring and writing for himself, Justice Wecht provided the tie-breaking vote. He concluded that the Date Instruction was mandatory, meaning Pennsylvania law required rejecting ballots contained in undated envelopes. *Id.* at 1079–80 (Wecht, J., concurring and dissenting). However, because candidates and voters did not have notice of these harsh consequences, Justice Wecht concluded that the Date Instruction's prohibitory effect should not be applied to the 2020 election. *Id.* at 1090.

25.     Justice Wecht did not express an opinion on whether the Date Instruction violated the Materiality Provision because the question had not been adequately briefed. *Id.* at 1089 n.54. But he expressed hope that the Pennsylvania General Assembly would amend the Election Code "bear[ing] that binding provision in mind" because "[i]t is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require." *Id.*

26.     Nearly two years after the Pennsylvania Supreme Court's decision in *In re Canvass*, the U.S. Court of Appeals for the Third Circuit held—based on undisputed evidence developed during the 2021 General Election—that the Date Instruction ran afoul of the Materiality Provision because the date on the mail ballot envelope was immaterial to whether an individual was eligible to vote under Pennsylvania law. *Migliori v. Cohen*, 36 F.4th 153, 163–64 (3d Cir. 2022). The Supreme Court declined to disrupt the Third Circuit's ruling when one of the parties in *Migliori* sought an emergency injunction to prevent the counting of consequential undated ballots pending appeal. *Ritter v. Migliori*, 142 S. Ct. 1824 (2022).

27.     While the U.S. Supreme Court recently vacated the Third Circuit's *Migliori* decision as moot without commenting on the merits, that vacatur does not call into question the Third Circuit's analysis. *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686, at *1 (U.S. Oct. 11,

- 9 -

App.68

2022) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)). Rather, "[t]he established practice of the [U.S. Supreme] Court in dealing with a civil case . . . which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss."[3] *Munsingwear*, 340 U.S. at 39. The Third Circuit's ruling and consideration of the evidence in that case remain highly persuasive authority. *See L.A. Cnty. v. Davis*, 440 U.S. 625, 646 n.10 (1979) (Powell, J. dissenting) (noting that even where a decision has been vacated "the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority"); *U.S. ex rel Espinoza v. Fairman*, 813 F.2d 117, 125 n.7 (7th Cir. 1987), *cert. denied*, 483 U.S. 1010 (1987) (decision vacated by Supreme Court remains persuasive precedent where Court did not reject decision's underlying reasoning).

28.     A few months later, the President Judge of the Pennsylvania Commonwealth Court reached the same conclusion as the Third Circuit. *Chapman v. Berks County Board of Elections*, No. 355 MD 2022, 2022 WL 4100998 (Pa. Cmwlth. Aug. 19, 2022). In a thorough, 67-page opinion where the court analyzed the robust evidentiary record before it, as well as the text and purpose of the Materiality Provision, it held that "invalidating ballots for the sole reason that the declaration on the return envelope does not contain a handwritten date violates the materiality provision of the Civil Rights Act." *Id*. at 29. The extensive, undisputed record before the court showed that the Date Instruction is not used to establish whether an elector is eligible to vote,

---

[3] The Date Instruction issue was raised before the Third Circuit in *Migliori* by voters whose mail ballots—all of which were received by county election officials prior to 8 p.m. on election day— were nevertheless rejected in a 2021 local judicial race in Lehigh County, solely because the ballot envelopes lacked handwritten dates. By the time the petition for a writ of certiorari was fully briefed before the Supreme Court in October 2022, the 2021 election had been certified and the winning judicial candidate installed months earlier.

identify fraudulent ballots, or even ensure that a ballot is timely cast. *See, e.g.*, *id.* at 19 ("the date the declaration is signed is not relevant to the voter's qualifications as of election day"); *see also id.* at 17–24 (providing thorough recitation of the evidence before the court showing that the Date Instruction serves no legitimate purpose).

29.      Despite the ample evidence developed in *Migliori* and *Berks County* that the Date Instruction serves no compelling interest or meaningful purpose, Republican Party committees and their supporters again asked the Pennsylvania Supreme Court to enforce the Date Instruction in Pennsylvania's Election Code and order all county boards not to count undated or incorrectly dated mail ballots and to invalidate Pennsylvania Department of State guidance directing election officials to count such ballots if they were timely received. *Ball v. Chapman*, No. 102 MM 2022, Pet'rs' Appl. (Pa. Oct. 16, 2022). In doing so, they argued that the Date Instruction required rejecting ballots contained in envelopes with missing or inaccurate dates, and that such a result did not violate the Materiality Provision of the Civil Rights Act. *Id.*[4]

30.      After an expedited briefing schedule, the Pennsylvania Supreme Court ordered all Pennsylvania county boards to segregate and refrain from counting mail ballots received for the November 8, 2022 General Election containing undated or incorrectly dated outer envelopes. *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702, at *1 (Pa. Nov. 1, 2022) (per curiam). The court concluded that the Date Instruction required this result as a matter of state law but was evenly split—and thus did not reach a decision—on whether rejecting undated or incorrectly dated mail ballots would violate the Materiality Provision of the Civil Rights Act. Three justices concluded

---

[4] Plaintiff DCCC joined the Pennsylvania Supreme Court proceedings as an Intervenor-Respondent, while the remaining plaintiffs were not parties to those proceedings.

that the Date Instruction violates the Materiality Provision, and three concluded that it does not. *Id.* at 1.[5]

31.     On November 5, 2022, the Pennsylvania Supreme Court issued a Supplemental Order clarifying what it meant by "incorrectly dated" ballots, stating that "mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through November 8, 2022" and "absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022" would be considered "incorrectly dated."

### CLAIMS FOR RELIEF

### COUNT I

### 52 U.S.C. § 10101; 42 U.S.C. § 1983
### VIOLATION OF SECTION 101 OF THE CIVIL RIGHTS ACT OF 1964

32.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

33.     Section 101(a) of the Civil Rights Act of 1964, as amended, provides:

No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2).

34.     The right to "vote" protected by the statute is expansively defined to include:

all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election.

*Id.* §§ 10101(a)(3)(A), 10101(e).

---

[5] Chief Justice Max Baer passed away on September 30, 2022, leaving the Court with six justices.

35.    Defendants are "persons" acting "under color of law": Pennsylvania's county boards of elections are units of local government to which 52 U.S.C. § 10101 applies. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978) (recognizing § 1983 claim against units of local government); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686 (3d Cir. 1980) (same); *United States v. Holmes Cnty., Miss.*, 385 F.2d 145, 148 (5th Cir. 1967) (holding that "person" bears same meaning in both 52 U.S.C. § 10101 (formerly 42 U.S.C. § 1971) and 42 U.S.C.A. § 1983).

36.    Defendants are now required under Pennsylvania law to deny the "right of an[] individual to vote" due to non-compliance with the Date Instruction by refusing to count otherwise-legitimate ballots cast by qualified electors. 52 U.S.C. § 10101(a)(2)(B). Defendants are withholding "action necessary to make a vote effective including . . . action required by State law prerequisite to . . . having such ballot counted and included in the appropriate totals of votes cast." *Id.* § 10101(e).

37.    This denial of the right to vote is based upon an omission on a "record or paper" relating to an "act requisite to voting." *Id.* § 10101(a)(2)(B). The omission in question is the failure of an elector to write the correct date on the outer envelope for their ballot. The "record or paper" is the outer envelope in which an elector's mail ballot is enclosed and the affirmation statement printed thereon. The "act requisite to voting" is the making of the required declaration.

38.    Finally, the Date Instruction is immaterial to determining whether an elector is qualified to vote in Pennsylvania. Because Pennsylvania law determines voter eligibility based on the date of the election—rather than the date of marking the ballot—the Date Instruction provides no information about whether a voter is qualified.

- 13 -

39. In fact, the Date Instruction serves no legitimate purpose. For example, the date on the envelope is not used to verify whether the ballot was timely marked: the deadline for marking a ballot and the deadline for the elections board receiving the ballot are identical, so any ballot received after the ballot-marking deadline is not timely and any ballot received prior is definitionally timely.

40. Defendants' enforcement of the Date Instruction will deprive Pennsylvanians— including Plaintiffs—of the rights secured to them by 52 U.S.C. § 10101(a)(2)(B).

## <u>COUNT II</u>

### U.S. CONST. AMENDS. I, XIV; 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

41. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

42. Under the First and Fourteenth Amendments to the U.S. Constitution, a state cannot utilize election practices that unduly burden the right to vote.

43. When addressing a challenge to a state election practice, a court balances the character and magnitude of the burden that the challenged practice imposes on the First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the justifications offered by the state in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

44. In conceptualizing the burden that a state electoral regulation places on constitutional rights, courts are not limited to considering only the effort needed to comply with the regulation; they also may consider the law's broader ramifications, including the consequences of noncompliance. Federal courts have accordingly recognized that disenfranchising voters for defects in their absentee ballots imposes significant burdens on voting rights even if the effort

- 14 -

App.73

needed for a voter to complete the ballot correctly appears slight when considered in isolation. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (stating burdens of absentee ballot signature matching requirement included increased risk of disenfranchisement from perceived signature mismatch); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters."); *see also Donald J. Trump for President v. Boockvar*, 502 F. Supp. 3d 899, 919 (M.D. Pa. 2020) ("Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties.")

45.     Similarly, when evaluating an early filing deadline for minor-party candidates, the Third Circuit did not only limit its analysis to the burden of complying with the deadline, but also considered the burden of the consequences of a missed deadline. *See Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 881 (3d Cir. 1997). Specifically, the court considered the negative impact that individual candidates' missing the deadline would have on a minor party's chances of achieving major party status, which required the party's candidates to collectively garner 10% of the total vote cast in all legislative races in state. *Id.*

46.     Even if the Court were to consider only the effort needed for a voter to find and fill in the "Date" field on the ballot envelope, the Date Instruction would still constitute an undue burden on voting rights. "However slight th[e] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). As explained, the Date Instruction serves no legitimate purpose. It is a trivial procedural formality that functions only to disenfranchise eligible voters seeking to

vote. The Date Instruction's burdens thus necessarily outweigh its benefits because there is nothing to place on the state-interest side of the scale.

47.    The Date Instruction imposes unnecessary hurdles that eligible Pennsylvanians must clear to exercise their most fundamental right, resulting in otherwise valid votes being arbitrarily rejected without any reciprocal benefit to the Commonwealth. It furthers no governmental interest, and, consequently, the burden it imposes on voters—including Plaintiffs— violates the First and Fourteenth Amendments to the U.S. Constitution.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.    Declaring that the Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires voters to provide (correct) dates on their mailing envelope—or precludes election officials from counting ballots that lack such dates—violates Section 101 of the Civil Rights Act of 1964 and the First and Fourteenth Amendments to the U.S. Constitution to the extent they result in the rejection of undated or incorrectly dated mail ballots;

b.    Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting or refusing to count absentee and mail-in ballots for failure to comply with the Date Instruction;

c.    Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action under 42 U.S.C. § 1988 and other applicable laws; and

d.    Granting such other and further relief as the Court deems just and proper.

Dated: November 7, 2022

Respectfully submitted,

By: _Adam C. Bonin_

Adam C. Bonin
**THE LAW OFFICE OF ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

Uzoma N. Nkwonta*
Justin Baxenberg*
Daniel C. Osher*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
**ELIAS LAW GROUP LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
dosher@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law

*\* Pro Hac Vice application forthcoming*
*Counsel for Plaintiffs*

App.76

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETTY EAKIN, et al, | ) | |
|     Plaintiffs, | ) | Civil Action No. 1:22-CV-340 |
| | ) | |
| v. | ) | Re: Motion to Intervene |
| | ) | ECF No. 34 |
| ADAMS COUNTY BOARD OF | ) | |
| ELECTIONS, et al, | ) | |
|     Defendants. | ) | |

## <u>MEMORANDUM ORDER</u>

Presently before this Court is a motion to intervene. ECF No. 34.

**Relevant Procedural History**

In 2019, the Commonwealth of Pennsylvania expanded mail-in voting. The new provisions have increased voter participation, but have been the subject of intense and repeated litigation in state and federal courts.

This action is brought by Bette Eakin and Ines Massella, who are registered Democratic voters residing in Erie County, the Fetterman for PA campaign, the Democratic Party's national senatorial committee (DSCC) and national congressional committee (DCCC). Plaintiffs challenge the Date Instruction of the Election Code as violative of the First and Fourteenth Amendments and the Materiality Provision of the Civil Rights Act.

The named Defendants are each of the sixty-seven county Boards of Elections of the Commonwealth. As relief, Plaintiffs seek a declaration that that the Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires

1

App.77

voters to provide (correct) dates on their mailing envelope – or precludes election officials from counting ballots that lack such dates—violates Section 101 of the Civil Rights Act of 1964 and the First and Fourteenth Amendments to the U.S. Constitution to the extent they result in the rejection of undated or incorrectly dated mail ballots. ECF No. 1, page 16.

Certain Republican Committees and several individual voters seek leave to intervene in this matter. ECF No. 34.[1] The Republican Committees include the Republican National Committee, National Republican Congressional Committee, and the Republican Party of Pennsylvania. Together, the Committees seek intervention claiming that they have a substantial interest in ensuring that the Commonwealth of Pennsylvania administers free and fair elections. ECF No. 35.The proposed individual intervenors[2] are "registered electors" who "consistently vote in each election." They claim that they have a particularized interest in knowing the exact requirements for mail-in ballots to be counted. Moreover, they claim that the counting of undated and incorrectly dated ballots in violation of Commonwealth Election Code threatens to interfere with their right to free and equal elections. They argue that their validly cast votes may be "diluted by the counting of undated or incorrectly dated ballots." *Id.* at page 13.

