No. 25-1644

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

BETTE EAKIN, et al.,

*Plaintiffs-Appellees,*

*v.*

ADAMS COUNTY BOARD OF ELECTIONS, et al.,

*Defendants-Appellees,*

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenors-Appellants,*

COMMONWEALTH OF PENNSYLVANIA,

*Intervenor-Appellant.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
Case No. 1:22-cv-00340 (Hon. Susan Paradise Baxter)

## BRIEF OF PLAINTIFFS-APPELLEES BETTE EAKIN, DSCC, DCCC, AND AFT PENNSYLVANIA

LAW OFFICE OF ADAM C. BONIN
Adam C. Bonin
121 South Broad Street,
Suite 400
Philadelphia, PA 19107
(267) 242-5014
adam@boninlaw.com

ELIAS LAW GROUP LLP
Uzoma N. Nkwonta
    *Counsel of Record*
Richard A. Medina
Nicole Wittstein
Daniel J. Cohen
Omeed Alerasool
250 Massachusetts Avenue NW,
Suite 400
Washington, DC 20001
(202) 968-4490
unkwonta@elias.law

*Counsel for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Plaintiffs-Appellees disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of their stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding. *See* Doc Nos. 12–14.

Dated: June 4, 2025                    *s/ Uzoma N. Nkwonta*
                                       Uzoma N. Nkwonta

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 4

STATEMENT OF THE CASE ................................................................ 4

    A.    Pennsylvania has disenfranchised tens of thousands of voters by discarding otherwise lawful mail ballots because of the date requirement ....................................................................... 4

    B.    County elections boards do not rely upon a voter's handwritten date for any purpose in administering elections. ............................................................................................ 10

    C.    The district court enjoined county boards from discarding ballots for defects in the handwritten date ........................... 11

SUMMARY OF THE ARGUMENT ....................................................... 14

ARGUMENT ........................................................................................ 20

I.    *Anderson-Burdick* is the proper framework to review Pennsylvania's mail-ballot date requirement. .............................. 20

    A.    The *Anderson-Burdick* framework applies to laws that even minimally burden the right to vote. ............................. 21

    B.    Mail-voting restrictions are not categorically exempt from constitutional scrutiny .................................................. 34

    C.    The RNC's complaints about judicial overreach under *Anderson-Burdick* review are meritless. ............................. 40

II.    The district court correctly held that the date requirement fails under the *Anderson-Burdick* test. ....................................... 42

    A.    The date requirement's burden on the right to vote is more than minimal. ............................................................... 42

    B.    Under any level of *Anderson-Burdick* scrutiny, the date requirement is invalid because it serves no meaningful purpose. ................................................................................. 48

1.    *Anderson-Burdick* requires more than traditional rational basis review. ...................................................50

2.    The date requirement serves no purpose. ...................56

CONCLUSION ...........................................................................66

COMBINED CERTIFICATIONS.............................................68

CERTIFICATE OF SERVICE.................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ................................................................ *passim*

*Angstadt v. Midd-W. Sch. Dist.,*
   377 F.3d 338 (3d Cir. 2004) ...........................................................57

*Ariz. Democratic Party v. Hobbs,*
   18 F.4th 1179 (9th Cir. 2021) .........................................................37

*Ball v. Chapman,*
   289 A.3d 1 (Pa. 2023)................................................... 11, 56, 59, 61

*Belitskus v. Pizzingrilli,*
   343 F.3d 632 (3d Cir. 2003) ................................................ 19, 49, 61

*Brnovich v. DNC,*
   594 U.S. 647 (2021) ......................................................................33

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .............................................................. *passim*

*Chapman v. Berks Cnty. Bd. of Elections,*
   No. 355 M.D. 2022, 2022 WL 4100998 (Pa. Commw. Ct. Aug. 19,
   2022) ...........................................................................................63

*Clingman v. Beaver,*
   544 U.S. 581 (2005) ......................................................................32

*Common Cause R.I. v. Gorbea,*
   970 F.3d 11 (1st Cir. 2020) ...........................................................57

*Council of Alt. Pol. Parties v. Hooks,*
   121 F.3d 876 (3d Cir. 1997) ...................................................... 44, 49

*Crawford v. Marion County Election Board*,
    553 U.S. 181 (2008) ................................................................. *passim*

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019)............................................... *passim*

*Dunn v. Blumstein*,
    405 U.S. 330 (1972) ........................................................................ 42

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020)............................................... *passim*

*Genser v. Butler Cty. Bd. of Elections*,
    325 A.3d 485 (Pa. 2024).................................................................. 36

*In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen.
    Election*, 241 A.3d 1058 (2020)............................................... 56, 59

*Lerman v. Bd. of Elections in N.Y.C.*,
    232 F.3d 135 (2d Cir. 2000) .......................................................... 50

*Luft v. Evers*,
    963 F.3d 665 (7th Cir. 2020)......................................................... 55

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020)......................................................... 53

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ..................................................... *passim*

*McDonald v. Board of Election Commissioners of Chicago*,
    394 U.S. 802 (1969) .......................................................... 16, 38, 39

*Middleton v. Andino*,
    488 F. Supp. 3d 261 (D.S.C. 2020) ............................................... 37

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) ........................................................... 11

*Molinari v. Bloomberg,*
    564 F.3d 587 (2d Cir. 2009) .......................................................... 31

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016)................................................... *passim*

*O'Brien v. Skinner,*
    414 U.S. 524 (1974) ....................................................................... 39

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012)................................................... *passim*

*Ohio Council 8 Am. Fed'n of State v. Husted,*
    814 F.3d 329 (6th Cir. 2016)......................................................... 53

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.,*
    97 F.4th 120 (3d Cir. 2024) ..................................................... *passim*

*Parker v. Conway,*
    581 F.3d 198 (3d Cir. 2009) .......................................................... 51

*Pisano v. Strach,*
    743 F.3d 927 (4th Cir. 2014)......................................................... 52

*Price v. New York State Bd. of Elections,*
    540 F.3d 101 (2d Cir. 2008) ..................................................... *passim*

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ....................................................................... 23

*Rodriguez v. Popular Democratic Party,*
    457 U.S. 1 (1982) ........................................................................... 32

*Rogers v. Corbett,*
    468 F.3d 188 (3d Cir. 2006) .......................................................... 51

*Saucedo v. Gardner,*
    335 F. Supp. 3d 202 (D.N.H. 2018) .................................................. 35

*Soltysik v. Padilla,*
    910 F.3d 438 (9th Cir. 2018) ...................................................... 49, 54

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986) ....................................................................... 49

*Taxpayers United for Assessment Cuts v. Austin,*
    994 F.2d 291 (6th Cir. 1993) ......................................................... 35

*Tedards v. Ducey,*
    951 F.3d 1041 (9th Cir. 2020) ................................................. 19, 52

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ......................................................... 40

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ........................................................................ 33

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ................................................................. 14, 21

## Statutes

25 P.S. § 2602 ....................................................................................5

25 P.S. § 3146.1 .................................................................................5

25 P.S. § 3146.2 .................................................................................5

25 P.S. § 3146.6 .................................................................................5

25 P.S. § 3146.8 .......................................................................... 11, 64

25 P.S. § 3150.11 ...............................................................................5

25 P.S. § 3150.16 ......................................................................5

## Other Authorities

Directive Concerning the Form of Absentee and Mail-in Ballot
  Materials, Pa. Dep't of State, Appendix A (July 1, 2024),
  perma.cc/PD3N-UDTV .....................................................5

Press Release, Commonwealth of Pennsylvania, *Shapiro
  Administration Announces 57% Decrease in Mail Ballots Rejected
  in 2024 General Election* (Jan. 24, 2025), perma.cc/6GS6-8ADN .....9

## INTRODUCTION

A voting rule that this Court has already recognized "serves little apparent purpose" has nonetheless disenfranchised thousands of voters since the Commonwealth adopted universal mail voting in 2019. *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 125 (3d Cir. 2024) ("*Pa. NAACP*"). To cast a mail ballot in Pennsylvania, a voter must sign the declaration on the ballot's outer envelope, and enter the date in the space beneath the signature box. But if the voter forgets or misstates the date, their ballot is discarded—often without notice or an opportunity to correct the error. In 2022 alone, the date requirement disenfranchised over *10,000* eligible voters. The district court correctly held that discarding ballots for this meaningless technicality unconstitutionally burdens the right to vote.

The framework is familiar. Under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), courts must balance an election regulation's burden on the right to vote against the state's interest in the law. The level of scrutiny courts apply depends on the extent of the burden: severely burdensome laws receive strict scrutiny, while review of those that are minimally burdensome is more

deferential. But in *any* case, courts must "balance th[e] burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 145 (3d Cir. 2022).

Application of the *Anderson-Burdick* standard here is straightforward. Pennsylvania's date requirement imposes a significant burden on voting rights by requiring otherwise lawful ballots cast on time and by eligible voters to be discarded for a meaningless technicality. The result is total and complete disenfranchisement. Worse yet, the record below shows that the law's disenfranchising effect bears out most heavily among Black, Hispanic, and elderly voters, as well as voters with lower academic achievement.

Meanwhile, the Commonwealth has no meaningful interest in discarding ballots for a missing or incorrect date to counterbalance the date requirement's burdens. *Two* Secretaries of the Commonwealth—one Democrat and one Republican—have confirmed expressly that the requirement is meaningless. This Court, as noted above, has agreed. With nothing on the Commonwealth's side of the ledger to offset the date requirement's burden on the right to vote, it is unconstitutional.

The RNC—now joined, at the eleventh hour, by the Pennsylvania Attorney General—seeks to rewrite decades of *Anderson-Burdick* precedent to uphold the date requirement. Perhaps recognizing that the date requirement has a poor outlook under *Anderson-Burdick* review, Appellants spill much ink arguing that this long-established framework does not apply at all. Yet they do not identify even *one* case in the 42 years since *Anderson* that has excluded a voting-process regulation like the date requirement from the balancing test in the way Appellants describe. Indeed, Supreme Court precedent forecloses their approach.

