No. 25-1644

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

BETTE EAKIN, et al.,

*Plaintiffs-Appellees,*

*v.*

ADAMS COUNTY BOARD OF ELECTIONS, et al.,

*Defendants-Appellees,*

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenors-Appellants,*

COMMONWEALTH OF PENNSYLVANIA,

*Intervenor-Appellant.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
Case No. 1:22-cv-00340 (Hon. Susan Paradise Baxter)

## SUPPLEMENTAL APPENDIX OF PLAINTIFFS-APPELLEES
## BETTE EAKIN, DSCC, DCCC, AND AFT PENNSYLVANIA,
## VOLUME 1 OF 2

**LAW OFFICE OF ADAM C. BONIN**
Adam C. Bonin
121 South Broad Street,
Suite 400
Philadelphia, PA 19107
(267) 242-5014
adam@boninlaw.com

**ELIAS LAW GROUP LLP**
Uzoma N. Nkwonta
  *Counsel of Record*
Richard A. Medina
Nicole Wittstein
Daniel J. Cohen
Omeed Alerasool
250 Massachusetts Avenue NW,
Suite 400
Washington, DC 20001
(202) 968-4490
unkwonta@elias.law

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

<u>VOLUME 1</u>

*Eakin v. Adams County Board of Elections*, No. 22-cv-340 (W.D. Pa.):

Dkt. 228: Amended Complaint for Declaratory and Injunctive Relief (Feb. 9, 2023)……………………………………………………**Supp. App. 1**

Dkt. 289: Concise Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment (Apr. 21, 2023) (Partially Redacted)……………………………………………………..**Supp. App. 21**

Dkt. 290: Appendix of Exhibits Accompanying Plaintiffs' Concise Statement of Material Facts (Apr. 21, 2023) (Excerpted)……………………………………………..**Supp. App. 43**

Dkt. 311: Response of Defendant Lancaster County Board of Elections, to the Concise Statement of Material Facts of Plaintiffs (May 5, 2023)……………………………………………**Supp. App. 198**

Dkt. 313: Intervenor-Defendants' Response to Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment (May 5, 2023)……………………………**Supp. App. 238**

Dkt. 315: Defendants Allegheny, Bucks, Chester, Montgomery, and Philadelphia County Boards of Elections' Memorandum in Response to Intervenor-Defendants' Motion for Summary Judgment (May 5, 2023)……………………………**Supp. App. 274**

Dkt. 323: Defendant Berks County Board of Elections' Response in Opposition to Plaintiffs' Motion for Summary Judgment and Concise Statement of Material Facts (May 5, 2023)……………………………………………………..**Supp. App. 292**

i

Dkt. 324: Defendant Berks County Board of Elections' Brief in Opposition to Plaintiffs' Motion for Summary Judgment (May 5, 2023)...............................................................**Supp. App. 327**

Dkt. 327: Intervenor-Defendants' Response to Defendants County Boards of Elections Additional Concise Statement of Material Facts and Responses to Intervenor-Defendants' Concise Statement of Material Facts (May 10, 2023)............................**Supp. App. 331**

Dkt. 383: Certification of Constitutional Challenge to Pennsylvania Attorney General (June 18, 2024)........................**Supp. App. 341**

Dkt. 290: Appendix of Exhibits Accompanying Plaintiffs' Concise Statement of Material Facts (Apr. 21, 2023) (Redacted Expert Declaration of Dr. Daniel Hopkins).......................**Supp. App. 342**

*Pa. State Conf. of the NAACP v. Schimdt*, No. 22-cv-339 (W.D. Pa.):

Dkt. 440: Brief of Al Schmidt in Response to Plaintiffs' and Intervenor-Defendants' Motions for Summary Judgment (July 18, 2024)...............................................................**Supp. App. 378**

VOLUME 2 (SEALED)

*Eakin v. Adams County Board of Elections*, No. 22-cv-340 (W.D. Pa.):

Dkt. 289: Concise Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment (Apr. 21, 2023) (Unredacted).....................................................**Supp. App. 398**

Dkt. 290: Appendix of Exhibits Accompanying Plaintiffs' Concise Statement of Material Facts (Apr. 21, 2023) (Unredacted Expert Declaration of Dr. Daniel Hopkins).......................**Supp. App. 420**

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION**

| | |
|---|---|
| BETTE EAKIN, DSCC, DCCC, and AFT PENNSYLVANIA, | Civil Action |
| *Plaintiffs*, | Case No. 1:22-cv-340-SPB |
| v. | |
| ADAMS COUNTY BOARD OF ELECTIONS, ALLEGHENY COUNTY BOARD OF ELECTIONS, ARMSTRONG COUNTY BOARD OF ELECTIONS, BEAVER COUNTY BOARD OF ELECTIONS, BEDFORD COUNTY BOARD OF ELECTIONS, BERKS COUNTY BOARD OF ELECTIONS, BLAIR COUNTY BOARD OF ELECTIONS, BRADFORD COUNTY BOARD OF ELECTIONS, BUCKS COUNTY BOARD OF ELECTIONS, BUTLER COUNTY BOARD OF ELECTIONS, CAMBRIA COUNTY BOARD OF ELECTIONS, CAMERON COUNTY BOARD OF ELECTIONS, CARBON COUNTY BOARD OF ELECTIONS, CENTRE COUNTY BOARD OF ELECTIONS, CHESTER COUNTY BOARD OF ELECTIONS, CLARION COUNTY BOARD OF ELECTIONS, CLEARFIELD COUNTY BOARD OF ELECTIONS, CLINTON COUNTY BOARD OF ELECTIONS, COLUMBIA COUNTY BOARD OF ELECTIONS, CRAWFORD COUNTY BOARD OF ELECTIONS, CUMBERLAND COUNTY BOARD OF ELECTIONS, DAUPHIN COUNTY BOARD OF ELECTIONS, DELAWARE COUNTY BOARD OF ELECTIONS, ELK COUNTY BOARD OF ELECTIONS, ERIE COUNTY BOARD OF ELECTIONS, FAYETTE COUNTY BOARD OF ELECTIONS, FOREST COUNTY BOARD OF ELECTIONS, FRANKLIN COUNTY BOARD OF ELECTIONS, FULTON COUNTY BOARD OF ELECTIONS, GREENE COUNTY BOARD OF ELECTIONS, HUNTINGDON COUNTY BOARD OF ELECTIONS, INDIANA COUNTY BOARD OF ELECTIONS, JEFFERSON COUNTY BOARD OF ELECTIONS, JUNIATA COUNTY BOARD OF ELECTIONS, LACKAWANNA COUNTY BOARD OF ELECTIONS, LANCASTER COUNTY BOARD | |

OF ELECTIONS, LAWRENCE COUNTY BOARD
OF ELECTIONS, LEBANON COUNTY BOARD OF
ELECTIONS, LEHIGH COUNTY BOARD OF
ELECTIONS, LUZERNE COUNTY BOARD OF
ELECTIONS, LYCOMING COUNTY BOARD OF
ELECTIONS, MCKEAN COUNTY BOARD OF
ELECTIONS, MERCER COUNTY BOARD OF
ELECTIONS, MIFFLIN COUNTY BOARD OF
ELECTIONS, MONROE COUNTY BOARD OF
ELECTIONS, MONTGOMERY COUNTY BOARD
OF ELECTIONS, MONTOUR COUNTY BOARD
OF ELECTIONS, NORTHAMPTON COUNTY
BOARD OF ELECTIONS, NORTHUMBERLAND
COUNTY BOARD OF ELECTIONS, PERRY
COUNTY BOARD OF ELECTIONS,
PHILADELPHIA COUNTY BOARD OF
ELECTIONS, PIKE COUNTY BOARD OF
ELECTIONS, POTTER COUNTY BOARD OF
ELECTIONS, SCHUYLKILL COUNTY BOARD OF
ELECTIONS, SNYDER COUNTY BOARD OF
ELECTIONS, SOMERSET COUNTY BOARD OF
ELECTIONS, SULLIVAN COUNTY BOARD OF
ELECTIONS, SUSQUEHANNA COUNTY BOARD
OF ELECTIONS, TIOGA COUNTY BOARD OF
ELECTIONS, UNION COUNTY BOARD OF
ELECTIONS, VENANGO COUNTY BOARD OF
ELECTIONS, WARREN COUNTY BOARD OF
ELECTIONS, WASHINGTON COUNTY BOARD
OF ELECTIONS, WAYNE COUNTY BOARD OF
ELECTIONS, WESTMORELAND COUNTY
BOARD OF ELECTIONS, WYOMING COUNTY
BOARD OF ELECTIONS, and YORK COUNTY
BOARD OF ELECTIONS,

*Defendants*.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUCTIVE RELIEF

Plaintiffs Bette Eakin, DSCC, DCCC, and AFT Pennsylvania, by and through undersigned

counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants, which

consist of Pennsylvania's 67 county boards of elections (full list recited in caption), and allege as

follows:

- 2 -

**Supp. App. 2**

## NATURE OF THE CASE

1. The constitutional right to vote is fundamental and "preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). To secure its free exercise, the Civil Rights Act of 1964 prohibits election officials from denying any individual access to the franchise because of an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"). In essence, the Materiality Provision prohibits the use of needless technical requirements to deny citizens their most fundamental right.

2. On November 1, 2022, the Pennsylvania Supreme Court—for the first time—ordered election officials to *not count* qualified voters' mail-in and absentee ballots (collectively, "mail ballots") due to an immaterial omission of a written date, or the entry of an incorrect date, on the outside of the ballot envelope. That decision was based on an interpretation of a Pennsylvania Election Code provision that directs voters to "fill out, date and sign the declaration" provided on the envelope in which they place their ballot. 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Instruction").

3. Within just a few days of the Pennsylvania Supreme Court order, county boards of elections identified thousands of mail ballots that would not be counted because a missing or incorrect date on the ballot envelope, rejecting qualified voters who accidentally failed to write the date on their ballot envelope, and more still will be rejected when voters enter an incorrect date, such as their birthdate, instead of the date they completed or signed their ballot. Election officials have been ordered to reject such ballots even when there is no question that they were timely received and properly signed by a qualified voter.

Supp. App. 3

4. The Date Instruction has no relevance to determining whether an individual is qualified to vote under Pennsylvania law. Pennsylvania residents are eligible to vote so long as, on the date of the election, they (1) are at least 18 years of age, (2) have been a citizen of the United States for at least one month, (3) have resided in the Commonwealth for at least 90 days, (4) have resided in the district they intend to vote in for at least 30 days, and (5) have not been confined for a felony within the last five years. *See* 25 P.S. §§ 2811, 2602(t); 25 Pa. C.S. § 1301.

5. To the extent any date is relevant to a voter's qualifications to participate in a particular election under Pennsylvania law, it is the date of that *election*, not the date that the voter completed, signed, or mailed their ballot. *See* 25 P.S. § 2602(t); 25 Pa. C.S. § 1301. Moreover, a mail ballot's timeliness depends not on the day that the voter completed, signed, and submitted it, but instead solely on the date and time the board of elections receives it. 25 P.S. §§ 3146.6(c), 3150.16(c) (requiring mail ballots to be received by 8 p.m. on Election Day).

6. The date on a mail ballot envelope thus has no bearing on a voter's qualifications and serves no purpose other than to erect barriers to qualified voters exercising their fundamental constitutional right to vote. This unnecessary impediment violates the Civil Rights Act and the First and Fourteenth Amendments to the U.S. Constitution.

### JURISDICTION AND VENUE

7. Plaintiffs bring this action under 52 U.S.C. § 10101 and 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the federal Civil Rights Act and the U.S. Constitution.

8. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws

Supp. App. 4

of the United States and involve the assertion of deprivation, under color of state law, of rights under the U.S. Constitution and federal law.

9.      This Court has personal jurisdiction over Defendants, who are government entities in Pennsylvania.

10.      Venue is proper in this Court, and in the Erie Division specifically, because a substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this Division. *See* 28 U.S.C. § 1391(b)(2). Plaintiff Eakin lives in Erie County, AFT Pennsylvania has two affiliates in Erie County, and Defendants Crawford, Elk, Erie, Forest, McKean, Venango, and Warren County Boards of Elections are all located in the Erie Division. *See* W.D. Pa. LCvR 3. Furthermore, of the 2,992,341 mail ballots received in Pennsylvania for the 2020 General Election, over 28% (839,493) were sent from counties located in this District.[1] Venue is therefore appropriate in the Erie Division of the Western District of Pennsylvania.

11.      This Court has the authority to enter declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

### PARTIES

12.      Plaintiff Bette Eakin is a veteran and registered Democrat in Erie County. In the 2022 general election, Ms. Eakin submitted a mail ballot to the Erie County Board of Elections but did not enter a handwritten date on the ballot return envelope. At the time she submitted the ballot, Ms. Eakin was undergoing care for a condition that has made her legally blind and was unable to cast an in-person ballot. Ms. Eakin learned that her ballot would be rejected unless the missing date was rectified, but due to her medical condition, she requires assistance to travel to

---

[1] *Report on the 2020 General Election*, PA. DEP'T OF STATE (May 14, 2021), *available at* https://www.dos.pa.gov/VotingElections/Documents/2020-General-Election-Report.pdf, at 18 (last visited Nov. 4, 2022).

Supp. App. 5

her county board of elections office. As a result, her husband was forced to return home early from a hunting trip nearly two hours away to help Ms. Eakin to cure her undated ballot envelope. Ms. Eakin is concerned that her ballot will be similarly rejected in future elections, either because she forgets to include a date on her mail ballot or because the lack of guidance as to what constitutes a "correct" date creates a serious risk that she will date her ballot in a manner that her county board will deem incorrect. As a result, Ms. Eakin would face additional burdens in seeking to have her future ballots counted because of the Date Instruction.

13.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party across the country, including in Pennsylvania, to the U.S. Senate. DSCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Pennsylvania, and mobilizing and supporting voters. DSCC has spent millions of dollars in contributions and expenditures to persuade and mobilize voters to support U.S. Senate candidates who affiliate with the Democratic Party, and it will continue to do so again in 2024, including to influence the 2024 senatorial campaign in Pennsylvania. DSCC asserts the claims in this complaint on behalf of itself and its members and constituents. Defendants' failure to count otherwise valid ballots of eligible voters for no other reason than a missing or incorrect date will result in disenfranchisement, including of voters DSCC seeks to mobilize, and impede DSCC's mission of getting Democratic candidates elected to the U.S. Senate. This will force DSCC to divert resources away from its existing voter outreach and mobilization efforts towards voter education necessitated specifically by this requirement, and other efforts to ensure that voters who would be disenfranchised as a result have their votes counted.

Supp. App. 6

14.     Plaintiff DCCC is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party from across the country, including those running in Pennsylvania's congressional districts, to the U.S. House of Representatives. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Pennsylvania, and assisting and mobilizing voters. DCCC has spent millions of dollars in contributions and expenditures to persuade and mobilize voters to support congressional candidates who affiliate with the Democratic Party, and it will continue to do so again in 2024, including to influence the 2024 congressional campaigns in Pennsylvania. DCCC asserts the claims in this complaint on behalf of itself and its members and constituents. Defendants' failure to count otherwise valid ballots of eligible voters for no other reason than a missing or incorrect date will result in disenfranchisement, including of voters DCCC seeks to mobilize, and impede DCCC's mission of getting Democratic candidates elected to the U.S. House of Representatives. This will force DCCC to divert resources away from its existing voter outreach and mobilization efforts towards voter education necessitated specifically by this requirement, and other effort to ensure that voters who would be disenfranchised as a result have their votes counted.

15.     Plaintiff AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,117 members in 55 local affiliates across Pennsylvania, including 179 members across two affiliates in Erie County. The Federation's members include public school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for teachers and school staff, as

- 7 -

Supp. App. 7

well as excellence in public service through cooperative problem-solving and workplace innovations. In furtherance of its mission, the Federation and its individual members devote significant resources to advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are successfully able to access the franchise to support these policies at the ballot box. The Federation asserts the claims in this complaint on behalf of itself and its members. Defendants' failure to count otherwise valid ballots because of a missing or incorrect date is substantially likely to disenfranchise members of the Federation. Defendants' rejection of such ballots also frustrates the Federation's mission and will force it to divert its scarce resources away from its current activities towards educating its members on Defendants' practices and helping its members, particularly its retired members, ensure their ballots are counted.

16.    Defendants are the county boards of elections for the 67 counties of the Commonwealth of Pennsylvania as set forth in 25 P.S. § 2641. They "have jurisdiction over the conduct of primaries and elections in such count[ies], in accordance with the provision of [the Election Code]." *Id.* § 2641(a); *see generally id.* § 2642. In this capacity, they are charged with accepting applications for mail ballots and mailing these ballots to the requesting voter. *Id.* §§ 3146.2(a), 3150.12(a), 3150.15; 25 Pa.C.S. § 3302. They also receive the mail ballots that voters return, 25 P.S. §§ 3146.6(a), 3150.16(a), which are held until Election Day and then opened and canvassed, *id.* § 3146.8. On the third day following the election, each Defendant combines its count of mail ballots with its count of in-person votes received from each election district, and then enters the results on a tabulation sheet. *Id.* § 3154. For statewide elections, Defendants send a certificate showing the totals of the returns cast to the Secretary of the Commonwealth, who, in

Supp. App. 8

turn, combines each of the certified counts she receives in order to determine the election winner. *Id.* §§ 3158, 3159. Defendants are sued for the manner in which they enforce the Date Instruction.

## STATEMENT OF FACTS AND LAW

17.    Under Pennsylvania law, a resident qualifies to vote if, on the date of the election, she (1) is at least 18 years old, (2) has been a citizen of the United States for at least one month, (3) has resided in the Commonwealth for at least 90 days, (4) has resided in the district she intends to vote in for at least 30 days, and (5) has not been confined for a felony within the last five years. *See* 25 P.S. §§ 2811, 2602(t); 25 Pa. C.S. § 1301.

18.    Before 2019, only limited categories of qualified voters were permitted to vote by mail. This changed in 2019 when the Pennsylvania General Assembly enacted Act 77, which made sweeping changes to pre-existing Pennsylvania election law, and for the first time in the Commonwealth's history allowed any qualified and registered Pennsylvania voter to vote by mail.[2]

19.    The Election Code instructs voters casting mail ballots to (1) mark their ballot "on or before eight o'clock p.m. the day of the primary or election"; (2) use only "black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen"; (3) "fold the ballot, enclose and securely seal the same in the envelope on which it is printed, stamped or endorsed 'official election ballot'"; (4) place their completed ballot in a blank, secrecy envelope; (5) place the secrecy envelope into a separate, outer envelope, "on which is printed the form of declaration of the elector"; and (6) "fill out, date and sign the declaration printed on such envelope" before returning it to the voter's county board of elections. 25 P.S. §§ 3150.16(a), 3146.6(a).

---

[2] House Republican Caucus, Historic Election Reform, https://www.pahousegop.com/electionreform (last visited Nov. 2, 2022); *see also* 25 P.S. § 3150.11.

Supp. App. 9

20.     The Date Instruction serves no meaningful purpose and is immaterial to whether a voter is qualified to vote under Pennsylvania law, as has been shown by ample evidentiary records developed through extensive litigation since the 2020 election. In July 2022, the Deputy Secretary for Elections and Commissions at the Pennsylvania Department of State, Jonathan Marks, testified that he "cannot think of any administrative purpose" to the handwritten date and that counties do not use the handwritten date to determine timeliness, and have no mechanism of verifying whether the handwritten date is accurate. Marks also testified that he didn't believe there was any situation in which the handwritten date would be relevant to whether the vote is counted.

21.     The Pennsylvania Supreme Court initially considered the effect of a voter's failure to comply with the Date Instruction on a Petition for Discretionary Review in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058, 1062 (Pa. 2020) (opinion announcing judgment) (hereinafter "*In re Canvass*"). There, the court was asked to determine whether the Date Instruction should be read as a directory or mandatory provision under Pennsylvania law.

22.     Three of the court's seven justices concluded that the Date Instruction was "a directory, rather than a mandatory, instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting." *Id.* at 1076. These three justices reasoned that the Date Instruction did not serve any "weighty interest," and that an interpretation of the Pennsylvania Election Code requiring that mail ballots be rejected any time a voter does not strictly comply with official directions when filling out the envelope would likely violate the Materiality Provision of the Civil Rights Act. *Id.* at 1074 n.5 (citing 52 U.S.C. § 10101(a)(2)(B)).

23.     Three other justices, dissenting in relevant part, concluded that the Date Instruction was mandatory, and that the Pennsylvania Code prohibited counties from counting any ballots if

Supp. App. 10

they were contained in envelopes that did not comply with the Date Instruction. *Id.* at 1090 (Dougherty, J., concurring and dissenting). The dissenting opinion did not address whether reading Pennsylvania law in this way conflicted with the Materiality Provision of the Civil Rights Act.

24.     Concurring and writing for himself, Justice Wecht provided the tie-breaking vote. He concluded that the Date Instruction was mandatory, meaning Pennsylvania law required rejecting ballots contained in undated envelopes. *Id.* at 1079–80 (Wecht, J., concurring and dissenting). However, because candidates and voters did not have notice of these harsh consequences, Justice Wecht concluded that the Date Instruction's prohibitory effect should not be applied to the 2020 election. *Id.* at 1090.

25.     Justice Wecht did not express an opinion on whether the Date Instruction violated the Materiality Provision because the question had not been adequately briefed. *Id.* at 1089 n.54. But he expressed hope that the Pennsylvania General Assembly would amend the Election Code "bear[ing] that binding provision in mind" because "[i]t is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require." *Id.*

26.     Nearly two years after the Pennsylvania Supreme Court's decision in *In re Canvass*, the U.S. Court of Appeals for the Third Circuit held—based on undisputed evidence developed during the 2021 General Election—that the Date Instruction ran afoul of the Materiality Provision because the date on the mail ballot envelope was immaterial to whether an individual was eligible to vote under Pennsylvania law. *Migliori v. Cohen*, 36 F.4th 153, 163–64 (3d Cir. 2022). The Supreme Court declined to disrupt the Third Circuit's ruling when one of the parties in *Migliori* sought an emergency injunction to prevent the counting of consequential undated ballots pending appeal. *Ritter v. Migliori*, 142 S. Ct. 1824 (2022).

Supp. App. 11

27. While the U.S. Supreme Court recently vacated the Third Circuit's *Migliori* decision as moot without commenting on the merits, that vacatur does not call into question the Third Circuit's analysis. *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686, at *1 (U.S. Oct. 11, 2022) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)). Rather, "[t]he established practice of the [U.S. Supreme] Court in dealing with a civil case . . . which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss."[3] *Munsingwear*, 340 U.S. at 39. The Third Circuit's ruling and consideration of the evidence in that case remain highly persuasive authority. *See L.A. Cnty. v. Davis*, 440 U.S. 625, 646 n.10 (1979) (Powell, J. dissenting) (noting that even where a decision has been vacated "the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority"); *U.S. ex rel Espinoza v. Fairman*, 813 F.2d 117, 125 n.7 (7th Cir. 1987), *cert. denied*, 483 U.S. 1010 (1987) (decision vacated by Supreme Court remains persuasive precedent where Court did not reject decision's underlying reasoning).

28. A few months later, the President Judge of the Pennsylvania Commonwealth Court reached the same conclusion as the Third Circuit. *Chapman v. Berks County Board of Elections*, No. 355 MD 2022, 2022 WL 4100998 (Pa. Cmwlth. Aug. 19, 2022). In a thorough, 67-page opinion where the court analyzed the robust evidentiary record before it, as well as the text and purpose of the Materiality Provision, it held that "invalidating ballots for the sole reason that the

---

[3] The Date Instruction issue was raised before the Third Circuit in *Migliori* by voters whose mail ballots—all of which were received by county election officials prior to 8 p.m. on election day—were nevertheless rejected in a 2021 local judicial race in Lehigh County, solely because the ballot envelopes lacked handwritten dates. By the time the petition for a writ of certiorari was fully briefed before the Supreme Court in October 2022, the 2021 election had been certified and the winning judicial candidate installed months earlier.

Supp. App. 12

declaration on the return envelope does not contain a handwritten date violates the materiality provision of the Civil Rights Act." *Id.* at 29. The extensive, undisputed record before the court showed that the Date Instruction is not used to establish whether an elector is eligible to vote, identify fraudulent ballots, or even ensure that a ballot is timely cast. *See, e.g.*, *id.* at 19 ("the date the declaration is signed is not relevant to the voter's qualifications as of election day"); *see also id.* at 17–24 (providing thorough recitation of the evidence before the court showing that the Date Instruction serves no legitimate purpose).

29.     Despite the ample evidence developed in *Migliori* and *Berks County* that the Date Instruction serves no compelling interest or meaningful purpose, Republican Party committees and their supporters again asked the Pennsylvania Supreme Court to enforce the Date Instruction in Pennsylvania's Election Code and order all county boards not to count undated or incorrectly dated mail ballots and to invalidate Pennsylvania Department of State guidance directing election officials to count such ballots if they were timely received. *Ball v. Chapman*, No. 102 MM 2022, Pet'rs' Appl. (Pa. Oct. 16, 2022). In doing so, they argued that the Date Instruction required rejecting ballots contained in envelopes with missing or inaccurate dates, and that such a result did not violate the Materiality Provision of the Civil Rights Act. *Id.*[4]

30.     After an expedited briefing schedule, the Pennsylvania Supreme Court ordered all Pennsylvania county boards to segregate and refrain from counting mail ballots received for the November 8, 2022 General Election containing undated or incorrectly dated outer envelopes. *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702, at *1 (Pa. Nov. 1, 2022) (per curiam). The court concluded that the Date Instruction required this result as a matter of state law but was evenly

---

[4] Plaintiff DCCC joined the Pennsylvania Supreme Court proceedings as an Intervenor-Respondent, while the remaining plaintiffs were not parties to those proceedings.

Supp. App. 13

split—and thus did not reach a decision—on whether rejecting undated or incorrectly dated mail ballots would violate the Materiality Provision of the Civil Rights Act. Three justices concluded that the Date Instruction violates the Materiality Provision, and three concluded that it does not. *Id.* at 1.[5]

31.      On November 5, 2022, the Pennsylvania Supreme Court issued a Supplemental Order clarifying what it meant by "incorrectly dated" ballots, stating that "mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through November 8, 2022" and "absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022" would be considered "incorrectly dated."

## CLAIMS FOR RELIEF

### COUNT I

**52 U.S.C. § 10101; 42 U.S.C. § 1983**
**VIOLATION OF SECTION 101 OF THE CIVIL RIGHTS ACT OF 1964**

32.      Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

33.      Section 101(a) of the Civil Rights Act of 1964, as amended, provides:

No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2).

34.      The right to "vote" protected by the statute is expansively defined to include:

all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes

---

[5] Chief Justice Max Baer passed away on September 30, 2022, leaving the Court with six justices.

Supp. App. 14

cast with respect to candidates for public office and propositions for which votes are received in an election.

*Id.* §§ 10101(a)(3)(A), 10101(e).

35.    Defendants are "persons" acting "under color of law": Pennsylvania's county boards of elections are units of local government to which 52 U.S.C. § 10101 applies. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978) (recognizing § 1983 claim against units of local government); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686 (3d Cir. 1980) (same); *United States v. Holmes Cnty., Miss.*, 385 F.2d 145, 148 (5th Cir. 1967) (holding that "person" bears same meaning in both 52 U.S.C. § 10101 (formerly 42 U.S.C. § 1971) and 42 U.S.C.A. § 1983).

36.    Defendants are now required under Pennsylvania law to deny the "right of an[] individual to vote" due to non-compliance with the Date Instruction by refusing to count otherwise-legitimate ballots cast by qualified electors. 52 U.S.C. § 10101(a)(2)(B). Defendants are withholding "action necessary to make a vote effective including . . . action required by State law prerequisite to . . . having such ballot counted and included in the appropriate totals of votes cast." *Id.* § 10101(e).

37.    This denial of the right to vote is based upon an omission on a "record or paper" relating to an "act requisite to voting." *Id.* § 10101(a)(2)(B). The omission in question is the failure of an elector to write the correct date on the outer envelope for their ballot. The "record or paper" is the outer envelope in which an elector's mail ballot is enclosed and the affirmation statement printed thereon. The "act requisite to voting" is the making of the required declaration.

38.    Finally, the Date Instruction is immaterial to determining whether an elector is qualified to vote in Pennsylvania. Because Pennsylvania law determines voter eligibility based on

- 15 -

Supp. App. 15

the date of the election—rather than the date of marking the ballot—the Date Instruction provides no information about whether a voter is qualified.

39.     In fact, the Date Instruction serves no legitimate purpose. For example, the date on the envelope is not used to verify whether the ballot was timely marked: the deadline for marking a ballot and the deadline for the elections board receiving the ballot are identical, so any ballot received after the ballot-marking deadline is not timely and any ballot received prior is definitively timely.

40.     Defendants' enforcement of the Date Instruction will deprive Pennsylvanians— including Plaintiffs—of the rights secured to them by 52 U.S.C. § 10101(a)(2)(B).

<u>**COUNT II**</u>

**U.S. CONST. AMENDS. I, XIV; 42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**

41.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

42.     Under the First and Fourteenth Amendments to the U.S. Constitution, a state cannot utilize election practices that unduly burden the right to vote.

43.     When addressing a challenge to a state election practice, a court balances the character and magnitude of the burden that the challenged practice imposes on the First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the justifications offered by the state in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

44.     In conceptualizing the burden that a state electoral regulation places on constitutional rights, courts are not limited to considering only the effort needed to comply with the regulation; they also may consider the law's broader ramifications, including the consequences

- 16 -

Supp. App. 16

of noncompliance. Federal courts have accordingly recognized that disenfranchising voters for defects in their absentee ballots imposes significant burdens on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (stating burdens of absentee ballot signature matching requirement included increased risk of disenfranchisement from perceived signature mismatch); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters."); *see also Donald J. Trump for President v. Boockvar*, 502 F. Supp. 3d 899, 919 (M.D. Pa. 2020) ("Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties.")

45.     Similarly, when evaluating an early filing deadline for minor-party candidates, the Third Circuit did not only limit its analysis to the burden of complying with the deadline, but also considered the burden of the consequences of a missed deadline. *See Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 881 (3d Cir. 1997). Specifically, the court considered the negative impact that individual candidates' missing the deadline would have on a minor party's chances of achieving major party status, which required the party's candidates to collectively garner 10% of the total vote cast in all legislative races in state. *Id.*

46.     Even if the Court were to consider only the effort needed for a voter to find and correctly fill in the "Date" field on the ballot envelope, the Date Instruction would still constitute an undue burden on voting rights. "However slight th[e] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*

- 17 -

*v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

47.     Pennsylvania's vague requirement that voters do not "incorrectly" date their ballot envelopes is unduly burdensome because it provides no guidance to a voter on how to determine whether the date they write on their ballot is correct and subjects voters to arbitrary disenfranchisement.  Voters and counties are thus entirely in the dark as to whether a ballot should be counted if, for example, a voter writes the date they mailed the ballot, rather than the date signed or completed the ballot, or uses a date format that the county board does not recognize. While the Supreme Court of Pennsylvania's November 5, 2022 supplemental order provided the date parameters specific to the 2022 general election, it has provided no such guidance for future elections.

48.     Rejecting ballots that are "incorrectly" dated, moreover, serves no legitimate purpose. It does not, for example, help counties determine whether a ballot was timely submitted because a ballot's timeliness depends on the date and time the board of elections *receives* it, not the date and time the ballot was completed, signed, or submitted. Rejecting ballots on the ground that they are "incorrectly" dated is nothing more than a trivial procedural formality that functions only to disenfranchise eligible voters.

49.     The Date Instruction imposes an unnecessary hurdle that eligible Pennsylvanians must clear to exercise their most fundamental right, resulting in otherwise valid votes being arbitrarily rejected, while advancing no compelling (or even legitimate) governmental interest. Consequently, the burden imposed on voters—including Plaintiffs—violates the First and Fourteenth Amendments to the U.S. Constitution.

Supp. App. 18

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.    Declaring that the Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires counties to reject ballots contained in envelopes that do not contain a correct date violates Section 101 of the Civil Rights Act of 1964 and the First and Fourteenth Amendments to the U.S. Constitution;

b.    Permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting or refusing to count absentee and mail-in ballots for failure to comply with the Date Instruction;

c.    Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action under 42 U.S.C. § 1988 and other applicable laws; and

d.    Granting such other and further relief as the Court deems just and proper.

Supp. App. 19

Dated: January 31, 2023

Respectfully submitted,

Adam C. Bonin
**THE LAW OFFICE OF ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Justin Baxenberg*
Daniel C. Osher*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
**ELIAS LAW GROUP LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
dosher@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law

* *Admitted pro hac vice*

*Counsel for Plaintiffs*

- 20 -

Supp. App. 20

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

|  |  |
|---|---|
| BETTE EAKIN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ADAMS COUNTY BOARD OF ELECTIONS, *et al.*, <br><br> Defendants. | Case No. 1:22-cv-00340-SPB |

**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Supp. App. 21

# TABLE OF CONTENTS

I.    Mail Voting in Pennsylvania ............................................................................... 1

II.   Defendants' enforcement of the Date Provision in the 2022 general election........................ 2

III.  The county boards do not (and cannot) use the written date on a mail ballot's outer
     envelope to determine a person's qualifications to vote. ........................................................ 5

IV.  The Date Provision's disparate impact. ............................................................... 6

V.   The interests purportedly served by the Date Provision ...................................... 9

    A.  Ensuring timely receipt of mail ballots ..........................................................9

    B.  Fraud prevention .............................................................................................11

    C.  The Date Provision does not further any other state interest. .........................12

VI.  Plaintiffs ..................................................................................................... 13

    A.  Bette Eakin ......................................................................................................13

    B.  DSCC ..............................................................................................................14

    C.  DCCC ..............................................................................................................16

    D.  AFT Pennsylvania............................................................................................18

Supp. App. 22

# I.    Mail Voting in Pennsylvania

1.    Prior to 2020, voters in Pennsylvania were required to cast an in-person ballot on election day unless they met specific qualifications to submit an "absentee" ballot. 25 P.S. § 3146.1.

2.    In 2019, Pennsylvania enacted Act 77, an omnibus election bill that introduced significant amendments to Pennsylvania's Election Code and created a new method of voting— "mail-in" ballots—which extended the option of voting by mail to all eligible citizens of the Commonwealth as an alternative to voting in person on election day. 25 P.S. 3150.11 *et seq.*

3.    Before submitting a completed mail-in or absentee ballot (collectively, "mail ballot") to their county board of elections ("county board" or "BOE"), a voter must fill out the ballot, place the completed ballot in a secrecy envelope, and then place the secrecy envelope in an outer return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a).

4.    The outer envelope of every mail ballot contains a voter declaration that Pennsylvania law instructs voters to "fill out, date and sign." 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Provision").

5.    For a mail ballot to be considered timely received and eligible to be counted, it must reach the voter's county board by 8:00 p.m. on election day. 25 P.S. §§ 3146.6(a), 3150.16(a).

6.    On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing all county boards of elections to set aside and not count any mail-in or absentee ballot "contained in undated or incorrectly dated outer envelope[]." *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam).

7.    On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that, for purposes of the 2022 general election only, the date on the outer envelope must be deemed incorrect if it (1) predated the earliest date state law permitted county boards to

1

Supp. App. 23

distribute mail ballots for that election, or (2) postdated election day. Ex. L. For purposes of future elections, the Supreme Court of Pennsylvania indicated in a subsequent opinion that the voter should enter the date they sign the declaration, but expressly left it to the discretion of each county board to decide how to evaluate whether that written date "is, in truth, the day upon which [the voter]  completed the declaration." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

## II.    Defendants' enforcement of the Date Provision in the 2022 general election.

8.      In the 2022 general election, Pennsylvania's county boards set aside any mail ballot that arrived in an outer envelope they regarded as undated or misdated. Ex. K (responses to Requests for Admission No. 5–8).

9.      In the 2022 general election, a total of 10,970 mail ballots were timely received but did not comply with the Date Provision. Ex. J (responses to Interrogatory 2).

10.     In the 2022 general election, 10,657 of the 10,970 undated or misdated mail ballots received by county boards had no other defect that would have prevented them from being counted. Ex. J (responses to Interrogatories 2 and 8).

11.     In the 2022 general election, 45 of the 67 county boards provided no notice to voters that their mail ballots were set aside due to noncompliance with the Date Instruction. Ex. J (responses to Interrogatory 11).

12.     In the 2022 general election, 37 of the 67 county boards provided voters no opportunity to cure their mail ballot if it was rejected under the Date Provision. Ex. J (responses to Interrogatory 12).

13.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot on which the voter wrote the date "11/3/2023," but would have counted the ballot had the voter written "11/3/2022." Ex. F (Kauffman Dep.) at 84:18–86:7.

14.     In the 2022 general election, the Berks County BOE rejected a timely-received mail

Supp. App. 24

ballot because the voter wrote their birthdate on the outer envelope, even though the county board's stamp on the outer envelope indicated that it had timely received the mail ballot on October 17, 2022. *Id.* at 86:8–87:19.

15.     When evaluating the date written on a mail ballot's outer envelope for correctness, the Berks County BOE accounts for the possibility that a voter may use either a Month/Day/Year format or a Day/Month/Year format, and will accept the ballot if the date is considered correct using either format. *Id.* at 51:13–53:5.

16.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an envelope on which the voter had written a day and month but omitted the year, even if the day and month were in the acceptable time range set by the Supreme Court of Pennsylvania's November 5, 2022 order. Ex. G (Miller Dep.) at 55:19–56:6.

17.     In the 2022 general election, the Lancaster County BOE evaluated the date written on outer envelope assuming that the voter intended to use a Month/Day/Year format. *Id.* at 64:23–65:25.

18.     In the 2022 general election, the Lancaster County BOE would have rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct if read using a Day/Month/Year format. *Id.*

19.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot with a handwritten date that read "11/25/22" even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 78:9–79:21.

20.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an outer envelope on which the voter had written their birthdate, even if the

Supp. App. 25

county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 80:10–82:10.

21.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/14/2023," but would have counted that ballot if the last digit of that handwritten date was "2" instead of "3." *Id.* at 76:13–77:22.

22.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/23/2033," but would have counted the ballot if the last two digits of that handwritten date were "22" instead of "33." *Id.* at 84:17–85:21.

23.     In the 2022 general election, the Westmoreland County BOE rejected mail ballots with handwritten dates of "1/1/2022," "8/17/2022," "11/9/2022," and "11/28/2022," even though the county board's stamp on those envelopes indicated that they were each received on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 74:9–79:9, 85:24–86:24.

24.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot with a handwritten date reading "10/9/2021" despite admitting that it would be impossible for someone to have filled the mail ballot on October 9, 2021, and despite the fact that the county board's stamp on the envelope indicated that it was timely received on October 13, 2022. *Id.* at 82:10–83:16.

25.     In the 2022 general election, the Westmoreland County BOE rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct when read as using a Day/Month/Year format. *Id.* at 81:3–82:7, 83:20–84:14.

Supp. App. 26

26.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot contained in an outer envelope where the voter had written their birthdate. *Id.* at 87:3–24.

27.     In the 2022 general election, at least 17 counties rejected mail ballots contained in outer envelopes on which the voter wrote a date that was incorrect if read using a Month/Day/Year format (even if the date was correct if read using a Day/Month/Year format), while approximately 32 counties may have counted mail ballots in outer envelopes on which the written date was correct using a Month/Day/Year format *or* Day/Month/Year format. Ex. K (responses to Request for Admission No. 8).

28.     Absent a change in the law or judicial intervention, all of Pennsylvania's county boards will not count mail ballots contained in envelopes that do not comply with the Date Provision. Ex. F (Kauffman Dep.) at 99:7–101:12; Ex. G (Miller Dep.) at 104:11–105:23, 111:16–112:9; Ex. H (McCloskey Dep.) at 88:13–89:6; Ex. K (responses to Request for Admission No. 5).

### III.    The county boards do not (and cannot) use the written date on a mail ballot's outer envelope to determine a person's qualifications to vote.

29.     To be eligible to vote in Pennsylvania, a person must (1) be at least 18 years old, (2) have been a citizen for at least one month, (3) have lived in Pennsylvania and that election district for at least 30 days, and (4) not be imprisoned for a felony. 25 Pa. C.S. § 1301(a); 25 P.S. § 2811.

30.     The only information that county boards use to determine a person's qualifications to vote is their age, citizenship status, length of residency in Pennsylvania and a given election district, and imprisonment status. Ex. E (Marks Dep.) at 102:5–9; Ex. F (Kauffman Dep.) at 33:20–34:8; Ex. G (Miller Dep.) at 36:17–38:3; Ex. H (McCloskey Dep.) at 31:17–32:16.

31.     No county board uses the date written on a mail ballot's outer envelope to determine

Supp. App. 27

that person's qualifications to vote. Ex. K (responses to Request for Admission No. 1); Ex. E (Marks Dep.) at 98:9–102:15.

32.     The date written on a mail ballot's outer envelope does not provide information relevant to the determination of a person's age, citizenship status, length of residency in Pennsylvania and their election district, or imprisonment status. Ex. J (responses to Interrogatory 14); Ex. E (Marks Dep.) 68:4–9; Ex. F (Kauffman Dep.) at 32:17–34:8; Ex. G (Miller Dep.) at 36:17–25, 37:1–6, 37:7–11, 37:12–15, 37:16–38:3; Ex. H (McCloskey Dep.) at 31:17–22, 32:23–33:2, 33:3–7, 33:8–11, 32:12–16.

## IV.    The Date Provision's disparate impact.

33.     Plaintiffs' expert, Dr. Daniel Hopkins, performed linear regression analyses to identify whether the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election. Ex. I ¶¶ 21–22.



Supp. App. 28



Supp. App. 29



46.     "Cost of voting" is a framework that political scientists have employed for decades to describe how procedural and administrative frictions in the voting process that increase the "cost" of voting lead to fewer citizens successfully navigating the voting process. *Id.* ¶ 12.

47.     Even among those who cast a ballot in an election, procedural and administrative frictions that raise that cost of voting may prevent their ballot from being counted. *Id.* ¶ 13.

48.     Voters with fewer resources—including those with lower educational levels; less access to housing, transportation, childcare; less flexible jobs; less English-language fluency or experience reading technical language—are less able to overcome additional procedural frictions in the voting process. *Id.*

49.     Black, Hispanic, and older voters in Pennsylvania have, on average, lower levels of socioeconomic resources, including "educational attainment, income, economic security, English language proficiency and literacy, and health," and they are less likely, on average, to overcome procedural and administrative frictions in the voting process. *Id.* ¶ 16.

50.     When a voter's mail ballot is rejected because of noncompliance with the Date

Supp. App. 30

Provision, they must take additional actions to ensure that their ballot is ultimately counted. *Id.* ¶ 19.

51.     The additional actions voters must take to ensure their rejected mail ballot is counted increase the cost of voting. *Id.* ¶ 19.

## V.     The interests purportedly served by the Date Provision

### A.     Ensuring timely receipt of mail ballots

52.     The Statewide Uniform Registry of Electors ("SURE") system is the voter registration system in Pennsylvania used by all 67 county BOEs. Ex. G (Miller Dep.) at 114:11–14.

53.     SURE allows counties to verify a voter's identification during the mail ballot application process, maintain their official voter rolls, and record returned mail ballots. Ex. E (Marks Dep.) at 44:6–10, 45:8–15, 68:19–69:6.

54.     The county boards are statutorily required to record the date and time that they receive a mail ballot. *Id.* at 70:5–19; 25 P.S. § 1222(c)(19)–(20).

55.     Each county board has a mechanism in place to identify which ballots were timely received, and that mechanism does not rely on the date written by voters on the mail-ballot's outer envelope. Ex. G (Miller Dep.) at 65:5–23.

56.     The outer envelope for every mail ballot sent to a voter in Pennsylvania has a unique barcode. *Id.* at 69:7–19.

57.     The Pennsylvania Department of State has instructed county boards to scan mail ballots into SURE as quickly as possible after they are received. Ex. E (Marks Dep.) at 82:20–83:17; Ex. E6.

58.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties scan the barcode on the outer envelope of a completed mail ballot upon receipt, which creates a record

9

in the SURE system of the date and time that the county board received the mail ballot, Ex. E (Marks. Dep.) at 68:19–70:24, 116:12–119:8; Ex. F (Kauffman Dep.) at 55:25–56:22; Ex. G (Miller Dep.) at 114:11–24, 115:19–25; Ex. H (McCloskey Dep.) at 66:18–67:10.

59.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties also physically stamp the outer envelope with the date and time upon receiving a completed mail ballot. Ex. F (Kauffman Dep.) at 37:2–6, 77:8–24, 79:22–80:8; Ex. G (Miller Dep.) at 61:19–25, 69:11–23, 72:2–6, 85:19–86:5, 115:19–25; Ex. H (McCloskey Dep.) at 74:16–75:3, 110:9–13; Ex. K14 ("All incoming ballots are date stamped."); Ex. K45 ("The envelopes are stamped with the date received.").

60.     The date on which the voter fills out the ballot or signs the declaration on the outer envelope has no bearing on whether it was timely received by the county. Ex. E (Marks Dep.) at 128:5–12.

61.     The Berks County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. F (Kauffman Dep.) at 76:25–77:24.

62.     The Lancaster County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. G (Miller Dep.) at 85:17–86:5.

63.     The Westmoreland County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. H (McCloskey Dep.) at 74:16–75:3.

64.     County boards can determine whether a mail ballot was timely received without ever looking at the date written on a mail ballot envelope. Ex. K (responses to Request for

Supp. App. 32

Admission No. 2).

### B. Fraud prevention

65.     The fact that the outer envelope of a mail ballot has no written date is not a reason to suspect fraud. Ex. G (Miller Dep.) at 118:11–17.

66.     The fact that a voter wrote the wrong year on the outer envelope of a mail ballot is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 84:17–85:11; Ex. G (Miller Dep.) at 70:13–71:6; Ex. H (McCloskey Dep.) at 76:19–77:12.

67.     The fact that a voter wrote a date on the outer envelope of a mail ballot that precedes the first date they could have received the ballot is not a reason to suspect fraud. Ex. G (Miller Dep.) at 70:13–18, 82:11–15; Ex. H (McCloskey Dep.) at 87:3–19.

68.     The fact that a voter wrote a date on the outer envelope of a mail ballot that falls after the date of the election is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 78:15–79:15, 84:18–85:11; Ex. H (McCloskey Dep.) at 76:19–77:9.

69.     The date written on a mail-ballot's outer envelope provides no help to a county board in preventing that voter from also casting an in-person ballot on election day. Ex. G (Miller Dep.) at 116:2–118:2.

70.     If a voter submits a mail ballot and then later casts an in-person provisional ballot on election day, the mail ballot will be counted and the in-person ballot will not be counted. *Id.* at 116:2–14.

71.     If a voter submits a mail ballot and casts an in-person provisional ballot on election day, the date written on the mail-ballot's outer envelope provides no help to a county board in determining which ballot to count. *Id.* at 116:22–117:3.

72.     No county identified, raised, or was made aware of any credible concern regarding fraud with respect to the way that voters wrote (or failed to write) the date on the outer envelope

11

Supp. App. 33

of their mail ballots in the November 2022 election. Ex. J (responses to Interrogatory No. 10); Ex. G (Miller Dep.) at 82:11–24; Ex. H (McCloskey Dep.) at 88:4–12.

73.     While a voter was referred to the district attorney in Lancaster County for allegedly voting on behalf of her deceased mother, the mother's ballot would never have been counted in that election because the county had already removed her from the voter rolls after receiving information indicating she had passed away. Ex. G (Miller Dep.) at 87:18–94:15.

74.     County boards are provided notification of a voter's death by the Department of Health. Ex. F (Kauffman Dep.) at 35:23–36:3; Ex. G (Miller Dep.) at 101:24–102:5; 25 P.S. § 1505(a).

75.     County boards do not use the date written on the outer envelope of a mail ballot to determine whether the voter passed away before election day or whether to count a ballot from such a person. Ex. F (Kauffman Dep.) at 36:20–37:25; Ex. H (McCloskey Dep.) at 36:12–23.

**C.     The Date Provision does not further any other state interest.**

76.     The date written on the outer envelope of a mail ballot provides no information regarding the date on which the voter filled out that ballot or the truthfulness of the voter's affirmation. Ex. E (Marks Dep.) at 127:3–18, 135:6–21, 156:11–22, 204:6–19; Ex. G (Miller Dep.) at 61:11–16, 79:3–21; Ex. H (McCloskey Dep.) at 66:9–15, 70:5–10.

77.     The Berks County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. F (Kauffman Dep.) at 39:22–40:2.

78.     The Lancaster County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. G (Miller Dep.) at 113:23–114:8.

79.     The Westmoreland County BOE does not use the date written on a mail ballot's

Supp. App. 34

outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. H (McCloskey Dep.) at 37:8–38:2.

## VI.    Plaintiffs

### A.    Bette Eakin

80.    Plaintiff Bette Eakin is a veteran and registered Democrat in Erie County. Ex. A (Eakin Decl.) ¶¶ 1–3.

81.    In the 2022 general election, Ms. Eakin submitted a mail ballot to the Erie County Board of Elections before election day because of her medical condition, which required her to travel to Ohio to receive medical care through election day. *Id.* ¶ 4.

82.    At the time she submitted her mail ballot, Ms. Eakin was undergoing care for a condition that has made her legally blind, forcing her to travel to a county board of elections office where she could obtain assistance in completing her ballot. An election worker helped Ms. Eakin request and obtain her mail ballot, complete the mail ballot, place the mail ballot in the secrecy and outer envelopes, and complete the declaration on the outer envelope. *Id.* ¶ 5.

83.    Days later, when Ms. Eakin was receiving her medical treatment in Ohio, she received an email stating that her mail ballot had been rejected because there was a defect on her balloting materials, which she later learned was due to a missing date on the outer envelope. *Id.* ¶ 6. She was told that she would have to fix this error if she wanted her ballot to be counted. *Id.*

84.    Voting is incredibly important to Ms. Eakin, and the news that her mail ballot had been rejected caused her to suffer significant emotional distress. *Id.* ¶ 7. Ms. Eakin suffers from post-traumatic stress disorder and a nervous disorder, and when she received the notification of her ballot's rejection, her anxiety skyrocketed. *Id.*

85.    Ms. Eakin spent the rest of the day making phone calls to rectify the situation, and even missed scheduled medical care appointments to figure out how to ensure her ballot would be

Supp. App. 35

counted. *Id.*

86.     Because Ms. Eakin was receiving medical treatment out of state, her husband had to immediately leave his hunting trip and drive two hours back to Erie so that he could help make sure Ms. Eakin's ballot was counted. *Id.* ¶ 8.

87.     Ms. Eakin's husband had to first stop at her son's residence and have her son assist him in printing a form that would authorize him to act as her designated agent. *Id.* ¶ 9.

88.     Ms. Eakin's husband then retrieved her ballot from where she submitted it, traveled to their local polling place, explained the situation, and submitted all materials at the last possible moment before the polling place closed. *Id.*

89.     Ms. Eakin is very concerned that the Date Provision will force her to go through a similar saga in future elections. *Id.* ¶ 10.

90.     Because of her disability, Ms. Eakin must rely on the assistance of others to complete a mail ballot like she did in 2022. But given her condition and anxiety disorders, going to her polling place on election day is extremely difficult and presents a serious risk to her health. *Id.*

**B.     DSCC**

91.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Ex. B (DSCC Decl.) ¶ 2.

92.     DSCC's mission is to support the election of candidates of the Democratic Party across the country, including in Pennsylvania, to the U.S. Senate. *Id.* ¶ 3.

93.     DSCC works to accomplish its mission by, among other things, mobilizing and persuading voters through grassroots mobilization of volunteers and field organizers to conduct get-out-the-vote activities such as door knocking, text messaging, and phone calling. *Id.* ¶ 4.

94.     DSCC also runs paid television, digital, and radio advertisements, as well as

14

mailings, in support of Democratic candidates throughout the country, including in Pennsylvania. *Id.*

95.     While most of DSCC's voter programs are focused on persuading eligible citizens to vote, DSCC also runs programs specifically geared toward explaining the voting process and how an eligible voter can successfully cast their ballot and have it counted. *Id.*

96.     DSCC also separately allocates substantial personnel time and money for "curing" activities in multiple states where it anticipates close senatorial races. *Id.* ¶ 5.

97.     DSCC's curing activities involve tracking data from counties, contacting voters whose ballots have been rejected, and helping them perform whatever task is necessary to ensure their ballot is ultimately counted, which varies by county. *Id.*

98.     Since DSCC invests in persuading and mobilizing voters across the country, investing additional funds or personnel in one state will necessarily divert those resources from other states and key races. *Id.* ¶ 4.

99.     The Date Provision frustrates DSCC's mission because it erects an obstacle to ensuring all mail ballots cast by Pennsylvanians who support Democratic Senate candidates are actually counted and impairs those Democratic candidates' electoral prospects. *Id.* ¶ 6.

100.     In the 2022 general election, the Date Provision forced DSCC to divert substantial personnel time and money away from its advocacy and persuasion activities discussed above and instead towards explaining the Date Provision to voters and warning them of the consequences of failing to comply with the Date Provision. *Id.* ¶ 7.

101.     The Date Provision also forced DSCC to divert resources in 2022 away from helping voters in other states cure their rejected ballots and instead towards identifying voters in Pennsylvania whose ballots had been rejected because of the Date Provision and helping them take

Supp. App. 37

the steps necessary to ensure their ballots would be counted. *Id.*

102.    Absent the requested injunction, the Date Provision will continue to force DSCC to divert personnel time and money away from its advocacy and persuasion activities in Pennsylvania *and* in other states and instead towards educating voters in Pennsylvania about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot and towards researching how each county will go about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 8.

103.    The Date Provision will also continue to force DSCC in future elections to divert resources away from efforts to assist voters in other states in resolving issues with their rejected ballots and towards helping voters in Pennsylvania ensure their undated or misdated mail ballots are ultimately counted. *Id.* ¶ 9.

104.    Democratic voters provide financial support in the form of political contributions to DSCC and candidates supported by DSCC on a regular basis, and also help select DSCC's leadership and ultimately determine DSCC's strategic and political direction by electing candidates to the United States Senate. *Id.* ¶ 10.

105.    In the 2022 general election, over 2.7 million Pennsylvanians cast a vote for the Democratic senatorial candidate. *Id.* ¶ 11.

**C.    DCCC**

106.    Plaintiff DCCC is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Ex. C (DCCC Decl.) ¶ 2.

107.    DCCC's mission is to support the election of candidates of the Democratic Party from across the country, including those running in Pennsylvania's congressional districts, to the U.S. House of Representatives. *Id.* ¶ 3.

108.    DCCC works to accomplish its mission by, among other things, running paid

Supp. App. 38

advertisements in support of Democratic candidates; engaging in grassroots mobilization of volunteers and field organizers to perform persuasion efforts such as door knocking, text messaging, and phone banking, all towards the goal of convincing voters to support Democratic candidates; running paid canvasses for its members' campaigns to boost voter turnout; and encouraging voters to exercise their right to vote, through paid television, social media, and radio advertisements, phone calls, and mailings for voter education, as well as paying for professionals to assist in the aforementioned get-out-the-vote efforts. *Id.* ¶ 4. DCCC also supports efforts of state parties throughout the country, including in Pennsylvania, to conduct these activities by providing money, staff and volunteer time, and ongoing coordination. *Id.*

109.    DCCC also allocates and devotes staff, volunteers, and funds to assist voters in curing absentee or mail ballots in states where it anticipates there will be close congressional races. *Id.* ¶ 5. Helping voters cure their ballots involves contacting voters whose ballots have been rejected and helping them perform whatever task is necessary to ensure that their ballot is ultimately counted. *Id.* These activities require DCCC to devote substantial personnel time and money to track data from counties, contact voters, and assist them in completing the curing process established in each county. *Id.*

110.    The Date Provision frustrates DCCC's mission because it erects an obstacle to ensuring all ballots cast by Pennsylvanians who support Democratic congressional candidates are actually counted, which harms those Democratic candidates' electoral prospects. *Id.* ¶ 6.

111.    As a result of the Date Provision, DCCC will be forced to divert personnel time and money away from its persuasion and mobilization activities and instead towards educating voters about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot, as well as spending personnel time researching how each county will go

17

about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 7.

112. The Date Provision will also force DCCC to divert the resources it has allocated for ballot curing activities in other states towards races in Pennsylvania, which impairs DCCC's ability to help voters and support Democratic candidates in other states. *Id.* ¶ 8.

113. DCCC also represents the interests of Democratic voters in Pennsylvania and considers those individuals to be DCCC's constituents. *Id.* ¶ 9. Democratic voters provide financial support in the form of political contributions to DCCC and candidates supported by DCCC on a regular basis, and also help select DCCC's leadership and ultimately determine DCCC's strategic and political direction by electing candidates to the United States House of Representatives. *Id.* DCCC asserts its claims on behalf of itself and its constituents in Pennsylvania. *Id.*

114. In the 2022 general election, more than 2.4 million Pennsylvanians cast a vote for the Democratic congressional candidate in their district. *Id.* ¶ 10.

**D. AFT Pennsylvania**

115. Plaintiff AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,000 members in 55 local affiliates across Pennsylvania. Ex. D (AFT Decl.) ¶¶ 2–3.

116. The Federation's members include public school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. *Id.* ¶ 3. These members attend meetings of, and pay dues to, their local AFT affiliates (who in turn contribute funds to the Federation as a whole), as well as elect delegates to a biannual statewide convention, which elects the Federation's leadership. *Id.* ¶ 4.

117. The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for

Supp. App. 40

teachers and school staff, as well as excellence in public service through cooperative problem-solving and workplace innovations. *Id.* ¶ 5.

118.　In furtherance of its mission, the Federation and its individual members devote significant resources towards advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are able to access the franchise to support these policies at the ballot box. These resources take the form of direct contributions to candidates, running phone banks and canvassing, and sharing information with members about getting out the vote. *Id.* ¶¶ 6–7.

119.　Because Federation members typically have to work on election day, many turn to mail ballots to exercise their right to vote. *Id.* ¶ 8.

120.　Any provision or policy requiring the rejection of valid mail ballots with missing or incorrect dates ("the Date Provision") threatens to disenfranchise members of the Federation who are unquestionably eligible to vote. *Id.*

121.　At least one Federation member had his mail ballot rejected in 2022 because of the Date Provision. *Id.* ¶ 9.

122.　For the 2022 general election, the Date Provision forced the Federation to spend resources on digital communications such as email newsletters and online publications to educate its members about the need to correctly date the outer envelope of mail ballots, and also to spend staff and member time reaching out to help its members and other Pennsylvania voters cure their ballots after they were rejected because of the Date Provision. *Id.* ¶ 10.

123.　The rejection of undated or misdated ballots frustrates the Federation's mission of electing candidates who support the policies for which the Federation advocates, and will force the Federation to divert staff and member time in future elections from its advocacy efforts toward

Supp. App. 41

educating its members and other voters specifically about the need to date their mail ballots and what to do if their ballot is rejected pursuant to the Date Provision. *Id.* ¶ 11. The Federation will also have to divert staff and member time helping voters whose mail ballots are rejected under the Date Provision ensure that their votes are ultimately counted. *Id.* And because the Federation has limited resources, the staff and member time spent on activities meant to mitigate the Date Provision's harms will necessarily divert resources away from the Federation's other core activities, including canvassing and get-out-the-vote efforts such as phone banking, door knocking, and rallying at community events like roundtables and book giveaways. *Id.*

Dated: April 21, 2023

Respectfully submitted,

Adam C. Bonin
**THE LAW OFFICE OF**
**ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Justin Baxenberg*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
Omeed Alerasool*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law
oalerasool@elias.law

* *Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

20

Supp. App. 42

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| BETTE EAKIN, *et al.*,<br><br>             Plaintiffs,<br><br>     v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>     Defendants. | Case No. 1:22-cv-00340-SPB |

**APPENDIX OF EXHIBITS ACCOMPANYING
PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS**

| Exhibit | Description | Appendix Page Number |
|---|---|---|
| A | Declaration of Bette Eakin | 1 |
| B | Declaration of Devan Barber (DSCC) | 5 |
| C | Declaration of Erik Ruselowski (DCCC) | 10 |
| D | Declaration of Arthur Steinberg (AFT Pennsylvania) | 15 |
| E | Deposition Transcript of Jonathan Marks (Excerpted) | 20 |
| F | Deposition Transcript of Cody Kauffman (Berks County) (Excerpted) | 68 |
| G | Deposition Transcript of Crista Miller (Lancaster County) (Excerpted) | 111 |
| H | Deposition Transcript of Greg McCloskey (Westmoreland County) (Excerpted) | 175 |
| I | Expert Declaration of Daniel Hopkins | 209 |
| J | County Responses to Interrogatories (Excerpted) | 243 |
| K | County Responses to Requests for Admission (Excerpted) | 530 |

| L | Order, *Ball v. Chapman*, No. 102 MM 2022 (Pa. Nov. 5, 2022) | 774 |
| M | Pa. Dep't of State, "Vote In Person By Mail Ballot Before Election Day," https://www.vote.pa.gov/Voting-in-PA/Pages/Early-Voting.aspx (retrieved April 16, 2023) | 777 |

Dated: April 21, 2023

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

Adam C. Bonin
**THE LAW OFFICE OF
ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

Uzoma N. Nkwonta*
Justin Baxenberg*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
Omeed Alerasool*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law
oalerasool@elias.law

* *Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

Supp. App. 44

# Exhibit E

Supp. App. 45

1                    J. Marks

2           IN THE UNITED STATES DISTRICT COURT

3          FOR THE WESTERN DISTRICT OF  PENNSYLVANIA
   ----------------------------------------------------x
4   PENNSYLVANIA STATE CONFERENCE OF THE NAACP, et al.,

5                  Plaintiffs,          Case No.
                                        1:22-cv-00339-SPB
6              vs.

7   LEIGH M. CHAPMAN, In Her Official Capacity as Acting
    Secretary of the Commonwealth, et al.,
8
                   Defendants.
9
               - and -
10
    EAKIN, et al.,
11
                   Plaintiffs,          Case No.
12                                      1:22-cv-00340
               vs.
13
    ADAMS COUNTY BOARD OF ELECTIONS, et al.,
14
                   Defendants.
15x

16          REMOTE VIDEOTAPED DEPOSITION OF

17               JONATHAN M. MARKS

18          Jefferson Hills, Pennsylvania

19           Tuesday, February 14, 2023

20

21

22

23  Reported by:

24  THOMAS A. FERNICOLA, RPR

25  JOB NO. 222618

1                    J. Marks

2    registered voter within the County entitled

3    to receive a ballot.

4        Q    So the voter returns this

5    application form.

6            Now, is the application form

7    standardized?

8        A    It is, yes.  The Department

9    issues a standardized form, both paper and

10   electronic.

11           I do believe third parties like

12   political parties and other -- you know,

13   other campaigns, can issue absentee or

14   mail-in ballot request forms as well, but

15   they have to conform with the statutory

16   requirements that are in our prescribed

17   form.

18       Q    By "statutory requirements,"

19   you're talking about the types of

20   information that the voter must provide,

21   including the I.D.?

22       A    Correct.

23       Q    So an application comes in, and

24   it goes to the Department of State or the

25   County?

1                    J. Marks

2      A      It goes to the individual's

3  County Board of Elections.

4      Q      What are the County Board's

5  obligations, if you know?

6      A      Well, the County has to review

7  the application, verify that the

8  identification provided by the voter checks

9  out.  And they do that systematically in

10  the SURE system.

11            And, upon approval, then the

12  County has to deliver a ballot along with

13  the necessary envelopes that the voter must

14  insert their ballot into after they're done

15  voting for return to the County Election

16  Office.

17      Q      You used a phrase I want you to

18  unpack for me.  Systematically through the

19  SURE system is how Counties verify, I

20  guess, voter eligibility.

21            Explain a little bit more what

22  that means.

23      A      Well, so, obviously, the SURE

24  system, Statewide Uniform Registry of

25  Electors, houses all of the registered

1                    J. Marks

2   voters within the County.  So they have the

3   voters record that they can compare the

4   application to.

5      Q     Wait, I'm sorry.  What do you

6   mean have their record?  What's in the

7   record that they're comparing?

8      A      It would be the voter

9   registration records.  So the County,

10  within the SURE system, maintain their

11  official voter rolls.

12            Each County maintains its

13  official voter rolls.  The Counties then

14  use the SURE system to verify the

15  identification provided by the voter.

16            So if the voter provides their

17  driver's license number, the system will

18  actually send out a call to PennDOT's

19  database to verify that that driver's

20  license number matches the name provided by

21  the registered voter.

22            Likewise, the last four of SSN

23  goes -- it also goes through PennDOT.

24            They have an agreement with the

25  Social Security Administration, so the last

```
 1                     J. Marks

 2    four of SSN can also be verified against

 3    the Social Security Administration's

 4    database.

 5         Q     What is SSN?

 6         A     Social Security number.  Excuse

 7    me.

 8         Q     So, I'm sorry --

 9         A     Sorry, we use lot of acronyms in

10    government, and I forget sometimes.

11         Q     Not a problem.

12               And so the Counties take all

13    these steps to verify that the individual

14    applying for a mail-in ballot is, in fact,

15    an eligible voter; is that correct?

16         A     That's correct.

17         Q     I want to walk you through or

18    have you walk me through the return process

19    for a mail-in ballot.

20               I'm going to direct you to

21    Exhibit 2.

22               MR. WALCZAK:  I'll try to put

23         that in the chat for folks following

24         along.

25               Kathy, did that come through?
```

1                    J. Marks

2          How does the voter return a

3   mail-in ballot?

4     A    So, as I said earlier, after the

5   voter votes the ballot, completes the

6   ballot, they fold it, insert the ballot

7   into the secrecy envelope.

8          They insert that then into the

9   declaration envelope and seal it, sign it,

10  and they return it to the Board of

11  Elections either through the mail, or if

12  the County has a drop box available, or

13  drop boxes available, they can drop it

14  there, or they can return it in person

15  directly to their County Board of

16  Elections.

17    Q    When it arrives at the County

18  Board of Elections, are there any legal

19  obligations that the Board has with respect

20  to these mail-in ballot envelopes, if you

21  know?

22          MS. MULLEN:  Objection.

23    A    My understanding, the primary

24  legal obligation after they receive the

25  ballot is to keep that ballot secure after

1                    J. Marks

2     they process it until Election Day, until

3     it can be canvassed or pre-canvassed,

4     excuse me.

5          Q     Is there a requirement that they

6     date and time stamp the ballot when it

7     arrives or the declaration envelope when it

8     arrives?

9          A     The Counties do have to determine

10    whether a ballot has been timely received.

11              So the Counties -- I believe most

12    Counties have some date stamp mechanism,

13    but I have seen Counties use slightly

14    different mechanisms.

15              One County, at least previously,

16    used a color coding system to determine or

17    to segregate ballots that were received by

18    the statutory deadline versus those that

19    were received after the statutory deadline.

20              But each County has some

21    mechanism in place to identify which

22    ballots were timely received and which ones

23    were not.

24         Q     Is there a uniform deadline for

25    receipt of ballots?

1                    J. Marks

2      A      There is.  There's a statutory

3  deadline of 8:00 p.m. on Election Day for

4  receipt of ballots.

5      Q      So if a ballot is received at

6  7:59 on Election Day, is it timely?

7      A      It is, yes.

8      Q      If it's received at 8:01 or

9  after, is that timely?

10     A      No.

11     Q      What happens with untimely

12  ballots?

13     A      Well, they're set aside and not

14  counted, but they remain in their -- you

15  know, unopened in their envelopes.  They

16  are set aside by the Board of Elections.

17            And, ultimately, they're rejected

18  or canceled, because they were not timely

19  received.

20     Q      So the critical date and time,

21  for purposes of submitting a valid mail-in

22  ballot, is 8:00 on the night of Election

23  Day; is that correct?

24     A      That's correct.

25     Q      So as long as the ballot is in

```
 1                     J. Marks
 2  the hands of the County Board of Elections,
 3  it's timely?
 4       A     Correct.
 5       Q     When do voters get their mail-in
 6  ballots?
 7       A     Well, voters -- at the very
 8  latest, if a voter has applied prior to
 9  that time, at very latest, the voters will
10  get their ballots around two weeks prior to
11  Election Day.  Counties have a deadline to
12  send ballots out.
13             In most cases, Counties begin
14  sending absentee and mail-in ballots as
15  soon as they have them printed, and they're
16  ready to go, which is, you know, typically
17  several weeks prior to Election Day.
18       Q     So when the voter gets the
19  ballot, is that relevant at all to whether
20  or not the ballot is going to be timely?
21       A     By "timely," you mean?
22       Q     Receipt --
23       A     -- whether it's going to be
24  timely received by the County Board of
25  Elections after the voter votes the ballot?
```

1                         J. Marks

2        Q      Yes.

3        A      No.

4        Q      Does the date that the voter

5   filled out the ballot and signs the

6   declaration envelope, is that at all

7   relevant to whether or not the ballot is

8   timely?

9        A      No.

10       Q      So the voter could fill out the

11  declaration, the ballot and declaration, as

12  soon as they get the ballot two or more

13  weeks before, or they could fill it out the

14  day before, or the day of Election Day, and

15  drop it off at the Board of Elections, as

16  long as it's there by 8:00 on Election

17  Night, it is timely received, correct?

18       A      Correct.

19       Q      Now, you talked about the SURE

20  database system before.

21              Is there any obligation by the

22  Counties to enter the return mail-in ballot

23  into the SURE system?

24       A      The Counties do record returned

25  ballots in the SURE system.  That's how

```
 1                    J. Marks
 2   vote history is assigned.
 3            So, you know, as a County
 4   receives ballots, or at least shortly after
 5   receiving ballots, the Counties will
 6   record.
 7            There is a barcode, a unique
 8   barcode on each envelope that's returned to
 9   the County that the County uses to scan.
10   And that unique barcode is attached to that
11   specific voter who requested the absentee
12   or mail-in ballots.
13            So, yes, the Counties record
14   those envelopes as returned in the
15   SURE system.
16      Q    Does the SURE system assign a
17   time to when they're scanned?
18      A    It does.  So it defaults to the
19   current date and time, as I recall.
20            Now, the Counties do have the
21   ability to edit that, if necessary, in a
22   circumstance where the County is recording
23   it at some point after the voter actually
24   returned the ballot to the County.
25      Q    So if all the staff are really
```

1                    J. Marks

2    busy when the ballot comes in and couldn't

3    enter it right away, they can change that?

4        A    Yes, that's my recollection, yes.

5        Q    There is a statutory obligation

6    for the Counties to record when the ballot

7    comes in; is that correct?

8        A    There is, yes.

9             Act 77 of 2019, you know, in

10   addition to what we talked about earlier,

11   also added a requirement that Counties

12   provide lists of individuals who requested

13   absentee and mail-in ballots.

14            And that list has to contain the

15   date the individual applied for the ballot,

16   the date the County sent the ballot to the

17   voter, the date that the ballot was

18   returned to the County.  All of those

19   elements have to be provided in that list.

20            And I believe they have to

21   provide that within 48 hours of receiving a

22   request for production list from a

23   candidate or a political party or a

24   campaign.

25       Q    Does entry by the County Board of

```
 1                    J. Marks
 2   Elections of the return ballot into the
 3   SURE system trigger any kind of notice to
 4   the voter?
 5      A     It does.  If the voter provided
 6   an email address at the time they applied,
 7   the voter will receive a notification via
 8   email letting them know that the County has
 9   received their absentee or mail-in ballot.
10           And it will also indicate the
11   disposition, generally, the disposition of
12   that ballot.
13      Q     What do you mean by "disposition
14   of the ballot"?
15      A     So if a County cancels a ballot
16   because there is a problem with the ballot,
17   either the voter did not include -- you
18   know, didn't insert it in a secrecy
19   envelope, for example, or the voter didn't
20   sign the declaration, and the County
21   records that disposition in SURE, the voter
22   would get a notification letting them know
23   that their ballot was received, but it was
24   canceled.
25           And it gives them kind of a
```

1                           J. Marks

2    the voter provided an email address, the

3    voter would receive notification that the

4    ballot was received.

5             If the County cancels the ballot

6    because there's some issue with it, they

7    would receive notification of that as well.

8             So how the County records it in

9    the SURE system would be relevant, yes.

10   Q       So can the County just record it

11   as ballot received at 7:00 p.m. on Election

12   Night, or do they have to say that it's

13   either accepted or declined?

14   A       They could record it as received,

15   and then later make a determination that

16   the ballot should be declined.  So it

17   somewhat depends on their own internal

18   process.

19             If they're not -- you know, if

20   they're simply, you know, doing intake and

21   not necessarily reviewing the ballots as

22   they come in, they're going to record them

23   as returned.

24             And then at some later point

25   during the pre-canvass, likely they will

1                    J. Marks

2    make a determination that there's an issue

3    with the outer envelope.  And they may at

4    that time change the disposition of the

5    ballot in the SURE system.

6        Q     So that determination that a

7    ballot has a deficient declaration envelope

8    could come after 8:00 on Election Night?

9        A     It could, yes.

10        Q     In which case, the SURE system

11    itself could not trigger any kind of notice

12    to the voter that their ballot had been

13    declined?

14        A     Well, the SURE system -- unless

15    I'm mistaken and something has changed

16    recently, the SURE system would still send

17    the notification to the voter irrespective

18    of when the County recorded that

19    disposition.

20              Our guidance to the Counties has

21    been consistently over the last couple of

22    years to record ballots in SURE as quickly

23    as possible after they're received.

24        Q     I'm sorry.  To try and clarify,

25    so when you say "enter," is that just the

1                        J. Marks

2    scan of the barcode that's on the

3    declaration envelope, or is there something

4    more that needs to be done?

5        A    You know, I do not work in SURE

6    myself, so, you know, my high-level

7    understanding is that you would also -- you

8    scan it, mark it as returned.

9              You also would, at some point,

10   identify the disposition of the ballot as

11   well.  So if it were to be canceled, you

12   would have to update that record to

13   indicate why the ballot was canceled.

14       Q    So the scanning indicates time of

15   return, and that determines whether it's

16   timely or not, correct?

17       A    Correct.

18       Q    And then the code would be

19   important to denote whether or not

20   facially, based on what you can tell from

21   the declaration envelope, the ballot

22   either -- the declaration envelope is

23   either compliant or it's not?

24       A    Correct.  And that may also be

25   used for some other reason.  As I said, you

1                    J. Marks

2    know, the secrecy envelope was not included

3    or the ballot was not included in the

4    secrecy envelope.

5            And that determination, you know,

6    those determinations may not be made until

7    during the pre-canvass or even the canvas

8    after 8:00 p.m. on Election Day depending

9    on when the ballot was returned.

10       Q    Is there uniformity in the

11   Counties in how and when they enter those

12   determinations?

13       A    There isn't.  As I said, you

14   know, each County, based on their workflow,

15   based on their staffing level, it's going

16   to vary from one County to another.

17       Q    So is it fair to say that some

18   Counties endeavor to alert voters of

19   deficient, facially deficient, ballots

20   prior to the return deadline?

21       A    That's my understanding.

22            You know, I, obviously, cannot

23   speak for all 67 Counties on this issue,

24   but I am aware that some Counties record

25   those ballots, try to notify voters as soon

J. Marks

1

2    Q    So now moving to the May 18,

3    2021, Primary.

4            So during that election, were

5    undated ballots counted?

6    A    My recollection is that they

7    weren't with the exception of a handful of

8    Counties that, in spite of the Department's

9    guidance to the contrary, decided to count

10   them.

11   Q    So, at some point, in late 2020,

12   early 2021, the Department put out guidance

13   about how to handle undated and misdated

14   mail-in ballots?

15   A    Yes, I believe based on, you

16   mentioned, Justice Wecht's concurring and

17   dissenting opinion, I think it was our

18   interpretation as well that, moving forward

19   after the November 2020 Election, that the

20   expectation was that those ballots would

21   not be counted if they weren't dated.

22   Q    And how about incorrectly dated?

23   A    I'd have to review our guidance

24   as it existed at the time.  I don't recall

25   when incorrectly dated -- you know, that is

```
 1                    J. Marks

 2      a term that doesn't exist in the Election

 3      Code.  It doesn't have a definition.

 4              Our Supreme Court last year

 5      before the November election attempted to

 6      provide some guidance, but I don't recall

 7      if we directly addressed incorrectly dated,

 8      but we certainly addressed undated ballots.

 9         Q    If I could ask you to take a look

10      at Exhibit 4 there.

11              (Marks' Exhibit 4, Marks' 6-1-21

12          Email, was marked for identification,

13          as of this date.)

14      BY MR. WALCZAK:

15         Q    Do you recognize what's marked as

16      Marks' Exhibit 4?

17         A    I do, yes.

18         Q    What is it?

19         A    This is an email that I sent out

20      to Counties in June of 2021 as a follow-up

21      from the May 18 Primary.

22         Q    I'll represent to you that this

23      was taken from an exhibit in the Migliori

24      case, hence, the blue lettering at the top

25      and the exhibit sticker at the bottom.
```

1                    J. Marks

2          Is it fair to say that the email

3    you sent did not bear either of those?

4       A     Those indicia, no.

5       Q     Now, I note at the top, it says

6    this is from Marks Jonathan to Marks

7    Jonathan.

8          Are you in the habit of just

9    sending emails to yourself, or does this go

10   a little bit broader?

11      A     No, I have talked to myself on

12   occasion.  But, no, we typically -- when we

13   blast an email out to Counties, we will

14   blind copy everyone so that we don't have a

15   big list of email addresses in the "to"

16   field.

17         So I'll send it to myself and

18   blind copy everyone else who receives it.

19   But this email did go out to all of our

20   Election Director contacts in the 67

21   Counties.

22      Q     So this was not targeted just to

23   a select number of Counties, this went to

24   all Counties?

25      A     Correct, yes.

1                          J. Marks

2       Q       And the subject line there says,

3    "DOS Email Reminder Regarding Requirement

4    to Sign and Date Declaration Envelopes."

5               Did I read that correctly?

6       A       That's correct, yes.

7       Q       So are you, in this email,

8    conveying your view, or are you

9    representing the Department of State?

10      A       I'm representing the Department

11   of State's view.

12      Q       Was this reviewed by lawyers at

13   the Department?

14      A       It was, yes.

15      Q       Why did you send this?

16      A       Well, I think the first paragraph

17   in the email indicates the why.

18               You know, we had received

19   information, not only through news

20   articles, but also calls and questions that

21   some Counties were continuing to accept and

22   count ballots that did not contain both a

23   signature and a date.  So it was sent as a

24   reminder to Counties what the current state

25   of the law was on the issue.

```
 1                    J. Marks

 2      Q     If you could go down to that

 3   third paragraph in Exhibit 4?

 4      A     Yes.

 5      Q     Reminder of previous

 6   clarification of 10/25/2020, it says:

 7           "There is no basis to reject a

 8   ballot for putting the wrong date on the

 9   envelope."

10           Is that correct?

11      A     Correct, yes.

12      Q     So undated ballots should not be

13   counted, but if there is any date on the

14   ballot, then it should be counted.

15           Is that the Department's advice

16   here?

17      A     Yes.

18      Q     Then it says, "Nor is the date

19   written used to determine the eligibility

20   of the voter."

21           What does that mean?

22      A     Well, I mean, it speaks for

23   itself.  You know, it's the Department's

24   opinion that the date that the voter

25   inserts on that envelope, whether it's the
```

1                    J. Marks

2    date they're assigning it or some other

3    date, has no bearing on the voter's

4    qualifications to vote.

5        Q     Those qualifications are what?

6        A     Well, they have to be, you know,

7    of age, a citizen, and a resident of the

8    Commonwealth for 30 days before an

9    election.

10             Those are the only ones that I'm

11   aware of.

12       Q     And the date that the voter

13   writes on their verification envelope does

14   not bear on any of those qualifications?

15       A     That's correct, yes.

16       Q     Did this guidance carry through

17   the November 2021 General Election?

18       A     I believe it did.  As I recall

19   the timeline, we did not have a decision in

20   Migliori until after the November 2021

21   Election.

22       Q     So the guidance from the

23   Department for the May Primary, or, yes,

24   May 2021 Primary, the November 2021

25   Election, and then the May 2022 Primary was

1                    J. Marks

2    that undated ballots should not be counted,

3    but ballots bearing any date, even one that

4    appears to be incorrect, should be counted;

5    is that accurate?

6         A      That is my recollection, yes.

7         Q      And the May Primary in 2022 was

8    May 17; is that right?

9         A      That sounds right, yes.

10        Q      And then you referenced a minute

11   ago Migliori.

12               What is Migliori?

13        A      Well, that was the case that

14   originated in Lehigh County in the, I

15   believe, Third Circuit Federal Court.

16               That decision, if I recall,

17   became very shortly after the May Primary

18   in 2022.  It would sort of change the

19   landscape on the question of undated

20   ballots.

21        Q      When you say, "change the

22   landscape," how did it do so?

23        A      Well, the Federal Court -- you

24   know, I'll be succinct.  I mean, the

25   Federal Court basically determined that

```
 1                    J. Marks

 2     Q     Was the purpose of this to

 3  basically alert the Counties to what the

 4  Department viewed as the impact or

 5  requirements of the Ball decision?

 6     A     That's correct, yes.

 7     Q     So what this did was kind of

 8  formally amend the Department's

 9  September 26 guidance which we looked at as

10  Marks' Exhibit 5; is that right?

11           MS. MULLEN:  Objection.

12     A     Yes, that's correct.

13           The supplement is probably a word

14  I would -- we struck through the

15  no-longer-relevant portions, and then

16  supplemented the guidance with this.

17     Q     Would you agree with me that the

18  biggest change Ball instituted was that now

19  incorrectly dated ballots, whatever that

20  means, could not be counted?

21           MS. MULLEN:  Objection.

22     A     Yes.  Substantively, that was the

23  biggest change.  Incorrectly dated ballots

24  could not be counted.

25           And, you know, prior to that, the
```

1              J. Marks

2    Department's guidance on that issue was

3    that if there's a date on the ballot, it

4    should be counted, even at the point in

5    time where we were telling Counties not to

6    count undated ballots.

7        Q     So after Ball, the Department's

8    read of that decision was that neither

9    undated nor incorrectly dated ballots could

10   be counted; is that right?

11       A     That's correct, yes.

12       Q     Looking down on page 3 of

13   Exhibit 6, the first bullet point talks

14   about directing Counties to scan return

15   ballots into the SURE system immediately?

16       A     Correct, yes.

17       Q     And to date-stamp those; is that

18   correct?

19       A     Yes.

20       Q     Why did you include that in this?

21       A     Well, we wanted to remind

22   Counties that they should have a mechanism

23   for determining which ballots were timely

24   received and on what date those ballots

25   were received.

```
 1                    J. Marks

 2      Q     So looking at the second and

 3  third bullet points there, they essentially

 4  ask the Counties to examine the declaration

 5  envelopes for signature and date, and then

 6  code them appropriately if they're missing

 7  either of those; is that correct?

 8      A     That's correct, yes.

 9      Q     And why did the Department

10  include that?

11      A     Well, we wanted -- for a couple

12  reasons, we wanted -- to the extent that

13  the voter provided an email address, we

14  wanted to make sure the voter was alerted

15  to the status of their ballot.

16            We also wanted to make sure that

17  Counties were putting -- were coding these

18  correctly so that we would have data on

19  which ballots were set aside, because there

20  was a problem with the declaration

21  envelope.

22      Q     Do you know whether all the

23  Counties complied with that guidance?

24      A     I don't.  I can't say that every

25  County did everything that was outlined in
```

1                    J. Marks

2   this guidance, including the, you know,

3   immediately recording ballots returned in

4   the SURE system.

5       Q     Do you know that some Counties

6   did not immediately record some ballots

7   into the SURE system?

8       A     My recollection is that that is

9   true, yes.

10      Q     Are you aware that some Counties

11  may have recorded it but not have put in

12  the cancellation code?

13      A     That's my recollection as well,

14  yes.

15      Q     And do you recall how many

16  Counties did not follow that guidance?

17      A     I don't recall the exact number

18  of Counties, and I don't know that we

19  necessarily surveyed the Counties on that

20  issue.

21      Q     Based on what you do know, do you

22  believe that it was more than five Counties

23  that did not comply with that guidance?

24      A     I believe that's true, yes.

25      Q     Do you believe it was more than

1                    J. Marks

2    ten?

3        A      I believe there were probably

4    more than ten, that it was in the double

5    digits, based on what I know.

6             Again, I don't have any empirical

7    data to back that up, but, anecdotally,

8    yes.

9        Q      Looking at the last bullet on

10   page 3 of Exhibit 6, is it fair to term

11   that as advice to provide notice and an

12   opportunity to cure for voters?

13       A      Yes.  We believe that if a voter

14   was returning their ballot by hand, and the

15   person who was receiving the ballot should

16   review it, and if they identified an error

17   on the outside of the envelope, that it was

18   appropriate to give that voter an

19   opportunity to fix that error before

20   submitting it to the County.

21       Q      Do you know whether all Counties'

22   Board of Elections complied with that

23   guidance?

24       A      I do not, no.

25       Q      Do you know whether any Counties

1                    J. Marks

2   did not comply with that guidance?

3       A     I don't recall.  I don't know

4   that -- if there are any Counties who did

5   not comply with that guidance on in-person,

6   you know, handing the ballot over the

7   counter, no, I don't know.

8       Q     So that "notice and cure" applies

9   to people who were returning their ballots

10  in person, but there's also potentially

11  "notice and cure" to people who submitted

12  their ballots by mail or just dropped them

13  off in a drop box or delivered in some

14  fashion as well; is that right?

15      A     That's correct, yes.

16      Q     As I believe you said earlier,

17  it's your understanding of the law that

18  there's no prohibition on that, but there's

19  also no requirement of that on the Counties

20  to do that "notice and cure"; is that

21  correct?

22      A     That's correct, yes.

23      Q     Are you aware of some Counties

24  that did do some variation of "notice and

25  cure" opportunity in the November 8, 2022,

1                  J. Marks

2      Q      And this was issued on

3  November 5, 2022?

4      A      That's correct, yes.

5      Q      So that's before Election Day,

6  correct?

7      A      It is, yes.

8      Q      What's your understanding of the

9  purpose of this supplemental order?

10      A      My understanding of the purpose

11  was to provide some standard, or some

12  guidance, if you will, on how a County

13  would go about determining whether a ballot

14  is incorrectly dated or not.

15      Q      If I'm reading this correctly,

16  they set out a range of dates that if the

17  date that was written on the declaration

18  envelope fell between or fell in that

19  range, one range for absentee, one for

20  mail-in ballots, that the ballots should be

21  counted, correct?

22      A      If the date inserted by the voter

23  fell within that range, the ballot should

24  be counted, is that your...

25      Q      Yes.

```
 1                    J. Marks

 2      A     Yes, that's correct.

 3      Q     Is there any way for the County

 4  Board of Elections to know whether the date

 5  the voter has put on the declaration form

 6  is, in fact, the date that they filled out

 7  the ballot?

 8      A     No.  Unless the voter is doing it

 9  in person in front of the County Election

10  official, no, they would not.

11      Q     But if it's being done at home or

12  away from an Elections Office, put in an

13  envelope and somehow delivered by mail or

14  dropped off, the County Election Board

15  can't know whether the date the voter has

16  marked is, in fact, the date that they

17  filled out the ballot, correct?

18      A     Correct, yes.

19      Q     For purposes of timeliness, as we

20  discussed earlier, the date that the voter

21  actually fills out the ballot is

22  irrelevant, correct?

23      A     The date the voter fills out the

24  ballot, no.

25      Q     So as long as it's received prior
```

1                    J. Marks

2    to the deadline, 8:00 on Election Night,

3    the date the voter fills out the ballot is

4    irrelevant?

5        A     Correct.  The date the voter

6    fills out the ballot, the date the voter

7    signs the declaration envelope and returns

8    the ballot to the County is irrelevant.

9              What's relevant is the date that

10   it's received by the County in determining

11   whether the ballot should be counted or

12   not.

13       Q     And if a voter is filling this

14   out in privacy, as they are supposed to do,

15   the ballots are secret, there's no way for

16   the Elections Board to know whether that

17   date is, in fact, representative of when

18   they filled out the ballot, or when they

19   signed the declaration, or when they, in

20   fact, put it in the mail, correct?

21       A     Correct.

22       Q     So this order applied to the

23   November 8 Election, correct?

24       A     Correct, yes.

25       Q     Has the Department of State given

```
 1                    J. Marks

 2    any kind of guidance to the County Board of

 3    Elections about how to handle,

 4    quote/unquote, incorrect dates for the

 5    May 2023 Primary?

 6       A     We have not.  Our current

 7    guidance on the issue will remain unchanged

 8    barring, you know, another ruling by this

 9    court or another court on the issue.

10             But we did provide a reminder to

11    the Counties who recently had special

12    elections that this was the current status

13    of our guidance on the issue of undated and

14    incorrectly dated ballots, meaning the

15    guidance that we issued shortly before the

16    November election in response to Ball v.

17    Chapman.  So that's the current status quo

18    right now.

19       Q     Does the Department have any

20    guidance on whether or not a date is

21    incorrect for the upcoming election?

22       A     We do not.

23       Q     Does the Department expect to put

24    out guidance for the upcoming election

25    around what is an incorrect date?
```

                         J. Marks

1    a hypothetical.  I don't know whether it

2    actually happened or not.

3           But, yes, hypothetically if that

4    were the case with an individual voter,

5    under the Supreme Court's supplemental

6    order, that ballot would have been counted

7    irrespective of the fact that the voter did

8    not put the date on which they signed the

9    declaration on the declaration.

10        Q     So to that extent, if a voter

11   simply made a mistake in the date, as long

12   as that date was within that range, it

13   would have counted?

14        A     Correct.

15        Q     And, you know, without a notary

16   requirement -- and I'm not certainly urging

17   the legislature to take that up, but some

18   states do have that, it's impossible to

19   tell whether or not that date accurately

20   reflects when the voter -- discussed

21   earlier, is that right?

22           MS. MULLEN:  Vic, you broke up

23        there.  Could you repeat your question?

24        The video froze.

```
 1                    J. Marks
 2             MR. WALCZAK:  It was brilliant.
 3         I don't know that I can repeat it.
 4         I'll do my best.
 5   BY MR. WALCZAK:
 6         Q     So because there's no witness
 7     requirement to that date, there's no way
 8     that the Board of Elections can know
 9     whether or not the voter inserted a date
10     that reflects the date on which they filled
11     out the ballot or mailed the declaration
12     envelope, correct?
13         A     Correct.  There would be no way
14     for the County to independently verify, if
15     that's what you're asking.
16         Q     And, ultimately, the only date
17     that matters here is whether or not that
18     ballot is received by the statutory
19     deadline of 8:00 on Election Night,
20     correct?
21         A     Correct.
22         Q     And the County Board of
23     Elections, because they received that date,
24     are in the best position to determine that,
25     correct?
```

1                    J. Marks

2       A    Correct.

3       Q    I want to talk about what other

4  possible uses the date on the declaration

5  envelope may serve in the election process.

6            So it's not relevant to whether

7  it's timely received, correct?

8       A    Correct.

9       Q    So correct me if I am wrong, one

10  of the eligibility requirements is that the

11  voter has to be 18, right?

12       A    Correct, yes.

13       Q    And the person's age would be

14  ascertained at the time of registration,

15  correct?

16       A    That's correct, yes.

17       Q    So if they submit an application,

18  and the application is returned to them,

19  they're 18 years old, correct?

20       A    Correct, or they will at least be

21  18 years old by the date of the next

22  election.

23       Q    Same for whether they have been a

24  citizen?

25       A    Correct.

1                    J. Marks

2    ballots?

3        A     That's correct, yes.

4             MR. WALCZAK:  I have no further

5        questions for Mr. Marks.

6             Jacob or Kathy, do you want to

7        let Mr. Baxenberg have a shot first?

8             MR. BOYER:  Yes, why doesn't

9        Mr. Baxenberg go next.  And then I may

10       have a small number of questions to

11       follow up.  Then after he is done, if

12       there's other defendant Counties who

13       want to question, maybe they can go

14       after I have.

15   BY MR. BAXENBERG:

16       Q     Good afternoon, Mr. Marks.

17   Justin Baxenberg here representing the

18   plaintiffs in the other lawsuit, the Eakin

19   lawsuit.

20             I just have maybe seven or eight

21   questions for you we can move through

22   pretty quick.

23             Other than the deadline for

24   receiving mail ballots, is there any

25   requirement that voters return mail ballot

1                    J. Marks

2    within a certain period of time after they

3    have dated and signed the ballot?

4        A    No.

5        Q    So a voter could receive and

6    complete their mail ballot, and then wait a

7    few weeks before submitting it as long as

8    it's submitted it by the deadline, is that

9    correct?

10       A    That's correct, yes.

11       Q    And a voter could, at least

12   hypothetically, sign their ballot one day,

13   put it aside for a couple weeks, and then

14   realize, oh, I need to date it and sign it,

15   put that day's date, send in the ballot,

16   correct, and as long as it's received by

17   the deadline, it will be counted?

18            MR. WALCZAK:  Objection.

19       A    Yes, that's correct.  I've done

20   that myself.  I've completed the ballot and

21   waited a few days afterwards because I

22   needed a stamp.

23       Q    It's one of those things that

24   people used to have.

25       A    Yes.  It's not something we keep

1                    J. Marks

2    handy anymore.

3        Q    Mail ballots are only sent to

4    voters who have timely completed and

5    submitted an application to vote by mail,

6    is that correct?

7        A    That's correct, yes.

8        Q    And mail ballots are specific to

9    each election?

10       A    They are, yes, they are unique to

11   each election, yes.

12       Q    Anyone who returns a mail ballot

13   for a particular election, therefore, must

14   have received that ballot at some point

15   after the ballots for that election were

16   distributed; is that correct?

17       A    Correct.

18       Q    And if a mail-in ballot is

19   returned with a signature, the ballot must

20   have been signed at some point between when

21   ballots were distributed and when the

22   ballot was returned; is that correct?

23       A    Correct, yes.

24       Q    If a mail-in ballot is received

25   after the return deadline but dated before

```
 1                    J. Marks

 2     A     Well, again, I think, you know,

 3   the Board would make a determination when

 4   examining.

 5           But I think the assumption is

 6   that the voter has signed the envelope

 7   after having their I.D. verified receiving

 8   the ballot.

 9           I'm not sure I understand the

10   question, but I think the Board would be

11   able to look at the outer envelope to

12   determine whether the voter signed it or

13   not.

14     Q     Well, my specific question was:

15   How would the Board know that it's the

16   voter him or herself that signed?

17     A     I suppose if the Board noticed

18   the signature of another individual or an

19   individual with a different name, I think

20   that would indicate that perhaps there was

21   a mixup there.

22           And we've seen that occur where a

23   spouse signed.  You know, they got it mixed

24   up, and they signed on behalf of their

25   spouse.
```

1                       J. Marks

2              I'm not sure what your question

3    is.  I mean, if you're asking me --

4         Q    As I understand it --

5         A    -- analysis, the answer is no.

6         Q    But I'm trying to understand the

7    Department's position as to why the

8    declaration is relevant or important but

9    the date is not?

10             MS. MULLEN:  Objection.

11        A    Well, again, I think without a

12   signature, the person who is returning the

13   ballot is not affirming that they're

14   qualified to vote in the election.  And I

15   think that's a relevant fact.

16             Whether they correctly dated that

17   affirmation or not, I don't believe, is

18   relevant in terms of the truthfulness of

19   the affirmation.

20        Q    But to your point, there's no

21   basis for the -- you agree that the

22   Department can't set aside a ballot based

23   on signature analysis, correct?

24        A    Correct.  Yes, that's not a

25   requirement.

1          J. Marks

2          And if it were to be, it would

3    require a whole lot of training and

4    upgrading of our infrastructure.

5    Q    So for this important purpose

6    that you stated of determining that they

7    are representing that it's their vote,

8    there's no way for the Board to determine

9    that it's the actual voter making that

10   determination?

11          MS. MULLEN:  Objection.

12   A    Absolutely determine, I suppose

13   you're correct.

14          MR. GIANCOLA:  I'm going to go

15       over my notes, but I'm happy to pass to

16       the next attorney to keep things

17       moving.

18          Thanks for your time.

19          MS. MULLEN:  Can we take just a

20       five-minute break?

21          Does anybody have an objection to

22       that?

23          MR. WALCZAK:  Kathy, I would just

24       ask if Mr. Giancola has additional

25       questions, that he go ahead and ask

**Supp. App. 88**

# Exhibit E6

Supp. App. 89

Exhibit 6

# Exhibit J

TLP:WHITE



# Guidance on Undated and Incorrectly Dated Mail-in and Absentee Ballot Envelopes Based on the Pennsylvania Supreme Court's Order in *Ball v. Chapman,* issued November 1, 2022

Date: November 3, 2022
Version: 1.0



TLP:WHITE

**Guidance on Undated and Incorrectly Dated Mail-in and Absentee Ballot Envelopes Based on the Pennsylvania Supreme Court's Order in *Ball v. Chapman,* issued November 1, 2022**

On November 1, 2022, the Pennsylvania Supreme Court issued an Order regarding undated and incorrectly dated outer envelopes containing mail-in and absentee ballots.  A copy of that Order is attached.  This email follows an initial communication from Deputy Secretary Jonathan Marks on the evening of November 1, 2022 and provides additional guidance to counties regarding the Court's Order.

In light of the Court's Order, the Department's September 26, 2022 Guidance Concerning Examination of Absentee and Mail-In Return Envelopes ("Envelope Guidance") and Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures as it relates to undated and incorrectly dated outer envelopes is modified as stated below and counties are directed as follows:

- Returned ballots should be scanned into the SURE system immediately upon receipt.  County election offices should ensure that previously received mail-in and absentee ballots have been scanned into SURE.
    - As a reminder, election offices should date-stamp return envelopes for all mail-in and absentee ballots immediately upon receipt.
- Examine all mail-in and absentee ballots received to determine if the return envelopes for those ballots are signed and dated.
- For ballots which are administratively determined to be undated or incorrectly dated, code that ballot as CANC – NO SIGNATURE within the SURE system.
- Further, for those ballots that have been administratively determined to be undated or incorrectly dated, the ballots must be segregated from other ballots. Counties may prefer to keep segregated undated and incorrectly dated ballots organized by precinct, and alphabetically by last name within each precinct.
    - The department strongly recommends that counties also segregate into separate groups undated ballots versus incorrectly dated ballots.
- For voters returning their ballots in person to election offices, office personnel should remind voters to confirm that they signed and correctly dated their ballots, and to provide them an opportunity to do so prior to submission.


### ###

| Version | Date | Description |
|---------|------|-------------|
| **1.0** | 11/3/22 | Original issue |
| | | |

TLP:WHITE
**App.67**

Supp. App. 92

# Exhibit G

```
 1

 2      IN THE UNITED STATES DISTRICT COURT

 3   FOR THE WESTERN DISTRICT OF PENNSYLVANIA  4

     ----------------------------------------------------------

 5   PENNSYLVANIA STATE CONFERENCE

 6   OF THE NAACP, et al.,

 7        Plaintiffs,

 8        v.

 9   LEIGH M. CHAPMAN, in her official capacity  as

10   Acting Secretary of the Commonwealth, et  al.,

11        Defendants.

12                    Case No.  1:22-cv-00339-SPB

13        -- and --

14   BETTY EAKIN, et al.

15        Plaintiffs,

16          v.

17   ADAMS COUNTY BOARD OF ELECTIONS, et  al.

18        Defendants.

19                    Case No.  1:22-cv-340

20   ----------------------------------------------------------

21     Remote Deposition of Crista Miller

22            Monday, February 13, 2023

23            11:00 a.m.

24   Recorded Stenographically by:
     Jennifer Miller, RMR, CRR, CCR
25   Job No.:222617
```

```
 1                    C. Miller
 2        my questioning.
 3                    MR. ZIMOLONG:  Well, you have
 4        misrepresented it, but I'll let you --
 5        I'll let you continue.
 6                    MR. LONEY:  Okay.  So I'm going
 7        to take the document production responses
 8        off the screen and go back to the
 9        interrogatory responses, which are Exhibit
10        Lancaster 3.
11   BY MR. LONEY:
12        Q.   And I have jumped here, Ms. Miller,
13   to Interrogatory Number 14.
14                    Do you see that on your -- on
15   your screen?
16        A.   I do.
17        Q.   And, again, if you feel the need to
18   flip through this and look at anything else to
19   contextualize your answer, let me know.  But,
20   otherwise, I'm just going to ask about Question
21   Number 14 for a moment.
22                    So plaintiffs' interrogatory
23   reads:  "Do you contend that the handwritten
24   date is material in determining whether a
25   ballot" -- "a mail ballot voter is qualified to
```

Page 36

```
 1                    C. Miller
 2    vote in the election in which they have cast a
 3    ballot?"  If so, what is the basis for that
 4    contention?"
 5                    Did I read that correctly?
 6        A.   You did.
 7        Q.   And can you take a moment to read
 8    over the Lancaster board's response?
 9        A.   Yeah, I will.
10        Q.   Let me know when you're finished
11    reading.
12        A.   Okay.
13        Q.   So the response that you just read,
14    you reviewed that and approved it before it was
15    served in this case, right?
16        A.   Yes.
17        Q.   And so you agree, in the first
18    instance, looking at the first line of the
19    response, that the dates written on envelopes
20    are not material to the question of whether a
21    person is qualified to vote?
22                    The date written on the
23    envelope, for example, doesn't tell you whether
24    the person is over 18 years old, right?
25        A.   Correct.
```

```
 1                    C. Miller
 2        Q.    And the date written on the envelope
 3   doesn't tell you whether the voter is or has
 4   been a U.S. citizen for at least a month,
 5   right?
 6        A.    Correct.
 7        Q.    And the date written on the envelope
 8   doesn't tell you whether the voter has resided
 9   in Lancaster County for at least 30 days, does
10   it?
11        A.    Correct.
12        Q.    And it also doesn't tell you whether
13   the person voting is incarcerated on a felony
14   conviction, right?
15        A.    Correct.
16        Q.    For all of those other things I just
17   went through -- citizenship, age, residence in
18   the county, whether the person is
19   incarcerated -- the Lancaster board has other
20   methods of confirming all of those things that
21   are relevant to qualification, right?  You
22   don't need the -- the -- the date on the
23   envelope?
24             MR. ZIMOLONG:  Objection to
25        form.
```

```
 1                    C. Miller
 2              You can answer.
 3              THE WITNESS:  That is correct.
 4   BY MR. LONEY:
 5       Q.  But it's the Lancaster board's
 6   position that -- and looking again at
 7   Interrogatory Number 14 -- that the date is,
 8   nevertheless, material in determining whether
 9   the ballot was cast in compliance with the
10   election code; is that right?
11       A.  That is correct.
12       Q.  Okay.  So can you help me understand
13   how that is?
14              Is it because the voter who
15   didn't write the correct date next to their
16   signature didn't comply with the election code
17   and its requirement to sign and date the outer
18   envelope?
19       A.  Correct.  The election code says that
20   it must be dated, and so we are looking to see
21   if there is a date or not to determine whether
22   we can open to count the ballot or not.
23       Q.  Okay.  So you've used the date or the
24   absence of a date to determine whether the
25   voter complied with the dating requirements.
```

1                    C. Miller

2              Do I have that right?

3       A.    Correct.

4       Q.    And that's the only way a

5  voter-written date is relevant to whether the

6  vote is counted, right, to determine if the

7  voter complied with that requirement to date

8  and sign?

9              MR. ZIMOLONG:  Objection to

10        form.

11              You can answer.

12              THE WITNESS:  We use that date.

13        We follow the court order, if there is

14        one, for that election to give us the date

15        range and if there is a date there at all.

16  BY MR. LONEY:

17       Q.    Right.  If they don't include the

18  date, it's a noncompliant vote, based on the

19  most recent court order.  And if they did

20  provide a date within a particular range, it's

21  a compliant vote.

22              Do I have that right?

23       A.    That is correct.

24       Q.    And that's -- that's the end of the

25  analysis of the date, from the Lancaster

```
 1                     C. Miller
 2        Q.   But if they wrote "September 20th,
 3   2022," the envelope would not have been set
 4   aside on the basis of the Ball order?
 5        A.   Correct.
 6        Q.   If somebody wrote a date after
 7   November 8th, 2022, you also would have set
 8   that aside pursuant to the court order?
 9        A.   Correct.  Except for a military
10   ballot was a different deadline.
11        Q.   And what was the military ballot
12   deadline?
13        A.   The military -- sorry.
14             Military ballots are due back to
15   county boards of elections one week
16   postelection.  So this past election would have
17   been November 15th.
18        Q.   Okay.  So if a military ballot voter
19   got their ballot back by November 15th but
20   wrote a date on the envelope that postdated
21   November 15th, that would have been set aside?
22        A.   Yes, that would have been set aside.
23        Q.   What about somebody who wrote
24   "October 2022" but didn't provide the exact
25   day?
```

1                    C. Miller

2        A.   I don't remember.  I believe we would

3   have set those aside as it was not a full date.

4        Q.   Okay.  But the entire month of

5   October is within the range provided by the

6   Supreme Court, right?

7        A.   Correct.

8        Q.   But if they said "October 2022," you

9   still would have set that aside?

10        A.   I don't remember that we had anything

11   like that to actually have looked at.  Those

12   would have just been set aside to look at at

13   the canvassing, and then a decision would have

14   been made.

15        Q.   Okay.  And if we could look at the

16   copies of the mail ballot envelopes, we might

17   find some in there that say "October 2022"?

18        A.   I don't know off the top of my head.

19        Q.   What about if somebody wrote the

20   month and day that was between September 19th

21   and November 8th but didn't write a year?

22             So if somebody just wrote

23   "October 1st" with no year, would you have set

24   that aside?

25        A.   Yes.

1                           C. Miller

2          Q.    Why?  Didn't that person date the

3    envelope, and isn't October 1st in the range?

4          A.    Again, that would have been set aside

5    to be looked at at the canvass as part of the

6    election.

7                      I do not believe that we had any

8    like that, though.  So I would be speculating

9    what we would have done.

10         Q.    Okay.  And all of the -- just so I'm

11   clear, all of the ballots at issue in this case

12   were submitted for the 2022 general election,

13   right?

14         A.    Correct.

15         Q.    And you know for sure that nobody

16   submitting any of these ballots filled them out

17   earlier in the year than September 26th because

18   that's when you first started issuing the

19   ballot packages, right?

20         A.    Military ballots are different from

21   that.  But all normal mail-in or absentee

22   ballots, that is correct.

23         Q.    Will you agree with me that the date

24   line on the voter declaration on the return

25   envelope doesn't actually specify that the

1                    C. Miller

2    voter has to write the year or, as you put it,

3    the full date?

4                    MR. ZIMOLONG:  Objection to

5         form.  Calls for speculation.

6                    THE WITNESS:  I would need to

7         see one in front of me to look at how we

8         have it.

9    BY MR. LONEY:

10        Q.   But sitting here right now, you don't

11   recall whether it says full date, month, day,

12   year?

13        A.   I believe that it does, but I would

14   just need to see one to confirm that.

15        Q.   Now, the November 5th supplemental

16   order of the Supreme Court said the envelopes

17   could be dated through November 8th, 2022.

18                    Did the Lancaster board apply

19   that literally to mean, if somebody wrote

20   "November 8th, 2022," that was within the range

21   because it's through November 8th and that

22   ballot would be counted?

23        A.   Yes.

24        Q.   And we're only talking about

25   envelopes that were received by 8:00 p.m. on

```
1                    C. Miller
2   else appeared to be in order, the Lancaster
3   board would have counted it, period, full stop,
4   right?  There's no further evaluation as to
5   whether or not the person signed it on
6   November 8th?
7                    MR. ZIMOLONG:  Objection to
8        form.
9                    THE WITNESS:  As long as it was
10       received by 8:00 p.m. on Election Day.
11  BY MR. LONEY:
12       Q.   And because that's what the Supreme
13  Court instructed, not because you're using the
14  voter-written date to make a determination as
15  to when the voter actually signed their
16  envelope, right?
17       A.   Correct.  We would not know that.
18       Q.   Let's talk a bit about dates falling
19  after November 8th, and I'm going to limit
20  these questions to domestic mail-in ballots,
21  right.  So leaving aside the military ballots
22  that might have come in by the 15th.
23                    If you receive an envelope by
24  8:00 p.m. on Election Day, you know for a fact
25  that the voter didn't fill out their ballot
```

1                    C. Miller

2    after November 8th, regardless of what they

3    wrote on the envelope, right?

4         A.    Correct.

5         Q.    But pursuant to the court order, you

6    still would have set aside any envelope where

7    the voter wrote a date that falls after

8    November 8th, 2022, even if it was received by

9    8:00 p.m. on Election Day, right?

10        A.    Correct.

11        Q.    And that's because you're

12   following -- strictly following the court

13   order, not because you're using the

14   voter-written date to determine when the voter

15   actually filled out the ballot, right?

16        A.    Correct.

17        Q.    What about envelopes received after

18   Election Day?

19                    Leaving aside for a second the

20   date issue on what's written on the envelope,

21   what does the Lancaster board do with mail

22   ballots received after Election Day?

23        A.    They are time-stamped in to show when

24   we received them, and then they are set aside

25   and not -- and not counted.

```
 1                    C. Miller
 2        Q.   And they're set aside and not counted
 3   regardless of the date the voter writes on
 4   them, right?
 5        A.   Correct.
 6        Q.   So if the voter doesn't get their
 7   mail ballot to the board by 8:00p.m.
 8   on Election Day, they couldn't possibly get
 9   their late vote counted by backdating the
10   signature on the envelope, right?
11        A.   Correct.
12        Q.   So whether or not you receive a
13   ballot before 8:00 p.m. on Election Day has
14   nothing to do with whether the voter wrote
15   "November 8th, 2022," or some earlier date on
16   the envelope?
17        A.   Correct.
18        Q.   Now, going to the other end of the
19   timeline, envelopes dated before
20   September 19th, 2022.  Again, I'll focus on
21   domestic mail ballots, leaving aside the
22   military ballots.
23             There is no way anybody in
24   Lancaster County could have actually filled out
25   the 2022 general election paperwork before
```

1                C. Miller

2   September 19th, right?

3        A.   Correct.

4        Q.   So even if somebody wrote "9/1/2022"

5   on their envelope, you knew for a fact they

6   could not have actually tried to vote using

7   this paperwork on 9/1/2022?

8        A.   Correct.

9        Q.   But you would have set aside that

10  envelope anyway because that's what the Supreme

11  Court instructed, right?

12       A.   For mail ballots, yes.  Absentees had

13  a different date range.

14       Q.   Do you know what the date range was

15  for absentee?

16       A.   August 30th through November 8th.

17       Q.   And so I can put up the document

18  again, but I just read it.  And good memory;

19  that's exactly what the document said in the

20  next part.  It wasn't intended to be a memory

21  test.

22            But it said August 30th, 2022,

23  through November 8th, 2022, and did not set

24  forth a different deadline for military

25  ballots, right?

1                    C. Miller

2        A.   Military ballots are absentee

3   ballots.

4        Q.   So the Pennsylvania Supreme Court

5   said on November 5th, 2022, that an incorrectly

6   dated outer envelope for absentee ballots would

7   be one with a date falling outside the range of

8   August 30th, 2022, through November 8th, 2022.

9                    But you still would have counted

10  a military absentee ballot received and dated

11  up through November 15th?

12       A.   Received by the 15th.  It still would

13  have to be dated by the 8th.

14       Q.   Understood.

15                   So if you receive a military

16  absentee ballot on November 14th, that met the

17  submission deadline; but if the date the voter

18  wrote on that envelope was November 9th, you

19  would have set it aside pursuant to the court

20  order?

21       A.   Correct.

22       Q.   Got it.

23                   Would the same thing be true of

24  people who might have flipped the day and the

25  month in their -- in how they write their date?

```
 1                     C. Miller
 2              So, for example, some people who
 3  wish to indicate November 4th might write
 4  4/11 instead of 11/4?
 5              MR. ZIMOLONG:  Objection to
 6         form.
 7              You can answer.
 8  BY MR. LONEY:
 9      Q.   Is that something you're aware of
10  people doing out in the world?
11              MR. ZIMOLONG:  Calls for
12         speculation as to what people out in the
13         world do.
14              THE WITNESS:  If somebody did,
15         we -- yes.  I mean, I'm sure that
16         happened.  But that would be seen as
17         month, date, year in our office.
18  BY MR. LONEY:
19      Q.   So your office would not have done
20  anything to evaluate whether flipping the day
21  and the month in the order would have actually
22  cured a problem?  You just did not count it if
23  it didn't hit the range, assuming everybody is
24  writing month then day then year?
25      A.   Correct.
```

```
 1                    C. Miller
 2                    MR. LONEY:  I think now would be
 3         a good time to take five minutes before I
 4         get into the next stretch.
 5                    Can we go off the record.
 6                    -   -   -
 7                    (Whereupon, a short recess was
 8           taken.)
 9                    -   -   -
10                    MR. LONEY:  Ms. Miller, I'm
11         going to show the next exhibit and ask the
12         Court Reporter to mark Tab 7 as Exhibit
13         Lancaster 7.
14                    -   -   -
15                    (Whereupon, Exhibit 7 was marked
16           for identification.)
17                    -   -   -
18                    MR. LONEY:  I'm sharing my
19         screen now.
20    BY MR. LONEY:
21         Q.   Ms. Miller, do you see on the screen
22    a mail-in ballot envelope sample?
23         A.   I do, yes.
24                    MR. LONEY:  Okay.  And for the
25         record, I'll note that, in order to orient
```

```
1                    C. Miller
2        my next line of questioning, I'm using a
3        couple of examples from Dauphin County's
4        production because we don't have any
5        produced by Lancaster County.  And Dauphin
6        is a neighboring county to Lancaster that
7        redacted all of the personal identifying
8        information of any voter on any of these
9        envelopes.
10                    I understand that the plaintiffs
11        in the 340 case have also received the
12        same production pursuant to protective
13        order.
14   BY MR. LONEY:
15        Q.   So this Exhibit Number 7,
16   Lancaster 7, does this show the same
17   declaration form that voters in Lancaster
18   County would have gotten for the 2022 general
19   election?
20        A.   I would need to see one of ours with
21   it to confirm, but it looks similar.
22        Q.   You don't see anything on here
23   that -- other than the markings at the very
24   bottom for this case, you don't see anything on
25   here that would distinguish it, as you sit here
```

```
 1                    C. Miller
 2   right now, from what Lancaster County voters
 3   got?
 4        A.   Again, I would have to see ours
 5   directly next to it in order to compare.
 6        Q.   Okay.  Well, this exhibit shows a
 7   date line.  It says "today's date" and, in
 8   parentheses, "required."
 9              Do you see where I'm looking?
10        A.   I do.
11        Q.   And there's nothing there that
12   requires -- to our earlier conversation --
13   requires that month, day, and year be provided
14   in that order, is there?
15              MR. ZIMOLONG:  Objection to
16        form.
17              You can answer.
18              THE WITNESS:  Not for Dauphin
19        County.  But, again, I would need to see
20        Lancaster's county next to it.
21   BY MR. LONEY:
22        Q.   Do the counties have different forms
23   for these declarations and outer envelopes
24   within the Commonwealth of Pennsylvania?
25        A.   Yes.
```

1                C. Miller

2       Q.    Okay.  So we would need to see one of

3    the Lancaster envelopes to know whether there's

4    a month, day, year requirement?

5       A.    Correct.

6       Q.    Also, in Exhibit Lancaster 7, there

7    is a date stamp -- date and time stamp near the

8    top.  I've just highlighted it.

9             Do you see that?

10      A.    Yes.

11      Q.    Did the Lancaster board also apply a

12   date stamp to incoming mail ballot envelopes?

13      A.    Yes.

14      Q.    And the date stamp on the return

15   envelope stamped by the Lancaster board would

16   reflect the day the envelope was received by

17   the board, right?

18      A.    Correct.

19      Q.    So if the date stamp applied by the

20   Lancaster board was before 8:00 p.m. on 1/8/22,

21   that envelope was received in time under the

22   election code, right?

23      A.    Correct.

24      Q.    Now, looking specifically at the

25   document marked Lancaster 7, there's a

1                    C. Miller

2    handwritten date on this envelope that reads

3    "11/7/2012."

4                    Do you see that?

5        A.   I do.

6        Q.   Now, if this were received in

7    Lancaster County, it couldn't possibly be

8    somebody who actually tried to vote in 2012,

9    right?

10       A.   Correct.

11       Q.   And nobody -- none of us knew that

12   Dr. Oz was running for Senate in 2012.

13                   So had you received an envelope

14   in Lancaster County where somebody, similarly,

15   wrote "2012" as the year instead of "2022,"

16   would that have indicated to you that the voter

17   was engaging in any sort of fraud?

18       A.   Not fraud.

19       Q.   But you would have set aside this

20   vote because it's incorrectly dated because it

21   falls outside the date range ordered by the

22   Supreme Court, right?

23       A.   Correct.

24       Q.   And that's because you were following

25   the Supreme Court's instructions, not because

```
1                    C. Miller
2  you would look at this 2012 date to determine
3  when the voter actually filled out their
4  ballot, right?
5       A.   We would have been following the
6  order from the Court.
7       Q.   But you wouldn't have viewed this
8  2012 date as any indication that somebody was
9  attempting to mark their ballot outside of the
10 allowable date, right?
11      A.   I'm not sure I completely understand
12 that question.
13      Q.   I'll ask a different question.
14                    Does it matter to the Lancaster
15 County board whether somebody was actually
16 marking their ballot within the date range if
17 they got the wrong date on the envelope?
18                    MR. ZIMOLONG:  Objection to
19      form.
20                    To the extent you understand the
21      question.
22                    THE WITNESS:  Yeah, I -- can you
23      rephrase that.
24 BY MR. LONEY:
25      Q.   Sure.  If somebody -- strike that.
```

1                    C. Miller

2                    If the stamp on the envelope

3    indicates the mail ballot was received in time,

4    right -- so the stamp is on or before

5    November 8th, right?

6        A.   Yes.

7        Q.   And you know that nobody voted before

8    September 26th, 2022, because nobody could have

9    gotten the mail ballot forms before that,

10   right, in Lancaster County?

11       A.   Correct.

12       Q.   And so you know everybody who

13   submitted one of these envelopes between the

14   time you issued the mail ballot packages and

15   the November 8th stamp voted -- actually filled

16   out their envelope during that window, right?

17                   MR. ZIMOLONG:  Objection to

18       form.  Calls for speculation.

19                   THE WITNESS:  One would have to

20       assume that.

21   BY MR. LONEY:

22       Q.   I mean, there's no way they could

23   have voted before September 26th, right?

24       A.   Correct.

25       Q.   And there's no way they could have

1               C. Miller

2  voted after November 8th if you stamped the

3  envelope "received" on or before November 8th,

4  right?

5      A.   Correct.

6      Q.   So in those situations, does any of

7  that matter once you see that somebody

8  mistakenly put "2012" instead of "2022" on

9  their envelope?

10     A.   For this election, it did not because

11  the Supreme Court order gave us date ranges to

12  use.

13              MR. LONEY:  I'm going to ask the

14         Court Reporter to mark the next exhibit,

15         which is Tab 8, as Lancaster 8.

16  -             -   -

17              (Whereupon, Exhibit 8 was marked

18         for identification.)

19              -   -   -

20              MR. LONEY:  Share that on my

21         screen.

22  BY MR. LONEY:

23     Q.   This is another example from Dauphin

24  County.

25              Do you have another mail ballot

1                    C. Miller

2    envelope sample up on your screen?

3         A.   I do.

4         Q.   And there's also a stamp on this

5    example near the top, similar to the date

6    stamps that the Lancaster board applied when it

7    received incoming mail ballots, right?

8         A.   Correct.

9         Q.   And there's also a handwritten date

10   on this envelope that reads "1/1/22," right?

11        A.   Correct.

12        Q.   And just like the last example, we

13   know nobody filled out a mail-in ballot for the

14   November '22 election as early as New Year's

15   Day 2022, right?

16        A.   Correct.

17        Q.   But if the person had just put an

18   extra 1 in front of the 1 that's currently

19   there for the month so that it would read

20   11/1/22 instead of 1/1/22, that would have been

21   in compliance with the dating rule, right?

22        A.   If it said 11/1, yes.

23        Q.   Right.  So if the Lancaster board

24   didn't inquire as to whether that was a simple

25   mistake, that somebody wrote 1 instead of 11,

```
 1                   C. Miller
 2   they would have set this aside based on what
 3   appears on the face of the envelope, right?
 4                   MR. ZIMOLONG:  Objection to
 5       form.
 6                   You can answer.
 7                   THE WITNESS:  Yes.  We take the
 8       date that is written by the voter.
 9   BY MR. LONEY:
10       Q.   And that's, again, because that's
11   what the Supreme Court instructed you to do,
12   not because you would look at a January date
13   and think that the person actually tried to
14   vote in January, right?
15       A.   Correct.
16                   MR. LONEY:  I'm going to ask the
17       Court Reporter to mark the next one, which
18       is Tab 9, as Exhibit Lancaster 9.
19       -              -  -
20                   (Whereupon, Exhibit 9 was marked
21          for identification.)
22                   -   -   -
23                   MR. LONEY:  I'll share that up
24       on my screen now.
25
```

1                    C. Miller

2   BY MR. LONEY:

3        Q.   Do you have another mail ballot

4   envelope sample up on your screen?

5        A.   I do.

6        Q.   And, again, this envelope has a

7   handwritten date on it that reads "8/11/22,"

8   right?

9        A.   Correct.

10       Q.   Now, this could be an example, could

11  it not, of what we were talking about before?

12  If somebody switched month and day, they wrote

13  day/month, then they were actually writing

14  Election Day on this envelope, right?

15                 MR. ZIMOLONG:  Objection to

16       form.  Calls for speculation.

17                 THE WITNESS:  It's not up to our

18       office to assume what someone is writing.

19       We can only look at exactly what's in

20       front of us and what is submitted.

21  BY MR. LONEY:

22       Q.   But you did assume that everybody

23  wrote month/day/year, and that was their

24  intent, right?

25       A.   Again, I would have to look at our

1                    C. Miller

2    envelope to see if that is actually on our

3    envelope.

4         Q.   And we would also have to look at

5    your envelopes to see if they are actually on

6    your envelope, right?

7         A.   Correct.

8         Q.   But in any event, if somebody wrote a

9    date that -- assuming it's month/day/year and

10   that didn't fall within the range ordered by

11   the Supreme Court, the Lancaster board didn't

12   inquire as to whether it could have been

13   someone intending to write day/month/year?

14        A.   We did not.

15        Q.   And this example up on the screen,

16   this is one that you would have set aside

17   without further inquiry, right?

18        A.   Correct.

19             MR. LONEY:  I'll ask the Court

20        Reporter to mark the next one, which is

21        Tab 11, as Exhibit Lancaster 10, if that

22        makes sense.

23                  -   -   -

24             (Whereupon, Exhibit 10 was

25        marked for identification.)

```
 1                    C. Miller

 2                    -   -   -

 3               MR. LONEY:  And I'm sharing that

 4      on the screen now.

 5  BY MR. LONEY:

 6      Q.   Ms. Miller, do you see another sample

 7  ballot envelope on your screen?

 8      A.   I do.

 9      Q.   And on this one, again, there's a

10  stamp near the top similar to the stamps that

11  the Lancaster board applied when it received

12  incoming mail ballots, right?

13      A.   Yes.

14      Q.   And that stamp is, in this example,

15  October 27th, 2022.

16               Do you see that?

17      A.   I do.

18      Q.   And there's also a handwritten date

19  on this envelope which reads "11/25/22," right?

20      A.   Correct.

21      Q.   Now, if you had received or seen an

22  envelope in Lancaster County dated

23  November 25th, 2022, would that have indicated

24  to you that somebody tried to vote after

25  Election Day?
```

```
 1                    C. Miller
 2        A.   No.
 3        Q.   And if you look at the comparison
 4   between the date written and the date stamped,
 5   if the person had put 10/25 instead of 11/25,
 6   that would have been in compliance and signed
 7   just two days before the board received it,
 8   right?
 9        A.   Correct.
10        Q.   But in Lancaster County's approach,
11   if you had seen this, you would set it aside
12   without further inquiry as to whether or not
13   the person intended to write "October" instead
14   of "November," right?
15        A.   Correct.
16        Q.   And, again, that's because that's
17   what the Supreme Court ordered and not because
18   you had any inclination that somebody mailed in
19   a ballot in October but actually filled it out
20   in November?
21        A.   Correct.
22             MR. LONEY:  I'm going to ask the
23        Court Reporter to mark as Exhibit
24        Lancaster 11 what we previously sent over
25        as Tab 12.
```

Page 80

1                         C. Miller

2                           -   -   -

3                   (Whereupon, Exhibit 11 was

4            marked for identification.)

5                   -         -   -

6     BY MR. LONEY:

7          Q.   Do you see another example mail

8     ballot envelope on your screen?

9          A.   I do.

10         Q.   So this document that's being marked

11    as Lancaster 11 actually has two dates written

12    on it.  One reads "9/25/22."  It looks like

13    somebody put an X through at least part of

14    that.  And then there's another date written

15    below it that's "3/6/1944."

16              Do you see that?

17         A.   I do.

18         Q.   Now, did you -- do you remember, in

19    Lancaster County, receiving any mail ballot

20    envelopes and setting them aside that had dates

21    that were long in the past?

22         A.   Yes.

23         Q.   Did you look to see if any of those

24    ballots came from people who wrote their birth

25    dates on the envelopes instead of the day they

1                    C. Miller

2   were voting?

3        A.   We did not go back to look at that.

4   We took just what the date was written.

5        Q.   So in this example, you would have

6   set it aside because the date that's not

7   crossed out is from 1944, which is obviously

8   outside of the date range ordered by the

9   Supreme Court, right?

10       A.   I would be speculating on that,

11  without seeing this unredacted, to see what

12  else was on this envelope and why there were

13  two dates.

14       Q.   Ah.  So you're saying -- so there are

15  a couple of things redacted here, not just the

16  signature.

17            Are you saying that you might --

18  if somebody wrote some sort of explanation

19  underneath, that might have weighed into your

20  thinking?

21       A.   Again, I would just need to see it

22  unredacted to know what we would have done.

23       Q.   Now, if the Lancaster board had seen

24  an envelope or if you had seen an envelope

25  submitted with just "3/6/1944" in the date line

1                    C. Miller

2   and nothing else other than the signature, you

3   would have set that aside, right?

4        A.   Correct.

5        Q.   And not because you thought somebody

6   had actually filled out a ballot in 1944 and

7   saved it until 2022, right?  It's just because

8   you were following the Supreme Court's order

9   as -- as written, right?

10       A.   Correct.

11       Q.   Now, does this indicate to you, if

12   somebody wrote a date long in the past, that

13   the voter was engaging in any sort of voter

14   fraud?

15       A.   No.

16       Q.   And did the Lancaster board initiate

17   any investigations of any voters who wrote

18   dates from the 1900s on their outer envelopes

19   to see if they were committing voter fraud?

20       A.   No.

21       Q.   Did you refer anybody to the police

22   from the November 2022 general election for

23   putting dates long in the past in the 1900s?

24       A.   No.

25                    MR. LONEY:  Is anybody else as

```
 1                    C. Miller
 2        disturbed as I am by continuing to say
 3        "the 1900s" like it's three centuries ago?
 4                    You don't have to answer that.
 5                    MR. ZIMOLONG:  No.  I think
 6        maybe people just aren't as disturbed as
 7        you by it.
 8                    MR. LONEY:  I'm going to go back
 9        for a moment to the requests for
10        admission, which I believe are Exhibit
11        Lancaster 2.
12                    I'm putting that back up on the
13        screen.
14   BY MR. LONEY:
15        Q.   So do you have the requests for
16   admissions back up on the screen?
17        A.   Yes.
18        Q.   I'm going to focus in on the second
19   request and denial here.
20                    Plaintiffs asked for an
21   admission that the Lancaster board had never
22   referred to the date handwritten on a mail
23   ballot return envelope to establish whether
24   you, the Lancaster board, received the ballot
25   by the applicable deadline.
```

```
 1                    C. Miller
 2              Do you see where I'm reading
 3    from?
 4        A.   Yes.
 5        Q.   And then the Lancaster board
 6    responded:  "Denied to the extent that the
 7    request is referring to the deadline referenced
 8    in Section 3150.16(c)."
 9              Do I have that right?
10        A.   Yes, I see that.
11        Q.   Now, do you happen to know whether
12    3150.16(c) is the provision requiring mail
13    ballots to be received at the county Board of
14    Elections by 8:00 p.m. on Election Day?
15        A.   Without it in front of me, I would be
16    speculating on that.  But I believe that it is.
17        Q.   Okay.  So if we -- and I will
18    represent, for the purpose of the next
19    question, that that was our intent in writing
20    this request, right.
21              The question is asking the
22    Lancaster board to admit that it has never
23    referred to the date handwritten on the mail
24    ballot envelope to establish whether the ballot
25    was received on Election Day or before.
```

1              C. Miller

2              So with that understanding, can

3    you help me understand why this statement is

4    denied?

5              MR. ZIMOLONG:  Objection.

6    BY MR. LONEY:

7         Q.   It doesn't sound like, from our prior

8    conversation -- like the Lancaster board

9    actually uses the date written to determine the

10   date received.

11             MR. ZIMOLONG:  Objection to

12        form.

13   BY MR. LONEY:

14        Q.   Is that right?

15        A.   We don't use -- can you rephrase

16   that.  I'm sorry.

17        Q.   Sure.  I'll just ask it separate from

18   the request for admission.

19             The Lancaster board doesn't

20   actually use the date written on the envelope

21   to establish when the ballot is received by the

22   board, does it?

23        A.   No.

24        Q.   I mean, it stamps the date received

25   on the envelope.

1                    C. Miller

2              It doesn't adjust the date on

3    the stamp according to the date written by the

4    voter, right?

5         A.   Correct.

6         Q.   So if we had written this statement

7    more cleanly to say that -- to say exactly

8    that, that the Lancaster board does not use the

9    date written by the voter to determine whether

10   the envelope was received by Election Day, it

11   shouldn't be a denial, right?  That should be

12   admitted?

13              MR. ZIMOLONG:  Objection to

14        form.

15              You can answer.

16              THE WITNESS:  I would be

17        speculating what the board would agree to

18        for that answer.  But for my own self, I

19        would say correct.

20   BY MR. LONEY:

21        Q.   So I asked a second ago about whether

22   anybody was referred to the police or

23   investigated for fraud.

24              Of the 232 voters whose mail

25   ballots were set aside in the 2022 general

```
 1                    C. Miller
 2   election based on this envelope dating issue,
 3   how many of those are being investigated for
 4   voter fraud?
 5        A.   None.
 6        Q.   And are you aware of any other cases
 7   involving alleged fraud in connection with this
 8   mail ballot envelope-dating issue?
 9              MR. ZIMOLONG:  Objection to
10        form.
11              What do you mean "this mail
12        ballot dating envelope issue"?
13   BY MR. LONEY:
14        Q.   Did you understand my question?
15        A.   No.
16        Q.   Okay.  So I'll ask a different
17   question.
18              Are you aware of a Lancaster
19   County voter being referred to the police in
20   connection with the 2022 primary election --
21        A.   Yes.
22        Q.   -- for alleged voter fraud?
23        A.   Yes.
24        Q.   And you were the person who reported
25   this voter to the police, right?
```

```
 1                    C. Miller
 2      A.   Correct.  To the district attorney.
 3      Q.   To the district attorney.  Okay.
 4               Now, that person was referred
 5  for voting another person's ballot, right?  It
 6  was their mother's ballot?
 7      A.   Correct.
 8      Q.   And that person was caught because
 9  their mother was deceased by Election Day,
10  right?
11      A.   Their mother was deceased when we
12  received the ballot back.
13      Q.   And did that -- those are mail ballot
14  envelopes, right -- or it was a mail ballot
15  envelope that purported to come from the
16  deceased person, right?
17      A.   Correct.
18      Q.   Did that mail ballot envelope have a
19  date on it under the signature?
20      A.   It did.
21      Q.   Was the date within the range that --
22  strike that.
23               Did it have a correct date on
24  it?
25               MR. ZIMOLONG:  Objection to
```

```
 1                    C. Miller

 2       form.

 3                    You can answer.

 4                    THE WITNESS:  It had a date on

 5       it.  There was -- there was not a Supreme

 6       Court order for the primary with the date

 7       range.

 8  BY MR. LONEY:

 9       Q.   Do you know whether it had a date

10  that was many years in the past, into the

11  1900s?

12       A.   No.  The date on it was August 26th,

13  2022.

14       Q.   August 26th or April 26th?

15       A.   Sorry.  April 26th.

16       Q.   Have you seen the police report from

17  that referral of -- well, strike that.  I'll

18  ask this first.

19                    The voter who was referred to

20  the DA's office is named Cheryl Mihaliak; is

21  that right?

22       A.   Correct.

23       Q.   And have you seen the police report

24  or the criminal complaint against Cheryl

25  Mihaliak before today?
```

Page 90

                    C. Miller
1
2    A.   Yes.
3              MR. LONEY:  I'm going to ask the
4    Court Reporter to mark as Exhibit
5    Lancaster 12 the document that we
6    previously emailed over as Tab 13.
7    -              -   -
8              (Whereupon, Exhibit 12 was
9         marked for identification.)
10   -              -   -
11             MR. LONEY:  I'll share my
12   screen.
13   BY MR. LONEY:
14       Q.   Do you have the police criminal
15   complaint up on your screen?
16       A.   I do.
17       Q.   And is this -- I'm going to scroll
18   through it.  Tell me to slow down if I need to.
19             My first question, as I scroll
20   through, is:  Is the document on your screen,
21   Exhibit Lancaster 12, the criminal complaint
22   against Cheryl Mihaliak --
23       A.   Yes.
24       Q.   -- that we were just talking about?
25       A.   Yes, it is.

```
 1                  C. Miller

 2      Q.   And on the affidavit of probable

 3  cause -- do you see where I am?

 4      A.   Yep.

 5      Q.   It appears to be written by Detective

 6  Larry Martin.

 7              Do you know who Larry Martin is?

 8      A.   I do.

 9      Q.   And did you provide a report of what

10  you knew about Ms. Mihaliak and her alleged

11  voter fraud to Detective Martin?

12      A.   I did.

13      Q.   Okay.  In the second paragraph, it

14  says the ballot for the Democrat primary was

15  received on April 28th, 2022, by your office,

16  right?

17      A.   Correct.

18      Q.   And the mother, Teresa Mihaliak, had

19  been deceased since April 14th, right?

20      A.   Correct.

21      Q.   Now, the criminal complaint here does

22  not indicate what date, if any, was written on

23  Ms. Mihaliak's mail-in vote, right?

24      A.   It was dated April -- it says it.  It

25  says it was dated April 26th, 2022.
```

Page 92

```
 1                    C. Miller
 2      Q.   Ah.   Thank you very much.
 3                 It also says that Teresa
 4  Mihaliak was removed from the voter roles on
 5  April 25th, 2022, right?
 6      A.   Correct.
 7      Q.   And that was before you received any
 8  mail-in ballot for her?
 9      A.   Yes, the day before -- or three days
10  before.
11      Q.   Got it.
12                 So Lancaster -- the Lancaster
13  board has some mechanism for removing people
14  who die before Election Day from the voter
15  rolls, right?
16      A.   Correct.
17      Q.   And you would have done that in this
18  case for Teresa Mihaliak before any mail-in
19  ballot had been submitted on her behalf, right?
20      A.   Correct.
21      Q.   So as soon as you or the system saw
22  that Teresa Mihaliak had submitted a mail-in
23  vote after she had been removed from the voters
24  rolls because she had died, you knew that this
25  was an invalid vote, right?
```

1                    C. Miller

2        A.   Yes.

3        Q.   You didn't need to look at the date

4    written on the envelope to determine that this

5    was an invalid vote?

6        A.   We did.

7        Q.   You did need to look at the envelope

8    to determine if this was an invalid vote?

9        A.   Yes, because of when -- because of

10   how the dates lined up for all of it to have

11   happened.

12                    She could have received -- she

13   did -- she would have received a ballot before

14   she died as well as the request.  However, once

15   it was returned, she had already been deceased

16   for, I believe, almost two weeks.

17       Q.   Right.  And dying two weeks before

18   the ballot comes in makes the vote invalid as a

19   matter of course, right?

20       A.   Oh, yes.  It would have been

21   invalidated it either way.

22       Q.   Right.  So regardless of the date

23   written on the envelope, that vote would not

24   have counted?

25       A.   Correct.

Page 94

```
 1                    C. Miller
 2       Q.   Because you had already caught that
 3   Teresa Mihaliak had died and removed her from
 4   the voter rolls before Election Day?
 5       A.   Yes.
 6       Q.   And I understand that the police are
 7   interested in how the dates line up because
 8   they're, presumably, going for a fraud case
 9   against Cheryl Mihaliak.
10            But just focusing on whether
11   this was a valid vote, the date written on the
12   envelope didn't matter one way or the other?
13       A.   Correct.  When we received it back,
14   as we had already removed her, that ballot
15   would have been set to the side.
16            MR. LONEY:  We can put this
17       aside for a second.  I want to get back
18       for a moment to military and overseas
19       ballots.
20            And I'd like to go back to
21       Exhibit Lancaster 3, the interrogatory
22       responses.
23            If everybody would just bear
24       with me for a second while I'm chopping
25       things out of my outline to get us out of
```

```
 1                    C. Miller

 2        here sooner.

 3   BY MR. LONEY:

 4        Q.   Okay.  So I'm sharing, again, Exhibit

 5   Lancaster 3.  And I've jumped to page 3, the

 6   response to Interrogatory Number 1.

 7                  Do you see where I am?

 8        A.   I do.

 9        Q.   Actually, I'm going to ask to go off

10   the record for a few minutes.

11   -                  -  -

12                  (Whereupon, a short recess was

13          taken.)

14                  -   -   -

15   BY MR. LONEY:

16        Q.   Ms. Miller, we were talking right

17   before the break about Cheryl Mihaliak, if I

18   pronounced that correctly.

19                  Are you aware of any other

20   Lancaster County voters being investigated for

21   voter fraud since your time working with the

22   Lancaster board?

23        A.   I am not.

24        Q.   Let me go back to sharing Exhibit

25   Lancaster 3.  We were just about to talk about
```

                          C. Miller

1    mean both mail-in ballots and absentee

2    ballots -- does the board make a determination

3    of whether that person is eligible to

4    participate in the election?

5         A.   I'm not sure I understand.

6         Q.   Sure.  So you said -- in response to

7    my question of after the person successfully

8    registers to vote, I asked you does the board

9    make any future determinations about that

10   person's eligibility to participate in

11   elections, and you said the board does roll

12   maintenance.

13                  And so my question was:  When a

14   person submits an application to vote by mail,

15   whether mail-in or absentee, does the board

16   make a determination again as to whether that

17   voter is eligible to vote?

18        A.   Yes.  The first thing we do is to

19   make sure that that person is actually a

20   registered voter first before we process any

21   mail ballot applications.

22        Q.   Okay.  And -- okay.  That answered my

23   question.  Thank you.

24                  So does the Board of Elections

25

```
 1                    C. Miller
 2   use the date that is written on the mail ballot
 3   return envelope to determine that person's
 4   eligibility to vote?
 5        A.   In a way, yes.  Because sometimes,
 6   when they come back, if it's a deceased voter,
 7   then we have to remove it.
 8        Q.   Okay.  And when is that person's
 9   eligibility to vote determined?
10                    Is it based on when they
11   submitted the ballot?  Is it based on Election
12   Day?
13                    What is the date by which you
14   determine that person's eligibility to vote in
15   a particular election?
16        A.   We pull deceased voter ballots up
17   through Election Day.
18        Q.   So if a person passes away before the
19   election, you say you pull the ballot.
20                    What does that mean?
21        A.   If we received their ballot -- their
22   voted ballot already, we would then pull that
23   from those received ballots and set aside.
24        Q.   And how do you determine whether a
25   person has passed away?
```

1                    C. Miller

2          A.    We receive Department of Health

3     records, as all counties do.  And we also use

4     local obituaries or if someone has a death

5     certificate that they have submitted to us.

6          Q.    So if a person passes away before

7     Election Day and they -- and their ballot is

8     received for a particular election, that

9     person's ballot will not be counted?

10         A.    Correct.

11         Q.    And that is regardless of whether

12    there's a date on their return envelope,

13    whether the date is incorrect?

14         A.    If there is not a date on the

15    envelope, we would have already pulled it for

16    it being no date.  But, yes, otherwise, looking

17    at the date, yes, we still would pull it at

18    that point.

19         Q.    So in response to Mr. Loney's

20    questions, you said that before the

21    Pennsylvania Supreme Court's order in November

22    of 2022 the Board of Elections was prepared to

23    count ballots regardless of whether they

24    contained a date on the envelope or whether

25    that date was correct; is that right?

1                    C. Miller

2        A.    Correct.

3        Q.    Okay.  Prior to that, has the Board

4    of Elections ever rejected a ballot solely

5    because it was contained in an envelope that

6    did not contain a date written on the envelope

7    or the date was incorrect?

8        A.    Previous to that, yes.  We did set

9    ballots aside that did not have a date, and we

10   did not count them.

11       Q.    And can you give me the time periods

12   for that?

13       A.    This fall would have been the first

14   election that we would have counted ballots

15   with no date.

16             All other elections before that,

17   we would have set those aside.  But per court

18   orders that came out -- or court cases, I

19   should say, that had determinations and updated

20   guidance by the Department of State, we were

21   following that for the fall election only.

22       Q.    Got it.  Thank you.

23             Are you aware that the Supreme

24   Court of Pennsylvania issued its opinions in

25   that Ball case last week?

                    C. Miller

1

2      A.   Yes.

3      Q.   Okay.  Are you familiar with those

4  opinions?  Did you review them?

5      A.   Very briefly.  I wouldn't say I'm

6  super familiar with them.

7      Q.   Has the board reviewed them?

8      A.   I -- I know they have been sent them.

9  I can't speak to whether they have actually

10  reviewed them themselves or not.

11      Q.   Okay.  I'm going to now ask you

12  questions about what the board is intending to

13  do in future elections with respect to dates

14  written on the envelopes containing mail-in and

15  absentee ballots.

16             How is the Board of Elections

17  going to handle mail ballots contained in

18  envelopes in which there are no written dates

19  in future elections?

20      A.   We have not spoken -- I've not spoken

21  with the Board of Elections to determine what

22  we will be doing going forward.

23      Q.   You have not spoken to the Board of

24  Elections?

25      A.   Since those orders have come out

Case 2:25-cv-00840-DBS Document 96 Page: 148 Date Filed: 06/04/2025

                    C. Miller
1
2   for -- to determine what we're doing going
3   forward, we have not met to speak about that
4   yet.
5       Q.   Okay.  Are you aware that, in the
6   notice -- the deposition notice that we sent
7   for this deposition, Topic Number 3 was "the
8   criteria that the Lancaster Board of Elections
9   will use during future elections to determine
10  whether the date written on the mail ballot
11  return envelope is correct"?
12      A.   I believe that's what that said, yes.
13      Q.   So were you aware that this
14  deposition was supposed to cover what the Board
15  of Elections was planning to do in future
16  elections?
17      A.   I do.  But those court orders also
18  just came out, and we have not had a chance to
19  meet to go over that yet.
20      Q.   When will that determination be made?
21      A.   I don't know if we have a date that
22  we have set yet.  I assume it would be sometime
23  in March, though, but I would be guessing.
24      Q.   Okay.  You answered some questions by
25  Mr. Loney about the format of the date that's

                    C. Miller

1

2    written on the mail ballot return envelope.

3                    And you said that -- that you

4    rejected -- when I say "you," I mean the Board

5    of Elections -- you rejected -- you rejected

6    on -- ballots contained in envelopes where the

7    date was written in a format that suggested

8    that the -- let's say the date predated the

9    first date of the range set by the Pennsylvania

10   Supreme Court; is that right?

11        A.   I believe.

12        Q.   And you presumed that the format was

13   month, date, then year.

14                    Did I hear that right?

15        A.   I did.  And, again, I would need to

16   see our ballot -- our ballot return envelope,

17   not Dauphin County's, because I believe that is

18   on our actual ballot return envelopes so people

19   have the right format.

20        Q.   And can you tell me why you think

21   that?

22        A.   I was -- I'm trying to remember

23   exactly what they look like, and I believe that

24   it is on there.  But, again, without seeing it

25   in front of me, I cannot confirm that.

```
 1                    C. Miller

 2      A.   It's fine.

 3      Q.   Okay.  Thanks.

 4            I'm going to move down to page 9

 5  of this document.  And it looks like -- and

 6  this is listed as Exhibit A to the responses to

 7  the request for production.

 8            I'm going to show you page 9,

 9  which looks like half of a ballot envelope.

10            Does that look right?

11      A.   Yes.

12      Q.   Okay.  And if -- you said before that

13  you recall that there might have been guidance

14  as to the format by which people should write

15  their date; is that right?

16      A.   Correct.

17      Q.   Would that have been -- so it looks

18  like, towards the bottom of this envelope, you

19  have the absentee -- it's cut off, so we can't

20  see everything that it says.  But it appears to

21  be the absentee elector's declaration.

22            Where in this would the guidance

23  as to date, month, year have been or month,

24  date, year?

25      A.   This -- these are used specifically
```

C. Miller

1

2  for military ballots, not all of our absentee

3  and regulatory mail-in ballots.  So this one

4  does not appear that it has it, but it would be

5  next to the date.

6      Q.   But before, when I asked you if there

7  was any reason why the board would have

8  different instructions as to the format of the

9  dates between absentee ballots, domestic mail

10  ballots, and military ballots, you could not

11  think of any; is that right?

12      A.   No, I couldn't think of any.

13           MR. OSHER:  Okay.  I am going to

14      stop sharing my screen.

15  BY MR. OSHER:

16      Q.   So going back to the assumption that

17  the date written on the envelope would be

18  month, date, year.

19           Why did you make that

20  assumption?

21      A.   Again, without seeing our -- for

22  domestic mail-in absentee ballots, without

23  seeing that in front of me, I believe that it

24  is on there, which is why we use that.

25      Q.   Any other reason?

1                         C. Miller

2          A.    No.

3          Q.    Will the Board of Elections make that

4     assumption in future elections?

5                    MR. ZIMOLONG:  Objection to

6               form.

7                    THE WITNESS:  I can't speak to

8               what the Board of Elections will determine

9               without meeting with them first.

10    BY MR. OSHER:

11         Q.    Does the Board of Elections provide

12    training to its workers about how to determine

13    whether the date written on a ballot is

14    correct?

15         A.    We go over it with the staff, yes.

16    But I don't know that there's direct training

17    about dates specifically.

18         Q.    Aside from your recollection that

19    there might have been guidance as to format of

20    the date that should be written on envelopes,

21    putting that aside, does the board provide

22    guidance to voters as to how they should format

23    the date written on the envelope?

24         A.    I can't recall at the moment without

25    seeing something in front of me.

1                    C. Miller

2      Q.   You're not aware of any?

3      A.   I can't recall.  I don't -- I just

4   don't remember what's exactly in our

5   instructions.

6      Q.   Okay.  I think in response to

7   Mr. Loney's questions you said that the board

8   does not provide notice to voters if their

9   ballot is rejected because of a missing or

10  incorrect date.

11                    Do I have that right?

12     A.   Correct.

13     Q.   To your knowledge, does the board

14  have any intention of providing such notice in

15  the future?

16     A.   I can't speak to what the board will

17  decide going forward.

18     Q.   Sure.  But to your knowledge, you

19  don't know of any intent to do that in the

20  future?

21     A.   I am not sure what they will do with

22  that going forward.

23     Q.   Earlier, in response to Mr. Loney's

24  questions, you said that the board uses the

25  date written on the envelope to determine

1                    C. Miller

2    whether the ballot is compliant with

3    election -- with the election code.

4                    Do I have that right?

5        A.    Correct.

6        Q.    Does the board use the written date

7    on the envelope for any other purpose?

8        A.    We do not.

9        Q.    I have a few questions about the SURE

10   system.

11                   So can you just explain what the

12   SURE system is?

13       A.    It's the voter registration system

14   for Pennsylvania.

15       Q.    Okay.  And can you describe to me the

16   process by which the Board of Elections

17   interacts with the SURE system when a mail

18   ballot is returned to them?

19       A.    So we have to -- all ballots have to

20   be scanned into the system to say that --

21   basically saying -- I was trying to think what

22   the exact wording is that it uses.

23                   But it's basically saying that

24   we received that ballot.  And then there are

25   rejection codes, should a rejection code be

1                    C. Miller

2  needed.

3        Q.    And what are those rejection codes

4  reflecting?

5        A.    I don't, off the top of my head, know

6  all of them.  But that could be no secrecy

7  envelope, no signature or date.  Things to that

8  nature.

9        Q.    Does the rejection code differentiate

10  between missing signature and missing date?

11       A.    I don't believe that it did.  I

12  believe that has been changed going forward,

13  though.

14       Q.    Do you know when that change was

15  made?

16       A.    I do not.  Again, I don't remember if

17  it actually updated that or not yet.  I just

18  know there was talk of it.

19       Q.    So am I correct that, when the mail

20  ballot is received by the Board of Elections,

21  it is time-stamped, and then that time and date

22  is entered into the SURE system?

23       A.    Yes.  They are scanned into the SURE

24  system that day so that the voter knows that we

25  have received their ballot.

1                    C. Miller

2        Q.    What happens if the board receives a

3    mail ballot from the voter and then the voter

4    appears at a voting place and tries to vote in

5    person?

6        A.    They would have to do a provisional

7    ballot.

8        Q.    And if they submit a provisional

9    ballot and nothing else happens, what happens?

10       A.    If we received their mail ballot,

11   their provisional ballot would not count.

12       Q.    And is that because the mail ballot

13   was received first?

14       A.    Correct.

15       Q.    How does the election official at the

16   polling place know that the voter has submitted

17   their mail ballot?

18       A.    It shows them in the poll book.

19       Q.    And when it comes time to tabulate

20   the votes, how does the Board of Elections

21   know -- I'm sorry.

22                When it comes time to tabulate

23   the votes, the Board of Elections will always

24   know whether a mail ballot was submitted prior

25   to any provisional ballot submitted by the

1                      C. Miller

2    voter; is that right?

3        A.   Correct.

4        Q.   What happens if a mail -- if a -- if

5    a voter requests a mail ballot, the board sends

6    it out, and the voter then appears at a polling

7    place and it does not appear that they have

8    returned their mail ballot?

9        A.   If they bring back their ballot as

10   well as their return envelope, there is a form

11   that they have to fill out.  They turn that in

12   to the judge of elections, and then they may

13   vote at the polls.

14               If they do not have those two

15   pieces, then they must vote provisionally.

16       Q.   And if they submit a provisional

17   ballot and the mail ballot comes in after that

18   and it's before the deadline, the 8:00 p.m.

19   deadline of Election Day, what happens then?

20       A.   I don't know if we've ever had a case

21   of that, so I can't speak to what would happen.

22       Q.   But in all events here, the board

23   will know when the mail ballot is returned and

24   when the provisional ballot has been cast,

25   correct?

1                     C. Miller

2       A.    Correct.

3       Q.    Aside from the incident that you

4    discussed with Mr. Loney regarding the 2022

5    primary, has the board identified any credible

6    fraud concerns relating to ballots,

7    specifically with respect to the date written

8    on their ballot, in any other instance besides

9    that one that you referred to?

10      A.    No.

11      Q.    If a mail envelope is missing a

12   written date, is that a reason to suspect voter

13   fraud?

14              MR. ZIMOLONG:  Objection to the

15         form.  Calls for speculation.

16              THE WITNESS:  No, we would not

17         assume that.

18              MR. OSHER:  All right.  Can we

19         go off the record for about five minutes.

20         Let me just make sure that I don't have

21         any other questions.

22                    -    -    -

23              (Whereupon, a short recess was

24         taken.)

25                    -    -    -

1                    C. Miller

2    BY MR. OSHER:

3        Q.   Ms. Miller, does the Lancaster board

4    coordinate at all with the boards of other

5    counties to ensure uniformity in the way that

6    they interpret the election code?

7                    MR. ZIMOLONG:  Objection to the

8        form.

9                    You can answer.

10                    THE WITNESS:  I would be

11        speculating if I said I knew if the board

12        members were reaching out directly to

13        other boards.

14    BY MR. OSHER:

15        Q.   Is there any formal system for that

16    that you're aware of?

17        A.   Not that I'm aware of.

18        Q.   Are you aware of any communication

19    between the boards of elections regarding how

20    they will deem dates to be correct or

21    incorrect?

22        A.   No.  Again, I would be speculating as

23    to what they sent to other people or talks

24    amongst themselves.

25        Q.   But you're not aware of any of that?

# Exhibit H

Supp. App. 157

Case 2:25-cv-16340-DSC Document 96 Page: 161 of 400 Date Filed 06/04/2023

```
1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

    PENNSYLVANIA STATE              )
                              4
                                    C
    ONFERENCE OF THE NAACP,         )
    et al.,                         )
5                                   )
              Plaintiffs,           )
6                                   )   Case No.
         vs.                        )   1:22-cv-340
7                                   )
    LEIGH M. CHAPMAN, in her        )
8   official capacity as            )
    Acting Secretary of the         )
9   Commonwealth, et al.,           )
    ------------------------------- )
10            Defendants.           )
                                    )
11
    BETTY EAKIN, et al.,            )
12                                  )
              Plaintiffs,           )
13                                  )   Case No.
         vs.                        )   1:22-cv-339-
14                                  )   SBP
    ADAMS COUNTY BOARD OF           )
15  ELECTIONS, et al.,              )
    ------------------------------- )
16            Defendants.           )
                                    )
17

18

19      REMOTE ZOOM VIDEOTAPED DEPOSITION  OF

20               GREG MCCLOSKEY

21          Friday, February 17, 2023

22

23  Reported by:

24  Stacey L. Daywalt

25  JOB NO. 222666
```

```
 1                    M. McCloskey

 2    here on Page 2 of what's marked as

 3    Westmoreland 2 for a second.

 4         A.    Yes.

 5         Q.    Okay.  Now plaintiffs' first request

 6    for admission reads:  "You never used or

 7    referred to the date handwritten on the outer

 8    return envelope containing a mail ballot for

 9    any purpose related to determining or

10    confirming the mail ballot voter's eligibility,

11    i.e., their age, citizenship, county and

12    duration of residence and felony status."

13              Did I read that request for

14    admission correctly?

15         A.    Yes.

16         Q.    Okay.  And then looking at the

17    answer that follows and looking at the second

18    sentence in particular, you responded that

19    Westmoreland, quote:  "Admits that in the 2021

20    and 2022 elections it did not use the

21    handwritten date on the outer return envelope

22    of an absentee or mail-in ballot to determine

23    or confirm the following qualifications of the

24    voter to cast a ballot in those elections:

25    Age, citizenship, county, duration of residence
```

1               M. McCloskey

2   or felony status."

3               Did I read your response correctly?

4        A.    Yes.

5        Q.    So when in responding to RFA 1

6   Westmoreland County singles out or points out

7   age, citizenship, county, duration of residence

8   or felony status, is that because those are the

9   criteria that determine whether someone is

10  qualified to vote in Pennsylvania?

11       A.    That is correct.  That is some of

12  the requirements.

13       Q.    Are there any other requirements to

14  be qualified to vote in Pennsylvania that you

15  can think of?

16       A.    Not off the top of my head.

17       Q.    All right.  And just to make sure

18  the record is clear, do you agree that the date

19  that is handwritten on the mail ballot envelope

20  doesn't tell you whether a person is over

21  18 years old?

22       A.    I do agree.

23       Q.    Do you agree that that handwritten

24  date doesn't tell you whether a person has been

25  a US citizen for at least a month?

1                    M. McCloskey

2        A.    I agree.

3        Q.    Do you agree that the date that a

4   voter handwrites on an envelope doesn't tell

5   you whether they've resided in the county for

6   at least 30 days?

7        A.    I agree.

8        Q.    Do you agree that the handwritten

9   date doesn't tell you whether the person is

10  incarcerated on a felony conviction?

11       A.    I agree.

12       Q.    And the county actually has other

13  methods of confirming all of those criteria

14  that are relevant to voter qualifications.

15  Right?

16       A.    Correct.

17       Q.    And that's why, in just looking at

18  the second paragraph of this answer that you

19  provided to RFA 1 and looking at the second

20  sentence, you then go on to say:  "Westmoreland

21  did not use a date to determine or confirm a

22  voter's eligibility."  Right?

23       A.    Correct.

24       Q.    So does Westmoreland County use that

25  handwritten date on the mail ballot return

1                       M. McCloskey

2    envelope for any other purpose?

3         A.    The only one I can think of would be

4    if a voter had passed away from the time that

5    they mailed their ballot back in prior to

6    election day.

7         Q.    Can you describe -- has that ever

8    happened where a voter passed away and then you

9    looked at the date on the envelope of their

10   mail ballot, or is that sort of speculating

11   that maybe you might?

12        A.    That did happen in the November '22

13   election.

14        Q.    In Westmoreland County?

15        A.    That is correct.

16        Q.    Can you describe what happened.

17        A.    Starting the pre-canvass process of

18   mailing an absentee ballot, we have about 16

19   individuals in that entire process.  The first

20   two individuals at the start of the process

21   review our roster list of who applied for and

22   who we've received the absentee and mail-in

23   ballots from.

24              And one of the two people doing that

25   process had recognized the individual's name as

```
 1                    M. McCloskey

 2   a friend that had passed away.  And that

 3   individual brought that ballot to my attention

 4   and we set that ballot aside that day.

 5        Q.    Okay.  And you set it aside because

 6   if a person sends in a mail ballot but then

 7   they die before election day, their vote isn't

 8   supposed to count.  Right?

 9        A.    I'm sorry.  The air conditioning

10   just kicked on in this room and I could not

11   here you, Ari.

12        Q.    You set that aside because if a

13   person sends in a mail ballot but then they die

14   before election day, their mail ballot is not

15   supposed to count under state law.  Right?

16        A.    Under state law it says if you have

17   the knowledge, you cannot count it.

18              That was set aside just for further

19   review.  And so I went to the office to

20   determine that it was factual by looking up the

21   obituary.

22              And so the law pretty much says if

23   you have knowledge, you do not count that vote.

24   However, if you basically didn't have knowledge

25   or had been made aware, you wouldn't basically
```

                        M. McCloskey

1   be held accountable for processing that vote.

2        Q.    All right.  So if the county becomes

3   aware that someone dies and you have a mail

4   ballot from them, you don't count the mail

5   ballot.  Right?

6        A.    We did not in that instance.

7        Q.    Well, you would never count the mail

8   ballot of a person who you know has passed away

9   before election day.  Right?

10       A.    If we verified it, correct.

11       Q.    And you have a process to look

12  through the list of folks who have applied for

13  a mail ballot to check against a list of folks

14  who have died to try to ascertain whether or

15  not there are any folks who may have passed

16  away before election day?

17       A.    The list -- the roster isn't used

18  strictly for that purpose, but it's a tool that

19  we could use, yes.

20       Q.    Okay.  So just to be clear, the rule

21  is you have to be alive on election day for

22  your vote to count.  Right?

23       A.    I'll say yes.

24             But I want to qualify back to what I

Case 2:25-cv-01840 Document 96 Page: 168 Date Filed 06/04/2025

1                    M. McCloskey

2    said.  If a person had passed away and that

3    mail ballot was not brought to our attention,

4    we would not know if a person had passed away

5    whether a vote's counted or not.  So in those

6    instances, it could still count.

7         Q.    Setting aside instances where the

8    county doesn't know and assuming the county

9    knows who has passed away and who's still

10   alive, you have to be alive on election day for

11   your vote to count.  Right?

12        A.    Correct.

13        Q.    And so if a person dies before

14   election day, they can't -- and you know about

15   it, you can't -- their mail ballot is not going

16   to be counted regardless of what date they

17   write on the envelope.  Right?

18        A.    Correct.

19        Q.    So the date on the envelope doesn't

20   matter for purposes of ensuring that folks who

21   have died don't have their ballots counted.

22   Right?

23        A.    Correct.

24        Q.    And so setting aside this question

25   of voters who may have passed away, does the

1                    M. McCloskey

2  Westmoreland County Board of Elections use that

3  handwritten date on the mail ballot return

4  envelope for any other purpose that you can

5  think of?

6       A.    Just to comply with the election

7  code and the orders.

8       Q.    And just to make sure I understand

9  that, what you're saying is Westmoreland County

10 uses the date on the envelope to determine

11 whether the voter complied with the requirement

12 to put the date on the envelope?

13      A.    That's correct.

14      Q.    Okay.  If they include the date --

15 if they don't include the date, it's a

16 noncompliant vote.  If they do provide the date

17 that's within the range, it's a compliant vote.

18            Is that basically it?

19      A.    Correct.

20      Q.    And so apart from determining

21 compliance with the date requirement itself,

22 does the Westmoreland County Board of Elections

23 use the handwritten date on the ballot return

24 envelope for any other purpose that you can

25 think of?

```
 1                    M. McCloskey

 2        A.    We do not.

 3        Q.    And while we're on the subject of

 4   voter qualifications, how does a voter obtain a

 5   mail ballot in Westmoreland County?

 6        A.    They complete an application to

 7   request mail-in or absentee ballots or they can

 8   also receive it annually through the permanent

 9   voter notice program of -- the election bureau,

10   automatically at the beginning of each year,

11   send out an application and request if they

12   want to continue to receive mail-in and

13   absentee ballots for all elections in that

14   year.

15        Q.    And when a voter applies to receive

16   a mail ballot through either one of those

17   mechanisms, the board is then required to

18   confirm their qualifications before their

19   application for a mail ballot is approved.

20   Right?

21        A.    That's correct.

22        Q.    And the board does confirm their

23   qualifications before issuing them a mail

24   ballot.  Right?

25        A.    We do.
```

```
 1                    M. McCloskey

 2      Q.    What does the board do to confirm a

 3   voter's qualifications when they apply for a

 4   mail ballot?

 5      A.    They verify the voter's name against

 6   the voter's registration record, their birth

 7   date, their Social Security and/or their

 8   driver's license information, their citizenship

 9   and how long they've been in the county.

10      Q.    And only after you've confirmed all

11   of that information, confirmed and determined

12   their qualification to vote, only after that

13   will you issue them a mail ballot package.

14   Right?

15      A.    Correct.

16      Q.    So let's go back to RFA 1.

17            But I think we're still sharing that

18   screen.  Right?  Can you still see RFA No. 1

19   here on your screen?

20      A.    Yes.

21      Q.    Okay.  And we're still on, for the

22   record, the document marked as Westmoreland 2.

23            So just looking at that second

24   paragraph here in the middle, you say, starting

25   with the word "voters":  "Voters who returned
```

1                    M. McCloskey

2    the envelope could be "through November 8th,

3    '22."

4              Do you apply that to mean that if

5    someone wrote November 8, 2022, that's included

6    within the range and you would open, canvass

7    and count that ballot?

8        A.    As long as it was received prior to

9    8 p.m. on November 8th, yes.

10       Q.    Understood.

11             So let's talk a bit about dates

12   falling -- and I can stop sharing the screen

13   now.

14             Let's talk about dates falling after

15   November 8th, 2022.

16             If you were to receive the envelope

17   by 8 p.m. on election day, you know for a fact

18   that the voter must have filled out the ballot

19   and the declaration sometime before 8 p.m. on

20   election day.  Right?

21       A.    Correct.

22       Q.    So you know for a fact that the

23   voter didn't fill out their ballot -- didn't

24   fill out the form after November 8th no matter

25   what they wrote on the return envelope.  Right?

```
 1                    M. McCloskey

 2        A.    Right.

 3        Q.    But you still would have set aside

 4   any envelope where the voter wrote some date

 5   that falls after November 8th even if you

 6   received it before 8 p.m. on November 8th.

 7   Right?

 8        A.    Correct.

 9        Q.    And that's because you were doing

10   what the Supreme Court instructed, not because

11   you were using the date that was written on

12   that return envelope to actually determine the

13   true date that a voter filled out the

14   declaration.  Right?

15        A.    Correct.

16        Q.    And so now let's talk about a

17   different scenario.

18              What about envelopes that you

19   received after 8 p.m. on election day?

20              So leaving aside whatever date was

21   written on the envelope, what did you do with

22   mail ballot packages that you received after

23   8 p.m. on election day?

24        A.    Those were put into the state SURE

25   system as received after the deadline.
```

1                    M. McCloskey

2        Q.    And you don't open those or count

3    those.  Right?

4        A.    We do not.

5        Q.    Doesn't matter what date is

6    handwritten on the return envelope.

7             If it comes in after 8 p.m. on

8    election day, doesn't count, it's not timely.

9    Right?

10       A.    Correct.

11       Q.    So a voter can't get their untimely

12   submitted ballot counted if they write a date

13   that's before November 8th.  Right?

14       A.    Could you repeat that, Ari.

15       Q.    Sure.

16             A voter can't somehow get their

17   ballot counted by writing a date that's before

18   November 8th if they submit their ballot after

19   8 p.m. on election day, can they?

20       A.    Correct, they cannot.

21       Q.    Because you don't use the

22   handwritten date on the outer return envelope

23   to determine if a ballot was timely received.

24   Right?

25       A.    Correct.

1                    M. McCloskey

2         Q.    If it's received after 8 p.m. on

3   election day, it doesn't count no matter what

4   the handwritten date on that envelope said?

5         A.    Correct, minus military ballots,

6   which come in -- have the ability to come in

7   postmarked on the 8th but we can still receive

8   them for a week after the election.

9         Q.    And understanding that we're talking

10  about mail ballots at this point.

11              So let's talk about envelopes dated

12  before September 19 or whatever cutoff was

13  used.

14              And let me be clear.

15              So sitting here today, do you know

16  whether a cutoff of September 19 was employed

17  or a cutoff of September 30th was employed when

18  you were determining which ballots were going

19  to be set aside and dated incorrect?

20        A.    September 19th was employed.

21        Q.    Okay.  So there's no way anyone in

22  Westmoreland County could have actually filled

23  out the 2022 general election mail ballot

24  package before September 19th.  Right?

25        A.    Correct, unless they saved one from

1                    M. McCloskey

2    the primary and never voted in the primary.

3        Q.    Well, that wouldn't be the 2022

4    general election mail ballot package, would it?

5        A.    You're correct.

6              I apologize for skipping that part.

7        Q.    No apology necessary.

8              And just to make it clear for the

9    record, it just wouldn't be possible for a

10   voter to fill out the 2022 general election

11   mail ballot package sometime before

12   September 19th because the board hadn't

13   distributed those yet.  Right?

14       A.    Correct.

15       Q.    So if someone wrote, say,

16   September 1st on the declaration form on their

17   return envelope, you know for a fact they

18   didn't actually sign that form on

19   September 1st.  Right?

20       A.    That they didn't sign the envelope

21   on September 1st?

22       Q.    Right, because they didn't have the

23   envelope on September 1st.

24       A.    Oh, yes, correct.

25       Q.    But you would have set the envelope

1                    M. McCloskey

2    and the ballot aside and not counted it anyway.

3    Right?

4         A.    Correct.

5         Q.    And that's because that's what the

6    Supreme Court instructed, not because you were

7    using the date written on the envelope to

8    determine when the voter truly actually filled

9    out their ballot or the declaration.  Right?

10        A.    That's correct.

11        Q.    Okay.  Now, if a voter wrote 4/11/22

12   on their return envelope, would that have been

13   set aside?

14        A.    Yes.

15        Q.    Now, do you know that some people

16   are used to writing the date with the day first

17   and then the month and then the year when they

18   write dates?

19        A.    I'm aware of that.

20        Q.    So someone might write 4/11/22 when

21   they mean November 4th, 2022 under that

22   convention.  Right?

23        A.    Yes.

24        Q.    And now turning to Westmoreland 2 --

25   and these are the RFA, the requests for

1                    M. McCloskey

2    admission, responses.  And I'm going to scroll

3    down to Page 5.

4            And this is the last RFA response.

5    And it deals with the American dating

6    convention of month, day and then year versus

7    other conventions.

8            And you say, in response to our

9    request for admission on that point:  "Although

10   Westmoreland generally follows the American

11   dating convention, there was one incident in

12   the 2022 general election where the European

13   dating convention was accepted."

14           Did I read that right?

15   A.    You did.

16   Q.    Can you describe the instance that

17   you're referring to here.

18   A.    So the ballots that were set aside

19   during the pre-canvass process and reviewed by

20   a two-member bipartisan team, that was one of

21   the last ballots that they reviewed.

22           And while looking at that, one of

23   them said, hey, that looks likes the European

24   dating model convention, and so they decided to

25   accept it.

1                    M. McCloskey

2        Q.    And was there any other process

3    after they -- after that group of two made the

4    decision, or their decision to count was the

5    decision and then the ballot was opened and

6    counted?

7        A.    That was their decision and the

8    ballot was then opened and counted.

9        Q.    And did you go back and look at the

10   other mail ballots that had been set aside

11   based on incorrect dates on the envelope to see

12   whether any of the others could have been

13   instances of using the European dating

14   convention?

15       A.    I did not.

16       Q.    Do you know if anyone did?

17       A.    I do not know if anyone did.

18       Q.    As far as you know -- would it be

19   safe to say as far as you know nobody went back

20   and did that?

21       A.    As far as I know, nobody went back

22   and did that.

23       Q.    Okay.  All right.

24             I'm going to pull up -- I'm going to

25   share my screen.  And I'm now sharing what's

1                    M. McCloskey

2    been marked as Westmoreland 6.

3              (Westmoreland Exhibit 6, Redacted

4    mail ballot envelopes, W036-W131, marked for

5    identification.)

6        Q.    And let's talk about some specific

7    examples.

8              Can you see the redacted mail ballot

9    envelope on your screen here?

10       A.    I can.

11       Q.    And did you review this set of mail

12   ballot envelopes that were produced in this

13   case redacted prior to their production?

14       A.    I have seen all of those, yes.

15       Q.    Okay.  And just for the record, the

16   envelope copies in what's been designated

17   Westmoreland 6 are Bates stamped W36 to W131.

18             And they comprise that 48 envelopes,

19   ballots, that were deemed incorrectly dated.

20   Is that right?

21       A.    Are you asking me, Ari?

22       Q.    Yeah, I'm asking you if this is all

23   48 of the incorrectly dated envelopes.

24       A.    Yes.

25       Q.    Okay.  So let's just look at the

```
 1                     M. McCloskey
 2   first page here for a second.  This is -- the
 3   Bates number here is W36.
 4             And this is the declaration form on
 5   the outer envelopes that were sent as part of
 6   the Westmoreland County mail ballot package for
 7   the 2022 general election.  Right?
 8        A.    Correct.
 9        Q.    Okay.  It's on the back of the mail
10   ballot return envelope.  Right?
11        A.    Correct.
12        Q.    And I see a date stamp here, and it
13   seems to say November 1, 2022, 11:26 a.m.
14             Does that look right to you?
15        A.    It does.
16        Q.    Okay.  And before we get into
17   anything else on here, does the county date
18   stamp mail ballot envelopes when they arrive?
19        A.    We do.  We time stamp them.
20        Q.    And the time stamps reflect the date
21   and time that a mail ballot package is received
22   by the board?
23        A.    Correct.
24        Q.    And that is what you look to to
25   determine whether a ballot is received by
```

1                    M. McCloskey

2   8 p.m. on election day and is timely?

3        A.    Correct.

4        Q.    So looking at this envelope on

5   Page W36 in Westmoreland 6, this ballot was

6   timely received, November 1, 11:30 a.m.  Right?

7        A.    Correct.

8        Q.    And there is a handwritten date on

9   the envelope.

10             And does that say 11/9/22 or

11   11/01/22?

12             I can zoom in a little.

13        A.    I believe it says 11/9/2022.

14        Q.    Okay.  Now, this can't actually have

15   been signed on 11/9/22, right, because it was

16   in the Board of Elections' custody a week

17   earlier than that?  Right?

18        A.    Correct.

19        Q.    But Westmoreland County set the vote

20   aside as incorrectly dated and didn't count

21   this voter's vote because it determined the

22   date written here falls outside the range

23   ordered by the Supreme Court.  Right?

24        A.    Correct.

25        Q.    And if the voter had written -- if

1                    M. McCloskey

2  that date did say 11/01 and not 11/9, this

3  ballot would have counted.  Right?

4        A.    Correct.

5        Q.    Because that would have been in the

6  range in the Supreme Court's November 5th

7  supplemental order?

8        A.    Correct.

9        Q.    So I'm going to scroll down.  Let me

10  know if the zooming is helpful or unhelpful.

11  I'm trying to be helpful here.

12        A.    That's very helpful.

13        Q.    We're on Page W38 now, still on

14  Westmoreland 6.

15             And again, this exhibit shows the

16  same declaration, same back of the return

17  envelope form.  Right?

18        A.    Yes.

19        Q.    And here the handwritten date -- and

20  I'll zoom in again -- seems to say 10/14/2023.

21             This doesn't indicate to you that

22  somebody actually voted the ballot from a year

23  in the future.  Right?

24        A.    Correct.

25        Q.    And if the voter had written 22

1                    M. McCloskey

2   instead of 23, it would have been in compliance

3   with the date range in the Supreme Court's

4   order.  Right?

5        A.    Correct.

6        Q.    Does this indicate to you that the

7   voter was engaged in some sort of fraud when

8   they wrote 23 instead of 22?

9        A.    Does not.

10       Q.    Seems like more of a paperwork

11  error.  Right?

12       A.    Correct.

13       Q.    And Westmoreland County would have

14  set this aside because it falls outside the

15  range in that November 5th Supreme Court

16  supplemental order.  Right?

17       A.    Correct.

18       Q.    Not because you think someone

19  actually tried to vote from the future but

20  because it's outside the range in the Supreme

21  Court's order.  Right?

22       A.    Correct.

23       Q.    Okay.  Zoom back out and scroll down

24  to W42.  Still on Westmoreland 6.

25            Now, here the handwritten date on

1                    M. McCloskey

2    the declaration form says 11/28/22.

3              Does that look right to you?

4    A.    Yes.

5    Q.    And I know it's -- I know it's

6    upside down, but bear with me.

7              It looks like the date stamp is

8    October 30th, 2022.  Right?

9    A.    Correct.

10   Q.    Okay.  Now, looking at that date

11   stamp, that doesn't indicate to you that

12   somebody actually filled out the declaration

13   weeks after election day and a month after they

14   submitted their mail ballot package to the

15   board.  Right?

16   A.    Correct.

17   Q.    If this voter had written 10 instead

18   of 11, it would be in the compliance with the

19   date range in the Supreme Court's November 5th

20   supplemental order.  Right?

21   A.    Correct.

22   Q.    And their ballot would have been

23   counted.  Right?

24   A.    Correct.

25   Q.    And frankly, it would have made a

1                     M. McCloskey
2    look right to you?
3         A.    Yes.
4         Q.    And looking over at the date stamp,
5    it's November 1, 2022?
6         A.    Yes.
7         Q.    And when you look at the handwritten
8    date here, that doesn't indicate to you that
9    somebody actually filled this out on New Year's
10   Day 2022.  Right?
11        A.    Correct.
12        Q.    That would be impossible?
13        A.    Correct.
14        Q.    If they had just written 11 instead
15   of 1, this would be in compliance with the
16   dating rule.  Right?
17        A.    Correct.
18        Q.    And make a lot more sense.  Right?
19        A.    Correct.
20        Q.    But this was set aside and not
21   counted as being outside of the range in the
22   November 5th order of the Pennsylvania Supreme
23   Court?
24        A.    Correct.
25        Q.    Okay.  And I'm just going to do one

1                     M. McCloskey

2    more.

3              Looking now at 124, here we have a

4    handwritten date.  It looks like it says

5    10/17/41.

6              Is that what it seems to say to you?

7         A.    I agree, yes.

8         Q.    Yeah.

9              Seems like that's somebody's

10   birthday.  Right?

11        A.    Correct.

12        Q.    It doesn't indicate to you that

13   somebody actually filled this mail ballot

14   package out in 1941.  Right?

15        A.    Correct.

16        Q.    Doesn't indicate to you that

17   somebody was trying to commit fraud or

18   anything, does it?

19        A.    Does not.

20        Q.    But this person's ballot was set

21   aside and not counted because it falls outside

22   the range in the Supreme Court's November 5th

23   supplemental order.  Right?

24        A.    Correct.

25        Q.    All right.  I'm going to stop

1                    M. McCloskey

2    sharing my screen.  I appreciate you bearing

3    with me to look at some of those examples.

4              Just very briefly, of the 95 voters

5    whose mail ballots were set aside in the '22

6    general election, are any of them being

7    investigated for any type of voter fraud?

8         A.    Not to my knowledge.

9         Q.    Are you aware of any cases involving

10   alleged fraud in connection with mail ballots

11   in Westmoreland County?

12        A.    I am not aware of any.

13        Q.    And a new set of questions now.

14             Absent some future decision by a

15   court or new legislation from the general

16   assembly, will Westmoreland County continue to

17   set aside and not count mail ballots where

18   voters mistakenly omit a handwritten date or

19   write a date that's deemed incorrect?

20        A.    Westmoreland County will continue

21   whatever the current legislation is.

22             But we have a new Board of

23   Elections, as I explained earlier, so we've not

24   had that discussion to even contemplate that

25   scenario.

1                         M. McCloskey

2         Q.    Can you rule out the possibility

3   that Westmoreland County will apply the same

4   rule that it did for the 2022 general election

5   in future elections?

6         A.    I personally can't rule that out.

7         Q.    A slightly separate question:  Does

8   Westmoreland County maintain a website listing

9   the total number of votes received by each

10  candidate on the ballot in the county in past

11  elections?

12        A.    If you're talking about election

13  night results, yes.

14        Q.    Okay.  And does it -- do those

15  results sort of stay up somewhere on the

16  website or do they go away after a while?

17        A.    Oh, the election -- they stay up for

18  a couple years.

19              But I just want to clarify.  You're

20  talking about election results election night,

21  not mail-in ballots received.  Correct?

22        Q.    I guess I'm talking about the totals

23  after all the canvassing and everything is said

24  and done, including all the votes total and

25  cast and counted?

1                    M. McCloskey

2        A.    Yes, those results are on the county

3   website and they're on there for -- I believe

4   you can go the whole way back to 2014 at this

5   moment, maybe even further.

6        Q.    Okay.  And in addition to the

7   website, does the county maintain some type of

8   physical record, a book, listing the totals

9   received by each candidate on the ballot in the

10  county for past elections?

11       A.    We do.

12            So we certify those each election,

13  and then they're retained for the period of

14  time in the retention -- state retention policy

15  for election documents.

16       Q.    And if a court ordered Westmoreland

17  County to change the total listed on the

18  website, the vote totals received by candidates

19  on the website, can you think of any reason why

20  the county would lack the capability to do

21  that, to follow a court's order?

22       A.    I personally can't.

23            I certainly would refer to my

24  solicitor.

25       Q.    And if a court ordered Westmoreland

M. McCloskey

1

2    objection.  It's calling for speculation at

3    this point based upon -- the question calls for

4    speculation.

5         Q.    You can answer.

6         A.    I can't tell you what the board

7    intends to do without them making that

8    decision.

9         Q.    Okay.  I'd like to look at

10   Exhibit 2.  I think I might have it here.

11             I'm sorry.  This is -- yeah.  Let me

12   see if I can pull it up.

13             Okay.  So you should be seeing the

14   responses to the requests for admission.

15        A.    I see that.

16        Q.    Okay.  And this was previously

17   marked as Exhibit 2.

18             I'd like to focus on the answer here

19   to Request 2, which says:  "You have never used

20   or referred to the date handwritten on the mail

21   ballot return envelope to establish whether you

22   received the ballot by the applicable

23   deadline."

24             Do you see that?

25        A.    Yes.

1              M. McCloskey

2      Q.    Okay.  And then it says here:

3  "Westmoreland admits only that in the 2021 and

4  2022 elections Westmoreland did not use the

5  handwritten date on an outer envelope to

6  determine if a ballot was timely received."

7              Did I read that correctly?

8      A.    Yes.

9      Q.    How did the board determine if a

10  ballot was timely received in the 2021 and 2022

11  elections?

12      A.    By the time stamp when the ballot

13  was received in the election bureau.

14      Q.    Is that how the board will determine

15  whether a ballot, a mail ballot, is timely

16  received in future elections?

17      A.    I can't tell you what the board

18  would decide.  That doesn't make sense.

19      Q.    So that would not be using the

20  handwritten date to determine if a ballot is

21  timely received.  Correct?

22      A.    I can't answer.  That's in the

23  future.

24      Q.    Has the handwritten date been used

25  to note in the poll book whether a person has

1                    M. McCloskey

2    submitted a mail ballot?

3        A.    Is the handwritten -- could you

4    repeat that, Dan.  I'm sorry.

5        Q.    Yeah.

6              Is the handwritten date on the outer

7    envelope of a mail ballot, is that used to note

8    in the poll book whether a person has submitted

9    a mail ballot?

10       A.    Oh, it is not, no.

11       Q.    Okay.  So in other words, even if

12   there's no handwritten date on the mail ballot,

13   if the person does not write a date, the poll

14   worker would still know if a voter who comes in

15   to vote in person has already submitted a mail

16   ballot.  Is that right?

17       A.    That's correct, because the judges

18   of the election receive the list of all the

19   people that have received ballots through the

20   night before election, and that's the most up

21   to date report we can give the judges.

22             So they would know that they had

23   already been sent a mail-in ballot, but they

24   would not know if they had returned the mail-in

25   ballot at that point, because we don't

# Exhibit J

Supp. App. 191

# Exhibit J20

Supp. App. 192

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**PENNSYLVANIA STATE CONFERENCE OF THE NAACP,** *et al.,*

      Plaintiffs,

    v.

**LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth,** *et al.,*

      Defendants.

**Case No. 1:22-cv-00339**

## DEFENDANT, ERIE COUNTY BOARD OF ELECTION'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant, Erie County Board of Elections, by and through their counsel, Talarico & Associates, hereby Answer the First Set of Plaintiff's Interrogatories as follows:

## DEFINITIONS

1.    The present tense includes the past and future tenses.

2.    The term "document," as used herein, means the original and all nonidentical copies of any handwritten, printed, typed, recorded, or graphic or photographic material of any kind and nature, including all drafts thereof and all mechanical or electronic sound recordings or transcripts thereof, however produced or reproduced, and including but not limited to accounting materials, accounts,

**App.356**

Supp. App. 193

(b)     41 military-overseas ballots

2.      State how many mail ballots You received in connection with the 2022 General Election that were signed and timely received but set aside and/or segregated because they lacked a handwritten date on the outer return envelope or showed a date on the outer return envelope that You deemed to be incorrect. If you allowed voters to correct or cure the envelope-date issue, specify whether your response includes ballots that were ultimately corrected or cured.

(a)     51 incorrected dated – including cured ballots

(b)     168 undated – including cured ballots

3.      Identify and describe how you determined if a date on a mail ballot outer return envelope was "incorrect."

Ballots dated prior to September 9, 2022 were determined to be incorrect

4.      State the date on which you began sending the mail ballot packages to voters?

(a)     October 6, 2022

5.      State whether you opened and/or counted mail ballots where the handwritten date on the return envelope was after September 19, 2022, but before the date on which you began sending the mail ballot package to voters.

(a)     Yes

Supp. App. 194

6.     State whether you opened and/or counted absentee ballots where the handwritten date on the return envelope was after August 30, 2022, but before the date on which you began sending the mail ballot package to voters.

(a)     Yes

7.     Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters whose timely received mail ballots You set aside and/or segregated because they were received in signed outer return envelopes that lacked a handwritten date or showed a date on the voter declaration that You deemed to be incorrect. In responding to this Interrogatory, state the specific reason why each such ballot was set aside and, if You allowed voters to correct or cure the date issue, specify whether each voter was able to correct or cure the issue.

See attached Exhibit "A"

8.     Did any mail ballots described in Interrogatory 2 have any other defects, besides a missing or incorrect handwritten date on the outer return envelope, that would cause You not to count them? If so, state how many such mail ballots had an additional defect, describe those defects, and identify the voters whose timely received mail ballots had such additional defect(s).

(a)     Yes, eight (8) undated ballots were also missing a signature

9

9. Did You determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

No, the office determined the qualifications of electors prior to sending mail-in or absentee ballots.

10. State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any individual mail ballot described in Interrogatory 2. If so, describe the nature of such fraud concerns.

No.

11. Did You provide notice to voters whose timely received mail ballots were set aside and/or segregated because the signed outer return envelope was missing a date or showed a date that You determined to be incorrect? If so, identify and describe how and when you notified voters of missing or incorrect dates on the signed outer return envelope.

(a) The Election Board approved a Notice to Cure on November 7, 2022. On the same day, the Board released a Notice to Cure to those electors whose undated or incorrectly dated ballots were set aside, by issuing a media release, by publication in the newspaper, on its website and on television. Further, office personnel actively contacted those electors whose ballots were

10

segregated and advised them of the opportunity to cure by either coming into the office or voting in person (provisionally) at the polls.

12.    Did You provide mail ballot voters described in Interrogatory 11 with an opportunity to correct or cure the identified issues with dating the outer return envelope? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any missing or incorrect date issues.

See answer to 11 above.

13.    If you provided notice and an opportunity to cure as described in Interrogatories 11 and 12, how many mail ballot voters cured their envelope date issue?

(a)    41 incorrectly dated ballots were cured.

(b)    72 undated ballots were cured.

14.    Do You contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot? If so, what is the basis for that contention?

(a)    No

15.    Did You count timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that You deemed to be incorrect? If so, state how many such military-overseas ballots You counted. If not, state how many such military-overseas ballots You set

Supp. App. 197

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### ERIE DIVISION

BETTE EAKIN, ET. AL.              :
                                  :
                 Plaintiffs,      :          Case No. 1:22-CV-340-SPB
                                  :
            v.                    :
AL SCHMIDT, ET. AL.               :
                                  :
                 Defendants.      :
                                  :

---

## RESPONSE OF DEFENDANT, LANCASTER COUNTY BOARD OF ELECTIONS, TO THE CONCISE STATEMENT OF MATERIAL FACTS OF PLAINTIFFS

1.      Prior to 2020, voters in Pennsylvania were required to cast an in-person ballot on election day unless they met specific qualifications to submit an "absentee" ballot. 25 P.S.

§ 3146.1.

> **Not disputed.**

2.      In 2019, Pennsylvania enacted Act 77, an omnibus election bill that introduced significant amendments to Pennsylvania's Election Code and created a new method of voting— "mail-in" ballots—which extended the option of voting by mail to all eligible citizens of the Commonwealth as an alternative to voting in person on election day. 25 P.S. 3150.11 *et seq.*

> **Not disputed.**

3.    Before submitting a completed mail-in or absentee ballot (collectively, "mail ballot") to their county board of elections ("county board" or "BOE"), a voter must fill out the ballot, place the completed ballot in a secrecy envelope, and then place the secrecy envelope in an outer return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a).

    Not disputed.

4.    The outer envelope of every mail ballot contains a voter declaration that Pennsylvania law instructs voters to "fill out, date and sign." 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Provision").

    Not disputed.

5.    For a mail ballot to be considered timely received and eligible to be counted, it must reach the voter's county board by 8:00 p.m. on election day. 25 P.S. §§ 3146.6(a), 3150.16(a).

    Not disputed.

6.    On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing all county boards of elections to set aside and not count any mail-in or absentee ballot "contained in undated or incorrectly dated outer envelope[]." *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam).

    Not disputed.

7.     On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that, for purposes of the 2022 general election only, the date on the outer envelope must be deemed incorrect if it (1) predated the earliest date state law permitted county boards to distribute mail ballots for that election, or (2) postdated election day. Ex. L. For purposes of future elections, the Supreme Court of Pennsylvania indicated in a subsequent opinion that the voter should enter the date they sign the declaration, but expressly left it to the discretion of each county board to decide how to evaluate whether that written date "is, in truth, the day upon which [the voter] completed the declaration." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

        Not disputed.

**II.     Defendants' enforcement of the Date Provision in the 2022 general election.**

8.     In the 2022 general election, Pennsylvania's county boards set aside any mail ballot that arrived in an outer envelope they regarded as undated or misdated. Ex. K (responses to Requests for Admission No. 5–8).

        Not disputed.

9.     In the 2022 general election, a total of 10,970 mail ballots were timely received but did not comply with the Date Provision. Ex. J (responses to Interrogatory 2).

        Not disputed.

10.     In the 2022 general election, 10,657 of the 10,970 undated or misdated mail ballots received by county boards had no other defect that would have prevented them from being counted. Ex. J (responses to Interrogatories 2 and 8).

        Not disputed.

**Supp. App. 200**

11.     In the 2022 general election, 45 of the 67 county boards provided no notice to voters that their mail ballots were set aside due to noncompliance with the Date Instruction. Ex. J (responses to Interrogatory 11).

        Not disputed.

12.     In the 2022 general election, 37 of the 67 county boards provided voters  no opportunity to cure their mail ballot if it was rejected under the Date Provision. Ex. J (responses to Interrogatory 12).

        Not disputed.

13.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot on which the voter wrote the date "11/3/2023," but would have counted the ballot had the voter written "11/3/2022." Ex. F (Kauffman Dep.) at 84:18–86:7.

        Not disputed.

14.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot because the voter wrote their birthdate on the outer envelope, even though the county board's stamp on the outer envelope indicated that it had timely received the mail ballot on October 17, 2022. *Id.* at 86:8–87:19.

        Not disputed.

15.     When evaluating the date written on a mail ballot's outer envelope for correctness, the Berks County BOE accounts for the possibility that a voter may use either a Month/Day/Year format or a Day/Month/Year format, and will accept the ballot if the date is considered correct using either format. *Id.* at 51:13–53:5.

        Not disputed.

16. In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an envelope on which the voter had written a day and month but omitted the year, even if the day and month were in the acceptable time range set by the Supreme Court of Pennsylvania's November 5, 2022 order. Ex. G (Miller Dep.) at 55:19–56:6.

   Not disputed.

17. In the 2022 general election, the Lancaster County BOE evaluated the date written on outer envelope assuming that the voter intended to use a Month/Day/Year format. *Id.* at 64:23– 65:25.

   Not disputed.

18. In the 2022 general election, the Lancaster County BOE would have rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct if read using a Day/Month/Year format. *Id.*

   Not disputed.

19. In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot with a handwritten date that read "11/25/22" even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 78:9–79:21.

   Not disputed.

**Supp. App. 202**

20.    In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an outer envelope on which the voter had written their birthdate, even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. Id. at 80:10–82:10.

   **Not disputed .**

21.    In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/14/2023," but would have counted that ballot if the last digit of that handwritten date was "2" instead of "3." *Id.* at 76:13–77:22.

   **Not disputed.**

22.    In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/23/2033," but would have counted the ballot if the last two digits of that handwritten date were "22" instead of "33." *Id.* at 84:17–85:21.

   **Not disputed.**

23.    In the 2022 general election, the Westmoreland County BOE rejected mail ballots with handwritten dates of "1/1/2022," "8/17/2022," "11/9/2022," and "11/28/2022," even though the county board's stamp on those envelopes indicated that they were each received on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 74:9–79:9, 85:24–86:24.

   **Not disputed.**

24.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot with a handwritten date reading "10/9/2021" despite admitting that it would be impossible for someone to have filled the mail ballot on October 9, 2021, and despite the fact that the county board's stamp on the envelope indicated that it was timely received on October 13, 2022. *Id.* at 82:10–83:16.

> **Not disputed.**

25.     In the 2022 general election, the Westmoreland County BOE rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct when read as using a Day/Month/Year format. *Id.* at 81:3– 82:7, 83:20–84:14.

> **Not disputed.**

26.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot contained in an outer envelope where the voter had written their birthdate. *Id.* at 87:3–24.

> **Not disputed.**

27.     In the 2022 general election, at least 17 counties rejected mail ballots contained in outer envelopes on which the voter wrote a date that was incorrect if read using a Month/Day/Year format (even if the date was correct if read using a Day/Month/Year format), while approximately 32 counties may have counted mail ballots in outer envelopes on which the written date was correct using a Month/Day/Year format *or* Day/Month/Year format. Ex. K (responses to Request for Admission No. 8).

> **Not disputed.**

28.     Absent a change in the law or judicial intervention, all of Pennsylvania's county boards will not count mail ballots contained in envelopes that do not comply with the Date Provision. Ex. F (Kauffman Dep.) at 99:7–101:12; Ex. G (Miller Dep.) at 104:11–105:23, 111:16– 112:9; Ex. H (McCloskey Dep.) at 88:13–89:6; Ex. K (responses to Request for Admission No. 5).

     **Not disputed.**

### III.   The county boards do not (and cannot) use the written date on a mail ballot's outer envelope to determine a person's qualifications to vote.

29.     To be eligible to vote in Pennsylvania, a person must (1) be at least 18 years old, (2) have been a citizen for at least one month, (3) have lived in Pennsylvania and that election district for at least 30 days, and (4) not be imprisoned for a felony. 25 Pa. C.S. § 1301(a); 25 P.S.§ 2811.

     **Not disputed .**

30.     The only information that county boards use to determine a person's qualifications to vote is their age, citizenship status, length of residency in Pennsylvania and a given election district, and imprisonment status. Ex. E (Marks Dep.) at 102:5–9; Ex. F (Kauffman Dep.) at 33:20– 34:8; Ex. G (Miller Dep.) at 36:17– 38:3; Ex. H (McCloskey Dep.) at 31:17–32:16.

     **Not disputed.**

31.     No county board uses the date written on a mail ballot's outer envelope to determine that person's qualifications to vote. Ex. K (responses to Request for Admission No. 1); Ex. E (Marks Dep.) at 98:9–102:15.

     **Not disputed .**

32.     The date written on a mail ballot's outer envelope does not provide information relevant to the determination of a person's age, citizenship status, length of residency in Pennsylvania and their election district, or imprisonment status. Ex. J (responses to Interrogatory 14); Ex. E (Marks Dep.) 68:4–9; Ex. F (Kauffman Dep.) at 32:17–34:8; Ex. G (Miller Dep.) at 36:17–25, 37:1–6, 37:7–11, 37:12–15, 37:16–38:3; Ex. H (McCloskey Dep.) at 31:17–22, 32:23– 33:2, 33:3–7, 33:8–11, 32:12–16.

        **Not disputed.**

## IV.    The Date Provision's disparate impact.

33.     Plaintiffs' expert, Dr. Daniel Hopkins, performed linear regression analyses to identify whether the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election. Ex. I ¶¶ 21–22.

        **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

34.     Dr. Hopkins concluded that the Date Provision caused county boards of elections to reject mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement at a disproportionately higher rate compared to other voters. *Id.* ¶¶ 10, 23.

        **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

35.     Dr. Hopkins found that voters in counties with a higher proportion of Black and Hispanic residents were more likely to submit mail ballots that failed to comply with the Date Instruction than counties with a lower proportion of voters from those demographic groups. *Id.* ¶¶ 30–34.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

36.     When considering the share of a county's population that identifies as Hispanic, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1383, meaning that a county with exclusively Hispanic residents would be expected to reject mail ballots under the Date Provision at a rate 13.8 percentage points higher than a county with no Hispanic residents. *Id.* ¶ 32; *id.* at Ex 1.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

37.     When considering the share of a county's population that identifies as Black, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1351, meaning that a county with exclusively Black residents would be expected to reject mail ballots under the Date Provision at a rate 13.5 percentage points higher than a county with no Black residents. *Id.* ¶ 33; *id.* at Ex. 1.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

38.     In a separate analysis, Dr. Hopkins used a representative sample of counties to analyze the demographic characteristics of the actual voters whose mail ballots were rejected in the November 2022 election. *Id.* ¶¶ 36–41.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate**

39.     In performing this individual-level analysis, Dr. Hopkins appended to each voter information about the block group in which they lived. Block groups are the smallest unit at which Census data is typically available publicly. *Id.* ¶ 36.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate**

40.     The results of this individual-level analysis demonstrated "strong, statistically significant, and substantively meaningful relationships indicating that Hispanic, Black, and older voters are more likely to submit ballots that are rejected under the Date Provision." *Id.* ¶¶ 42–44.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate**

41.     The results of Dr. Hopkins's individual-level analysis indicated that in the 2022 general election, a voter living in an all-Hispanic block group would have been twice as likely to have their ballot rejected under the Date Provision compared to a voter living in a block group containing no Hispanic residents. *Id.* ¶ 43.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate**

42.    The results of Dr. Hopkins's individual-level analysis indicated that age was positively correlated with rejection, meaning that the older a voter was, the more likely they were to submit an undated or misdated ballot. *Id.* ¶ 45; *id.* at Ex. 2.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

43.    The sample counties' pattern of rejecting Hispanic, Black, and older voters' ballots at disproportionately higher rates remained the same even "when looking only at *undated* ballots" and also "when looking only at *misdated* ballots." *Id.* ¶¶ 49–57; *id.* at Exs. 3–4.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

44.    There was also a significant relationship between mail ballot rejection pursuant to the Date Provision and educational achievement, indicating that voters lacking Bachelor's degrees were more likely to have their ballots rejected than those who have obtained Bachelor's degrees.

*Id.* ¶ 47.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

45.    There was also a significant negative relationship between a voter's successful use of mail voting in 2020 and the likelihood that their ballot would be rejected under the Date Provision, indicating that voters less familiar with the mail-voting process were more likely to make mistakes causing their mail ballot to be rejected than those with more experience. *Id.* ¶ 46.

**It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

46. "Cost of voting" is a framework that political scientists have employed for decades to describe how procedural and administrative frictions in the voting process that increase the "cost" of voting lead to fewer citizens successfully navigating the voting process. *Id.* ¶ 12.

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

47. Even among those who cast a ballot in an election, procedural and administrative frictions that raise that cost of voting may prevent their ballot from being counted. *Id.* ¶ 13.

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

48. Voters with fewer resources—including those with lower educational levels; less access to housing, transportation, childcare; less flexible jobs; less English-language fluency or experience reading technical language—are less able to overcome additional procedural frictions in the voting process. *Id.*

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

49. Black, Hispanic, and older voters in Pennsylvania have, on average, lower levels of socioeconomic resources, including "educational attainment, income, economic security, English language proficiency and literacy, and health," and they are less likely, on average, to overcome procedural and administrative frictions in the voting process. *Id.* ¶ 16.

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

50.     When a voter's mail ballot is rejected because of noncompliance with the Date Provision, they must take additional actions to ensure that their ballot is ultimately counted. *Id. ¶ 19.*

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

51.     The additional actions voters must take to ensure their rejected mail ballot is counted increase the cost of voting. *Id. ¶ 19.*

> **It is not disputed that Dr. Hopkins reached this conclusion. It is disputed the conclusion is accurate.**

## V.     The interests purportedly served by the Date Provision

### A.     Ensuring timely receipt of mail ballots

52.     The Statewide Uniform Registry of Electors ("SURE") system is the voter registration system in Pennsylvania used by all 67 county BOEs. Ex. G (Miller Dep.) at 114:11– 14.

> **Not disputed.**

53.     SURE allows counties to verify a voter's identification during the mail ballot application process, maintain their official voter rolls, and record returned mail ballots. Ex. E (Marks Dep.) at 44:6–10, 45:8–15, 68:19–69:6.

> **Not disputed.**

54.     The county boards are statutorily required to record the date and time that they receive a mail ballot. *Id.* at 70:5–19; 25 P.S. § 1222(c)(19)–(20).

> **Not disputed.**

55. Each county board has a mechanism in place to identify which ballots were timely received, and that mechanism does not rely on the date written by voters on the mail-ballot's outer envelope. Ex. G (Miller Dep.) at 65:5–23.

       **Not disputed.**

56. The outer envelope for every mail ballot sent to a voter in Pennsylvania has a unique barcode. *Id.* at 69:7–19.

       **Not disputed.**

57. The Pennsylvania Department of State has instructed county boards to scan mail ballots into SURE as quickly as possible after they are received. Ex. E (Marks Dep.) at 82:20– 83:17; Ex. E6.

       **Not disputed.**

58. As instructed by the Pennsylvania Department of State, Ex. E6, many counties scan the barcode on the outer envelope of a completed mail ballot upon receipt, which creates a record .in the SURE system of the date and time that the county board received the mail ballot, Ex. E (Marks. Dep.) at 68:19–70:24, 116:12–119:8; Ex. F (Kauffman Dep.) at 55:25–56:22; Ex. G (Miller Dep.) at 114:11–24, 115:19–25; Ex. H (McCloskey Dep.) at 66:18–67:10.

       **Not disputed.**

59. As instructed by the Pennsylvania Department of State, Ex. E6, many counties also physically stamp the outer envelope with the date and time upon receiving a completed mail ballot. Ex. F (Kauffman Dep.) at 37:2–6, 77:8–24, 79:22–80:8; Ex. G (Miller Dep.) at 61:19–25, 69:11–23, 72:2–6, 85:19–86:5, 115:19–25; Ex. H (McCloskey Dep.) at 74:16–75:3, 110:9–13; Ex. K14 ("All incoming ballots are date stamped."); Ex. K45  ("The envelopes are stamped with the date received.").

**Supp. App. 212**

Not disputed.

60. The date on which the voter fills out the ballot or signs the declaration on the outer envelope has no bearing on whether it was timely received by the county. Ex. E (Marks Dep.) at 128:5–12.

Not disputed.

61. The Berks County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. F (Kauffman Dep.) at 76:25– 77:24.

Not disputed.

62. The Lancaster County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. G (Miller Dep.) at 85:17– 86:5.

Not disputed.

63. The Westmoreland County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. H (McCloskey Dep.) at 74:16–75:3.

Not disputed.

64. County boards can determine whether a mail ballot was timely received without ever looking at the date written on a mail ballot envelope. Ex. K (responses to Request for Admission No. 2).

Not disputed.

**B. Fraud prevention**

65. The fact that the outer envelope of a mail ballot has no written date is not a reason to suspect fraud. Ex. G (Miller Dep.) at 118:11–17.

Not disputed.

66.     The fact that a voter wrote the wrong year on the outer envelope of a mail ballot is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 84:17–85:11; Ex. G (Miller Dep.) at 70:13– 71:6; Ex. H (McCloskey Dep.) at 76:19–77:12.

        **Not disputed.**

67.     The fact that a voter wrote a date on the outer envelope of a mail ballot that precedes the first date they could have received the ballot is not a reason to suspect fraud. Ex. G (Miller Dep.) at 70:13–18, 82:11–15; Ex. H (McCloskey Dep.) at 87:3–19.

        **Not disputed.**

68.     The fact that a voter wrote a date on the outer envelope of a mail ballot that falls after the date of the election is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 78:15– 79:15, 84:18–85:11; Ex. H (McCloskey Dep.) at 76:19– 77:9.

        **Not disputed**.

69.     The date written on a mail-ballot's outer envelope provides no help to a county board in preventing that voter from also casting an in-person ballot on election day. Ex. G (Miller Dep.) at 116:2–118:2.

        **Not disputed.**

70.     If a voter submits a mail ballot and then later casts an in-person provisional ballot on election day, the mail ballot will be counted and the in-person ballot will not be counted. *Id.* at 116:2–14.

        **Not disputed.**

71.    If a voter submits a mail ballot and casts an in-person provisional ballot on election day, the date written on the mail-ballot's outer envelope provides no help to a county board in determining which ballot to count. *Id.* at 116:22–117:3.

    **Not disputed.**

72.    No county identified, raised, or was made aware of any credible concern regarding fraud with respect to the way that voters wrote (or failed to write) the date on the outer envelope of their mail ballots in the November 2022 election. Ex. J (responses to Interrogatory No. 10); Ex. G (Miller Dep.) at 82:11–24; Ex. H (McCloskey Dep.) at 88:4–12.

    **Not disputed.**

73.    While a voter was referred to the district attorney in Lancaster County for allegedly voting on behalf of her deceased mother, the mother's ballot would never have been counted in that election because the county had already removed her from the voter rolls after receiving information indicating she had passed away. Ex. G (Miller Dep.) at 87:18–94:15.

    **Not disputed.**

74.    County boards are provided notification of a voter's death by the Department of Health. Ex. F (Kauffman Dep.) at 35:23–36:3; Ex. G (Miller Dep.) at 101:24–102:5; 25 P.S. § 1505(a).

    **Not disputed.**

75.    County boards do not use the date written on the outer envelope of a mail ballot to determine whether the voter passed away before election day or whether to count a ballot from such a person. Ex. F (Kauffman Dep.) at 36:20–37:25; Ex. H (McCloskey Dep.) at 36:12–23.

Not disputed.

### C. The Date Provision does not further any other state interest.

76.     The date written on the outer envelope of a mail ballot provides no information regarding the date on which the voter filled out that ballot or the truthfulness of the voter's affirmation. Ex. E (Marks Dep.) at 127:3–18, 135:6–21, 156:11–22, 204:6–19; Ex. G (Miller Dep.) at 61:11–16, 79:3–21; Ex. H (McCloskey Dep.) at 66:9–15, 70:5–10.

Not disputed.

77.     The Berks County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. F (Kauffman Dep.) at 39:22–40:2.

Not disputed.

78.     The Lancaster County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. G (Miller Dep.) at 113:23–114:8.

Not disputed.

79.     The Westmoreland County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. H (McCloskey Dep.) at 37:8–38:2.

Not disputed.

## VI.   Plaintiffs

### A. Bette Eakin

80.     Plaintiff Bette Eakin is a veteran and registered Democrat in Erie County. Ex. A (Eakin Decl.) ¶¶ 1–3.

Not disputed.

81.     In the 2022 general election, Ms. Eakin submitted a mail ballot to the Erie County Board of Elections before election day because of her medical condition, which required her to travel to Ohio to receive medical care through election day. *Id.* ¶ 4.

Not disputed.

82.     At the time she submitted her mail ballot, Ms. Eakin was undergoing care for a condition that has made her legally blind, forcing her to travel to a county board of elections office where she could obtain assistance in completing her ballot. An election worker helped Ms. Eakin request and obtain her mail ballot, complete the mail ballot, place the mail ballot in the secrecy and outer envelopes, and complete the declaration on the outer envelope. *Id.* ¶ 5.

Not disputed.

83.     Days later, when Ms. Eakin was receiving her medical treatment in Ohio, she received an email stating that her mail ballot had been rejected because there was a defect on her balloting materials, which she later learned was due to a missing date on the outer envelope. *Id.* ¶ 6. She was told that she would have to fix this error if she wanted her ballot to be counted. *Id.*

Not disputed.

84.     Voting is incredibly important to Ms. Eakin, and the news that her mail ballot had been rejected caused her to suffer significant emotional distress. *Id.* ¶ 7. Ms. Eakin suffers from post-traumatic stress disorder and a nervous disorder, and when she received the notification of her ballot's rejection, her anxiety skyrocketed. *Id.*

Not disputed.

85.     Ms. Eakin spent the rest of the day making phone calls to rectify the situation, and even missed scheduled medical care appointments to figure out how to ensure her ballot would be counted. *Id.*

> Not disputed.

86.     Because Ms. Eakin was receiving medical treatment out of state, her husband had to immediately leave his hunting trip and drive two hours back to Erie so that he could help make sure Ms. Eakin's ballot was counted. *Id.* ¶ 8.

> Not disputed.

87.     Ms. Eakin's husband had to first stop at her son's residence and have her son assist him in printing a form that would authorize him to act as her designated agent. *Id.* ¶ 9.

> Not disputed.

88.     Ms. Eakin's husband then retrieved her ballot from where she submitted it, traveled to their local polling place, explained the situation, and submitted all materials at the last possible moment before the polling place closed. *Id.*

> Not disputed.

89.     Ms. Eakin is very concerned that the Date Provision will force her to go through a similar saga in future elections. *Id.* ¶ 10.

> Not disputed.

90.     Because of her disability, Ms. Eakin must rely on the assistance of others to complete a mail ballot like she did in 2022. But given her condition and anxiety disorders, going to her polling place on election day is extremely difficult and presents a serious risk to her health. *Id.*

> Not disputed.

## B. DSCC

91.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Ex. B (DSCC Decl.) ¶ 2.

> **Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

92.     DSCC's mission is to support the election of candidates of the Democratic Party across the country, including in Pennsylvania, to the U.S. Senate. *Id.* ¶ 3.

> **Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

93.     DSCC works to accomplish its mission by, among other things, mobilizing and persuading voters through grassroots mobilization of volunteers and field organizers to conduct get-out-the-vote activities such as door knocking, text messaging, and phone calling. *Id.* ¶ 4.

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.

94.        DSCC also runs paid television, digital, and radio advertisements, as well as mailings, in support of Democratic candidates throughout the country, including in Pennsylvania.

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.

*Id.*

95.        While most of DSCC's voter programs are focused on persuading eligible citizens to vote, DSCC also runs programs specifically geared toward explaining the voting process and how an eligible voter can successfully cast their ballot and have it counted. *Id.*

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did

not identify Ruselowski on its initial disclosures or any supplemental disclosure.

96.     DSCC also separately allocates substantial personnel time and money for "curing" activities in multiple states where it anticipates close senatorial races. *Id.* ¶ 5.

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.

97.     DSCC's curing activities involve tracking data from counties, contacting voters whose ballots have been rejected, and helping them perform whatever task is necessary to ensure their ballot is ultimately counted, which varies by county. *Id.*

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.

98.     Since DSCC invests in persuading and mobilizing voters across the country, investing additional funds or personnel in one state will necessarily divert those resources from other states and key races. *Id.* ¶ 4.

        **Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

99.     The Date Provision frustrates DSCC's mission because it erects an obstacle to ensuring all mail ballots cast by Pennsylvanians who support Democratic Senate candidates are actually counted and impairs those Democratic candidates' electoral prospects. *Id.* ¶ 6.

        **Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

100. In the 2022 general election, the Date Provision forced DSCC to divert substantial personnel time and money away from its advocacy and persuasion activities discussed above and instead towards explaining the Date Provision to voters and warning them of the consequences of failing to comply with the Date Provision. *Id.* ¶ 7.

**Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

101. The Date Provision also forced DSCC to divert resources in 2022 away from helping voters in other states cure their rejected ballots and instead towards identifying voters in Pennsylvania whose ballots had been rejected because of the Date Provision and helping them take the steps necessary to ensure their ballots would be counted. Id.

**Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

Supp. App. 223

102.    Absent the requested injunction, the Date Provision will continue to force DSCC to divert personnel time and money away from its advocacy and persuasion activities in Pennsylvania *and* in other states and instead towards educating voters in Pennsylvania about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot and towards researching how each county will go about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 8.

**Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

103.    The Date Provision will also continue to force DSCC in future elections to divert resources away from efforts to assist voters in other states in resolving issues with their rejected ballots and towards helping voters in Pennsylvania ensure their undated or misdated mail ballots are ultimately counted. *Id.* ¶ 9.

**Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.**

104.    Democratic voters provide financial support in the form of political contributions to DSCC and candidates supported by DSCC on a regular basis, and also help select DSCC's leadership and ultimately determine DSCC's strategic and political direction by electing candidates to the United States Senate. *Id.* ¶ 10.

Disputed. DSCC supports this averment with a declaration of Erik Ruselowski. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Ruselowski on its initial disclosures or any supplemental disclosure.

105.    In the 2022 general election, over 2.7 million Pennsylvanians cast a vote for the Democratic senatorial candidate. *Id.* ¶ 11.

Undisputed.

C.    DCCC

106.    Plaintiff DCCC is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Ex. C (DCCC Decl.) ¶ 2.

Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.

107.    DCCC's mission is to support the election of candidates of the Democratic Party from across the country, including those running in Pennsylvania's congressional districts, to the U.S. House of Representatives. *Id.* ¶ 3.

**Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.**

108.    DCCC works to accomplish its mission by, among other things, running paid advertisements in support of Democratic candidates; engaging in grassroots mobilization of volunteers and field organizers to perform persuasion efforts such as door knocking, text messaging, and phone banking, all towards the goal of convincing voters to support Democratic candidates; running paid canvasses for its members' campaigns to boost voter turnout; and encouraging voters to exercise their right to vote, through paid television, social media, and radio advertisements, phone calls, and mailings for voter education, as well as paying for professionals to assist in the aforementioned get-out-the-vote efforts. *Id.* ¶ 4. DCCC also supports efforts of state parties throughout the country, including in Pennsylvania, to conduct these activities by providing money, staff and volunteer time, and ongoing coordination. *Id.*

**Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was**

substantially justified or is harmless." DSCC did not identify Barber on its initial

disclosures or any supplemental disclosur

109.    DCCC also allocates and devotes staff, volunteers, and funds to assist

voters in curing absentee or mail ballots in states where it anticipates there will be

close congressional races. *Id.* ¶ 5. Helping voters cure their ballots involves

contacting voters whose ballots have been rejected and helping them perform

whatever task is necessary to ensure that their ballot is ultimately counted. *Id.*

These activities require DCCC to devote substantial personnel time and money to

track data from counties, contact voters, and assist them in completing the curing

process established in each county. *Id.*

**Disputed. DCCC supports this averment with a declaration of Devan**

**Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or**

**identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that**

**information or witness to supply evidence on a motion . . . .unless the failure was**

**substantially justified or is harmless." DSCC did not identify Barber on its initial**

**disclosures or any supplemental disclosure.**

110.    The Date Provision frustrates DCCC's mission because it erects an

obstacle to ensuring all ballots cast by Pennsylvanians who support Democratic

congressional candidates are actually counted, which harms those Democratic

candidates' electoral prospects. *Id.* ¶ 6.

**Disputed. DCCC supports this averment with a declaration of Devan**

**Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information**

or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.

111. As a result of the Date Provision, DCCC will be forced to divert personnel time and money away from its persuasion and mobilization activities and instead towards educating voters about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot, as well as spending personnel time researching how each county will go about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 7.

Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.

112. The Date Provision will also force DCCC to divert the resources it has allocated for ballot curing activities in other states towards races in Pennsylvania, which impairs DCCC's ability to help voters and support Democratic candidates in other states. *Id.* ¶ 8.

Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed

to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.

113. DCCC also represents the interests of Democratic voters in Pennsylvania and considers those individuals to be DCCC's constituents. *Id.* ¶ 9. Democratic voters provide financial support in the form of political contributions to DCCC and candidates supported by DCCC on a regular basis, and also help select DCCC's leadership and ultimately determine DCCC's strategic and political direction by electing candidates to the United States House of Representatives. *Id.* DCCC asserts its claims on behalf of itself and its constituents in Pennsylvania. *Id.*

Disputed. DCCC supports this averment with a declaration of Devan Barber. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." DSCC did not identify Barber on its initial disclosures or any supplemental disclosure.

114. In the 2022 general election, more than 2.4 million Pennsylvanians cast a vote for the Democratic congressional candidate in their district. *Id.* ¶ 10.

Not disputed .

115.    Plaintiff AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,000 members in 55 local affiliates across Pennsylvania. Ex. D (AFT Decl.) ¶¶ 2–3. ¶ 3. These members attend meetings of, and pay dues to, their local AFT affiliates (who in turn contribute funds to the Federation as a whole), as well as elect delegates to a biannual statewide convention, which elects the Federation's leadership. *Id.* ¶ 4.

**Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.**

116.    The Federation's members include public school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. *Id.*

**Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.**

117.    The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for teachers and school staff, as well as excellence in public service through cooperative problem‐ solving and workplace innovations. *Id.* ¶ 5.

> **Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.**

118.    In furtherance of its mission, the Federation and its individual members devote significant resources towards advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are able to access the franchise to support these policies at the ballot box. These resources take the form of direct contributions to candidates, running phone banks and canvassing, and sharing information with members about getting out the vote. *Id.* ¶¶ 6–7.

> **Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.**

119.    Because Federation members typically have to work on election day, many turn to mail ballots to exercise their right to vote. *Id.* ¶ 8.

Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.

120.    Any provision or policy requiring the rejection of valid mail ballots with missing or incorrect dates ("the Date Provision") threatens to disenfranchise members of the Federation who are unquestionably eligible to vote. *Id.*

Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.

121.    At least one Federation member had his mail ballot rejected in 2022 because of the Date Provision. *Id.* ¶ 9.

Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.

122.    For the 2022 general election, the Date Provision forced the Federation to spend resources on digital communications such as email newsletters and online publications to educate its members about the need to correctly date the outer envelope of mail ballots, and also to spend staff and member time reaching out to help its members and other Pennsylvania voters cure their ballots after they were rejected because of the Date Provision. *Id.* ¶ 10.

**Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.**

123.    The rejection of undated or misdated ballots frustrates the Federation's mission of electing candidates who support the policies for which the Federation advocates, and will force the Federation to divert staff and member time in future elections from its advocacy efforts toward educating its members and other voters specifically about the need to date their mail ballots and what to do if their ballot is rejected pursuant to the Date Provision. *Id.* ¶ 11. The Federation will also have to divert staff and member time helping voters whose mail ballots are rejected under the Date Provision ensure that their votes are ultimately counted. *Id.* And because the Federation has limited resources, the staff and member time spent on activities meant to mitigate the Date Provision's harms will necessarily divert resources away from the Federation's other core activities, including canvassing and get-out-the-vote efforts such as phone banking, door knocking, and rallying at community events like roundtables and book giveaways. *Id.*

Disputed. AFT supports this averment with a declaration of Arthur Steinberg. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . .unless the failure was substantially justified or is harmless." AFT did not identify Steinberg on its initial disclosures or any supplemental disclosure.

Respectfully submitted,

Date: May 5, 2023

*/s/ Walter S. Zimolong*
WALTER S. ZIMOLONG III, ESQ.
wally@zimolonglaw.com
JAMES J. FITZPATRICK III, ESQ.
james@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
*Attorneys for Defendant*
*Lancaster County Board of*
*Elections*

Supp. App. 234

## CERTIFICATE OF SERVICE

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Western District of Pennsylvania. I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Respectfully submitted,

Date: May 5, 2023

*/s/ Walter S. Zimolong III*
Walter S. Zimolong III, Esq.
wally@zimolonglaw.com
James J. Fitzpatrick III, Esq.
james@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
*Attorneys for Defendant*
*Lancaster County Board of*
*Elections*

**Supp. App. 235**

## COUNTERSTATEMENT OF MATERIAL FACTS

1.    LCBOE incorporates by reference its concise statement of material facts in support of its motion for summary judgment, ECF No. 284.


                                        Respectfully submitted,

Date: May 5, 2023                       */s/ Walter S. Zimolong*
                                        WALTER S. ZIMOLONG III, ESQ.
                                        wally@zimolonglaw.com
                                        JAMES J. FITZPATRICK III, ESQ.
                                        james@zimolonglaw.com
                                        P.O. Box 552
                                        Villanova, PA 19085
                                        (215) 665-0842
                                        *Attorneys for Defendant*
                                        *Lancaster County Board of*
                                        *Elections*

Supp. App. 236

## CERTIFICATE OF SERVICE

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Western District of Pennsylvania. I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Respectfully submitted,

Date: May 5, 2023

*/s/ Walter S. Zimolong III*
Walter S. Zimolong III, Esq.
wally@zimolonglaw.com
James J. Fitzpatrick III, Esq.
james@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
*Attorneys for Defendant*
*Lancaster County Board of*
*Elections*

**Supp. App. 237**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA
### ERIE DIVISION

BETTE EAKIN, *et al*.,

        Plaintiffs,

   v.

ADAMS COUNTY BOARD OF
ELECTIONS, *et al*,

        Defendants.

Case No. 1:22-cv-00340-SPB

## INTERVENOR-DEFENDANTS' RESPONSE TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Intervenor-Defendants the Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania respectfully file these Responses to Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment and state as follows:

## I. Mail Voting in Pennsylvania

1. Prior to 2020, voters in Pennsylvania were required to cast an in-person ballot on election day unless they met specific qualifications to submit an "absentee" ballot. 25 P.S. § 3146.1.

    **Intervenor-Defendants' Response: Admitted.**

2. In 2019, Pennsylvania enacted Act 77, an omnibus election bill that introduced significant amendments to Pennsylvania's Election Code and created a new method of voting— "mail-in" ballots—which extended the option of voting by mail to all eligible citizens of the Commonwealth as an alternative to voting in person on election day. 25 P.S. 3150.11 *et seq.*

    **Intervenor-Defendants' Response: Admitted.**

1

**Supp. App. 238**

3.      Before submitting a completed mail-in or absentee ballot (collectively, "mail ballot") to their county board of elections ("county board" or "BOE"), a voter must fill out the ballot, place the completed ballot in a secrecy envelope, and then place the secrecy envelope in an outer return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a).

**Intervenor-Defendants' Response: Admitted.**

4.      The outer envelope of every mail ballot contains a voter declaration that Pennsylvania law instructs voters to "fill out, date and sign." 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Provision").

**Intervenor-Defendants' Response: Admitted.**

5.      For a mail ballot to be considered timely received and eligible to be counted, it must reach the voter's county board by 8:00 p.m. on election day. 25 P.S. §§ 3146.6(a), 3150.16(a).

**Intervenor-Defendants' Response: Admitted.**

6.      On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing all county boards of elections to set aside and not count any mail-in or absentee ballot "contained in undated or incorrectly dated outer envelope[]." *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam).

**Intervenor-Defendants' Response: Admitted.**

7.      On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that, for purposes of the 2022 general election only, the date on the outer envelope must be deemed incorrect if it (1) predated the earliest date state law permitted county boards to distribute mail ballots for that election, or (2) postdated election day. Ex. L. For purposes of future elections, the Supreme Court of Pennsylvania indicated in a subsequent opinion that the voter should enter the date they sign the declaration, but expressly left it to the discretion of each county

Supp. App. 239

board to decide how to evaluate whether that written date "is, in truth, the day upon which [the voter] completed the declaration." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

> **Intervenor-Defendants' Response: Admitted.**

## II. Defendants' enforcement of the Date Provision in the 2022 general election.

8. In the 2022 general election, Pennsylvania's county boards set aside any mail ballot that arrived in an outer envelope they regarded as undated or misdated. Ex. K (responses to Requests for Admission No. 5–8).

> **Intervenor-Defendants' Response: Admitted.**

9. In the 2022 general election, a total of 10,970 mail ballots were timely received but did not comply with the Date Provision. Ex. J (responses to Interrogatory 2).

> **Intervenor-Defendants' Response: Admitted that this number is approximately correct.**

10. In the 2022 general election, 10,657 of the 10,970 undated or misdated mail ballots received by county boards had no other defect that would have prevented them from being counted. Ex. J (responses to Interrogatories 2 and 8).

> **Intervenor-Defendants' Response: Admitted that Plaintiffs' number is approximately accurate. However, because some counties did not track whether the undated or misdated mail ballots had other defects, it is impossible to arrive at an exactly accurate number from the discovery responses in this case. *E.g.*, *compare* Ex. 1 at App.287 *with* Ex. 2 at App.274.**

11. In the 2022 general election, 45 of the 67 county boards provided no notice to voters that their mail ballots were set aside due to noncompliance with the Date Instruction. Ex. J (responses to Interrogatory 11).

> **Intervenor-Defendants' Response: Admitted in part and denied in part.**
>
> **Denied to the extent that Plaintiffs include Susquehanna County and Bedford County, because neither county rejected *any* ballots as undated or misdated. Ex. 3 at App.473; Ex. 4 at App.511.**

3

**Supp. App. 240**

12.     In the 2022 general election, 37 of the 67 county boards provided voters no opportunity to cure their mail ballot if it was rejected under the Date Provision. Ex. J (responses to Interrogatory 12).

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Denied to the extent that Plaintiffs misconstrue Interrogatory 12, which asks only if "notified voters" were given opportunity to cure their ballots, and thus does not technically include those counties which provide opportunity to cure, but do not notify voters of defects. Ex. 5 at App.449. Also denied to the extent that Plaintiffs include Susquehanna County and Bedford County, because neither county rejected *any* ballots as undated or misdated. Ex. 3 at App.473; Ex. 5 at App.511.**

13.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot on which the voter wrote the date "11/3/2023," but would have counted the ballot had the voter written "11/3/2022." Ex. F (Kauffman Dep.) at 84:18–86:7.

**Intervenor-Defendants' Response: Admitted.**

14.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot because the voter wrote their birthdate on the outer envelope, even though the county board's stamp on the outer envelope indicated that it had timely received the mail ballot on October 17, 2022. *Id.* at 86:8–87:19.

**Intervenor-Defendants' Response: Admitted.**

15.     When evaluating the date written on a mail ballot's outer envelope for correctness, the Berks County BOE accounts for the possibility that a voter may use either a Month/Day/Year format or a Day/Month/Year format, and will accept the ballot if the date is considered correct using either format. *Id.* at 51:13–53:5.

**Intervenor-Defendants' Response: Admitted.**

16.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an envelope on which the voter had written a day and month but omitted the

4

Supp. App. 241

year, even if the day and month were in the acceptable time range set by the Supreme Court of Pennsylvania's November 5, 2022 order. Ex. G (Miller Dep.) at 55:19–56:6.

**Intervenor-Defendants' Response: Admitted. Intervenor-Defendants note, however, that the Lancaster County BOE's date line on the voter's declaration read: "Today's date (MM/DD/YYYY) (required)." Ex. 6.**

17.     In the 2022 general election, the Lancaster County BOE evaluated the date written on outer envelope assuming that the voter intended to use a Month/Day/Year format. *Id.* at 64:23–65:25.

**Intervenor-Defendants' Response: Admitted. Intervenor-Defendants note, however, that Lancaster County BOE's date line on the voter's declaration read: "Today's date (MM/DD/YYYY) (required)." Ex. 7.**

18.     In the 2022 general election, the Lancaster County BOE would have rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct if read using a Day/Month/Year format. *Id.*

**Intervenor-Defendants' Response: Admitted. Intervenor-Defendants note, however, that Lancaster County BOE's date line on the voter's declaration read: "Today's date (MM/DD/YYYY) (required)." Ex. 7.**

19.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot with a handwritten date that read "11/25/22" even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 78:9–79:21.

**Intervenor-Defendants' Response: Admitted.**

20.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an outer envelope on which the voter had written their birthdate, even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that

Supp. App. 242

fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 80:10–82:10.

> **Intervenor-Defendants' Response: Admitted, except that, in the cited testimony, the given date was the voter's birthdate was not a part of the hypothetical.**

21.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/14/2023," but would have counted that ballot if the last digit of that handwritten date was "2" instead of "3." *Id.* at 76:13–77:22.

> **Intervenor-Defendants' Response: On the understanding that Plaintiffs intended to cite to the McCloskey deposition, admitted.**

22.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/23/2033," but would have counted the ballot if the last two digits of that handwritten date were "22" instead of "33." *Id.* at 84:17–85:21.

> **Intervenor-Defendants' Response: While noting that Plaintiffs did not include this portion of the testimony in their appendix, admitted.**

23.     In the 2022 general election, the Westmoreland County BOE rejected mail ballots with handwritten dates of "1/1/2022," "8/17/2022," "11/9/2022," and "11/28/2022," even though the county board's stamp on those envelopes indicated that they were each received on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 74:9–79:9, 85:24–86:24.

> **Intervenor-Defendants' Response: While noting that Plaintiffs' citations are incomplete and are not entirely included in their appendix, admitted.**

24.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot with a handwritten date reading "10/9/2021" despite admitting that it would be impossible for someone to have filled the mail ballot on October 9, 2021, and despite the fact that the county

Supp. App. 243

board's stamp on the envelope indicated that it was timely received on October 13, 2022. *Id.* at 82:10–83:16.

> **Intervenor-Defendants' Response: While noting that Plaintiffs' citations are not included in their appendix, admitted.**

25.     In the 2022 general election, the Westmoreland County BOE rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct when read as using a Day/Month/Year format. *Id.* at 81:382:7, 83:20–84:14.

> **Intervenor-Defendants' Response: Denied. While Plaintiffs cite to portions of a deposition (which are not in Plaintiffs' appendix) indicating instances where a European dating convention was not used, Westmoreland County indicated that "there was one instance in the 2022 General Election where the European dating convention was accepted." Ex. 8 at App.761.**

26.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot contained in an outer envelope where the voter had written their birthdate. *Id.* at 87:3–24.

> **Intervenor-Defendants' Response: Admitted in part and denied in part.**

> **Denied to the extent that Plaintiffs incorrectly suggest that the deposition established that the date was that voter's birthdate. Ex. 9 at App.202.**

27.     In the 2022 general election, at least 17 counties rejected mail ballots contained in outer envelopes on which the voter wrote a date that was incorrect if read using a Month/Day/Year format (even if the date was correct if read using a Day/Month/Year format), while approximately 32 counties may have counted mail ballots in outer envelopes on which the written date was correct using a Month/Day/Year format *or* Day/Month/Year format. Ex. K (responses to Request for Admission No. 8).

> **Intervenor-Defendants' Response: Denied in part. Based on the responses collected in Plaintiffs' Exhibit K, Intervenor-Defendants count 39 counties who denied Request for Admission No. 8.**

Supp. App. 244

28.     Absent a change in the law or judicial intervention, all of Pennsylvania's county boards will not count mail ballots contained in envelopes that do not comply with the Date Provision. Ex. F (Kauffman Dep.) at 99:7–101:12; Ex. G (Miller Dep.) at 104:11–105:23, 111:16–112:9; Ex. H (McCloskey Dep.) at 88:13–89:6; Ex. K (responses to Request for Admission No. 5).

**Intervenor-Defendants' Response: Admitted that, absent a change in the law or judicial intervention, Pennsylvania's date requirement is mandatory and valid.**

### III.    The county boards do not (and cannot) use the written date on a mail ballot's outer envelope to determine a person's qualifications to vote.

29.     To be eligible to vote in Pennsylvania, a person must (1) be at least 18 years old, (2) have been a citizen for at least one month, (3) have lived in Pennsylvania and that election district for at least 30 days, and (4) not be imprisoned for a felony. 25 Pa. C.S. § 1301(a); 25 P.S. § 2811.

**Intervenor-Defendants' Response: Admitted, except that Pennsylvania law provides that "if qualified to vote in an election district prior to removal of residence, [the elector] may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election." 25 P.S. § 2811(3).  Additionally, Intervenor-Defendants note that Pennsylvania law also requires that the elector "shall have resided in the State ninety days immediately preceding the election." 25 P.S. § 2811(2).  Moreover, Pennsylvania law requires that an individual must not have "been confined in a penal institution for a conviction of a felony within the last five years" to "be eligible to register." 25 Pa. C.S. § 1301(a).**

30.     The only information that county boards use to determine a person's qualifications to vote is their age, citizenship status, length of residency in Pennsylvania and a given election district, and imprisonment status. Ex. E (Marks Dep.) at 102:5-9; Ex. F (Kauffman Dep.) at 33:20–34:8; Ex. G (Miller Dep.) at 36:17–38:3; Ex. H (McCloskey Dep.) at 31:17–32:16.

**Intervenor-Defendants' Response: Admitted in part.  Intervenor-Defendants agree that age, citizenship status, length of residency in Pennsylvania and a given election district, and imprisonment status are relevant to a person's qualifications to vote.  However, Intervenor-Defendants deny that those are the *only* information relevant to a person's qualifications to vote.  An individual who is not imprisoned at the moment may still be ineligible to vote if he was "confined in a penal institution for a conviction of a felony within the last five years." 25 Pa. C.S. § 1301(a).**

8

Supp. App. 245

31.     No county board uses the date written on a mail ballot's outer envelope to determine that person's qualifications to vote. Ex. K (responses to Request for Admission No. 1); Ex. E (Marks Dep.) at 98:9–102:15.

**Intervenor-Defendants' Response: Admitted.**

32.     The date written on a mail ballot's outer envelope does not provide information relevant to the determination of a person's age, citizenship status, length of residency in Pennsylvania and their election district, or imprisonment status. Ex. J (responses to Interrogatory 14); Ex. E (Marks Dep.) 68:4–9; Ex. F (Kauffman Dep.) at 32:17–34:8; Ex. G (Miller Dep.) at 36:17–25, 37:1–6, 37:7–11, 37:12–15, 37:16–38:3; Ex. H (McCloskey Dep.) at 31:17–22, 32:23–33:2, 33:3–7, 33:8–11, 32:12–16.

**Intervenor-Defendants' Response: Admitted.**

## IV.     The Date Provision's disparate impact.

33.     Plaintiffs' expert, Dr. Daniel Hopkins, performed linear regression analyses to identify whether the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election. Ex. ¶¶ 21–22.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins performed linear regression analyses.**

**Otherwise denied because Dr. Hopkins's analyses do not identify whether, much less demonstrate, that the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election.** *See infra* **Responses to ¶¶ 34-51.**

34.     Dr. Hopkins concluded that the Date Provision caused county boards of elections to reject mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement at a disproportionately higher rate compared to other voters. *Id.* ¶¶ 10, 23.

Supp. App. 246

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted to the extent that Dr. Hopkins purported to reach that conclusion.**

**Denied to the extent that Dr. Hopkins's linear regression analyses do not support that conclusion.** *See* **Ex. 10 at 69:19-21, 71:2-10. Dr. Hopkins admitted that he did not determine the race or ethnicity of any voter.** *See id.* **at 69:19-21, 71:2-10, 97:3-16.**

35.     Dr. Hopkins found that voters in counties with a higher proportion of Black and Hispanic residents were more likely to submit mail ballots that failed to comply with the Date Instruction than counties with a lower proportion of voters from those demographic groups. *Id.* ¶¶ 30–34.

**Intervenor-Defendants' Response: Denied. Dr. Hopkins's linear regression analyses made no predictions about actual Pennsylvania counties. Instead, the analyses examined the predicted rate of compliance with the date requirement in hypothetical counties with either a Black population percentage of 0% or 100% or a Hispanic population percentage of 0% or 100%.** *See* **Ex. 11 ¶¶ 25-35. But Dr. Hopkins conceded that there are no counties in Pennsylvania with 100% Black or 100% Hispanic population and that he did not know whether there are any counties in Pennsylvania with a 0% Black or 0% Hispanic population.** *See* **Ex. 10 at 79:18-80:2, 81:25-83:4.**

36.     When considering the share of a county's population that identifies as Hispanic, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1383, meaning that a county with exclusively Hispanic residents would be expected to reject mail ballots under the Date Provision at a rate 13.8 percentage points higher than a county with no Hispanic residents. *Id.* ¶ 32; *id.* at Ex. 1.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins purported to reach that conclusion with his linear regression analysis.**

**Denied to the extent that Dr. Hopkins's analyses did not predict compliance with the date requirement in actual Pennsylvania counties. In fact, Dr. Hopkins admitted that it is not possible from his county-level analysis to determine how much more or less likely, if at all, a Black or Hispanic voter is to cast a ballot that does not comply with the date requirement than a white voter.** *See* **Ex. 10 at 79:18-80:2, 81:25-83:4.**

Supp. App. 247

37. When considering the share of a county's population that identifies as Black, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1351, meaning that a county with exclusively Black residents would be expected to reject mail ballots under the Date Provision at a rate 13.5 percentage points higher than a county with no Black residents. *Id.* ¶ 33; *id.* at Ex. 1.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins purported to reach that conclusion with his linear regression analysis.**

**Denied to the extent that Dr. Hopkins's analyses did not predict compliance with the date requirement in actual Pennsylvania counties. In fact, Dr. Hopkins admitted that it is not possible from his county-level analysis to determine how much more or less likely, if at all, a Black or Hispanic voter is to cast a ballot that does not comply with the date requirement than a white voter. *See* Ex. 10 at 79:18-80:2, 81:25-83:4.**

38. In a separate analysis, Dr. Hopkins used a representative sample of counties to analyze the demographic characteristics of the actual voters whose mail ballots were rejected in the November 2022 election. *Id.* ¶¶ 36–41.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins's purported to engage in census block group analysis in only ten Pennsylvania's 67 counties. *See* Ex. 11 ¶¶ 36-57; Ex. 10 at 92:16-93:7.**

**Denied that Dr. Hopkins ever established that his sample of ten counties is representative of all 67 counties in Pennsylvania. Ex. 10. 93:2-97:2. Further, it is denied that Dr. Hopkins ever analyzed "the demographic characteristics of the actual voters whose mail ballots were rejected in the November 2022 election"; Dr. Hopkins examined the demographic characteristics of hypothetical census-block groups, not actual voters. *See* Ex. 10 at 97:3-98:19.**

**Dr. Hopkins admitted that he did not determine the race or ethnicity of any voter. *See id.* at 69:19-21, 71:2-10, 97:3-16. Rather, with respect to race, Dr. Hopkins's analysis was a regression analysis that purported to examine how the rate of noncompliance with the date requirement would change in a hypothetical census block group that experienced a change in population from either 0% to 100% Black or 0% to 100% Hispanic. *See* Ex. 11 ¶¶ 36-57; Ex. 10 at 101:16-102:17. Dr. Hopkins could not recall whether there were, in fact, any 100% Black, 100% Hispanic, 0% Black, or 0% Hispanic block groups in his data set. *See* Ex. 10 at 111:20-112:12.**

Supp. App. 248

39.     In performing this individual-level analysis, Dr. Hopkins appended to each voter information about the block group in which they lived. Block groups are the smallest unit at which Census data is typically available publicly. *Id.* ¶ 36.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins performed this appending of information and that census block groups ordinarily are the smallest unit at which Census data is typically available publicly.**

**Denied that Dr. Hopkins performed an "individual-level analysis"; as explained in Intervenor-Defendants' counter statement of facts, Dr. Hopkins examined the demographic characteristics of hypothetical census block groups, not individuals. *See supra* Response to ¶ 38.**

40.     The results of this individual-level analysis demonstrated "strong, statistically significant, and substantively meaningful relationships indicating that Hispanic, Black, and older voters are more likely to submit ballots that are rejected under the Date Provision." *Id.* ¶¶ 42–44.

**Intervenor-Defendants' Response: Denied.  Dr. Hopkins conceded that it is not possible from his individual and block-group level analysis to determine how much more or less likely, if at all, a Black or Hispanic voter is to cast a ballot that does not comply with the date requirement than a white voter.  *See* Ex. 10 at 107:10-17.**

41.     The results of Dr. Hopkins's individual-level analysis indicated that in the 2022 general election, a voter living in an all-Hispanic block group would have been twice as likely to have their ballot rejected under the Date Provision compared to a voter living in a block group containing no Hispanic residents. *Id.* ¶ 43.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins purported to reach that conclusion with his census block group analysis.**

**Denied that Dr. Hopkins ever conducted an "individual-level analysis"; as explained in Intervenor-Defendants' counter statement of facts, Dr. Hopkins examined the demographic characteristics of hypothetical census-block groups, not individuals. *See supra* Responses to Paragraphs 38 and 40.**

Supp. App. 249

42. The results of Dr. Hopkins's individual-level analysis indicated that age was positively correlated with rejection, meaning that the older a voter was, the more likely they were to submit an undated or misdated ballot. *Id.* ¶ 45; *id.* at Ex. 2.

> **Intervenor-Defendants' Response: Admitted that Dr. Hopkins's purported to reach that conclusion with his census block group analysis. Intervenor-Defendants note, however, that Dr. Hopkins's purported effect was that a 60-year old voter is "0.2 percentage points more likely to cast a mail ballot lacking a date" than a 20-year-old voter. Ex. 11 ¶ 52.**

43. The sample counties' pattern of rejecting Hispanic, Black, and older voters' ballots at disproportionately higher rates remained the same even "when looking only at *undated* ballots" and also "when looking only at *misdated* ballots." *Id.* ¶¶ 49–57; *id.* at Exs. 3–4.

> **Intervenor-Defendants' Response: Admitted in part and denied in part.**
>
> **Admitted that Dr. Hopkins purported to reach these conclusions.**
>
> **Denied that any of Dr. Hopkins's analyses can show that Hispanic or Black voters' ballots were rejected at disproportionately high rates because Dr. Hopkins did not determine the race of any voter. *See supra* Responses to Paragraphs 38 and 40; Ex. 10 at 97:4-7.**

44. There was also a significant relationship between mail ballot rejection pursuant to the Date Provision and educational achievement, indicating that voters lacking Bachelor's degrees were more likely to have their ballots rejected than those who have obtained Bachelor's degrees. *Id.* ¶ 47.

> **Intervenor-Defendants' Response: Admitted in part and denied in part.**
>
> **Admitted that Dr. Hopkins's purported to reach that conclusion with as part of his census block group analysis.**
>
> **Denied that Dr. Hopkins's analysis supported this conclusion. Dr. Hopkins considered levels of educational attainment in census block groups, not any individual voter's level of educational attainment. *See supra* Responses to Paragraphs 38 and 40; Ex. 10 at 97:8-10.**

Supp. App. 250

45. There was also a significant negative relationship between a voter's successful use of mail voting in 2020 and the likelihood that their ballot would be rejected under the Date Provision, indicating that voters less familiar with the mail-voting process were more likely to make mistakes causing their mail ballot to be rejected than those with more experience. *Id.* ¶ 46.

> **Intervenor-Defendants' Response: Admitted that Dr. Hopkins's purported to reach that conclusion. Dr. Hopkins similarly noted that "[t]his result suggests that voters who are more familiar with the mail ballot process are less likely to make mistakes that cause their mail ballot to be rejected." Ex. 10 at 108:21-109:3.**

46. "Cost of voting" is a framework that political scientists have employed for decades to describe how procedural and administrative frictions in the voting process that increase the "cost" of voting lead to fewer citizens successfully navigating the voting process. *Id.* ¶ 12.

> **Intervenor-Defendants' Response: Admitted that Dr. Hopkins's report makes that assertion. Otherwise denied.**

47. Even among those who cast a ballot in an election, procedural and administrative frictions that raise that cost of voting may prevent their ballot from being counted. *Id.* ¶ 13.

> **Intervenor-Defendants' Response: Denied. Dr. Hopkins's report says that "procedural frictions may prevent" voters "from successfully casting a vote," Ex. 11 ¶ 13, not that such frictions "may prevent their ballot from being counted."**

48. Voters with fewer resources—including those with lower educational levels; less access to housing, transportation, childcare; less flexible jobs; less English-language fluency or experience reading technical language—are less able to overcome additional procedural frictions in the voting process. *Id.*

> **Intervenor-Defendants' Response: On the understanding that Plaintiffs intended to cite to paragraph 14 of Dr. Hopkins's report, admitted that Dr. Hopkins's report makes that assertion. Otherwise denied.**

49. Black, Hispanic, and older voters in Pennsylvania have, on average, lower levels of socioeconomic resources, including "educational attainment, income, economic security, English

14

Supp. App. 251

language proficiency and literacy, and health," and they are less likely, on average, to overcome procedural and administrative frictions in the voting process. *Id.* ¶ 16.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Dr. Hopkins's report makes this assertion.**

**Denied to the extent that Plaintiffs suggest Dr. Hopkins established that his conclusion is correct as to Pennsylvanian voters. Dr. Hopkins admitted that he did not cite to any Pennsylvania-specific source for this assertion, and that his report does not cite to any source to prove that national samples are instructive in Pennsylvania. Ex. 10 at 51:20-53:16.**

50.    When a voter's mail ballot is rejected because of noncompliance with the Date Provision, they must take additional actions to ensure that their ballot is ultimately counted. *Id.* ¶ 19.

**Intervenor-Defendants' Response: Admitted.**

51.    The additional actions voters must take to ensure their rejected mail ballot is counted increase the cost of voting. *Id.* ¶ 19.

**Intervenor-Defendants' Response: Denied. Ballot curing is downstream of complying with the date requirement. Complying with the date requirement does not become more difficult because a curing mechanism is available.**

**V.    The interests purportedly served by the Date Provision**

**A.    Ensuring timely receipt of mail ballots**

52.    The Statewide Uniform Registry of Electors ("SURE") system is the voter registration system in Pennsylvania used by all 67 county BOEs. Ex. G (Miller Dep.) at 114:11-14.

**Intervenor-Defendants' Response: Admitted.**

53.    SURE allows counties to verify a voter's identification during the mail ballot application process, maintain their official voter rolls, and record returned mail ballots. Ex. E (Marks Dep.) at 44:6–10, 45:8–15, 68:19–69:6.

Supp. App. 252

**Intervenor-Defendants' Response: Admitted.**

54.     The county boards are statutorily required to record the date and time that they receive a mail ballot. *Id.* at 70:5–19; 25 P.S. § 1222(c)(19)–(20).

**Intervenor-Defendants' Response: Admitted.  *See* 25 P.S. § 3146.9(b), § 3150.17(b).**

55.     Each county board has a mechanism in place to identify which ballots were timely received, and that mechanism does not rely on the date written by voters on the mail-ballot's outer envelope. Ex. G (Miller Dep.) at 65:5–23.

**Intervenor-Defendants' Response: On the understanding that Plaintiffs intended to cite to the Marks deposition, admitted.**

56.     The outer envelope for every mail ballot sent to a voter in Pennsylvania has a unique barcode. *Id.* at 69:7–19.

**Intervenor-Defendants' Response: On the understanding that Plaintiffs intended to cite to the Marks deposition, admitted.**

57.     The Pennsylvania Department of State has instructed county boards to scan mail ballots into SURE as quickly as possible after they are received. Ex. E (Marks Dep.) at 82:20–83:17; Ex. E6.

**Intervenor-Defendants' Response: Admitted.**

58.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties scan the barcode on the outer envelope of a completed mail ballot upon receipt, which creates a record in the SURE system of the date and time that the county board received the mail ballot, Ex. E (Marks. Dep.) at 68:19–70:24, 116:12–119:8; Ex. F (Kauffman Dep.) at 55:25–56:22; Ex. G (Miller Dep.) at 114:11–24, 115:19–25; Ex. H (McCloskey Dep.) at 66:18–67:10.

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 253

59.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties also physically stamp the outer envelope with the date and time upon receiving a completed mail ballot. Ex. F (Kauffman Dep.) at 37:2–6, 77:8–24, 79:22–80:8; Ex. G (Miller Dep.) at 61:19–25, 69:11–23, 72:2–6, 85:19–86:5, 115:19–25; Ex. H (McCloskey Dep.) at 74:16–75:3, 110:9–13; Ex. K14 ("All incoming ballots are date stamped."); Ex. K45 ("The envelopes are stamped with the date received.").

**Intervenor-Defendants' Response: Admitted.**

60.     The date on which the voter fills out the ballot or signs the declaration on the outer envelope has no bearing on whether it was timely received by the county. Ex. E (Marks Dep.) at 128:5–12.

**Intervenor-Defendants' Response: Admitted.**

61.     The Berks County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. F (Kauffman Dep.) at 76:25–77:24.

**Intervenor-Defendants' Response: Admitted that Berks County "did not use the handwritten date on an outer return envelope to determine if a ballot (excluding military/civilian overseas ballots) was timely received." Ex. 12 at App.557.**

62.     The Lancaster County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. G (Miller Dep.) at 85:17–86:5.

**Intervenor-Defendants' Response: Admitted.**

63.     The Westmoreland County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. H (McCloskey Dep.) at 74:1–75:3.

17

**Intervenor-Defendants' Response: Admitted.**

64. County boards can determine whether a mail ballot was timely received without ever looking at the date written on a mail ballot envelope. Ex. K (responses to Request for Admission No. 2).

**Intervenor-Defendants' Response: Admitted.**

**B.     Fraud prevention**

65. The fact that the outer envelope of a mail ballot has no written date is not a reason to suspect fraud. Ex. G (Miller Dep.) at 118:11–17.

> **Intervenor-Defendants' Response: Denied.  An incorrect date was already used to help determine that voter fraud took place.  *See* Ex. 13 ¶ 2.  Because a handwritten date led to detection of fraud, failing to provide a date can be a method of *avoiding* detection of fraud.**

66. The fact that a voter wrote the wrong year on the outer envelope of a mail ballot is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 84:17–85:11; Ex. G (Miller Dep.) at 70:13–71:6; Ex. H (McCloskey Dep.) at 76:19–77:12.

> **Intervenor-Defendants' Response: Denied as speculative.  An incorrect date was already used to help determine that voter fraud took place.  *See* Ex. 13 ¶ 2.**

67. The fact that a voter wrote a date on the outer envelope of a mail ballot that precedes the first date they could have received the ballot is not a reason to suspect fraud. Ex. G (Miller Dep.) at 70:13–18, 82:11–15; Ex. H (McCloskey Dep.) at 87:3–19.

> **Intervenor-Defendants' Response: Denied as speculative.  Plaintiffs are extrapolating from testimony in which the deponent was asked about specific ballots.  An incorrect date was already used to help determine that voter fraud took place.  *See* Ex. 13 ¶ 2.**

68. The fact that a voter wrote a date on the outer envelope of a mail ballot that falls after the date of the election is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 78:15–79:15, 84:18–85:11; Ex. H (McCloskey Dep.) at 76:19–77:9.

18

Supp. App. 255

**Intervenor-Defendants' Response: Denied as speculative. Plaintiffs are extrapolating from testimony in which the deponent was asked about specific ballots. An incorrect date was already used to help determine that voter fraud took place.** *See* **Ex. 13 ¶ 2.**

69.     The date written on a mail-ballot's outer envelope provides no help to a county board in preventing that voter from also casting an in-person ballot on election day. Ex. G (Miller Dep.) at 116:2–118:2.

**Intervenor-Defendants' Response: Denied as speculative. Plaintiffs are extrapolating from testimony in which the deponent was asked about specific ballots. An incorrect date was already used to help determine that voter fraud took place.** *See* **Ex. 13 ¶ 2.**

70.     If a voter submits a mail ballot and then later casts an in-person provisional ballot on election day, the mail ballot will be counted and the in-person ballot will not be counted. *Id.* at 116:2–14.

**Intervenor-Defendants' Response: Admitted.**

71.     If a voter submits a mail ballot and casts an in-person provisional ballot on election day, the date written on the mail-ballot's outer envelope provides no help to a county board in determining which ballot to count. *Id.* at 116:22–117:3.

**Intervenor-Defendants' Response: Admitted.**

72.     No county identified, raised, or was made aware of any credible concern regarding fraud with respect to the way that voters wrote (or failed to write) the date on the outer envelope of their mail ballots in the November 2022 election. Ex. J (responses to Interrogatory No. 10); Ex. G (Miller Dep.) at 82:11–24; Ex. H (McCloskey Dep.) at 88:4–12.

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Denied to the extent that Pike County responded to Interrogatory No. 10 with "NA." Ex. 14 at App.453.**

**Further denied because Interrogatory No. 10 did *not* ask whether county boards were made aware of any fraud concerns.** *Id.*

19

73.     While a voter was referred to the district attorney in Lancaster County for allegedly voting on behalf of her deceased mother, the mother's ballot would never have been counted in that election because the county had already removed her from the voter rolls after receiving information indicating she had passed away. Ex. G (Miller Dep.) at 87:18–94:15.

**Intervenor-Defendants' Response: Admitted.  Intervenor-Defendants further note that, in that case, the handwritten date on the declaration was the only evidence on the face of the ballot envelope that a third party had fraudulently attempted to cast the ballot.  *See* Ex. 13 ¶ 2.**

74.     County boards are provided notification of a voter's death by the Department of Health. Ex. F (Kauffman Dep.) at 35:23–36:3; Ex. G (Miller Dep.) at 101:24–102:5; 25 P.S. § 1505(a).

**Intervenor-Defendants' Response: On the understanding that Plaintiffs intended to cite to 25 Pa. C.S. § 1505, admitted.**

75.     County boards do not use the date written on the outer envelope of a mail ballot to determine whether the voter passed away before election day or whether to count a ballot from such a person. Ex. F (Kauffman Dep.) at 36:20–37:25; Ex. H (McCloskey Dep.) at 36:12–23.

**Intervenor-Defendants' Response: Denied as speculative.  Plaintiffs do not cite evidence of the practice of all 67 Pennsylvania counties.**

**C.     The Date Provision does not further any other state interest.**

**Intervenor-Defendants' Response: Denied to the extent that Plaintiffs are stating a legal conclusion and because the date requirement advances several state interests.  *See, e.g., In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1079–80 (Pa. 2020) (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy); *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023); *see also* Ex. 15 at 100-116, 141-153.**

76.     The date written on the outer envelope of a mail ballot provides no information regarding the date on which the voter filled out that ballot or the truthfulness of the voter's affirmation. Ex. E (Marks Dep.) at 127:3–18, 135:6–21, 156:11–22, 204:6–19; Ex. G (Miller Dep.) at 61:11–16, 79:3–21; Ex. H (McCloskey Dep.) at 66:9–15, 70:5–10.

Supp. App. 257

**Intervenor-Defendants' Response: Denied. The handwritten date in fact is supposed to reflect when the ballot declaration was filled out. *Ball v. Chapman*, 289 A.3d 1, 22-23 (Pa. 2023).**

77. The Berks County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. F (Kauffman Dep.) at 39:22–40:2.

**Intervenor-Defendants' Response: Denied. In response to whether there is "any other reason why the Berks Board uses th[e] handwritten date . . . other than determining whether the ballot is compliant with legal requirements," Mr. Kauffman testified only that he "[c]urrently" "can't think of any." Ex. 16 at App.78-79.**

78. The Lancaster County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. G (Miller Dep.) at 113:23–114:8.

**Intervenor-Defendants' Response: Denied. Lancaster County has used an incorrect date to help determine that voter fraud took place. *See* Ex. 13 ¶ 2.**

79. The Westmoreland County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. H (McCloskey Dep.) at 37:8–38:2.

**Intervenor-Defendants' Response: Denied to the extent that Plaintiffs are characterizing Mr. McCloskey's testimony. While Mr. McCloskey did agree that Westmoreland County "uses the date on the envelope to determine whether the voter complied with the requirement to put the date on the envelope," he did not say that was the *only* use of the date. Ex. 9 at App.183.**

21

Supp. App. 258

## VI.  Plaintiffs

### A.  Bette Eakin

80.  Plaintiff Bette Eakin is a veteran and registered Democrat in Erie County. Ex. A (Eakin Decl.) ¶¶ 1–3.

**Intervenor-Defendants' Response: Admitted.**

81.  In the 2022 general election, Ms. Eakin submitted a mail ballot to the Erie County Board of Elections before election day because of her medical condition, which required her to travel to Ohio to receive medical care through election day. *Id.* ¶ 4.

**Intervenor-Defendants' Response: Admitted.**

82.  At the time she submitted her mail ballot, Ms. Eakin was undergoing care for a condition that has made her legally blind, forcing her to travel to a county board of elections office where she could obtain assistance in completing her ballot. An election worker helped Ms. Eakin request and obtain her mail ballot, complete the mail ballot, place the mail ballot in the secrecy and outer envelopes, and complete the declaration on the outer envelope. *Id.* ¶ 5.

**Intervenor-Defendants' Response: Admitted.**

83.  Days later, when Ms. Eakin was receiving her medical treatment in Ohio, she received an email stating that her mail ballot had been rejected because there was a defect on her balloting materials, which she later learned was due to a missing date on the outer envelope. *Id.* ¶ 6. She was told that she would have to fix this error if she wanted her ballot to be counted. *Id.*

**Intervenor-Defendants' Response: Admitted.**

84.  Voting is incredibly important to Ms. Eakin, and the news that her mail ballot had been rejected caused her to suffer significant emotional distress. *Id.* ¶ 7. Ms. Eakin suffers from post-traumatic stress disorder and a nervous disorder, and when she received the notification of her ballot's rejection, her anxiety skyrocketed. *Id.*

Supp. App. 259

**Intervenor-Defendants' Response: Admitted.**

85.     Ms. Eakin spent the rest of the day making phone calls to rectify the situation, and even missed scheduled medical care appointments to figure out how to ensure her ballot would be counted. *Id.*

**Intervenor-Defendants' Response: Admitted.**

86.     Because Ms. Eakin was receiving medical treatment out of state, her husband had to immediately leave his hunting trip and drive two hours back to Erie so that he could help make sure Ms. Eakin's ballot was counted. *Id.* ¶ 8.

**Intervenor-Defendants' Response: Admitted.**

87.     Ms. Eakin's husband had to first stop at her son's residence and have her son assist him in printing a form that would authorize him to act as her designated agent. *Id.* ¶ 9.

**Intervenor-Defendants' Response: Admitted.**

88.     Ms. Eakin's husband then retrieved her ballot from where she submitted it, traveled to their local polling place, explained the situation, and submitted all materials at the last possible moment before the polling place closed. *Id.*

**Intervenor-Defendants' Response: Admitted.**

89.     Ms. Eakin is very concerned that the Date Provision will force her to go through a similar saga in future elections. *Id.* ¶ 10.

**Intervenor-Defendants' Response: Admitted.**

90.     Because of her disability, Ms. Eakin must rely on the assistance of others to complete a mail ballot like she did in 2022. But given her condition and anxiety disorders, going to her polling place on election day is extremely difficult and presents a serious risk to her health. *Id.*

**Supp. App. 260**

**Intervenor-Defendants' Response: Admitted.**

**B.     DSCC**

91.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Ex. B (DSCC Decl.) ¶ 2.

**Intervenor-Defendants' Response: Admitted.**

92.     DSCC's mission is to support the election of candidates of the Democratic Party across the country, including in Pennsylvania, to the U.S. Senate. *Id.* ¶ 3.

**Intervenor-Defendants' Response: Admitted.**

93.     DSCC works to accomplish its mission by, among other things, mobilizing and persuading voters through grassroots mobilization of volunteers and field organizers to conduct get-out-the-vote activities such as door knocking, text messaging, and phone calling. *Id.* ¶ 4.

**Intervenor-Defendants' Response: Admitted.**

94.     DSCC also runs paid television, digital, and radio advertisements, as well as mailings, in support of Democratic candidates throughout the country, including in Pennsylvania. *Id.*

**Intervenor-Defendants' Response: Admitted.**

95.     While most of DSCC's voter programs are focused on persuading eligible citizens to vote, DSCC also runs programs specifically geared toward explaining the voting process and how an eligible voter can successfully cast their ballot and have it counted. *Id.*

**Intervenor-Defendants' Response: Admitted.**

96.     DSCC also separately allocates substantial personnel time and money for "curing" activities in multiple states where it anticipates close senatorial races. *Id.* ¶ 5.

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 261

97.     DSCC's curing activities involve tracking data from counties, contacting voters whose ballots have been rejected, and helping them perform whatever task is necessary to ensure their ballot is ultimately counted, which varies by county. *Id.*

**Intervenor-Defendants' Response: Admitted.**

98.     Since DSCC invests in persuading and mobilizing voters across the country, investing additional funds or personnel in one state will necessarily divert those resources from other states and key races. *Id.* ¶ 4.

**Intervenor-Defendants' Response: Admitted.**

99.     The Date Provision frustrates DSCC's mission because it erects an obstacle to ensuring all mail ballots cast by Pennsylvanians who support Democratic Senate candidates are actually counted and impairs those Democratic candidates' electoral prospects. *Id.* ¶ 6.

**Intervenor-Defendants' Response: Admitted.**

100.     In the 2022 general election, the Date Provision forced DSCC to divert substantial personnel time and money away from its advocacy and persuasion activities discussed above and instead towards explaining the Date Provision to voters and warning them of the consequences of failing to comply with the Date Provision. *Id.* ¶ 7.

**Intervenor-Defendants' Response: Admitted.**

101.     The Date Provision also forced DSCC to divert resources in 2022 away from helping voters in other states cure their rejected ballots and instead towards identifying voters in Pennsylvania whose ballots had been rejected because of the Date Provision and helping them take the steps necessary to ensure their ballots would be counted. *Id.*

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 262

102.     Absent the requested injunction, the Date Provision will continue to force DSCC to divert personnel time and money away from its advocacy and persuasion activities in Pennsylvania *and* in other states and instead towards educating voters in Pennsylvania about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot and towards researching how each county will go about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 8.

**Intervenor-Defendants' Response: Admitted.**

103.     The Date Provision will also continue to force DSCC in future elections to divert resources away from efforts to assist voters in other states in resolving issues with their rejected ballots and towards helping voters in Pennsylvania ensure their undated or misdated mail ballots are ultimately counted. *Id.* ¶ 9.

**Intervenor-Defendants' Response: Admitted.**

104.     Democratic voters provide financial support in the form of political contributions to DSCC and candidates supported by DSCC on a regular basis, and also help select DSCC's leadership and ultimately determine DSCC's strategic and political direction by electing candidates to the United States Senate. *Id.* ¶ 10.

**Intervenor-Defendants' Response: Admitted.**

105.     In the 2022 general election, over 2.7 million Pennsylvanians cast a vote for the Democratic senatorial candidate. *Id.* ¶ 11.

**Intervenor-Defendants' Response: Admitted.**

**C.     DCCC**

106.     Plaintiff DCCC is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Ex. C (DCCC Decl.) ¶ 2.

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 263

107.     DCCC's mission is to support the election of candidates of the Democratic Party from across the country, including those running in Pennsylvania's congressional districts, to the U.S. House of Representatives. *Id.* ¶ 3.

**Intervenor-Defendants' Response: Admitted.**

108.     DCCC works to accomplish its mission by, among other things, running paid advertisements in support of Democratic candidates; engaging in grassroots mobilization of volunteers and field organizers to perform persuasion efforts such as door knocking, text messaging, and phone banking, all towards the goal of convincing voters to support Democratic candidates; running paid canvasses for its members' campaigns to boost voter turnout; and encouraging voters to exercise their right to vote, through paid television, social media, and radio advertisements, phone calls, and mailings for voter education, as well as paying for professionals to assist in the aforementioned get-out-the-vote efforts. *Id.* ¶ 4. DCCC also supports efforts of state parties throughout the country, including in Pennsylvania, to conduct these activities by providing money, staff and volunteer time, and ongoing coordination. *Id.*

**Intervenor-Defendants' Response: Admitted.**

109.     DCCC also allocates and devotes staff, volunteers, and funds to assist voters in curing absentee or mail ballots in states where it anticipates there will be close congressional races. *Id.* ¶ 5. Helping voters cure their ballots involves contacting voters whose ballots have been rejected and helping them perform whatever task is necessary to ensure that their ballot is ultimately counted. *Id.* These activities require DCCC to devote substantial personnel time and money to track data from counties, contact voters, and assist them in completing the curing process established in each county. *Id.*

**Intervenor-Defendants' Response: Admitted.**

27

Supp. App. 264

110.    The Date Provision frustrates DCCC's mission because it erects an obstacle to ensuring all ballots cast by Pennsylvanians who support Democratic congressional candidates are actually counted, which harms those Democratic candidates' electoral prospects. *Id.* ¶ 6.

**Intervenor-Defendants' Response: Admitted.**

111.    As a result of the Date Provision, DCCC will be forced to divert personnel time and money away from its persuasion and mobilization activities and instead towards educating voters about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot, as well as spending personnel time researching how each county will go about determining whether the date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 7.

**Intervenor-Defendants' Response: Admitted.**

112.    The Date Provision will also force DCCC to divert the resources it has allocated for ballot curing activities in other states towards races in Pennsylvania, which impairs DCCC's ability to help voters and support Democratic candidates in other states. *Id.* ¶ 8.

**Intervenor-Defendants' Response: Admitted.**

113.    DCCC also represents the interests of Democratic voters in Pennsylvania and considers those individuals to be DCCC's constituents. *Id.* ¶ 9. Democratic voters provide financial support in the form of political contributions to DCCC and candidates supported by DCCC on a regular basis, and also help select DCCC's leadership and ultimately determine DCCC's strategic and political direction by electing candidates to the United States House of Representatives. *Id.* DCCC asserts its claims on behalf of itself and its constituents in Pennsylvania. *Id.*

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 265

114.     In the 2022 general election, more than 2.4 million Pennsylvanians cast a vote for the Democratic congressional candidate in their district. *Id.* ¶ 10.

**Intervenor-Defendants' Response: Admitted.**

D.     **AFT Pennsylvania**

115.     Plaintiff AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,000 members in 55 local affiliates across Pennsylvania. Ex. D (AFT Decl.) ¶¶ 2–3.

**Intervenor-Defendants' Response: Admitted.**

116.     The Federation's members include public school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. *Id.* ¶ 3. These members attend meetings of, and pay dues to, their local AFT affiliates (who in turn contribute funds to the Federation as a whole), as well as elect delegates to a biannual statewide convention, which elects the Federation's leadership. *Id.* ¶ 4.

**Intervenor-Defendants' Response: Admitted.**

117.     The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for teachers and school staff, as well as excellence in public service through cooperative problem-solving and workplace innovations. *Id.* ¶ 5.

**Intervenor-Defendants' Response: Admitted.**

118.     In furtherance of its mission, the Federation and its individual members devote significant resources towards advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are able to access the franchise to support these policies at the ballot box. These resources take the form of

Supp. App. 266

direct contributions to candidates, running phone banks and canvassing, and sharing information

with members about getting out the vote. *Id.* ¶¶ 6–7.

**Intervenor-Defendants' Response: Admitted.**

119.    Because Federation members typically have to work on election day, many turn to

mail ballots to exercise their right to vote. *Id.* ¶ 8.

**Intervenor-Defendants' Response: Admitted that Federation members may choose to
vote by mail.  Denied to the extent that Plaintiffs are stating a legal conclusion that
voting by mail is part of the right to vote.**

120.    Any provision or policy requiring the rejection of valid mail ballots with missing

or incorrect dates ("the Date Provision") threatens to disenfranchise members of the Federation

who are unquestionably eligible to vote. *Id.*

**Intervenor-Defendants' Response: Denied.  Applying Pennsylvania's longstanding
date requirement does not disenfranchise or threaten to disenfranchise anyone.**

121.    At least one Federation member had his mail ballot rejected in 2022 because of the

Date Provision. *Id.* ¶ 9.

**Intervenor-Defendants' Response: Admitted.**

122.    For the 2022 general election, the Date Provision forced the Federation to spend

resources on digital communications such as email newsletters and online publications to educate

its members about the need to correctly date the outer envelope of mail ballots, and also to spend

staff and member time reaching out to help its members and other Pennsylvania voters cure their

ballots after they were rejected because of the Date Provision. *Id.* ¶ 10.

**Intervenor-Defendants' Response: Admitted.**

123.    The rejection of undated or misdated ballots frustrates the Federation's mission of

electing candidates who support the policies for which the Federation advocates, and will force the

Federation to divert staff and member time in future elections from its advocacy efforts toward

Supp. App. 267

educating its members and other voters specifically about the need to date their mail ballots and what to do if their ballot is rejected pursuant to the Date Provision. *Id.* ¶ 11. The Federation will also have to divert staff and member time helping voters whose mail ballots are rejected under the Date Provision ensure that their votes are ultimately counted. *Id.* And because the Federation has limited resources, the staff and member time spent on activities meant to mitigate the Date Provision's harms will necessarily divert resources away from the Federation's other core activities, including canvassing and get-out-the-vote efforts such as phone banking, door knocking, and rallying at community events like roundtables and book giveaways. *Id.*

**Intervenor-Defendants' Response: Admitted.**

## INTERVENOR-DEFENDANTS' COUNTER STATEMENT OF MATERIAL FACTS

124.    Pursuant to Local Rule LCvR 56.C.1.c, Intervenor-Respondents incorporate by reference their Concise Statement of Material Facts, ECF No. 283, as if same were set forth at length herein.

### A.    The Date Requirement

125.    Pennsylvania's election laws provide a date requirement for absentee and mail-in voting.  25 P.S. § 3146.6(a); § 3150.16(a).

126.    In both provisions, the wording of the date requirement is the same: "The elector shall then fill out, date and sign the declaration printed on such envelope."  25 P.S. § 3146.6(a); § 3150.16(a).

127.    After seven cases in five courts over two years, the current state of the law is that the General Assembly's date requirement is mandatory and that any noncompliant absentee or mail-in ballot may not be counted.

Supp. App. 268

128.    The U.S. Supreme Court vacated the Third Circuit's panel decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022). *See Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).

129.    When addressing a request for a stay at an earlier stage in that case, three Justices opined that the Third Circuit's now-vacated holding was "very likely wrong" on the merits because it rested upon a misconstruction of the materiality provision. *Ritter*, 142 S. Ct. at 1824 (Mem.) (Alito, J., dissenting from the denial of the application for stay).

130.    In November 2022, the Pennsylvania Supreme Court exercised its original jurisdiction to reaffirm that the General Assembly's date requirement is mandatory. *Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022).

131.    In that litigation, Acting Secretary Leigh M. Chapman agreed that the signature requirement is valid and mandatory and does not violate the federal materiality provision. **Ex. 17**, Acting Sec'y Ans. 15–23, *Ball v. Chapman*, No. 102 MM 2022 (Oct. 19, 2022).

132.    The Acting Secretary also conceded in that litigation that the secrecy-envelope requirement does not violate the federal materiality provision. *Id.* at 39 n.15.

133.    In an opinion that followed, the Pennsylvania Supreme Court held that the date requirement refers to the "day upon which an elector signs the declaration," and noted that "[t]o hold otherwise would be to require unnecessarily specific drafting on the part of the General Assembly." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

134.    The Pennsylvania Supreme Court was evenly divided on whether the federal materiality provision invalidates the date requirement. *Id.* at 9.

Supp. App. 269

135.   Every county board of elections accepts as valid dates written in the standard "American" Month/Day/Year format.  *See* **Ex. 18**, County Boards of Elections' Responses to Requests for Admissions (Request #8).

**B.    The Date Requirement Serves "Unquestionable Purposes."**

136.   In Lancaster County, the only information a voter is required to supply on a ballot declaration is the date and a signature.  *See* **Exs. 6, 7**, Exemplar Ballot Declarations from Lancaster County Board.

137.   Under the Pennsylvania Supreme Court's current precedent, county boards of elections lack authority to conduct signature comparisons, so they may not check ballots for a non-matching signature, much less use any non-matching signature to detect fraud by a third party.  *See In re November 3, 2020 General Election*, 240 A.3d 591 (Pa. 2020).

138.   In *Mihaliak*, the only evidence on the face of the ballot declaration indicating that someone other than the decedent had completed the ballot was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away.  *See* **Ex. 13** ¶ 2.

139.   The investigation into the election fraud committed in *Mihaliak* was predicated upon the date supplied on the ballot declaration.  *See id.* ¶ 2.

**C.    Dr. Hopkins's Putative Expert Testimony**

140.   Plaintiffs have proffered no evidence to establish that any voter bears Plaintiffs' alleged burdens of the date requirement—namely, "[i]dentifying and replicating the precise date format that county boards will accept, research cure procedures for 'defective' ballots, [and] making last minute arrangements and traveling to county board offices to correct undated or misdated ballots," ECF No. 488 at 19.  *See* Hopkins Dep. 30:24-31:9; *see also id.* at 35:17-36:3.

141.   Dr. Daniel Hopkins submitted a putative expert declaration.  *See* **Ex. 11**.

33

Supp. App. 270

142.    Dr. Hopkins did not assess the benefits of the date requirement.  *See* **Ex. 10** at 26:9-14.

143.    Dr. Hopkins conceded, moreover, that he did not measure the cost to any voter of complying with the date requirement.  *Id*. at 30:9-13 ("Q: Did you measure the cost of the date requirement in your report?  A: Not directly.  I measured -- what I did measure is its differential impacts on certain groups of voters."); *id.* at 30:24-31:1 ("Q: Did you measure the cost to any individual of complying with the vote -- the date requirement?  A: No.").

144.    Dr. Hopkins did not "attempt to measure how easy or difficult it is for voters to comply with the date requirement," and did not "conduct any surveys or interviews of voters to ask them how easy or difficult it is to comply with the date requirement."  *Id.* at 31:2-9.

145.    Dr. Hopkins conceded that what he measured is not actually the cost of complying the date requirement.  *Id.* at 33:5-11 ("Q: I believe you just said that what you measured is closely related to the cost of voting; is that right?  A: I did say that, yeah.  Q: Is it actually the cost of the date requirement?  A: So the cost -- to answer your question, no.").

146.    Instead, rather than "directly" measure the cost of the date requirement, Dr. Hopkins purported to measure the date requirement's "differential impact on certain groups of voters."  *Id.* at 30:9-13.

147.    Thus, Dr. Hopkins purported to measure the rate of noncompliance with the date requirement among "certain groups of voters" and, thus, the rate at which "certain groups of voters" may experience the consequences of noncompliance with the date requirement.  *Id.* at 30:14-23.

Supp. App. 271

148.    Dr. Hopkins's report purports to conclude that "the date requirement increases the cost of voting and imposes the heaviest burdens on individuals who are already highly vulnerable to cost increases and are less likely to overcome them." **Ex. 11** ¶ 20.

149.    Dr. Hopkins's county-level analysis did not examine the cost to any individual or group of voters of complying with the date requirement. *See id.* at 71:25-72:15; *see also id.* at 33:5-11.

150.    Rather, it examined "what county-level attributes are associated with counties which have higher or lower ratios of setting aside mail ballots." *Id.* at 72:7-11.

151.    Dr. Hopkins calculated the statewide rejection rate for all absentee and mail-in ballots that do not comply with the date requirement as 0.93%, *see id.* ¶ 27, which is "similar" to but "slightly" lower than the rejection rate for ballots that do not comply with the secrecy envelope requirement, **Ex. 10** at 114:14-115:20.

152.    Dr. Hopkins testified that the statewide rejection rate for noncompliance with the date requirement is 0.93%. **Ex. 10** at 83:5-84:22; *see also* **Ex. 11** ¶ 32.

153.    Dr. Hopkins also co-authored an article which represented that "about … 1 percent of mail ballots returned in Philadelphia were naked ballots which was similar to the estimated share statewide." **Ex. 10** at 113:20-114:5.

154.    Though Dr. Hopkins represented that "1 percent is very similar to .93 percent," he conceded that "1 percent is greater than .93 percent." **Ex. 10** at 115:5-20.

35

Supp. App. 272

Dated:  May 5, 2023

Respectfully submitted,

/s/ Kathleen A. Gallagher
Kathleen A. Gallagher
PA I.D. #37950
Russell D. Giancola
PA. I.D. #200058
GALLAGHER GIANCOLA LLC
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
Phone: (412) 717-1900
kag@glawfirm.com
rdg@glawfirm.com

John M. Gore (*pro hac vice*)
E. Stewart Crosland
Louis J. Capozzi III
Joshua S. Ha
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com

Thomas W. King, III
Thomas E. Breth
DILLON, McCANDLESS, KING,
 COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA  16001
Phone: (724) 283.2200
tking@dmkcg.com
tbreth@dmkcg.com

*Counsel for Intervenor-Defendants*

Supp. App. 273

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> AL SCHMIDT, in his official capacity as Acting Secretary of the Commonwealth, *et al.*, <br><br> *Defendants.* | Case No. 1:22-cv-339 |
| BETTE EAKIN, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> ADAMS COUNTY BOARD OF ELECTIONS, *et al.*, <br><br> *Defendants.* | Case No. 1:22-cv-340 |

**DEFENDANTS ALLEGHENY, BUCKS, CHESTER, MONTGOMERY, AND PHILADELPHIA COUNTY BOARDS OF ELECTIONS' MEMORANDUM IN RESPONSE TO INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The right to vote is the cornerstone of American democracy, serving as a safeguard that ensures the protection of all other rights. The Philadelphia, Allegheny, Bucks, Chester, and Montgomery County Boards of Elections ("Responding Counties") are charged with protecting the right to vote through administering fair and orderly elections in their respective Counties and ensuring that voters in those Counties are meaningfully able to exercise the elective franchise. In addition to State

1

Supp. App. 274

and local voter protections, Congress sought to protect each qualified voter's right to vote at the federal level by prohibiting States from disqualifying timely and eligible votes—and, in the process, disenfranchising the voters who cast such votes—due to immaterial paperwork omissions or errors. 52 U.S.C. § 10101(a)(2)(B). This "materiality provision" was enacted to end immaterial requirements that "served no purpose other than as a means to inducing voter-generated errors that could be used to justify" denying the right to vote. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).

One such immaterial mandate is the Pennsylvania Election Code's requirement to handwrite a date on the outer return envelope of an absentee or mail-in ballot. *See* 25 P.S. §§ 3146.6(a), 3150.16(a). Responding Counties do not rely on the handwritten date to determine a voter's qualification or the timeliness of the ballot. Nor do Responding Counties rely on the handwritten date to prevent or detect fraud. The handwritten date is therefore meaningless. The "materiality provision" prohibits States from denying the right to vote solely because the voter failed to handwrite the date correctly on the outer return envelope. The Civil Rights Act was intended for a situation like this one, where there is an effort to disenfranchise voters because of a mere paperwork-related technicality—one that has no bearing on a voter's eligibility to vote or the timeliness of the ballot.

Responding Counties recognize that, as the defendants, they need not respond to Intervenor-Defendants' motion for summary judgment, and that their decision to respond is somewhat atypical. But this unresolved issue of federal law is too

2

important for Responding Counties to sit idly by without expressing their strongly held view that this dating requirement violates the materiality provision of the Civil Rights Act as a matter of law.[1] Responding Counties also want to highlight that enforcement of this dating provision will primarily serve to disenfranchise elderly voters. And it will also require county boards of elections to needlessly expend significant additional time and labor. Responding Counties urge this Court to deny the Intervenor-Defendants' motion for summary judgment and to declare that the handwritten date requirement should not be enforced in upcoming elections because it violates the Civil Rights Act as a matter of law.

## BACKGROUND

In Philadelphia, Allegheny, Bucks, Chester, and Montgomery County, strict enforcement of the dating requirement has had—and will continue to have—the practical effect of collectively disenfranchising thousands of otherwise eligible voters who cast timely ballots but failed to include a "correct" handwritten date on the outer return envelope of those ballots. This Court is aware of the history of the litigation involving the requirement to handwrite a date. Because the material facts underlying the question of whether that requirement violates the materiality provision are undisputed here, this Court should resolve that question in Plaintiffs' favor as a

---

[1] The Responding Counties take no position on the merit of the separate constitutional claims raised by Plaintiffs in these actions or the merits of the "standing" arguments raised by Plaintiffs and Intervenor Defendants in this litigation. Nor do Responding Counties take a position on the question of whether the Civil Rights Act can be enforced by private parties in a Section 1983 action—a question the Third Circuit answered in the affirmative in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot*, 143 S. Ct. 297 (Mem) (2022).

3

matter of law. For this reason, Responding Counties will only highlight those facts necessary to introduce the unique perspective of county boards of elections who have been, and will be, charged with overseeing and enforcing the date requirement. The experience of Philadelphia County is exemplative.

## A. The handwritten date is not used to determine the qualification of the voter, to determine the timeliness of the ballot, or to prevent fraud.

Philadelphia County does not use the handwritten date on the ballot's outer return envelope for any purpose.[2] SMF ¶¶ 9, 14, 15. To vote by absentee or mail-in ballot in Philadelphia County, prospective voters must first send a voter application to Philadelphia County. SMF ¶ 1. Philadelphia County then reviews the application and determines the voter's eligibility to vote. *See* SMF ¶ 2. If Philadelphia County approves the application, it mails an absentee or mail-in ballot package to the approved voter. SMF ¶ 3. This review and approval process at the application stage confirms the voter's identity and eligibility to vote. SMF ¶ 4. Philadelphia County's determination that an individual is qualified to vote is conclusive unless the voter's eligibility is challenged before Election Day. 25 P.S. §§ 3150.12b, 3146.8(g)(3)-(4).

Each absentee and mail-in ballot envelope contains a correspondence ID that is unique to both the voter and the election for export to the Statewide Uniform Registry of Electors (SURE) system. SMF ¶ 6. When Philadelphia County receives absentee and mail-in ballot envelopes, it runs those envelopes through a sorting machine that scans the unique ID and records that the voter has returned an

---

[2] The Allegheny, Bucks, Chester, and Montgomery County Boards of Elections likewise do not use the handwritten date to determine whether a voter is qualified, or whether a ballot was timely. SMF ¶ 15.

Supp. App. 277

absentee or mail-in ballot. SMF ¶ 7. This system prevents a voter from using outdated ballot material because Philadelphia County will only count absentee and mail-in ballot that contain the correspondence ID unique to both the voter and the election. SMF ¶ 8. This process does not rely on the voter's handwritten date on the outer return envelope to determine the voter's qualifications to vote. SMF ¶ 9.

Philadelphia County also ensures that each absentee and mail-in ballot is timely received. SMF ¶ 10. Absentee and mail-in voters must fill out and return the ballot to Philadelphia County by 8:00 p.m. on Election Day. 25 P.S. §§ 3146.6, 3150.16; *see* SMF ¶ 10. Philadelphia County records the time it receives each returned absentee or mail-in ballot envelope. SMF ¶ 11. The vast majority of all ballot envelopes are run through the sorting machine, which stamps each ballot envelope with the date and time the ballot was returned to Philadelphia County. SMF ¶ 12. A small number of ballot envelopes are manually marked with the date and time the ballot was returned to Philadelphia County. SMF ¶ 13. Philadelphia County then confirms the timeliness of each absentee and mail-in ballot by referring to the date and time that it was either stamped by the sorting machine or manually marked by Philadelphia County. *See* SMF ¶ 14. Timestamping each ballot envelope when received ensures the timeliness of absentee and mail-in ballots and precludes the possibility of voter backdating.

A voter's handwritten date is irrelevant to this process and serves no meaningful purpose to Philadelphia County. SMF ¶ 15. A voter's eligibility is determined at the application stage, not based on a handwritten date. SMF ¶¶ 1-4.

Supp. App. 278

The timeliness of a ballot is determined by reference to when Philadelphia County received the ballot, not by reference to a handwritten date. SMF ¶¶ 7-14. And outdated ballots are detected by Philadelphia County's process, including the unique ID on each absentee and mail-in ballot, not by reviewing a handwritten date. SMF ¶¶ 8, 15. Philadelphia County has not identified any actual or suspected instances of voting-related fraud connected with absentee or mail-in ballots, and it has no reason to believe that non-enforcement of the handwritten date requirement would cause an increase in voter-related fraud. SMF ¶ 16.

Additionally, Philadelphia County will need to expend significant time and labor to check for a handwritten date that is otherwise entirely irrelevant. SMF ¶¶ 17, 23. Philadelphia County receives many absentee and mail-in ballots each election cycle. SMF ¶ 18. For example, in the 2022 General Election, Philadelphia County received nearly 134,000 absentee and mail-in ballots before the Election Day deadline. SMF ¶ 19. Given the volume, Philadelphia County does not manually review the vast majority of absentee and mail-in ballots for compliance with the Pennsylvania Election Code. SMF ¶ 20. Rather, automated sorting machines are configured to recognize when a ballot is returned without a handwritten signature or without the internal secrecy envelope that is required by the Pennsylvania Election Code. SMF ¶ 21. These machines cannot be configured to detect a ballot's outer return envelope missing a "correctly" handwritten date. SMF ¶ 22. As a result, to enforce the dating requirement, Philadelphia County is required to devote considerable extra

6

Supp. App. 279

time and labor to manually identify ballots that have a missing or incorrect date. SMF ¶¶ 17, 23.

**B. The dating requirement disproportionately affects elderly Pennsylvania residents.**

In the 2022 General Election, pursuant to orders of the Pennsylvania Supreme Court, Philadelphia County was required to segregate and not count more than 2,600 timely ballots by otherwise qualified voters solely because the voters failed to comply with the meaningless handwritten date requirement.[3] SMF ¶ 24. Elderly voters were disproportionately overrepresented in the number of segregated and uncounted ballots:

- The median age of voters who submitted undated ballots is **64-years old.** The median jumps to **66-years old** for voters who submitted misdated ballots.

- Voters **over the age of 50** submitted **nearly 75%** of undated ballots and **77%** of misdated ballots.

- Voters **over the age of 60** submitted **more than 60%** of the undated ballots and **64% of the** misdated ballots.

- Voters **over the age of 70** submitted more **than 40%** of misdated ballots and **37.5%** of undated ballots.

- Voters **in their 80s** submitted approximately **14%** of the undated and misdated ballots.

---

[3] None of the voters who submitted those ballots submitted replacement ballots, but 580 of those voters submitted provisional ballots. SMF ¶ 24.

7

Supp. App. 280

- And **more than 70** ballots from voters **90-years old and older** were segregated and not counted as either misdated or undated.

SMF ¶ 26.

"[T]hese percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent." SMF ¶ 27. Additionally, Philadelphia County's review of the data suggests that enforcement of the dating requirement in the 2022 General Election also disproportionately impacted discrete Philadelphia communities, including areas with higher poverty rates and lower rates of educational attainment. SMF ¶ 28.

In the end, the dating requirement is immaterial. Its continued enforcement will disenfranchise qualified voters, especially older and disadvantaged voters. The Civil Rights Act should prevent such a result.

## **ARGUMENT**

### A.    **The Dating Requirement Violates the Materiality Provision.**

The dating requirement violates the Civil Rights Act of 1964, as a matter of law, because a voter's handwritten date on the ballot's outer return envelope does not determine the voter's qualification or the timeliness of the ballot. The Civil Rights Act provides in relevant part:

> No person acting under color of law shall . . .  deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

Supp. App. 281

52 U.S.C. § 10101(a)(2)(B). This section was enacted to end immaterial requirements that "served no purpose other than as a means of inducing voter-generated errors that could be used to justify" denying the right to vote. *Browning*, 522 F.3d at 1173; *see also*, *e.g.*, *Schwier v. Cox*, 340 F. 3d 1284, 1294 (11th Cir. 2003) (explaining that the materiality provision serves to prevent States from "requiring unnecessary information" and then using the omission of that information to deny a person's right to vote).

To fall within the materiality provision, four distinct requirements must be satisfied. There must be (1) a denial of the right to "vote" (2) "because of an error or omission," (3) "on any record or paper relating to . . . [an] act requisite to voting," (4) that is "not material" in determining the voter's qualification to vote. All the material facts are undisputed. Those facts establish as a matter of law that the four requirements of the Civil Rights Act are satisfied here, where in the 2022 General Election (pursuant to orders of the Supreme Court of Pennsylvania), Responding Counties were required to set aside and thus invalidate thousands of timely ballots from eligible voters solely because those voters did not include a correct, handwritten date on the outer return envelope of their ballots.

*First*, when the State invalidates a ballot because the voter failed to handwrite a date, it plainly "den[ies] the right of any individual to vote."

*Second*, when a voter does not handwrite a date, or does so illegibly or incorrectly, that voter has committed an "error or omission."

9

Supp. App. 282

*Third*, the placement of an absentee or mail-in ballot into the outer envelope is an act "requisite to voting" and the outer envelope is a "paper" that relates to that act. The Election Code requires a voter to place the voted ballot into the secrecy envelope and place that secrecy envelope into the outer (paper) mailing envelope. 25 P.S. 41 §§ 3146.6(a), 3150.16(a). If the voter did not place the absentee or mail-in ballot in the paper envelopes, then the county boards of elections cannot count that voter's ballot. *Id.* § 3146.8(g)(3). Thus, an incorrect date is an error "on any record or paper" (the outer envelope), "relating to . . . [an] act requisite to voting" (placing and mailing the ballot inside the outer envelope). 52 U.S.C. § 10101(a)(2)(B).

*Finally*, a voter's missing or incorrect date is "not material in determining whether such individual is qualified under State law to vote." *Id.* § 10101(a)(2)(B). For example, in Philadelphia County, a voter's qualification to vote is determined at the application stage, when the voter initially requests the absentee or mail-in ballot. SMF ¶¶ 1-4. Moreover, under Pennsylvania law, a voter is qualified if, *by Election Day*, they are at least 18 years old, have been a citizen of Pennsylvania for at least one month, have lived in the relevant election district for at least 30 days, and have not been imprisoned for a felony. *See* 25 P.S. §§ 2811, 1301. Responding Counties do not examine the handwritten date on a ballots outer return envelope to make these determinations. SMF ¶¶ 1-4, 9, 15. And that makes sense: Election Day—not the day the voter completed the ballot—is the date against which a voter's eligibility is

Supp. App. 283

measured. *See* 25 P.S. §§ 2811, 1301. So the date on the outer ballot is irrelevant to any concern about voter eligibility.[4]

There is also no concern that without a handwritten date a ballot may be cast outside the proper time frame. Every absentee or mail-in ballot must be received by the county boards of elections before the 8:00 p.m. deadline on Election Day. 25 P.S. §§ 3146.6(a), 3150.16(a); *see also Migliori v. Cohen*, 36 F.4th 153, 1574 (3d Cir. 2022) *cert. granted and judgment vacated*, *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).[5] This deadline—not a voter's handwritten date—ensures the voter completed the ballot within the proper time frame and prevents the supposed backdating of ballots. As Third Circuit thoroughly explained, there is no "persuasive reason" for how a handwritten date on the outer envelope helps to determine any of these qualifications or requirements. *Migliori*, 36 F.4th at 162-63.

In a futile attempt to show the importance of the dating requirements, the Intervenor-Defendants cite one instance where a handwritten date was used in an affidavit of probable cause against a woman who cast and dated a fraudulent ballot in her deceased mother's name twelve days after her mother had died. *Eakin v.*

---

[4] Unlike the date, which is not relevant to verifying the right to vote, a signature is a voter's verification that he or she is a qualified elector in the election. 25 P.S. §§ 3146.4, 3150.14, 3553.

[5] The United States Supreme Court vacated the judgment in *Migliori* because the case had become moot after one party conceded the election following the Third Circuit's judgment. It is not an assessment of the merits of the Third Circuit's analysis. *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) (noting that reversing or vacating a decision that became moot on its way to the U.S. Supreme Court is the "established practice" of the Court).

Supp. App. 284

*Adams County*, Intervenor-Defendants' Brief in Support of their Motion for Summary Judgment ("I-D"), at 3. But even there, the date played no role in determining the eligibility of the voter and hence the validity of the ballot. Because the mother died before the date of that election, her vote could not be counted, regardless of the handwritten date on the ballot. Indeed, even before the daughter's fraud was discovered, the mother's ballot was already excluded because the records showed—without any reference to the handwritten date—that the mother had died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022). And because the date had no role in determining the validity of the deceased mother's ballot, its role as a piece of criminal evidence against the daughter's fraud is entirely beside the point: the date is still "not material in determining" the eligibility of a voter.

## B. The Intervenor-Defendants' Contrary Arguments Lack Merit.

The Intervenor-Defendants' reliance on a dissent by Justice Alito is misguided. In addition to the obvious fact that it is a dissent by a single Justice (not an opinion of the Court), even Justice Alito confessed that he had only limited time to study the issue and did not rule out changing his view. *Ritter v. Migliori*, 142 S. Ct. 1824 (2022) (Alito, J., dissenting). The Intervenor-Defendants ignore that cautionary note and reiterate three arguments that are inconsistent with Section 10101's text and Pennsylvania law.

1. The Intervenor-Defendant's contend that when a voter's ballot is invalidated for lacking a handwritten date, then "the voter was not denied the right

12

**Supp. App. 285**

to vote . . . . [r]ather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." I-D at 6.

This is sophistry. When a voter's ballot is invalidated because of a failed literacy test, that voter is denied the right to vote. When voter's ballot is invalidated because of a misspelling on a voting application, that voter is denied the right to vote. And when a voter's ballot is invalidated because there is no date, or an "incorrect" date, on the outer return envelope, that voter too is denied the right vote.

The plain language of the Civil Rights Act confirms this conclusion. Section 10101 itself defines "vote" to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, *casting a ballot, and having such ballot counted and included* in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C. § 10101(e) (emphasis added). A voter who does not correctly date the outer return envelope does not have their absentee or mail-in "ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election," and is therefore denied the right to vote.

True, when a voter shows up at the polls on the wrong day or after the polls have closed, then that voter has also in some sense been denied the right to vote. But that is a red herring because, unlike here, those denials are not based on an "error or omission on any record or paper" and therefore they do not fall within the scope of the materiality provision. Similarly, when a voter who fails to place a ballot into a

Supp. App. 286

secrecy envelope—it may be an omission, but it is not an omission "*on* a record or paper." The same is true for a voter who fails to adequately indicate the intent to vote for a particular candidate, or who indicates too many candidates for a single office, that error is in the act of voting itself, and therefore does not relate to a "registration, application, or other act requisite to voting"—as required by the materiality provision. The same is *not* true for the failure to correctly handwrite a date on an envelope in which a ballot is placed: that failure is an error or omission on a paper that relates to act requisite to voting (*i.e.*, placing the ballot into an outer envelope).

2.      Next, the Intervenor-Defendants mistakenly argue that the materiality provision is inapplicable here because the dating requirements does not "affect a determination whether such individual is qualified under State law to vote." I-D at 8. In their view, only a requirement that determines whether an individual is qualified to vote can violate the materiality provision.

Precisely the opposite is true. The materiality provision prohibits the denial of the right to vote based on errors or omissions that are "**not material** in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(b). If an error is material—that is, "it goes to determining age, citizenship, residency, or current imprisonment for a felony,*" Migliori*, 36 F.4th at 163, then denial of the right to vote would not violate the materiality provision. Here, the Intervenor-Defendants themselves agree, "the date requirement is not used to determine whether an individual is qualified under State law to vote." I-D at 13. So, it violates the materiality provision.

14

**Supp. App. 287**

Consider the absurdity of the Intervenor-Defendants' argument that the Civil Rights Act only relates to "determinations of *who* may vote . . . not what voters must *do* to cast a ballot" I-D at 10 (emphasis in original). According to Intervenor-Defendants, the materiality provision prevents States from imposing a literacy test at the registrar's office but does not prevent States from imposing one at the poll booth. Both the plain text of the materiality provision and common sense do not permit such a conclusion.

3.      Finally, the Intervenor-Defendants argue that the act of handwriting the date on the outer envelope does not fall within the scope of the materiality provision because it would be "awkward" to consider "casting a ballot" as an "act requisite to voting." I-D at 12. But the flaw in their argument is that when a voter inserts the ballot into an outer return envelope, that voter is not casting a ballot or engaging in an act of voting. Instead, that voter is simply taking an act requisite to casting the ballot. As a result, the requirement to date that outer envelope involves a prerequisite act to voting—not the act of voting itself—and therefore comfortably falls within the scope of the materiality provision.

## **CONCLUSION**

In the end, a plain reading of the materiality provision shows that federal law prohibits invalidating a voter's ballot simply because that voter did not include a correct handwritten date on the outer return envelope. Doing so would deny the right to vote, based on an error or omission, on a record or paper, that relates to a prerequisite act of voting, that is not material to determining a voter's qualification.

15

Supp. App. 288

For these reasons, the Court should deny the Intervenor-Defendants' motion for summary judgment the first counts asserted in Plaintiffs' respective complaints. In doing so, this Court should also declare that the Pennsylvania Election Code's handwritten date requirement violates the Civil Rights Act's materiality provision as a matter of law.

Supp. App. 289

Dated: May 5, 2023

By: /s/ George M Janocsko
George M. Janocsko (PA 26408)
Allan J. Opsitnick  (PA 28126)
Lisa G. Michel (PA 59997)
Allegheny County Law Department
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
george.janocsko@alleghenycounty.us
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us
T (412) 350-1120

*Counsel for the Allegheny County Board
of Elections*

By: */s/ Amy M. Fitzpatrick*
Amy M. Fitzpatrick (pro hac vice)
(PA 324672)
Daniel D. Grieser (PA 325445)
Law Department – County of Bucks
55 E. Court St., 5th Floor
Doylestown, PA 18901
amfitzpatrick@buckscounty.org
ddgrieser@buckscounty.org

*Counsel for the Bucks County Board
of Elections*

By: /s/ Colleen M. Frens
Colleen M. Frens (*pro hac vice*)
 (PA 309604)
Faith Mattox-Baldini (PA 323868)
Chester County Solicitor's Office
313 W. Market Street, Suite 6702
West Chester, PA 19382
T 610.344.6195
cfrens@chesco.org
fmattoxbaldini@chesco.org

*Counsel for the Chester County Board
of Elections*

Respectfully submitted,

By: /s/ Ilana H. Eisenstein
Ilana H. Eisenstein (*pro hac vice*)
 (PA 94907)
Brian H. Benjet (*pro hac vice*)
 (PA 205392)
DLA Piper LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
T (215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benjet@us.dlapiper.com

Zachary G. Strassburger
 (PA 313991)
Aimee D. Thomson (*pro hac vice*)
 (PA 326328)
Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
zachary.strassburger@phila.gov
aimee.thomson@phila.gov

*Counsel for Philadelphia
County Board of Elections*

By: /s/ John A. Marlatt
John A. Marlatt
(PA 210141)
Maureen Calder (*pro hac vice*)
 (PA 68055)
Montgomery County Solicitor's Office
PO Box 311
Norristown, PA 19404

*Counsel for Montgomery
County Board of Elections*

17

**Supp. App. 290**

## <u>CERTIFICATE OF CONSENT</u>

I hereby certify that I have obtained the consent of the non-filing signatories to this Memorandum in Response to the Intervenor-Defendants' Motion to Dismiss—the above-listed counsel for Defendants the Allegheny, Bucks, Chester, and Montgomery County Boards of Elections.

Dated: May 5, 2023

By: *<u>/s/ Ilana H. Eisenstein</u>*

*Counsel for Philadelphia*
*County Board of Elections*

18

Supp. App. 291

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETTY EAKIN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 1:22-cv-00340-SPB |
| | : | |
| ADAMS COUNTY BOARD OF | : | |
| ELECTIONS, *et al.*, | : | |
| | : | **ELECTRONICALLY FILED** |
| Defendants. | : | |

**DEFENDANT BERKS COUNTY BOARD OF ELECTIONS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
<u>CONCISE STATEMENT OF MATERIAL FACTS</u>**

Defendant Berks County Board of Elections ("Berks Board"), by its undersigned

attorneys, hereby responds in opposition to Plaintiffs' motion for summary judgment (doc. 287)

and concise statement of material facts (doc. 289). Berks Board incorporates by reference the

memorandum of law in opposition to Plaintiffs' motion for summary judgment filed by

Lancaster Board of Elections (doc. 306). For all the reasons below and those stated in Lancaster

Board's memorandum in opposition, Plaintiffs' motion for summary judgment should be denied

in its entirety, and Berks County Board of Elections' motion for summary judgment (by joinder

with the Motion for Summary Judgment filed by Defendant Lancaster County Board of

Elections, doc. 286) should be granted, and all of Plaintiffs' claims against Berks Board should

be dismissed with prejudice.

Berks Board's responses to Plaintiffs' concise statement of materials facts are set forth

below, with the numbered paragraphs corresponding to and restating each of Plaintiffs' concise

statement of material facts (including footnotes), followed by Berks Board's response.

1

**Supp. App. 292**

1.      Prior to 2020, voters in Pennsylvania were required to cast an in-person ballot on election day unless they met specific qualifications to submit an "absentee" ballot. 25 P.S. § 3146.1.

**RESPONSE**:  Admitted.

2.      In 2019, Pennsylvania enacted Act 77, an omnibus election bill that introduced significant amendments to Pennsylvania's Election Code and created a new method of voting—"mail-in" ballots—which extended the option of voting by mail to all eligible citizens of the Commonwealth as an alternative to voting in person on election day. 25 P.S. 3150.11 *et seq.*

**RESPONSE**:  Admitted.

3.      Before submitting a completed mail-in or absentee ballot (collectively,  "mail ballot") to their county board of elections ("county board" or "BOE"), a voter must fill out the ballot, place the completed ballot in a secrecy envelope, and then place the secrecy envelope in an outer return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a).

**RESPONSE**:  Admitted.

4.      The outer envelope of every mail ballot contains a voter declaration that Pennsylvania law instructs voters to "fill out, date and sign." 25 P.S. §§ 3146.6(a), 3150.16(a) (the "Date Provision").

**RESPONSE**:  Admitted.

5.      For a mail ballot to be considered timely received and eligible to be counted, it must reach the voter's county board by 8:00 p.m. on election day. 25 P.S. §§ 3146.6(a), 3150.16(a).

**RESPONSE**:  Admitted.

Supp. App. 293

6.      On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing all county boards of elections to set aside and not count any mail-in or absentee ballot "contained in undated or incorrectly dated outer envelope[]." *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam).

**RESPONSE**: Admitted.

7.      On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that, for purposes of the 2022 general election only, the date on the outer envelope must be deemed incorrect if it (1) predated the earliest date state law permitted county boards to distribute mail ballots for that election, or (2) postdated election day. Ex. L. For purposes of future elections, the Supreme Court of Pennsylvania indicated in a subsequent opinion that the voter should enter the date they sign the declaration, but expressly left it to the discretion of each county board to decide how to evaluate whether that written date "is, in truth, the day upon which [the voter] completed the declaration." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

**RESPONSE**: Admitted.

8.      In the 2022 general election, Pennsylvania's county boards set aside any mail ballot that arrived in an outer envelope they regarded as undated or misdated. Ex. K (responses to Requests for Admission No. 5–8).

**RESPONSE**: Denied as stated.  Berks Board disputes the language "regarded as undated or misdated."  Pennsylvania county boards of elections set aside mail ballots that arrived in an outer envelope on which the voter declaration did not include any date or was "incorrectly dated" in compliance with the November 1, 2022 and November 25, 2022 Pennsylvania Supreme Court orders in *Ball v. Chapman*.

Supp. App. 294

9. In the 2022 general election, a total of 10,970 mail ballots were timely received but did not comply with the Date Provision. Ex. J (responses to Interrogatory 2).

**RESPONSE**: Berks Board admits the accuracy of the numbers of absentee and mail-in ballots that were timely received but were set aside for not complying with the Date Provision in Berks County in November 2022 as reported by Berks Board in its interrogatory responses. Berks Board is without knowledge about the precise numbers of absentee and mail-in ballots that were timely received but were set aside for not complying with the Date Provision in other counties in November 2022, but Berks Board does not dispute those numbers for purposes of Plaintiffs' motion for summary judgment. The precise numbers are not material to the claims or defenses in this action.

10. In the 2022 general election, 10,657 of the 10,970 undated or misdated mail ballots received by county boards had no other defect that would have prevented them from being counted. Ex. J (responses to Interrogatories 2 and 8).

**RESPONSE**: Berks Board admits the accuracy of the numbers of absentee and mail-in ballots that were undated or incorrectly dated in Berks County and that had no other defect in November 2022 as reported by Berks Board in its interrogatory responses. Berks Board is without knowledge about the precise numbers of absentee and mail-in ballots that undated or incorrectly dated and that had no other defect in other counties in November 2022, but Berks Board does not dispute those numbers for purposes of Plaintiffs' motion for summary judgment. The precise numbers are not material to the claims or defenses in this action.

4

Supp. App. 295

11.     In the 2022 general election, 45 of the 67 county boards provided no notice to voters that their mail ballots were set aside due to noncompliance with the Date Instruction. Ex. J (responses to Interrogatory 11).

**RESPONSE**: Admitted.

12.     In the 2022 general election, 37 of the 67 county boards provided voters no opportunity to cure their mail ballot if it was rejected under the Date Provision. Ex. J (responses to Interrogatory 12).

**RESPONSE**: Admitted.

13.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot on which the voter wrote the date "11/3/2023," but would have counted the ballot had the voter written "11/3/2022." Ex. F (Kauffman Dep.) at 84:18–86:7.

**RESPONSE**: Admitted.

14.     In the 2022 general election, the Berks County BOE rejected a timely-received mail ballot because the voter wrote their birthdate on the outer envelope, even though the county board's stamp on the outer envelope indicated that it had timely received the mail ballot on October 17, 2022. *Id.* at 86:8–87:19.

**RESPONSE**: Admitted.

15.     When evaluating the date written on a mail ballot's outer envelope for correctness, the Berks County BOE accounts for the possibility that a voter may use either a Month/Day/Year format or a Day/Month/Year format, and will accept the ballot if the date is considered correct using either format. *Id.* at 51:13–53:5.

**RESPONSE**: Admitted.

Supp. App. 296

16.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an envelope on which the voter had written a day and month but omitted the year, even if the day and month were in the acceptable time range set by the Supreme Court of Pennsylvania's November 5, 2022 order. Ex. G (Miller Dep.) at 55:19–56:6.

**RESPONSE**: Admitted.

17.     In the 2022 general election, the Lancaster County BOE evaluated the date written on outer envelope assuming that the voter intended to use a Month/Day/Year format. *Id.* at 64:23– 65:25.

**RESPONSE**: Admitted.

18.     In the 2022 general election, the Lancaster County BOE would have rejected any mail ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year format, even if the date was correct if read using a Day/Month/Year format. *Id.*

**RESPONSE**: Admitted.

19.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot with a handwritten date that read "11/25/22" even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 78:9–79:21.

**RESPONSE**: Admitted.

Supp. App. 297

20.     In the 2022 general election, the Lancaster County BOE would have rejected a mail ballot contained in an outer envelope on which the voter had written their birthdate, even if the county board's stamp on the outer envelope indicated it had received the mail ballot on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 80:10–82:10.

**RESPONSE**:  Admitted.

21.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/14/2023," but would have counted that ballot if the last digit of that handwritten date was "2" instead of "3." *Id.* at 76:13–77:22.

**RESPONSE**:  Admitted.

22.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot because its outer envelope had a handwritten date of "10/23/2033," but would have counted the ballot if the last two digits of that handwritten date were "22" instead of "33." *Id.* at 84:17–85:21.

**RESPONSE**:  Admitted.

23.     In the 2022 general election, the Westmoreland County BOE rejected mail ballots with handwritten dates of "1/1/2022," "8/17/2022," "11/9/2022," and "11/28/2022," even though the county board's stamp on those envelopes indicated that they were each received on a date that fell within the acceptable range set by the Supreme Court of Pennsylvania's November 5 order. *Id.* at 74:9–79:9, 85:24–86:24.

**RESPONSE**:  Admitted.

24.     In the 2022 general election, the Westmoreland County BOE rejected a mail ballot with a handwritten date reading "10/9/2021" despite admitting that it would be impossible

7

for someone to have filled the mail ballot on October 9, 2021, and despite the fact that the county

board's stamp on the envelope indicated that it was timely received on October 13, 2022. *Id.* at

82:10–83:16.

**RESPONSE**:  Admitted.

25.	In the 2022 general election, the Westmoreland County BOE rejected any mail

ballot if its outer envelope contained a date that was incorrect if read using a Month/Day/Year

format, even if the date was correct when read as using a Day/Month/Year format. *Id.* at 81:3–

82:7, 83:20–84:14.

**RESPONSE**:  Admitted.

26.	In the 2022 general election, the Westmoreland County BOE rejected a mail

ballot contained in an outer envelope where the voter had written their birthdate. *Id.* at 87:3–24.

**RESPONSE**:  Admitted.

27.	In the 2022 general election, at least 17 counties rejected mail ballots contained

in outer envelopes on which the voter wrote a date that was incorrect if read using a

Month/Day/Year format (even if the date was correct if read using a Day/Month/Year format),

while approximately 32 counties may have counted mail ballots in outer envelopes on which the

written date was correct using a Month/Day/Year format *or* Day/Month/Year format. Ex. K

(responses to Request for Admission No. 8).

**RESPONSE**:  Berks Board is without knowledge about the number of counties that rejected mail

ballots in outer envelopes on which the voter wrote a date that was incorrect if read using a

Month/Day/Year format (even if the date was correct if read using a Day/Month/Year format)

and the number of counties that counted mail ballots in outer envelopes on which the written date

was correct using a Month/Day/Year format *or* Day/Month/Year format, but Berks Board does

8

not dispute those numbers for purposes of Plaintiffs' motion for summary judgment. The precise numbers are not material to the claims or defenses in this action.

28.      Absent a change in the law or judicial intervention, all of Pennsylvania's county boards will not count mail ballots contained in envelopes that do not comply with the Date Provision. Ex. F (Kauffman Dep.) at 99:7–101:12; Ex. G (Miller Dep.) at 104:11–105:23, 111:16–112:9; Ex. H (McCloskey Dep.) at 88:13–89:6; Ex. K (responses to Request for Admission No. 5).

**RESPONSE**: Admitted as to Berks County. Berks Board is without knowledge about how the other counties intend to proceed.

29.      To be eligible to vote in Pennsylvania, a person must (1) be at least 18 years old, (2) have been a citizen for at least one month, (3) have lived in Pennsylvania and that election district for at least 30 days, and (4) not be imprisoned for a felony. 25 Pa. C.S. § 1301(a); 25 P.S. § 2811.

**RESPONSE**: Admitted

30.      The only information that county boards use to determine a person's qualifications to vote is their age, citizenship status, length of residency in Pennsylvania and a given election district, and imprisonment status. Ex. E (Marks Dep.) at 102:5–9; Ex. F (Kauffman Dep.) at 33:20– 34:8; Ex. G (Miller Dep.) at 36:17–38:3; Ex. H (McCloskey Dep.) at 31:17–32:16.\

**RESPONSE**: Admitted

31.      No county board uses the date written on a mail ballot's outer envelope to determine that person's qualifications to vote. Ex. K (responses to Request for Admission No. 1); Ex. E (Marks Dep.) at 98:9–102:15.

**RESPONSE**: Admitted

Supp. App. 300

32.     The date written on a mail ballot's outer envelope does not provide information relevant to the determination of a person's age, citizenship status, length of residency in Pennsylvania and their election district, or imprisonment status. Ex. J (responses to Interrogatory 14); Ex. E (Marks Dep.) 68:4–9; Ex. F (Kauffman Dep.) at 32:17–34:8; Ex. G (Miller Dep.) at 36:17–25, 37:1–6, 37:7–11, 37:12–15, 37:16–38:3; Ex. H (McCloskey Dep.) at 31:17–22, 32:23–33:2, 33:3–7, 33:8–11, 32:12–16.

**RESPONSE**: Admitted

33.     Plaintiffs' expert, Dr. Daniel Hopkins, performed linear regression analyses to identify whether the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election. Ex. I ¶¶ 21–22.

**RESPONSE**: Admitted in part, denied in part. Berks Board admits only that Plaintiffs' expert Dr. Daniel Hopkins attempted to perform linear regression analyses to attempt to determine whether the Date Provision disproportionately impacted certain demographic groups of voters in the November 2022 election. Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant. It is not relevant whether the Date Provision had or has a disproportionate or disparate impact on certain demographic groups of voters. The Date Provision is applied neutrally across all demographic groups of voters and was adopted without any discriminatory intent. There is no evidence that an individual voter from any demographic group, based on that voter's membership in any given group, is less likely to be able to comply with the Date Provision.

Supp. App. 301

34.     Dr. Hopkins concluded that the Date Provision caused county boards of elections to reject mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement at a disproportionately higher rate compared to other voters.  *Id.* ¶¶ 10, 23.

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins concluded the Date Provision caused county boards of elections to reject mail ballots submitted by Black, Hispanic, and older voters, as well as voters with lower educational achievement at a disproportionately higher rate compared to other voters.  Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

35.     Dr. Hopkins found that voters in counties with a higher proportion of Black and Hispanic residents were more likely to submit mail ballots that failed to comply with the Date Instruction than counties with a lower proportion of voters from those demographic groups.  *Id.* ¶¶ 30–34.

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins found that voters in counties with a higher proportion of Black and Hispanic residents were more likely to submit mail ballots that failed to comply with the Date Instruction than counties with a lower proportion of voters from those demographic groups.  Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

36.     When considering the share of a county's population that identifies as Hispanic, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1383, meaning that a county with exclusively Hispanic residents would be expected to reject mail ballots under the Date Provision at a rate 13.8 percentage points higher than a county with no Hispanic residents. *Id.* ¶ 32; *id.* at Ex. 1.

11

Supp. App. 302

**RESPONSE**: Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins' county-level regression analysis for Hispanic voters resulted in a coefficient of 0.1383, which according to Dr. Hopkins means a county with exclusively Hispanic residents would be expected to reject mail ballots under the Date Provision at a rate 13.8 percentage points higher than a county with no Hispanic residents.  Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

37.     When considering the share of a county's population that identifies as Black, Dr. Hopkins's county-level regression resulted in a coefficient of 0.1351, meaning that a county with exclusively Black residents would be expected to reject mail ballots under the Date Provision at a rate 13.5 percentage points higher than a county with no Black residents. *Id.* ¶ 33; *id.* at Ex. 1.

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins' county-level regression analysis for Black voters resulted in a coefficient of 0.1351, which according to Dr. Hopkins means a county with exclusively Hispanic residents would be expected to reject mail ballots under the Date Provision at a rate 13.5 percentage points higher than a county with no Black residents.  Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

38.     In a separate analysis, Dr. Hopkins used a representative sample of counties to analyze the demographic characteristics of the actual voters whose mail ballots were rejected in the November 2022 election. *Id.* ¶¶ 36–41.

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins attempted to perform a separate analysis that attempted to use a representative sample of counties to analyze the demographic characteristics of the actual voters whose mail ballots were rejected

Supp. App. 303

in the November 2022 election. Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

39.     In performing this individual-level analysis, Dr. Hopkins appended to each voter information about the block group in which they lived. Block groups are the smallest unit at which Census data is typically available publicly. *Id.* ¶ 36.

**RESPONSE**: Admitted in part, denied in part. Berks Board admits only that Dr. Hopkins appended to each voter included in his individual-level analysis information about the block group in which they lived, and that block groups are the smallest unit at which Census data is typically available publicly. Berks Board disputes that Dr. Hopkins' conclusions are valid or relevant.

40.     The results of this individual-level analysis demonstrated "strong, statistically significant, and substantively meaningful relationships indicating that Hispanic, Black, and older voters are more likely to submit ballots that are rejected under the Date Provision." *Id.* ¶¶ 42–44.

**RESPONSE**:  Admitted in part, denied in part. Berks Board admits only that Dr. Hopkins contends that his individual-level analysis demonstrated "strong, statistically significant, and substantively meaningful relationships that purport to indicate that Hispanic, Black, and older voters are more likely to submit ballots that are rejected under the Date Provision."  Berks Board disputes that Dr. Hopkins' contentions are valid or relevant.

41.     The results of Dr. Hopkins's individual-level analysis indicated that in the 2022 general election, a voter living in an all-Hispanic block group would have been twice as likely to have their ballot rejected under the Date Provision compared to a voter living in a block group containing no Hispanic residents. *Id.* ¶ 43.

13

Supp. App. 304

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins contends that his individual-level analysis indicated that in the 2022 general election, a voter living in an all-Hispanic block group would have been twice as likely to have their ballot rejected under the Date Provision than a voter living in a block group containing no Hispanic residents. Berks Board disputes that Dr. Hopkins' contentions are valid or relevant.

42.     The results of Dr. Hopkins's individual-level analysis indicated that age was positively correlated with rejection, meaning that the older a voter was, the more likely they were to submit an undated or misdated ballot.  *Id.* ¶ 45; *id.* at Ex. 2.

**RESPONSE**:  Admitted in part, denied in part.  Berks Board admits only that Dr. Hopkins contends that his individual-level analysis indicated that age was positively correlated with rejection, meaning that the older a voter was, the more likely they were to submit an undated or misdated ballot.  Berks Board disputes that Dr. Hopkins' contentions are valid or relevant.

43.     The sample counties' pattern of rejecting Hispanic, Black, and older voters' ballots at disproportionately higher rates remained the same even "when looking only at *undated* ballots" and also "when looking only at *misdated* ballots."  *Id.* ¶¶ 49–57; *id.* at Exs. 3–4.

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

44.     There was also a significant relationship between mail ballot rejection pursuant to the Date Provision and educational achievement, indicating that voters lacking Bachelor's degrees were more likely to have their ballots rejected than those who have obtained Bachelor's degrees. *Id.* ¶ 47.

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

14

Supp. App. 305

45.     There was also a significant negative relationship between a voter's successful use of mail voting in 2020 and the likelihood that their ballot would be rejected under the Date Provision, indicating that voters less familiar with the mail-voting process were more likely to make mistakes causing their mail ballot to be rejected than those with more experience. *Id.* ¶ 46.

**RESPONSE**: Denied. Berks Board disputes this conclusion. Even if this averment were true, it is not relevant to the claims or defenses at issue.

46.     "Cost of voting" is a framework that political scientists have employed for decades to describe how procedural and administrative frictions in the voting process that increase the "cost" of voting lead to fewer citizens successfully navigating the voting process. *Id.* ¶ 12.

**RESPONSE**: Berks Board is without knowledge sufficient to admit or deny the averment in Paragraph 46 of Plaintiffs' concise statement of material facts about whether "cost of voting" is a framework that political scientists have used for decades to describe how procedural and administrative frictions in the voting process that increase the "cost" of voting lead to fewer citizens successfully navigating the voting process. To the extent this averment is accurate, Berks Board disputes that the "cost of voting" framework is relevant to the claims or defenses at issue in this action.

47.     Even among those who cast a ballot in an election, procedural and administrative frictions that raise that cost of voting may prevent their ballot from being counted. *Id.* ¶ 13.

**RESPONSE**: Berks Board is without knowledge sufficient to admit or deny the averment in Paragraph 47 of Plaintiffs' concise statement of material facts about whether procedural and administrative frictions that allegedly raise the "cost" of voting may prevent those who cast a ballot in an election from having their ballot counted. To the extent this averment is accurate, Berks Board disputes that the "cost of voting" framework is relevant to the claims or defenses at

Supp. App. 306

issue in this action. Even if it were, common sense dictates there is no material "cost" to voters writing the date they sign their voter declaration in the space provided near their signature.

48.     Voters with fewer resources—including those with lower educational levels; less access to housing, transportation, childcare; less flexible jobs; less English-language fluency or experience reading technical language—are less able to overcome additional procedural frictions in the voting process. *Id.*

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

49.     Black, Hispanic, and older voters in Pennsylvania have, on average, lower levels of socioeconomic resources, including "educational attainment, income, economic security, English language proficiency and literacy, and health," and they are less likely, on average, to overcome procedural and administrative frictions in the voting process. *Id.* ¶ 16.

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

50.     When a voter's mail ballot is rejected because of noncompliance with the Date Provision, they must take additional actions to ensure that their ballot is ultimately counted. *Id.* ¶ 19.

**RESPONSE**:  Denied.   Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

51.     The additional actions voters must take to ensure their rejected mail ballot is counted increase the cost of voting. *Id.* ¶ 19.

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.  Even if this averment were true, it is not relevant to the claims or defenses at issue.

16

Supp. App. 307

52.     The Statewide Uniform Registry of Electors ("SURE") system is the voter registration system in Pennsylvania used by all 67 county BOEs. Ex. G (Miller Dep.) at 114:11- 14.

**RESPONSE**:  Admitted.

53.     SURE allows counties to verify a voter's identification during the mail ballot application process, maintain their official voter rolls, and record returned mail ballots. Ex. E (Marks Dep.) at 44:6–10, 45:8–15, 68:19–69:6.

**RESPONSE**:  Admitted.

54.     The county boards are statutorily required to record the date and time that they receive a mail ballot. *Id.* at 70:5–19; 25 P.S. § 1222(c)(19)–(20).

**RESPONSE**:  Admitted.

55.     Each county board has a mechanism in place to identify which ballots were timely received, and that mechanism does not rely on the date written by voters on the mail-ballot's outer envelope. Ex. G (Miller Dep.) at 65:5–23.

**RESPONSE**:  Admitted.

56.     The outer envelope for every mail ballot sent to a voter in Pennsylvania has a unique barcode. *Id.* at 69:7–19.

**RESPONSE**:  Admitted.

57.     The Pennsylvania Department of State has instructed county boards to scan mail ballots into SURE as quickly as possible after they are received. Ex. E (Marks Dep.) at 82:20–83:17; Ex. E6.

**RESPONSE**:  Admitted.

17

**Supp. App. 308**

58.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties scan the barcode on the outer envelope of a completed mail ballot upon receipt, which creates a record in the SURE system of the date and time that the county board received the mail ballot, Ex. E (Marks. Dep.) at 68:19–70:24, 116:12–119:8; Ex. F (Kauffman Dep.) at 55:25–56:22; Ex. G (Miller Dep.) at 114:11–24, 115:19–25; Ex. H (McCloskey Dep.) at 66:18–67:10.

**RESPONSE**:  Admitted.

59.     As instructed by the Pennsylvania Department of State, Ex. E6, many counties also physically stamp the outer envelope with the date and time upon receiving a completed mail ballot. Ex. F (Kauffman Dep.) at 37:2–6, 77:8–24, 79:22–80:8; Ex. G (Miller Dep.) at 61:19–25, 69:11– 23, 72:2–6, 85:19–86:5, 115:19–25; Ex. H (McCloskey Dep.) at 74:16–75:3, 110:9–13; Ex. K14 ("All incoming ballots are date stamped."); Ex. K45 ("The envelopes are stamped with the date received.").

**RESPONSE**:  Admitted.

60.     The date on which the voter fills out the ballot or signs the declaration on the outer envelope has no bearing on whether it was timely received by the county. Ex. E (Marks Dep.) at 128:5–12.

**RESPONSE**:  Admitted.

61.     The Berks County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. F (Kauffman Dep.) at 76:25–77:24.

**RESPONSE**:  Admitted.

18

Supp. App. 309

62.     The Lancaster County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. G (Miller Dep.) at 85:17–86:5.

**RESPONSE**:  Admitted.

63.     The Westmoreland County BOE does not use the handwritten date on a mail ballot's outer envelope to determine whether the ballot was timely received. Ex. H (McCloskey Dep.) at 74:16–75:3.

**RESPONSE**:  Admitted.

64.     County boards can determine whether a mail ballot was timely received without ever looking at the date written on a mail ballot envelope. Ex. K (responses to Request for Admission No. 2).

**RESPONSE**:  Admitted.

65.     The fact that the outer envelope of a mail ballot has no written date is not a reason to suspect fraud. Ex. G (Miller Dep.) at 118:11–17.

**RESPONSE**:  Admitted.

66.     The fact that a voter wrote the wrong year on the outer envelope of a mail ballot is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 84:17–85:11; Ex. G (Miller Dep.) at 70:13–71:6; Ex. H (McCloskey Dep.) at 76:19–77:12.

**RESPONSE**:  Admitted.

67.     The fact that a voter wrote a date on the outer envelope of a mail ballot that precedes the first date they could have received the ballot is not a reason to suspect fraud. Ex. G (Miller Dep.) at 70:13–18, 82:11–15; Ex. H (McCloskey Dep.) at 87:3–19.

**RESPONSE**:  Admitted.

19

Supp. App. 310

68.     The fact that a voter wrote a date on the outer envelope of a mail ballot that falls after the date of the election is not a reason to suspect fraud. Ex. F (Kauffman Dep.) at 78:15–79:15, 84:18–85:11; Ex. H (McCloskey Dep.) at 76:19–77:9.

**RESPONSE**:  Admitted.

69.     The date written on a mail-ballot's outer envelope provides no help to a county board in preventing that voter from also casting an in-person ballot on election day. Ex. G (Miller Dep.) at 116:2–118:2.

**RESPONSE**:  Admitted.

70.     If a voter submits a mail ballot and then later casts an in-person provisional ballot on election day, the mail ballot will be counted and the in-person ballot will not be counted. *Id.* at 116:2–14.

**RESPONSE**:  Admitted.

71.     If a voter submits a mail ballot and casts an in-person provisional ballot on election day, the date written on the mail-ballot's outer envelope provides no help to a county board in determining which ballot to count. *Id.* at 116:22–117:3.

**RESPONSE**:  Admitted.

72.     No county identified, raised, or was made aware of any credible concern regarding fraud with respect to the way that voters wrote (or failed to write) the date on the outer envelope of their mail ballots in the November 2022 election. Ex. J (responses to Interrogatory No. 10); Ex. G (Miller Dep.) at 82:11–24; Ex. H (McCloskey Dep.) at 88:4–12.

**RESPONSE**:  Admitted.

Supp. App. 311

73.     While a voter was referred to the district attorney in Lancaster County for allegedly voting on behalf of her deceased mother, the mother's ballot would never have been counted in that election because the county had already removed her from the voter rolls after receiving information indicating she had passed away. Ex. G (Miller Dep.) at 87:18–94:15.

**RESPONSE**: Admitted.

74.     County boards are provided notification of a voter's death by the Department of Health. Ex. F (Kauffman Dep.) at 35:23–36:3; Ex. G (Miller Dep.) at 101:24–102:5; 25 P.S. § 1505(a).

**RESPONSE**: Admitted.

75.     County boards do not use the date written on the outer envelope of a mail ballot to determine whether the voter passed away before election day or whether to count a ballot from such a person. Ex. F (Kauffman Dep.) at 36:20–37:25; Ex. H (McCloskey Dep.) at 36:12–23.

**RESPONSE**: Admitted.

76.     The date written on the outer envelope of a mail ballot provides no information regarding the date on which the voter filled out that ballot or the truthfulness of the voter's affirmation. Ex. E (Marks Dep.) at 127:3–18, 135:6–21, 156:11–22, 204:6–19; Ex. G (Miller Dep.) at 61:11–16, 79:3–21; Ex. H (McCloskey Dep.) at 66:9–15, 70:5–10.

**RESPONSE**: Admitted.

77.     The Berks County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. F (Kauffman Dep.) at 39:22–40:2.

**RESPONSE**: Admitted.

Supp. App. 312

78. The Lancaster County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. G (Miller Dep.) at 113:23–114:8.

**RESPONSE**: Admitted.

79. The Westmoreland County BOE does not use the date written on a mail ballot's outer envelope for any purpose other than to determine compliance with the Date Provision. Ex. H (McCloskey Dep.) at 37:8–38:2.

**RESPONSE**: Admitted.

80. Plaintiff Bette Eakin is a veteran and registered Democrat in Erie County. Ex. A (Eakin Decl.) ¶¶ 1–3.

**RESPONSE**: Berks Board is without knowledge about plaintiff Bette Eakin, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

81. In the 2022 general election, Ms. Eakin submitted a mail ballot to the Erie County Board of Elections before election day because of her medical condition, which required her to travel to Ohio to receive medical care through election day. *Id.* ¶ 4.

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

Supp. App. 313

82.     At the time she submitted her mail ballot, Ms. Eakin was undergoing care for a condition that has made her legally blind, forcing her to travel to a county board of elections office where she could obtain assistance in completing her ballot. An election worker helped Ms. Eakin request and obtain her mail ballot, complete the mail ballot, place the mail ballot in the secrecy and outer envelopes, and complete the declaration on the outer envelope. *Id.* ¶ 5.

**RESPONSE**:  Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

83.     Days later, when Ms. Eakin was receiving her medical treatment in Ohio, she received an email stating that her mail ballot had been rejected because there was a defect on her balloting materials, which she later learned was due to a missing date on the outer envelope. *Id.* ¶ 6.  She was told that she would have to fix this error if she wanted her ballot to be counted. *Id.*

**RESPONSE**:  Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

84.     Voting is incredibly important to Ms. Eakin, and the news that her mail ballot had been rejected caused her to suffer significant emotional distress. *Id.* ¶ 7. Ms. Eakin suffers from post-traumatic stress disorder and a nervous disorder, and when she received the notification of her ballot's rejection, her anxiety skyrocketed. *Id.*

**RESPONSE**:  Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

Supp. App. 314

85.     Ms. Eakin spent the rest of the day making phone calls to rectify the situation, and even missed scheduled medical care appointments to figure out how to ensure her ballot would be counted. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

86.     Because Ms. Eakin was receiving medical treatment out of state, her husband had to immediately leave his hunting trip and drive two hours back to Erie so that he could help make sure Ms. Eakin's ballot was counted. *Id.* ¶ 8.

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

87.     Ms. Eakin's husband had to first stop at her son's residence and have her son assist him in printing a form that would authorize him to act as her designated agent. *Id.* ¶ 9.

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

88.     Ms. Eakin's husband then retrieved her ballot from where she submitted it, traveled to their local polling place, explained the situation, and submitted all materials at the last possible moment before the polling place closed. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

24

89.     Ms. Eakin is very concerned that the Date Provision will force her to go through a similar saga in future elections. *Id.* ¶ 10.

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

90.     Because of her disability, Ms. Eakin must rely on the assistance of others to complete a mail ballot like she did in 2022. But given her condition and anxiety disorders, going to her polling place on election day is extremely difficult and presents a serious risk to her health. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff The League of Women Voters of Pennsylvania (the "League"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

91.     Plaintiff DSCC is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Ex. B (DSCC Decl.) ¶ 2.

**RESPONSE**: Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

92.     DSCC's mission is to support the election of candidates of the Democratic Party across the country, including in Pennsylvania, to the U.S. Senate. *Id.* ¶ 3.

**RESPONSE**: Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

93.     DSCC works to accomplish its mission by, among other things, mobilizing and persuading voters through grassroots mobilization of volunteers and field organizers to conduct get-out-the-vote activities such as door knocking, text messaging, and phone calling. *Id.* ¶ 4.

Supp. App. 316

**RESPONSE**: Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

94.     DSCC also runs paid television, digital, and radio advertisements, as well as mailings, in support of Democratic candidates throughout the country, including in Pennsylvania. *Id.*

**RESPONSE**:  Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

95.     While most of DSCC's voter programs are focused on persuading eligible citizens to vote, DSCC also runs programs specifically geared toward explaining the voting process and how an eligible voter can successfully cast their ballot and have it counted. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

96.     DSCC also separately allocates substantial personnel time and money for "curing" activities in multiple states where it anticipates close senatorial races. *Id.* ¶ 5.

**RESPONSE**:  Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

97.     DSCC's curing activities involve tracking data from counties, contacting voters whose ballots have been rejected, and helping them perform whatever task is necessary to ensure their ballot is ultimately counted, which varies by county. *Id.*

**RESPONSE**:  Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

26

Supp. App. 317

98.     Since DSCC invests in persuading and mobilizing voters across the country, investing additional funds or personnel in one state will necessarily divert those resources from other states and key races. *Id.* ¶ 4.

**RESPONSE**: Denied.

99.     The Date Provision frustrates DSCC's mission because it erects an obstacle to ensuring all mail ballots cast by Pennsylvanians who support Democratic Senate candidates are actually counted and impairs those Democratic candidates' electoral prospects. *Id.* ¶ 6.

**RESPONSE**:  Denied

100.     In the 2022 general election, the Date Provision forced DSCC to divert substantial personnel time and money away from its advocacy and persuasion activities discussed above and instead towards explaining the Date Provision to voters and warning them of the consequences of failing to comply with the Date Provision. *Id.* ¶ 7.

**RESPONSE**:  Denied

101.     The Date Provision also forced DSCC to divert resources in 2022 away from helping voters in other states cure their rejected ballots and instead towards identifying voters in Pennsylvania whose ballots had been rejected because of the Date Provision and helping them take the steps necessary to ensure their ballots would be counted. *Id.*

**RESPONSE**:  Denied

102.     Absent the requested injunction, the Date Provision will continue to force DSCC to divert personnel time and money away from its advocacy and persuasion activities in Pennsylvania *and* in other states and *instead* towards educating voters in Pennsylvania about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot and towards researching how each county will go about determining whether the date

Supp. App. 318

written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 8.

**RESPONSE**: Denied

103.    The Date Provision will also continue to force DSCC in future elections to divert resources away from efforts to assist voters in other states in resolving issues with their rejected ballots and towards helping *voters* in Pennsylvania ensure their undated or misdated mail ballots are ultimately counted. *Id.* ¶ 9.

**RESPONSE**: Denied

104.    Democratic voters provide financial support in the form of political contributions to DSCC and candidates supported by DSCC on a *regular* basis, and also help select DSCC's leadership and ultimately determine DSCC's strategic and political direction by electing candidates to the United States Senate. *Id.* ¶ 10.

**RESPONSE**: Berks Board is without knowledge about plaintiff DSCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

105.    In the 2022 general election, over 2.7 million Pennsylvanians cast a vote for the Democratic senatorial candidate. *Id.* ¶ 11.

**RESPONSE**: Berks Board is without knowledge about the number of Pennsylvania voters who cast a vote for the Democrat candidate for U.S. Senator in Pennsylvania, but Berks Board does not dispute this averment for purposes of Plaintiffs' motion for summary judgment.

106.    Plaintiff DCCC is the Democratic *Party's* national congressional committee as defined by 52 U.S.C. § 30101(14). Ex. C (DCCC Decl.) ¶ 2.

**RESPONSE**: Berks Board is without knowledge about plaintiff DCCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

28

Supp. App. 319

107.     DCCC's mission is to support the election of candidates of the Democratic Party from across the country, including those running in *Pennsylvania's* congressional districts, to the U.S. House of Representatives. *Id.* ¶ 3.

**RESPONSE**: Berks Board is without knowledge about plaintiff DCCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

108.     DCCC works to accomplish its mission by, among other things, running paid advertisements in support of Democratic candidates; engaging in grassroots mobilization of volunteers and field organizers to perform persuasion efforts such as door knocking, text messaging, and phone banking, all towards the goal of convincing voters to support Democratic candidates; running paid canvasses for its members' *campaigns* to boost voter turnout; and encouraging voters to exercise their right to vote, through paid television, social media, and radio advertisements, phone calls, and mailings for voter education, as well as paying for professionals to assist in the aforementioned get-out-the-vote efforts. *Id.* ¶ 4. DCCC also supports efforts of state parties throughout the country, including in Pennsylvania, to conduct these activities by providing money, staff and volunteer time, and ongoing coordination. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff DCCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

109.     DCCC also allocates and devotes staff, volunteers, and funds to assist voters in curing absentee or mail ballots in states where it anticipates there will be close congressional races. *Id.* ¶ 5. Helping voters *cure* their ballots involves contacting voters whose ballots have been rejected and helping them perform whatever task is necessary to ensure that their ballot is ultimately counted. *Id.* These activities require DCCC to devote substantial personnel time and

29

money to track data from counties, contact voters, and assist them in completing the curing process established in each county. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff DCCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

110.    The Date Provision frustrates DCCC's mission because it erects an obstacle to ensuring all ballots cast *by* Pennsylvanians who support Democratic congressional candidates are actually counted, which harms those Democratic candidates' electoral prospects. *Id.* ¶ 6.

**RESPONSE**: Denied

111.    As a result of the Date Provision, DCCC will be forced to divert personnel time and money away from its *persuasion* and mobilization activities and instead towards educating voters about the Date Provision and the severe consequences of failing to correctly date the outer envelope of a mail ballot, as well as spending personnel time researching how each county will go about determining whether *the* date written on a mail-ballot envelope is "correct," and their respective procedures for curing such ballots. *Id.* ¶ 7.

**RESPONSE**: Denied

112.    The Date Provision will also force DCCC to divert the resources it has allocated for ballot curing activities in *other* states towards races in Pennsylvania, which impairs DCCC's ability to help voters and support Democratic candidates in other states. *Id.* ¶ 8.

**RESPONSE**: Denied

113.    DCCC also *represents* the interests of Democratic voters in Pennsylvania and considers those individuals to be DCCC's constituents. *Id.* ¶ 9. Democratic voters provide financial support in the form of political contributions to DCCC and candidates supported by DCCC on a regular basis, and also help select DCCC's leadership and ultimately determine DCCC's strategic

Supp. App. 321

and political direction by electing candidates to the United States House of Representatives. *Id.* DCCC asserts its claims on behalf of itself and its constituents in Pennsylvania. *Id.*

**RESPONSE**: Berks Board is without knowledge about plaintiff DCCC, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

114.    In the 2022 general *election*, more than 2.4 million Pennsylvanians cast a vote for the Democratic congressional candidate in their district. *Id.* ¶ 10.

**RESPONSE**: Berks Board is without knowledge about the number of Pennsylvania voters who cast a vote for the Democrat candidate for U.S. Representative in their district, but Berks Board does not dispute this averment for purposes of Plaintiffs' motion for summary judgment.

115.    Plaintiff AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,000 members in 55 local affiliates *across* Pennsylvania. Ex. D (AFT Decl.) ¶¶ 2–3.

**RESPONSE**: Berks Board is without knowledge about plaintiff AFT Pennsylvania (the "Federation"), but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

116.    The Federation's members include public school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. *Id.* ¶ 3. These members attend meetings of, and pay dues to, their local AFT affiliates (who in turn contribute funds to the Federation as a whole), as well as elect delegates to a biannual statewide convention, which elects the Federation's leadership. *Id.* ¶ 4.

**RESPONSE**: Berks Board is without knowledge about plaintiff the Federation, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

Supp. App. 322

117.    The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for teachers and school staff, as well as excellence in public service through cooperative problem-solving and workplace innovations. *Id.* ¶ 5.

**RESPONSE**: Berks Board is without knowledge about plaintiff the Federation, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

118.    In furtherance of its mission, the Federation and its individual members devote significant resources towards advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are able to access the franchise to support these policies at the ballot box. These resources take the form of direct contributions to candidates, running phone banks and canvassing, and sharing information with members about getting out the vote. *Id.* ¶¶ 6–7.

**RESPONSE**:  Berks Board is without knowledge about plaintiff the Federation, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

119.    Because Federation members typically have to work on election day, many turn to mail ballots to exercise their right to vote. *Id.* ¶ 8.

**RESPONSE**:  Berks Board is without knowledge about plaintiff the Federation, but Berks Board does not dispute these averments for purposes of Plaintiffs' motion for summary judgment.

120.    Any provision or policy requiring the rejection of valid mail ballots with missing or incorrect dates ("the Date Provision") threatens to disenfranchise members of the Federation who are unquestionably eligible to vote. *Id.*

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.

Supp. App. 323

121.     At least one Federation member had his mail ballot rejected in 2022 because of the Date Provision. *Id.* ¶ 9.

**RESPONSE**:  Berks Board is without knowledge about whether at least one Federation member had his mail ballot rejected in 2022 because of the date provision, but Berks Board does not dispute this averment for purposes of Plaintiffs' motion for summary judgment.  The Federation member whose mail ballot was rejected in 2022 based on non-compliance with the Date Provision was a Philadelphia County voter, not a Berks County voter.

122.     For the 2022 general election, the Date Provision forced the Federation to spend resources on digital communications such as email newsletters and online publications to educate its members about the need to correctly date the outer envelope of mail ballots, and also to spend staff and member time reaching out to help its members and other Pennsylvania voters cure their ballots after they were rejected because of the Date Provision. *Id.* ¶ 10.

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.

123.     The rejection of undated or misdated ballots frustrates the Federation's mission of electing candidates who support the policies for which the Federation advocates, and will force the Federation to divert staff and member time in future elections from its advocacy efforts toward educating its members and other voters specifically about the need to date their mail ballots and what to do if their ballot is rejected pursuant to the Date Provision. *Id.* ¶ 11. The Federation will also have to divert staff and member time helping voters whose mail ballots are rejected under the Date Provision ensure that their votes are ultimately counted. *Id.*  And because the Federation has limited resources, the staff and member time spent on activities meant to mitigate the Date Provision's harms will necessarily divert resources away from the Federation's other core

Supp. App. 324

activities, including canvassing and get-out-the-vote efforts such as phone banking, door knocking, and rallying at community events like roundtables and book giveaways. *Id.*

**RESPONSE**:  Denied.  Berks Board disputes this conclusion.

<div align="center">
Respectfully submitted,
</div>

Dated: May 5, 2023                                    **SMITH BUKOWSKI, LLC**

By:    /s/ Jeffrey D. Bukowski
        Jeffrey D. Bukowski, Esquire
        PA Attorney I.D. No. 76102
        **JBukowski@SmithBukowski.com**
        1050 Spring Street, Suite 1
        Wyomissing, PA 19610
        Telephone: (610) 685-1600
        Facsimile:  (610) 685-1300

*Attorneys for Berks County Board of Elections*

**Supp. App. 325**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENNSYLVANIA STATE | : | |
| CONFERENCE OF THE NAACP, *et al.*, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | No. 1:22-cv-00339-SPB |
| v. | : | |
| | : | |
| LEIGH M. CHAPMAN, in her official | : | |
| capacity as Acting Secretary of the | : | |
| Commonwealth, *et al.*, | : | |
| | : | **ELECTRONICALLY FILED** |
| Defendants. | : | |

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. Civ. P. 5(b) and LCvR 5.6, the undersigned hereby certifies that the

foregoing document was electronically filed on the below date with the Court's CM/ECF system,

which transmitted a Notice of Electronic Filing of the filed document on counsel of record and/or

each party in the case who is registered as a Filing User.

Dated: May 5, 2023

**SMITH BUKOWSKI, LLC**

By: /s/ Jeffrey D. Bukowski
     Jeffrey D. Bukowski, Esquire
     PA Attorney I.D. No. 76102
     **JBukowski@SmithBukowski.com**
     1050 Spring Street, Suite 1
     Wyomissing, PA 19610
     Telephone: (610) 685-1600
     Facsimile: (610) 685-1300

*Attorneys for Berks County Board of Elections*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETTY EAKIN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 1:22-cv-00340-SPB |
| | : | |
| ADAMS COUNTY BOARD OF | : | |
| ELECTIONS, *et al.*, | : | |
| | : | **ELECTRONICALLY FILED** |
| Defendants. | : | |

**DEFENDANT BERKS COUNTY BOARD OF ELECTIONS' BRIEF IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant Berks County Board of Elections ("Berks Board"), by its undersigned attorneys, joins in and incorporates by reference the brief in opposition to Plaintiffs' motion for summary judgment (doc. 287) filed by Lancaster County Board of Elections ("Lancaster Board") (doc. 306). All of the arguments asserted by Lancaster Board apply equally to Berks Board.

For all the reasons stated in Lancaster Board's brief in opposition to Plaintiffs' motion for summary judgment, Plaintiffs' motion should be denied, and the Court should grant summary judgment in favor of Berks Board and the other defendants.

Berks Board makes one additional argument in opposition to Plaintiffs' motion for summary judgment and in support of Defendants' motions for summary judgment.

The provision of the Election Code at issue involves a voter's declaration, and the Pennsylvania Election Code requires the declaration to be both signed and dated. The voter's declaration is returned to the voter's county board of elections with the voter's mail-in or absentee ballot.

1

Supp. App. 327

How can a voter be held accountable for a false declaration stating, among other things, "I have not already voted in this election," unless the voter's declaration is both signed and dated?

It is not onerous or unusual to legally require a declarant to sign and date a declaration or affidavit stating certain facts are true. Indeed, 28 U.S.C. § 1746 is a federal law example of such a requirement. That federal statute allows provides that when any matter is required or permitted to be supported, evidenced, established, or proved by a <u>sworn</u> written declaration, verification, certificate, statement, oath or affidavit, an <u>unsworn</u> declaration, verification, certificate, statement, oath or affidavit may be provided instead, with like force and effect, to support, evidence, establish or prove the matter at issue, as long as the unsworn declaration is in a writing that is subscribed to be true under penalty of perjury, and dated, in a specified form (depending on whether it is executed within or without the United States, its territories, possessions, or commonwealths).

Regardless of where it is executed, both forms require the declarant to provide the date on which the declaration is executed:

> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

*See* 28 U.S.C. § 1746.

Supp. App. 328

**WHEREFORE**, the Court should deny Plaintiffs' motion for summary judgment, and the Court should instead grant summary judgment in favor of Berks Board and the other defendants.

Respectfully submitted,

Dated: May 5, 2023                                    **SMITH BUKOWSKI, LLC**

By:  /s/ Jeffrey D. Bukowski
     Jeffrey D. Bukowski, Esquire
     PA Attorney I.D. No. 76102
     **JBukowski@SmithBukowski.com**
     1050 Spring Street, Suite 1
     Wyomissing, PA 19610
     Telephone: (610) 685-1600
     Facsimile:  (610) 685-1300

*Attorneys for Berks County Board of Elections*

Supp. App. 329

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETTY EAKIN, *et al.*,                     :
                                            :
                    Plaintiffs,            :       CIVIL ACTION
                                            :
          v.                                :       No. 1:22-cv-00340-SPB
                                            :
ADAMS COUNTY BOARD OF                       :
ELECTIONS, *et al.*,                        :
                                            :       **ELECTRONICALLY FILED**
                    Defendants.             :

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and LCvR 5.6, the undersigned hereby certifies that the foregoing document was electronically filed on the below date with the Court's CM/ECF system, which transmitted a Notice of Electronic Filing of the filed document on counsel of record and/or each party in the case who is registered as a Filing User.

Dated: May 5, 2023                          **SMITH BUKOWSKI, LLC**

                                    By:     /s/ Jeffrey D. Bukowski
                                            Jeffrey D. Bukowski, Esquire
                                            PA Attorney I.D. No. 76102
                                            **JBukowski@SmithBukowski.com**
                                            1050 Spring Street, Suite 1
                                            Wyomissing, PA 19610
                                            Telephone: (610) 685-1600
                                            Facsimile: (610) 685-1300

                                    *Attorneys for Berks County Board of Elections*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BETTE EAKIN, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ADAMS COUNTY BOARD OF<br>ELECTIONS, *et al.*,<br><br>        Defendants. | Case No. 1:22-cv-00339 |

**INTERVENOR-DEFENDANTS' RESPONSE TO DEFENDANTS' COUNTY BOARDS
OF ELECTIONS ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS
AND RESPONSES TO INTERVENOR-DEFENDANTS'
CONCISE STATEMENT OF MATERIAL FACTS**

Intervenor-Defendants the Republican National Committee, National Republican
Congressional Committee, and Republican Party of Pennsylvania respectfully file these Responses
to the Defendants' County Boards of Elections Additional Concise Statement Of Material Facts
And Responses To Intervenor-Defendants' Concise Statement Of Material Facts, Dkt. No. 316,
and state as follows:

## RESPONDING COUNTIES' ADDITIONAL STATEMENT OF MATERIAL FACTS

**I.    Philadelphia County Board of Elections ("Philadelphia County") does not use the
handwritten date to determine the qualification of the voter, the timeliness of the
ballot, or prevent fraud**

> **Intervenor-Defendants' Response: Admitted in part and denied in part.**

> **Admitted that the handwritten date is not used to determine the qualification of the
voter or the timeliness of the ballot.**

> **Denied that the handwritten date is not used to prevent fraud. The handwritten date
has already been used to detect voter fraud. *See* Dkt. No. 272 ¶¶ 48-55. It follows
that the handwritten date is relevant for deterring and thereby preventing fraud.**

**Supp. App. 331**

1.     To vote by absentee or mail-in ballot in Philadelphia County, prospective voters must first send a voter application to Philadelphia County. APP-70 (Custodio Decl. ¶ 6).

**Intervenor-Defendants' Response**: **Admitted that Mr. Custodio made this assertion in his declaration.**

2.     Philadelphia County then reviews the application and determines whether the voter is registered and qualified to vote. APP-70-71 (Custodio Decl. 6, 12); 25 P.S §§ 3146.2b, § 3146.8(g)(4), 3150.12b.

**Intervenor-Defendants' Response**: **Admitted that Mr. Custodio made this assertion in his declaration.**

3.     If Philadelphia County approves the application, it mails an absentee or mail-in ballot package to the approved voter. APP-70 (Custodio Decl. ¶ 6).

**Intervenor-Defendants' Response**: **Admitted that Mr. Custodio made that assertion in his declaration, on the understanding that he also declared that "if the voter is applying in person, the Board hands them the ballot package."  Dkt. No. 317 at 73 (APP-70).**

4.     This review and approval process at the application stage confirms the voter's identity and eligibility to vote. APP-70-71 (Custodio Decl. 6, 12).

**Intervenor-Defendants' Response**: **Admitted that Mr. Custodio made this assertion in his declaration.**

5.     Philadelphia County's determination that an individual is qualified to vote is conclusive unless the voter's eligibility is challenged before Election Day. 25 P.S. §§ 3150.12b, 3146.8(g)(3)-(4).

**Intervenor-Defendants' Response**: **Admitted.**

6.     Each absentee and mail-in ballot envelope contains a correspondence ID that is unique to both the voter and election for export to the Statewide Uniform Registry of Electors (SURE) system. APP-71-72 (Custodio Decl. ¶¶ 10, 16).

Supp. App. 332

**Intervenor-Defendants' Response: Admitted that Mr. Custodio makes that assertion in his declaration.**

7.     When Philadelphia County receives absentee and mail-in ballot envelopes, it runs those envelopes through a sorting machine that scans the unique ID and records that the voter has returned an absentee or mail-in ballot. APP-70-71 (Custodio Decl. 8-10).

**Intervenor-Defendants' Response: Admitted that Mr. Custodio makes this assertion in his declaration, on the qualification that he made this assertion for the "vast majority" of ballots rather than all ballots.  Dkt. No. 317 at 73 (APP-70).**

8.     This system prevents a voter from using outdated ballot material because Philadelphia County will only count absentee and mail-in ballot that contain the correspondence ID unique to both the voter and the election. APP-72 (Custodio Decl. 15-16).

**Intervenor-Defendants' Response: Admitted that Mr. Custodio makes that assertion in his declaration.**

9.     This process does not rely on the voter's handwritten date on the outer return envelope to determine the voter's qualifications to vote. APP-70-71 (Custodio Decl. 6, 12).

**Intervenor-Defendants' Response: Admitted.**

10.     Philadelphia County also ensures that each absentee and mail-in ballot is timely received, because absentee and mail-in voter must fill out and return the ballot to Philadelphia County by 8:00 p.m. on Election Day. APP-70-71 (Custodio Decl. 6, 8-11) 25 P.S. §§ 3146.6, 3150.16.

**Intervenor-Defendants' Response: Admitted.**

11.     Philadelphia County records the time it receives each returned absentee or mail-in ballot envelope. APP-70 (Custodio Decl. ¶ 9).

**Intervenor-Defendants' Response: Admitted.**

Supp. App. 333

12.     The vast majority of all ballots are run through the sorting machine, which stamps each ballot envelope with the date and time the ballot was returned to Philadelphia County. APP-70 (Custodio Decl. ¶ 9).

**Intervenor-Defendants' Response: Admitted that Mr. Custodio makes that assertion in his declaration.**

13.     A small number of ballots are manually marked with the date and time the ballot was returned to Philadelphia County. APP-70 (Custodio Decl. 8-9).

**Intervenor-Defendants' Response: Admitted that Mr. Custodio makes that assertion in his declaration.**

14.     Philadelphia County then confirms the timeliness of each absentee and mail-in ballot by referring to the date and time that it was either stamped by the sorting machine or manually marked by Philadelphia County. APP-71 (Custodio Decl. ¶ 11).

**Intervenor-Defendants' Response: Admitted.**

15.     A voter's handwritten date is irrelevant to this process and is not used to determine whether a mail-in or absentee ballot is timely received. It serves no purpose to Philadelphia County. APP-71-72 (Custodio Decl. 12, 16). The Allegheny, Bucks, Chester, and Montgomery County Boards of Elections likewise do not use the handwritten date to determine whether a voter is qualified, or whether a ballot was timely. APP-79-80 (Allegheny County Response to Interrogatory No. 14); APP-85 (Bucks County Response to Interrogatory No. 14); APP-97 (Chester County Response to Interrogatory No. 14); APP-102-103 (Montgomery County Response to RFA Nos 1, 2).

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that the handwritten date is not used to determine whether the ballot was timely received or whether the voter is qualified.**

**Denied that the handwritten date "serves no purpose." For instance, the handwritten date has already been used to detect voter fraud. *See* Dkt. No. 272 ¶¶ 48-55.**

4

16.     Philadelphia County has not identified any actual or suspected instances of voting-related fraud connected with absentee or mail-in ballots, and it has no reason to believe that non-enforcement of the handwritten date requirement would cause an increase in voter-related fraud. APP-72 (Custodio Decl. ¶¶ 15-16).

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Mr. Custodio asserts in his declaration that Philadelphia County has not identified any actual or suspected instances of voting-related fraud connected with mail-in or absentee ballots returned in undated or misdated envelopes.**

**Denied that Philadelphia County "has no reason to believe that non-enforcement of the handwritten date requirement would cause an increase in voter-related fraud." The handwritten date has already been used to detect voter fraud in Pennsylvania. *See* Dkt. No. 272 ¶¶ 48-55.  That itself is reason to believe that failing to enforce the date requirement would lead to voter fraud going undetected.**

17.     Philadelphia County will need to expend significant time and labor to check for a handwritten date that is not relevant to determining that any ballots were timely received, whether the voter is qualified to vote, or any other purpose. APP-71 (Custodio Decl. 12, 14).

**Intervenor-Defendants' Response: Admitted in part and denied in part.**

**Admitted that Mr. Custodio asserts that enforcing the date requirement requires significant time and labor by the Board.**

**Denied that the handwritten date is not relevant to any purpose.  For instance, the handwritten date has already been used to detect voter fraud. *See* Dkt. No. 272 ¶¶ 48-55.**

18.     Philadelphia County receives many absentee and mail-in ballots each election cycle. APP-71-72 (Custodio Decl. ¶ 14).

**Intervenor-Defendants' Response: Admitted.**

19.     For example, in the 2022 General Election, Philadelphia County received nearly 134,000 absentee and mail-in ballots before the Election Day deadline. APP-71-72 (Custodio Decl. ¶ 14).

Supp. App. 335

_**Intervenor-Defendants' Response**_: **Admitted.**

20.    Given the volume, Philadelphia County does not manually review the vast majority absentee and mail-in ballots. APP-71 (Custodio Decl. ¶ 13 & n.1).

> _**Intervenor-Defendants' Response**_: **Admitted that Mr. Custodio makes this assertion in his declaration, on the understanding that the Counties are also referring to paragraph 9. Dkt. No. 317 at 73 (APP-70).**

21.    Rather, automated sorting machines are configured to recognize when a ballot is returned without a handwritten signature or without the internal secrecy envelope that is required by the Pennsylvania Election Code. APP-71 (Custodio Decl. ¶ 13 & n.1).

> _**Intervenor-Defendants' Response**_: **Admitted.**

22.    These machines cannot be configured to detect a ballot missing a "correct" handwritten date. APP-71 (Custodio Decl. ¶ 13 & n.1).

> _**Intervenor-Defendants' Response**_: **Admitted that Mr. Custodio makes this assertion in his declaration.**

23.    To enforce the dating requirement, Philadelphia County is required to devote considerable extra time and labor to manually identify ballots that have a missing or incorrect date. APP-71-72 (Custodio Decl. ¶¶ 13-14).

> _**Intervenor-Defendants' Response**_: **Admitted that Mr. Custodio makes this assertion in his declaration.**

**II.    The dating requirement disproportionately affects elderly Pennsylvania residents**.

> _**Intervenor-Defendants' Response**_: **Denied as unsupported for the reasons stated below.**

24.    In the 2022 General Election, pursuant to orders of the Pennsylvania Supreme Court, Philadelphia County was required to segregate and not count 2,617 timely ballots by otherwise qualified voters solely because the voters failed to comply with the handwritten date requirement. APP-3 (Philadelphia County Response to Interrogatory No. 2).

Supp. App. 336

**Intervenor-Defendants' Response: Admitted.**

25.    None of the voters who submitted those ballots submitted replacement ballots, but 580 of those voters submitted provisional ballots. APP-3 (Philadelphia County Response to Interrogatory No. 2).

**Intervenor-Defendants' Response: Admitted.**

26.    Elderly voters were disproportionately overrepresented in the number of segregated and uncounted ballots:

> **Intervenor-Defendants' Response: Denied as unsupported.  Even if the numbers below are accurate, no data is provided as to the breakdown by age of the pool of voters who voted by absentee or mail-in ballot.  In other words, no evidence is provided regarding the rate at which elderly voters and non-elderly voters used absentee or mail-in ballots, as opposed to other methods of voting.  Because elderly voters may have used absentee or mail-in voting at a higher rate than non-elderly voters, the rate at which elderly voters' absentee or mail-in ballots were set aside may have been lower than the rate at which non-elderly voters' absentee or mail-in ballots were set aside.  See Dkt. No. 272 ¶¶ 135-146.**

- The median age of voters who submitted undated ballots is **64-years old.** The median jumps to **66-years old** for voters who submitted misdated ballots.

> **Intervenor-Defendants' Response: Admitted that the cited meeting transcript makes this assertion as to Philadelphia County.  Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots."  See also Dkt. No. 272 ¶¶ 135-146.**

- Voters **over the age of 50** submitted **nearly 75%** of undated ballots and **77%** of misdated ballots.

> **Intervenor-Defendants' Response: Admitted that the cited meeting transcript makes this assertion as to Philadelphia County.  Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots."  See also Dkt. No. 272 ¶¶ 135-146.**

- Voters **over the age of 60** submitted **more than 60%** of the undated ballots and **64% of the** misdated ballots.

Supp. App. 337

**Intervenor-Defendants' Response:** Admitted that the cited meeting transcript says that voters over the age of 60 submitted 60.9% of the undated ballots and 64.1% of the misdated ballots in Philadelphia County. Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots." *See also* **Dkt. No. 272 ¶¶ 135-146.**

- Voters **over the age of 70** submitted more **than 40%** of misdated ballots and **37.5%** of undated ballots.

    **Intervenor-Defendants' Response:** Admitted that the cited meeting transcript says that voters over the age of 70 submitted 40.9% of the misdated ballots and 37.5% of the undated ballots in Philadelphia County. Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots." *See also* **Dkt. No. 272 ¶¶ 135-146.**

- Voters **in their 80s** submitted approximately **14%** of the undated and misdated ballots.

    **Intervenor-Defendants' Response:** Admitted that the cited meeting transcript makes this assertion as to Philadelphia County. Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots." *See also* **Dkt. No. 272 ¶¶ 135-146.**

- And **more than 70** ballots from voters **90-years old and older** were segregated and not counted as either misdated or undated.

APP-18-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 4-6, PHILA-000041-43).

    **Intervenor-Defendants' Response:** Admitted that the cited meeting transcript says that 72 ballots from voters 90-years old and older were either misdated or undated. Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots." *See also* **Dkt. No. 272 ¶¶ 135-146.**

27. "[T]hese percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent." APP-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 6:2-5, PHILA-000043).

    **Intervenor-Defendants' Response:** Admitted that the cited meeting transcript makes this assertion. Denied that this fact supports the Counties' assertion that "[e]lderly voters were disproportionately represented in the number of segregated and uncounted ballots." *See also* **Dkt. No. 272 ¶¶ 135-146. Indeed, the relevant pool of**

Supp. App. 338

**voters is not all of Philadelphia's registered voters, but those voters who chose to vote by absentee or mail-in ballot in the November 2022 general election.**

28.     Philadelphia County's review of the data suggests that enforcement of the dating requirement in the 2022 General Election also disproportionately impacted discrete Philadelphia communities, including areas with higher poverty rates and lower rates of educational attainment. APP-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 6:13-20, PHILA-000043).

> **Intervenor-Defendants' Response: Admitted that the cited meeting transcript makes this assertion.  Denied to the extent that the term "disproportionately impacted" is vague.  Also denied to the extent that this analysis mirrors Philadelphia County's other analyses, which failed to measure the rate of utilization of absentee or mail-in ballots or the rate at which such ballots were set aside.  Also denied to the extent that the Counties do not explain this analysis, and Intervenor-Defendants therefore cannot opine as to whether Philadelphia County's "review of the data" "suggests" anything.**

Supp. App. 339

Dated:  May 10, 2023

Respectfully submitted,

_/s/ Kathleen A. Gallagher_       
Kathleen A. Gallagher
PA I.D. #37950
Russell D. Giancola
PA. I.D. #200058
GALLAGHER GIANCOLA LLC
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
Phone: (412) 717-1900
kag@glawfirm.com
rdg@glawfirm.com

John M. Gore (*pro hac vice*)
E. Stewart Crosland
Louis J. Capozzi III
Joshua S. Ha
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com

Thomas W. King, III
Thomas E. Breth
DILLON, McCANDLESS, KING,
  COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA  16001
Phone: (724) 283.2200
tking@dmkcg.com
tbreth@dmkcg.com

*Counsel for Intervenor-Defendants*

Supp. App. 340

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETTY EAKIN, et al, | ) | |
|     Plaintiffs, | ) | Civil Action No. 1:22-CV-340 |
| | ) | |
|     v. | ) | |
| | ) | |
| ADAMS COUNTY BOARD OF | ) | |
| ELECTIONS, et al, | ) | |
|     Defendants. | ) | |

# CERTIFICATION
# OF CONSTITUTIONAL CHALLENGE
# TO PENNSYLVANIA ATTORNEY GENERAL

Plaintiffs in this action challenge the constitutionality of Commonwealth's date requirement, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), under the First and Fourteenth Amendments to the U.S. Constitution.

Plaintiffs have not named the state or any state agency as a party to this lawsuit. Accordingly, pursuant to 28 U.S.C. § 2403(b) and Federal Rule of Civil Procedure 5.1, the Attorney General of Pennsylvania is hereby noticed of this constitutional challenge.

AND NOW, this 18th day of June 2024,

IT IS HEREBY ORDERED that the Commonwealth of Pennsylvania is permitted to intervene for the presentation of evidence and for argument on the question of constitutionality.

SUSAN PARADISE BAXTER
United States District Judge

1

Supp. App. 341

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA
### ERIE DIVISION

|  |  |
|---|---|
| BETTE EAKIN, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>          Defendants. | Case No. 1:22-cv-00340-SPB |

## APPENDIX OF EXHIBITS ACCOMPANYING
## PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS

| Exhibit | Description | Appendix Page Number |
|---------|-------------|----------------------|
| A | Declaration of Bette Eakin | 1 |
| B | Declaration of Devan Barber (DSCC) | 5 |
| C | Declaration of Erik Ruselowski (DCCC) | 10 |
| D | Declaration of Arthur Steinberg (AFT Pennsylvania) | 15 |
| E | Deposition Transcript of Jonathan Marks (Excerpted) | 20 |
| F | Deposition Transcript of Cody Kauffman (Berks County) (Excerpted) | 68 |
| G | Deposition Transcript of Crista Miller (Lancaster County) (Excerpted) | 111 |
| H | Deposition Transcript of Greg McCloskey (Westmoreland County) (Excerpted) | 175 |
| I | Expert Declaration of Daniel Hopkins | 209 |
| J | County Responses to Interrogatories (Excerpted) | 243 |
| K | County Responses to Requests for Admission (Excerpted) | 530 |

| L | Order, *Ball v. Chapman*, No. 102 MM 2022 (Pa. Nov. 5, 2022) | 774 |
| M | Pa. Dep't of State, "Vote In Person By Mail Ballot Before Election Day," https://www.vote.pa.gov/Voting-in-PA/Pages/Early-Voting.aspx (retrieved April 16, 2023) | 777 |

Dated: April 21, 2023

<div style="display: flex; justify-content: space-between;">

Adam C. Bonin
**THE LAW OFFICE OF**
**ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

</div>

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Justin Baxenberg*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
Omeed Alerasool*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law
oalerasool@elias.law

*\* Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

Supp. App. 343

# Exhibit I

Supp. App. 344

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

BETTE EAKIN, *et al.*,

        Plaintiffs,

    v.

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

        Defendants.

Case No. 1:22-cv-00340-SPB

## EXPERT DECLARATION OF DANIEL HOPKINS

Pursuant to 28 U.S.C. § 1746, I, Daniel Hopkins, hereby declare as follows:

1.      I have personal knowledge of the matters in this declaration and can testify to them in court.

2.      I am over eighteen years of age and am otherwise competent to testify.

## I.    Qualifications

3.      I am a tenured Professor of Political Science at the University of Pennsylvania. I received a Ph.D. in Government from Harvard University in 2007, where I had previously received an A.B. in Social Studies in 2000 *Magna Cum Laude*. I have taught undergraduate and Ph.D.-level courses on elections and statistical methods at Yale University, Harvard University, Georgetown University, and the University of Pennsylvania since receiving my Ph.D. I have published more than 50 peer-reviewed academic articles, and I have also published writings in *The Washington Post*, FiveThirtyEight.com, and other general-interest venues. According to Google Scholar, my research has been cited by other scholars over 10,000 times. My published peer-reviewed work includes analyses of voter mobilization by election officials and of "naked ballots" cast outside of secrecy envelopes in Philadelphia County, Pennsylvania. Another article I co-authored examines

1

shifting presidential voting patterns in Pennsylvania (alongside other states) between 2012 and 2016. Additionally, my research has examined the effects of ballots in non-English languages as well as changes in policies related to voter identification. I am the author of *The Increasingly United States: How and Why American Political Behavior Nationalized*, a 2018 book published by the University of Chicago Press which analyzes federal, state, and local election results.

4.      At the University of Pennsylvania, my responsibilities include teaching applied statistics to Ph.D. students as well as data science and American elections to undergraduates. I also serve as an associate editor of *Political Analysis*, the leading journal of statistical methodology within the discipline of political science. I previously served as an associate editor for the journal *Political Behavior*. I served on the White House Social and Behavioral Sciences Team in 2015. I also co-founded the Philadelphia Behavioral Science Initiative and served as the President of the Political Psychology section of the American Political Science Association.

5.      My CV is appended to the end of this report.

6.      I am being paid at a rate of $400 per hour for my work related to this case. In the previous four years I have not testified as an expert witness at a trial or by deposition.

## II.      Summary of Opinions

7.      Counsel for the plaintiffs in this case asked me to analyze the impact on voters caused by Pennsylvania's requirement that county board of elections reject mailed ballots contained in an undated or misdated envelope, a policy I refer to as the "date requirement."

8.      In this declaration, I reach two main conclusions about the effect of the date requirement.

9.      First, by increasing the "cost" of casting a successfully recorded vote, the date requirement imposes burdens on Pennsylvanians' ability to exercise their right to vote. Those burdens are not felt uniformly, as voters with fewer resources are less likely to be able to overcome

**Supp. App. 346**

them. Prior research consistently finds that individuals with more resources—whether those resources are financial, educational, experiential, linguistic, or with respect to time, health, social networks, or mobility—are better able to adjust to increases in the costs of voting. For different reasons Black, Hispanic, and older voters in Pennsylvania may have lower levels of these resources on average. As a result, we might expect these groups to be particularly susceptible to increased costs of voting such as those caused by the date requirement.

10.     Second, a quantitative analysis of mail ballots submitted in the 2022 general election confirms that expectation: the date requirement leads county boards of elections to reject ballots submitted by Black, Hispanic, and older voters at disproportionately higher rates. Moreover, I find that voters with higher levels of educational achievement are less likely to have their mail ballot rejected under the date requirement than those with lower levels of educational achievement.

## III.     The Date Requirement's Impact on the Cost of Voting

11.     In recent decades, research across the social sciences has emphasized how subtle changes in the costs and frictions involved in undertaking certain activities can influence their completion (e.g. Thaler and Sunstein 2009, Benartzi et al. 2017), and there is extensive evidence that procedural frictions can have meaningful impacts on who is able to interact with government, access benefits, or participate in other rights and responsibilities as citizens (Herd and Moynihan 2019).

12.     This research is also relevant in assessing the impact of election laws and administration. For more than 50 years, researchers have analyzed the decision to vote using a "cost of voting" framework which emphasizes that, as the cost of voting rises, fewer citizens will participate in elections (Riker and Ordeshook 1968). As compared to many other high-income democracies, the United States has lower levels of voter turnout, and political scientists have

Supp. App. 347

concluded that one of the causes of such depressed turnout is the cost borne by individual citizens in navigating our electoral system (Rosenstone and Hansen 1993, Highton 2004).

13.     Even for citizens who choose to vote in a given election, procedural frictions may prevent them from successfully casting a vote for the candidate or measure of their choice and having that vote counted. Examples of such frictions that voters may experience include long lines at their polling station, not possessing the required form of identification, unavailability of a ballot in the voter's spoken language, confusion over how to properly mark or complete the ballot, and changes in polling-place locations (Spencer and Markovits 2010, Brady and McNulty 2011, Hopkins 2011, Hopkins et al. 2017).

14.     The severity of the impact a friction will have on a voter depends on the voter's circumstances. Voters with the fewest resources available to them are often the least equipped to overcome increases in the costs of voting (Verba, Brady, and Schlozman 1995). Voters with lower education levels, for example, are less likely to be able to withstand increased administrative burdens in casting a valid ballot. Similarly, those lacking homes, cars, childcare, time off from work, English-language fluency, experience reading technical language, or other resources may be less able to bear increased costs associated with certain changes in the procedures for registering to vote and/or casting a valid ballot. As a result, particular frictions can have a disproportionately adverse impact on certain demographic groups, causing them to alter their behavior.

15.     Because mail voting involves fewer costs for many voters, the voters most susceptible to increases in costs of voting may be more likely to vote by mail. The availability of mail ballots reduces the costs of voting on average by providing opportunities to vote without needing to travel to a polling place at a specified time (or determine the location of one's polling

App.213

Supp. App. 348

place and whether it has changed). As such, mail voting has been linked to detectable increases in voter turnout (Gerber et al. 2013, Thompson et al. 2020).

16.     In Pennsylvania, Black, Hispanic, and older residents are among the groups at particular risk when the costs of voting increase, as these groups have lower levels of some resources (on average) including educational attainment, income, economic security, English language proficiency and literacy, and health (Jencks and Phillips 2011, Phelan and Link 2015, Chetty et al. 2020, Semega and Kollar 2022).

17.     Studies of voting behavior suggest that Black, Hispanic, and older residents vote by mail at disproportionate rates. Brady and McNulty (2011) find that older voters are especially likely to respond to a polling place relocation by switching to mail voting. In the 2020 general election, a U.S. Census Bureau report found that those 65 years and older were especially likely to use non-traditional voting methods such as voting by mail, and that voters identifying as non-Hispanic Black, non-Hispanic Asian American, and Hispanic were all more likely to use non-traditional voting methods (like mail voting) than were non-Hispanic White voters (Scherer 2021).

18.     To be sure, voting by mail involves administrative frictions to which certain voters may be especially susceptible (Stewart 2020). Mail voters must comply with instructions including the use of secrecy envelopes (Hopkins et al. 2022) and the proper completion of their ballot, and they usually do so without the presence of an election official who can answer questions. These frictions have disproportionate effects on certain demographic groups of voters. Generally, non-White voters are more likely to have their mail ballots rejected than White voters (Baringer et al. 2020, Hopkins et al. 2022, Shino et al. 2022). An analysis of Philadelphia voters in the 2020 election shows that older voters and voters from racial/ethnic minority backgrounds were more likely than other voters to have their mail ballot rejected because they failed to place it within a

**App.214**

**Supp. App. 349**

secrecy envelope (Hopkins et al. 2022). Another study shows that first-time mail voters are more likely to have their ballots rejected as well (Cottrell et al. 2021).

19.    Once a county board rejects a mail ballot due to noncompliance with the date requirement, they may offer the voter an opportunity to "cure" the ballot, or they may simply reject it outright, in which case the voter's only recourse is to come to their polling place. This is a significant friction that increases the cost of voting for those who fail to properly date their mail ballot. That increased cost may be especially pronounced for voters who do not learn in a timely way that their ballot has been rejected or are unable to get to their polling station during voting hours on election day due to work commitments or mobility limitations (Haspel and Knotts 2005, Brady and McNulty 2011, Hopkins 2016).

20.    In sum, the date requirement increases the cost of voting and imposes the heaviest burdens on individuals who are already highly vulnerable to cost increases and are less likely to overcome them. In Pennsylvania, Black, Hispanic, and older voters on average are less equipped to navigate such cost increases and added burdens compared to the rest of the voting population.



6



Supp. App. 351



App.217

Supp. App. 352



9

Supp. App. 353



App.219

Supp. App. 354



App.220

Supp. App. 355



12

Supp. App. 356



13

Supp. App. 357



App.223

Supp. App. 358



App.224

Supp. App. 359



App.225

Supp. App. 360



I reserve the right to supplement this declaration in light of additional facts, testimony and/or materials that may come to light. I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 29, 2023

_____
Daniel Hopkins

17

# References

Baringer, Anna, Michael C. Herron, and Daniel A. Smith. "Voting by mail and ballot rejection: Lessons from Florida for elections in the age of the coronavirus." *Election Law Journal: Rules, Politics, and Policy* 19, no. 3 (2020): 289-320.

Benartzi, Shlomo, John Beshears, Katherine L. Milkman, Cass R. Sunstein, Richard H. Thaler, Maya Shankar, Will Tucker-Ray, William J. Congdon, and Steven Galing. "Should governments invest more in nudging?." *Psychological science* 28, no. 8 (2017): 1041-1055.

Brady, Henry E., and John E. McNulty. "Turning out to vote: The costs of finding and getting to the polling place." *American Political Science Review* 105, no. 1 (2011): 115-134.

Chetty, Raj, Nathaniel Hendren, Maggie R. Jones, and Sonya R. Porter. "Race and economic opportunity in the United States: An intergenerational perspective." *The Quarterly Journal of Economics* 135, no. 2 (2020): 711-783.

Cottrell, David, Michael C. Herron, and Daniel A. Smith. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* 49, no. 6 (2021): 577-590.

Garcia Bedolla, Lisa, and Melissa R. Michelson. *Mobilizing inclusion: Transforming the electorate through get-out-the-vote campaigns*. Yale University Press, 2012.

Gerber, Alan S., Gregory A. Huber, and Seth J. Hill. "Identifying the effect of all-mail elections on turnout: Staggered reform in the evergreen state." *Political Science research and methods* 1, no. 1 (2013): 91-116.

Green, Donald P., and Alan S. Gerber. *Get out the vote: How to increase voter turnout*. Brookings Institution Press, 2019.

Haspel, Moshe, and H. Gibbs Knotts. "Location, location, location: Precinct placement and the costs of voting." *The Journal of Politics* 67, no. 2 (2005): 560-573.

Hopkins, Daniel. 2016. "A Transit Strike in Philly Could Lower Turnout, Especially among Black and Poor Voters." FiveThirtyEight.com November 6th. URL: https://fivethirtyeight.com/features/a-transit-strike-in-philly-could-lower-turnout-among-black-and-poor-voters/ [accessed March 26th, 2023]

Herd, Pamela, and Donald P. Moynihan. *Administrative burden: Policymaking by other means*. Russell Sage Foundation, 2019.

Highton, Benjamin. "Voter registration and turnout in the United States." *Perspectives on Politics* 2, no. 3 (2004): 507-515.

Hopkins, Daniel J. "Translating into votes: the electoral impacts of Spanish-language ballots." *American Journal of Political Science* 55, no. 4 (2011): 814-830.

Hopkins, Daniel J., Marc Meredith, Anjali Chainani, and Nathaniel Olin. "Whose Vote Is Lost by Mail? Evidence from Philadelphia in the 2020 General Election." *Election Law Journal: Rules, Politics, and Policy* 21, no. 4 (2022): 329-348.

Hopkins, Daniel J., Marc Meredith, Michael Morse, Sarah Smith, and Jesse Yoder. "Voting but for the law: Evidence from Virginia on photo identification requirements." *Journal of Empirical Legal Studies* 14, no. 1 (2017): 79-128.

Hopkins, Daniel, Susanne Schwarz, and Anjali Chainani. "Officially Mobilizing: Repeated Reminders and Feedback from Local Officials Increase Turnout." (2022).

Jencks, Christopher, and Meredith Phillips, eds. *The Black-White test score gap*. Brookings Institution Press, 2011.

Phelan, Jo C., and Bruce G. Link. "Is racism a fundamental cause of inequalities in health?." *Annual Review of Sociology* 41 (2015): 311-330.

Riker, William H., and Peter C. Ordeshook. "A Theory of the Calculus of Voting." *American political science review* 62, no. 1 (1968): 25-42.

Rosenstone, Steven J., and John Mark Hansen. *Mobilization, participation, and democracy in America*. Longman Publishing Group, 1993.

Scherer, Zachary. 2021. "A Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020." United States Census Bureau. URL: https://www.census.gov/library/stories/2021/04/what-methods-did-people-use-to-vote-in-2020-election.html [accessed March 24, 2023]

Semega, Jessica and Melissa Kollar. 2022. "Income in the United States: 2021." United States Census Bureau. https://www.census.gov/library/publications/2022/demo/p60-276.html [accessed March 29th, 2023]

Shino, Enrijeta, Mara Suttmann-Lea, and Daniel A. Smith. "Determinants of rejected mail ballots in georgia's 2018 general election." *Political Research Quarterly* 75, no. 1 (2022): 231-243.

Spencer, Douglas M., and Zachary S. Markovits. "Long lines at polling stations? Observations from an election day field study." *Election Law Journal* 9, no. 1 (2010): 3-17.

Stewart III, Charles H. "Reconsidering lost votes by mail." *Harvard Data Science Review* 2, no. 4 (2020).

Thaler, Richard H., and Cass R. Sunstein. *Nudge: Improving decisions about health, wealth, and happiness*. Penguin, 2009.

Thompson, Daniel M., Jennifer A. Wu, Jesse Yoder, and Andrew B. Hall. "Universal vote-by-

mail has no impact on partisan turnout or vote share." *Proceedings of the National Academy of Sciences* 117, no. 25 (2020): 14052-14056.

United States Census Bureau. 2023. "Glossary." Available online at: https://www.census.gov/programs-surveys/geography/about/glossary.html#par_textimage_4 [accessed March 19, 2023]

Verba, Sidney, Kay Lehman Schlozman, and Henry E. Brady. 1995. *Voice and equality: Civic voluntarism in American politics*. Harvard University Press.

**App.229**

**Supp. App. 364**

# Daniel J. Hopkins
*Curriculum Vitae*
January 25th, 2023

## Address
Department of Political Science
Ronald O. Perelman Center for Political Science and Economics
University of Pennsylvania
133 S. 36th Street
Philadelphia, PA 19104
danhop (at) sas (dot) upenn (dot) edu
http://www.danhopkins.org

## Education

Ph.D. in Government, Harvard University                           *November 2007*
Dissertation Committee: Robert D. Putnam (Chair), Gary King, Claudine Gay, and Andrea L. Campbell

B.A. IN SOCIAL STUDIES, MAGNA CUM LAUDE, HARVARD COLLEGE          *JUNE 2000*

## ACADEMIC EMPLOYMENT

Professor (with tenure), University of Pennsylvania              *July 2018 – present*
      Primary Appointment: Department of Political Science
      Secondary Appointment: Annenberg School for Communication

Associate Professor (with tenure), University of Pennsylvania   *July 2015 – June 2018*

Senior Fellow, Leonard Davis Institute of Health Economics      *January 2016 - present*

Visiting Professor, University of Copenhagen                     *January 2016 - present*

Associate Professor (with tenure), Georgetown University        *August 2013 – July 2015*

Fellow, U.S. Social and Behavioral Sciences Team                 *January 2015 – July 2015*

Assistant Professor, Georgetown University                       *August 2009 – July 2013*

Post-Doctoral Fellow and Lecturer, Harvard University            *July 2008 – July 2009*

Post-Doctoral Fellow, Yale University                            *Sept. 2007 – June 2008*

# ACADEMIC HONORS

- Visiting Scholar, Russell Sage Foundation (spring 2022)
- Best Paper with a Pre-registration Award, *Journal of Experimental Political Science* (joint with Cheryl Kaiser, Efrén O. Pérez, Sara Hagá, Corin Ramos, and Michael Zárate; 2021)
- American Political Science Association Citizenship and Migration Section Best Article Prize (joint with Gregory Huber and Seth J. Hill; 2020)
- Recipient of Pi Sigma Alpha's Henry Teune Award for advancing undergraduate education (2020)
- *Political Research Quarterly* Outstanding Reviewer Award (2019)
- Named Clarence Stone Scholar by the Urban Politics section of the American Political Science Association (2015)
- Awarded Society of Political Methodology's Miller Prize for the best work appearing in *Political Analysis* in the prior year with Jens Hainmueller and Teppei Yamamoto (2015)
- Emerging Scholar Award from the Elections, Public Opinion, and Voting Behavior Section of the American Political Science Association (2014)
- Awarded Editor's Choice paper by *Political Analysis* with Jens Hainmueller and Teppei Yamamoto (2014)
- Awarded Best Paper by the Elections, Public Opinion, and Voting Behavior Section of the American Political Science Association with Jens Hainmueller (2013)
- Winner with Jens Hainmueller and Teppei Yamamoto, Time-sharing Experiments in the Social Sciences Competition (2013)
- Winner, Time-sharing Experiments in the Social Sciences Competition (2011)
- Awarded Best Paper by the Political Organizations and Parties Section of the American Political Science Association with Lee Drutman (2011)
- Awarded Deil Wright Best Paper Award by the Federalism and Intergovernmental Relations Section of the American Political Science Association (2009)
- Awarded E.E. Schattschneider Award by the American Political Science Association for the best doctoral dissertation in the field of American Government (2008)
- Awarded Harvard University Graduate School of Arts and Sciences' Richard J. Herrnstein Prize for "best dissertation that exhibits excellent scholarship, originality, breadth of thought, and a commitment to intellectual independence" (2008)
- Awarded Harvard University's Charles Toppan Prize for best dissertation in political science (2008)
- Named Graduate Fellow, American Academy of Political and Social Science (2008)
- Winner with Van Tran and Abigail Williamson, Special Time-sharing Experiments in the Social Sciences Competition (2007)
- Received award for the best poster at the Summer Meeting of the Society for Political Methodology (2007)
- Winner with Gary King, Third Annual Time-sharing Experiments in the Social Sciences Competition (2005)
- Graduate Student Associate, Institute for Quantitative Social Science (2004-7)
- Awarded Fainsod Prize (2002)
- Awarded Hoopes Prize for senior thesis on the Spanish Civil War (2000)
- Inducted to Phi Beta Kappa as a junior (1999)
- Awarded Center for European Studies, Weatherhead Center for International Affairs Fellowships (1999)

# PUBLISHED WORK: BOOKS

2. Daniel J. Hopkins. 2023. *Stable Condition: Elites' Limited Influence on Health Care Attitudes.* Forthcoming. New York, NY: Russell Sage Foundation.

1. Daniel J. Hopkins. 2018. *The Increasingly United States: How and Why American Political Behavior Nationalized.* Chicago, IL: University of Chicago Press.

## PUBLISHED WORK: SCHOLARLY ARTICLES

54. Daniel J. Hopkins, Cheryl Kaiser, and Efrén O. Pérez. Forthcoming. "The Surprising Stability of Asian Americans' and Latinos' Partisan Identities in the Early Trump Era." *Journal of Politics.*

53. Daniel J. Hopkins, Eric Schickler, and David L. Azizi. 2022. "From Many Divides, One? The Polarization and Nationalization of American State Party Platforms, 1918-2017." *Studies in American Political Development.* 36(1):1-20.

52. Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto. 2022. "Using Conjoint Experiments to Analyze Elections: The Essential Role of the Average Marginal Component Effect." *Political Analysis.*

51. Daniel J. Hopkins. 2022. "Stable Views in a Time of Tumult: Assessing Trends in American Public Opinion, 2007-2020." *British Journal of Political Science.*

50. Daniel J. Hopkins, Susanne Schwarz, and Anjali Chainani. 2022. "Officially Mobilizing: Repeated Reminders and Feedback from Local Officials Increase Turnout." *Journal of Politics.*

49. Daniel J. Hopkins and Hans Noel. 2022. "Trump and the Shifting Meaning of `Conservative': Using Activists' Pairwise Comparisons to Measure Politicians' Perceived Ideologies." *American Political Science Review.* 116(3):1133-1140.

48. Daniel J. Hopkins, Marc Meredith, Anjali Chainani, and Nathaniel Olin. 2022. "Whose Vote Is Lost by Mail? Evidence from Philadelphia in the 2020 General Election." *Election Law Journal* 21(4):329-348.

47. David Yokum, Daniel J. Hopkins, Andrew Feher, Elana Safran, and Joshua Peck. 2022. "Effectiveness of Behaviorally Informed Letters on Health Insurance Marketplace Enrollment: A Randomized Clinical Trial." *JAMA Health Forum* 3(3):e220034.

46. Alexandra Golos, Daniel J. Hopkins, Syon P. Bhanot, and Alison M. Buttenheim. 2022. "Partisanship, Messaging, and the COVID-19 Vaccine: Evidence from Survey Experiments." *American Journal of Health Promotion.* 36(4):602-611.

45. Seth Hill, Daniel J. Hopkins and Gregory Huber. 2021. "Not by Turnout Alone: Measuring the Sources of Electoral Change, 2012-2016." *Science Advances* 17(7).

44. Daniel J. Hopkins, Marc Meredith, Anjali Chainani, Nathaniel Olin, and Tiffany Tse. 2021.

"Results from a 2020 field experiment encouraging voting by mail." *Proceedings of the National Academy of Sciences* 118(4):1-3.

43. Will Hobbs and Daniel J. Hopkins. 2021. "Offsetting Policy Feedback Effects: Evidence from the Affordable Care Act." *The Journal of Politics*. 83(4):1800-1817.

42. Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto. 2021. "Beyond the Breaking Point? Survey Satisficing in Conjoint Experiments." *Political Science Research and Methods,* 9(1):53-71.

41. Daniel J. Hopkins. 2021. "The Activation of Prejudice and Presidential Voting: Panel Evidence from the 2016 U.S. Election." *Political Behavior,* 43:663-686.

40. Daniel J. Hopkins and Samantha Washington. 2020. "The Rise of Trump, the Fall of Prejudice? Tracking White Americans' Racial Attitudes 2008-2018 via a Panel Survey." *Public Opinion Quarterly*, 84(1):119-140.

39. Seth Hill, Daniel J. Hopkins and Gregory Huber. 2019. "Demographic Change, Threat, and Presidential Voting: Evidence from U.S. Electoral Precincts, 2012-2016." *Proceedings of the National Academy of Sciences.* 116(50):25023-25028

38. Seth Goldman and Daniel J. Hopkins. 2019. "Past Place, Present Prejudice: The Impact of Adolescent Racial Content on White Racial Attitudes." *Journal of Politics,* 82(2):529-542.

37. Daniel J. Hopkins, Cheryl Kaiser, Efrén O. Pérez, Sara Hagá, Corin Ramos, and Michael Zárate. 2019. "Does Perceiving Discrimination Influence Partisanship among U.S. Immigrant Minorities?" *Journal of Experimental Political Science,* 7(2):112-136.

36. Daniel J. Hopkins, John Sides, and Jack Citrin. 2019. "The Muted Consequences of Correct Information on Immigration." *Journal of Politics*, 81(1):315-320.

35. Daniel J. Hopkins and Kalind Parish. 2019. "The Medicaid Expansion and Attitudes toward the Affordable Care Act." *Public Opinion Quarterly*, 83(1):123-34.

34. Seth Goldman and Daniel J. Hopkins. 2019. "When Can Exemplars Shape White Racial Attitudes? Evidence from the 2012 U.S. Presidential Campaign." *International Journal of Public Opinion Research,* 31(4):649-668.

33. Daniel J. Hopkins. 2018. "The Exaggerated Life of Death Panels: The Limits of Framing Effects in the 2009-2012 Health Care Debate." *Political Behavior,*40(3):681-709.

32. Daniel J. Hopkins and Lindsay Pettingill. 2018. "Retrospective Voting in Big-City U.S. Mayoral Elections." *Political Science Research and Methods*, 6(4):697-714*.

**App.233**

**Supp. App. 368**

31. Bansak, Kirk, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto. 2018. "The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments." *Political Analysis.* 26(1):112-119.

30. Daniel J. Hopkins, Eunji Kim, and Soojong Kim. 2017. "Does newspaper coverage influence or reflect public perceptions of the economy?" *Research and Politics* (October-December):1-7.

29. Daniel J. Hopkins and Jonathan Mummolo. 2017. "Assessing the Breadth of Framing Effects." *Quarterly Journal of Political Science* 12(1):37-57.

28. Daniel J. Hopkins, Marc Meredith, Michael Morse, Sarah Smith, and Jesse Yonder. 2017. "Voting but for the Law: Evidence from Virginia on Photo Identification Requirements." *Journal of Empirical Legal Studies,* 14(1):79-128.

27. Daniel Preotiuc-Pietro, Ye Liu, Daniel J. Hopkins, and Lyle Ungar. 2017. "Beyond Binary Labels: Political Ideology Prediction of Twitter Users." *Proceedings of the 55th Annual Meeting of the Association for Computational Linguistics.* Vancouver, Canada, July 30th-August 4th: 729-740.

26. Bailey, Michael A., Daniel J. Hopkins, and Todd Rogers. 2016. "Unresponsive, Unpersuaded: The Unintended Consequences of Voter Persuasion Efforts." *Political Behavior,* 38(3):713-46.

25. Daniel J. Hopkins, Jonathan Mummolo, Victoria Esses, Cheryl Kaiser, Helen Marrow, and Monica McDermott. 2016. "Out of Context: The Unexpected Absence of Spatial Variation in U.S. Immigrants' Perceptions of Discrimination." *Politics, Groups, and Identities,* 4(3):363-392.

24. Jens Hainmueller and Daniel J. Hopkins. 2015. "The Hidden American Immigration Consensus: A Conjoint Analysis of Attitudes toward Immigrants." *American Journal of Political Science,* 59(3):529-548.

23. Daniel J. Hopkins. 2015. "The Upside of Accents: Language, Skin Tone, and Attitudes toward Immigration." *British Journal of Political Science*, 45(3):531-557.

22. Daniel J. Hopkins. 2014. "One Language, Two Effects: Partisanship and Responses to Spanish." *Political Communication,* 31(3):421-455.

21. Daniel J. Hopkins and Jonathan M. Ladd. 2014. "The Consequences of Broader Media Choice: Evidence from the Expansion of Fox News." *Quarterly Journal of Political Science,* 9(1):115-135.

20. Daniel J. Hopkins, Van C. Tran, and Abigail Fisher. 2014. "See No Spanish: Language, Local Context, and Attitudes toward Immigration." *Politics, Groups, and Identities*, 2(1):35-51.

25

Supp. App. 369

19. Jens Hainmueller and Daniel J. Hopkins. 2014. "Public Attitudes toward Immigration." *Annual Review of Political Science,* 17:225-249.

18. Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto. 2014. "Causal Inference in Conjoint Analysis: Understanding Multi-Dimensional Choices via Stated Preference Experiments." *Political Analysis,* 22(1):1-30.

17. Lee Drutman and Daniel J. Hopkins. 2013. "The Inside View: Using the Enron Email Archive to Understand Corporate Political Attention." *Legislative Studies Quarterly.* 38(1):5-30.

16. Daniel J. Hopkins and Katherine T. McCabe. 2012. "After It's Too Late: Estimating the Policy Impacts of Black Mayoralties in U.S. Cities." *American Politics Research.* 40(4):665-700.

15. Daniel J. Hopkins. 2012. "Flooded Communities: Explaining Local Reactions to the Post-Katrina Migrants." *Political Research Quarterly.* 65(2):443-459.

14. Daniel J. Hopkins. 2012. "Perceptions of Economic Performance during Unequal Growth." *Public Opinion Quarterly.* 76(1):50-70.

13. Daniel J. Hopkins and Thad Williamson. 2012. "Inactive by Design: The Elements of Suburban Sprawl that Reduce Political Participation." *Political Behavior.* 34(1):79-101.

12. Daniel J. Hopkins. 2011. "Translating Into Votes: The Electoral Impacts of Spanish-Language Ballots." *American Journal of Political Science.* 55(4):814-830.

11. Daniel J. Hopkins. 2011. "National Debates, Local Responses: The Origins of Local Concern about Immigration in the U.K. and the U.S." *British Journal of Political Science.* 41(3):499-524.

10. Elisabeth R. Gerber and Daniel J. Hopkins. 2011. "When Mayors Matter: Estimating the Impact of Mayoral Partisanship on City Policy." *American Journal of Political Science.* 55(2):326-339.

9. Daniel J. Hopkins. 2011. "The Limited Local Impacts of Ethnic and Racial Diversity." *American Politics Research.* 39(2):344-379.

8. Daniel J. Hopkins. 2010. "Politicized Places: Explaining Where and When Immigrants Provoke Local Opposition." *American Political Science Review.* 104(1):40-60.

7. Daniel J. Hopkins and Gary King. 2010. "A Method of Automated Nonparametric Content Analysis for Social Science." *American Journal of Political Science.* 54(1):229-247.

6. Daniel J. Hopkins and Gary King. 2010. "Improving Anchoring Vignettes: Designing Surveys to Correct Interpersonal Incomparability." *Public Opinion Quarterly.* 74(2):201-222.

5. Daniel J. Hopkins. 2009. "No More Wilder Effect, Never a Whitman Effect: Why and When Polls Mislead about Black and Female Candidates." *Journal of Politics.* 71(3):769-781.

4. Daniel J. Hopkins. 2009. "The Diversity Discount: How Increasing Ethnic and Racial Diversity Dampens Support for Tax Increases." *Journal of Politics.* 71(1):160-177.

3. Daniel J. Hopkins. 2009. "Partisan Reinforcement and the Poor: The Impact of Context on Attitudes toward Poverty." *Social Science Quarterly.* 90(3):744-764.

2. Daniel J. Hopkins. 2009. "Racial Contexts' Enduring Influence on Attitudes toward Poverty." *Social Science Quarterly.* 90(3):770-776.

1. Simmons, Beth A. and Daniel J. Hopkins. 2005. "The Constraining Power of International Treaties: Theory and Methods." *American Political Science Review.* 99(4):623-631.

## EDITED BOOKS

Daniel J. Hopkins and John Sides, editors. 2015. *Political Polarization in American Politics.* Bloomsbury Academic: New York, NY.

## OTHER ACADEMIC WRITING

Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto. 2021. "Conjoint Survey Experiments." In *Advances in Experimental Political Science,* James N. Druckman and Donald P. Green (eds.). Cambridge University Press: New York, NY.

Review of "*The Cities on the Hill*" by Thomas K. Ogorzalek. 2019. *Perspectives on Politics.*

## SELECT PRESENTATIONS

- **APSA**: 2002, 2005-2010, 2012-2016, 2018-2019, 2022
- **MPSA**: 2004, 2005, 2007, 2009-2016, 2021-2022
- **NEPSA**: 2003, 2004
- **CELS**: 2009
- **PRIEC**: 2021
- **Summer Methods Meeting**: 2004-9 (invited poster presentations); 2011 (paper); 2012 (plenary session); 2013 (paper); 2015 (paper); 2017-2021 (paper); 2021 (paper); 2022 (discussant)
- **Text as Data Conference,** 2012 (paper); 2019 (paper), 2021 (poster), 2022 (poster)

- **Political Networks Conference**: 2009
- **International Society for Political Psychology**: 2021
- **Behavioral Seminar Series**, Geary Institute, University College Dublin, March 6th, 2007
- **Latino National Survey Junior Scholars Conference**, Cornell University, November 3rd, 2007
- **American Politics Seminar**, Yale University, February 27th, 2008
- **Columbia Quantitative Political Science Seminar**, March 27th, 2008
- **Works in Progress Seminar**, MIT Department of Political Science, September 26th, 2008
- **Race and the American Voter Conference**, Harris School, University of Chicago, December 11th, 2008
- **American Politics Seminar,** Dartmouth College, March 6th, 2009
- **Applied Statistics Seminar,** Harvard University, March 11th, 2009
- **American Politics Seminar,** Georgetown University, March 13th, 2009
- **American Politics Seminar,** Yale University, April 15th, 2009
- **Political Psychology and Behavior Workshop,** Harvard University, May 1st, 2009
- **American Politics Seminar,** University of Virginia, October 16th, 2009
- **American Politics Seminar,** George Washington University, February 19th , 2010
- **Triangle Political Methodology Seminar**, University of North Carolina, April 8th, 2010
- **Dreher Colloquium,** The Ohio State University, May 21st, 2010
- **Harvard-Manchester Social Change Workshop,** University of Manchester, June 14th, 2010
- **Ethnic Politics Workshop,** George Washington University, October 15th, 2010
- **Invited Presentation,** Center for AIDS Research, New York University, October 18th, 2010
- **American Politics Workshop,** University of Chicago, February 16th, 2011
- **Immigration Conference,** Quantitative Institute for Social and Policy Research, University of Kentucky, March 10th, 2011
- **American Politics Summer Conference,** Yale University, June 23rd, 2011
- **Department of Political Science Seminar**, Emory University, November 15th, 2011
- **DC Area American Politics Seminar,** George Washington University, January 9th, 2012
- **NYU CESS 5th Annual Experimental Political Science Conference,** New York University, March 3rd, 2012
- **American Politics and Political Institutions and Center for Comparative Immigration Studies Seminar,** University of California San Diego, May 23rd, 2012
- **Symposium the on Politics of Immigration, Ethnicity, and Race,** Yale University, October 12th, 2012
- **Latinos in the 2012 Election**, Princeton University, October 25th, 2012
- **American Politics Workshop,** Stanford University, January 9th, 2013
- **Immigrants, Citizens, and the Law,** Keynote Address, Brigham Young University, January 24th, 2013
- **Spatial Analysis Seminar,** University of Michigan, February 1st, 2013
- **Race, Ethnicity, and Immigration Colloquium,** UC Berkeley, March 8th, 2013
- **Computational Linguistics Colloquium,** University of Maryland, March 13th, 2013
- **Campaigns and Elections Seminar,** Temple University, April 22nd, 2013
- **New Immigrant Destinations Conference,** Trinity College, October 10th, 2013
- **Social Policy and Inequality Seminar**, Harvard University, November 18th, 2013
- **American Politics Seminar,** Dartmouth College, January 12th, 2014
- **American Politics Workshop,** University of North Carolina at Chapel Hill, January 24th, 2014
- **American Politics Seminar,** Duke University, April 11th, 2014
- **Center for the Study of Democratic Politics Seminar,** Princeton University, April 17th, 2014
- **Center for the Study of American Politics,** Yale University, October 1st, 2014
- **Class, Race, and Ethnicity Workshop,** Michigan State University, March 20th, 2015
- **Vanderbilt Department of Political Science,** Vanderbilt University, March 26th, 2015
- **Harvard Conference on Political Geography,** Harvard University, May 9th, 2015
- **International Methods Colloquium,** Society for Political Methodology, October 23rd, 2015
- **American Politics Workshop,** University of Chicago, December 2nd, 2015
- **Centre for the Study of Democratic Citizenship,** McGill University, January 29th, 2016
- **Computational Linguistics and Lunch,** University of Pennsylvania, March 17th, 2016
- **Political Science Speaker Series,** University of Southern California, April 22nd, 2016

- **Political Economy Seminar,** Graduate School of Business, Stanford University, April 25th, 2016
- **Invited Seminar,** Department of Political Science, University of Copenhagen, May 11th, 2016
- **Identity Politics Research Group Meeting,** Columbia University, May 26th, 2016
- **Comparative Approaches to Immigration, Ethnicity, and Integration,** Yale University, June 15th, 2016
- **Elihu Katz Colloquium,** Annenberg School for Communication, University of Pennsylvania, February 3rd, 2017
- **Center for Political Studies**, University of Michigan, March 8th, 2017
- **Rubin Lecture Series**, University of Michigan, March 9th, 2017
- **Kopf Conference on Diverse Perspectives toward Immigration and Racial/Ethnic Minorities**, Arizona State University, March 31st, 2017
- **Electoral Realignments in Advanced Democracies,** Princeton University, May 20th, 2017
- **Joint Statistical Meeting,** Late-breaking panel presentation, Baltimore, Maryland, July 31st, 2017
- **Center for the Study of Democratic Politics**, Princeton University, October 19th, 2017
- **Mershon Center's 2016 Election Conference,** The Ohio State University, November 3rd, 2017
- **Behavioral Insights from Text Conference**, Wharton School of the University of Pennsylvania, January 12th, 2018
- **Invited Seminar**, Department of Government, Cornell University, February 23rd, 2018
- **Invited Seminar,** Department of Political Science, George Washington University, March 9th, 2018
- **Public Policy Breakfast**, Washington University, March 20th, 2018
- **Invited Seminar,** Department of Politics, New York University, April 26th, 2018
- **Invited Seminar,** Media Lab, Massachusetts Institute of Technology, October 4th, 2018
- **Invited Seminar,** ETH-Zürich and the University of Zürich, December 13th, 2018
- **Invited Seminar,** American Politics Workshop, University of Wisconsin, April 1st, 2019
- **Invited Seminar,** Law, Economics, and Organization Workshop, Yale Law School, February 27th, 2020
- **Invited Seminar,** American and Comparative Political Behavior Workshop, Yale University, February 28th, 2020
- **Invited Seminar,** American and Comparative Politics Workshop, Texas A&M University, March 2nd, 2020
- **Invited Seminar,** Rutgers Computational Social Science Institute, June 18th, 2020
- **Invited Seminar,** Berkeley Demography Brownbag, October 14th, 2020
- **Invited Seminar,** Washington University American Politics Workshop, November 17th, 2020
- **Politics and Computational Social Science**, Northeastern University, August 11th, 2021
- **Virtual Intergroup Relations Workshop**, November 19th, 2022
- **Asian POLMETH**, January 6th, 2022
- **Monash-Warwick-Zurich Text-as-Data Workshop**, February 17th, 2022
- **Russell Sage Foundation**, March 2nd, 2022
- **Columbia University Methodology Colloquium,** April 22nd, 2022
- **POLMETH Europe**, June 11th, 2022
- **American Political Economy**, August 3rd, 2022
- **Invited Seminar,** American University, November 18th, 2022

## GRANTS AND FELLOWSHIPS

- Co-PI, NSF award, "Robust Learning and Inference Protocols for Recuperating from Information Pollution. With Dan Goldwasser and Dan Roth, PIs (2022)
- Awarded support for participation in the Causal Inference for Social Impact Lab's Data Challenge (2022)
- Awarded Leonard Davis Institute for Health Economics COVID-19 Rapid Reward to study partisan polarization and public opinion on measures to address spread of coronavirus (2020)
- Awarded University of Pennsylvania School of Arts and Sciences "Making a Difference in Diverse Communities" grant to study voter turnout in Philadelphia (2018)

**Supp. App. 373**

- Awarded Russell Sage Foundation grant to study attitudes toward the Affordable Care Act (2018)
- Awarded Russell Sage Foundation grant to study perceived discrimination and its political impacts among Asian Americans and Latinos (2016)
- Awarded Russell Sage Foundation grant to study attitudes toward the Affordable Care Act (2016)
- Senior Fellow, Leonard Davis Institute of Health Economics (2015-2016)
- Awarded Russell Sage Foundation grant to study perceptions of discrimination and the acquisition of partisanship among first-generation immigrants with Efren Perez and Cheryl Kaiser (2014)
- Awarded Georgetown University Grant-in-Aid to study the nationalization of American voting behavior (2013)
- Book Incubator Grant of the Department of Government, Georgetown University (2013)
- Senior personnel, Computing Research Infrastructure grant from the National Science Foundation to Georgetown University (2012)
- Awarded Georgetown University Grant-in-Aid to study attitudes toward political candidates (2012)
- Awarded Georgetown University Grant-in-Aid to study attitudes toward prospective immigrants (2011)
- Principal Investigator, Russell Sage Foundation Presidential Authority Award to study perceptions of discrimination among immigrants with co-Principal Investigators Victoria Esses, Cheryl Kaiser, Helen Marrow, and Monica McDermott (2011)
- Awarded Russell Sage Foundation Presidential Authority Award to study responses to foreign languages (2010)
- Awarded Georgetown University Summer Academic Grant (2010)
- Awarded Georgetown Center for New Designs in Learning and Scholarship Curriculum Improvement Grant (2009-10)
- Awarded Marguerite Ross Barnett Research Grant from American Political Science Association (2008)
- Awarded Center for American Political Studies Dissertation Fellowship (2005)
- Awarded Harvard Graduate Society Summer Pre-Dissertation Fellowship (2005)
- Awarded Doctoral Fellowship in Inequality and Social Policy (2004)

## TEACHING

### America and Russia, Archetypes of Democracy and Autocracy?
- Undergraduate first-year seminar
- Overall Rating from Students: 4.80 on a 1 to 5 scale        Fall 2022 (U. of Pennsylvania)

### Introduction to Data Science
- Undergraduate first-semester data science course in R
- Overall Rating from Students: 3.92 on a 1 to 5 scale        Fall 2021 (U. of Pennsylvania)
- Overall Rating from Students: 4.14 on a 1 to 5 scale        Fall 2019 (U. of Pennsylvania)
- Overall Rating from Students: 4.18 on a 1 to 5 scale        Fall 2018 (U. of Pennsylvania)
- Overall Rating from Students: 4.49 on a 1 to 5 scale        Fall 2017 (U. of Pennsylvania)

### Analysis of Political Data II
- Undergraduate second-semester quantitative methods course
- Overall Rating from Students: 4.80 on a 1 to 5 scale        Spring 2015 (Georgetown)

### Quantitative Analysis II
- Graduate second-semester quantitative methods course
- Overall Rating from Students: 4.46 on a 1 to 5 scale        Spring 2019 (U. of Pennsylvania)
- Overall Rating from Students: 4.29 on a 1 to 5 scale        Spring 2017 (U. of Pennsylvania)
- Overall Rating from Students: 5.00 on a 1 to 5 scale        Spring 2014 (Georgetown)
- Overall Rating from Students: 4.64 on a 1 to 5 scale        Spring 2012 (Georgetown)

30

- Overall Rating from Students: 4.86 on a 1 to 5 scale    Spring 2011 (Georgetown)
- Overall Rating from Students: 4.85 on a 1 to 5 scale    Spring 2010 (Georgetown)

## Quantitative Analysis III
- Graduate third-semester quantitative methods course
- Overall Rating from Students: 4.83 on a 1 to 5 scale    Fall 2020 (U. of Pennsylvania)
- Overall Rating from Students: 4.65 on a 1 to 5 scale    Spring 2018 (U. of Pennsylvania)
- Overall Rating from Students: 4.40 on a 1 to 5 scale    Spring 2016 (U. of Pennsylvania)
- Overall Rating from Students: 5.00 on a 1 to 5 scale    Fall 2014 (Georgetown)
- Overall Rating from Students: 5.00 on a 1 to 5 scale    Fall 2013 (Georgetown)

## Political Behavior
- Ph.D. seminar
- Overall Rating from Students: 5.00 on a 1 to 5 scale    Spring 2014 (Georgetown)

## The Changing American Electorate, 1960-2008
- Undergraduate lecture course
- Overall Rating from Students: 4.09 on a 1 to 5 scale    Fall 2022 (U. of Pennsylvania)
- Overall Rating from Students: 4.28 on a 1 to 5 scale    Spring 2017 (U. of Pennsylvania)
- Overall Rating from Students: 4.58 on a 1 to 5 scale    Fall 2014 (Georgetown)
- Overall Rating from Students: 4.81 on a 1 to 5 scale    Fall 2013 (Georgetown)
- Overall Rating from Students: 4.67 on a 1 to 5 scale    Fall 2010 (Georgetown)
- Overall Rating from Students: 4.55 on a 1 to 5 scale    Fall 2009 (Georgetown)
- Overall Rating from Students: 4.43 on a 1 to 5 scale    Spring 2008 (Yale)

## Contemporary American City
- Undergraduate seminar
- Overall Rating from Students: 4.53 on a 1 to 5 scale    Fall 2017 (U. of Pennsylvania)
- Overall Rating from Students: 4.69 on a 1 to 5 scale    Fall 2015 (U. of Pennsylvania)
- Overall Rating from Students: 4.70 on a 1 to 5 scale    Spring 2012 (Georgetown)
- Graduate seminar
- Overall Rating from Students: 5.00 on a 1 to 5 scale    Fall 2009 (Georgetown)
- Undergraduate seminar    Spring 2009 (Harvard)

## Race in American Politics
- Undergraduate seminar
- Overall Rating from Students: 4.92 on a 1 to 5 scale    Spring 2011 (Georgetown)

## Senior Thesis Writers' Workshop
- Undergraduate seminar
- Overall Rating from Students: 4.82 on a 1 to 5 scale    Fall 2006 (Harvard)

## Advanced Quantitative Methods
- Teaching assistant, graduate second-semester quantitative methods course
- Overall Rating from Students: 4.92 on a 1 to 5 scale    Spring 2006 (Harvard)

## American Public Opinion
- Teaching assistant, undergraduate lecture course
- Overall Rating from Students: 4.68 on a 1 to 5 scale    Fall 2004 (Harvard)

## MENTORSHIP

Ph.D. Dissertation Committees
- Evelyne Brie (chair), Breanna Gray (chair), Eunji Kim (co-chair), Hajer Al-Faham, Maxwell Allamong, Sabrina Arias, Hamutal Bernstein, Ryan Boeka, Vivienne Born, Rachel Blum, Kimberly Cardenas, Micah Jensen, Karin Kitchens, Justin Koch, Clara Lee, Amber Mackey, Angie Ocampo, Jacob Pearl, Lindsay Pettingill, Devlin Winkelstein

Post-doctoral Fellows
- M. Brielle Harbin

## PATENTS

A System for Estimating a Distribution of Message Content Categories in Source Data
- U.S. Patent 8180717, issued May 15th, 2012
- Jointly held with Gary King and Ying Lu

## SERVICE, UNIVERSITY OF PENNSYLVANIA

Member, School of Arts and Sciences Graduate Education Committee (2022)
Chair, Search Committee, Climate/environmental politics (2022)
Member, "Diversity, Equity, and Inclusion" Committee (2020-2022)
Member, "Diversity in Seminars" Committee (2018-2020)
Member, School of Arts and Sciences Phi Beta Kappa Award Committee (2019-2020)
Co-coordinator, Philadelphia Behavioral Science Initiative (January 2016 – present)
Co-Coordinator, Philadelphia Behavioral Science Initiative (January 2016 – present)
Member/Chair, Curriculum Committee, School of Arts and Sciences (Fall 2015-June 2018)
Member, Faculty Advisory Committee on Information Technology (January 2016 – present)
Coordinator, American Politics Workshop (2016-2018)
Coordinator, American Politics Working Group (2015-present)

## OTHER ACADEMIC SERVICE

Associate Editor, *Journal of Experimental Political Science (2023-present)*
Associate Editor, *Political Analysis (2018-present)*
Associate Editor, *Political Behavior (2018-2022)*
Past President, Political Psychology Section of APSA *(2020-2022)*
President, Political Psychology Section of APSA *(2018-2020)*
President-Elect, Political Psychology Section of APSA *(2016-2018)*
Editorial Board, *State Politics and Policy Quarterly (2011-2014)*
Associate Editor, *R&P (2013-2017)*
Occasional Contributor, *The Monkey Cage Blog (Washington Post); FiveThirtyEight*

| | |
|---|---|
| Undergraduate Chair, Political Science Department | *2018 – 2020* |
| Coordinator, Georgetown American Politics Seminar | *2012; 2014* |
| Member, MA Program Director Search Committee | *2014* |
| Coordinator, DC Area American Politics Workshop | *2011 – 2014* |
| Government Department Admissions Committee | *2014 – 2015* |
| Government Department Planning and Budget Committee | *2010 – 2012* |
| Tutor, Harvard College | *2004 – 2006* |
| Concentration Advisor, Government Department | *2004 – 2006* |
| Proctor, Harvard College | *2002 –2004* |

**LANGUAGES**

- Fluent in Spanish; Proficient in Russian

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNSYLVANIA STATE CONFERENCE OF
THE NAACP, *et al.*,

Plaintiffs,

v.

AL SCHMIDT, *in his official capacity as Acting Secretary of the Commonwealth*, *et al.*,

Defendants.

No. 1:22-cv-339
Judge Susan Paradise Baxter

**BRIEF OF AL SCHMIDT IN RESPONSE TO PLAINTIFFS' AND
INTERVENOR-DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities .................................................................................... ii

Argument ..................................................................................................... 1

   I.     The Date Requirement is a Vestige of a Different Era ................................ 2

   II.    Declaration Dates Have No Election Function ............................................. 6

   III.   Requiring Officials to Review Declaration Dates Impedes
         Effective Election Administration ............................................................... 14

Conclusion ................................................................................................... 16

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................................................1

*Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) ................................................. 1, 9, 10, 11

*Bonner v. Chapman*, 298 A.3d 153 (Pa. Cmwlth. 2023) .......................................12

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................................1

*Chapman v. Berks Cnty. Bd. of Elections*, No. 355 MD 2022, 2022
    WL 4100998 (Pa. Cmwlth. Aug. 19, 2022) .............................................. 8, 9, 10

*Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d
    326 (Mass. 2018) ..............................................................................................6

*In re Canvass of Absentee and Mail-in Ballot*, 241 A.3d 1058 (Pa.
    2020) ................................................................................... 1, 9, 10, 11

*In re Nov. 3 Gen. Election*, 240 A.3d 591, 610 (Pa. 2020) ......................................5

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) .................................................. 8, 12

*Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) ..............................15

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
    97 F.4th 120 (3d Cir. 2024) ..................................................................7

*Pa. State Conference of NAACP v. Schmidt*, No. 22-339, 2023 WL
    8091601 (W.D. Pa. Nov. 21, 2023) .................................................. 7, 10, 12, 15

**Constitutions**

Pa. Const. art. VII, § 4...............................................................................................6

**Statutes**

25 P.S. § 2811 ..........................................................................................................10

25 P.S. § 3050 ..........................................................................................................11

Supp. App. 380

25 P.S. § 3146.4 ................................................................................13

25 P.S. § 3146.6 ........................................................................... 6, 11

25 P.S. § 3150.14 ..............................................................................13

25 P.S. § 3150.16 ...................................................................... 6, 11, 13

25 P.S. § 3159 ...................................................................................14

25 P.S. § 3553 ............................................................................... 6, 13

25 P.S. §§ 3146.1-3146.7 ...................................................................13

25 P.S. §§ 3150.11-3150.16 ...............................................................13

25 Pa.C.S. § 1301 ..............................................................................10

Act of Aug. 1, 1941, P.L. 672, No. 273 .................................................3

Act of Aug. 13, 1963, P.L. 707, No. 379 ...............................................4

Act of Dec. 11, 1968, P.L. 1183, No. 375 ...........................................4, 5

Act of June 3, 1937, P.L. 1333, No. 320 .............................................2, 3

Act of Mar. 9, 1945, P.L. 29, No. 17 ..................................................3, 4

Supp. App. 381

## ARGUMENT

Under Pennsylvania's Election Code, anyone who votes by mail is instructed to date a declaration that must be returned with a mail ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). During the canvassing of mail ballots, counties shall include in the returns sent to the Secretary any mail ballot for which the declaration is "sufficient" (and that meets other criteria not relevant here). *Id.* 3146.8(g)(3)-(4). The Supreme Court of Pennsylvania has held that Pennsylvania's Election Code requires that mail ballots returned without a correctly dated declaration be rejected. *See Ball v. Chapman*, 289 A.3d 1 (Pa. 2023); *see also In re Canvass of Absentee and Mail-in Ballot*, 241 A.3d 1058 (Pa. 2020).

In Count III of their amended complaint, plaintiffs allege that rejecting timely mail ballots from qualified voters who failed to correctly write a meaningless date on the declaration returned with a mail ballot violates the First and Fourteenth Amendments to the U.S. Constitution. Am. Compl. ¶¶ 89-92 (ECF No. 413). Under the U.S. Supreme Court's decisions in *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the analytical framework for evaluating such a claim requires weighing the burden a voting rule places on the right to vote against the election interests it serves.

Secretary of the Commonwealth Al Schmidt files this brief to aid the Court's performance of this balancing by explaining why rejecting timely mail ballots from

1

**Supp. App. 382**

qualified voters who failed to correctly write a meaningless date does not advance any state election interest and why it, in fact, undermines sound election administration.[1]

## I.      The Date Requirement is a Vestige of a Different Era

The instruction that voters write a date on the declaration returned with a mail ballot is a remnant of bygone voting rules. The history of Pennsylvania's Election Code demonstrates what function the "shall…date" instruction was meant to serve and also demonstrates that the handwritten date ceased to serve its intended, or any, function in 1968.[2]

When the Election Code was first enacted in 1937, most voters could vote only in person. Some active military members—referred to as "detached" electors— were permitted to vote absentee. Act of June 3, 1937, P.L. 1333, No. 320, §§ 1327-1330 (attached as Exhibit 1). Those voters had to *complete* their ballot "on or before the day of the election." *Id.* § 1329. Their absentee ballots, however, could be counted even if they arrived after Election Day. *Id.* § 1317.

Absentee ballots were returned in an envelope printed with "the affidavit of the [voter], together with the jurat of the officer in whose presence the ballot is

---

[1] With respect to Count II of plaintiffs' amended complaint, the Secretary incorporates by reference his brief filed on May 5, 2023 (ECF No. 298).

[2] The provisions governing mail voting in Pennsylvania are described on pages 2-6 of the Secretary's prior summary judgment brief (ECF No. 298).

Supp. App. 383

marked and before whom the affidavit is made." *Id.* § 1328. Voters had to "subscribe and swear to the affidavit" and the jurat had to "be subscribed by the [witnessing] officer," but neither the affidavit nor jurat had to be dated. *Id.* § 1329. During canvassing, county boards were required to "compare the signature of such absent voter with his signature upon any register or other record in their possession." *Id.* § 1330. If a county board was "satisfied that the signatures correspond and that the affidavit and jurat are sufficient," it was supposed to process the ballot. *Id.*

Because there was no instruction to date either the affidavit or jurat, the boards' determination of whether the affidavit and jurat were "sufficient" did not include any assessment of whether either was dated.

The General Assembly amended the Code in 1941. The amended Code directed county boards to "set aside" during canvassing any ballot with a return envelope that "bear[s] a postmark later than the date of the particular Election Day involved." Act of Aug. 1, 1941, P.L. 672, No. 273, sec. 4, § 1307 (attached as Exhibit 2). After setting aside those untimely ballots, county boards were to review whether the "affidavit and jurat are sufficient." *Id.* The separate section that instructed absentee voters how to complete their absentee ballot and the included declaration remained unchanged. *Id.* sec. 4, § 1306.

In 1945, the General Assembly added to the Code language stating that voters' jurat "shall be … dated." Act of Mar. 9, 1945, P.L. 29, No. 17, sec. 10, § 1306

3

**Supp. App. 384**

(attached as Exhibit 3). Consistent with the new dating language, counties were specifically directed to "set aside" all ballots in which the "jurat bears a date later than the date of the election." *Id.*, sec. 10, § 1307. The written date, then, replaced the postmark as the necessary evidence a ballot was timely completed. After setting aside ballots based on the jurat date, counties were to review the remaining ballots to determine whether "the affidavit and jurat are sufficient." *Id.*

As part of 1963 amendments permitting certain categories of civilians to vote absentee, the requirement of a separate affidavit and jurat was replaced with the single declaration that is still in use today. Act of Aug. 13, 1963, P.L. 707, No. 379, sec. 22, § 1304 (attached as Exhibit 4). Reflecting this consolidation, the previous instruction to date the jurat became an instruction to date the declaration: "The elector shall … fill out, date and sign the declaration printed on [the outer ballot-return] envelope." *Id.*, sec. 22, § 1306. The Code's canvassing section was amended to instruct counties to set aside ballots returned with declarations bearing a date after the election. *Id.*, sec. 24, § 1308(c). After setting aside ballots based on the declaration date, counties were to review whether the "declaration is sufficient." *Id.*, sec. 24, § 1308(e).

In 1968, the General Assembly aligned, for the first time, the respective deadlines for absentee voters to complete their ballot, and for county boards to receive those ballots. Act of Dec. 11, 1968, P.L. 1183, No. 375, sec. 8, § 1308(a)

Supp. App. 385

(attached as Exhibit 5).[3] After creating a simultaneous deadline for both acts (and eliminating the possibility that a ballot could be timely received but not timely completed), the General Assembly *removed* the requirement that counties set aside ballots based on the date appearing on the ballot-return declaration. *Id.*, sec. 8, § 1308(c). In all other ways, the Code was materially unchanged. *Id.*, sec. 8, § 1306.

When the General Assembly passed Act 77 of 2019, giving all registered, qualified voters the option to vote by mail, it adopted wholesale the pre-existing text and procedures for absentee voting, which had been materially unchanged since 1968. The General Assembly likewise simply incorporated no-excuse mail-in ballots into the existing canvassing procedures for absentee ballots. *Id.*, sec. 7, § 1308.

As this history shows, the declaration date is among the "vestiges remaining in the Election Code" of prior voting rules. *In re Nov. 3 Gen. Election*, 240 A.3d 591, 610 n.24 (Pa. 2020). It was meant to confirm that a ballot was timely completed during a period in history when the deadline for completing a ballot was earlier than the deadline for the county board to receive it. Therefore, while rejecting absentee ballots based on a declaration date once served a purpose, it is now the case that a rule "once considered constitutionally permissible [has] come to significantly interfere with the fundamental right to vote in light of conditions existing in

---

[3] The single deadline used to be 5 p.m. on the Friday before Election Day but in 2019 was changed to 8 p.m. of Election Day.

Supp. App. 386

contemporary society." *Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 334 (Mass. 2018).

## II.  Declaration Dates Have No Election Function

Historically and currently, the Election Code has provided detailed rules for Pennsylvania's qualified, registered electors who vote by mail. These rules typically have a reasonable connection to advancing the orderly and secure administration of Pennsylvania's elections. For example, the declaration that mail voters must sign and return with their ballot is an attestation, under penalty of perjury, that they are qualified to vote the ballot being returned. 25 P.S. §§ 3146.6(a), 3150.16(a); *see also id.* § 3553. Voters also must place their mail ballot in a secrecy envelope, a requirement that can reasonably be understood to further the constitutional interest in secret ballots. 25 P.S. §§ 3146.6(a), 3150.16(a); *see also* Pa. Const. art. VII, § 4. Return deadlines for mail ballots allow election officials to timely perform their duties so that winning candidates can assume office without delay.

Unlike the above-mentioned rules, handwriting a date on the return-envelope's declaration does not have a legal or administrative purpose under Pennsylvania Election Code, and so rejecting ballots for mistakes with respect to that date serves no state interest. The record in this case has conclusively demonstrated as much.

6

Supp. App. 387

As this Court's prior opinion thoroughly described, the undisputed record in this case has established that the declaration date is "wholly irrelevant." *Pa. State Conf. of NAACP v. Schmidt* ("*NAACP I*"), No. 22-339, 2023 WL 8091601, at *31 (W.D. Pa. Nov. 21, 2023). Although the Third Circuit disagreed with this Court's reading of 52 U.S.C. § 10101(a)(2)(B), that court also understood that "[t]he date requirement, it turns out, serves little apparent purpose." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 125 (3d Cir. 2024).

Indeed, the undisputed facts prove that counties do not rely on the declaration date to track whether a ballot was returned on time. *NAACP I*", No. 22-339, 2023 WL 8091601, at *20-21, *32. Rather, counties independently track whether ballots were received on time though measures such as scanning the ballot envelope into the Statewide Uniform Registry of Electors (SURE) system or time stamping. *Id.* at *20-21, *32. And counties do not mingle timely and untimely ballots. Likewise, the undisputed facts show, and the parties previously agreed, "that the county boards of elections did not use the handwritten date on the Return Envelope for any purpose related to determining a voter's age, citizenship, county or duration of residence, or felony status." *Id.* at *29. Instead, the date a voter signs the declaration "is untethered from any other requirement on the ballot" because the only significant date under the Election Code is the date the ballot is *received*. *Id.* at *31-32.

7

Supp. App. 388

Pennsylvania courts also have readily concluded that the declaration date serves no function. Most notably, in an action that the Secretary brought during the 2022 primary against three counties that refused to include ballots with declaration-date errors in the returns sent to the Secretary, the Department of State's Deputy Secretary of Elections as well as a county commissioner from each of the three counties testified about declaration dates. *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 MD 2022, 2022 WL 4100998, at *5-6 (Pa. Cmwlth. Aug. 19, 2022). After hearing that testimony, the Commonwealth Court's President Judge concluded that the date is not used to determine a voter's qualifications, determine whether they already voted, or preserve confidentiality. *Id.* at *19, *20. There also was no dispute that the date was not needed to establish if a mail ballot was returned by the statutory deadline. *Id.* at *18. Nor did the Election Code suggest any purpose for writing a date or how the date is used. *Id.* at *18. As a result, the President Judge correctly concluded that "the parties have not identified a specific purpose served by dating the declaration on the return envelope, and the Court cannot discern any." *Id.* at *20; *see also id.* at *18 ("[T]here is **no factual or legal basis** for concluding that the dating provision serves [any identified] interest." (emphasis in original)).

In fact, before the Supreme Court's decision in *Ball* required otherwise, ballots would be counted no matter what date a voter wrote. *Migliori v. Cohen*, 36 F.4th 153, 163-64 (3d Cir. 2022) *vacated as moot by Ritter v. Migliori*, 143 S.Ct.

8

297 (2022); *Berks*, No. 355 MD 2022, 2022 WL 4100998, at *18. That it did not matter what date a voter wrote further confirms that the date itself serves no purpose.

Despite what the record in this case indisputably establishes, the RNC repeats several theories Justice Dougherty offered in his opinion dissenting from the Pennsylvania Supreme Court's 2020 *In Re Canvass* decision, as if they were actual purposes the date serves. RNC Br. at 18 (citing *In re Canvass*, 241 A.3d at 1090-91 (Dougherty, J., dissenting)).

Yet in litigation since *In re Canvass*—a decision issued without the benefit of time or a record—five of the six Justices of the Pennsylvania Supreme Court expressly recognized that there is no connection between the handwritten date on the return envelope and determining a voter's qualifications. *Ball*, 289 A.3d at 24 & n.139 (Wecht, J., announcing judgment, joined by Todd, C.J., and Donahue, J.); *see also id.* at 39 (Brobson, J., dissenting, joined by Mundy, J.) (observing that the declaration date would not "have any bearing on determining voter qualification at all."). Also since *In re Canvass*, the Department has repeatedly explained that none of Justice Dougherty's hypothesized purposes is consistent with the Election Code or the way elections are administered in Pennsylvania.[4]

---

[4] Notably, in a portion of the Supreme Court's *Ball* decision joined by Justice Dougherty, that Court recognized that the Department has rebutted each of Justice Dougherty's theories. *Ball*, 289 A.3d at 16 n.77.

9

It is wrong that "[t]he date … ensures the elector completed the ballot within the proper time frame." *In re Canvass*, 241 A.3d at 1091 (Dougherty, J., dissenting). Ballots and ballot return envelopes are unique to each election; a voter has access to complete a mail ballot only in the several weeks before Election Day. Moreover, because the deadlines to complete and return a ballot are the same, if a ballot is timely received by a county board, it necessarily was timely completed by the voter. And the date written by the voter does not assist county boards in determining whether the board received the ballot before that deadline. Rather, county boards keep timely and untimely ballots separate and independently track timeliness by stamping mail ballot envelopes based on when the county board in fact received them and by logging them in SURE. *NAACP I*, No. 22-339, 2023 WL 8091601, at *20-21, *32; *see also Ball*, 289 A.3d at 16 n.77; *In re Canvass*, 241 A.3d at 1077; *Berks*, No. 355 MD 2022, 2022 WL 4100998, at *6, *19.

Nor does the date "establish[] a point in time against which to measure the elector's eligibility to cast the ballot." *In re Canvass*, 241 A.3d at 1090 (Dougherty, J., dissenting). Election Day—not the day the voter dated the return envelope—is the date against which a voter's qualifications are measured. *See* 25 P.S. § 2811; 25 Pa.C.S. § 1301; *see also Ball*, 289 A.3d at 16 n.77.

Next, because the handwritten date does not identify any meaningful point in time, it also does not prevent fraud. *Contra In re Canvass*, 241 A.3d at 1091

10

(Dougherty, J., dissenting). Any notion that the date "prevents the counting of potentially fraudulent back-dated votes," *id.*, has the issue backwards. There is no point in "fraudulently back-dat[ing]" a ballot envelope if the date is not used to determine whether the ballot was timely received and carries no weight. It is only where the handwritten date affects whether the ballot will be counted that a motivation to alter it could possibly exist.

Further, a declaration date does not help election officials determine if an elector intended to vote by mail ballot "in lieu of appearing in person at a polling place." *Contra In re Canvass*, 241 A.3d at 1091 (Dougherty, J., dissenting). Anyone who has requested a mail ballot cannot vote at a polling place on Election Day unless they bring their mail ballot to the polls and surrender it. 25 P.S. §§ 3146.6 (b)(3), 3150.16(b)(3). Someone who arrives at their polling place on Election Day having requested a mail ballot but without that ballot in hand, can vote only provisionally. 25 P.S. §§ 3146.6(b)(1)-(2), 3150.16(b)(1)-(2). And if the voter both successfully returns a mail ballot and casts a provisional ballot at the polling place, only the absentee or mail-in ballot will count. 25 P.S. § 3050(a.4)(5)(ii)(F); *see also Ball*, 289 A.3d at 16 n.77.

Moreover, as it has done before, the RNC cites a criminal affidavit as supposed evidence of the date's anti-fraud function, RNC Br. at 20, but omits all relevant facts, which reveal the fallacy of its reliance on that complaint.

11

Supp. App. 392

In 2022, a Lancaster County woman returned her deceased mother's ballot and dated the return-envelope declaration 12 days after her mother's death. DOS Response to RNC's SOF ¶¶ 49, 52 (ECF No. 299); Ex. 12 to RNC SOF (ECF No. 273-12). The affidavit of probable cause states that the ballot was immediately flagged not because of the date, but because (following proper procedures) the deceased mother had been removed from the voting rolls three days before the ballot arrived at the county's office. Ex. 12 to RNC SOF (ECF No. 273-12). Indeed, a Lancaster County Commissioner testified that the date had no bearing on the county's decision to reject the ballot. DOS Response to RNC's SOF ¶ 48 (ECF No. 299).[5]

The RNC also borrows Judge Matey's speculation that the date might be a backstop if counties do not time stamp or scan ballots into SURE, *Migliori*, 36 F.4th at 165 (Matey, J., concurring). Judge Matey, however, was working without the benefit of a fully-developed record like the one available here. The undisputed evidence shows that no county uses used declaration dates as Judge Matey imagined. *See NAACP I*, No. 22-339, 2023 WL 8091601, *31-33. Moreover, Judge Matey's

---

[5] And even assuming the date had any non-electoral utility in this circumstance (and none has ever been presented), ruling for Plaintiffs here would not undermine it. The instruction that voters date the declaration would remain in the Election Code even if there is an order that ballots may not be rejected for omitting the date. *See Bonner v. Chapman*, 298 A.3d 153, 168 (Pa. Cmwlth. 2023).

12

Supp. App. 393

speculation contained multiple faulty notions: (1) that timely and untimely ballots are ever co-mingled such that there would ever be a need to consult the date; (2) that there is any way to verify that the date written is accurate; and (3) that the date written, even if accurate, would indicate when a ballot was received.

Next, the RNC tries to ascribe a solemnity to the dating requirement that the General Assembly itself has not embraced. RNC Br. at 19. The declaration a voter is instructed to sign is an attestation of their eligibility to vote in that election. 25 P.S. §§ 3146.4, 3150.14. **By signing the declaration alone**, an elector subjects himself to criminal charges if he knows the statement is false. *Id.* § 3553. The date is not mentioned.

The RNC's imagined purposes are not only wrong legally and factually, but also are not the actual reason the date instruction exists. *Supra* at 2-6. Dates stopped serving that—or any—function once the completion and receipt deadline were aligned in 1968. *Id.* Notably, after aligning the two deadlines, the General Assembly removed the prior instruction to set aside mail ballots bearing dates after the deadline to complete the ballot. *Id.* When the General Assembly passed Act 77 in 2019 to create no-excuse mail-in voting, it adopted wholesale the existing procedures for absentee ballots—including the dating remnant. *Compare* 25 P.S. §§ 3146.1-3146.7 (absentee ballots) *with id.* §§ 3150.11-3150.16 (no-excuse mail in ballots).

13

Supp. App. 394

## III.    Requiring Officials to Review Declaration Dates Impedes Effective Election Administration

Not only does rejecting mail ballots returned without a correct declaration date fail to advance any election interest, requiring that those ballots be rejected risks impairing free, honest, and fair elections in at least three discrete ways.

First, election officials have significant and demanding responsibilities between Election Day and the deadline to certify an election's returns to the Secretary, which is just 20 days after an election. 25 P.S. § 2642(k). The Secretary has his own certification obligations that follow those of the counties. 25 P.S. § 3159. If officials must reject mail ballots because of declaration date errors, they must engage in the laborious process of reviewing voters' handwritten dates and determining if they are correct.[6] Forcing already burdened election officials to engage in this time-intensive but gratuitous work occupies resources that can, and should, be spent performing tasks that actually further the free, honest, and fair administration of an election.

Second, as discovery in this case has shown, requiring counties to review and reject mail ballots based on declaration dates leads to inconsistent and varying

---

[6] Setting aside obvious errors, such as dates in the future or dates that do not exist, there is no way to ever confirm a date is "correct." There is no independent means of verifying the accuracy of a handwritten date. *See Ball*, 289 A.3d at 23 ("How county boards are to verify that the date an elector provides is, in truth, the day upon which he or she completed the declaration is a question that falls beyond our purview.").

14

practices within and across counties, specifically as to what qualifies as a sufficient date. *NAACP I*, No. 22-339, 2023 WL 8091601, at *32-33. There is no benefit to those inconsistencies. Requiring election officials to reject ballots based on declaration dates results in excluding indisputably qualified individuals from the electoral process notwithstanding that they timely returned their ballot, as happened in the 2022 general election. *Id.* at 33. These variations and acts of disenfranchisement undermine voter confidence, confidence that "is essential to the functioning of our participatory democracy." *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 387 (Pa. 2020) (Wecht, J., concurring).

Third, ascribing importance to the date requirement introduces risks that would not otherwise exist. If counties need not review the handwritten date, there is no incentive for anyone to manipulate it. But requiring that voters write a correct date for their declaration to be "sufficient" makes the date a piece of information that potentially can be manipulated such that a timely completed, properly returned ballot is not counted. While the Secretary is not aware of any evidence that such manipulation has occurred, no similar risk exists if counties simply count timely-received ballots cast by registered voters regardless of whether the voter wrote the correct date on the ballot envelope.

15

## CONCLUSION

For the reasons set forth above, there is no state interest in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return-envelope declaration.

July 18, 2024

Respectfully submitted,

Robert A. Wiygul (Bar. No. 310760)
Hangley Aronchick Segal Pudlin &
Schiller
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

/s/ *Jacob B. Boyer*

Jacob B. Boyer (Bar. No. 324396)
Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Secretary Al Schmidt*

Supp. App. 397