No. 25-1644

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

BETTE EAKIN, *et al.*,

*Plaintiffs-Appellees*,

v.

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the Western District of
Pennsylvania, Case No. 1:22-cv-00340 (Hon. Susan Paradise Baxter)

———————————

BRIEF OF AMICI CURIAE PENNSYLVANIA STATE
CONFERENCE OF THE NAACP; LEAGUE OF WOMEN VOTERS
OF PENNSYLVANIA; BLACK POLITICAL EMPOWERMENT
PROJECT; POWER INTERFAITH; COMMON CAUSE
PENNSYLVANIA;  AND MAKE THE ROAD PENNSYLVANIA

———————————

Stephen Loney (PA 202535)
Kate Steiker-Ginzberg (PA 332236)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
sloney@aclupa.org

Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
asavitzky@aclu.org

*Counsel for Plaintiffs-Appellees Continued on Inside Cover*

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

*Counsel for Amici Curiae
Pennsylvania State Conference of
the NAACP, League of Women
Voters of Pennsylvania, POWER
Interfaith, Common Cause
Pennsylvania, Black Political
Empowerment Project, and Make
the Road Pennsylvania*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................ii

INTRODUCTION AND STATEMENT OF INTEREST ..........................1

BACKGROUND ..................................................................................4

    A.   Mail Ballot Voting in Pennsylvania .......................................4

    B.   The *PA NAACP* and *Eakin* Cases ...........................................6

    C.   This Appeal ..........................................................................10

    D.   Additional Developments .....................................................12

ARGUMENT ......................................................................................13

   I.   THE RECORD DEMONSTRATES A SUBSTANTIAL BURDEN ON VOTERS .............................................................15

  II.   THE RECORD REVEALS ZERO JUSTIFICATION FOR THE BURDEN .......................................................................25

CONCLUSION ...................................................................................35

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)............................................................ 2, 14, 25, 26

*Ball v. Chapman,*
   289 A.3d 1 (Pa. 2023) ...........................................................................6

*Baxter v. Philadelphia Board of Elections,*
   329 A.3d 483 (Pa. Commw. Ct. 2024)................................................. 13

*Black Political Empowerment Project v. Schmidt,*
   325 A.3d 1046, 2024 WL 4002321 (Pa. Commw. Ct.) ....................... 13

*Burdick v. Takushi,*
   504 U.S. 428 (1992)................................................................. 2, 13, 14

*Constitutional Party of Pennsylvania v. Cortes,*
   877 F.3d 480 (3d Cir. 2017) ....................................................... *passim*

*Crawford v. Marion County Election Board,*
   553 U.S. 181 (2008)................................................................ 15, 23, 26

*Democratic Executive Committee of Florida v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) .......................................................... 22

*Frank v. Walker,*
   819 F.3d 384 (7th Cir. 2016)............................................................... 23

*Mazo v. New Jersey Secretary of State,*
   54 F.4th 124 (3d Cir. 2022)....................................................... *passim*

*Migliori v. Cohen,*
   36 F.4th 153 (3d Cir. 2022)......................................................... 2, 3, 31

*Northeast Ohio Coalition for the Homeless v. Husted,*
   837 F.3d 612 (6th Cir. 2016)................................................... 24, 26, 31

*Ohio State Conference of NAACP v. Husted,*
    768 F.3d 524 (6th Cir. 2014) ............................................................. 26

*Paennsylvania State Conference of NAACP Branches v. Secretary
    Commonwealth of Pennsylvania,*
    97 F.4th 120 (3d Cir. 2024) ................................................ 2, 3, 10, 27

*Price v. New York State Board of Elections,*
    540 F.3d 101 (2d Cir. 2008) ............................................................. 26

*Public Integrity Alliance, Inc. v. City of Tucson,*
    836 F.3d 1019 (9th Cir. 2016) ........................................................... 23

*Soltysik v. Padilla,*
    910 F.3d 438 (9th Cir. 2018) ............................................................ 26

*United States v. Classic,*
    313 U.S. 299 (1941) ......................................................................... 22

**Statutes**

25 P.S. § 2602 ....................................................................................... 5

25 P.S. § 3146.2 .................................................................................... 5

25 P.S. § 3146.2b .................................................................................. 5

25 P.S. § 3146.4 .................................................................................. 32

25 P.S. § 3146.6 ........................................................................... *passim*

25 P.S. § 3146.8 .............................................................................. 5, 30

25 P.S. § 3146.9 .................................................................................. 27

25 P.S. § 3150.12 .................................................................................. 5

25 P.S. § 3150.12b ................................................................................ 5

25 P.S. § 3150.14 ................................................................................ 32

25 P.S. § 3150.16 .............................................................................. *passim*

25 P.S. § 3150.17 ............................................................................ 27

25 P.S. § 3553 ................................................................................. 32

25 Pa. C.S. § 1505 .......................................................................... 30

52 U.S.C. § 10101(a)(2)(B) ............................................................ 9

Act of Dec. 11, 1968, P.L. 1183, No. 375 ................................... 28

Act of Oct. 31, 2019, P.L. 552, No. 77 ....................................... 4

## Other Authorities

Mark Scolforo, *Pennsylvania Elections Chief Touts Progress In Reducing Mail Ballot Rejection Rate*,
Associated Press (Jan. 31, 2025),
https://apnews.com/article/pennsylvania-mail-ballots-election-voting-f51bfba8910686eb0f63c15fb6757f20 ...................................... 12

*Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election*,
PA DOS (Jan. 24, 2025),
https://www.pa.gov/agencies/dos/newsroom/shapiro-administration-announces-57--decrease-in-mail-ballots-re.html ...... 12

## INTRODUCTION AND STATEMENT OF INTEREST[1]

*Amici* are non-partisan groups dedicated to safeguarding the right to vote for all and ensuring civic engagement and participation across Pennsylvania, including for their thousands of members and in traditionally disenfranchised communities. *Amici* are the organizational plaintiffs in a companion case to this one, *Pennsylvania State Conference of the NAACP v. Schmidt*, No. 22 Civ. 339 (W.D. Pa.) ("*PA NAACP*"), challenging the unjustified disenfranchisement of voters for failure to comply with the meaningless envelope-date requirement at issue here.