Plaintiffs filed an opposition brief. ECF No. 51. The proposed intervenors have filed a

---

[1] In accordance with Federal Rule of Civil Procedure 24(c) which requires that an application for intervention "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought," the intervenors have attached a proposed motion to dismiss and answer to their filing. ECF No. 34-1; 34-3.

[2] The individual voters are David Ball of Washington County; James Bee of Cambria County; Jesse Daniel of Indiana County; Gwendolyn Mae DeLuca and Lynn Marie Kalcevic of Beaver County; Ross Farber of Westmoreland County; Vallerie Sicilano-Biancaniello of Delaware County; and S. Michael Streib of Butler County. Although named in the caption of the motion to intervene and the proposed order granting intervention, there are no factual details regarding Debra Biro. There is no information explaining who she is, where she resides, or her interest in this case. The other proposed intervenors are described as being registered voters who consistently vote in each election.

App.78

Reply brief. ECF No. 63.

**The Allegations of the Complaint**

The Commonwealth's newly enacted mail-in voting provisions allow all eligible voters to vote by mail. ECF No. 1, ¶19. The Election Code instructs voters casting mail ballots to (1) mark their ballot "on or before eight o'clock p.m. the day of the primary or election"; (2) use only "black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen"; (3) "fold the ballot, enclose and securely seal the same in the envelop on which it is printed, stamped or endorsed 'office election ballot'"; (4) place their completed ballot in a blank, secrecy envelope; (5) place the secrecy envelope into a separate outer envelope "on which is printed the form of declaration of the elector"; and (6) "fill out, date and sign the declaration printed on such envelope" before returning it to the voter's county board of elections. *Id.* at ¶ 20, *quoting* 25 P.S. § § 3150.16(a), 3146.6(a).

Plaintiffs allege that the Date Instruction serves no meaningful purpose and is immaterial to whether a voter is qualified to vote in Pennsylvania. The Date Instruction has been the subject of much litigation in state and federal courts. *Id.* at ¶ ¶ 21-31.[3] The most recent litigation in state

---

[3] *See In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Elec.*, 241 A.3d 1058, 1074 (Nov. 30, 2020) (majority suggested without deciding that invalidating votes for failure to comply with the envelope-dating provision "could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons" contrary to the federal Materiality Provision); *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. May 27, 2022) (holding that Materiality Provision of the civil rights statute governing voter qualifications and eligibility conferred federal right enforceable by private citizens through § 1983 and, in dicta, opining that "[i]gnoring ballots because the outer envelope was undated, even though the Ballot was indisputably received before the deadline for voting serves no purpose other than disenfranchising otherwise qualified voters."); *Chapman v. Berks Cty. Bd. of Elections*, 2022 WL 4100998 (Pa. Commw. Ct. Aug. 19, 2022) ("[T]he lack of a handwritten date on the declaration on the return envelope of a timely received absentee or mail-in ballot does not support excluding those ballots from the

court commenced shortly before the November 2022 midterm election. The Republican Party Committees and their supporters asked the Pennsylvania Supreme Court to enforce the Date Instruction and order all county boards not to count undated or incorrectly dated mail ballots and to invalidate Pennsylvania Department of State Guidance directing election officials to count such ballots if they were timely received. *Id.* at ¶ 29. On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing that the mail-in ballots at issue should be segregated and not counted. The Court explained that its conclusion was required as a matter of state law, but the Court was deadlocked[4] as to whether "failing to count such ballots violated 52 U.S.C. § 10101(a)(2)(B)" (the federal Materiality Provision). *Id.* at ¶ 30.

**Legal Standard for Intervention**

Federal Rule of Civil Procedure 24 governs intervention by nonparties. The Rule provides for both intervention as of right and intervention by permission of court. A nonparty may intervene as of right if it "(1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." F.R.Civ.P. 24(a). Alternatively, permissive intervention may be allowed by the court if

---

Boards' certified results under both Pennsylvania law and Section 10101(a)(2)(B) of the Civil Rights Act.").

[4] At the time of its decision, the Pennsylvania Supreme Court had only six justices due to the recent death of Chief Justice Max Baer around October 1, 2022. *See* www.pacourts.us/news-and-statistics/news/news-detail/1115/pennsylvania-supreme-court-announces-passing-of-chief-justice-max-baer.

App.80

it "(1) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." F.R.Civ.P. 24(b).

The proposed  intervenors seek intervention as of right, and alternatively, by permission of the court. Plaintiffs take no position on the intervention of the Republican Committees, but do oppose intervention by the individuals. ECF No. 51. The proposed Intervenors have filed a Reply brief. ECF No. 63.


**Intervention as of Right**

Four elements must be satisfied for intervention as of right to be proper: "(1) timely application; (2) sufficient interest in the litigation; (3) threat that the interest will be impaired or affected by the disposition of the case; and (4) inadequate representation of the prospective intervenor's interest by existing parties." *Commonwealth of  Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 (3d Cir. 2018). It is the burden of the party seeking intervention to satisfy all four requirements. *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005).


*Timeliness*

The inquiry as to the timeliness of an application to intervene is based on "the totality of the circumstances arising from three factors: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Wallach v. Eaton Corp.,* 837 F.3d 356, 371 (3d Cir. 2016). As this case is in its infancy, having been filed only a few days before the motion to intervene, the motion is timely and there has been no delay.

5

App.81

*Sufficient Interest and Disposition's Effect on Interest*

Although Rule 24 does not detail what constitutes a sufficient interest, the Supreme Court has indicated that "what is obviously meant … is a significantly protectable interest." *Donaldson v. United States*, 400 U.S. 517, 531 (1971). A sufficient interest in the litigation is one "that is specific to [the intervenor], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Transource Pennsylvania, LLC v. Dutrieuille*, 2022 WL 2235466, at *2 (3d Cir. Jun. 22, 2022) *quoting Kleissler v. United States Forest Serv.,* 157 F.3d 964, 972 (3d Cir. 1998). "[T]he polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Id.*

To date, no party has objected to the Republican Committees' claim that they have a substantial and particularized interest in ensuring that Pennsylvania administers free and fair elections. ECF No. 35, pages 11-12. This Court agrees. The claims brought by Plaintiffs could affect the Committees' ability to participate in the election process within the state.

The individual intervenors claim that they have a significant interest in maintaining certainty regarding their rights and obligations if they choose to exercise their statutory right to vote by mail. *Id.* at page 13. They also claim that the weight of their votes could be "debased or diluted" by the counting of invalid ballots in contravention of the Date Instruction. *Id.* Plaintiffs argue that the individual intervenors' interest in protecting the weight of their votes is not cognizable and is merely a "generalized grievance." This Court agrees.

Rather than merely showing some impact, a prospective intervenor "must demonstrate that there is a tangible threat to a legally cognizable interest…" *Benjamin v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938, 951 (3d Cir. 2012). The individual intervenors have failed to establish that they have an interest in the state not counting the ballots of others. While

App.82

the individual intervenors certainly have a legal interest in having their own ballots counted, they do not have an interest in prohibiting the state from counting other ballots. *See Obama for America v. Husted*, 697 F.3d 423, 428 (6th Cir. Oct. 5, 2012) ("The right to vote is a precious and fundamental right. … A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). Moreover, the individual intervenors are not the only voters who have an interest in having their future mail votes counted. Indeed, every voter in the Commonwealth has an interest in having their mail vote counted, making this a textbook example of a generalized rather than a specific interest.

Because the individual intervenors have not met their burden to show that they have a sufficient direct interest in this litigation, they may not intervene in this matter as of right.

*Inadequate representation of the intervenor's interest by the existing parties*

Finally, the moving intervenor's interest "must be inadequately represented by the existing parties to the suit." *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). This requirement is clearly satisfied here as to the Republican Committees, as several Defendants have explicitly expressed an interest in not participating in the defense of this case by the filing of motions to be excused from active participation. *See* ECF No. 128 (Blair County); ECF No. 132 (Potter County); ECF No. 146 (Lycoming County); ECF No. 148 (Clarion, Susquehanna, and Tioga Counties); ECF No. 155 (Union County); ECF No. 156 (Franklin and Perry Counties).

Intervention as of right is appropriate for the Republican Committees and the motion to intervene will be granted in this regard.

App.83

**Permissive Intervention**

Rule 24(b) provides for permissive intervention if the proposed intervenor "(1) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." F.R.Civ.P. 24(b). The Rule permits a party to intervene by demonstrating: (1) a timely application for intervention; and (2) that the party's claim or defense shares a common question of law or fact with the under lying action. F.R.Civ. P. 24(b)(1)(B). When reviewing a request for permissive intervention, the court must also consider whether permissive intervention would "unduly delay or prejudice the adjudication of the rights of the original parties." *Panzy v. Borough of Stroudsburg*, 23 F.3d 772, 779 n.6 (3d Cir. 1994).

"Whether to allow a party to permissively intervene is left to the sound discretion of the Court." *Worthington v. Bayer Healthcare, LLC,* 2011 WL 630399, at *8 (D.N.J. Dec. 15, 2011); *Brody By & Through Sugzdinis v. Spang*, 957 F.2d 1108, 1124 (3d Cir. 1992) ("[A]s the doctrine's name suggests, [it] is within the discretion of the district court" whether to grant permissive intervention.").

Because, as explained above, the prospective individual intervenors do not have a sufficient and direct interest in this case, they will not be permitted to intervene. Furthermore, the individuals do not have a claim or defense distinct from their co-Intervenors that warrants their intervention. The defense of the Republican Committees is no different than any defense of these individual voters. *See, for example,* ECF No. 34-2 (proposed motion to dismiss the complaint); ECF No. 34-3 (proposed answer to complaint).

App.84

**Conclusion**

"Federal courts should allow intervention where no one would be hurt and the greater justice could be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal citation omitted). Here, that "greater justice" means that the Republican Committees may intervene as of right, but the proposed individual intervenors may not intervene as of right or by permission of this Court.

AND NOW, this 6th day of January 2023,

IT IS HEREBY ORDERED that the motion to intervene [ECF No. 34] is granted in part insofar as the Republican Committees may intervene in this matter as of right. The motion is denied in all other respects.

IT IS FURTHER ORDERED that the Republican Committees file a responsive pleading addressing the Complaint by January 17, 2023. In the event the Republican Committees file a dispositive motion, oppositions thereto shall be filed by January 31, 2023.

The parties are on notice that the filing of any dispositive motion does **not** stay discovery.

SUSAN PARADISE BAXTER
United States District Judge

9

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

|  |  |
|---|---|
| BETTE EAKIN, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>        Defendants. | Case No. 1:22-cv-00340-SPB |

## PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.   Plaintiffs have Article III standing for their claims against Lancaster County and Berks County Boards of Elections. ........................................................... 2

    A.   DSCC, DCCC, and the Federation have associational standing to bring claims on behalf of their members and constituents. ............................................... 3

    B.   The Organizational Plaintiffs have direct standing to sue over their own injuries caused by Lancaster and Berks Counties. ................................................. 5

II.  Plaintiffs have a private right to enforce the Materiality Provision of the Civil Rights Act. ................................................................................................................ 6

III. The Date Provision violates the Materiality Provision. ................................... 10

    A.   County Boards' enforcement of the Date Provision results in a denial of the right to vote. ........................................................................................................ 12

    B.   The Date Provision relates to an application, registration, or other act requisite to voting. ............................................................................................................ 13

    C.   The handwritten date on a mail ballot's outer envelope is unrelated to the voter's qualifications. ...................................................................................................... 16

IV.  The Date Provision violates the First and Fourteenth Amendments under the *Anderson-Burdick* test. ........................................................................................................ 17

    A.   Rejecting mail ballots implicates the fundamental right to vote. .......................... 17

    B.   Defendants' enforcement of the Date Provision imposes a serious burden on Pennsylvanians' right to vote. ............................................................................. 19

    C.   The Date Provision does not serve any state interest. ......................................... 20

    D.   Plaintiffs' expert testimony shows that the Date Provision disproportionately burdens racial minorities and older voters. .......................................................... 23

CONCLUSION ............................................................................................................. 24

App.87

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Riga*,
    208 F.3d 419 (3d Cir. 2000)................................................................5

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)................................................................15

*Am. Party of Tex. v. White*,
    415 U.S. 767 (1974)................................................................18

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)................................................................17, 18

*Belitskus v. Pizzingrilli*,
    343 F.3d 632 (3d Cir. 2003)................................................................22

*Burdick v. Takushi*,
    504 U.S. 428 (1992)................................................................17

*Chapman v. Berks Cnty. Bd. of Elections*,
    No. 355 M.D. 2022, 2022 WL 4100998 (Pa. Cmwlth. Aug. 19, 2022)................................................................20

*Citizens Coal Council v. Matt Canestrale Contracting, Inc.*,
    40 F. Supp. 3d 632 (W.D. Pa. 2014)................................................................3

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005)................................................................8, 9

*Cottrell v. Alcon Labs.*,
    874 F.3d 154 (3d Cir. 2017)................................................................3

*Council of Alt. Pol. Parties v. Hooks*,
    121 F.3d 876 (3d Cir. 1997)................................................................19

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)................................................................18, 20, 24

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ................................................................17, 19

*Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*,
    823 F.3d 209 (3d Cir. 2016)................................................................5

App.88

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ........................................................22

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009).............................................................................9

*Ford v. Tenn. S.*,
    No. 06-2031-DV, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ........13

*Freeman v. Corzine*,
    629 F.3d 146 (3d Cir. 2010)............................................................5, 6

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)........................................................................7, 8

*Goosby v. Osser*,
    409 U.S. 512 (1973)...........................................................................18

*Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*,
    570 F.3d 520 (3d Cir. 2009)...........................................................7, 8

*Green Party of N.Y. v. N.Y. State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004)..............................................................22

*Idahoan Fresh v. Advantage Produce, Inc.*,
    157 F.3d 197 (3d Cir. 1998)..............................................................15