Appellants' arguments assuming *Anderson-Burdick* applies fare no better. For starters, they both mischaracterize the burden as minimal. But even if they are right about the extent of the burden, they apply the wrong standard of review, conflating *Anderson-Burdick* review with garden-variety rational basis. Under the proper framework, the state interests they offer—detecting voter fraud, ensuring timeliness, and promoting solemnity—do not hold water. On each score, a handwritten date does so little to advance these interests that they cannot justify the resulting burden on the right to vote.

The Court should affirm.

3

## STATEMENT OF THE ISSUES

Whether rejecting timely ballots submitted by eligible, qualified voters for failure to include an acceptable, handwritten date on the ballot declaration violates the First and Fourteenth Amendments to the U.S. Constitution by imposing burdens on the right to vote that cannot be justified by any legitimate state interest, as articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

## STATEMENT OF THE CASE

### A.    Pennsylvania has disenfranchised tens of thousands of voters by discarding otherwise lawful mail ballots because of the date requirement.

Thousands of Pennsylvanians that have relied on the Commonwealth's guarantee that all voters may cast their vote by mail have had their ballots rejected because of meaningless, technical defects involving the handwritten date on their ballot's outer envelope. *See* Supp. App. 200 ¶¶ 8–10 (Lancaster Cnty. Statement of Material Fact (SMF) Resp.); *accord* Supp. App. 240 ¶¶ 8–10 (RNC SMF Resp.).

To vote by mail, Pennsylvania voters may utilize one of two vehicles: an absentee ballot, which is available to those with a disability or who plan to be out of town on election day; or a mail-in ballot, which

is available to all voters. 25 P.S. §§ 2602(z.6), 3146.1, 3150.11. To obtain either a mail-in or absentee ballot (collectively, "mail ballot"), a voter must submit an application and provide certain information, including their name, date of birth, and how long they have resided in their election district. *Id.* §§ 3146.2, § 3150.12(b).

Once a voter receives their mail ballot, they must fill it out and place it within a secrecy envelope. *Id.* §§ 3146.6(a), 3150.16(a). The voter then must place the secrecy envelope into a second, "outer" envelope. *See id.* This outer envelope contains a voter declaration, asking the voter to verify that (a) they are qualified to vote and have not yet voted in the election; and (b) they marked the ballot themselves or with assistance in the event of illness or physical disability. *See* Directive Concerning the Form of Absentee and Mail-in Ballot Materials, Pa. Dep't of State, Appendix A (July 1, 2024), perma.cc/PD3N-UDTV. The declaration also includes a box for the voter to sign and date.

For a ballot to be eligible for counting, the voter must date the declaration with technical precision, and the date requirement prompts clerks to discard otherwise lawful and timely mail ballots because of missing or superficially defective handwritten dates. Over the last

several election cycles, tens of thousands of Pennsylvania voters have been disenfranchised because of this "date requirement," including over 10,000 voters in the 2022 general election alone. *See* App. 13 (Mem. Op.); *see also* Supp. App. 200 ¶ 10 (Lancaster Cnty. SMF Resp.).

Despite its draconian penalty, Pennsylvania law neither dictates the format for the voter declaration nor offers guidance on how to evaluate a written date for compliance, resulting in arbitrary and inconsistent enforcement. For example, some counties have discarded mail ballots because the voter used the day/month/year format popular in other countries (Supp. App. 204 ¶ 27 (Lancaster Cnty. SMF Resp.)); dated the declaration with the month and day, but not the year (Supp. App. 202 ¶ 16; *accord* Supp. App. 241–42 ¶ 16 (RNC SMF Resp.); Supp. App. 297 ¶ 16 (Berks Cnty. SMF Resp.)); or listed an incorrect date that predates when the county began distributing mail ballots for that election (Supp. App. 203–04 ¶¶ 20, 23–24, 26 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 242–44 ¶¶ 20, 23–24, 26 (RNC SMF Resp.); Supp. App. 298–99 ¶¶ 20, 23–24, 26 (Berks Cnty. SMF Resp.)). In contrast, in the 2022 general election, at least 30 county boards counted mail ballots with dates that were correct using a Month/Day/Year format *or*

6

Day/Month/Year format. Supp. App. 204 ¶ 27 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 244 ¶ 27 (RNC SMF Resp.).

Appellee Bette Eakin's experience exemplifies the date requirement's threat of arbitrary disenfranchisement. Erie County rejected her mail ballot for omitting a handwritten date—but through no fault of her own. Supp. App. 216–17 ¶¶ 80–83 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 259 ¶¶ 80–83 (RNC SMF Resp.). Ms. Eakin required medical care in Ohio through the date of the 2022 general election. Supp. App. 217 ¶ 81 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 259 ¶ 81 (RNC SMF Resp.). At the time, she was undergoing care for a condition that made her legally blind, and she required assistance from an election worker to complete her mail ballot. Supp. App. 217 ¶ 82 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 259 ¶ 82 (RNC SMF Resp.). Days later, while undergoing treatment, Ms. Eakin learned that her ballot had been rejected for a missing date on the outer envelope, and she would need to correct the error for her ballot to be counted. Supp. App. 217 ¶ 83 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 259 ¶ 83 (RNC SMF Resp.).

This notice triggered a herculean effort to correct the error, with Ms. Eakin missing medical appointments and her husband driving two hours to submit materials correcting the error in person at their polling place—just as polls were about to close on election day. Supp. App. 217–18 ¶¶ 84–88 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 259–60 ¶¶ 84–88 (RNC SMF Resp.). Even this effort was possible only because Erie County notifies voters of defects in mail ballots and offers the opportunity to cure. *See* Supp. App. 196–97 (Pls.' SMF App.). Numerous counties do not. *See* Supp. App. 201 ¶ 12 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 241 ¶ 12 (RNC SMF Resp.).

Worse, the disenfranchising effects of the date requirement are not evenly distributed. County boards have rejected mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement, at a disproportionately higher rate as compared to other voters. Supp. App. 405 ¶ 34 (Pls' SMF)); Supp. App. 425 ¶ 10 (Hopkins Decl.). Voters in counties with a higher proportion of Black and Hispanic residents were more likely to submit mail ballots that failed to comply with the date requirement than voters in counties with lower proportions of those demographic groups. Supp. App. 405 ¶ 35 (Pls'

SMF); *see also* Supp. App. 405-06 ¶¶ 36–37, 41, 43; Supp. App. 431 ¶ 31 (Hopkins Decl.).

To minimize the date requirement's impact, the RNC and Attorney General offer extra-record evidence that, before the 2024 election, the Secretary of the Commonwealth redesigned the mail ballot declaration in an effort to reduce widespread errors. *See* RNC Br. 10–11; Commonwealth Br. 2–3. The Court should disregard this evidence, which was not available to the district court. *In re Capital Cities/ABC, Inc.'s Application*, 913 F.2d 89, 96 (3d Cir. 1990). But in any event, the 2024 election results show that the date requirement has continued to disenfranchise voters by the thousands, even after this redesign. Despite the Secretary's best efforts to reduce errors, approximately *4,500* eligible Pennsylvania voters had their ballots tossed out for missing or incorrect dates.[1]

---

[1] *See* Press Release, Commonwealth of Pennsylvania, *Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election* (Jan. 24, 2025), perma.cc/6GS6-8ADN.

**B.** **County elections boards do not rely upon a voter's handwritten date for any purpose in administering elections.**

As the district court found, two consecutive Secretaries of the Commonwealth—one Democrat, one Republican—have acknowledged that "there is no state interest in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return envelope." App. 27–28 (Mem. Op.), Supp. App. 361 (*Pa. NAACP* Schmidt Br.). In fact, adding the extra step of "requiring officials to review declaration dates *impedes* effective election administration." App. 28 (emphasis added).

The record also confirms that county boards do not rely on the handwritten declaration date to determine whether a mail ballot is (a) timely or (b) fraudulent. County boards independently record the date and time they receive each voter's completed mail ballot by stamping the outer envelope and then scanning the ballot into the statewide registration system (known as "SURE") to create an electronic record of receipt. Supp. App. 211–12 ¶¶ 52–57 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 252–53 ¶¶ 52–57 (RNC SMF Resp.). Then, as part of the canvassing process, the county boards set aside all ballots delivered

after 8:00 p.m. on election day, 25 P.S. § 3146.8(g)(1)(ii), as well as ballots submitted by voters who passed away before election day, *id.* § 3146.8(d). The record evidence shows that "an outer envelope that is missing a hand-written date is no reason to suspect voter fraud." App. 24 (Mem. Op.) (citing Supp. App. 155); *see also* Supp. App. 215 ¶ 71 (Lancaster Cnty. SMF Resp.).

In short, as this Court and others have observed, the date requirement "serves little apparent purpose." *Pa. NAACP*, 97 F.4th at 125; *see also, e.g.*, *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022) (finding handwritten date was "superfluous and meaningless" and not used for any purpose), *vacated as moot on procedural grounds sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *Ball v. Chapman*, 289 A.3d 1, 16 n.77 (Pa. 2023) (noting handwritten date was not used to determine voter eligibility or timeliness, detect fraud, or for any other purpose).

### C. The district court enjoined county boards from discarding ballots for defects in the handwritten date.

Because of its mass-disenfranchising effect, Plaintiffs-Appellees Bette Eakin, the Democratic Senatorial Campaign Committee (DSCC), the Democratic Congressional Campaign Committee (DCCC), and American Federation of Teachers (AFT) Pennsylvania (collectively,

"Plaintiffs") filed this case in November 2022.[2] Plaintiffs challenged the county boards' practice of discarding otherwise valid mail ballots for noncompliance with the date requirement as violating Pennsylvanians' right to vote under the First and Fourteenth Amendments,[3] and Plaintiffs sought to enjoin the Commonwealth's 67 county boards from relying on the date requirement to discard otherwise valid mail ballots. Supp. App. 16–18 ¶¶ 41–49; Supp. App. 19 (Am. Compl.).