In the *PA NAACP* litigation, *amici* obtained full discovery from all 67 county boards of elections. That discovery record was incorporated into the *Eakin* case and forms the underlying evidentiary record in this appeal. *Amici* also litigated, in this Court, a federal statutory claim against enforcement of the envelope-date requirement. In that appeal, this Court reversed the district court's grant of summary judgment on statutory interpretation grounds, but agreed in light of the record that

---

[1] Counsel for *amici* certifies that no other person or entity, including counsel for any party, has authored this brief, in whole or in part, or paid for the preparation or submission of this brief.

the handwritten date "is immaterial" to voters' qualifications and "serves little apparent purpose." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 125, 129 (3d Cir. 2024); *id.* at 139-140 (Shwartz, J., dissenting) (date is "not used to (1) evaluate a voter's statutory qualifications to vote, (2) determine the ballot's timeliness, or (3) confirm that the voter did not die before Election Day or to otherwise detect fraud"); *see also Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir.) ("Ignoring ballots because the outer envelope was undated, even though the ballot was indisputably received before the deadline for voting serves no purpose other than disenfranchising otherwise qualified voters."), *vacated as moot*, 143 S. Ct. 297 (2022).

The constitutional question now before the Court centers on the nature of the burden on voters from enforcing the envelope-date requirement and the state interests that do (or, as here, do not) justify the burden. *See Const. Party of Pa. v. Cortes*, 877 F.3d 480, 484 (3d Cir. 2017) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992). *Amici* have spent years litigating over the envelope-date requirement, which needlessly disenfranchises thousands of qualified Pennsylvania voters in election

after election.    There is no justification—*none*—for this mass disenfranchisement.  The envelope-date requirement has not served any cognizable election-administration function since the late 1960s, and now "serves little apparent purpose," *Pa. State Conf. of NAACP*, 97 F.4th at 125, "other than disenfranchising otherwise qualified voters," *Migliori*, 36 F.4th at 164.

The record amassed in the *PA NAACP* case (and in subsequent litigation around the issue) confirms this in vivid detail, strongly supporting the district court's grant of summary judgment.  It shows that thousands were disenfranchised in 2022 and in subsequent elections, even when they attempted to comply with the envelope-date requirement, including for obvious typos like adding or transposing a digit.  It shows that local officials knew and acknowledged that every impacted voter had voted within the proper period notwithstanding any errors on the envelope but refused to count voters' ballots anyway.  It shows that, despite years in the crucible of litigation, no one has ever identified any real purpose for this mass-disenfranchising practice.  To the contrary, government officials acknowledged in their discovery responses and in their sworn depositions here that the envelope-date

requirement serves no purpose other than disenfranchising qualified voters.

The *Anderson-Burdick* balancing analysis is "fact intensive." *E.g.*, *Cortes*, 877 F.3d at 486.  Here, the evidence conclusively shows that the mass-disenfranchising envelope-date requirement violates the constitutional right to vote of Pennsylvania voters.  It cannot continue.

## BACKGROUND

### A.    Mail Ballot Voting in Pennsylvania

Pennsylvania allows all registered, eligible voters to vote by mail. SMF ¶ 2[2]; *see also* Act of Oct. 31, 2019, P.L. 552, No. 77 ("Act 77"), § 8.  A

---

[2]  Citations to "SMF" refer to the Statement of Material Facts filed in conjunction with *amici*'s pending motion for summary judgment.  *See* Pls.' Rule 56(B)(1) Stmt., *Pa. State Conf. of NAACP v. Schmidt*, No. 22 Civ. 339 (W.D. Pa) ("*NAACP* Dkt."), ECF No. 401.  The SMF incorporates the appendix (cited as "APP_") filed in connection with *amici*'s initial 2023 summary judgment motion, *see* ECF Nos. 277-282 & 288, *NAACP* Dkt, which compiles interrogatory responses, examples of rejected envelopes, and county officials' deposition testimony.

This discovery record was incorporated wholesale into the *Eakin* evidentiary record.  *See* Case Mgmt. Order at 2, *Eakin v. Adams Cty. Bd. of Elections,* No. 22 Civ. 340 (W.D. Pa) ("*Eakin* Dkt.*"), ECF No. 227. *See also* Concise Stmt. of Material Facts and Appx. of Exs., ECF Nos. 289 & 290, *Eakin* Dkt. (partially reproduced in Pls.'-Appellees' Supp. Appendix 21-197, ECF No. 96).

A copy of the SMF is appended to this brief for ease of reference.

voter seeking to vote by mail must complete an application and provide proof of identity to their county board of elections. SMF ¶ 5; 25 P.S. §§ 3146.2, 3150.12; *see also* 25 P.S. § 2602(z.5)(3), APP_01036-01037. County boards then verify applicants' qualifications and identities. SMF ¶¶ 4-8; 25 P.S. §§ 3146.2b, 3150.12b, 3146.8(g)(4).

The counties then send verified voters a package containing a ballot, a "secrecy envelope," and a pre-addressed outer return envelope, on which a "voter declaration form" is printed. SMF ¶¶ 7-9; 25 P.S. §§ 3146.6(a), 3150.16(a).