*June Med. Servs. L. L. C. v. Russo*,
    140 S. Ct. 2103 (2020)........................................................................5

*La Union del Pueblo Entero v. Abbott*,
    No. 5:21-CV-0844-XR, 2022 WL 3045657 (W.D. Tex. Aug. 2, 2022).................................6

*League of Women Voters of Ark. v. Thurston*,
    No. 5:20-CV-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021)
    ......................................................................6, 11, 12, 14

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ..............................................13

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ........................................................18, 24

*McDonald v. Board of Election Commissioners of Chicago*,
    394 U.S. 802 (1969)......................................................................17, 18

*McKay v. Thompson*,
    226 F.3d 752 (6th Cir. 2000) ............................................................10

App.89

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) .................................................................. *passim*

*Northeast Ohio Coalition for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ......................................................10, 19, 20

*O'Brien v. Skinner,*
    414 U.S. 524 (1974) ........................................................................18

*Ohio State Conf. of N.A.A.C.P. v. Husted,*
    768 F.3d 524 (6th Cir. 2014) ............................................................22

*Pa. Psych. Soc'y v. Green Spring Health Servs., Inc.,*
    280 F.3d 278 (3d Cir. 2002) ..............................................................4

*Peyton v. Rowe,*
    391 U.S. 54 (1968) ..........................................................................11

*Puerto Rico v. Franklin Cal. Tax-Free Trust,*
    579 U.S. 115 (2016) ........................................................................15

*Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.,*
    867 F.3d 338 (3d Cir. 2017) ..........................................................1, 14

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ........................................................ *passim*

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp,*
    No. 1:21-CV-01284-JPB, 2021 WL 6495360 (N.D. Ga. Dec. 9, 2021) ..................12

*Tex. Democratic Party v. Hughs,*
    474 F. Supp. 3d 849 (W.D. Tex. 2020) ..................................................7

*Tineo v. Attorney General of the United States,*
    937 F.3d 200 (3d Cir. 2019) ..............................................................4

*United States v. Classic,*
    313 U.S. 299 (1941) ........................................................................12

*Wilder v. Va. Hosp. Ass'n,*
    496 U.S. 498 (1990) ..........................................................................8

**Statutes**

25 P.S. § 2811 ....................................................................................16

25 P.S. § 3063(a) ................................................................................16

25 P.S. § 3150.16(a) ............................................................................15

App.90

25 Pa. C.S.A. § 1301(a) .............................................................................................16

25 Pa. C.S.A. § 1505(a) .............................................................................................20

42 U.S.C. § 1983 .................................................................................................. *passim*

52 U.S.C. § 10101(a)(2)(B) .................................................................................. *passim*

52 U.S.C. § 10101(a)(3)(A) .........................................................................................16

52 U.S.C. § 10101(d) ...................................................................................................9

52 U.S.C. § 10101(e) ......................................................................................2, 12, 16

Civil Rights Act, Title VI, 42 U.S.C. § 2000d ............................................................7

Education Amendments of 1972, Title IX, 20 U.S.C. § 1681 .....................................7

**Other Authorities**

H.R. Rep. No. 85-291 (1957)........................................................................................9

App.91

## INTRODUCTION

The motions for summary judgment filed by Defendants Lancaster County Board of Election and Berks County Board of Elections ("County Boards"), ECF No. 280, and Intervenors the Republican National Committee, National Republican Congressional Committee, and the Republican Party of Pennsylvania ("Intervenors"), ECF No. 282, confirm that the material facts in this case are not genuinely disputed. Pennsylvania law requires county boards of elections to reject an otherwise valid mail-in or absentee ballot if, in timely submitting that ballot, the voter mistakenly failed to write a date that the boards deem correct on the ballot return envelope (hereinafter, "Date Provision"), *see* ECF No. 282 at 1, but that handwritten date is irrelevant in determining whether an individual is qualified to vote, *id.* at 13.

Section 101 of the Civil Rights Act prohibits states from refusing to count a person's ballot on the ground that the person made a mistake on a piece of paper that is immaterial to their qualification to vote. *See* 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"). That is exactly what happens when the County Boards enforce the Materiality Provision—as the Third Circuit recently held in an opinion that, while mooted, clearly reflects that court's views. *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022), *judgment vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (Mem.) (2022); *see also Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) (opinion vacated on non-merits grounds "sets forth the view of our Court"). Plaintiffs are entitled to judgment as a matter of law on all counts and the Court should deny summary judgment to the County Boards and Intervenors.

Nothing in the County Boards' or Intervenors' motions for summary judgment alters this conclusion. Lancaster and Berks Counties' attempt to attack Plaintiffs' standing and their right to bring this action fails because the Date Provision has resulted in thousands of ballots being discarded—including those of Plaintiffs' members and constituents who live and vote across

1

App.92

Pennsylvania, Pls.' Concise Statement of Material Facts, ECF No. 289, ("CSMF") ¶¶ 104–05, 113–15, 121; Pls.' Statement of Additional Material Facts ("SAMF") ¶¶ 1–3—and will continue to result in otherwise-valid ballots being discarded in future elections. Furthermore, enforcement of the Date Provision requires Plaintiffs to divert resources away from their other activities and towards understanding how each county intends to apply the Date Provision and assisting their members to avoid disenfranchisement. CSMF ¶¶ 99–103, 110–12, 122–23. And well-established case law makes clear that private plaintiffs can sue to enjoin violations of the Materiality Provision. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294-1296 (11th Cir. 2003).

Intervenors take another approach: they attempt to narrow the Materiality Provision to the point of obsolescence by reading into the statute various restrictions that would limit the Provision's protections to registration materials, and only to information used to determine voter eligibility. The plain text of the Materiality Provision defies these efforts. The law provides broad protection to ensure that qualified voters are not disenfranchised through strict application of needless technicalities such as the Date Provision on papers or records used at any stage of the voting process—from registration to vote counting. *See* 52 U.S.C. § 10101(e) (defining "vote").

Plaintiffs are entitled to judgment as a matter of law on all counts and the Court should deny summary judgment to the County Boards and Intervenors.

## ARGUMENT

### I. Plaintiffs have Article III standing for their claims against Lancaster County and Berks County Boards of Elections.

The unrefuted evidence and settled authorities submitted with Plaintiffs' motion for summary judgment establish that (1) Plaintiffs suffered an injury as a result of the County Boards' rejection of undated or incorrectly dated ballots (collectively, "undated ballots"); (2) such injury is fairly traceable to the County Boards; and (3) a favorable judicial decision will likely redress

App.93

those injuries. *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017). Plaintiffs have members or constituents in both counties whose votes are at risk as a result of the Date Provision, CSMF ¶¶ 104–05, 113–15, 121; SAMF ¶¶ 1–3, and furthermore must divert time and resources away from other projects to learn how each county applies the Date Provision and assist their members to avoid disenfranchisement, CSMF ¶¶ 99–103, 110–12, 122–23.

Despite rejecting a combined total of over 1,000 ballots cast by eligible Pennsylvanians, the Lancaster and Berks County Boards of Election contend that they have caused no injury sufficient to establish standing. Their improbable assertion misapplies the relevant standards and ultimately unravels in the face of Plaintiffs' unrefuted testimony establishing that Organizational Plaintiffs DSCC, DCCC, and AFT Pennsylvania (the "Federation") have standing to bring claims against all Defendants, including the County Boards.

### A. DSCC, DCCC, and the Federation have associational standing to bring claims on behalf of their members and constituents.

To establish associational standing, an organizational plaintiff must show that: (1) their members and constituents "otherwise have standing in their own right," (2) "the interests [the organizations] seek[] to protect are germane to [their] purpose," and (3) the members and constituents' participation is unnecessary to resolve Plaintiffs' claims. *Citizens Coal Council v. Matt Canestrale Contracting, Inc.*, 40 F. Supp. 3d 632, 636–37 (W.D. Pa. 2014) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Lancaster and Berks Counties do not directly challenge Plaintiffs' satisfaction of any of these three elements but instead argue that DSCC, DCCC, and the Federation (the "Organizational Plaintiffs") lack standing on the sole basis that they have failed to identify a specific member that has suffered or will suffer harm because of the Date Provision. ECF No. 280 at 3–4. That is incorrect. All three organizations have identified injured members or constituents, CSMF ¶¶ 80, 121, and both Lancaster and Berks Counties have

3

admitted to disenfranchising more than a thousand voters collectively in the 2022 general election because of the Date Provision. *See* CSMF ¶¶ 8–10; Pls' Appendix of Exhibits, ECF No. 290, ("CSMF App.") at App.273 (Berks County admitting they set aside "782 ballots" because of the Date Provision), App.396 (Lancaster County admitting they "segregated and/or set aside 232 mail ballots" because of the Date Provision).[1] And because these counties have committed to enforcing the Date Provision in future elections, Organizational Plaintiffs' members and constituents will remain at risk of having their mail ballots rejected.

DSCC, DCCC, and the Federation additionally have third-party standing to protect the rights of their members and constituents in each county. The Third Circuit has recognized that a plaintiff may have standing to assert a non-party's rights where "the party asserting the right has a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Tineo v. Attorney General of the United States*, 937 F.3d 200, 209 (3d Cir. 2019) (quoting *Sessions v. Morales-Santana*, 582 U.S 47, 57 (2017)). For example, "doctors may be able to assert the rights of patients; lawyers may be able to assert the rights of clients; vendors may be able to assert the rights of customers; and candidates for public office may be able to assert the rights of voters." *Pa. Psych. Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 n.10 (3d Cir. 2002). Organizational Plaintiffs satisfy each of the three prerequisites for third party standing, *see id.* at 288-289: they are injured by enforcement of the Date Provision, *see* CSMF ¶¶ 99–103, 110–12, 122–23; SAMF ¶¶ 1–3; each Plaintiff has a close relationship with its members and constituents, *see* CSMF ¶¶ 93, 95–97, 104–05, 108–09,

---

[1] Of those hundreds of ballots, the specific voter identities were designated as Confidential Information pursuant to the Court's Protective Order. ECF No. 224. The contents of those ballots—such as the completed ballots themselves, indicating who those individuals actually voted for—were neither requested nor produced.

113–19; and these individuals cannot protect their interests because they cannot determine in advance whether they will forget to date—or incorrectly date—their mail ballot envelope and may not learn of the deprivation of their rights until it is too late, CSMF ¶¶ 8–28, 46–51, 81–90. Plaintiffs therefore have third-party standing to assert the claims of their members and constituents who may inadvertently fail to comply with the Date Provision in future elections. *Cf. June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2173–74 (2020) (Gorsuch, J., dissenting) (recognizing that controlling opinion allowed abortion providers third-party standing to "assert the constitutional rights of an undefined, unnamed, indeed unknown, group of women who they hope will be their patients in the future"), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

### B. The Organizational Plaintiffs have direct standing to sue over their own injuries caused by Lancaster and Berks Counties.

Putting aside the injuries suffered by their members and constituents, Organizational Plaintiffs have direct standing because Lancaster and Berks Counties' actions "impair[] [Plaintiffs'] ability to carry out [their] mission," resulting in a diversion of resources. *Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016); *see also Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000). Lancaster and Berks Counties attempt to evade responsibility for any diversion of resources by claiming that they are not responsible for the Date Provision. ECF No. 280 at 5. But as discussed, both counties—along with every other county in Pennsylvania—have admitted that they have refused to count undated or incorrectly dated mail ballots and will continue to do so in future elections. *See* CSMF ¶¶ 8–10; CSMF App. at App.273, App.396. Thus, their actions have directly caused (and will continue to cause) the disenfranchisement of Organizational Plaintiffs' members and constituents, and consequently the resulting diversion of Organizational Plaintiffs' resources. *See Freeman v. Corzine*, 629 F.3d 146,

App.96

153 (3d Cir. 2010) (recognizing that to show causation, a plaintiff need only show their injury is "fairly traceable" to the challenged conduct, and even "an indirect causal relationship will suffice," *id.* (quotation omitted)).

The Counties also claim—without support—that because the Date Provision is "already in place and ha[s] already been used in one election," there is no diversion of resources. ECF No. 280 at 6. But as discussed in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, the threat of disenfranchisement caused by Defendants' enforcement of the Date Provision is ongoing, and will continue to force Organizational Plaintiffs to divert resources in the form of personnel, time, and money away from existing activities such as get-out-the-vote programs, advocacy efforts, or helping voters in other states cure their ballots, and instead toward helping their constituents and members in Pennsylvania ensure their vote is ultimately counted and not set aside because of the Date Provision. CSMF ¶¶ 91–103, 106–12, 115, 117–23. The fact that Organizational Plaintiffs have already been harmed by the Date Provision in a previous election does not prevent them from seeking a remedy to prevent future injury.

Whether asserting claims directly or on behalf of their members and constituents, each Organizational Plaintiff has more than adequately alleged standing to bring claims against Lancaster and Berks Counties.

## II. Plaintiffs have a private right to enforce the Materiality Provision of the Civil Rights Act.

Intervenors misrepresent both the text of the Civil Rights Act and the relevant case law to argue that Plaintiffs lack a private right to enforce the Materiality Provision. This argument fails because a private right of action is unequivocally provided through 42 U.S.C. § 1983. *See Migliori*, 36 F.4th at 162; *see also Schwier*, 340 F.3d at 1297; *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3045657, at *29–30 (W.D. Tex. Aug. 2, 2022); *League of Women*

App.97

*Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021); *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 859–60 (W.D. Tex. 2020), *rev'd on other grounds by Tex. Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021). And if a statute "unambiguously confers an individual right," Plaintiffs presumptively may enforce it through Section 1983. *Migliori,* 36 F.4th at 159.