Shortly after Plaintiffs filed suit, the Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania intervened in the case, accompanied

---

[2] At its inception, this case was brought by Bette Eakin, Ines Massella, Fetterman for PA, DSCC, and DCCC. App. 64–65 ¶¶ 12–16 (Compl.). After the complaint was amended in February 2023, however, only Ms. Eakin, DSCC, and DCCC remained, with AFT joining as well. Supp. App. 5–8¶¶ 12–15 (Am. Compl.).

[3] Plaintiffs also challenged the date requirement under the Materiality Provision of the Civil Rights Act. Supp. App. 14–16 ¶¶ 32–40 (Am. Compl.). This Court rejected an identical cause of action in a related case, *Pa. NAACP,* 97 F.4th 120. Consistent with that ruling, the district court denied Plaintiffs summary judgment on their Materiality Provision claim.

The date requirement is also subject to an ongoing legal challenge under the Pennsylvania Constitution. *See Baxter v. Philadelphia Bd. of Elections,* No. 1 EAP 2025, 2 EAP 2025 (Pa.).

by a group of individual voters (collectively, "RNC"). App. 77 (order granting intervention). Because the case involved a constitutional challenge to the operation of a state law, the district court later invited the Commonwealth to intervene and defend the date requirement. Supp. App. 341 (Certification). The Commonwealth did not accept that invitation.

Following summary judgment briefing, the district court granted Plaintiffs' motion in relevant part and enjoined the county boards from discarding otherwise valid ballots based on the date requirement. Applying the framework that the Supreme Court developed in *Anderson* and *Burdick*, the district court agreed with Plaintiffs that "[d]isenfranchising voters for defects in their ballots imposes *significant burdens* on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation." App. 18–19 (emphasis added). Somewhat paradoxically, the court then assumed that, because the date requirement "applies to <u>all</u> vote-by-mail voters," it "imposes only a minimal burden on Plaintiffs' rights." App. 22–23. Even so, the court examined the record and concluded that there was not a shred of evidence "that the date requirement serves any state interest,"

App. 27; thus, the court concluded that none of the interests advanced was sufficient to justify even a minimal burden on the right to vote. App. 23–27.

The RNC appealed, Doc. 1, but not one of the 67 county defendants has opted to participate. And despite sitting out the district court proceedings entirely, the Attorney General has now appeared at the eleventh hour to intervene on the Commonwealth's behalf. Doc. 52, 64.

## SUMMARY OF THE ARGUMENT

**I.** The Court must review the date requirement under the *Anderson-Burdick* balancing test.

**A.** The right to vote is a "fundamental political right" that is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). To safeguard this right while respecting states' authority to regulate their electoral process, the Supreme Court developed the *Anderson-Burdick* framework. When evaluating voting-process regulations, courts "consider what burden is placed on the rights which plaintiffs seek to assert and then . . . balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Mazo*, 54 F.4th at 145

14

(quoting *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006)). Severely burdensome laws receive strict scrutiny; but even "generally applicable, nondiscriminatory voting regulation[s]" are invalid unless the State can "show that its legitimate interests are sufficient to outweigh the limited burden." *Id.* at 137, 139 n.11 (quoting *Burdick*, 504 U.S., at 440) (cleaned up).

The *Anderson-Burdick* framework governs review of the date requirement. The rule that a voter must date their mail ballot with technical precision for it to be counted is precisely the sort of voting-process regulation that courts have always recognized falls within the *Anderson-Burdick* framework. The mere fact that the rule has operated to disenfranchise tens of thousands of Pennsylvania voters lays plain that it burdens the right to vote *to some extent*, at least. That is all that is required to trigger *Anderson-Burdick* review.

Appellants' bid to carve out "nondiscriminatory, minimally burdensome ballot-casting regulations"—which, in their view, includes the date requirement—from *Anderson-Burdick* review is meritless. The Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and this Court's decision in *Mazo*, foreclose their

approach. Those cases are clear that even nondiscriminatory, minimally burdensome election regulations trigger *Anderson-Burdick* review—even if that review is deferential. Decades of circuit precedent confirm this approach. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631–32 (6th Cir. 2016) ("*NEOCH*"); *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008).

**B.** RNC's argument that mail-voting regulations are categorically excluded from *Anderson-Burdick* review likewise misreads settled precedent. Courts nationwide have applied *Anderson-Burdick* to cases involving mail- or absentee-voting restrictions, as this Court recognized in *Mazo*, 54 F.4th at 137 n.8, 140–41. When a state chooses to offer multiple methods of voting, the Constitution protects the franchise regardless of how a voter exercises their rights.

*McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), a case which predated both *Anderson* and *Burdick*, cannot bear the weight the RNC assigns it. There, the Supreme Court assessed whether the state was constitutionally required to create an absentee voting process for unsentenced inmates who were not permitted to vote

absentee under state law. But even *McDonald* recognized that once a state creates such procedures—as the Commonwealth has done here—it must administer the absentee voting process in accordance with federal law and cannot reject ballots with impunity.

**C.** The RNC's claim that affirming the district court will upend election codes and disrupt the "constitutional order" is a groundless attempt to evade judicial review. Challenges to election laws often require courts to reconcile the state's authority to regulate elections with the inevitable burdens those regulations impose on the right to vote—and for decades, *Anderson-Burdick* has supplied the framework to do just that, without the disastrous consequences the RNC anticipates. It is the *RNC*'s approach, which would allow states to disenfranchise eligible voters for meaningless technicalities without any real justification, that threatens to upend democratic processes.

**II.** Applying the *Anderson-Burdick* standard, discarding otherwise lawful mail votes for a missing or defective declaration date unconstitutionally burdens the right to vote.

**A.** The date requirement imposes a more-than-minimal burden on the right to vote. As the district court observed, "[d]isenfranchising voters

for defects in their ballots imposes *significant* burdens on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation." App. 18–19 (emphasis added).

Appellants' narrow focus on the effort required to date a mail-ballot is misplaced. When a law, like the date requirement, meaningfully increases the risk of total disenfranchisement for a significant number of voters, courts have rightly treated the burden as substantial. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1127–28 (10th Cir. 2020); *Lee*, 915 F.3d at 1319; *Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012).

**B.** Even if the date requirement's burden could properly be characterized as minimal, it still is not justified by sufficiently weighty state interests, as confirmed by the Secretary of the Commonwealth— Pennsylvania's chief elections officer. Indeed, two consecutive Secretaries with different political affiliations have acknowledged that the date requirement does not serve any state interests. This Court has likewise recognized that the date requirement "serves little apparent purpose." *Pa. NAACP*, 97 F.4th at 125.

The RNC's and Attorney General's arguments otherwise come up short—in substantial part because they apply the wrong standard of review. Citing almost nothing, they both contend that the Court must apply rational basis review because the date requirement's burden is minimal.

Even if Appellants were right about the extent of the burden, they are wrong that rational basis applies. Courts that have squarely addressed the issue have repeatedly found that *Anderson-Burdick* review of even minimally burdensome election laws is more searching than rational basis. *See, e.g.*, *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020); *Lee*, 915 F.3d at 1318–19; *Obama for Am.*, 697 F.3d at 429; *Price*, 540 F.3d at 108. Rather than apply any mechanical formula, courts must "determine the legitimacy and strength" of the state's interests and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003) (quoting *Anderson*, 460 U.S. at 789).

Under the proper standard of review, Appellants' asserted state interests of fraud detection, orderly election administration, and solemnity cannot justify the date requirement's burden. As the district

court held, none finds support in the record. Even if legitimate in the abstract, there is zero evidence that the date requirement in fact advances any of those interests. And to the extent it does, its impact is infinitesimal. In all cases, the state's interests in the date requirement are extremely weak and cannot justify burdening the right to vote.

The Court should affirm.

## ARGUMENT

## I.    *Anderson-Burdick* **is the proper framework to review Pennsylvania's mail-ballot date requirement.**

When confronted with claims that a voting rule impermissibly burdens the right to vote under the First and Fourteeth Amendments, courts across the country—including this Court—have uniformly applied the framework developed by the Supreme Court in *Anderson* and *Burdick*. This is especially true when enforcement of a voting rule results in disenfranchisement. And this long-established framework applies even if the burden on voters is minimal (though in this case it is not).

The RNC's and Attorney General's bid to discard the *Anderson-Burdick* framework and shrug off the disenfranchisement of tens of thousands of voters not only contradicts the fundamental tenets of *Anderson* and *Burdick*, it is unprecedented. Neither Appellant identifies

a single case that adopts their radical theory, for good reason: The right to vote has long been recognized as a "fundamental political right" that is "preservative of all rights." *Yick Wo*, 118 U.S. at 370. And although some regulation of the voting process is necessary in structuring elections, the flexible *Anderson-Burdick* standard was designed specifically to accommodate this delicate balance. *Burdick*, 504 U.S. at 433–34. Simply put, there is no hidden cellar beneath *Anderson-Burdick* review where burdensome laws that fail to clear Appellants' imagined threshold can evade judicial review.

### A.    The *Anderson-Burdick* framework applies to laws that even minimally burden the right to vote.

**1.** The Supreme Court's *Anderson-Burdick* framework recognizes that while "States must take an 'active role in structuring elections,'" election laws will "'inevitably affect, at least to some degree,' certain fundamental rights." *Mazo*, 54 F.4th at 136–37 (quoting *Burdick*, 504 U.S. at 433, and *Anderson*, 460 U.S. at 788) (alterations incorporated). The Court developed the *Anderson-Burdick* framework to reconcile the states' authority to efficiently regulate elections with the inevitable burdens that those regulations may impose on the very fundamental right they are meant to safeguard—the right to vote. So whenever a law

(a) "burden[s] a relevant constitutional right, such as the right to vote or the First Amendment rights of free expression and association," and (b) "primarily regulate[s] the mechanics of the electoral process, as opposed to core political speech," courts apply the *Anderson-Burdick* framework to determine the appropriate level of judicial scrutiny for a constitutional challenge. *See id.* at 138 (collecting cases).