At "any time after receiving" the package, voters mark their ballot, put it inside the secrecy envelope, and place the secrecy envelope in the return envelope. SMF ¶ 10; 25 P.S. §§ 3146.6(a), 3150.16(a). They then "fill out, date and sign the declaration printed on [the return] envelope." 25 P.S. §§ 3146.6(a), 3150.16(a). SMF ¶ 13.

The voter then delivers the ballot, in the envelopes, to county elections officials by 8 p.m. on Election Day. SMF ¶ 11; 25 P.S. §§ 3146.6(c), 3150.16(c). Upon receipt, counties must date-stamp or otherwise mark the envelope to confirm its timeliness and enter this information in the Statewide Uniform Registry of Electors ("SURE")

system.  SMF ¶ 12.  The ballot's timeliness is determined by when it was received and stamped, not any handwritten date.  SMF ¶¶ 11, 12; *see also* SMF ¶¶ 53-54.

### B.    The *PA NAACP* and *Eakin* Cases

This case and the *PA NAACP* case involve the stringent enforcement of the statutory requirement that voters casting a mail ballot correctly "date … the declaration printed on [the return] envelope," 25 P.S. §§ 3146.6(a), 3150.16(a).  That enforcement practice stems from a state-court lawsuit brought by Republican Party entities less than a month before the 2022 election, in which the Pennsylvania Supreme Court held, as a matter of state statutory interpretation, that the "shall … date" language was mandatory rather than permissive and thus required voters to write a correct date on the envelope.  *See generally Ball v. Chapman*, 289 A.3d 1 (Pa. 2023); *see* SMF ¶¶ 17-21.

Immediately after the *Ball* decision changed the rules (days before the November 2022 election), *amici* filed suit challenging enforcement of the envelope-date requirement to disenfranchise voters on federal statutory and Equal Protection grounds.  *See generally* Compl., *Pa. State Conf. of NAACP v. Schmidt*, No. 22 Civ. 339 (WD. Pa 2024) ("*NAACP*

Dkt."), ECF No. 1. The *Eakin* action, filed shortly thereafter, was marked as related, and the Republican Intervenor-Appellants ("RNC Intervenors") intervened in both actions. *See* Mem. Order, *NAACP Dkt.*, ECF No. 167.; *see also* Order, *Eakin v. Adams Cty. Bd. of Elections*, No. 22 Civ. 340 (W.D. Pa 2024) ("*Eakin* Dkt."), ECF No. 165. The district court handled the initial stages of the cases in tandem. *See* Order, ECF No. 147, *Eakin* Dkt. (coordinated conference); Order, ECF No. 212, *Eakin* Dkt. (coordinated deadlines).

*Amici* obtained full discovery in the *PA NAACP* case from all sixty-seven counties. This record was incorporated into the *Eakin* case by order of the district court, and thus served as the basis for the summary judgment records in both cases. *See* Case Mgmt. Order at 2, ECF No. 227, *Eakin* Dkt.; *see also supra* n.2.

*Amici* propounded document requests and requests for admission on the counties, obtaining information on the voters disenfranchised in 2022, including copies of return envelopes deemed insufficient. *E.g.*, SMF ¶¶ 36, 65-97. These responses confirmed that the counties received approximately 1.2 million mail ballots in the 2022 general election and that they rejected approximately 10,500 of them (close to 1%) based on

missing or purportedly "incorrect" handwritten dates on the voter declaration on the outer return envelopes.  *E.g.*, SMF ¶¶ 3, 33, 35-39.; *accord* RNC Appendix ("App.") 13, ECF No. 76.

*Amici* also propounded interrogatories regarding the use of the handwritten date.  In response, every county specifically acknowledged that it did not use the handwritten date for any purpose related to determining a voter's age (SMF ¶ 47), citizenship (SMF ¶ 48), residence (SMF ¶ 49), or felony status (SMF ¶ 50), or whether their ballot was timely received by Election Day (SMF ¶¶ 51-52).  They all confirmed that the 10,000-plus disenfranchised voters had been determined eligible and qualified to vote before being issued a mail ballot.  SMF ¶ 42.  They confirmed that these voters necessarily filled out their ballots at the proper time, which by law is "any time" after receiving the mail-ballot package, and timely returned their ballots by 8 p.m. on Election Day.  SMF ¶¶ 10, 37-39, 53-55.  Indeed, they conceded it was literally impossible to have signed the form outside that window.  SMF ¶¶ 53-55, 65, 73.

The undisputed facts established in discovery demonstrated that, in 2022, voters were required to write a complete date, on the right place

on the envelope, using the county's date-formatting preferences, and that they were required to avoid any unintentional slips of the pen, misprints or mistakes, like writing their birthdate. Any deviation could result in disenfranchisement:

- Over 100 voters were disenfranchised for writing a date that was correct but missing a term, such as "10 - - 2022," or "Oct. 25," SMF ¶¶ 71, 76, 80.

- At least 12 were disenfranchised for writing a "correct" date but on the wrong place on the envelope. SMF ¶ 83.

- At least 34 voters were disenfranchised for writing a date that was correct under the international date format (day/month/year). SMF ¶¶ 86-88.

- Hundreds of voters (at least 1,734 in all) were disenfranchised for obviously unintentional slips of the pen (such as a voter writing "2021," or "2033," or "2202" instead of "2022," or "10/111/2022" instead of "10/11/2022"). SMF ¶¶ 67, 70, 74, 75, 77.

- At least 50 voters were disenfranchised for mistakenly writing their birthdate on the envelope. SMF ¶¶ 68-69.