The Materiality Provision easily meets this standard because it has "an unmistakable focus" on the individual right to vote. *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 528 (3d Cir. 2009). Specifically, the Materiality Provision prohibits denying "any individual" the right to vote based on "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B). As the Third Circuit explained, by "plac[ing] all citizens qualified to vote at the center of its import and provid[ing] that they shall be entitled and allowed to vote," this language "unambiguously confers a personal right." *Migliori*, 36 F.4th at 159 (cleaned up).

In this respect, the Materiality Provision's language is "clearly analogous" to Title VI of the Civil Rights Act, 42 U.S.C. § 2000d ("No person in the United States shall on the ground of race, color, or national origin . . . be subjected to discrimination . . .") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex . . . be subjected to discrimination . . ."), which contain epitomic rights-creating language. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.3 (2002) ("We have recognized, for example, that Title VI … and Title IX … create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'") (emphasis in original); *see also Schwier*, 340 F.3d at 1291, 1296 (finding the Materiality Provision conferred a private right

7

App.98

enforceable through Section 1983). Like Titles VI and IX, the Materiality Provision's "No person . . . shall" formulation targets "the denial of rights to individuals," creating an unmistakable federal right. *Schwier*, 340 F.3d at 1291, 1296. "Indeed, the rights-creating language here may be even stronger" than that of Titles VI and IX because the Materiality Provision "explicitly include[s] the word 'right.'" *Grammer*, 570 F.3d at 531; *see also Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 524 (1990) (finding Medicaid Act provision that *required states* to provide for payment of medical services for needy individuals using reasonable rates conferred private rights on medical providers); 52 U.S.C. § 10101(a)(2)(B) (protecting the "*right* of any individual to vote" (emphasis added)).

Because the Materiality Provision unambiguously confers an individual right to voters, it is presumptively enforceable through Section 1983 and Intervenors have the burden to demonstrate that Congress intended to exclude the possibility of a private right of action by identifying either "express terms" in the statute foreclosing private enforcement or a "comprehensive remedial scheme" that is more restrictive than Section 1983. *See Gonzaga Univ.*, 536 U.S. at 284; *Grammer*, 570 F.3d at 532. While Intervenors point to language enabling the Attorney General to bring suit to enjoin violations of the Materiality Provision, this "is inadequate, without more, to rebut the presumption of a private right of action under § 1983." *Migliori*, 36 F.4th at 162; *see also Schwier*, 340 F.3d at 1294–96 (holding that the Attorney General's authority to enforce the Materiality Provision does not preclude private enforcement). Indeed, the primary case they cite in support actually undermines their argument. In *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), the Supreme Court considered whether Section 332(c)(7) of the Telecommunications Act was enforceable through § 1983. In determining that it was not, the Supreme Court identified "the dividing line between those cases in which we have held that an action would lie under § 1983 and

8

those in which we have held that it would not": "the existence of a more restrictive *private remedy* for statutory violations." *City of Rancho Palos Verdes*, 544 U.S. at 121 (emphasis added). Intervenors do not (and cannot) identify any such remedial scheme here.

The Supreme Court has further made clear that it does not "lightly conclude that Congress intended to preclude reliance on § 1983" and in the very few instances where it has, "the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit," and they involved "unusually elaborate, carefully tailored, and restrictive enforcement schemes." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254-55 (2009) (internal quotations omitted). Section 101 of the Civil Rights Act bears no resemblance to these schemes; to the contrary, the statutory text contemplates private litigation by explaining that federal courts "shall exercise" jurisdiction over "proceedings instituted pursuant to [the statute]" regardless of whether "the party aggrieved shall have exhausted any administrative or other remedies," 52 U.S.C. § 10101(d).

The legislative history also confirms that Congress intended for the Materiality Provision to remain enforceable through § 1983 actions. In the House Report accompanying the bill establishing the Attorney General's enforcement authority, the Judiciary Committee recognized that "Section 1983 of Title 42 U.S.C. has been used to enforce the rights, legislatively declared in the existing law." H.R. Rep. No. 85-291 (1957). The addition of public enforcement by the Attorney General was intended "to provide means for *further* securing and protecting the right to vote," *id.*, in recognition that "deprivation of the right to vote is the first step on the road to tyranny and dictatorship" and therefore "the right of franchise must be protected by the sovereign," *id.* As the Eleventh Circuit has recognized, "[t]his language demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant

9

App.100

merely to substitute one form of protection for another." *Schwier*, 340 F.3d at 1295.

Intervenors' position furthermore is not supported by any meaningful authority. Three federal appellate courts have considered whether the Materiality Provision is enforceable through § 1983: The Third Circuit in *Migliori* and the Eleventh Circuit in *Schwier* thoroughly analyzed the issue, evaluating the text, structure, and history of § 10101 to conclude that it could be enforced through a § 1983 action. Intervenors acknowledge *Schwier* but make no effort to engage with the Eleventh Circuit's reasoning (or with the Third Circuit's reasoning in *Migliori*). Instead, they rely on the Sixth Circuit's opinion in *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) ("*NEOCH*"). That opinion does not engage with the merits at all; the panel instead briefly discusses the Eleventh Circuit's reasoning in *Schwier* but acknowledges the binding effect of a previous Sixth Circuit decision. *See NEOCH,* 837 F.3d at 630. That previous decision— *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000)—devotes exactly ten words to the issue.

The careful and extensive review of the Third Circuit in *Migliori* and the Eleventh Circuit in *Schwier*, including detailed consideration of the text, structure, and history of the Civil Rights Act, stand in stark contrast to the Sixth Circuit's cursory analysis. Intervenors offer no argument that warrants departure from these courts' thorough analyses.

## III. The Date Provision violates the Materiality Provision.

There are no factual disputes as to whether the Date Provision violates the Materiality Provision; instead, Intervenors advance legal arguments that ignore the text of the statute in favor of hyperbolic claims about the implications of enforcing the statute as written. Because each of their arguments fails, they are not entitled to summary judgment. Judgment instead should be granted to Plaintiffs for the reasons discussed in Plaintiffs' motion. *See* ECF No. 288.

The Materiality Provision makes it unlawful to:

deny the right of any individual to vote in any election because of an error or

App.101

omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). Congress enacted this provision to rid the country of state laws "that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters." *Thurston*, 2021 WL 5312640, at *4. As remedial legislation, the Materiality Provision must be "liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968).

The Materiality Provision's text consists of three clauses, giving rise to a three-element claim. The first two clauses identify the universe of voting regulations to which the Materiality Provision applies. Clause 1 requires that the regulation result in the "den[ial of] the right of any individual to vote." 52 U.S.C. § 10101(a)(2)(B). Clause 2 requires that the cause of that denial be "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." *Id.* Meanwhile, Clause 3 creates the test for determining the regulation's legality: If the "error or omission is not material in determining whether such individual is qualified under State law to vote in such election," enforcement of the regulation is unlawful. *Id.* Intervenors argue that rejecting undated or misdated ballots does not violate any of these elements: they claim that the first element is not satisfied because refusing to count a noncompliant ballot does not deprive anyone of the right to vote, ECF No. 282 at 6; that the second element is not satisfied because the Materiality Provision only "regulates requirements and practices related to qualifications and registration to vote, not rules 'that must be met in order to cast a ballot that will be counted,'" *id.* at 8 (quoting *Ritter,* 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay)); and that the third element is not satisfied because casting a mail ballot is voting rather than an act requisite to voting, *id.* at 12. These theories share the same fatal flaw: They are incompatible with the text of the statute.

11

App.102

A. **The County Boards' enforcement of the Date Provision results in a denial of the right to vote.**

The Date Provision's requirement that county boards reject a mail ballot due to a missing or incorrect written date on its envelope unquestionably denies the right to vote, which includes not only the ability to "cast a ballot," but also to "*have it counted*." *United States v. Classic*, 313 U.S. 299, 318 (1941) (emphasis added). Congress wrote this understanding directly into the Materiality Provision, explicitly defining the word "vote" as used in the Provision to encompass "all action[s] necessary to make a vote effective, including . . . having [a] ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e); *id.* § 10101(a)(3)(A) (incorporating this definition for purposes of the Materiality Provision's use of the term "vote"). By prohibiting county boards from counting otherwise valid mail ballots due to a missing or incorrect written date on the envelope, the Date Provision denies the right to vote as Congress has explicitly defined that term.

This statute's definition of the term "vote" also forecloses Intervenors' self-refuting argument that the Date Provision's enforcement does not violate the Materiality Provision because "[t]he consequence of . . . noncompliance is not disqualifying the voter, stripping the voter's eligibility to vote, or removing the voter from the list of registered voters, but rather declining to count the voter's (invalid) ballot." ECF No. 282 at 7. Applying the plain text of the Materiality Provision, courts have repeatedly found that it applies to state laws that, like the Date Provision here, do not stand in the way of a voter casting a ballot but instead require rejecting that ballot after submission because of a mistake or omission made by the voter. *See Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360, at *14 (N.D. Ga. Dec. 9, 2021) (finding plaintiffs stated a plausible Materiality Provision claim in challenge against requirement that absentee voters write their birth date on their absentee ballot envelope); *Thurston*,

12

App.103

2021 WL 5312640, at *4 (finding plaintiffs stated a plausible Materiality Provision claim in challenge against requirement that absentee voters who have already demonstrated their eligibility to provide similar evidence with their absentee ballot as well); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) (enjoining county from rejecting absentee ballots due to voter's failure to write correct year of birth on envelope because doing so likely violates the Materiality Provision); *Ford v. Tenn. S.*, No. 06-2031-DV, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006) (explaining Materiality Provision prohibits rejecting a voter's ballot envelope because of the voter's failure to sign both ballot and poll book). Intervenors meanwhile fail to cite a single decision that relies upon their atextual theory.

### B. The Date Provision relates to an application, registration, or other act requisite to voting.

The Date Provision prohibits rejecting a ballot "because of an error or omission on *any* record or paper relating to *any* application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It requires counties to reject mail ballots due to an "omission" (failing to write the date) or "error" (writing the wrong date) made by the voter on a "paper" (the envelope) relating to an "act requisite to voting" (completing the voter declaration). *Id.*

Intervenors seek to rewrite the Materiality Provision by arguing that it should apply only when "the error or omission affect[s] a 'determin[ation] whether such individual is qualified under State law to vote.'" ECF No. 282 at 8 (quoting 52 U.S.C. § 10101(a)(2)(B)); *see also id.* at 9-10. This argument badly misconstrues the statutory text and has been rejected by other courts. *Ford*, 2006 WL 8435145, at *11 (rejecting same argument that the Materiality Provision applies "solely [to] determining eligibility to vote"). It is Clauses 1 and 2 of the Materiality Provision, not Clause 3, that delineate the *type* of voting regulation governed. And their plain text makes clear that the Provision applies to any regulation that denies the right to vote "because of an error or omission

13

App.104

on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).

This is why, in *Migliori*, the Third Circuit determined that the Materiality Provision "applies" to the Date Provision by asking only whether "mail-in ballot[s] [] constitute[] a paper relating to an act for voting." 36 F.4th at 162 n.56. Having found that the Date Provision "squarely" does so, the court moved on to Clause 3's test, which determines not whether a regulation falls within the Materiality Provision's ambit, but instead whether the regulation is lawful. *Id.* at 163–64. Under that test, if the omission or mistake at issue is "material in determining whether such individual is qualified under State law to vote in such election," the regulation's enforcement is lawful; if it is immaterial, enforcement is unlawful. 52 U.S.C. § 10101(a)(2)(B). As explained below, the *Migliori* court easily concluded (and Intervenors concede) that the Date Provision fails that test.[2]

If Congress had intended to limit the Materiality Provision to papers and records used to determine a person's eligibility, it would have stated that it applies only to papers and records relating to *registration*, the phase during which election officials determine a voter's eligibility. *See Thurston*, 2021 WL 5312640, at *4; *see also* SAMF ¶¶ 4–5. But Congress did the opposite, using expansive language making clear that the Materiality Provision's scope applies to *any* record

---

[2] Intervenors claim that *Migliori* is not persuasive authority because it was vacated as moot, and that therefore "[t]he Court should not rely on that analysis," but the Third Circuit has confirmed that an opinion vacated on non-merits grounds remains highly persuasive. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) ("Although our judgment . . . was vacated by the Supreme Court, it nonetheless sets forth the view of our Court. . . . [The Supreme Court] vacated our judgment, . . . but did not attack our reasoning. . . . While [the vacated opinion] is no longer controlling, there is nothing that would require us—or anyone else—to conclude that our reasoning in that opinion was incorrect."). Intervenors' attack on *Migliori*'s persuasive value furthermore rings hollow given that their brief cites Justice Alito's *Ritter* dissent on behalf of only three justices at least a dozen times. *See* ECF No. 282 at 1, 4, 6–9, 12–13.

App.105

or paper relating not only to "registration," but "any . . . *other* act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (noting Supreme Court precedent that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'"). To accept Intervenors' reading of the statute would render that last phrase superfluous. *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) ("In interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous."). If Congress intended to circumscribe the Materiality Provision to constrain its scope only to instances when state actors use the information provided to determine a voter's eligibility, "it would have said so." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 128 (2016). Not only did Congress *not* adopt this restriction, it included language making clear that it intended the Provision to have a much broader reach. The plain text of the statute forecloses Intervenors' theory.

Intervenors also exaggerate the consequences of Plaintiffs' interpretation of the Materiality Provision, suggesting that it would prevent states from enacting "*any* requirements for completing ballots . . . that do not confirm the individual's qualifications to vote." ECF No. 282 at 13. But the examples they offer to demonstrate this point fall flat because it remains unclear why any of them would violate the Materiality Provision's plain text the way the Date Provision does. Intervenors fail to explain, for example, why the requirements that voters place their mail ballot in a secrecy envelope, *id.* at 14 (citing 25 P.S. §§ 3146.6(a), 3150.16(a)), or appear at a polling place before the polls close amount to "error[s] or omission[s] *on* any record or paper" as required to trigger the Materiality Provision. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). And when a county board declines to count an overvote, ECF No. 282 at 14, it does not deny that voter the ability to vote;

App.106

rather, it effectuates the voter's ballot to the fullest practicable extent. *See* 25 P.S. § 3063(a) ("the ballot shall be counted for all offices for which it is properly marked"). Indeed, Intervenors fail to identify a single example of another instance in which the basic, textual application of the Materiality Provision would invalidate other state voting laws.