The level of scrutiny courts apply is thus the product of "a weighing process" that "consider[s] what burden is placed on the rights which plaintiffs seek to assert and then . . . balance[s] that burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Id.* at 145 (quoting *Rogers*, 468 F.3d at 194). Where a burden is severe, courts apply strict scrutiny; but even "'generally applicable, nondiscriminatory voting regulation[s]' are subject to the balancing test." *Id.* at 139 n.11. And such regulations are invalid unless the State can "show that its legitimate interests are sufficient to outweigh the limited burden." *Id.* at 137 (quoting *Burdick*, 504 U.S. at 440).

Plaintiffs' date-requirement challenge falls squarely within core *Anderson-Burdick* territory. Regulations governing "the voting process

itself, inevitably affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 788. "[T]he basic premise of *Anderson-Burdick* is that ordinary election laws necessarily have incidental burdens on political speech by 'channeling expressive activity at the polls.'" *Mazo*, 54 F.4th at 140 (quoting *Burdick*, 504 U.S. at 438). Appellate courts have thus applied the *Anderson-Burdick* framework to a wide range of state laws regulating the electoral process.

The date requirement bears directly on the "voting process," regulating both how a ballot must be cast *and* whether a vote is later counted. And the constitutional right to vote broadly includes "the right to have one's vote counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). In that way, this case is just like the examples *Mazo* identified in its comprehensive survey of circuit case law applying *Anderson-Burdick* to "ordinary election laws" governing absentee voting, early voting, voter registration and proof-of-citizenship requirements, and many more. 54 F.4th at 140–41.

Although, for the reasons articulated below, Appellants are wrong to characterize the burden imposed by the date requirement as

23

"minimal," the *extent* of the burden is irrelevant to determining whether the *Anderson-Burdick* test applies in the first place. The question is simply whether a burden exists; if it does, the Court must balance it against the state's interests. *See Mazo*, 54 F.4th at 145; *Lee*, 915 F.3d at 1318–19.

The Sixth Circuit's decision in *Northeast Ohio Coalition for the Homeless* is also instructive. In that case, the court evaluated an Ohio law that required boards of elections to invalidate mail-in ballots if the voter failed to accurately complete the birthdate and address fields on the accompanying "identification envelope." *NEOCH*, 837 F.3d at 619. Much like the date requirement here, rejecting a voter's ballot for failure to accurately complete these fields "directly and measurably disenfranchise[d] some voters." *Id.* at 631. While the number of ballots the state's election boards had invalidated under the provision was "small" relative to "the number of total ballots cast in a general election in Ohio," the court held the law nonetheless burdened the right to vote because "identifiable voters may be disenfranchised based only on a technicality." *Id.* at 632.

Just so here. Pennsylvania election officials have discarded thousands of mail ballots solely because of the date requirement, *see* Supp. App. 200 ¶ 10 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 240 (RNC SMF Resp.), even though the law provides no guidance on how a handwritten date should be evaluated for compliance. Some county boards reject a voter's mail ballot based on the formatting of the handwritten date, for instance. *See* Supp. App. 204 ¶ 27 (Lancaster Cnty. SMF Resp.). Some county boards reject mail ballots whose outer envelopes contain a date and month but not a year, while others may count them. Supp. App. 202 ¶ 16 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 241–42 (RNC SMF Resp.); Supp. App. 297 ¶ 16 (Berks Cnty. SMF Resp.). And enforcing the date requirement has resulted in the rejection of mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement at disproportionately higher rates than other voters. Supp. App. 405–08 (Pls' SMF); Supp. App. 425 ¶ 10 (Hopkins Decl.).

Because the date requirement *at least* minimally burdens the right to vote, it must be evaluated under the *Anderson-Burdick* framework. *See Lee*, 915 F.3d at 1318–19 ("[E]ven when a law imposes only a slight

burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.").

**2.** Against the overwhelming weight of precedent, the RNC and Attorney General contend the date requirement does not even *implicate* the right to vote, invoking a purported "rule" that "nondiscriminatory, minimally burdensome ballot-casting regulations trigger no scrutiny" whatsoever. RNC Br. 29; *see also* Commonwealth Br. 12–13 (similar).

This "rule" does not exist—in fact, settled precedent forecloses it. In *Crawford*, the Supreme Court reviewed Indiana's voter identification law under the *Anderson-Burdick* framework. A majority of the Court agreed to uphold Indiana's law but divided over how to apply *Anderson-Burdick*. The dispute, however, centered on whether the framework should weigh special burdens on individual voters—not whether *Anderson-Burdick* applied to facially nondiscriminatory laws *at all*. The plurality straightforwardly applied the framework, explaining that because there is no "litmus test for measuring the severity of a burden that a state law imposes on [voters]," *any* burden "must be justified by relevant and legitimate state interests" "*[h]owever slight that burden may appear*." *Crawford*, 553 U.S. at 191 (plurality op.) (emphasis added).

In his concurrence, Justice Scalia similarly acknowledged that Indiana's law could be allowed only because "the burden at issue [was] minimal *and justified.*" *Id.* at 204 (Scalia, J., concurring) (emphasis added). He noted expressly that, "[t]o evaluate a law respecting the right to vote," including laws regulating "the voting process," courts "use the approach set out in *Burdick*," which calls for "application of a deferential," but not *nonexistent*, "standard for nonsevere, nondiscriminatory restrictions." *Id.* In short, as this Court correctly noted in *Mazo*, a majority of justices in *Crawford* agreed that even minimally burdensome, "'nondiscriminatory voting regulations' are subject to the balancing test." *Mazo*, 54 F.4th at 139 n.11.

Consistent with *Crawford,* courts nationwide—including this one—routinely apply *Anderson-Burdick* even where they ultimately judge the relevant burden to be minimal. *Mazo* itself applied the framework to a law that, in the Court's view, only minimally burdened candidates' expressive rights. *See Mazo*, 54 F.4th at 153; *see also, e.g., Lee*, 915 F.3d at 1318–19 ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."); *Price*, 540 F.3d at 112 (applying *Anderson-Burdick*

where the burden was "not large"). These cases include challenges to so-called "ballot-casting" regulations, like the address and birthdate requirements in *NEOCH*, 837 F.3d at 619, and signature-matching requirement in *Lee*, 915 F.3d at 1319.

The same is true of facially nondiscriminatory voting regulations. Indeed, far from exempting such laws from scrutiny altogether, courts applying *Anderson-Burdick* have determined that nondiscriminatory regulations may even impose "significant" burdens on voting rights, triggering heightened scrutiny. *See, e.g.*, *Fish*, 957 F.3d at 1127–28 (finding that Kansas's universally-applicable documentary-proof-of-citizenship requirement significantly burdened the right to vote and applying heightened scrutiny).

The RNC has not identified even *one* case in the 42 years since *Anderson* applying the purported "rule" it asks the Court to recognize here. Instead, it distorts *Crawford* to support its position. It first contends that Justice Scalia's (nonbinding) concurrence "argued that only severe burdens *implicate the right to vote*" at all. RNC Br. 26–27. Not so, as explained above. The RNC further misreads the plurality opinion as "recogniz[ing] [that] some burdens imposed by election rules

28

are simply too inconsequential to merit judicial scrutiny under the constitutional right to vote." *Id.* at 27. According to the RNC, because *Crawford* "found that [Indiana's voter ID law] imposed only a minimal burden that did not 'represent a significant increase over the usual burdens of voting,'" it follows that the plurality "understood that the 'usual burdens of voting' do not even *implicate* the right to vote." RNC Br. 28 (quoting *Crawford*, 553 U.S. at 203–04 (Scalia, J., concurring)).

That argument is perplexing because *Crawford* says no such thing. To the contrary, the plurality confirmed that "[h]owever slight [the] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation,'" *Crawford*, 553 U.S. at 190, and it examined each asserted state interest to determine whether it justified the resulting burdens on voters as established by the record, *id.* at 191–197, 204.

It is not surprising that the RNC fails to support its "rule" exempting "ballot-casting" regulations from *Anderson-Burdick* review. The Supreme Court has long cautioned that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions."

29

*Anderson*, 460 U.S. at 789 (quotation omitted). Yet that is precisely the sort of standard the RNC advocates here—one that deems any "nondiscriminatory, minimally burdensome ballot-casting regulations" categorically immune from scrutiny. RNC Br. 29. This is not, and never has been, the law.

**3.** The RNC also attempts to escape the plain holding of *Mazo* and the extensive case law it surveyed—including *Crawford*—by taking a single clause out of context and reading it in a way that irreconcilably contradicts the rest of the opinion. True, the *Mazo* court noted that *Anderson-Burdick* scrutiny is not triggered when a law's "burden on [the right to vote] is no more than *de minimis*." RNC Br. 28 (quoting *Mazo*, 54 F.4th at 138–39). But this qualification cannot bear the weight the RNC assigns it.

Read in context, and consistent with the cases on which *Mazo* relies, the Court simply acknowledged that laws which burden constitutional rights only *incidentally*, or indirectly, do not trigger *Anderson-Burdick* scrutiny. State laws whose *entire purpose* is to regulate the mechanism of elections still must be analyzed within the *Anderson-Burdick* framework. As *Burdick* itself recognized, "[e]lection laws will invariably

impose some burden upon individual voters." 504 U.S. at 433. The *Anderson-Burdick* framework accounts for this by requiring courts to weigh the "character and magnitude" of that burden against the state's interests. *Id.* at 434.