The record also shows that the burden from the rigid enforcement of the envelope-date requirement fell hardest on older voters. SMF ¶ 45; *see also* APP_01188.

In November 2023, the district court granted *amici*'s motion for summary judgment on their statutory claim under the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B). *See* Mem.

Op. at 77, *NAACP* Dkt., ECF No. 347. RNC Intervenors appealed, and this Court reversed in a split ruling. The panel majority agreed based on the record that the handwritten envelope-date requirement "serves little apparent purpose[,]" and indeed "bears no relation—it is immaterial—to whether a voter is qualified under Pennsylvania law to vote," but held as a matter of statutory construction that the Materiality Provision's protections did not apply to the envelope form. *See Pa. State Conf. of NAACP*, 97 F.4th at 125, 131.

The Court then remanded for consideration of *amici*'s Equal Protection claim.

## C.    This Appeal

On remand, *amici* amended their pleadings to add an *Anderson-Burdick* claim based on the existing record and sought summary judgment on both their constitutional claims.[3] *See* Order, *NAACP* Dkt., ECF No. 412; Pls.' MSJ, *NAACP* Dkt., ECF No. 402. The *Eakin* plaintiffs meanwhile renewed their motion for summary judgment on their

---

[3] That motion remains pending. After the grant of summary judgment in *Eakin*, *amici* moved for a Rule 54(b) judgment as to their *Anderson-Burdick* claim. *See* Mot. for Rule 54(b) Judgment & MIL, ECF Nos. 475 & 476, *NAACP* Dkt. That motion also remains pending.

*Anderson-Burdick* claim on the same record.  *See* Second Suppl. Mem. ISO Mot. for S.J., ECF No. 380, *Eakin* Dkt.

On March 31, 2025, the district court granted the motion for summary judgment in *Eakin*.  The court concluded that, based on the record, and consistent with this Court's statements in the *Pennsylvania State Conference* decision, "the weight of the burden on the citizens['] right to vote is not counterbalanced by evidence of any governmental interest" and accordingly that enforcement of the envelope-date requirement to needlessly disenfranchise voters was unconstitutional. App.28.

The district court rejected the few attempted justifications for rigidly enforcing the envelope-date requirement proffered by RNC Intervenors as unsupported by the record.  The court noted that no party had provided any evidence that the handwritten date furthers any purported interest in fraud prevention. App.23-24.  It held that there was no evidentiary support for the "supposition" that the handwritten date promotes "solemnity" in the act of voting.  App.24-25.  Nor was there any support for the "speculative assertion" that the handwritten envelope date might serve as a "useful backstop" to all of the other methods of

determining whether a mail ballot was received on time.  App.25.

### D.    Additional Developments

Since the close of discovery in 2022, mass disenfranchisement of qualified voters due to envelope-dating mistakes has continued.  In 2024 alone, despite massive efforts by *amici* and other civic groups to educate voters, and despite efforts by the Pennsylvania Department of State to improve the envelope declaration, including by pre-printing "2024" on the form, envelope-date mistakes disenfranchised approximately 4,700 voters in the November general election.[4]

Meanwhile, parallel state court litigation of state law claims (in which RNC Intervenors have also intervened) has not uncovered any use for the envelope date, either.  No party in those cases has identified any practical purpose for the handwritten date or disputed that the thousands who are disenfranchised by the envelope-date requirement's

---

[4] Mark Scolforo, *Pennsylvania Elections Chief Touts Progress In Reducing Mail Ballot Rejection Rate*, Associated Press (Jan. 31, 2025), https://apnews.com/article/pennsylvania-mail-ballots-election-voting-f51bfba8910686eb0f63c15fb6757f20; *Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election*, PA DOS (Jan. 24, 2025), https://www.pa.gov/agencies/dos/newsroom/shapiro-administration-announces-57--decrease-in-mail-ballots-re.html.

enforcement are qualified or submitted their ballots on time. *See Black Pol. Empowerment Project v. Schmidt*, 325 A.3d 1046 (table), 2024 WL 4002321 at *32 (Pa. Commw. Ct.) ("As has been determined in prior litigation involving the dating provisions, the date on the outer absentee and mail-in ballot envelopes is not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud. It is therefore apparent that the dating provisions are virtually meaningless and, thus, serve no compelling government interest."), *vacated on other grounds*, 322 A.3d 221 (Pa. 2024); *Baxter v. Philadelphia Bd. of Elections*, 329 A.3d 483 (Pa. Commw. Ct. 2024) ("It is apparent that the trial court determined, as we did in *BPEP II* under similar factual circumstances, that the dating provisions are virtually meaningless and, thus, serve no compelling government interest."), *appeal granted in part*, 332 A.3d 1183 (Pa. 2025).

## ARGUMENT

"[V]oting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (citation omitted). To balance the fundamental importance of the right to vote with the reality that elections necessarily must be regulated, the question whether a

particular election rule unduly burdens the constitutional right to vote is subject to a "flexible standard." *Id.* at 434. That is the so-called *Anderson-Burdick* framework.

*Anderson-Burdick* is about balance. Courts must, based on the record before them, consider "the character and magnitude of the asserted injury" from a challenged election rule and then weigh these against the "precise interests put forward by the State as justifications for the burden imposed by its rule," *Cortes*, 877 F.3d at 484 (quoting *Anderson*, 460 U.S. at 789), "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (citation omitted).

"Evidence is key to the balancing of interests at the heart of the *Anderson-Burdick* framework." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 152 (3d Cir. 2022); *accord Cortes*, 877 F.3d at 486. Here, on the record developed in the district court in coordinated discovery, the *Anderson-Burdick* balance is heavily, indeed uncommonly, lopsided. Enforcement of the envelope-date requirement imposes a significant burden on voters—complete disenfranchisement for anything but perfect compliance—with a stunning lack of governmental justification.