Finally, Intervenors attempt to drag the Date Provision outside of the Materiality Provision's scope by claiming that "casting a ballot . . . constitutes the *act* of voting, not an . . . act *requisite* to voting." ECF No. 282 at 11-12. But this argument immediately falls apart in light of Intervenors' simultaneous admission that "casting a ballot . . . *requires* completing the declaration." *Id.* at 11 (emphasis added). If a voter is required to complete the declaration to cast a ballot, completing the declaration is an act requisite to voting. In any event, this imagined distinction cannot be squared with the statutory text. As explained, the Materiality Provision expressly defines "vote" as including "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e).

### C. The handwritten date on a mail ballot's outer envelope is unrelated to the voter's qualifications.

Intervenors effectively concede the third element of Plaintiffs' Materiality Provision claim. As they explain, "Plaintiffs are entirely correct that compliance with the date requirement is not a qualification to vote." ECF No. 282 at 13. A person is eligible to vote in Pennsylvania if they are at least 18 years old on the day of the next election, have been a citizen of the United States for at least one month before the next election, and have resided in the Pennsylvania election district where they plan to vote for at least 30 days prior to the next election, provided they have not been convicted of a felony within the last five years. 25 P.S. § 2811; 25 Pa. C.S.A. § 1301(a). As the *Migliori* court unanimously concluded (and Intervenors do not dispute), a voter's failure to write

App.107

a correct date on the envelope containing their mail ballot has nothing to do with their qualifications to vote. 36 F.4th at 163; *see also* ECF No. 282 at 13 ("[T]he date requirement is not used to determine whether an individual is 'qualified under State law to vote.'"). Nor do any of the defendant county board of elections rely upon it to determine whether a ballot was timely submitted. Rejecting mail ballots on this ground plainly violates the Materiality Provision.

## IV. The Date Provision violates the First and Fourteenth Amendments under the *Anderson-Burdick* test.

Not only is the Date Provision immaterial to voter qualifications, it also fails to advance any sufficiently weighty state interest and thus violates the First and Fourteenth Amendments. When considering such challenges to state election laws, courts apply the *Anderson-Burdick* balancing test, which weighs the character and magnitude of the burdens imposed against the precise interest that Defendants claim warrants that burden. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Because the Date Instruction serves no legitimate purpose in the voting process, the significant burdens imposed by its enforcement are unjustifiable and create unlawful barriers to the franchise.

### A. Rejecting mail ballots implicates the fundamental right to vote.

At the outset, Intervenors ask the Court to reject the *Anderson-Burdick* test entirely because the Date Provision regulates only absentee and mail-in voting and therefore purportedly does not implicate a fundamental right. ECF No. 282 at 17. In support of this argument, Intervenors cite *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807–08 (1969), a case that pre-dates *Anderson* itself—and by extension the *Anderson-Burdick* test that courts apply

App.108

today. But Intervenors' reliance on *McDonald* to rewrite the *Anderson-Burdick* test suffers from another fundamental flaw: *McDonald* did not insulate absentee voting restrictions from adherence to the constitutional right to vote. *McDonald* simply required the Court to determine whether unsentenced inmates awaiting trial met one of the four *qualifications* under which absentee ballots were provided by Illinois law, with the Court concluding that they could not show they qualified as "physically incapacitated." *Id.* at 803–05, 809–10; *see also O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("Essentially the Court's disposition of the claims in *McDonald* rested on failure of proof."); *Goosby v. Osser*, 409 U.S. 512, 520–22 (1973) (finding that *McDonald* suggested different result if plaintiffs had presented evidence that the state was effectively preventing them from voting). And since *McDonald*, the Supreme Court has acknowledged that restrictions on absentee voting *can* impose burdens that violate the Equal Protection Clause. *See Am. Party of Tex. v. White*, 415 U.S. 767, 794 (1974); *O'Brien*, 414 U.S. at 530.

The Supreme Court has also been clear that there are *no litmus tests* dividing appropriate restrictions from invalid ones under its *Anderson-Burdick* framework. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008). In every case, the court must take a hard look at the evidence and determine whether the burdens imposed by the restrictions are justified by the specific interests set forth by the state. *Anderson*, 460 U.S. at 789-90. To accept Intervenors' argument would be to find that there *is* a broad litmus test shielding a wide array of restrictive voting laws—governing absentee or mail-in voting—from review entirely, a view that the Supreme Court has never endorsed since announcing the *Anderson-Burdick* test. That is why courts have consistently applied the *Anderson-Burdick* test to "a wide range of electoral-process regulations," including "absentee voting, early voting, . . . [and] the counting of ballots[.]" *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140–41 (3d Cir. 2022) (collecting cases).

App.109

Here, Plaintiffs provided myriad, undisputed evidence that Defendants' enforcement of the Date Provision has resulted in rejection of otherwise valid ballots and they have committed to do the same in future elections, which burdens the constitutional right to voter.

**B.    Defendants' enforcement of the Date Provision imposes a serious burden on Pennsylvanians' right to vote.**

In the 2022 general election, Defendants rejected more than 10,000 otherwise valid and timely received ballots simply because of a missing or incorrect date on the ballot's outer envelope. CSMF ¶ 10. Courts have consistently held that disenfranchisement for failure to comply with technical requirements, like the Date Provision, imposes a serious burden on the right to vote. *See, e.g.*, *NEOCH,* (holding that rejecting mail ballots based on voters' failure to write their birthday and address with "technical precision" imposed unjustified burden); *Democratic Exec. Comm. Of Fla.,* 915 F.3d at 1319 (recognizing that absentee ballot signature matching requirement imposed burden of a "risk of disenfranchisement" from a perceived signature mismatch). And courts regularly include the costs of noncompliance with a challenged provision—in this case, being disenfranchised—in their *Anderson-Burdick* analysis of the provision's burden. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319–20; *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876 (1997); *NEOCH*, 837 F.3d at 631–34.

Despite the fact that Defendants' past and future enforcement of the Date Provision has disenfranchised thousands of eligible voters, Intervenors claim that the Date Provision imposes no more than the "usual burdens of voting" such as obtaining a photo identification. ECF No. 282 at 18–21. But there is nothing "usual" about the Date Provision: it requires voters to effectively guess which format their county boards of elections will use, which varies by county and is not explicitly defined anywhere. *See* CSMF ¶¶ 7, 15, 17–18, 25, 27. If voters fail to replicate that format, they must then either follow their county's specific "cure" procedures (which, if their county even

App.110

allows curing in the first instance, may require last-minute travel, *see* CSMF ¶¶ 83–88) or simply not have their vote counted. As the Sixth Circuit recognized in *Northeast Ohio Coalition for the Homeless v. Husted*, even a "burden [that] is small for most voters" may impose an impermissible burden when "none of the precise interests put forward by [the state] justifies it." 837 F.3d 612, 632 (6th Cir. 2016) (quotation omitted); *see also Crawford*, 553 U.S. at 199 (recognizing possibility that "heavier burden may be placed on a limited number of persons").

### C.    The Date Provision does not serve any state interest.

To survive scrutiny under the *Anderson-Burdick* analysis, the burden, "[h]owever slight," "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (controlling op.) (internal quotations omitted). The Date Provision fails this test because—unlike the photo identification requirement in *Crawford* or the signature requirement—the Date Provision serves no relevant or legitimate state interest.

While Intervenors claim the Date Provision prevented voter fraud on a single ballot in Lancaster County where the handwritten date post-dated the date the decedent had passed away, this assertion is not supported by the evidence. ECF No. 282 at 19–20. As Lancaster County Board of Elections admitted in deposition testimony, that fraudulent ballot would not have been counted under any circumstance because the deceased had already been removed from the voter rolls before the ballot was received. CSMF ¶ 73; *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *21 n.14 (Pa. Cmwlth. Aug. 19, 2022) ("the ballot at issue had already been separated by the chief clerk because the scan of the return envelope revealed, through the SURE system, that the elector was deceased"); *see also* CSMF ¶ 74; 25 Pa. C.S.A. § 1505(a) ("The Department of Health shall . . . send the name and address of residence of that [deceased] individual to [voter registration] commission . . . [and] [t]he commission shall promptly update information contained in its registration records."). And as Lancaster County Board of Elections and other

App.111

county boards have admitted, election officials do *not* rely on the handwritten date for any purpose other than merely determining that the mail ballot itself complies with the Date Provision—a tautological technical requirement that is unconnected to any legitimate state interest. CSMF ¶¶ 65–68, 76–79.

Intervenors' repetition of the proposed justifications for the Date Provision expressed in a 2020 case before the Pennsylvania Supreme Court—which the court considered on an expedited timeline in the immediate aftermath of the 2020 election—also ignores critical (and undisputed) evidence, along with the comprehensive analysis of election procedures developed since that time, which shows that the Date Provision does not actually serve any of those purported interests. *See* ECF No. 266 at 20–21 (citing *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) ("*In re 2020 Canvass*"), *cert. denied sub nom. Donald J. Trump for President, Inc. v. Degraffenreid*, 141 S. Ct. 1451 (2021)). No county board uses the handwritten date to determine a voter's qualifications. CSMF ¶¶ 31–32; SAMF ¶¶ 4–5. That date does not serve to ensure timely receipt of mail ballots. CSMF ¶¶ 52–64. It does not serve to detect or prevent fraud. CSMF ¶¶ 65–75. And it serves no other purpose whatsoever, other than mere compliance with the Date Provision itself. CSMF ¶¶ 76–79. *See also* ECF No. 288 at 22–24.

Perhaps sensing the lack of any evidence supporting those interests, Intervenors for the first time advance a new purported state interest—that of "solemnity"—in claiming that adding technical formalities to casting a ballot encourages "deliberation" and "considered decisions." ECF No. 282 at 20–21.[3] But such a purely hypothetical interest is not sufficient to justify the Date

---

[3] Notably, at no point in litigation in any court has the Commonwealth of Pennsylvania claimed

Provision's specific burden, which disenfranchises thousands of voters. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 645 (3d Cir. 2003) (requiring evaluation of "precise interests," including "the extent to which those interests make it necessary" to justify the burden (quoting *Anderson,* 460 U.S. at 789)). It defies logic to claim that needless "formalities" are self-justifying by encouraging "considered decisions" when one such formality is singularly responsible for over 10,000 votes not being counted. ECF No. 282 at 20–21; *see also* CSMF ¶ 10. Nor have Intervenors provided any evidence at all to show that the Date Provision has any effect on promoting more voter contemplation. In reality, the Date Provision needlessly strips voters of their voice due to a technical error; it does not empower them to cast a wiser ballot.

Intervenors also claim for the first time—and again without evidence—that the Date Provision advances a state interest in "safeguarding voter confidence" in Pennsylvania elections. ECF No. 282 at 23 (quoting *Crawford,* 553 U.S. at 191). But such a nebulous interest cannot justify the severe burden of disenfranchising thousands of eligible voters for a purely technical requirement. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1132–33 (10th Cir. 2020) (recognizing asserted state interests as "legitimate in the abstract" but rejecting that "those interests make it necessary to burden the plaintiff's rights"); *see also Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 545 (6th Cir. 2014) ("the state must articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary"), *vacated on other grounds sub nom. Ohio State Conf. of NAACP v. Husted*, No. 14–3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 421 (2d Cir.

---

that the interest in "solemnity," or any other state interest, is furthered by the Date Provision. To the contrary, the Commonwealth forcefully argued before the Third Circuit that the requirement serves no valid state interest and should be struck under the Materiality Provision. *See* Amicus Br. of the Commw. of Penn. In Support of Appellants and Reversal at 7, *Migliori v. Lehigh County*, No. 22-1499, 2022 WL 1045074 (3d Cir. Apr. 1, 2022), Dkt. No. 42.

App.113

2004) ("that the defendants' asserted interests are important in the abstract does not necessarily mean that its chosen means of regulation will in fact advance those interests") (cleaned up). After all, voter confidence includes the confidence in "ensur[ing] qualified voters were not disenfranchised by meaningless requirements[.]" *Migliori*, 36 F.4th at 164. In that respect, the Date Provision only undermines voter confidence.

Finally, Intervenors attempt to tie the Date Provision to signature requirements, which are not at issue in this action. ECF No. 282 at 13–15, 19–23. The two requirements differ in several important ways, not least of which being that while county boards have conceded that the Date Provision serves no purpose, they have not made similar concessions about the signature requirement. *See, e.g.*, CSMF ¶¶ 31–32, 54, 57–68, 71–72, 74–79. And while the signature on a declaration may purport to confirm a voter's identity, no similar claim can be made regarding the handwritten date, which has nothing to do with identifying a voter or determining whether they are qualified to vote. CSMF ¶¶ 31–32.[4]

### D. Plaintiffs' expert testimony shows that the Date Provision disproportionately burdens racial minorities and older voters.

The fact that the Date Provision burdens voters is illustrated through the analysis of Plaintiffs' expert, Dr. Hopkins, which shows that certain groups of voters—namely Black, Hispanic, and older voters—were disproportionately disenfranchised because of the Date Provision. CSMF ¶¶ 33–43. Using the well-established "cost of voting" framework, Dr. Hopkins showed a "***statistically significant***" relationship between the number of Black or Hispanic residents in a given county and the rate of rejected mail ballots in that county, CSMF ¶¶ 35–37 (emphasis added), which means that this correlation is "extremely unlikely to have emerged by

---

[4] Intervenors claim that "Plaintiffs concede that the signature requirement is constitutional," ECF No. 282 at 19, but fail to provide any evidence of such an alleged concession. In any event, the signature requirement is beyond the scope of this action.