Consider the cases *Mazo* cites to support its observation about "*de minimis*" burdens. *See Mazo*, 54 F.4th at 139 n.10. In *Molinari v. Bloomberg*, the Second Circuit declined to apply *Anderson-Burdick* to a New York City Charter amendment that extended term limits for certain local officials. 564 F.3d 587, 589–90 (2d Cir. 2009). The law did not regulate the mechanics of elections. As the Second Circuit explained, there is "no First Amendment right to term limits," and any indirect chilling effects were insufficient to trigger constitutional scrutiny because the law was not a "direct restriction[]" on speech. *Id.* at 604–05. In other words, the law did not burden constitutional rights *at all*. But *Molinari* itself recognized that "in determining whether to apply the First Amendment balancing test, 'it is important only that there is *at least some* burden on the voter-plaintiffs' rights.'" *Id.* at 604 (emphasis added) (quoting *Price*, 540 F.3d at 109).

31

In *Clingman v. Beaver*, where the Court upheld an Oklahoma law prohibiting voters registered with a political party from voting in another party's primary, the Court questioned whether the plaintiffs sought to associate *at all*. 544 U.S. 581, 589 (2005) ("[A] voter who is unwilling to disaffiliate from another party to vote in the [Libertarian Party's] primary forms little 'association' with the [Party]—nor the [Party] with him."). But it then "employed the same weighing analysis it had in *Burdick*, even though the Court concluded that the burden on any associational interests was 'minor'" or "modest." *Price*, 540 F.3d at 108–109 (discussing *Clingman*).[4]

Whatever the *Mazo* Court might have meant by "*de minimis*" burdens, it decidedly did not mean that entire swaths of "nondiscriminatory" ballot-casting rules "trigger no scrutiny," as the

---

[4] *Rodriguez v. Popular Democratic Party*, which predated both *Anderson* and *Burdick*, is even farther afield. In that case, the Supreme Court applied rational basis to review Puerto Rico's procedure for filling vacancies in elected office. 457 U.S. 1, 4–5 (1982). The Court held that Puerto Rico's "choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico Legislature; however, the effect is minimal, and . . . it does not fall disproportionately on any discrete group of voters, candidates, or political parties." *Id.* at 12.

RNC would have it. RNC Br. 29. Not when, in the same breath, *Mazo* stated plainly that "'generally applicable, nondiscriminatory voting regulation[s]' are subject to [*Anderson-Burdick*'s] balancing test," and it then applied the framework to a law it deemed minimally burdensome. *Mazo*, 54 F.4th at 139 & n.11.

The RNC's reliance on cases applying federal voting rights statutes fares no better, for they involve entirely different standards than constitutional right-to-vote cases. The first case RNC cites, *Brnovich v. DNC*, 594 U.S. 647 (2021), involved Section 2 of the Voting Rights Act. The crux of a Section 2 claim is that a voting regulation *is discriminatory*. *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). But as the RNC concedes, the constitutional right to vote covers unduly *burdensome* laws, as well as those that are discriminatory. RNC Br. 26.

The RNC also misreads this Court's opinion in *Pa. NAACP*. There, this Court held that the same date requirement challenged here did not

violate the Civil Rights Act's Materiality Provision because the scope of that statute did not extend beyond voter registration and corresponding qualifications determinations. 97 F.4th at 131–35. The Court also commented that disqualifying ballots under the date requirement would not "*deny* the right to vote," as the Civil Rights Act uses the term "deny." *Id.* at 134 (emphasis added). Here, however, that is not the question. The Court in *Pa. NAACP* had no occasion to address whether the date requirement inappropriately *burdens* the constitutional right to vote.

In short, the RNC's reliance on a single out-of-context statement from *Mazo* to exempt "nondiscriminatory" and "minimally burdensome" election laws from any constitutional scrutiny runs headlong into decades of precedent from this Court, the Supreme Court, and federal courts around the country—not to mention the holdings of *Mazo* itself.

## B.    Mail-voting restrictions are not categorically exempt from constitutional scrutiny.

The RNC next attempts to blink the reality that courts nationwide have consistently applied *Anderson-Burdick* to mail-voting regulations. *Mazo*, 54 F.4th at 137 n.8, 140–41 (collecting cases); *see also, e.g. Lee*, 915 F.3d at 1318–19 (applying *Anderson-Burdick* to law requiring disqualification of mail votes for signature mismatch). Once a state has

chosen to allow mail voting, inducing its residents to rely on mail ballots to exercise their rights, it is not then free to arbitrarily burden that process simply because electors *could* have—but did not—vote another way. *Cf. Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("[A]lthough the right to an initiative is not guaranteed by the federal Constitution, once an initiative procedure is created, the state may not place restrictions on the exercise of the initiative that unduly burden First Amendment rights." (discussing *Meyer v. Grant*, 486 U.S. 414 (1988)); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted."). The Constitution does not permit states to lay traps for unwary voters who cast their ballots using a method provided by state law.

The RNC's argument that "Pennsylvanians who are unwilling or unable to fill in the date on the ballot-return envelope can simply vote in person instead," RNC Br. 44, underscores why this is so. While voters may choose to vote in person, that is often not an option for a voter whose mail ballot is rejected due to a missing or incorrect date. The Attorney

General suggests that "several county boards provide notice and cure procedures in the event that a voter makes a mistake." Commonwealth Br. 21 n.14. True, some do. But 45 counties provide no notice, and 37 do not allow voters to cure the error. Supp. App. 201 ¶¶ 11–12 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 240–41 (RNC SMF Resp.); Supp. App. 296 ¶¶ 11–12 (Berks Cnty. SMF Resp.).[5] In short, when a voter chooses to vote by mail as provided by state law, they run an unacceptable risk that they will be completely—and arbitrarily—disenfranchised based on a meaningless requirement.

Recognizing this dilemma, courts around the country have regularly applied *Anderson-Burdick* to absentee voting regulations, as this Court has observed. *Mazo*, 54 F.4th at 140–41 & n.18 (collecting

-------

[5] A group of Republican legislators, as amici, contends that the Pennsylvania Supreme Court has recently "ruled that voters . . . who fail to complete the [mail ballot] declaration now have the right under Pennsylvania law to cure that mistake through casting a provisional ballot." Topper *et al.* Amicus Br. 16 (citing *Genser v. Butler Cty. Bd. of Elections*, 325 A.3d 458 (Pa. 2024)). That is wrong. *Genser* held that provisional ballots *may* be counted under Pennsylvania law when a county allows voters to cure a defective mail-in ballot. *See* 325 A.3d at 485. It does not, however, require counties to provide notice of the defect and offer the opportunity to cure in the first place.

cases). The Ninth Circuit, for example, applied *Anderson-Burdick* to evaluate a constitutional challenge to Arizona's election-day deadline for correcting mail ballots with missing signatures. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1186–87 (9th Cir. 2021). In *Lee*, the Eleventh Circuit applied *Anderson-Burdick* analysis to Florida's signature-matching requirement for absentee ballots. 915 F.3d at 1318–19. In *NEOCH*, the Sixth Circuit applied *Anderson-Burdick* to evaluate Ohio's requirement that voters write their birthdate and address on their absentee ballot envelope. 837 F.3d at 631–34. *See also Middleton v. Andino*, 488 F. Supp. 3d 261, 295–96 (D.S.C. 2020) (applying *Anderson-Burdick* to absentee-ballot rule because even though "a right to absentee voting is not guaranteed by the First Amendment," that "does not mean absentee voting is *per se* unprotected").

In *Price*, the Second Circuit used the *Anderson-Burdick* framework to evaluate a constitutional challenge to New York's failure to provide absentee voting in elections for political party county committees despite offering it for every other type of election. 540 F.3d at 107–08. The Second Circuit explained: "While one can debate the extent to which the plaintiffs' associational rights are burdened, *there can be no real debate*

*that all of the plaintiffs' First Amendment rights have been burdened to some degree." Id.* at 107 (emphasis added). "Every provision of a state elections code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, *or the voting process itself*, inevitably affects—at least to some degree—the individual's right to vote and to associate with others for political ends.'" *Id.* at 107–08 (quoting *Anderson*, 460 U.S. at 788) (emphasis added). And "[b]ecause there is *some burden* on the plaintiffs' associational rights, we must apply the framework articulated in *Burdick*." *Id.* In short, ample precedent demonstrates that unnecessary hurdles to absentee or mail voting must be evaluated within the *Anderson-Burdick* framework.

In the RNC's view, though, the Second, Sixth, Ninth, and Eleventh Circuits (at least) all missed the memo that the Supreme Court's decision in *McDonald* categorically immunized laws regulating absentee voting from constitutional scrutiny. Not so. The RNC's argument ignores a critical distinction between the millions of Pennsylvanians who rely on mail ballots to exercise the franchise and the unsentenced inmates in *McDonald* who were never authorized under state law to vote absentee to begin with. 394 U.S. at 803–04. The *McDonald* plaintiffs claimed a

"right to *receive*" absentee ballots, which Illinois law generally did not permit at that time. 394 U.S. at 807 (emphasis added). But the Supreme Court also recognized that once a state provides a means of exercising the right to vote, that process must be administered in accordance with federal law. *See id.*

Moreover, since *McDonald*, the Supreme Court has further explained that the "disposition" of that case "rested on failure of proof" that the lack of access to absentee ballots prohibited the plaintiffs from voting, rather than on some broad exemption of absentee voting from the protections of federal law. *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974). When plaintiffs presented evidence of a burden on their right to vote in a later case challenging an absentee voting restriction, the Court held the restriction unconstitutional. *See id.* at 530. And post-*Anderson-Burdick* cases have distinguished *McDonald* on precisely that basis. *See Price*, 540 F.3d at 109 n.9 (explaining *McDonald* did not affect its decision to apply

*Anderson-Burdick* review to an absentee-voting rule because the record was "not similarly barren" of evidence of a burden on the right to vote.").[6]

Constitutional protections for the right to vote do not wax and wane depending upon the means by which a voter chooses to exercise that right. The Appellants' rule, which would categorically exempt mail-voting regulations from the right to vote and the *Anderson-Burdick* framework, is precisely the sort of bright-line "litmus test" the Supreme Court has routinely disavowed in this setting. *See Crawford*, 553 U.S. at 191; *Anderson*, 460 U.S. at 789.