14

## I.    THE RECORD DEMONSTRATES A SUBSTANTIAL BURDEN ON VOTERS

The first question in the *Anderson-Burdick* balance is the severity of the burden on voters' right to cast a ballot and have it counted.  "There is no 'litmus test for measuring the severity of a burden that a state [election] law imposes."  *Mazo*, 54 F.4th at 146 (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.)).  But considerations that this Court has identified as important indicate that the burden here is substantial—indeed, severe.

1.    Rules and practices that "effectively exclude" some voters from the ballot have been held to "impose[] a severe burden," especially where those excluded have little alternative to ensure that they can exercise their rights.  *Mazo*, 54 F.4th at 151 (collecting cases).  Enforcement of the envelope date rule does just that.

The envelope-date requirement is stringently enforced:  Voters must correctly input the month, date, and year, in the right place on the envelope, legibly, completely, and without any typos or slips of the pen, and, at least in some instances, precisely use the American (rather than international) month-day-year format and adhere to their county's other formatting preferences.  *See* SMF ¶¶ 38-39; 65-68; 70-71; 73-77, 80; 83-

88. Even minor deviations resulted in the voter's ballot being set aside and not counted—*i.e.*, with the voter *completely losing their right to vote*. *Id.*

A few examples, reproduced below, of qualified voters who attempted to complete the date line but were *still* disenfranchised, illustrate the burden here.[5] It is worth seeing them with one's own eyes.

Hundreds of voters were disenfranchised for writing the "wrong" month or year, often with obvious typos, such as writing the year "2024" or "2122" instead of "2022," or writing "September" instead of "October," even though it is undisputed that they only could have completed their mail ballot packages during the proper pre-election period in 2022:

---

[5] The clips reproduced below are from documents that were included in a sealed volume of the *PA NAACP* summary judgment appendix, ECF No. 282 (APP_01290-APP_01522), because some of the envelopes and other documents therein were designated as "Confidential" pursuant to the protective order in *PA NAACP* (ECF No. 230) and *Eakin* (ECF No. 224). These materials were also supplied to this Court in the *Pennsylvania State Conference* appeal, *see* Sealed Supp.Appx, No. 23-3166 (3d Cir. 2024), ECF No. 150.

For the avoidance of doubt, none of the clips reproduced herein are taken from documents designated as "Confidential" and none of them includes any voter's personal identifying information.



APP_01427 (date stamp says "10/25/22").



APP_01431 (date stamp says "10/25/22").



APP_01466 (date stamp says "10/17/2022").



APP_01470 (date stamp says "2022 OCT 20").



APP_01464 (date stamp says "10/14/22").

Others were disenfranchised because they wrote dates that were correct but missing a term, like "10/ / 2022" or "October 8" (no year):



APP_01439 (date stamp says "10/11/2022").



APP_01446 (date stamp says "10/13/2022").



APP_01447 (date stamp says "10/31/2022").



APP_01452 (date stamp says "11/3/2022").

Others simply were disenfranchised for simple slips of the pen, like the voter who wrote "10/111/2022.":

APP_01486 (date stamp says "2022 OCT 13").

In addition to the 8,000-plus voters who forgot to include the meaningless date, *almost 2,000 voters in 2022 alone* were disenfranchised for typos like those above, even though they attempted to handwrite a date in satisfaction of the requirement.  SMF ¶¶ 65-96.

These issues have persisted in more recent elections, too—despite the Department of State's prefilling of the year on the envelope date line. Among the thousands disenfranchised for envelope-dating mistakes in the 2024 general election, the below examples show how qualified voters who tried to comply were again disenfranchised for trivial errors, such as placing a "2" in the tens column rather than the ones column,



 or transposing the "Month" and the "Day" (*i.e.*, using the international dating convention),



or because they attempted to squeeze in the year along with the month and the day,

Br. of Appellees at 6 n.4, *Baxter v. Phila. Bd. of Elections*, Nos. 1 EAP 2025 & 2 EAP 2025 (Pa. Mar. 31, 2025).

Importantly, voters often lack any opportunity to fix such mistakes, no matter how trivial. *Mazo*, 54 F.4th at 151. In 2022, about half of the counties provided *no notice or opportunity* for voters to cure mistakes on the mail ballot envelope. *See* SMF ¶¶ 40-41, 115-116. That was the case for the individual voters who are plaintiffs along with *amici* in the *PA NAACP* case, none of whom were notified of any opportunity to cure any defect prior to Election Day. *See* SMF ¶¶ 22-26.

Moreover, even when voters are theoretically able to receive notice, they often lack the practical ability to fix mistakes, because they did not find out in time, or because they lack the ability to physically come to the board of elections office. Stark examples of this come from Clearfield County. For instance, the county set aside the ballot of a voter who mistakenly omitted the handwritten date, although the county's stamp indicates the ballot was received on "OCT 24 2022." An election official wrote a note on the envelope, dated several days before the election,

indicating they had contacted the voter. The note says, "can not fix[,] in Florida."



APP_01434. The envelope of another voter, who forgot the date but whose ballot was timely received on "OCT 11 2022," bears a similar note: "Can't come in[,] disabled."

APP_01433.