23

random chance alone." CSMF App. Ex. I ¶ 34. It also reveals that Defendants' enforcement of the Date Provision most heavily impacts the least resourced voter populations. *See also id.* at ¶ 11–14, 16, 48–49.

Intervenors miss the point of such analysis, claiming that Plaintiffs are relying on an abnormal burden specific to those groups. ECF No. 282 at 24. But if there were no burden at all associated with the Date Provision, then there would not be a statistically significant relationship between those groups of voters who are least resourced and the number of ballots rejected because of the Date Provision. CSMF App. Ex. I ¶ 34. In other words, Dr. Hopkins's robust group-level analysis shows that the Date Provision *actually burdens voters*, and Intervenors point to no authority that requires Plaintiffs to "calculate" or otherwise quantify the cost to individual voters as their brief suggests. ECF No. 282 at 24–25.[5]

Because Defendants' enforcement of the Date Provision imposes a serious burden by disenfranchising thousands of Pennsylvania voters for no legitimate state interest, it fails the *Anderson-Burdick* test and violates the First and Fourteenth Amendments.

## CONCLUSION

The Court should deny Defendants Lancaster County and Berks County's and Intervenors' motions for summary judgment.

---

[5] To the extent Intervenors demand that Dr. Hopkins quantify the cost to voters, their argument fundamentally misunderstands the cost of voting framework and contradicts the Supreme Court's admonition against the use of litmus tests and formulas in the *Anderson-Burdick* analysis. *See Crawford*, 553 U.S. at 191 (rejecting "litmus test for measuring the severity of a burden that a state law imposes"); *Mazo*, 54 F.4th at 146 (citing *Crawford*, 553 U.S. at 191).

App.115

Dated: May 5, 2023                  Respectfully submitted,


Adam C. Bonin                  */s/ Uzoma N. Nkwonta*

**THE LAW OFFICE OF**       Uzoma N. Nkwonta*

**ADAM C. BONIN**           Justin Baxenberg*

121 South Broad Street, Suite 400   Jacob D. Shelly*

Philadelphia, PA 19107       Dan Cohen*

Telephone: (267) 242-5014    Daniela Lorenzo*

Facsimile: (215) 827-5300     Omeed Alerasool*

adam@boninlaw.com         **ELIAS LAW GROUP LLP**

                            250 Massachusetts Ave., Suite 400

                            Washington, D.C. 20001

                            Telephone: (202) 968-4490

                            Facsimile: (202) 968-4498

                            unkwonta@elias.law

                            jbaxenberg@elias.law

                            jshelly@elias.law

                            dcohen@elias.law

                            dlorenzo@elias.law

                            oalerasool@elias.law

                            *\* Admitted Pro Hac Vice*

App.116

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BETTY EAKIN, *et al.*, | Civil Action No.: 1:22-cv-00340 |
| Plaintiffs, | |
| v. | |
| ADAMS COUNTY BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

**INTERVENOR-DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**

In support of their Motion for Summary Judgment, the Intervenor-Defendants the Republican National Committee, the National Republican Congressional Committee, and the Republican Party of Pennsylvania submit the following concise statement of material facts.

**I.    THE PARTIES**

**A.    Plaintiffs**

1.    Plaintiff Bette Eakin pleads that she is a registered voter in Pennsylvania.  **Ex. 1**, Am. Compl. ¶ 12 (Dkt. No. 228).

2.    Ms. Eakin pleads that she did not initially date her absentee or mail-in ballot but was able to cure her ballot with her husband's assistance.  *See id.*

3.    Plaintiff DSCC "is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14).  *Id.* ¶ 13.

4.    Plaintiff DCCC "is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14)."  *Id.* ¶ 14.

5.    Plaintiff AFT Pennsylvania "is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals."  *Id.* ¶ 15.

App.117

6.      Plaintiff Black Political Empowerment Project is "a non-profit, non-partisan organization" whose "work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work." *Id.* ¶¶ 24-25.

**B.      Named Defendants**

7.      Defendant County Boards of Elections have "jurisdiction over the conduct of primaries and elections in [their respective] count[ies], in accordance with the provisions of this act." 25 P.S. § 2641(a).

**C.      Intervenor-Defendants**

8.      The Republican National Committee is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

9.      The National Republican Congressional Committee is the national congressional committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

10.      The Republican Party of Pennsylvania is a major political party, 25 P.S. § 2831(a), and the "State committee" for the Republican Party in Pennsylvania, 25 P.S. § 2834, as well as a federally registered "State Committee" of the Republican Party as defined by 52 U.S.C. § 30101(15).

11.      Any court order purporting to change the law and direct counting of undated or incorrectly dated mail-in or absentee ballots would inflict significant harm on Intervenor-Defendants. *See* **Ex. 2**, Intervenor-Defendants' Resps. & Objs. to Plaintiffs' 1st Set of Interrogs. #1.

12.      Unlawful counting of ballots undermines the integrity of elections, generates voter confusion, and erodes public confidence in elections. Therefore, unlawful counting of ballots can discourage voters, including Republican voters, from voting or otherwise

App.118

participating in elections and, thus, change the outcome of election contests in Pennsylvania. *See id.*; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).

13.    Intervenor-Defendants were the prevailing parties in the *Ball* litigation upholding the date requirement, so any court order invalidating the date requirement harms Intervenor-Defendants' rights secured in that litigation. *See* **Ex. 2** at Interrog. #1.

14.    As political parties, Intervenor-Defendants expend substantial resources toward educating, mobilizing, assisting, and turning out voters in Pennsylvania and supporting Republican candidates up and down the ballot. *Id.*

15.    These efforts include devoting time and resources toward training and education programs that ensure that Intervenor-Defendants and their voters understand the rules governing the election process, including applicable dates, deadlines, and requirements for voting by mail or absentee. *Id.*

16.    The efforts also encompass training, education, and monitoring of the voting and vote counting process in Pennsylvania to ensure it is conducted lawfully. *Id.*

17.    Any change in the laws governing Pennsylvania elections harms Intervenor-Defendants by rendering their training, voter education, and monitoring programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

18.    For instance, the Republican Party of Pennsylvania has statutory rights to appoint poll watchers to observe casting, counting, and canvassing of ballots at the polling place, 25 P.S. § 2687(a), and an "authorized representative" to "remain in the room" at the county board of elections and observe the pre-canvass and canvass of "absentee ballots and mail-in ballots," *id.* §§ 3146.8(g)(1.1)-(2). *See* **Ex. 2** at Interrog. #1.

App.119

19.     The Republican Party of Pennsylvania has exercised these statutory rights in the past several election cycles and will do so again in future election cycles. *Id.* at 9.

20.     In conjunction with its Election Day Operations, the Republican Party of Pennsylvania devotes substantial time and resources toward the recruitment and training of poll workers, poll watchers, and volunteers throughout the 67 counties of the Commonwealth to assist voters on election day, to observe the casting and counting of ballots at the polling place, and to observe the pre-canvass and canvass of absentee and mail-in ballots at the county board of elections. *Id.*

21.     As part of its Election Day Operations, the Republican Party of Pennsylvania also devotes substantial time and resources toward the recruitment and training of a "ground team" of lawyers throughout the Commonwealth who stand ready on Election Day to assist poll workers, poll watchers, and volunteers should questions arise as to elections laws or the voting process within the Commonwealth. *Id.*

22.     The Republican Party of Pennsylvania's Election Day Operations, training programs, and voter education programs include training and information regarding the requirements for voters to cast lawful and valid ballots, and the governing rules delineating unlawful and invalid ballots and preventing election officials from pre-canvassing, canvassing, or counting such ballots. *Id.*

23.     Any change in the laws governing Pennsylvania elections harms the Republican Party of Pennsylvania by rendering its Election Day Operations, training programs, and voter education programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

App.120

24. Any change in the laws governing Pennsylvania elections could affect the outcome of an election in which Intervenor-Defendants, their voters, and their supported candidates exercise their constitutional rights to vote and to participate. *Id.*

25. The Third Circuit's failure to enforce the date requirement in *Migliori v. Cohen* actually did change the outcome of an election in which a Republican candidate had prevailed. *See* **Ex. 3**, Cert. Pet. at 7-12, *Ritter v. Migliori*, No. 22-30 (U.S. July 7, 2022), https://www.supremecourt.gov/DocketPDF/22/2230/229591/20220707140738344_Ritter%20Petition.pdf.

## II. THE DATE REQUIREMENT

26. Pennsylvania's election laws provide a date requirement for absentee and mail-in voting. 25 P.S. § 3146.6(a); § 3150.16(a).

27. In both provisions, the wording of the date requirement is the same: "The elector shall then fill out, date and sign the declaration printed on such envelope." 25 P.S. § 3146.6(a); § 3150.16(a).

### A. The Date Requirement Has Been A Part Of Pennsylvania's Election Code Since 1945.

28. The first version of the Election Code permitted some active military members to vote by mail. **Ex. 4**, Act of June 3, 1937, P.L. 1333, No. 320, §§ 1327-1330, 1937 Pa. Laws 1333, 1442-44.

29. In 1945, the mail ballot provision was amended to require that the jurat on the ballot-return envelope be dated. **Ex. 5**, Act of Mar. 9, 1945, P.L. 29, No. 17, sec. 10, § 1306, 1945 Pa. Laws 29, 37.

30. Eighteen years later, the General Assembly enacted the date requirement in its current form, providing that "[t]he elector shall then fill out, date and sign the declaration printed

App.121

on such envelope." **Ex. 6**, Act of Aug. 13, 1963, P.L. 707, No. 379, sec. 22, § 1304, 1963 Pa. Laws. 707, 736.

31.     In 2019, the General Assembly passed Act 77, extending the option to vote by mail to all qualified voters, and adopting the date requirement for such ballots. **Ex. 7**, Act 77, P.L. 552, sec. 8 (Oct. 31, 2019).

32.     Act 77 also provides that section 8—containing the date requirement—is "nonseverable," and that "[i]f any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." **Ex. 8**, Act 77, P.L. 552, sec. 11 (Oct. 31, 2019).

**B.     The Date Requirement Has Been A Subject Of Multiple Recent Lawsuits.**

33.     After seven cases in five courts over two years, the current state of the law is that the General Assembly's date requirement is mandatory and that any noncompliant absentee or mail-in ballot may not be counted.

34.     In 2020, a majority of the Pennsylvania Supreme Court held that the date requirement is mandatory and that election officials may not count any noncompliant ballot in any election after the 2020 general election. *See In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1079–80 (2020) (Opinion of Justice Wecht); *id.* at 1090–91 (Opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy).

35.     In the first two cases following that ruling, the Pennsylvania Commonwealth Court upheld mandatory application of the date requirement. *See In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993 (Pa. Commw. 2022) (unpublished), appeal denied, 273 A.3d 508 (Pa. 2022); *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Pa. Commw. 2022) (unpublished), appeal denied, 271 A.3d 1285 (Pa. 2022).

App.122

36. Four days after the Pennsylvania Supreme Court resolved *Ritter*, individual voters filed a new lawsuit in federal court claiming that the date requirement violates the federal materiality provision, 52 U.S.C. § 10101(a)(2)(B).  *See* **Ex. 9**, Compl., *Migliori v. Lehigh County Bd. of Elections*, No. 5:22-cv-397 (E.D. Pa. Jan. 31, 2022), ECF No. 1.

37. The Third Circuit agreed with the plaintiffs, but the U.S. Supreme Court vacated that decision.  *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *cert. granted and judgment vacated*, *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).

38. When addressing a request for a stay at an earlier stage in that case, three Justices opined that the Third Circuit's now-vacated holding was "very likely wrong" on the merits because it rested upon a misconstruction of the materiality provision. *Ritter*, 142 S. Ct. at 1824 (Mem.) (Alito, J., dissenting from the denial of the application for stay).

39. The Commonwealth Court twice invoked the Third Circuit decision to depart from the General Assembly's date requirement in unpublished, non-precedential cases arising out of the 2022 primary election.  *See McCormick for U.S. Senate v. Chapman*, 2022 WL 2900112 (Pa. Commw. June 2, 2022) (unpublished); *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 (Pa. Commw. Aug. 19, 2022) (unpublished).

40. Finally, in November 2022, the Pennsylvania Supreme Court exercised its original jurisdiction to reaffirm that the General Assembly's date requirement is mandatory. *Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022).

41. In that litigation, Acting Secretary Leigh M. Chapman agreed that the signature requirement is valid and mandatory and does not violate the federal materiality provision. **Ex. 10**, Acting Sec'y Ans. 15–23, *Ball v. Chapman*, No. 102 MM 2022 (Oct. 19, 2022).

App.123

42.     The Acting Secretary also conceded in that litigation that the secrecy envelope does not violate the federal materiality provision.  *Id.* at 39 n.15.

43.     In an opinion that followed, the Pennsylvania Supreme Court held that the date requirement refers to the "day upon which an elector signs the declaration," and noted that "[t]o hold otherwise would be to require unnecessarily specific drafting on the part of the General Assembly."  *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

44.     The Pennsylvania Supreme Court was evenly divided on whether the federal materiality provision invalidates the date requirement.  *Id.* at 9.

### C.     *Commonwealth v. Mihaliak*

45.     The date requirement has already been used to detect election fraud.  *See* **Ex. 11**, Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022), at 100-116, 141-153.

46.     Last year, officials in Lancaster County discovered that an individual had cast a fraudulent ballot in her deceased mother's name in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022); *see* **Ex. 12**, Affidavit of Probable Cause ¶ 2, Police Criminal Complaint, *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022) ("*Mihaliak* Compl.").