### C.    Appellants' complaints about judicial overreach under *Anderson-Burdick* review are meritless.

In a final bid to convince the Court to ignore precedent, the RNC speculates that the district court's ruling risks "upend[ing] election codes

---

[6] The RNC also cites *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 406 (5th Cir. 2020), in which a motions panel of the Fifth Circuit proclaimed: "*McDonald* lives." *See* RNC Br. 19. But the RNC fails to acknowledge that the merits panel in the same case later disavowed that ruling precisely because of its questionable application of *McDonald*. As the Fifth Circuit explained, it was "hesitant to hold that *McDonald* applies," in part because of the Supreme Court's decision in *American Party of Texas v. White*. *See Tex. Democratic Party v. Abbott*, 978 F.3d168, 193 (5th Cir. 2020) (citing 415 U.S. at 794–95).

nationwide" and "seriously disrupt[ing] the constitutional order." RNC Br. 36; *see also* Commonwealth Br. 21. Its handwringing is needless. *Anderson-Burdick*, as the district court applied it, has been the law of the land for over four decades. And in that time, courts have applied the framework to all manner of state election laws, including those governing absentee voting. Yet the parade of horribles the RNC imagines has never materialized.

The reason is obvious: if the state has a legitimate reason for passing a minimally burdensome regulation, courts usually will not disturb it. Nothing about the district court's ruling displaces *Burdick*'s guidance that a "State's important regulatory interests are *generally* sufficient to justify" a minimally burdensome restriction on the right to vote. *Burdick*, 504 U.S. at 428 (emphasis added). Exceptions to that general rule, however, arise where a state fails to offer any such "important regulatory interest."

More, it is Appellants' conception of *Anderson-Burdick* that carries startling implications for the preservation of "the constitutional order." RNC Br. 36. They appear to believe that a state may, with impunity, litter its electoral process with procedural traps that serve no real

purpose, inducing its citizens to rely on voting systems that maximize the risk of disenfranchisement. Such blind deference is incompatible with the Supreme Court's recognition that the right to vote is "a fundamental political right, . . . preservative of all rights." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (quotation omitted). Undermining this right by discarding verifiably timely votes, by verifiably eligible voters, based on completely meaningless technicalities, risks unraveling the broader tapestry of individual freedoms democratic self-governance has woven together.

## II. The district court correctly held that the date requirement fails under the *Anderson-Burdick* test.

### A. The date requirement's burden on the right to vote is more than minimal.

The first step in *Anderson-Burdick* analysis is to "determine the 'character and magnitude' of the burden that the challenged law imposes on constitutional rights." *Mazo*, 54 F.4th at 137 (quoting *Burdick,* 504 U.S. at 434). "If the burden is 'severe,' the court must apply exacting scrutiny and decide if the law is 'narrowly tailored and advance[s] a compelling state interest.'" *Id.* (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). Although it ultimately reached the

correct result, the district court misstepped when it concluded the date requirement imposes only a "minimal" burden on the right to vote. *See* App. 22. And the Appellants here take the district court's error and run with it.

A closer reading of the district court's ruling reveals the disconnect. The RNC, Attorney General, and legislator amici misread the district court's assessment of the burden in this case. The district court did not, as the RNC suggests, simply conclude that the date requirement's burden *on the right to vote* was minimal. *See* RNC Br. 50; *see also* Commonwealth Br. 18–19; Amicus Br. 17. Quite the opposite, the court recognized (correctly) that "[d]isenfranchising voters for defects in their ballots imposes *significant* burdens on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation." App. 18–19 (emphasis added).

The court went awry only by apparently assuming that any facially *nondiscriminatory* election regulation must necessarily be evaluated under deferential *Anderson-Burdick* review. *See* App. 22–23. But that is not the case. The district court, respectfully, conflated the question whether an election regulation is *discriminatory* with whether it unduly

43

*burdens* the right to vote. The mere fact that a law is facially nondiscriminatory does not, standing alone, mean it is minimally burdensome. *See Fish,* 957 F.3d at 1128–29.

The district court, however, was right on the money with its observation that "[d]isenfranchising voters for defects in their ballots imposes *significant* burdens on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation." App. 18–19 (emphasis added). No party disputes the record evidence that the date requirement has disenfranchised *thousands* of otherwise eligible mail ballots—including more than 10,000 in 2022 alone. The district court was right to treat this as strong evidence of a significant burden on voting rights. *E.g., Fish,* 957 F.3d at 1128–29.

The RNC and the Attorney General attempt to minimize this burden by focusing myopically on the physical act of filling in a date on an absentee ballot envelope. In their view, the extent of the burden for *Anderson-Burdick* purposes turns on how laborious it is to complete the required paperwork. Their analysis simply ignores the severe consequence—complete disenfranchisement—that results from even a minor error in completing that task. *Cf. Council of Alt. Pol. Parties v.*

*Hooks*, 121 F.3d 876, 881 (3d Cir. 1997) (incorporating the severity of the consequence of a minor party's candidate failing to comply with filing deadline into assessment of burden).

This approach to measuring the severity of the burden on the right to vote would depart from the settled view of federal courts around the country. In *Lee*, for example, the Eleventh Circuit recognized that the burdens imposed by an absentee ballot signature matching requirement included the increased risk of disenfranchisement from a perceived signature mismatch. 915 F.3d at 1319. Likewise, when assessing the nature of the burden imposed by an Ohio law limiting early in-person voting, the Sixth Circuit credited plaintiffs' "extensive evidence that a significant number of Ohio voters will in fact be precluded from voting." *Obama for Am.*, 697 F.3d at 431. And in *Fish v. Schwab*, the Tenth Circuit applied heightened scrutiny to Kansas's documentary-proof-of-citizenship requirement because the "significant burden *quantified by* the 31,089 voters who had their registration applications canceled or suspended requires us to increase the 'rigorousness of our inquiry[.]'" *Fish*, 957 F.3d at 1127 (emphasis added) (quoting *Burdick*, 504 U.S. at 434); *see also id.* at 1127–28 ("Based primarily on the district court's

finding that 31,089 applicants were prevented from registering to vote because of the [documentary proof of citizenship] DPOC requirement, we conclude that the burden imposed on the right to vote by the DPOC requirement was significant and requires heightened scrutiny.").

As in *Fish*, and unlike in *Crawford*, the record here amply demonstrates that a quantifiable number of voters have been prevented from voting as a direct result of the date requirement. *See Fish*, 957 F.3d at 1128 ("These factual findings create a fundamental distinction between this case and *Crawford*."). In the 2022 general election, the date requirement had a mass disenfranchising effect, disqualifying over 10,000 otherwise lawful votes. And Plaintiffs offered expert statistical evidence showing that older, Black, Hispanic, and less-educated voters were disproportionately likely to submit noncompliant ballots. Supp. App. 405 ¶ 34 (Pls' SMF); Supp. App. 425 ¶ 10 (Hopkins Decl.). Both factors show a more-than-minimal burden on the right to vote. *See Fish*, 957 F.3d at 1128–29 (finding a significant burden on the right to vote "[b]ased primarily on the district court's finding that 31,089 applicants were prevented from registering to vote"); *Anderson*, 460 U.S. at 793 ("[I]t

is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group[.]").

Even though invalidating ballots because of the date requirement has disenfranchised *thousands* of eligible Pennsylvania voters, the RNC argues that "the rejection rates under the date requirement are so small that they *confirm* the requirement does not implicate, let alone violate, any right to vote." RNC Br. 35. To paint this counterfactual, the RNC emphasizes that since the 2022 election, the Secretary of the Commonwealth has reformatted the date field on the mail-ballot declaration, and noncompliance rates have dropped. *See id.* at 34–35. The RNC's narrow focus on the percentage of total voters disenfranchised is misplaced. Again, take *Fish*, where the Tenth Circuit held that more than 31,000 disenfranchised voters was evidence of a "significant" burden, which represented only about two and half percent of Kansas voters in

the last presidential election preceding the DPOC rule. *Fish*, 957 F.3d at 1128–29.[7]

The RNC's further argument that one Commonwealth Secretary's entirely discretionary formatting decisions spare the date requirement from constitutional scrutiny does not even pass the smell test. Nothing in Act 77 requires the Commonwealth to style mail ballot declarations one way or another. Indeed, despite the current administration's efforts to reformat the declaration, voters continue to be disenfranchised based on meaningless technicalities, and absolutely nothing stops the next (or even the current) administration from reversing course.

### B.    Under any level of *Anderson-Burdick* scrutiny, the date requirement is invalid because it serves no meaningful purpose.

The second step in applying *Anderson-Burdick*'s flexible standard is to weigh the date requirement's burden "against the precise interests identified by the state." *Mazo*, 54 F.4th at 145 (quotation omitted); *see*

---

[7] According to the Kansas Secretary of State's official vote totals, 1,235,872 people cast ballots in the 2008 presidential election. Kansas Secretary of State, *2008 General Election Official Vote Totals* 1, perma.cc/57DU-F6DX.

*also Burdick*, 504 U.S. at 434 (same). To do so, courts must "determine the legitimacy and strength" of the state's interests and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Belitskus*, 343 F.3d at 643 (quoting *Anderson*, 460 U.S. at 789).