For many of the thousands of voters who forgot or otherwise made some minor error in handwriting the date on the envelope—voters who, again, already went through the process of applying for, obtaining, filling out, and timely submitting a mail ballot—the cost of making such a trivial mistake was thus *total disenfranchisement*, with no effective

notice and no possibility of a cure or an alternative. *See, e.g., Mazo*, 54 F.4th at 151; *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-1322 (11th Cir. 2019) ("serious" burden where signature match policy disenfranchised voters with little chance to cure). This effective exclusion from the franchise for failure to perfectly comply with an irrelevant paperwork requirement, depriving thousands of the basic American right "to cast a ballot and to have it counted," *United States v. Classic*, 313 U.S. 299, 318 (1941), is a significant burden.

2. This Court has also emphasized "the importance of considering the real-world impact of voting rights restrictions" in assessing the severity of the burden on voters under the *Anderson-Burdick* framework. *Cortes*, 877 F.3d at 486; *accord Mazo*, 54 F.4th at 152 (considering whether plaintiffs pleaded they "themselves faced any burdens" under challenged rule). The inquiry, into "the extent to which a challenged regulation *actually* burdens constitutional rights, ... is 'fact intensive.'" *Cortes*, 877 F.3d at 486. The discovery record here speaks volumes.

For one, the *magnitude* of the disenfranchisement confirms that the burden is significant. In 2022, over 10,000 qualified Pennsylvania voters

across nearly every county who completed and cast mail ballots were disenfranchised because of the envelope-date requirement—roughly .8% of all mail ballot voters in that year. *See* SMF ¶¶ 3, 35-36; *see also* App.13. Thousands more were disenfranchised in 2024, despite enormous efforts by the Department of State and civil society groups like *amici*. *See supra* 12. Those burdens fall especially heavily on older voters, who are more likely to use (and to need) mail ballot voting. *See Pub. Integrity All. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (en banc) ("impact on subgroups" relevant).

Such mass-disenfranchising effects indicate a much greater burden than with those "ordinary and widespread" inconveniences of rule compliance that do not actually hinder large numbers of persons from voting. *Compare Crawford*, 553 U.S. at 206 (Scalia, J., concurring) (noting "a single plaintiff" cannot "claim a severe burden" and suggesting broader effects required) *with Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (even a "single" voter can claim constitutional violation). Indeed, the Sixth Circuit, in an analogous case, held that the rejection of approximately 1,800 absentee ballots across two elections, based on a failure "to accurately complete birthdate and address fields," was an

unconstitutional burden under *Anderson-Burdick*. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631-34 (6th Cir. 2016). The burden there, from requiring "technical precision" in completing a required form, is uncannily similar to this one: Voters were "disenfranchised based only on a technicality" like "transposing the location of the month and year numerals of a birthdate, writing the current date by mistake, and inverting digits in an address." *Id*. at 632. But here, *over 10,000 voters were disenfranchised in one election*, indicating an even heavier burden on voters.

The examples highlighted above, *supra* 16-20, of voters who tried to handwrite the date on the envelope but suffered total disenfranchisement for obvious, trivial errors, highlights the grossly unfair "real-world impact" of enforcing the envelope-date requirement to mass-disenfranchise Pennsylvania voters. *Cortes*, 877 F.3d at 486; *see* SMF ¶¶ 67, 70, 74, 75, 77.

And as the situation of one voter in Westmoreland County, illustrates, the burden is especially galling because county officials know exactly what voters mean to write in such circumstances. That voter wrote "10/23/2033" on their envelope, leading to their

24

disenfranchisement for mistakenly writing "2033" instead of "2022." APP_00929n-00929o, _01432. Of course, the voter could not have cast their ballot from ten years in the future; indeed, county officials uniformly admitted that it was literally impossible for a voter in the 2022 general election to have signed the voter declaration form in any year other than 2022. *E.g.*, SMF ¶ 65. Rather, because the voter's ballot was date-stamped on October 25, 2022, the county official knew what the voter was trying to write. APP_01432. Asked whether he had "*any doubt that this voter was trying to write 10/23/2022*" on the form rather than 2033, the county's chief election official said, in a sworn deposition, "I agree." APP_00929n-00929o.

The voter was disenfranchised anyway. That is the "real-world impact" of the utterly arbitrary, mass-disenfranchising practice at issue here. *Cortes*, 877 F.3d at 486.

## II. THE RECORD REVEALS ZERO JUSTIFICATION FOR THE BURDEN

Even if the burden on voters were only minimal (and here it is not), "important regulatory interests" would still be needed to "justify reasonable, nondiscriminatory restrictions." *E.g.*, *Anderson*, 460 U.S. at 788. But there are no "important" interests at stake here, and the

restriction at issue is not "reasonable." *Id.* It therefore does not matter in the end how precisely the Court characterizes the severity of the burden on voters from enforcement of the envelope-date rule. Whatever the severity, the record reveals an utter lack of "relevant and legitimate state interests 'sufficiently weighty to justify [it].'" *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 538 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) (quoting *Crawford*, 553 U.S. at 191 (plurality op.)); *see Ne. Ohio Coalition*, 837 F.3d at 631-34; *accord Mazo*, 54 F.4th at 153; *see also Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109-10 (2d Cir. 2008). For this mass-disenfranchising practice to survive constitutional review, there must be state interests that go beyond "mere[] speculative concern[s]." *Soltysik v. Padilla*, 910 F.3d 438, 448-49 (9th Cir. 2018). Such interests must be "specific," not "abstract," and Appellants must "explain why the particular restriction imposed ... actually addresses[] the interest put forth." *Ohio State Conf. of NAACP*, 768 F.3d at 545 (citation omitted).

Appellants can point to no such thing on this record.