47.     In Lancaster County, the only information a voter is required to supply on a ballot declaration is the date and a signature.  *See* **Ex. 13**, Exemplar Ballot Declaration from Lancaster County Board.

48.     Under the Pennsylvania Supreme Court's current precedent, county boards of elections lack authority to conduct signature comparisons, so they may not check ballots for a non-matching signature, much less use any non-matching signature to detect fraud by a third party.  *See In re November 3, 2020 General Election*, 240 A.3d 591 (Pa. 2020).

App.124

49.     In *Mihaliak*, the only evidence on the face of the ballot declaration indicating that someone other than the decedent had completed the ballot was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away.  *See* **Ex. 12** ¶ 2.

50.     The investigation into the election fraud committed in *Mihaliak* was predicated upon the date supplied on the ballot declaration.  *See id.* ¶ 2.

## III.    THIS LITIGATION

51.     Plaintiffs in this case filed suit on November 7, 2022, seeking to invalidate the General Assembly's date requirement.  ECF No. 1.

52.     Plaintiffs claim that the date requirement—which has been on the books in some form since 1945—violates a provision of the 1964 Civil Rights Act and the Equal Protection Clause of the U.S. Constitution.  *Id.*

### A.    County Boards Of Elections' Responses To Discovery Requests Regarding The 2022 General Election.

53.     Allegheny County Board of Elections responded as follows.

      a.     It received 161,575 mail ballots, of which 151 were military ballots.  **Ex. 14**, Allegheny Cnty. Bd.'s Am. Ans. to Interrog. #1.

      b.     It set aside 1,009 mail ballots with undated or misdated ballot declarations.  **Ex. 15**, Allegheny Cnty. Bd.'s Ans. to Interrog. #2.

      c.     It did not receive any undated or misdated military ballots.  *Id.* Interrog. #15.

54.     Beaver County Board of Elections responded as follows.

      a.     It received 15,172 mail ballots, of which 48 were military-overseas ballots.  **Ex. 16**, Beaver Cnty. Bd.'s Ans. to Interrog. #1.

App.125

b.     It received 182 mail ballots with undated or misdated ballot declarations, of which 41 were corrected or cured. *Id.* at 8. Of the non-cured mail ballots, 9 were also missing their inner/secrecy envelopes. *Id.* at 10. "One voter who had an error on their ballot also had a naked ballot," and though that voter "corrected the ballot envelope prior to [the board's] notice being published," "the ballot was not counted as the error on the ballot was not determined until the pre-canvassing began." *Id.*

c.     "No timely-received military-overseas ballots were missing a date or signature or were dated incorrectly." *Id.* Interrog. #15.

55.     Bedford County Board of Elections responded as follows.

a.     It received 2,868 mail ballots and 6 military-overseas ballots. **Ex. 17**, Bedford Cnty. Bd., et al. ("BCCZ") Ans. to Interrog. #1.

b.     It did not set aside any mail ballots for a date issue. *Id.* at Interrog. #2.

56.     Berks County Board of Elections responded as follows.

a.     It received 28,829 mail ballots, including 146 military-overseas ballots. **Ex. 18**, Berks Cnty. Bd.'s Ans. to Interrog. #1.

b.     It set aside 782 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

57.     Blair County Board of Elections responded as follows.

a.     It received 9,022 mail ballots, and 27 military-overseas ballots. **Ex. 19**, Blair Cnty. Bd.'s Ans. Interrogs. #1.

b.     It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

App.126

c. It did not receive any undated or misdated military ballots for which the declaration was on the outside of the return envelope. *Id.* at Interrog. #15.

58. Bradford County Board of Elections responded as follows.

a. It received 2,787 mail ballots, and 16 military-overseas ballots. **Ex. 20**, Bradford Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 3 undated/misdated ballots lacked a secrecy envelope. *Id.*

c. It did not receive any undated or misdated military-overseas ballots. *Id.* at Interrog. #15.

59. Bucks County Board of Elections responded as follows.

a. It received 87,321 mail ballots and 466 military-overseas ballots. **Ex. 21**, Bucks Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 357 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It received 11 military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

d. It counted military-overseas ballots with undated or misdated ballot declarations. *Id.*

60. Butler County Board of Elections responded as follows.

a. It received 18,212 mail ballots. **Ex. 22**, Butler Cnty. Bd.'s Ans. Interrogs. #1.

App.127

      b.    It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.*

      c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

61.    Cambria County Board of Elections responded as follows.

      a.    It received 9,848 mail and military-overseas ballots. **Ex. 23**, Cambria Cnty. Bd.'s Ans. to Interrogs. #1.

      b.    It set aside 38 mail-in/absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

62.    Cameron County Board of Elections responded as follows.

      a.    It received 410 mail ballots and 2 military-overseas ballots. **Ex. 24**, Cameron Cnty. Bd.'s Ans. to Interrogs. #1.

      b.    It set aside 5 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

63.    Carbon County Board of Elections responded as follows.

      a.    It received 4,823 mail ballots and 14 military-overseas ballots. **Ex. 17** at Interrog. #1.

      b.    It set aside 27 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

App.128

64. Centre County Board of Elections responded as follows.

    a. It received 15,654 mail ballots and 126 military-overseas ballots. *Id.* at Interrog. #1.

    b. It set aside 116 mail ballots with undated or misdated ballot declarations. **Ex. 25**, Centre County, Montour County and York County Bds.' Supp. Ans. Interrogs. #2.

65. Chester County Board of Elections responded as follows.

    a. It received 70,023 mail ballots and 638 military/overseas/federal absentee ballots. **Ex. 26**, Chester Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 116 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 19 mail ballots had no date and no signature. *Id.*

    c. It set aside 12 military/overseas/federal absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

66. Clarion County Board of Elections responded as follows.

    a. It received 12 mail ballots. **Ex. 27**, Clarion Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.*

67. Clearfield County Board of Elections responded as follows.

    a. It received 4,564 mail ballots, including 8 military and civilian overseas ballots. **Ex. 28**, Clearfield Cnty. Bd.'s Ans. to Interrogs. #1 & Ex. "Clfd. 1."

App.129

b. It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

68. Clinton County Board of Elections responded as follows.

a. It received 2,248 mail ballots and 14 military-overseas ballots. **Ex. 29**, Clinton Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

69. Columbia County Board of Elections responded as follows.

a. It received 4,168 mail ballots and 11 military-overseas ballots. Ex. 17 at Interrog. #7.

b. It set aside 29 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

70. Crawford County Board of Elections responded as follows.

a. It received 5,917 mail ballots and 22 military-overseas ballots. **Ex. 30**, Crawford Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 49 mail ballots with undated or misdated ballot declarations. *Id.* at Interrogs. #2, 8. It set aside an additional 2 mail ballots with undated or misdated ballot declarations that also lacked a signature. *Id.* at Interrog. #8.

14

App.130

      c.      It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

71.      Cumberland County Board of Elections responded as follows.

      a.      It received 26,298 mail ballots and 113 military-overseas ballots. **Ex. 31**, Cumberland Cnty. Bd.'s Ans. to Interrogs. #1.

      b.      It set aside 100 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.      It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

72.      Dauphin County Board of Elections responded as follows.

      a.      It received 25,839 mail ballots and 154 military-overseas ballots. **Ex. 17** at Interrog. #1.

      b.      It set aside 95 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

73.      Delaware County Board of Elections responded as follows.

      a.      It received 60,154 mail ballots. **Ex. 32**, Delaware Cnty. Bd.'s Ans. to Interrogs. #1.

      b.      It set aside 114 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.      It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

App.131

74.     Elk County Board of Elections responded as follows.

    a.    It received 2,012 absentee/mail-in ballots and 19 military-overseas ballots. **Ex. 33**, Elk Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It received 10 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of those, 7 voters either corrected the error or filed a provisional ballot. *Id.* at Interrog. #13.

    c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

75.     Erie County Board of Elections responded as follows.

    a.    It received 26,766 mail-in ballots and 41 military-overseas ballots. **Ex. 34**, Erie Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 211 mail ballots with undated or misdated ballot declarations, including cured ballots. *Id.* at Interrog. #2. An additional 8 mail ballots with undated ballot declarations were also missing a signature. *Id.* at Interrog. #8. 113 of these ballots were cured. *Id.* at Interrog. #13.

    c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

76.     Fayette County Board of Elections responded as follows.

    a.    It received 9,036 mail ballots and 33 military-overseas ballots. **Ex. 35**, Fayette Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 137 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Eleven of these "signed another voter's ballot return envelope. *Id.* at Interrog. #8. 93 "[v]oters whose timely received mail

App.132

ballots were set aside and/or segregated by Fayette County because the signed outer return envelope was missing a date or showed a date the county determined to be incorrect" "came to the Fayette County Election Bureau and cured their mail ballots." *Id.* at Interrog. #13.

c.   It stated that it "did not timely receive any military-overseas ballots in the 2022 General Election on which the voter failed to date their voter declaration or included a date that the county deemed to be incorrect." *Id.* at Interrog. #15.

d.   "Dates were not reviewed for military/overseas ballots that were timely received." **Ex. 36**, Fayette Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #3.

77.   Forest County Board of Elections responded as follows.

a.   It received 447 mail ballots and 0 military-overseas ballots. **Ex. 37**, Forest Cnty. Bd.'s Ans. to Interrogs. #1.

b.   It set aside 38 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of these, two mail ballots were signed by the incorrect person. *Id.* at Interrog. #8. Two ballots were cured. *Id.* at Interrog. #13.

78.   Franklin County Board of Elections responded as follows.

a.   It received 10,496 mail ballots and 68 military-overseas ballots. **Ex. 38**, Franklin Cnty. Bd.'s Ans. to Interrogs. #1.

b.   It set aside 114 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Seven of those were also missing a signature. *Id.* at Interrog. #8.

App.133

79. Greene County Board of Elections responded as follows.

    a.    It received 2,384 mail ballots and 7 military-overseas ballots. **Ex. 39**, Greene Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 11 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

    c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

80. Huntingdon County Board of Elections responded as follows.

    a.    It received 2,452 mail ballots and 8 military-overseas ballots. **Ex. 17** at Interrog. #1.

    b.    It set aside 34 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

81. Indiana County Board of Elections responded as follows.

    a.    It received 2,452 mail ballots and 8 military-overseas ballots. *Id*. at Interrog. #1.

    b.    It set aside 107 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

82. Jefferson County Board of Elections responded as follows.

    a.    It received 2,278 mail ballots and 12 military-overseas ballots. *Id*. at Interrog. #1.

    b.    It set aside 23 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

App.134

83. Juniata County Board of Elections responded as follows.

    a.     It received 1,244 mail-in ballots and 7 military-overseas ballots. **Ex. 40**, Juniata Cnty. Bd.'s Ans. to Interrogs. #1.

    b.     It set aside five mail ballots with undated or misdated ballot declarations. *Id*. at Interrog. #2. Of those, two were also missing signatures. *Id*. at Interrog. #8. Two ballots were cured. *Id*.

    c.     In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "No." *Id.* at Interrog. #15. It set aside one military-overseas ballot with an undated ballot declaration. *Id*. at Interrog. #16. It was also missing a signature. *Id*.

84. Lackawanna County Board of Elections responded as follows.

    a.     It received 20,759 mail ballots, including 29 military ballots and 26 civilian overseas ballots. **Ex. 41**, Lackawanna Cnty. Bd.'s Ans. to Interrogs. #1.

    b.     It set aside 160 mail ballots with undated ballot declarations. *Id.* at Interrog. #2.

    c.     It did not deem any military-overseas ballots as incorrect. *Id.* at Interrog. #15.

85. Lancaster County Board of Elections responded as follows.

    a.     It received 34,202 mail ballots and 188 military-overseas ballots. **Ex. 42**, Lancaster Cnty. Bd.'s Ans. to Interrogs. #1.

App.135

   b.     It set aside 232 mail ballots which had undated or misdated ballot declarations. *Id.* at Interrog. #2. Of those, 51 had additional defects. *Id*. at Interrog. #8.

   c.     It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15; **Ex. 43**, Miller Dep. 96:15-98:4.

86.   Lawrence County Board of Elections responded as follows.

   a.     It received 6,888 mail ballots and 33 military-overseas ballots. **Ex. 17** at Interrog. #1.

   b.     It set aside 107 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

87.   Lebanon County Board of Elections responded as follows.

   a.     It received 10,771 mail ballots and 64 military-overseas ballots. **Ex. 17** at Interrog. #1.

   b.     It set aside 24 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

88.   Lehigh County Board of Elections responded as follows.

   a.     It received 35,425 mail-in/absentee ballots and 101 military/overseas/civilian ballots. **Ex. 44**, Lehigh Cnty. Bd.'s Ans. to Interrogs. #1.

   b.     It set aside 390 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 23 mail ballots had no date and no signature on their ballot declarations. *Id.*

   c.     It did not review military-overseas ballots for dates. *Id.* at Interrog. #15.

App.136

89. Luzerne County Board of Elections responded as follows.

   a. It received 29,002 mail ballots. **Ex. 45**, Luzerne Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 166 mail ballots with undated or misdated ballot declarations. **Ex. 46**, Luzerne Cnty. Bd.'s Am. Ans. to Interrogs. 16 of these voters voted provisionally. **Ex. 45** at Interrog. #7.

   c. It "[d]o[es] not recall any" military-ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

90. Lycoming County Board of Elections responded as follows.

   a. It received 6,474 mail ballots. **Ex. 47**, Lycoming Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 36 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Six of these voters cast provisional ballots. *Id.* at Interrog. #12.

   c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

91. McKean County Board of Elections responded as follows.

   a. It received 1,957 mail in ballots and 5 military-overseas ballots. **Ex. 48**, McKean Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 35 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

   c. It set aside 5 military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

21

App.137

92.    Mercer County Board of Elections responded as follows.

    a.    It received 8,220 mail ballots.  **Ex. 49**, Mercer Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 63 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

    c.    Though it received "12 mail ballots where the Declaration was unsigned," "[a]ny ballot that was both unsigned and missing a date were categorized as 'Unsigned' since this is a fatal defect outside the scope of current litigation." *Id.* at Interrog. #8.

    d.    In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "This issue did not arise in 2022." *Id.* at Interrog. #15.