Even if a state interest is "legitimate in the abstract," Defendants must put forward "concrete evidence" proving that "such an interest" justifies the "burden [on] voters' rights." *Fish*, 957 F.3d at 1132–33. Where the state cannot "articulate how achieving [its] goals makes it at all necessary or desirable to" burden the right to vote, there is "nothing to weigh on the [state's] side" of *Anderson-Burdick* balancing. *Council of Alt. Pol. Parties*, 121 F.3d at 881. In other words, where a challenged practice does not actually advance the asserted state interests, those interests cannot justify even the slightest burden on the right to vote. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 219–22 (1986) (holding insufficient "legitimate interest[s]" in preventing party raiding and in avoiding voter confusion because those interests were not advanced by the challenged statute); *see also Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (holding that even an "important government interest" could not justify burden because the court "struggle[d] to

understand how [the challenged statutes] . . . advance[d] that goal"); *Lerman v. Bd. of Elections in N.Y.C.*, 232 F.3d 135, 149 (2d Cir. 2000) ("[T]he fact that the defendants['] asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994))).

This Court has already recognized that the date requirement "serves little apparent purpose." *Pa. NAACP*, 97 F.4th at 125. As a result, even if Appellants are correct that the burden it imposes on the right to vote is "minimal," the requirement still fails to satisfy even deferential review—a standard that has more bite than garden-variety rational basis. For the same reasons, the requirement *certainly* cannot survive the heightened scrutiny required for significant burdens on the right to vote.

1. ***Anderson-Burdick* requires more than traditional rational basis review.**

Appellants misstep at the outset by assuming that traditional rational-basis review applies. Citing cases applying rational basis outside the election context, they argue that the district court erred by looking too closely at the proffered justifications, faulting the court for expecting something more than rank speculation that the RNC's asserted interests

were "legitimate" and "important"—or even real. *See Burdick*, 504 U.S. at 434, 440. But that is exactly the analysis that *Anderson-Burdick* requires—even for "minimal" burdens on the right to vote. Appellants' resort to the "convenient and familiar linguistic device[s] by which courts . . . have characterized their review" in other cases is simply misplaced, where *Anderson* and *Burdick* have instead promulgated "a less categorical system of classification" recognizing that the Court's "scrutiny is a weighing process." *Rogers*, 468 F.3d at 194.

When voting rights are at stake, the *Anderson-Burdick* framework *never* authorizes the sort of rubber-stamp review that Appellants fault the district court for depriving them here. Even when a restriction is minimally burdensome, "the court must actually 'weigh' the burdens imposed on the plaintiff against 'the precise interests put forward by the State,' and the court must take 'into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Price*, 540 F.3d at 108 (quoting *Burdick*, 504 U.S. at 434). That is a far cry from rational-basis review, which requires only that a "statute be rationally related to a legitimate government objective." *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009) (quoting *Tenafly Eruv Ass'n, Inc. v. Borough of*

*Tenafly*, 309 F.3d 144, 165 n.24 (3d Cir. 2002)).

To that end, courts have frequently refused to equate less-exacting *Anderson-Burdick* review with standard rational-basis review. *See, e.g.*, *Tedards*, 951 F.3d at 1066 ("[T]he burdening of the right to vote always triggers a higher level of scrutiny than rational basis review."); *Lee*, 915 F.3d at 1318–19 ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."); *Pisano v. Strach*, 743 F.3d 927, 935 (4th Cir. 2014) (even where plaintiffs did not show that "North Carolina's [signature collection and filing deadline] scheme burdens them in any meaningful way," the proper framework was to "balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests" and that the "asserted regulatory interests" must be "sufficiently weighty to justify the limitation imposed" (quotation omitted)); *Obama for Am.*, 697 F.3d at 429 (in equal-protection context, "a straightforward rational basis standard of review should be used" when "a plaintiff alleges only that a state treated him or her differently than similarly situated voters, *without a corresponding burden on the fundamental right to vote*." (emphasis

added)); *Price*, 540 F.3d at 108 (rejecting state defendants' argument "that pure rational basis review should be utilized" when reviewing an election regulation).

In passing, the RNC cites *Mays v. LaRose* to support applying rational-basis review. *See* RNC Br. 53 (quoting 951 F.3d 775, 784 (6th Cir. 2020)). *Mays* is unpersuasive for two reasons. First, the Sixth Circuit in *Mays*—much like the RNC here—simply assumed that *Anderson-Burdick* review of a minimally burdensome law receives rational basis review without directly confronting the question. *See Mays*, 951 F.3d at 784, 786. Second, in another case where the Sixth Circuit gave more thorough treatment to the applicable standards within the *Anderson-Burdick* framework, the court agreed that "straightforward rational basis" applies only when there is no "corresponding burden on the fundamental right to vote." *Obama for Am.*, 697 F.3d at 429; *see also Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (explaining that minimally burdensome laws apply a standard of review "closer to rational basis," but not true rational basis).

In short, while deferential, *Anderson-Burdick* review is not toothless—even for laws that minimally burden the right to vote. And

when weighing the State's "precise interests" and the necessity of burdening the right to vote, *Price*, 540 F.3d at 108 (quoting *Burdick*, 504 U.S. at 434), courts appropriately consider record evidence supporting the State's claimed interests—or the lack thereof. *See Soltysik*, 910 F.3d at 448 (rejecting the state's argument that it "is categorically 'not required to make an evidentiary showing of its interests,' . . . especially where that burden is more than de minimis"). While a court may not demand "elaborate, empirical verification of the weightiness of the State's asserted justifications," *Mazo*, 54 F.4th at 153 (quoting *Timmons*, 520 U.S. at 364), it may nonetheless appropriately conclude that unsubstantiated, post-hoc rationalizations for a law are not sufficiently weighty to justify burdens on the right to vote. *See NEOCH*, 837 F.3d at 632–33 (finding that an "abstract[]" interest in combatting voter fraud did not justify burdensome date and address requirement where "the district court was not presented with a shred of evidence of mail-in absentee-voter fraud").

The Commonwealth relies on *Crawford* to disclaim any obligation to present evidence supporting its interests. But *Crawford* again supports Plaintiffs' view. True, responding to the State's assertion that a

54

voter ID requirement advanced its interest in combating "in-person voter impersonation at polling places," the Supreme Court acknowledged that "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana[.]" *Crawford*, 553 U.S. at 194. But the Court did not, as the Commonwealth suggests (at 23–24), end its analysis there, content to allow the State to speculate over what interests the law might serve. Instead, it credited *other* evidence in the record supporting the State's argument, including that "flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history," and that "occasional examples have surfaced in recent years." *Id.* at 195; *see also id.* at 195 n.12 (citing record evidence).[8]

Neither the RNC nor the Commonwealth has identified such evidence here. As the district court rightly concluded, none exists.

---

[8] The Commonwealth also cites *Luft v. Evers*, 963 F.3d 665, 677 (7th Cir. 2020), in which the Seventh Circuit applied rational-basis review to invalidate a law allowing Wisconsinites to use valid—but not expired—student IDs to vote. *See* Commonwealth Br. 24. But in so doing, the court was applying traditional equal-protection analysis—*not* right-to-vote *Anderson-Burdick* review. *See Luft*, 963 F.3d at 677. *Luft* is thus inapposite.

## 2.    The date requirement serves no purpose.

The date requirement cannot survive the *Anderson-Burdick* test—under either deferential or heightened scrutiny—because it is straightforwardly meaningless. *Two* consecutive Secretaries of the Commonwealth charged by law with prescribing the voter declaration's form—one Democrat and one Republican—have said so in no uncertain terms. *See In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 663 Pa. 283, 293, 241 A.3d 1058, 1064 (2020). According to Secretary, "**there is no state interest** in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return envelope." Supp. App. 361 (*Pa. NAACP* Schmidt Br.). In fact, "requiring officials to review declaration dates *impedes* effective election administration." Supp. App. 359 (emphasis added); *see also Ball*, 289 A.3d at 16 n.77 (describing the then-Acting Secretary "rebut[ting] arguments for the date requirement's functionality").

Underscoring this express disavowal of any state interest in the date requirement, "the Commonwealth [did] not identif[y]" for the district court "any interests that are served by imposing even [a] minimal burden on the right to vote." App. 23 (Mem. Op.). This, despite the Court's

invitation for the Commonwealth to intervene in the case and defend the date requirement's constitutionality. *See id.* Thus, "unlike the process contemplated by the Court in *Anderson*," the district court was "unable to consider 'justifications put forward by the State.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). The Commonwealth's failure to claim any interest in the law—no less develop a record defending an interest—"fairly support[s] the view that the rule is not of great import for any particular regulatory purpose." *See id.* at 16.

Instead, the purported state interests on review here were advanced by a third-party political organization. But unlike true rational-basis review, where a law "must be upheld if there is any *reasonably conceivable* state of facts that could provide a rational basis" for the given restriction, *Angstadt v. Midd-W. Sch. Dist.*, 377 F.3d 338, 345 (3d Cir. 2004) (emphasis added) (quotation omitted), *Anderson-Burdick* requires courts to weigh "the *precise interests* put forward *by the State* as justifications for the burden imposed by its rule," *Burdick*, 504 U.S. at 434 (emphasis added) (quotation omitted). Here, the state itself did not advance "precise interests" to balance. The RNC's hypotheses

about what interests the law *might*—but do not in fact—serve should carry even less weight.

To be sure, the Commonwealth has now appeared at the eleventh hour to endorse the abstract interests the RNC offered below.[9] The district court, however, lacked any opportunity to weigh the Commonwealth's views in the first instance; accordingly, this Court should reject the Attorney General's efforts to skew a record it was content to leave alone in the court charged with making factual findings concerning any state interest in the date requirement.

As for the three abstract state interests that the RNC pressed below—(1) detecting voter fraud; (2) promoting "solemnity" in the act of voting; and (3) ensuring the "orderly administration of elections," *see*

---

[9] In the district court, only one of the 67 county defendants—Berks County—proffered a defense of the date requirement at summary judgment. *See* Supp. App. 328 (Berks Cnty. SMF Resp.).But it no longer presses those interests here. *See* Doc. 51. Indeed, not *one* county board of elections—the entities responsible for administering elections in Pennsylvania—is defending the date requirement in this appeal alongside the Attorney General, who has no role in the process.