1.    It was completely and uniformly conceded in discovery that the envelope date has no role in determining a voter's qualifications or

eligibility, SMF ¶ 47-50, or in determining whether a ballot was completed or submitted on time, *see* SMF ¶¶ 12, 51-52; *see also Pa. State Conf. of NAACP*, 97 F.4th at 127 (handwritten date "plays no role in determining a ballot's timeliness").  It was specifically conceded that the thousands of disenfranchised voters all submitted identification, had their qualifications confirmed, and were properly issued mail ballots. *E.g.*, SMF ¶ 42.  It was conceded that they all completed their ballots during the proper time—*i.e.*, "any time" between when they received it and 8 p.m. on Election Day, 25 P.S. §§ 3146.6(c), 3150.16(c)—as confirmed by the date-stamp and the SURE system.  *E.g.*, SMF ¶ 12; *see also* 25 P.S. §§ 3146.9(b)(5), 3150.17(b)(5) (mandating scanning of mail ballots using voter-specific bar codes).  Indeed, it was conceded that it would be *literally impossible* for voters to have completed and submitted their ballot at any time except during the proper period, irrespective of any date written on the envelope.  SMF ¶¶ 10, 54, 56, 65, 73.

If it has nothing to do with timeliness (or qualifications), what other legitimate and sufficiently weighty purpose could the handwritten date have?  Before 1968, the handwritten date *did* relate to timeliness—for a time, absentee ballots were allowed to arrive after Election Day, and the

handwritten date was used as a check to confirm that the ballot had been completed during the proper period (*i.e.*, by Election Day). *See* Act of Dec. 11, 1968, P.L. 1183, No. 375, sec. 8, §§ 1308(a) & (c). But in 1968, the Pennsylvania General Assembly amended the Election Code to require that absentee ballots be received by the close of the polls, and it eliminated the canvassing provision that had previously required county boards to set aside absentee ballots bearing a date after the election. *Id*. Thus, although the instruction to "fill out, date and sign" absentee ballot return envelopes remained in the Election Code—and was copied verbatim from the Code's absentee ballot provisions into its mail ballot provisions in 2019 as part of Act 77, *compare* 25 P.S. § 3150.16(a) with § 3146.6(a)[6]—the 1968 changes rendered the voter-written date completely irrelevant for any election-administration purpose and utterly vestigial. Consistent with that, in discovery, no party identified any

---

[6] Republican legislative leaders acknowledged this in a state court amicus filing, stating that the General Assembly reused the absentee-ballot language verbatim in Act 77 "to minimize the complexities of legislative drafting," *not* because the voter-written date served any particular purpose in contemporary election administration. Br. of Amici Curiae Cutler, et al.. at 24, *Black Political Empowerment Project v. Schmidt*, No. 283 MD 2024 (Pa. Commw. Ct. June 24, 2024).

purpose for the envelope-date rule relating to election administration under current Pennsylvania law.   SMF ¶¶ 57-60; *see also, e.g.*, APP_00915-00916 ("Q: [S]o apart from determining compliance with the date requirement itself, does the [county] use the handwritten date on the ballot return envelope for any other purpose that you can think of? A: We do not.").

2.    In discovery, RNC Intervenors and two out of 67 counties tried to suggest that the handwritten date might serve some anti-fraud function relating to deceased voters.  *See* SMF ¶ 60.  In the end, though, the undisputed facts debunked that theory.  SMF ¶¶ 43, 61-64; *accord* App.23-24.  Appellants try again here (RNC Br. 55-57, 61-62; PA AG Br. 26-27) but cannot make something out of nothing.

In 2022, *none* of the approximately 10,500 disqualified general election voters was ever accused of any fraud or misconduct.  No party or amicus has ever suggested or asserted that any missing or "incorrect" dates indicated any fraud in the 2022 general election.  SMF ¶ 43.

Appellants rely here (as they did below) on a single instance of apparent mail ballot fraud from Lancaster County from the 2022 primary election.  But when questioned about this incident under oath, Lancaster

County's designee readily admitted that it was not the handwritten date that led authorities to uncover the fraud, and that the ballot at issue would have been disqualified regardless of the envelope date.

The incident involved Cheryl Mihaliak, who attempted to vote her mother's mail ballot in the primary after her mother had died. The county's chief election official testified that the county knew not to count the ballot without having to consult the envelope date—indeed, it had *already removed* the mother from the rolls before it even received her ballot because it had learned of her death through its normal checks. *See* APP_00895-00896; 25 P.S. § 3146.8(d); *see also* 25 Pa. C.S. § 1505.  The county knew the vote was invalid and potentially suspect, no matter what date was written on the envelope, because it arrived weeks after the voter's death.   APP_00888-00892.   The Lancaster official testified, specifically:

> Q.   But just focusing on whether this was a valid vote, the date written on the envelope didn't matter one way or the other?
>
> A.   Correct. When we received it back, as we had already removed her, that ballot would have been set to the side.

APP_00892:10-15.

Notably, all of this occurred in connection with an election—the May 2022 primary—when ballots with envelope-date errors or omissions *were required to be counted* pursuant to this Court's subsequently-vacated decision in *Migliori,* 36 F.4th 153. Lo and behold: Even though voters were *not* required to be disenfranchised for envelope-dating errors at the time, county officials and law enforcement were still fully able to detect, stop, and prosecute Ms. Mihaliak's fraud. *That* is the only relevant "point of *Mihaliak*." PA AG Br. 52.

No one has even tried to point to any other incident from any election cycle. Nor, more fundamentally, has anyone explained how disenfranchising qualified voters for mistakes in complying with the envelope-dating rule serves a government interest in detecting or preventing fraud. Sheer speculation about an amorphous "fraud interest" cannot "offset [a] burden of technical perfection" that disenfranchises thousands. *Ne. Ohio Coalition*, 837 F.3d at 633.