93.    Mifflin County Board of Elections responded as follows.

    a.    It received 2,680 mail-in ballots and 8 military-overseas ballots.  **Ex. 50**, Mifflin Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 13 mail-in/absentee ballots with undated ballot declarations, exclusive of ballots with other defects.  **Ex. 51**, Mifflin Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #2 & Ex. 1.

    c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. **Ex. 50** at Interrog. #15.

App.138

94. Monroe County Board of Elections responded as follows.

    a. It received 15,651 mail ballots and 56 military-overseas ballots. **Ex. 17** at Interrog. #1.

    b. It set aside 462 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of these, 191 were cured. *Id.* at Interrog. #13.

95. Montgomery County Board of Elections responded as follows.

    a. It received 118,224 mail-in/absentee ballots and 914 military-overseas ballots. **Ex. 52**, Montgomery Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 460 mail ballots with undated or misdated ballot declarations. *Id.* 44 of those ballots had other defects. *Id.* at Interrog. #2.

    c. In Montgomery County, "[m]ilitary-overseas ballots were checked to make sure the declarations were complete. If the declarations were complete, the ballot was counted. No military-overseas ballots were set aside for having a missing or incorrect date." *Id.* at Interrog. #15.

96. Montour County Board of Elections responded as follows.

    a. It received 1,718 mail ballots and 3 military-overseas ballots. **Ex. 25** at Interrog. #1.

    b. It set aside 8 mail ballots with undated or misdated ballot declarations. Ex. 17 at Interrog. #2.

97. Northampton County Board of Elections responded as follows.

    a. It received 36,401 mail/absentee ballots, including 91 UMOVA ballots. **Ex. 53**, Northampton Cnty. Bd.'s Ans. to Interrogs. #1.

App.139

       b.      It set aside 280 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

98.      Northumberland County Board of Elections responded as follows.

       a.      It received 4,835 mail ballots and 30 military-overseas ballots. **Ex. 17** at Interrog. #1.

       b.      It set aside 14 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

99.      Perry County Board of Elections responded as follows.

       a.      It received 2,340 mail ballots and 4 military ballots. **Ex. 54**, Perry Cnty. Bd.'s Ans. to Interrogs. #1.

       b.      It set aside 35 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

100.     Philadelphia County Board of Elections responded as follows.

       a.      It received 133,968 absentee and mail-in ballots, including military-overseas ballots. **Ex. 55**, Philadelphia Cnty. Bd.'s Ans. to Interrogs. #1. It counted 127,934 absentee and mail-in ballots and 1,014 military-overseas ballots. *Id.*

       b.      It set aside 2,617 mail-in and absentee ballots. *Id.* at Interrog. #2. 580 of these voters submitted provisional ballots. *Id.*

       c.      It counted 13 military-overseas ballots with undated ballot declarations. *Id.* at Interrog. #15.

App.140

101.    Potter County Board of Elections responded as follows.

    a.    It received 888 mail-in ballots, including 2 military-overseas ballots. **Ex. 56**, Potter Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 11 mail ballots with undated or misdated ballot declarations, not including voters who submitted provisional ballots or ballots with other defects. *Id.* at Interrog. #2.

102.    Schuylkill County Board of Elections responded as follows.

    a.    It received 8,657 mail ballots and 25 military-overseas ballots. **Ex. 57**, Schuylkill Cnty. Bd.'s Ans. to Interrogs. #1.

    b.    It set aside 59 mail ballots with undated or misdated ballot declarations, including one ballot which also was missing a signature and another where the date was missing from the voter assistance declaration. **Ex. 58**, Ex. 2 to Schuylkill Resp. to Requests for Prod. of Docs.

    c.    It did not receive any military-overseas ballots with undated ballot declarations. **Ex. 57** at Interrog. #1.

103.    Snyder County Board of Elections responded as follows.

    a.    It received 2,286 mail ballots and 5 military-overseas ballots. **Ex. 17** at Interrog. #1.

    b.    It set aside 9 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

104.    Somerset County Board of Elections responded as follows.

    a.    It received 4,211 mail ballots, including 47 military-overseas ballots. **Ex. 59**, Somerset Cnty. Bd.'s Ans. to Interrogs. #1.

App.141

     b.     It set aside 63 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Two also did not contain signatures. *Id.*

     c.     It did not receive any military-overseas ballots with an undated or misdated outer return envelope. *Id.* at Interrog. #15.

105.    Sullivan County Board of Elections responded as follows.

     a.     It received 505 mail ballots and 4 military-overseas ballots. **Ex. 60**, Sullivan Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 4 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

     c.     It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

106.    Susquehanna County Board of Elections responded as follows.

     a.     It received 3,247 mail-in ballots and 16 military-overseas ballots. **Ex. 61**, Susquehanna Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It did not set aside any mail ballots for undated or misdated ballot declarations. *Id.* at Interrog. #2.

107.    Tioga County Board of Elections responded as follows.

     a.     It reported that "[o]ut of 2,363 total ballots, 10 were returned." **Ex. 62**, Tioga Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside four mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

App.142

c.     It reported that it counted ten military-overseas ballots in which the voter failed to date their voter declaration or which included an incorrect date. *Id.* at Interrog. #15.

108.    Union County Board of Elections responded as follows.

a.     It received 2,997 mail ballots, including 41 military-overseas ballots. **Ex. 63**, Union Cnty. Bd.'s Ans. to Interrogs. #1.

b.     It set aside 23 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c.     It "believes it did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #16.

109.    Venango County Board of Elections responded as follows.

a.     It received 3,027 mail ballots and 35 military-overseas ballots. **Ex. 17** at Interrog. #1.

b.     It set aside 42 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

110.    Warren County Board of Elections responded as follows.

a.     It received 2,266 mail ballots and 8 military ballots. **Ex. 64**, Warren Cnty. Bd.'s Ans. to Interrogs. #1.

b.     It set aside 18 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. One of these ballots also did not have a signature. *Id.* at Interrog. #8.

App.143

     c.     It did not receive any military-overseas ballots that were undated or misdated. *Id.* at Interrog. #15.

111.    Washington County Board of Elections responded as follows.

     a.     It received 19,569 mail ballots, including 51 military-overseas ballots. **Ex. 65**, Washington Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

     c.     It reported that "none of the military-overseas ballots it received in the 2022 General Election were required to be set aside." *Id.* at Interrog. #15.

112.    Wayne County Board of Elections responded as follows.

     a.     It received 4,692 mail ballots. **Ex. 66**, Wayne Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at 8. Fewer than 10 of these were cured. *Id.* at Interrog. #2.

     c.     It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

113.    Westmoreland County Board of Elections responded as follows.

     a.     It received 34,599 mail ballots and 109 military-overseas ballots. **Ex. 67**, Westmoreland Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 95 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

App.144

      c.     It "did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #15.

114.     Wyoming County Board of Elections responded as follows.

      a.     It received 2,029 mail ballots and 7 military-overseas ballots. **Ex. 68**, Wyoming Cnty. Bd.'s Ans. to Interrogs. #1.

      b.     It set aside 17 mail ballots with undated ballot declarations. *Id.* One ballot also was missing a signature on the declaration. *Id.* at Interrog. #2.

      c.     It reported that "[n]o military-overseas ballot was set aside for incorrect or missing date." *Id.* at Interrog. #15.

115.     York County Board of Elections responded as follows.

      a.     It received 37,296 mail ballots and 185 military-overseas ballots. **Ex. 25** at Interrog. #1.

      b.     It set aside 1,354 mail ballots with an undated or misdated ballot declaration. *Id.* at Interrog. #2.

**C.    Dr. Daniel Hopkins's Putative Expert Testimony**

116.     Dr. Daniel Hopkins submitted a putative expert declaration. *See* **Ex. 69**, Expert Declaration of Daniel Hopkins ("Hopkins Decl.").

117.     Dr. Hopkins did not assess the benefits of the date requirement. *See* **Ex. 70**, Hopkins Dep. at 27:16-21.

118.     Dr. Hopkins conceded, moreover, that he did not measure the cost to any voter of complying with the date requirement. *Id*. at 31:16-19, 32:5-7.

App.145

119.    Dr. Hopkins did not attempt to measure how easy it is for voters to comply with the date requirement, and did not conduct surveys or interviews of voters to ask them how easy or difficult it is to comply with the date requirement. *Id.* at 32:8-15.

120.    Dr. Hopkins conceded that what he measured is not actually the cost of complying the date requirement. *Id.* at 34:11-17.

121.    Instead, rather than "directly" measure the cost of the date requirement, Dr. Hopkins purported to measure the date requirement's "differential impact on certain groups of voters." *Id.* at 31:18-19.

122.    Thus, Dr. Hopkins purported to measure the rate of noncompliance with the date requirement among "certain groups of voters" and, thus, the rate at which "certain groups of voters" may experience the consequences of noncompliance with the date requirement. *Id.* at 31:20-32:4.

123.    Dr. Hopkins's report purports to conclude that "the date requirement increases the cost of voting and imposes the heaviest burdens on individuals who are already highly vulnerable to cost increases and are less likely to overcome them." **Ex. 69** ¶ 20.

124.    Dr. Hopkins purported to show that the date requirement imposes a greater burden on "older, Black, and Hispanic voters" through "analyses" that "demonstrate" that such voters "were disproportionately likely to submit mail ballots that were rejected due to a failure to satisfy the date requirement." *Id.* ¶ 23.

125.    That opinion, however, is multiply flawed because Dr. Hopkins's analyses showed no such thing. *See* **Ex. 70** at 70:16-18, 71:24-72:8.

126.    Dr. Hopkins did not determine the race or ethnicity of any voter. *See id.* at 70:16-18, 71:24-72:8, 97:5-17.

App.146

127.    Dr. Hopkins's county-level analysis did not examine the cost to any individual or group of voters of complying with the date requirement.  *See id.* at 72:25-73:13.

128.    Rather, it examined "what county-level attributes are associated with counties which have higher or lower ratios of setting aside mail ballots."  *Id.* at 73:6-10.

129.    Dr. Hopkins's county-level analysis was a regression analysis that purported to examine how the rate of noncompliance with the date requirement would change in a hypothetical county that experienced a change in population from either 0% to 100% Black or 0% to 100% Hispanic.  *See* **Ex. 69** at ¶¶ 25-35.

130.    Dr. Hopkins conceded that there are no counties in Pennsylvania with 100% Black or 100% Hispanic population. *See* **Ex. 70** at 82:16-83:5.

131.    Dr. Hopkins admitted that it is not possible from his county-level analysis to determine how much more likely a Black or Hispanic voter is to cast a ballot that does not comply with the date requirement than a white voter.  *See id.* at 80:12-21.

132.    Dr. Hopkins's individual and block-group level analysis examined census block groups in only 10 of Pennsylvania's 67 counties.  *See* **Ex. 69** ¶¶ 36-57.

133.    Dr. Hopkins's individual and block-group level analysis did not examine any census block groups in the remaining 57 Pennsylvania counties.  *See id.*; **Ex. 70** at 92:20-93:11.

134.    Dr. Hopkins's individual and block-group level analysis did not determine the race of any individual or groups of individuals.  *See* **Ex. 70** at 97:5-17.

135.    Rather, it examined whether certain block-group level attributes, including the racial composition of the block group's population, have higher or lower ratios of setting aside mail ballots.  *See id.* at 97:18-98:20.

App.147

136.    Thus, with respect to race, Dr. Hopkins's individual and block-group level analysis was a regression analysis that purported to examine how the rate of noncompliance with the date requirement would change in a hypothetical census block group that experienced a change in population from either 0% to 100% Black or 0% to 100% Hispanic.  *See* **Ex. 69** ¶¶ 36-57; **Ex. 70** at 101:16-102:18.

137.    Dr. Hopkins conceded that it is not possible from his individual and block-group level analysis to determine how much more likely a Black or Hispanic voter is to cast a ballot that does not comply with the date requirement than a white voter.  *See* **Ex. 70** at 107:18-25.

138.    Dr. Hopkins reports that a 60-year-old voter is "0.2 percentage points more likely to cast a mail ballot lacking a date" than a 20-year-old voter.  **Ex. 69** ¶ 52.

139.    Dr. Hopkins calculated the statewide rejection rate for all absentee and mail-in ballots that do not comply with the date requirement as 0.93%, *see id.* ¶ 27, which is "similar" to but "slightly" lower than the rejection rate for ballots that do not comply with the secrecy envelope requirement, **Ex. 70** at 114:25-116:8.

140.    Dr. Hopkins conceded that "voters who are more familiar with the mail ballot process are less likely to make mistakes that cause mail ballots to be rejected" compared to voters who are less familiar with that process.  *Id.* at 109:5-12.

Dated:  April 21, 2023

Respectfully submitted,

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher (PA #37950)
Russell D. Giancola (PA #200058)
GALLAGHER GIANCOLA LLC
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
Phone: (412) 717-1900
kag@glawfirm.com
rdg@glawfirm.com

App.148

John M. Gore (*pro hac vice*)
E. Stewart Crosland
Louis J. Capozzi III
Joshua S. Ha
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com

Thomas W. King, III
Thomas E. Breth
DILLON, McCANDLESS, KING,
 COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
Phone: (724) 283.2200
tking@dmkcg.com
tbreth@dmkcg.com

*Counsel for Intervenor-Defendants*

App.149