RNC Br. 52–62; Commonwealth Br. 26–30[10]—the district court found that, based on the record before it, each was insufficiently weighty to justify even a minimal burden on Pennsylvanians' right to vote. App. 27. Viewed through the proper lens, the district court's conclusion was correct.

***Deterring voter fraud.*** While combatting voter fraud is surely a legitimate state interest in the abstract, the date requirement does nothing to advance that interest. The district court credited record evidence *from multiple county boards* "admit[ting] that an outer envelope that is missing a hand-written date is no reason to suspect voter fraud." App. 24 (citing Supp. App. 155 (Pls' SMF App.)); *see also* App. 213–15 ¶¶ 65–75 (Lancaster BOE admitting date serves no fraud prevention

---

[10] The legislator amici further argue that "[t]he presence of a date also establishes a point in time against which to measure the elector's eligibility to cast the ballot." Amicus Br. 6 (quoting *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1079 (Pa. 2020) (Dougherty, J., concurring and dissenting)). Because this purported interest was not preserved before the district court, this Court should disregard this argument—but it is meritless anyway. A voter's eligibility is "determined based on an elector's qualifications '*as of Election day*,' not as of the moment that the elector fills out a [mail] ballot." *Ball*, 289 A.3d at 16 n.77.

interests); Supp. App. 310–12 ¶¶ 65–75 (same for Berks BOE); Supp. App. 180–81, 184–85 (Pls.' SMF App.) (Westmoreland BOE testifying similarly)). Nor had the county boards identified, raised, or been made aware of any credible concern regarding fraud with respect to the date requirement. App. 215 ¶ 72 (Lancaster Cnty. SMF Resp.). Indeed, Pennsylvania has conducted several elections without invalidating mail ballots for imperfect dates while the date requirement has been intermittently stayed in other litigation, and no fraud-related concerns have emerged.

The RNC counters that a state "does not have to endure fraud before acting to prevent and combat it." RNC Br. 56 (citing *Brnovich*, 594 U.S. at 686). Maybe so, but not by whatever means it chooses. In the *Anderson-Burdick* context, when the record shows "no indication of a legitimate fraud concern at all[,] . . . the fraud interest [can]not offset [an election regulation's] burden of technical perfection." *NEOCH*, 837 F.3d at 633. For his part, in response to the total dearth of evidence that the date requirement advances any interest in fraud deterrence, the Attorney General adds that it "is of no moment" whether "the date requirement often detects fraud or represents the first line of defense

against fraud." Commonwealth Br. 27. That is not right, either. For if the State effectively detects and defends itself against fraud *without* the date requirement, then it is self-evidently "[un]necessary to burden the plaintiff's rights" to protect that interest. *Belitskus*, 343 F.3d at 643 (quotation omitted).

The RNC and Attorney General also raise *Commonwealth v. Mihaliak* as record support for the date requirement's fraud-detection function. *Mihaliak* involved a Lancaster County voter allegedly completing and backdating her recently deceased mother's mail ballot. RNC Br. 56–57; Commonwealth Br. 26–27. But as the Lancaster County Board of Elections admitted, the perpetrator's mother had already been removed from the voter rolls before the ballot was received, and thus her mail ballot *never* would have been counted, regardless of what was written on the outer envelope. App. 215 ¶¶ 73–75 (Lancaster Cnty. SMF Resp.). Moreover, as the Lancaster County registrar reported to police, the decedent had passed away two weeks before her ballot was received by the Lancaster registrar, at which point she had already been removed from the rolls. App. 227. Thus, "an investigation would have followed no matter what was written on the return envelope." *Ball*, 289 A.3d at 16

n.77. The district court appropriately afforded the incident little weight in support of a state interest in fraud detection or prevention. *See* App. 23–24.

Neither Appellant disputes the district court's finding that the handwritten date on the ballot envelope in *Mihaliak* did nothing to prevent fraudulent votes from being counted. *See id.* Instead, they argue that the handwritten date had independent evidentiary value to investigate and prosecute the *daughter*'s fraudulent conduct. *See* RNC Br. 56–57; Commonwealth Br. 26–27. The distinction is irrelevant. The district court's order does not *eliminate* handwritten dates from mail ballots or require the Commonwealth to remove the "date" line from ballot envelopes—nor did Plaintiffs seek that relief below. Supp. App. 19 (Am. Compl.). The order merely prevents county boards from disqualifying otherwise valid mail ballots for noncompliant dates. App. 3–4. So the date requirement's supposed evidentiary function remains intact.

In any event, the state's interest in a *single piece of evidence* in a case where no fraudulent ballots could have been counted cannot justify a burden on the right to vote that has disenfranchised *thousands* of

eligible Pennsylvania voters. *See Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *21 (Pa. Commw. Ct. Aug. 19, 2022) ("[A] single instance of alleged fraud related to a ballot that would have been rejected anyway . . . does not support the drastic consequence of disenfranchising otherwise qualified Pennsylvania electors[.]" (citation omitted)). Appellants' purported desire to rely on the date requirement as an extra piece of evidence of fraud is an "exceptionally and extraordinarily weak" reason to burden Pennsylvanians' right to vote. *See Price*, 540 F.3d at 112. An interest that carries such "infinitesimal weight . . . do[es] not justify the burdens imposed" on voting rights, even if that burden "is not large." *See id.*

**_Orderly election administration._** Relatedly, the district court correctly observed that there is no evidence that invalidating mail-ballots based on the date requirement advances any interest in the "orderly administration" of elections by verifying the date by which a ballot was executed. App. 25 (Mem. Op.). Indeed, the Secretary of the Commonwealth has previously confirmed that "requiring officials to review declaration dates *impedes* effective election administration." App. 27 n.9 (Mem. Op.) (quoting Supp. App. 361 (*Pa. NAACP* Schmidt Br.)).

Even without evidence directly contradicting the RNC's position, the record nonetheless lacks any evidence to suggest Pennsylvania election officials have even *once* used a handwritten date to verify the timeliness of a ballot. *See* App. 25 (Mem. Op.). The SURE system confirms a ballot's timeliness. Supp. App. 211–12 ¶¶ 52–57 (Lancaster Cnty. SMF Resp.); *accord* Supp. App. 252–53 ¶¶ 52–57 (RNC SMF Resp.), and the Secretary further directs election offices to date-stamp return envelopes for all mail-in ballots, Supp. App. 92 (Pls.' SMF App.). The RNC argues the handwritten date remains a "useful backstop" in case *both* methods of verifying a ballot's timeliness somehow fail. RNC Br. 53. But the date on which a ballot is completed is irrelevant; its *receipt date* governs whether it can be counted. *See* 25 P.S. § 3146.8(g)(1)(ii) (mail ballots "shall be canvassed . . . [if] *received* in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" (emphasis added)). The RNC does not—and cannot—explain how the voter declaration date aids that inquiry. Regardless, any state interest in an improbable *third* line of defense against untimely ballots is, again, quite weak and warrants very little weight.

***Solemnity.*** Appellants' purported interest in "marking the casting of a vote as a serious and solemn act" is just as far off the mark. *See* RNC Br. 54; Commonwealth Br. 28–29. Neither the RNC nor the Attorney General explains how a state may legitimately impose additional procedural barriers to exercising the franchise merely to force some indeterminate degree of additional "solemnity" upon voters, nor how marginal increases in solemnity can be measured. *Cf. Anderson*, 460 U.S. at 798 (criticizing "[a] State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them").

Even if this purported interest in "solemnity" were legitimate, again, the district court's order does not require the Commonwealth to eliminate the date field on declarations for mail-ballot envelopes. It simply governs the actions of election officials once they receive a potentially non-compliant ballot. And Appellants do not explain why their purported interest in solemnity when a ballot is cast is enhanced by *rejecting* ballots on the back-end.

As the district court found, App. 24–25, there is absolutely nothing in the record to suggest that discarding ballots for failure to comply with

the date requirement accomplishes anything that may enhance the "solemnity" of the voting process. Allowing such an indeterminate and vague interest to justify burdening the right to vote has no end. If deemed sufficient, it could be used to rationalize an endless parade of otherwise pointless voting barriers, such that *any* burden can be justified on the basis that it could somehow make voting a more solemn procedure.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's summary judgment ruling.

Dated: June 4, 2025                    Respectfully submitted,

                                       *s/Uzoma N. Nkwonta*

Adam C. Bonin (PA # 80929)             Uzoma N. Nkwonta (DC # 975323)
**LAW OFFICE OF ADAM C. BONIN**        Richard A. Medina (DC # 90003752)
121 South Broad Street, Suite 400      Nicole Wittstein (DC # 1725217)
Philadelphia, PA 19107                 Daniel J. Cohen (DC # 90001911)
(267) 242-5014                         Omeed Alerasool (PA # 332873)
adam@boninlaw.com                      **ELIAS LAW GROUP LLP**
                                       250 Massachusetts Avenue NW,
                                       Suite 400
                                       Washington, DC 20001
                                       (202) 968-4490
                                       unkwonta@elias.law
                                       rmedina@elias.law
                                       nwittstein@elias.law
                                       dcohen@elias.law
                                       oalerasool@elias.law

*Counsel for Plaintiffs-Appellees Bette Eakin, DSCC, DCCC,*
*and AFT Pennsylvania*

## COMBINED CERTIFICATIONS

At least one of the attorneys whose name appears on this brief is a member of the bar of this Court, or has filed an application for admission pursuant to L.A.R. 46.1.

This brief complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 12,978 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point serif font (Century Schoolbook) using Microsoft Word.

The text of this electronic brief is identical to the text in paper copies that will be filed with the Court.

Pursuant to 3d Cir. L.A.R. 31.1(c), Sophos Core Agent version 2024.3.2.3.0 has been run on this electronic file and no virus was detected.

Dated: June 4, 2025

*s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

## CERTIFICATE OF SERVICE

I hereby certify that, on June 4, 2025, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system.

Dated: June 4, 2025          *s/ Uzoma N. Nkwonta*
                                      Uzoma N. Nkwonta