3. There is similarly no authority or evidence for the "nebulous contention" that the handwritten date serves a supposed interest in "solemnity," App.25. *See* RNC Br. 60-61. This supposed interest—which was never suggested below by any government entity during discovery

and was posited by RNC Intervenors in a legal brief without any citation to the record—simply ignores the actual process that voters must go through to vote by mail.

In Pennsylvania, a voter must submit an application and have their identification and qualifications verified to obtain their mail ballot materials. *See supra* 5; SMF ¶¶ 4-9, 42. Before submitting their mail ballot, they must sign a declaration stating, "I am qualified to vote the enclosed ballot and I have not already voted in this election." *E.g.*, APP_01172; 25 P.S. §§ 3146.4, 3146.6, 3150.14, 3150.16. Signing the application and the envelope form subjected them to criminal penalties for any false signatures. *See* 25 P.S. § 3553 (penalties for falsely "sign[ing]" an application or declaration, regardless of handwritten date). All the disenfranchised voters signed their applications and their envelopes. SMF ¶ 36. And voters were required to complete and return their ballots by 8 p.m. on Election Day—and again, all of them did so. SMF ¶¶ 36-39.

It is not only factually baseless but also insulting to these voters to suggest that, after taking all these steps, a minor mistake in writing the meaningless date somehow negates the "solemnity" of their conduct or

suggests they did not adequately contemplate their actions, such that they can justifiably be deprived of the right to an effective ballot.

4.    Making local election workers pore over envelopes to find irrelevant dating errors in submissions they already know were received on time, solely to disqualify otherwise valid ballots, can hardly be said to serve any interest in the "orderly administration of elections," either. *E.g.*, RNC Br. 59; PA AG Br. 29-30.  Rather, enforcement of the envelope-date requirement has led to arbitrary treatment, disuniformity, and confusion.

As described already, enforcement of the envelope-date requirement has disenfranchised thousands of voters who timely completed and submitted their ballots, including voters who affirmatively wrote a date but had it deemed "incorrect," often due to obvious, factually impossible typos like writing "2202" or "2222" instead of "2022."  *See* SMF ¶ 65-70, 74-75; *see also* APP_01426, 01430.

The arbitrariness and absurdity of these instances is magnified by the fact that, in the same election, counties also *counted* ballots where the dates were necessarily *incorrect*.  For example, Berks County counted ballots if a voter wrote any date after September 19 on the envelope, even

though the county did not begin sending ballot packages to voters *until seventeen days later* on October 7, 2022 and thus earlier-dated ballots were unquestionably "incorrect." SMF ¶ 92. Lancaster County similarly counted ballots whenever a voter wrote some date after September 19, even though it did not begin sending ballot packages to voters until September 26. SMF ¶ 93.[7] At least one county, Luzerne, voted to count a person's ballot where they wrote September 31 on the date line—*even though that date literally does not exist*—while other counties penalized this typo with disenfranchisement. SMF ¶¶ 77-78.

Counties also took inconsistent approaches on date formatting. Eighteen county boards strictly applied the American dating convention of writing the month, day, and year (MM/DD/YYYY) in that order. SMF ¶ 86. At least thirty-one others tried to account for both the American and international dating conventions, but even then they admitted that they did so inconsistently. SMF ¶¶ 87-88; *see* APP_00929a-00929b,

---

[7] Counties used the September 19 date because it was chosen by the Pennsylvania Supreme Court to clarify which dates could be considered "correct." *Ball*, 289 A.3d at 23 & n.130. However, in 2022, more than half of counties began sending mail ballot packages to voters in October. SMF ¶ 34.

00929m-00929n.  Thus, notwithstanding the fact that no county actually used the handwritten date for any purpose, a voter using the international format could write the date and have their ballot counted in some parts of the Commonwealth, but the same submission would lead them to be disqualified elsewhere.

Does any of this sound remotely like the "orderly administration of elections"?  It does not—and Appellants never even try to point to any record evidence to demonstrate an actual administrative purpose served by enforcing the envelope-date requirement other than denying the right to vote.  The chaos and arbitrariness manifest in the discovery record are the unsurprising result of turning a vestigial, irrelevant line of paperwork with no practical election-administration purpose into a rigid rule requiring strict compliance on pain of disenfranchisement.

It is time for this injustice to end.

## CONCLUSION

The district court's grant of summary judgment should be affirmed.

Dated: June 9, 2025

Stephen Loney (PA 202535)
Kate Steiker-Ginzberg (PA 332236)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
sloney@aclupa.org

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

Respectfully submitted,

*/s/ Ari J. Savitzky*
Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
slakin@aclu.org

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

*Counsel for Amici the
Pennsylvania State Conference of
the NAACP, League of Women
Voters of Pennsylvania, POWER
Intefaith, Common Cause
Pennsylvania, Black Political
Empowerment Project, and Make
the Road Pennsylvania*

## COMBINED CERTIFICATIONS

The undersigned is a member of the bar of this Court.

This brief complies with the word limit of Fed. R. App. P. 27(d)(2) because this document contains fewer than 6,500 words.

The text of this electronic brief is identical to the text in any paper copies that will be filed with the Court.

A virus detection program, Microsoft Word from the Microsoft Office Professional Plus 2010 suite, has been run on this electronic brief and no virus was detected.


Dated: June 9, 2025                    Respectfully submitted,

                                        /s/ Ari J. Savitzky
                                       Ari J. Savitzky

# CERTIFICATE OF SERVICE

I herby certify that on June 9, 2025, I caused a true and correct copy of the foregoing Motion to be served on all parties via the Court's CM/ECF system.

Dated: June 9, 2025                    Respectfully submitted,

                                        _/s/ Ari J. Savitzky_
                                       Ari J. Savitzky