No. 25-1644

In the United States Court of Appeals for the Third Circuit

BETTE EAKIN, *et al.*,

*Plaintiff-Appellees*

*v.*

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

*Defendant-Appellees*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenor-Defendant-Appellants.*

**On Appeal from the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-340 (Baxter, J.)**

## PETITION FOR REHEARING EN BANC

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

John M. Gore
(D.C. Bar No. 502057)
  *Counsel of Record*
E. Stewart Crosland
Benjamin P. Daus
David Wreesman
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
bdaus@jonesday.com
dwreesman@jonesday.com

*Counsel for Intervenor-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

RULE 35.1 STATEMENT .................................................................. vi

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 5

REASONS FOR GRANTING THE PETITION ..................................... 8

    I.    The Panel's Decision Contravenes *Crawford*, *Brnovich*, And *Mazo*. ................................................................... 8

    II.   *McDonald* And *Crawford* Bar The Panel's Conclusion That Expanding Mail Voting Can Violate The Right to Vote. ................................................................... 14

    III.  The Panel's Placement Of A Burden On The Commonwealth Conflicts With Decisions Of This Court, Other Circuits, And The Supreme Court. ................ 17

CONCLUSION ............................................................................. 21

COMBINED CERTIFICATIONS

EXHIBIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ................................................................ 2, 12

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) ................................................................ 7

*Baxter v. Phila. Bd. of Elections,*
    325 A.3d 645 (Pa. 2024) (per curiam) ................................................ 7

*Baxter v. Phila. Bd. of Elections,*
    332 A.3d 1183 (Pa. 2025) (per curiam) ............................................... 7

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ............................................................. *passim*

*Buckley v. Am. Const. L. Found., Inc.,*
    525 U.S. 182 (1999) ................................................................ 16

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ................................................................. 2

*Common Cause Ind. v. Lawson,*
    977 F.3d 663 (7th Cir. 2020) .................................................... 15, 16

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ............................................................. *passim*

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) ................................................. 13, 17

*Democratic Exec. Comm. of Fla. v. NRSC,*
    950 F.3d 790 (11th Cir. 2020) ...................................................... 14

*FCC v. Beach Commc'ns., Inc.*,
    508 U.S. 307 (1993) ............................................................... 17

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ........................................... 13

*Groff v. DeJoy*,
    600 U.S. 447 (2023) .............................................................. 11

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) .............................................................. 16

*Kramer v. Union Free Sch. Dist. No. 15*,
    395 U.S. 621 (1969) .............................................................. 16

*Luft v. Evers*,
    963 F.3d 665 (7th Cir. 2020) ................................................. 9

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020) ........................................... 3, 17

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ......................................... *passim*

*McDonald v. Board of Election Commissioners of Chicago*,
    394 U.S. 802 (1969) ................................................... 3, 14–16

*Meyer v. Grant*,
    486 U.S. 414 (1988) .............................................................. 16

*Molinari v. Bloomberg*,
    564 F.3d 587 (2d Cir. 2009) ................................................. 16

*Ne. Ohio Coal. for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ........................................... 13, 17

*O'Brien v. Skinner*,
    414 U.S. 524 (1974) ........................................................ 15, 16

iii

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) ..................................................... 13

*Org. for Black Struggle v. Ashcroft,*
  978 F.3d 603 (8th Cir. 2020) ..................................................... 17

*Pa. State Conf. of NAACP Branches v. Sec'y Pa.,*
  97 F.4th 120 (3d Cir. 2024) .................................................... 7, 9

*Price v. N.Y. State Bd. of Elections,*
  540 F.3d 101 (2d Cir. 2008) ...................................................... 17

*Tedards v. Ducey,*
  951 F.3d 1041 (9th Cir. 2020) (Op. 44 n. 34) ...................... 19

*Tex. Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ..................................................... 15

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ...................................................... 1, 17, 21

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. art. I, § 4, cl. 1 ........................................................ 1

U.S. Const. art. II, § 1, cl. 2 ....................................................... 1

Act of Mar. 9, 1945, Pub. L. 29, No. 17, 1945 Pa. Laws 29, 37 ................ 5

Pa. Stat. § 3146.6 ................................................................... 5, 9

Pa. Stat. § 3050 ......................................................................... 9

Pa. Stat. § 3150.16 ............................................................... 1, 5, 9

## OTHER AUTHORITIES

Directive Concerning the Form of Absentee and Mail-in
  Ballot Materials, Pa. Dep't of State (July 1, 2024) ................ 6

Pennsylvania Mail-In Registration Form ............................................... 10

# RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

- *i.e.*, the panel's decision is contrary to the decisions of the Supreme Court in (i) *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), (ii) *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021), and (iii) *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), and of this Court in *Mazo v. New Jersey Secretary of State*, 54 F.4th 124 (3d Cir. 2022);

And that this appeal involves three questions of exceptional importance:

- *i.e.*, (i) whether neutral ballot-casting rules imposing only "the usual burdens of voting" trigger any federal judicial scrutiny at all; (ii) whether the constitutional right to vote extends to mail voting when the State makes another method of voting available; and (iii) whether neutral, minimally burdensome ballot-casting rules

trigger anything more than rational-basis review under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

/s/ *John M. Gore*
John M. Gore
*Counsel for Appellants*

## INTRODUCTION

The Constitution recognizes States' vast authority to set election rules. *See* U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. In fact, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

The Pennsylvania General Assembly did precisely that in 2019, when it enacted Act 77 in a historic bipartisan compromise. Act 77 created universal mail voting for the first time in Commonwealth history, subject to safeguards to promote election integrity. One such safeguard extended to mail ballots is the declaration mandate that has governed absentee ballots for eighty years. That mandate requires voters to "fill out, date, and sign the declaration printed" on their mail-ballot return envelopes. 25 Pa. Stat. § 3150.16.

Multiple state and federal courts, including this Court, have upheld the date requirement aspect of this mandate. In this latest challenge, the panel agreed that the requirement imposes at most a "minimal" burden on voters, but nonetheless held that it *violates the Constitution*. Op. 34, 42-55.

Even the panel acknowledged that its decision exacerbates multiple circuit splits. *Id.* at 33 n.23, 44 n.34, 45 n.35. Regrettably, it does not stop there: The decision also contravenes decisions from the Supreme Court and this Court. Rehearing en banc is warranted.

*First*, the panel erred in applying the so-called *Anderson-Burdick* framework *at all*. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). "[E]very voting rule imposes a burden of some sort" on voters. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 669 (2021). The Constitution, however, permits States to adopt neutral voting rules that impose "the usual burdens of voting," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality op.); *accord Brnovich*, 594 U.S. at 669, or only "*de minimis*" burdens, *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138-39 (3d Cir. 2022). Accordingly, federal courts must reject claims that such rules violate the constitutional right to vote. *See Crawford*, 553 U.S. at 198 (plurality op.); *Mazo*, 54 F.4th at 138-39.

The panel never mentioned this constitutional rule, much less explained how the date requirement imposes anything other than a usual burden of voting. *See* Op. 34-42. Instead, it unpersuasively quibbled with

the Court's decision in *Mazo*. *Id.* at 38-39. And it suggested that the extraordinarily high *99.77% rate of compliance* with the requirement somehow evinces constitutional infirmity, *see id.* at 39-42—thus yet again contradicting Supreme Court precedent it failed to address.

*Second*, the panel contravened the rule established by *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), affirmed by *Crawford*, and applied by the Fifth and Seventh Circuits. As *McDonald* explained, the constitutional right to vote does not extend to mail voting where the State makes another method available. *Id.* at 807-11. Pennsylvania has done so here, preserving in-person voting and exempting it from the date requirement. Pennsylvania thus did not violate the right to vote by *expanding* opportunities to vote in Act 77.

*Third*, even if the panel were correct that *Anderson-Burdick* governs, it misapplied that framework in gross departure from the precedent of the Supreme Court, this Court, and other circuits. "[C]ourts apply rational basis review" to nondiscriminatory ballot-casting rules that impose minimal burdens. *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020). The panel, however, opted to apply more searching scrutiny

and to dismiss the Commonwealth's interests based on what it viewed as a lack of supporting evidence.

The dismissal of Pennsylvania's anti-fraud interest was especially egregious because "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686.  Moreover, even if the requirement's defenders bore an evidentiary burden, they easily satisfied it by pointing out that the requirement *has* been used to prosecute fraud in a case the panel attempted to brush aside.

If left uncorrected, the panel's decision will have staggering implications for Pennsylvania voters and the federal courts.  Indeed, the decision may have *invalidated universal mail voting in Pennsylvania* under Act 77's robust nonseverability clause.  The panel's decision also would subject *every* ballot-casting rule enacted by a state legislature to open-ended federal judicial scrutiny.  After all, in the panel's world, *no* burden is too minimal to escape the federal courts' notice, and *every* state interest must be supported by evidence sufficient to satisfy federal judges.  The federal courthouse doors would be thrown open to *every*

plaintiff looking to wield *Anderson-Burdick* to undo a political defeat—or compromise—struck in the statehouse.

The Court should grant rehearing en banc.

## BACKGROUND

The declaration mandate and its date requirement have been part of Pennsylvania law governing absentee voting since 1945. *See* Act of Mar. 9, 1945, Pub. L. 29, No. 17, 1945 Pa. Laws 29, 37. Act 77 generally extended to mail voting the same ballot-casting rules that govern absentee voting, including the date requirement. *See* 25 Pa. Stat. §§ 3146.6(a), 3150.16(a). And Act 77's nonseverability provision mandates that if "*any* [covered] provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." Act 77, § 11 (emphasis added).

From the outset, compliance with the date requirement among mail voters has exceeded 99%—higher than the compliance rate with other ballot-casting rules, like the secrecy-envelope requirement. *See* Opening Br. 9-10. After the 2024 primaries, the Secretary of the Commonwealth redesigned the declaration to make compliance even easier: Now voters need only fill the two-digit month and day into premarked boxes. The

redesigned declaration also emphasizes that filling in the boxes is "REQUIRED," and calls for "Today's date."



Directive Concerning the Form of Absentee and Mail-in Ballot Materials, Pa. Dep't of State 12 (July 1, 2024), https://perma.cc/PD3N-UDTV.

After the redesign, the compliance rate jumped again, to 99.77%. *See* Opening Br. 11. In the 2024 General Election, only 0.23% of mail ballots—or a mere *0.064%* of all votes cast—lacked a proper date. *Id.*

Courts have rebuffed all legal challenges to the date requirement thus far. The Pennsylvania Supreme Court held that compliance with

the requirement is mandatory under state law.  *Ball v. Chapman*, 289 A.3d 1, 28 (Pa. 2023).  This Court later rejected a challenge to the requirement under the federal Materiality Provision.  *Pa. State Conf. of NAACP Branches v. Sec'y Pa.*, 97 F.4th 120, 128 (3d Cir. 2024).

A group of plaintiffs is now arguing before the Pennsylvania Supreme Court that the requirement violates the Pennsylvania Constitution.  *See Baxter v. Phila. Bd. of Elections*, 325 A.3d 645, 645-46 (Pa. 2024) (per curiam).  That court has stayed a lower court's injunction against enforcement of the requirement.  *Id.* at 645.  Oral argument takes place on September 10, 2025, and that court is also considering the scope of Act 77's nonseverability provision.  *See Baxter v. Phila. Bd. of Elections*, 332 A.3d 1183 (Pa. 2025) (per curiam).

Meanwhile, Plaintiff-Appellees assert that the requirement violates their right to vote under the U.S. Constitution.  The panel agreed, despite acknowledging that any burden the requirement imposes is "minimal."  Op. 34-42.  It reasoned that because ballot-casting rules, whether or not mandatory, "'invariably' place[] some burden on the right to vote," they *all* trigger open-ended judicial balancing.  *Id.* at 26.  It then

rejected the Commonwealth's interests in the requirement due to what it perceived as a lack of sufficient supporting evidence. *Id.* at 42-54.

## REASONS FOR GRANTING THE PETITION

### I. The Panel's Decision Contravenes *Crawford*, *Brnovich*, And *Mazo*.

States do not *violate* the Constitution when they exercise their constitutional *authority* to adopt rules that impose "the usual burdens of voting," *Crawford*, 553 U.S. at 198; *accord Brnovich*, 594 U.S. at 669, or even "*de minimis*" burdens, *Mazo*, 54 F.4th at 138-39.

The Supreme Court has never found that a non-discriminatory ballot-casting regulation violates the right to vote. In fact, it made clear in *Crawford* that rules imposing only "the usual burdens of voting" do not even *implicate* the right to vote. Three concurring Justices concluded that only severe burdens implicate that right. *See* 553 U.S. at 206-08 (Scalia, J., concurring in the judgment). Likewise, the plurality found that the challenged photo-ID provision's burdens did not "represent a significant increase over the usual burdens of voting," and thus confirmed that the "usual burdens of voting" do not implicate the right to vote. *Id.* at 198.

The Supreme Court reiterated this rule in *Brnovich*, a case arising under Section 2 of the Voting Rights Act. There—citing *Crawford*—it reaffirmed that because "every voting rule imposes a burden of some sort," rules imposing "the usual burdens of voting" cannot violate any right to vote. 594 U.S. at 669.

This Court likewise held in *Mazo* that rules imposing "*de minimis*" burdens are not subject to *Anderson-Burdick* review. 54 F.4th at 138-39; *see also Luft v. Evers*, 963 F.3d 665, 676-77 (7th Cir. 2020). When analyzing the Materiality Provision, this Court confirmed the date requirement itself—and any other ballot-casting rules carrying only the usual burdens of voting—do not "deny the right to vote" even when they require declining to count noncompliant ballots. *Pa. State Conf. of NAACP Branches*, 97 F.4th at 133 (cleaned up).

The date requirement imposes a "usual burden[] of voting," *Crawford*, 553 U.S. at 198 (plurality op.), or at most a "*de minimis*" burden, *Mazo*, 54 F.4th at 138-39. There is nothing objectively difficult about performing this task. Indeed, every State, including Pennsylvania, requires voters to fill out forms to register to vote and to cast ballots. *See, e.g.*, 25 Pa. Stat. §§ 3146.6(a), 3150.16(a) (declaration mandate); *id.*

§ 3050 (requirement to maintain in-person voting poll books); Pennsylvania Mail-In Registration Form, https://perma.cc/K7LP-THTJ.

The panel thus erred in applying the *Anderson-Burdick* framework *at all*. The panel, in fact, *never* cited *Brnovich* in its opinion or mentioned *Crawford* in its burden analysis. *See* Op. 34-42. Instead, its sole mention of *Crawford* appeared when noting elsewhere that a rule that cognizably burdens the right to vote must be justified by state interests "[h]owever slight [a] burden may appear." *Id.* at 29 (quoting 553 U.S. at 191 (plurality op.)) (emphasis omitted). Of course, in context, *Crawford* makes clear that this proposition applies only to rules triggering *Anderson-Burdick* scrutiny, not those carrying the "usual burdens of voting." 553 U.S. at 198 (plurality op.); *id.* at 204-09 (Scalia, J., concurring in the judgment); *accord Brnovich*, 594 U.S. at 669.

But to the panel, that proposition, combined with the truism that all voting rules "invariably" impose some burden, means that *all* such rules are subject to federal judicial review, no matter how "minimal" the burden. Op. 26, 35. That conclusion contradicts not only the Supreme Court's governing precedent, but also this Court's holding in *Mazo*. *See* 54 F.4th at 138-39.

The panel's attempt to detour around *Mazo* was unavailing—and, in fact, contravened *Crawford* and *Brnovich* yet again. The panel suggested that a burden is "*de minimis*" only when it is "speculative," Op. 38, but *Mazo* never uses that word, *see* 54 F.4th at 138-39. And, of course, they have different meanings: A "*de minimis*" burden actually exists and is minimal, whereas a speculative burden has not been shown to exist at all. *See Groff v. DeJoy*, 600 U.S. 447, 464 (2023).

The panel's retreat to the position that the date requirement's burden is not "speculative" or "*de minimis*," Op. 38-39, only made matters worse. The panel found the requirement burdensome because a "mail-in voter who fails to comply . . . will not have [her] vote counted." *Id.* at 39. It thus conflated the *burden of compliance* with the requirement with the *consequence for noncompliance*. *Id.* That cannot possibly be correct: If it were, then *every* mandatory rule that results in ballots not being counted would be subject to open-ended federal judicial scrutiny under *Anderson-Burdick*.

Unsurprisingly, it is not correct. *Crawford* itself made clear that the "relevant" burdens are the burdens of compliance. Thus, the *Crawford* court focused on the burdens of obtaining a photo ID—the

"inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph"—*not* the consequence for noncompliance of being disallowed to vote. 553 U.S. at 198 (plurality op.); *id.* at 205 (Scalia, J., concurring in the judgment); *see also Brnovich*, 594 U.S. at 669, 678 (burdens were "travel," lost "time," and "identify[ing] one's own polling place," not the consequence of out-of-precinct ballots being rejected).

In other words, that a ballot-casting rule is mandatory has no bearing on whether it is burdensome. But even if the consequence for noncompliance were relevant, the panel's reasoning again departed from Supreme Court precedent. *Brnovich* explained that a rule that over 98% of voters comply with cannot "render a system unequally open" or violate any right to vote. 594 U.S. at 680. Here, 99.77% of mail voters comply with the date requirement, so it also does not violate the right to vote even under the panel's mode of inquiry. *See id.*

Nothing in the various First Amendment cases the panel cited affects, much less alters, this conclusion. *See* Op. 39. Cases involving "chilling effect," *id.* at 39, *Anderson*'s loss of opportunity "to rally[] around a newly emerged candidate," *id.* at 40 (quoting 460 U.S. at 791), or a

hypothetical bar on "a candidate from appearing on a ballot," *id.* at 40 n.32, involve a complete *loss* of opportunity to exercise constitutional rights. They therefore have nothing to say about ballot-casting rules, such as the date requirement, that do *not* prevent anyone from exercising the right to cast a ballot—and that, in fact, *facilitate* increased voting opportunity.

The same is true of the four inapposite cases from "other circuits" the panel relegated to a footnote, *id.* at 41 n.33, as Intervenor-Appellants explained to the panel, *see* Reply 8-9, 19-21. Two involved rules that, the deciding courts concluded, deprived voters of the opportunity to vote entirely. *Fish v. Schwab*, 957 F.3d 1105, 1127-28 (10th Cir. 2020); *Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012). The third did not involve a *de minimis* burden, and no party argued that the *Anderson-Burdick* framework does not reach rules imposing *de minimis* burdens. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631-33 (6th Cir. 2016) ("*NEOCH*"). The fourth is not even precedential in the issuing court and, in any event, involved "a serious burden on the right to vote," not a *de minimis* one. *Democratic Exec. Comm. of Fla. v.*

*Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019); *see Democratic Exec. Comm. of Fla. v. NRSC*, 950 F.3d 790, 795 (11th Cir. 2020).

The Court should grant rehearing en banc.

## II. *McDonald* And *Crawford* Bar The Panel's Conclusion That Expanding Mail Voting Can Violate The Right to Vote.

The constitutional "right to vote" does not encompass "a claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807. Accordingly, a plaintiff can challenge a mail-voting regulation as a violation of the right to vote only by first showing she is "absolutely prohibited from exercising the franchise" through any other method— including in-person voting. *Id.* at 809; *see also Crawford*, 553 U.S. at 201 (plurality op.) (explaining that the voter-ID requirement did not violate elderly voters' right to vote in part because "the elderly in Indiana are able to vote absentee without presenting photo identification"); *id.* at 209 (Scalia, J, concurring).

Thus, the Seventh Circuit has declined to apply *Anderson-Burdick* to a mail-voting ballot-casting rule, explaining that "[a]s long as it is possible to vote in person, the rules for absentee ballots are constitutionally valid if they are supported by a rational basis and do not discriminate based on a forbidden characteristic such as race or sex."

14

*Common Cause Ind. v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020). The Fifth Circuit, too, has concluded, "voting by mail is a privilege that can be limited without infringing the right to vote." Order Granting Stay Pending Appeal, *United States v. Paxton*, No. 23-50885, ECF No. 80-1, at 5 (5th Cir. Dec. 15, 2023) (per curiam).

This rule should have ended this case. *See* Opening Br. 40-44. Pennsylvanians who are unwilling or unable to comply with the date requirement can vote in person, as most Pennsylvanians do. And because Pennsylvania "permits [voters] to vote in person" without complying with the requirement—the "exact opposite of 'absolutely prohibit[ing]' them from" voting—Plaintiff-Appellees' claim fails. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 808 n.7).

The panel offered no defensible basis for departing from this rule. It did not discuss *Crawford*'s treatment of the issue at all. *See* Op. 29-34. One of the Supreme Court cases it cited actually applied *McDonald*'s rule and reaffirmed that the *McDonald* plaintiffs' claims failed on a "failure of proof" that the State had deprived them of all opportunity to vote. *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974).

The other cases the panel cited (Op. 31-32) are inapposite. None involved a challenge to a mail-voting regulation, let alone where the State allowed voters to vote in person free of that regulation. Instead, all involved the total deprivation of any opportunity to vote, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) (distinguishing *McDonald* on that basis); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966), or to exercise some other constitutional right, *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 (1999); *Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir. 2009).

To be sure, States choosing to grant the convenience of mail voting may not do so in a way that violates the Constitution, such as offering mail voting only to members of a suspect class. *See, e.g.*, *Harper*, 383 U.S. 663; *Common Cause Indiana*, 977 F.3d at 664. But a nondiscriminatory mail-ballot regulation does not implicate the constitutional right to vote as addressed by the *Anderson-Burdick* framework when the State has not "absolutely prohibited [voters] from exercising the franchise." *McDonald*, 394 U.S. at 809; *see also O'Brien*, 414 U.S. at 529-30; *Crawford*, 553 U.S. at 201 (plurality op.).

The four circuit cases the panel cited (Op. 33 n.23) do not change anything.  None cited *McDonald*.  *See Lee*, 915 F.3d at 1321; *NEOCH*, 837 F.3d 612; *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101 (2d Cir. 2008). One involved what the court viewed as a complete deprivation of the opportunity to vote.  *See Price*, 540 F.3d at 109 & n.9.  And as explained, *Lee* is not even precedential in the issuing court.  *See supra* 15.

For these reasons as well, the panel erred in applying *Anderson-Burdick*, and rehearing en banc is warranted.

## III.   The Panel's Placement Of A Burden On The Commonwealth Conflicts With Decisions Of This Court, Other Circuits, And The Supreme Court.

"[C]ourts apply rational-basis review" when reviewing rules that impose minimal burdens on voters, whether under the *Anderson-Burdick* framework or otherwise.  *Mays*, 951 F.3d at 784.  This review is deferential:  The legislature's judgment "is not subject to courtroom fact-finding," and a court may uphold a challenged law "based on rational speculation unsupported by evidence or empirical data."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *see also Timmons*, 520 U.S. at

364 (*Anderson-Burdick* does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications").

The panel recognized that the Sixth, Seventh, and Eleventh Circuits have applied rational-basis scrutiny to minimally burdensome voting laws. *See* Op. 33 n.23; 45 n.35. The panel, however, declined to do so. *Id.* at 42-46. And the panel further departed from the precedents of this Court, other circuits, and the Supreme Court both when it imposed on the Commonwealth a burden to adduce evidence to support its interests in the date requirement *and* when it rejected the Commonwealth's evidence as insufficient. *Id.* at 45-54.

The panel believed that placing this burden on the Commonwealth inexorably flowed from its rejection of rational-basis scrutiny. *Id.* at 45 n.36. But even the cases the panel cited for rejecting rational-basis scrutiny prove otherwise. For example, in *Mazo* this Court (which did not reject rational-basis review) upheld the state interests in the law on a motion to dismiss without any supporting evidence. *See* 54 F.4th at 153-54. Instead, the Court cited caselaw recognizing the legitimacy of those interests and declared them sufficient to justify the law. *See id.*

The Ninth Circuit employed a similar analysis in *Tedards v. Ducey*, 951 F.3d 1041 (9th Cir. 2020) (Op. 44 n.34). Even though the Ninth Circuit rejected rational-basis scrutiny, it declined to require "an evidentiary hearing" to probe state interests. *Id.* at 1067. Rather, it upheld those interests as sufficient to defeat the plaintiffs' claim on a motion to dismiss because prior judicial decisions had found those interests "important." *Id.* at 1066-68; *id.* at 1068 ("Plaintiffs have failed to plausibly allege that [the challenged law] is not justified by 'important' state interests.").

So too here: Prior judicial decisions have recognized that the three interests advanced for the date requirement—providing proof of when the voter executed the ballot, promoting solemnity, and preventing fraud—are all important and sufficient to justify the requirement. *See* Opening Br. 53-57. Even the panel recognized the importance of those interests. *See* Op. 46-54. It nonetheless rejected them because, in its view, the Commonwealth had not adduced sufficient evidence that those interests justify the requirement's minimal burden. *See id.*

That holding not only conflicts with precedent; it also creates untenable consequences. It opens the federal courthouse doors wide to—

and forecloses federal courts from dismissing—*any Anderson-Burdick* claim because it subjects *every* rule imposing *any* burden to federal judicial review, *see supra* Part I, and requires state interests to be supported by evidence sufficient to satisfy federal judges.

Moreover, once the panel got around to analyzing the Commonwealth's interests, it yet again ran headlong into *Brnovich* and *Crawford*. A State may "take action to prevent election fraud without waiting for it to occur and be detected within its own borders," *Brnovich*, 594 U.S. at 686, and *Crawford* upheld Indiana's anti-fraud interest in its photo-ID law even in the absence of evidence of in-person voter fraud in that State, *see* 553 U.S. at 194-96 (plurality op.).

The panel's insistence that the Commonwealth adduce evidence to support its anti-fraud interest departed from those decisions. Op. 45 n.36. The panel then went further afield because the date requirement's proponents actually *did* adduce evidence the requirement has been used to ferret out and prosecute fraud. *Id.* at 50-54; *see* Opening Br. 55-57. The panel recognized the requirement "can narrowly advance the Commonwealth's interest in fraud detection and deterrence," but thought the supporting evidence insufficient because fraud-detection instances

were too "rare" to justify the requirement.  Op. 52.  Even under *Anderson-Burdick*, the panel was required to defer to—not substitute its judgment for—the General Assembly's conclusion that this anti-fraud interest suffices to justify the minimally burdensome date requirement.  *See, e.g.*, *Timmons*, 520 U.S. at 364; *Crawford*, 553 U.S. at 194-96 (plurality op.); *Mazo*, 54 F.4th at 153-54.

## CONCLUSION

The Court should grant rehearing en banc.

Dated:  September 9, 2025

Respectfully submitted,

*/s/ John M. Gore*

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

John M. Gore
(D.C. Bar No. 502057)
 *Counsel of Record*
E. Stewart Crosland
Benjamin P. Daus
David Wreesman
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
bdaus@jonesday.com
dwreesman@jonesday.com

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.    This Petition complies with the type-volume limitations of Fed. R. App. P. 40(d)(3)(A) because it contains 3,899 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This Petition complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Century Schoolbook) in the text and the footnotes.

3.    The text of the electronic Petition is identical to the text in the paper copies.

4.    The electronic file containing the Petition was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.

Dated: September 9, 2025          */s/ John M. Gore*
                                                  John M. Gore
                                                  *Counsel for Appellants*

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1644
_____

BETTE EAKIN; DSCC; DCCC; AFT PENNSYLVANIA

v.

ADAMS COUNTY BOARD OF ELECTIONS;
ALLEGHENY COUNTY BOARD OF ELECTIONS;
BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD
COUNTY BOARD OF ELECTIONS; BERKS COUNTY
BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF
ELECTIONS; BRADFORD COUNTY BOARD OF
ELECTIONS; BUCKS COUNTY BOARD OF
ELECTIONS; BUTLER COUNTY BOARD OF
ELECTIONS; CAMBRIA COUNTY BOARD OF
ELECTIONS;
CAMERON COUNTY BOARD OF ELECTIONS;
CARBON COUNTY BOARD OF ELECTIONS; CENTRE
COUNTY BOARD OF ELECTIONS; CHESTER COUNTY
BOARD OF ELECTIONS; CLARION COUNTY BOARD
OF ELECTIONS; CLEARFIELD COUNTY BOARD OF
ELECTIONS; CLINTON COUNTY BOARD OF
ELECTIONS; COLUMBIA COUNTY BOARD OF
ELECTIONS; CRAWFORD COUNTY BOARD OF
ELECTIONS; CUMBERLAND COUNTY BOARD OF

ELECTIONS; DAUPHIN COUNTY BOARD OF
ELECTIONS; DELAWARE COUNTY BOARD OF
ELECTIONS; ELK COUNTY BOARD OF ELECTIONS;
FAYETTE COUNTY BOARD OF ELECTIONS;
FOREST COUNTY BOARD OF ELECTIONS; FRANKLIN
COUNTY BOARD OF ELECTIONS; FULTON COUNTY
BOARD OF ELECTIONS; HUNTINGDON COUNTY
BOARD OF ELECTIONS; INDIANA COUNTY BOARD
OF ELECTIONS; JEFFERSON COUNTY BOARD OF
ELECTIONS;
JUNIATA COUNTY BOARD OF ELECTIONS;
LACKAWANNA COUNTY BOARD OF ELECTIONS;
LANCASTER COUNTY BOARD OF ELECTIONS;
LAWRENCE COUNTY BOARD OF ELECTIONS;
LEBANON COUNTY BOARD OF ELECTIONS; LEHIGH
COUNTY BOARD OF ELECTIONS;
LUZERNE COUNTY BOARD OF ELECTIONS;
LYCOMING COUNTY BOARD OF ELECTIONS;
MCKEAN COUNTY BOARD OF ELECTIONS; MERCER
COUNTY BOARD OF ELECTIONS; MIFFLIN COUNTY
BOARD OF ELECTIONS; MONROE COUNTY BOARD
OF ELECTIONS;
MONTGOMERY COUNTY BOARD OF ELECTIONS;
MONTOUR COUNTY BOARD OF ELECTIONS;
NORTHAMPTON COUNTY BOARD OF ELECTIONS;
NORTHUMBERLAND COUNTY BOARD OF
ELECTIONS; PERRY COUNTY BOARD OF ELECTIONS;
PIKE COUNTY BOARD OF ELECTIONS;
POTTER COUNTY BOARD OF ELECTIONS; SNYDER
COUNTY BOARD OF ELECTIONS; SOMERSET
COUNTY BOARD OF ELECTIONS; SULLIVAN

2

COUNTY BOARD OF ELECTIONS; TIOGA COUNTY
BOARD OF ELECTIONS; UNION COUNTY BOARD OF
ELECTIONS; VENANGO COUNTY BOARD OF
ELECTIONS; WARREN COUNTY BOARD OF
ELECTIONS; WAYNE COUNTY BOARD OF
ELECTIONS; WESTMORELAND COUNTY BOARD OF
ELECTIONS; WYOMING COUNTY BOARD OF
ELECTIONS; ERIE COUNTY BOARD OF ELECTIONS;
GREENE COUNTY BOARD OF ELECTIONS;
PHILADELPHIA COUNTY BOARD OF ELECTIONS;
SCHUYLKILL COUNTY BOARD OF ELECTIONS;
SUSQUEHANNA COUNTY BOARD OF ELECTIONS;
YORK COUNTY BOARD OF ELECTIONS;
ARMSTRONG COUNTY BOARD OF ELECTIONS;
WASHINGTON COUNTY BOARD OF ELECTIONS


REPUBLICAN NATIONAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL
COMMITTEE;
REPUBLICAN PARTY OF PENNSYLVANIA,
(Intervenors in District Court)
                                            Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 1:22-cv-00340)
District Judge:  Honorable Susan Paradise Baxter
_____

3

Argued July 1, 2025

Before: SHWARTZ, FREEMAN, and SMITH, *Circuit Judges*

(Filed: August 26, 2025)

Brett Graham [ARGUED]
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

Daniel B. Mullen
Office of Attorney General of Pennsylvania
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
        *Counsel for Intervenor Appellant*
        *Commonwealth of Pennsylvania*

Louis J. Capozzi III
E. Stewart Crosland
Benjamin Daus
John M. Gore [ARGUED]
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001

Thomas E. Breth
Thomas W. King, III

Dillon McCandless King Coulter & Graham
128 W. Cunningham Street
Butler, PA 16001

Kathleen A. Gallagher, Esq.
Gallagher Firm
436 Seventh Avenue
30th Floor
Pittsburgh, PA 15219
      *Counsel for Intervenor Defendant Appellants*
      *Republican National Committee, National*
      *Republican Congressional Committee,*
      *Republican Party of Pennsylvania*

Zachary M. Wallen
Chalmers Adams Backer & Kaufman
301 S Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
      *Counsel for Amicus Appellants*
      *Representative Jesse Topper, Kim Ward, Joe Pittman*

Omeed Alerasool
Daniel J. Cohen
Richard A. Medina
Uzoma N. Nkwonta [ARGUED]
Jacob D. Shelly
Nicole E. Wittstein
Elias Law Group
250 Massachusetts Avenue NW
Suite 400

5

Washington, DC 20001

Adam C. Bonin
Suite 400
121 S. Broad Street
Philadelphia, PA 19107
        *Counsel for Plaintiff Appellees*
        *Bette Eakin, AFT Pennsylvania,*
        *Democratic Senatorial Campaign Committee,*
        *Democratic Congressional Campaign Committee*

Molly R. Mudd
Adams County Office of Solicitor
117 Baltimore Street
Gettysburg, PA 17325
        *Counsel for Defendant Appellee*
        *Adams County Board of Elections*

Frances M. Liebenguth
Rosalyn Guy-McCorkle
Lisa G. Michel
Virginia S. Scott
Allegheny County Law Department
445 Fort Pitt Boulevard
3rd Floor
Pittsburgh, PA 15219
        *Counsel for Defendant Appellee*
        *Allegheny County Board of Elections*

Dara Burns
Amy Fitzpatrick

Bucks County Law Department
55 E. Court Street
5th Floor
Doylestown, PA 18901

Jessica L. Vanderkam
Stuckert & Yates
2 N State Street
P.O. Box 70
Newtown, PA 18940
*Counsel for Defendant Appellee*
*Bucks County Board of Elections*

Faith Mattox-Baldini
Colleen M. Frens
Office of Solicitor of Chester County
313 W. Market Street
Suite 6702
West Chester, PA 19380

Timothy J. Ford
Dilworth Paxson
1650 Market Street
Suite 1200
Philadelphia, PA 19102
*Counsel for Defendant Appellee*
*Chester County Board of Elections*

Maureen E. Calder
John Marlatt

Montgomery County Office of Solicitor
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404
    *Counsel for Defendant Appellee*
    *Montgomery County Board of Elections*

Melissa A. Guiddy
Suite 103
2 N Main Street
Greensburg, PA 15601
    *Counsel for Defendant Appellee*
    *Westmoreland County Board of Elections*


Brian H. Benjet
Ilana H. Eisenstein
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Ben C. Fabens-Lassen
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067


Michael W. Pfautz
Alison L. Stohr
Zachary G. Strassburger

City of Philadelphia
Law Department
1515 Arch Street
15th Floor
Philadelphia, PA 19102
*Counsel for Defendant Appellee*
*Philadelphia County Board of Elections*


Jacob B. Boyer [ARGUED]
Office of Attorney General of Pennsylvania
Office of General Counsel
30 North Third Street
Suite 200
Harrisburg, PA 17101
*Counsel for Amicus Appellee*
*Pennsylvania Department of State, Al Schmidt*

Ari J. Savitzky
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004
*Counsel for Amicus Appellees*
*Black Political Empowerment Project, Common Cause*
*Pennsylvania, League of Women Voters of*
*Pennsylvania, Power Interfaith, Pennsylvania State*
*Conference of the NAACP*

9

_____

OPINION OF THE COURT

_____

SMITH, *Circuit Judge*

I.    Introduction

The ballot is a building block of our democracy.  Perhaps no civic act has greater importance—or consequences—than a citizen's casting of a ballot.  Our Constitution calls upon the States to regulate the mechanics of how its citizens cast their ballots so that those citizens may meaningfully express their voices in what George Washington once called "the last great experiment [in] promoting human happiness."[1]    But our Constitution also calls upon the Courts to scrutinize such regulations to ensure they do not unduly burden voters' voices. This inquiry is often a difficult one.  It requires a court to balance the State's constitutionally mandated duty against its citizens' constitutionally protected right.  But "there is 'no substitute for the hard judgments that must be made.'" *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

This appeal asks us to make one such hard judgment.  We must determine if the Commonwealth of Pennsylvania's requirement that mail-in ballots that arrive in undated or

_____

[1] Letter from George Washington to Catharine Sawbridge Macaulay Graham (Jan. 9, 1790) (on file with the National Archives).

10

misdated return envelopes be discarded complies with our Constitution.  Weighing the burden that practice imposes on Pennsylvanians' constitutional right to vote against the State's interest in the practice, the balance of the scales leads us to hold that it does not comply with our Constitution.  We therefore will affirm the judgment of the District Court.

II.   Facts

a.   History of Mail-in Voting in the Commonwealth of Pennsylvania

Voting by mail first became a component of Pennsylvania's electoral system when the General Assembly adopted the Commonwealth's Election Code in 1937.  Act of June 3, 1937, Pub. L. 1333, No. 320.  The Code permitted some members of the military to vote by absentee ballot.  *Id.* §§ 1301, 1327–30.[2]  Per the Code, military absentee ballots were timely so long as a voter completed his absentee ballot on or before Election

---

[2]  Specifically, Pennsylvania provided for what were called "Detached Soldier's Ballots" for qualified Pennsylvanians serving in the military who were "members of companies of another state or territory" or were separated from their proper unit in such a manner "as shall render it probable that they will be unable to rejoin their proper unit or to be present at their proper place of election on or before the day of any election." *Id.* §§ 1327–28.  A soldier would complete a Detached Soldier's Ballot and place it into an envelope printed with "the affidavit of the [voter], together with the jurat of the officer in whose presence the ballot is marked and before whom the affidavit is made." *Id.* § 1328.  The Code did not require that either the affidavit or the jurat contain a date.  *See id.* § 1329.

11

Day, regardless of when a county board of elections ("county election board")[3] received the ballot. *Id.* § 1329.[4] To give county election boards a means to determine when a voter completed an absentee ballot, Pennsylvania amended the Election Code in 1945 to require that the return envelopes containing absentee ballots be dated upon completion. Act of Mar. 9, 1945, Pub. L. 29, No. 17, § 10 (amending § 1306).[5] A

---

[3] The Act of June 3, 1937 required each county of the Commonwealth to establish a "county board of elections" that would "have jurisdiction over the conduct of primaries and elections in such county." *Id.* § 301(a) (codified today at 25 P.S. § 2641(a)). These boards remain responsible for administering many aspects of Pennsylvania's elections today, including accepting applications for mail-in and absentee ballots, sending mail-in and absentee ballots to voters, and receiving and canvassing mail-in and absentee ballots. *E.g.*, 25 P.S. §§ 3146.2(a), 3146.6(a), 3150.12a(a), 3150.15, 3150.16(a).

[4] If any member of the military voted in the election, Pennsylvania's Election Code required county election boards to delay final vote tallies until the third Friday after an election "within which period all returns of votes cast by electors of the county in military service . . . shall be added . . . and included." Act of June 3, 1937, Pub. L. 1333, No. 320, § 1317.

[5] From 1941 to 1945, county election boards relied on the postmark of return envelopes to determine timeliness. *See* Act of August 1, 1941, Pub. L. 672, No. 273, § 4 (requiring county election boards to examine return envelopes containing military ballots and "set aside unopened all such envelopes

12

ballot was timely if its return envelope bore a date on or before Election Day, and untimely if the return envelope bore a date which fell after Election Day. *See id.* (amending § 1307). Consistent with that design, the Election Code directed county election boards to "set aside," i.e., not count, those ballots contained within return envelopes bearing a date later than that of the election. *Id.*

Absentee voting was extended to the broader public in certain enumerated circumstances in 1963. Act of Aug. 13, 1963, Pub. L. 707, No. 379, § 20.[6] Pennsylvania then changed its criteria for determining an absentee ballot's timeliness in 1968, making an absentee ballot's timeliness hinge on whether a county election board *received* it by Election Day instead of whether a voter had *completed* it by Election Day. Act of Dec. 11, 1968 ("1968 Act"), Pub. L. 1183, No. 375, § 8 (amending § 1308(a)). The amended Election Code required that voters place their absentee ballots inside a return envelope which bore

which bear a postmark later than the date of the particular election day involved") (amending § 1307).

[6] Section 20 of the 1963 amendment established categories of "qualified absentee electors" who could vote by mail. This included any qualified elector who was absent from his or her state or county of residence and was a spouse or dependent of a person in the military, a qualified elector who was part of a religious or welfare group attached to the armed forces and was absent from his or her state or county of residence, or any qualified elector who was unable to make it to the polls due to illness or physical disability, to name a few examples. *Id.* (amending § 1301(a)–(l)).

13

a declaration that included a date and signature field. *Id.* (amending § 1304). It further instructed that an "elector shall . . . fill out, date[,] and sign the declaration." *Id.* (amending § 1306). Notably, the General Assembly removed the explicit requirement that county election boards "set aside" ballots with missing or incorrect dates. *Compare* Act of Aug. 13, 1963, Pub. L. 707, No. 379, § 24 (including in § 1308(c) of Election Code the requirement that county election boards set aside envelopes bearing a date after an election); *with* 1968 Act § 8 (amending § 1308(c) to remove the requirement that county election boards set aside envelopes bearing a date after an election). Consistent with that amendment, county election boards counted absentee ballots with missing or incorrect dates for the next half-century. That practice changed, however, soon after the General Assembly passed the Act of Oct. 31, 2019, Pub. L. 552, No. 77, commonly referred to as "Act 77."

### b. Act 77

Act 77 was the product of a bipartisan majority[7] that enacted universal mail-in voting for the first time in Pennsylvania's history. 25 P.S. § 3150.11(a). As part of the

---

[7] *House Roll Call Vote Summary, Details for RCS No. 781*, PA. HOUSE OF REPRESENTATIVES (Oct. 29, 2019), https://www.palegis.us/house/roll-calls/summary?sessYr=2019&sessInd=0&rcNum=781 [https://perma.cc/D4QP-LB3V]; *Senate Roll Call Vote Summary, Details for RCS No. 311*, PA. STATE SENATE (Oct. 29, 2019), https://www.palegis.us/senate/roll-calls/summary?sessYr=2019&sessInd=0&rcNum=311 [https://perma.cc/8S6H-CHWA].

14

enactment, Act 77 included robust anti-fraud measures, prescribed a comprehensive process for Pennsylvanians to apply to vote by mail, and tasked the Secretary of State with designing a declaration form that would appear on all return envelopes. *E.g.*, 25 P.S. §§ 3150.12, 3150.14(b), 3150.15. Pennsylvania's election code maintained its provisions allowing certain individuals to vote by absentee ballot, which also contained anti-fraud measures, outlined a specific process for absentee voters to submit their ballots, and tasked the Secretary of State with designing the declaration form on return envelopes. *E.g.*, *id.* §§ 3146.2, 3146.4, 3146.5.[8]

Measures aimed at safeguarding the integrity of elections include verification of voter IDs that accompany mail-in ballot applications, 25 P.S. §§ 3146.2b(c), 3150.12b(c); criminal penalties for false registration, 25 P.S. § 3552; a challenge process to dispute a voter's qualifications to vote by mail, 25 PA. CONST. STAT. § 1329; voter roll maintenance procedures, 25 PA. CONST. STAT. § 1222; timely-return deadlines, 25 P.S. §§ 3146.6(a), 3150.16(a); a requirement that county election boards maintain and make public records concerning electors who apply for a mail-in ballot, 25 P.S. §§ 3146.9, 3150.17; and post-election audits, 25 P.S. § 3031.17.

Additionally, Act 77 established a comprehensive process for voting by mail. A voter must first apply to the county election board, submitting a copy of a photo ID together with his or her name, address, date of birth, and length of residency in the voting district, among other information. 25 P.S. §§

---

[8] For purposes of this opinion, we refer to absentee and mail-in ballots or voters collectively as "mail-in" ballots or voters.

15

3146.2, 3150.12(b).  By law, the application for a mail-in ballot must inform voters that they may not vote in person if they have applied to vote by mail unless they bring with them to the polling place their mail-in ballots and remit them.  25 P.S. §§ 3146.2(i)(1), 3150.12(f).

Upon receipt, a county election board determines if the voter meets the four eligibility criteria to vote in Pennsylvania, requiring that the voter be: (1) at least 18 years old on Election Day; (2) a U.S. citizen for at least one month before Election Day; (3) a resident of his or her election district for at least 30 days; and (4) not currently incarcerated for a felony conviction. PA. CONST. ART. VII § 1; 25 P.S. § 2811.  To determine eligibility, county election boards compare the application to vote by mail against the voter's registration data in the Statewide Uniform Registry of Electors ("SURE") system—a database of registered voters.[9]  25 P.S. §§ 3146.2b, 3150.12b; 25 PA. CONS. STAT. § 1222.

---

[9] More specifically, the SURE system is "[t]he integrated voter registration system of all registered electors in [the] Commonwealth." 25 P.S. § 3150.1.  In addition to including a database of all registered voters, the SURE system permits the auditing of registered voters' registration records, identifies the district to which a voter should be assigned, identifies duplicate voter registrations on a countywide and Statewide basis, identifies voters who have been issued a mail-in ballot, identifies electors who voted and the means by which they voted, and allows election officials to obtain a copy of a wallet-sized identification card submitted by the voter.  25 PA. CONS. STAT. § 1222(c)(1), (11), (15), (17), (19)–(21).

16

If a mail-in voter application is approved, the county election board provides the applicant with a mail ballot, a secrecy envelope, and a larger, pre-addressed return envelope. 25 P.S. §§ 3146.4, 3150.14.  The voter then marks the ballot, seals it within the secrecy envelope, and places the secrecy envelope within the return envelope.  25 P.S. §§ 3146.6(a), 3150.16(a).  Each return envelope contains a SURE system barcode that is unique to each voter and each election year. Additionally, the return envelope includes a declaration that the voter is qualified to vote and has not already voted, along with spaces for the voter to sign and date the declaration.  As a voter's final step before mailing in the completed ballot, the voter must sign and date the declaration on the spaces provided on the return envelope.  The date should represent the date on which the voter actually completed the declaration.  25 P.S. §§ 3146.6(a), 3150.16(a).

By Pennsylvania law, a ballot is timely only if the county election board receives it before 8 p.m. on Election Day.  25 P.S. §§ 3146.6(c), 3150.16(c).  Hence, the Election Code requires county election boards to record the date and time they receive each mail-in ballot.  25 P.S. §§ 3146.9(b)(5), 3150.17(b)(5).  Upon receipt, county election boards date stamp or otherwise physically notate the time of receipt on the return envelope provided by the county election board.  County election boards then scan the barcode on the return envelope, thereby entering the time it was received into the SURE system.  Appellees Phila., Allegheny, Bucks, Chester, and Montg. Cnty. Election Bds. Br. ("Counties Br.") at 6. Additionally, county election boards often physically segregate timely ballots from untimely ballots.

17

### c. The Date Requirement

Act 77 retained language from the Election Code which required that voters shall "fill out, date and sign" the declaration on return envelopes. 25 P.S. §§ 3146.6(a); 3150.16(a). Construing this language as a matter of statutory interpretation, the Supreme Court of Pennsylvania has determined that it requires county election boards to discard return envelopes (and the ballots contained therein) with a missing or incorrect date. *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election* ("*2020 General Election*"), 241 A.3d 1058, 1079, 1090 (Pa. 2020); *Ball v. Chapman*, 289 A.3d 1, 21–22 (Pa. 2023).[10] Pursuant to this "date requirement," if a return envelope's date field contains a mistaken additional digit, a stray pen mark, or

---

[10] The Supreme Court of Pennsylvania has seven justices. In *2020 General Election*, the three-justice Opinion Announcing the Judgment of the Court stated that county election boards could count ballots contained in return envelopes that lacked dates. 241 A.3d at 1076, 1078. Nevertheless, four justices filed or joined concurring and dissenting opinions stating that county election boards could not count ballots contained in return envelopes with missing dates. *Id.* at 1079 (Wecht, J., concurring in part and dissenting in part), 1090 (Dougherty, J., concurring in part and dissenting in part). In *Chapman*, the Supreme Court of Pennsylvania determined that "an undeniable majority" of the court in *2020 General Election* had determined "that undated ballots would *not* be counted." 289 A.3d at 21. *Chapman* also held that ballots in incorrectly dated return envelopes could not be counted, either. *Id.* at 23.

18

missing information (including a year) then the ballot contained within that envelope may not be counted. *Ball*, 289 A.3d at 21–23; *see, e.g.*, Supp. App. 175–84; Amicus Pa. State Conf. of the NAACP et al. Br., at 9, 17–21 (providing examples of ballots rejected due to the date requirement).

Additionally, the Supreme Court of Pennsylvania has held that county election boards need not provide notice to a mail-in voter that her ballot has been rejected because it did not conform to the date requirement. *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 374 (Pa. 2020). Nor is that voter entitled to cure the date deficiency. *Id.* Some, but not all, of Pennsylvania's county election boards provide no notice to voters if their ballots have been rejected due to having failed to meet the date requirement. *E.g.*, Supp. App. 73–74; Eakin Br. at 36. This inconsistent practice of notifying voters when they have submitted a noncompliant envelope results in some voters being able to resubmit a ballot, while others do not have their votes counted due to this technicality.

d. Ramifications of the Date Requirement

Failure to conform with the date requirement caused over 10,000 ballots to be discarded in the 2022 General Election. Responding to that more-than-negligible figure, Governor Josh Shapiro's administration redesigned the return envelope format. *Shapiro Administration Announces 57% Decrease in Mail Ballots Rejected in 2024 General Election* ("*Shapiro Administration*"), COMMONWEALTH OF PENNSYLVANIA (Jan. 24, 2025), https://www.pa.gov/agencies/dos/newsroom/shapiro-administration-announces-57--decrease-in-mail-ballots-re

19

[perma.cc/QV2Q-NXVL].   The redesigned return envelope was used for the first time in 2024 with notable results.  *Id.*  It culminated in a 57% drop in the rejection of mail ballots.  *Id.*  Overall, only 23% of rejected mail-in ballots, or 0.064% of total votes cast, were rejected due to some failure to meet the date requirement.  *Id.*  That still means that roughly 4,500 eligible Pennsylvania voters who made the effort to vote by mail in 2024 had their ballots discarded due to a missing or incorrect date.  *Id.*

e.  Procedural History

Plaintiff-appellee Bette Eakin is a Pennsylvania resident who had her mail-in ballot rejected during the 2022 general election after she failed to write a date on her return envelope. Joined by various entities affiliated with the Democratic party[11] and a federation of teachers,[12] Eakin filed suit against the county election boards of all 67 Pennsylvania counties, alleging the date requirement violated the Materiality Provision of the Civil Rights Act[13] and the First and Fourteenth

---

[11] Those entities included the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC").

[12] AFT Pennsylvania "is the Pennsylvania affiliate of the American Federation of Teachers and a union of professionals representing approximately 25,117 members in 55 local affiliates across Pennsylvania."  Supp. App. 7.

[13] Codified at 52 U.S.C. § 10101(a)(2)(B), the "Materiality Provision" of the Civil Rights Act of 1964 prohibits any person acting under color of law from denying another's right to vote

Amendments of the Constitution. The lawsuit was filed in the U.S. District Court for the Western District of Pennsylvania.

The District Court granted leave to intervene to a group of Republican party entities: the Republican National Committee, the National Republican Congressional Committee, and the Republican Party of Pennsylvania (collectively the "RNC"). Dist. Ct. Dkt., ECF 165 (Jan. 6, 2023). The District Court also notified the Commonwealth of Pennsylvania of the lawsuit in June of 2024, but the Pennsylvania Office of the Attorney General opted not to intervene. Dist. Ct. Dkt., ECF No. 383 (June 18, 2024). Although Plaintiffs initiated this lawsuit by naming as defendants the county election boards of all 67 counties that comprise the Commonwealth, only two defendant county election boards defended the date requirement: Berks County and Lancaster County. The case proceeded to discovery, producing voluminous pages of interrogatories, depositions, and other documents. The parties then filed cross motions for summary judgment.

Addressing the dispositive motions, the District Court first determined that Eakin's argument under the Materiality Provision was foreclosed by our decision in *Pennsylvania State Conference of NAACP Branches v. Secretary of the Commonwealth of Pennsylvania* ("*NAACP*"), 97 F.4th 120 (3d Cir. 2024). There, we determined that the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B),

---

because of an "error or omission" on paperwork that relates "to any application, registration, or other act requisite to voting" if the error or omission is "not material in determining whether [an] individual is qualified" to vote.

"is triggered when conduct or laws restrict *who* may vote" but leaves "to the States to decide *how* qualified voters must cast a valid ballot." *NAACP*, 97 F.4th at 130. Because the date requirement is embedded in the act of casting a ballot, we determined that it falls outside the Materiality Provision's scope. *Id.* at 135.

Second, the District Court held that the date requirement violated the First and Fourteenth Amendments. Relying on our decision in *Mazo v. New Jersey Secretary of State*, 54 F.4th 124 (3d Cir. 2022), the District Court reasoned that the *Anderson-Burdick* framework ("*Anderson-Burdick*") applied because the date requirement burdened the right to vote and primarily regulated the mechanics of the electoral process. The District Court next proceeded to weigh the burden imposed by the date requirement against the justifications for it advanced by the RNC and Berks County.[14] In applying *Anderson-Burdick*, the District Court concluded that the date requirement imposed a minimal burden on Pennsylvanians' right to vote, reasoning that it is easy to date an envelope and that the requirement is non-discriminatory. Yet the District Court concluded that none of the proffered State interests advanced to support the date requirement—enhancing election efficiency, promoting solemnity, or preventing voter fraud—justified the burden the date requirement imposed. The District Court highlighted that the RNC and Berks County had failed

---

[14] Although the Lancaster County Election Board opposed Plaintiffs' lawsuit, its motion for summary judgment did not identify interests that purported to justify the date requirement. ECF No. 280 (Apr. 21, 2023).

22

to adduce any evidence in support of the asserted interests in enhancing election efficiency or promoting solemnity.

The District Court also emphasized that the RNC had produced only a single criminal case of voting fraud which involved a mail-in ballot: *Commonwealth v. Mihaliak*, No. MJ-2202-CR-126-22 (Pa. Mag. Dist. Ct. 2022). In that criminal prosecution, a woman was convicted on charges relating to her having completed and mailed her recently deceased mother's ballot to the county election board of Lancaster County. The fraud was easily detected because, by the time the county received the ballot, it had already removed the decedent from the voter rolls. The county election board discounted the ballot after scanning the barcode on the return envelope, causing the SURE system to flag the ballot as invalid because the registered voter was deceased. Thus, the District Court determined that *Mihaliak* did not support the RNC's position. Notably, the SURE system, and not the date on the return envelope, is what alerted the County to the fraud. The District Court then highlighted that the Lancaster County Board of Election's Chief Clerk, Christa Miller, had admitted in a deposition that "an outer envelope that is missing a hand-written date is no reason to suspect voter fraud."

Concluding that none of the proffered State interests justified the burden the date requirement imposed, the District Court granted summary judgment in favor of Eakin and enjoined Pennsylvania's county election boards from discarding ballots contained in return envelopes with missing or incorrect dates. Important to a full understanding of this case, nothing in the District Court's order prevents the Commonwealth or county election boards from including a

date field in the declaration on return envelopes.  The order merely prevents county election boards from discarding mail-in ballots based on how a voter fills in the date field on the return envelope's declaration.

The RNC timely appealed the District Court's order granting Eakin's motion for summary judgment.  No county election board has joined this appeal on the side of the RNC. After the RNC appealed, the Attorney General of the Commonwealth sought to intervene to defend the date requirement.[15]  We granted that motion.

## III.    Standard of Review

We review the grant of summary judgment *de novo.  N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 854 (3d Cir. 2022).  Summary judgment "is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

## IV.    Jurisdiction

The District Court had federal question jurisdiction under 28 U.S.C. § 1331 because Eakin's claim arose out of a federal statute and the U.S. Constitution.   We have appellate

---

[15]  Pennsylvania voters elected a new attorney general in November of 2024. Angela Couloumbis, *Republican Dave Sunday Wins Attorney General Race in Pennsylvania, Beating Eugene DePasquale*, SPOTLIGHT PA (Nov. 6, 2024).

jurisdiction under 28 U.S.C. § 1291 over the District Court's final judgment.

V.    Discussion

This appeal asks us to determine whether Pennsylvania's requirement that county election boards discard mail-in ballots sent to them in return envelopes with missing or incorrect dates violates the First and Fourteenth Amendments.  We agree with the District Court that it does, and we will affirm.

a.    An Overview of *Anderson-Burdick*

Voting rights cases sit at the juncture of two competing interests.  First, "voting is of the most fundamental significance under our constitutional structure."  *Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).  The general right to vote is "implicit in our constitutional system." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973).  And the courts afford special protections for this "precious" and "fundamental" right.  *Harper v. Va. State Bd. Elections*, 383 U.S. 663, 670 (1966).

Yet secondly, the right to vote in any manner is not absolute. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  The Constitution establishes the States' prerogative to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const. Art. I, § 4, cl. 1.  Furthermore, "[c]ommon sense, as well as constitutional law, compels the conclusion that . . . 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to

25

accompany the democratic processes.'" *Burdick*, 504 U.S. at 433 (quoting *Storer*, 415 U.S. at 730).

Because of these important—yet sometimes conflicting—interests at stake in voting rights cases, the Supreme Court developed the *Anderson-Burdick* framework (also called the *Anderson-Burdick* balancing test or simply "*Anderson-Burdick*"), which derives from the cases *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). The test requires a weighing of the burden imposed on a voter's constitutional rights by a voting law or regulation against the State's legitimate interest in the law, thereby allowing a court to factor in both interests before reaching a final determination. *Burdick*, 504 U.S. at 434.

The test proceeds in two steps. At step one, a court determines the nature and extent of the burden that a challenged voting law imposes on a constitutional right, weighing "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. *Burdick* acknowledges that an election law "invariably" places some burden on the right to vote. *Burdick*, 504 U.S. at 433. And precedent clarifies several factors that we consider in assessing a law's burden.[16]

At step two, a court weighs the burden against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). A court applying *Anderson-*

---

[16] *See infra* Pt. V(c).

26

*Burdick* "must not only determine the legitimacy and strength of [the State's] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

The touchstone of this analysis "is its flexibility in weighing competing interests." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016). A more burdensome law invites a proportionally more searching scrutiny.[17] But *Anderson-Burdick* is not without clear guideposts. A law that imposes a "severe" burden on voting rights must meet strict scrutiny. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* (quoting *Burdick*, 504 U.S. at 434).

Our precedent instructs that we apply *Anderson-Burdick* to evaluate voting laws that both burden a "relevant constitutional right" and "primarily regulate the mechanics of the electoral process."[18] *Mazo*, 54 F.4th at 138; *see also Crawford v. Marion*

---

[17] *See Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020); *Ariz. Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012).

[18] The Commonwealth, as Intervenor, alleges that *Anderson-Burdick* does not apply to claims that do not implicate "the ability to express oneself nor the ability to associate." Commonwealth Opening Br. at 13. *Mazo* forecloses this argument. 54 F.4th at 140 (recognizing that *Anderson-Burdick*

27

*Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring) (plurality opinion) (stating that we use *Anderson-Burdick* to evaluate laws respecting the right to vote, "whether it governs voter qualifications, candidate selection, or the voting process").[19]  The relevant burden need not be severe. Numerous cases analyzing election laws—including *Mazo*—

---

applies broadly to claims implicating many different constitutional rights and "is not limited to laws that burden free association").

[19] Here, the date requirement meets the two elements identified in *Mazo*.  First, *Mazo* squarely holds that the "right to vote" is a "relevant constitutional right" to which *Anderson-Burdick* applies.  *Mazo*, 54 F.4th at 138.  The date requirement burdens this right by requiring county election boards to discard ballots in envelopes with missing dates or those containing even minor errors in the handwritten date.  *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted* ("*NEOH*"), 837 F.3d 612, 632 (6th Cir. 2016) (applying *Anderson-Burdick* to evaluate law mandating "technical precision in the address and birthdate fields of the absentee-ballot identification envelope"), *abrogated on other grounds recognized by Tenn. Conf. of Nat'l Ass'n for Advancement of Colored People v. Lee*, 139 F.4th 557, 563 (6th Cir. 2025); *Democratic Exec. Comm. of Fla. v. Lee* ("*Lee*"), 915 F.3d 1312, 1319 (11th Cir. 2019) (applying *Anderson-Burdick* to evaluate policy of rejecting ballots based on how a voter wrote his or her signature).  Second, the date requirement primarily regulates "mechanics of the electoral process," by requiring voters to include certain information with their ballots for their votes to be counted.  *See Mazo*, 54 F.4th at 140–41.

have applied *Anderson-Burdick* to voting laws that imposed only a minimal burden on voting rights. *See, e.g.*, *Crawford*, 553 U.S. at 209 (Scalia, J., concurring) (concluding that a law was constitutional because the State's interests were "sufficient to sustain [the law's] *minimal burden*" (emphasis added)); *Mazo*, 54 F.4th at 153 (determining a law's burden was minimal and proceeding to step two of *Anderson-Burdick*). Moreover, a plurality of the Supreme Court in *Crawford* instructed that "*[h]owever slight* [a] burden may appear . . ., it must be justified by relevant and legitimate state interests." *Crawford*, 553 U.S. at 191 (emphasis added). Nevertheless, as *Mazo* instructed, *Anderson-Burdick* does not apply to voting laws that impose only a *de minimis* burden on constitutional rights. 54 F.4th at 138–39.

With this background in mind, we first address Appellants' argument that *Anderson-Burdick* does not apply to the matter at hand.

### b. *Anderson-Burdick* Can Apply to Regulations of Mail-in Voting

Appellants argue that *Anderson-Burdick* is inapplicable to this case because the right to vote does not extend to voting by mail. Their argument relies heavily on the Supreme Court's decision in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). There, the Supreme Court denied a claim by pre-trial detainees that the State's refusal to grant them absentee ballots violated the Equal Protection

Clause of the Fourteenth Amendment.[20]  *Id.* at 803, 811.  The Court reasoned that the detainees had not introduced evidence showing that the State would not bring them to the polls on Election Day, leading the Court to comment that "[i]t is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots."  *Id.* at 807–08.[21]  Relying on

---

[20] Prior to *Anderson-Burdick*, courts addressed voting rights claims under the Equal Protection Clause.  If a litigant could show that an election law either invidiously discriminated or infringed the fundamental right to vote, then strict scrutiny applied.  *Harper v. Va. State Bd. Elections*, 383 U.S. 663, 666–67, 670 (1966) (determining a law invidiously discriminated and applying strict scrutiny); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."); *see also Anderson*, 460 U.S. at 786 n.7 (discussing the "fundamental rights" strand of equal protection analysis).  Otherwise, rational basis review applied.  *McDonald*, 394 U.S. at 807–09.  Some courts continue to apply *Anderson-Burdick* to challenges to state laws on Equal Protection grounds.  *E.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (applying *Anderson-Burdick* in Equal Protection Clause lawsuit, noting, "when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson–Burdick* standard applies").

[21] Later Supreme Court cases construed *McDonald* as "rest[ing] on failure of proof."  *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974).  In another case with facts similar to those in *McDonald*, the Court determined that a State's failure to provide pre-trial detainees absentee ballots did violate the

30

*McDonald*, Appellants argue that a State does not deny the right to vote by limiting or regulating mail-in voting so long as a State preserves the right to vote in person.[22]    Because Pennsylvanians who fail to comply with the date requirement may vote in person, they argue, the date requirement cannot operate to deny the right to vote.  Accordingly, they contend, *Anderson-Burdick* does not apply here.    We reject that argument.

The fact that Pennsylvanians may not have a constitutional right to vote by mail is not dispositive of whether the date requirement violates the Constitution.    Supreme Court precedent has recognized that, even if its citizens did not have a right to a franchise in the first place, a State may not grant a franchise in such a way that violates the Constitution.  For example, there is no First Amendment right to vote for members of a school board, so a state entity may appoint school board members without an election.  *Sailors v. Bd. of Ed. of Kent Cnty.*, 387 U.S. 105, 110–11 (1967).    Nevertheless, a

---

Constitution because the inmates showed the State would not provide them alternative means of voting. *Goosby v. Osser*, 409 U.S. 512, 521–22 (1973).

[22] At one point in its brief, the RNC argues that "a rule cannot impose a severe burden on the right to vote where the State makes available another method of voting exempt from the rule."  RNC Opening Br. at 43.  We decline here to summon up the range of hypothetical regulations that might severely burden the mail-in voter were courts to indulge States in the broad exercise of discretion that Appellants seem willing to grant them.

31

State violates the right to vote by providing for popular election of school board members while at the same time providing that some "bona fide residents" may vote while others may not. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969).  There is likewise no First Amendment right to a ballot initiative.  *Meyer v. Grant*, 486 U.S. 414, 424 (1988).  Yet a State violates the First Amendment by permitting ballot initiatives to be held but only in a manner that unduly burdens associational rights.  *Id.* at 424–25, 428 (striking down a law prohibiting citizens from paying someone to circulate a ballot initiative and rejecting the argument that "because the power of the initiative is a state-created right, it is free to impose [any] limitations on the exercise of that right"); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186, 204–05 (1999) (striking down several conditions a State placed on the ballot-initiative process); *Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir. 2009) (noting that, "as the Supreme Court has recognized, if a [S]tate chooses to confer the right of referendum to its citizens, it is 'obligated to do so in a manner consistent with the Constitution'" (quoting *Meyer*, 486 U.S. at 420)).

So too here.  Even if no First Amendment right to vote by mail-in exists, we still must scrutinize Pennsylvania's mail-in voting regime to ensure that it complies with the Constitution.  As the Supreme Court has instructed in the Equal Protection context, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the . . . Fourteenth Amendment."  *Harper*, 383 U.S. at 665.

Any other rule would have severe ramifications for the democratic process.  A State could induce its citizens to vote by mail, yet proceed to discard countless ballots for any

32

number of reasons unrelated to a voter's qualifications or the State's legitimate interests. Especially as mail-in voting becomes increasingly popular throughout our nation, *see, e.g.*, *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1181 (9th Cir. 2021), we do not think the Constitution countenances such an outcome.[23]

Constitutional scrutiny applies for the independent reason that a Pennsylvanian who fails to comply with the date requirement cannot vote in person. Pennsylvania law provides that a voter who receives a mail-in ballot may not vote at the

---

[23] This conclusion finds support in the Second, Sixth, Ninth, and Eleventh Circuits, which have all applied *Anderson-Burdick* to mail-voting regulations. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019); *Hobbs*, 18 F.4th at 1186–87 (9th Cir.); *NEOH*, 837 F.3d at 631–34; *Price v. New York State Bd. of Elections*, 540 F.3d 101, 107–09 (2d Cir. 2008). The Eighth Circuit noted that the right to vote does not extend to voting by mail but still proceeded to apply *Anderson-Burdick* to a challenge concerning a mail-voting regulation. *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607–09 (8th Cir. 2020). And the Fifth Circuit expressly disavowed whether it was deciding if *Anderson-Burdick* should apply to a challenge concerning mail-in voting based on the Twenty-Sixth Amendment. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 194 (5th Cir. 2020). The Seventh Circuit held that *Anderson-Burdick* did not apply to a challenge to a law imposing a deadline to receive absentee ballots. *Common Cause Indiana v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) (applying rational basis review).

33

polls unless he or she brings the mail-in ballot to the polls and remits it. 25 P.S. §§ 3146.2(i)(1), 3150.12(f). A voter loses that option once that voter mails in a ballot. It is false to claim, then, that a Pennsylvanian who has chosen to vote by mail may simply vote in person if he or she fails to comply with the date requirement. Instead, that person's ballot will be discounted— potentially without notice or any opportunity to correct the ballot. *See Boockvar*, 238 A.3d at 374.

We will, therefore, apply *Anderson-Burdick* and must look to its first step by assessing the character and extent of the burden that the date requirement imposes on a Pennsylvania voter's constitutional rights.

### c. The Date Requirement Imposes a Minimal Burden on Voting Rights

At *Anderson-Burdick*'s first step, we examine the nature and extent of the burden the date requirement imposes on First and Fourteenth Amendment protected rights. Precedent has delineated several, non-exhaustive considerations that bear on this inquiry. They include: (1) can voters comply with a voting law with ease;[24] (2) does the law disproportionately limit political participation "by an identifiable political group whose members share a particular viewpoint, associational

---

[24] *Hobbs*, 18 F.4th at 1189 (defining the burden of signing an affidavit that accompanies a mail-in ballot as "the small burden of signing the affidavit or, if the voter fails to sign, of correcting the missing signature by election day").

34

preference, or economic status";[25] (3) are there alternative means for affected voters to vindicate the interest burdened by a challenged law;[26] (4) have the challengers provided evidence of specific unconstitutional applications of the law, including data of voters affected by a law;[27] and (5) what are the impacts of the voting law?[28]

---

[25] *Anderson*, 460 U.S. at 793; *see id.* at 793–94 ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties.").

[26] *Timmons*, 520 U.S. at 363 (holding that a law that prevented independent parties from listing a major party candidate as their candidate reduced an independent party's ability to convey support for major candidates, but that the burden was reduced because the "party retains great latitude in its ability to communicate ideas to voters and candidates through its participation in the campaign" process); *see also Burdick*, 504 U.S. at 435–36 (reasoning that a Hawaii law prohibiting write-in ballots was less burdensome because Hawaii provided multiple mechanisms for candidates to appear on the ballot).

[27] *Mazo*, 54 F.4th at 152 ("Evidence is key to the balancing of interests at the heart of the *Anderson-Burdick* framework.").

[28] *Anderson*, 460 U.S. at 790 (looking at impact of law in assessing its burden); *Fish*, 957 F.3d at 1127–28 (considering the number of applicants that were prevented from registering to vote when assessing burden).

Weighing these factors, we hold that the date requirement imposes a minimal burden on voting rights. Although it may seem easy to place a date on a return envelope—and there is no evidence that the date requirement disproportionately limits political participation by a defined political group—the date requirement caused county election boards to discard over 10,000 ballots in the 2022 general election. Appellants highlight that this number dropped in the 2024 election after the Shapiro Administration revised the declaration form that appears on return envelopes, and that "only 0.064% percent [sic] of all ballots cast were rejected under the date requirement [in 2024]." RNC Opening Br. at 34. But that still amounts to 4,500 ballots rejected due to some failure to meet the date requirement. *See Shapiro Administration*, *supra*; *Presidential Election (Official Returns)*, COMMONWEALTH OF PENNSYLVANIA (Nov. 5, 2024), https://www.electionreturns.pa.gov/General/VoteByMethod? officeId=1&districtId=1&ElectionID=105&ElectionType=G &IsActive=0&isRetention=0 [https://perma.cc/3M66-UGCA].

Moreover, in its Motion to Expedite, the RNC contended that a district court's enjoining county election boards from discarding ballots contained in return envelopes that did not comply with the date requirement in 2022 caused "a Republican incumbent [to lose] his office because undated mail ballots were counted."[29] Hence, despite its argument that

---

[29] App. Dkt., No. 35 (Apr. 17, 2025), RNC Mot. to Expedite at 2; *see id.* ("Indeed, three Republican candidates since 2020 have lost elections solely because undated mail ballots were

a low percentage of ballots were rejected due to the date requirement, the RNC itself acknowledges that the date requirement can result in the rejection of a number of ballots sufficient to affect the composition of elected governing bodies.

Additionally, an individual Pennsylvania voter who fails to comply with the date requirement potentially has no means to correct the deficiency and cast a valid ballot. Pennsylvania county election boards have no obligation under the Election Code to notify voters if their ballots are rejected for failure to comply with the date requirement. *Boockvar*, 238 A.3d at 374. Pennsylvania law provides that a voter who received a mail-in ballot cannot vote in person unless the voter brings his or her mail-in ballot to the polling place and remits it. 25 P.S. §§ 3146.2(i)(1), 3150.12(f). Millions of Pennsylvania voters since 2019 have taken the time to apply for and receive mail-in ballots.[30] In submitting them to county election boards, they surely believed they had completed those ballots correctly. But despite these voters' best efforts, their ballots may be rejected for something as trivial as a stray mark on the date field. *See Chapman*, 289 A.3d at 28. Voters who do not know that their mail-in ballots have been rejected can hardly be expected to find a way to cure a deficiency on the return envelope. And they cannot vote in person because they cannot remit a mail-in

_____

counted."). The RNC has not clarified which offices its candidates lost due to undated ballots being counted.

[30] *See, e.g.*, *Presidential Election (Official Returns)*, *supra* (showing that almost two million people voted by mail in Pennsylvania during the 2024 election alone).

37

ballot they already mailed to county offices.    25 P.S. §§ 3146.2(i)(1), 3150.12(f).

Because the date requirement causes thousands of ballots to be discarded and can leave voters without a means to cast a valid ballot, we conclude that the date requirement imposes a minimal burden on Pennsylvania voters' rights protected by the First and Fourteenth Amendments.

Appellants marshal two arguments challenging this conclusion.  The first is that the date requirement imposes only a *de minimis* burden—not a minimal burden—and hence escapes *Anderson-Burdick* entirely, per *Mazo*.  *See Mazo*, 54 F.4th at 138–39 (commenting that *Anderson-Burdick* "does not apply . . . where the burden on a constitutional right is no more than *de minimis*").  This argument fails because a *de minimis* burden is one that has merely a speculative impact on and connection to voting rights.[31]  The date requirement does not

_____

[31] *Mazo* cited three cases for the proposition that a voting law that imposes only a *de minimis* burden is not subject to *Anderson-Burdick*. 54 F.4th at 139 n.10 (citing *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009), *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 12 (1982), and *Clingman v. Beaver*, 544 U.S. 581, 584 (2005)).  *Molinari* and *Rodriguez* both involved a speculative impact on constitutionally protected rights. In *Molinari v. Bloomberg*, the Second Circuit highlighted that litigants challenging a law permitting the City Council and Mayor of New York City to enact laws amending the City Charter and extending term limits "are not in any way restricted from engaging in First Amendment activity" by the challenged law.  564 F.3d at 599.

38

impose a *de minimis* burden because its impact on and connection to voting rights is not speculative: A Pennsylvania mail-in voter who fails to comply with the date requirement will not have his or her vote counted. Period.

Second, Appellants argue that our burden analysis may not consider the impacts of the date requirement or the consequences of a voter's failure to comply with the date requirement. Our focus should be on the "*burden* of compliance" and not, they contend, "the *consequence* of noncompliance." RNC Reply Br. at 16. We disagree.

The Supreme Court's First Amendment jurisprudence regularly looks to a law's downstream consequences in assessing its constitutionality. For example, an easy-to-comply-with law faces heightened scrutiny if it has a "chilling effect" on conduct protected by the First Amendment. *NAACP*

---

In *Rodriguez v. Popular Democratic Party*, a case decided before *Anderson-Burdick*, the Supreme Court upheld a law permitting the Governor of Puerto Rico to make interim appointments to Puerto Rico's legislature. 457 U.S. at 3. Crucially, no law provided a right to vote for interim appointees, hence Puerto Rico's decision to select interim appointees without an election had only a speculative impact on a constitutionally protected right. *Id.* at 8–9, 12. *Mazo*'s cite to *Clingman* may have been in error because—as *Mazo* itself recognized, 54 F.4th at 138—*Clingman* applied *Anderson-Burdick*. *See Clingman*, 544 U.S. at 590, 593–94 (determining that a semi-closed primary system imposed a minimal burden and rejecting a challenge to that system because the State's interests in the system justified its burden).

39

*v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451, 460–62, 466 (1958) (invalidating a $100,000 fine against the NAACP for failing to comply with an Alabama law requiring it to disclose its members and agents because the law abridged associational rights); *see id.* at 460–61 ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). *Anderson-Burdick* is no different and requires a court to look to a law's consequences and downstream impacts in assessing a law's burden. In *Anderson*, for example, the Supreme Court determined that an Ohio law imposing a March deadline for independents to declare their candidacy for the presidency imposed a substantial burden on associational rights. 460 U.S. at 786, 790–95. Crucial to that conclusion, the Supreme Court highlighted that the deadline "may have a substantial *impact* on independent-minded voters," *id.* at 790 (emphasis added), and would prevent independent-minded voters from rallying around a newly emerged independent candidate later in the campaign season, *id.* at 791; *see also Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.").

Lastly, limiting our burden analysis to consider only the burden of complying with a law's requirements would lead us to under-scrutinize laws that—while seemingly easy to adhere to—nevertheless severely burden constitutional rights because of their downstream effects.[32] We thus reject Appellants'

---

[32] Consider, for example, a law specifying that in any petition to appear on a ballot there be no typos and that the presence of

argument that at *Anderson-Burdick*'s first step we may consider only the burden of complying with a law. We hold that a court applying the first step of *Anderson-Burdick* may look to a law's impacts, including the consequences of noncompliance with a voting law or regulation.[33]

---

a typo in a petition bars a candidate from appearing on a ballot for two years. *Anderson-Burdick* would apply in a lawsuit challenging the law. *Cf. Belitskus v. Pizzingrilli*, 343 F.3d 632, 643–47 (3d Cir. 2003) (applying *Anderson-Burdick* in challenge to ballot access law). If a court applying *Anderson-Burdick*'s first step could consider only the burden of compliance, it could conclude that the law imposed a minimal burden because it is easy to avoid typos. Nevertheless, barring a candidate from appearing on a ballot for two years is a severe consequence that a court applying *Anderson-Burdick* should be able to consider.

[33] Multiple other circuits applying *Anderson-Burdick* have weighed the impacts of a voting law in assessing how a law burdens constitutionally protected rights. For example, the Sixth Circuit in *Obama for America v. Husted* credited that a law requiring county election offices to close on weekends and reducing the window during which voters could vote early would prevent thousands of working-class, less-educated Americans from voting, thereby burdening the right to vote. 697 F.3d 423, 430–32 (6th Cir. 2012); *see also NEOH*, 837 F.3d at 630–35 (assessing both the burden of providing personal information on ballot envelopes and the "impact" on voters whose ballots were not counted due to inaccuracies in that information). Similarly, the Eleventh Circuit in *Lee*

41

In summary, we conclude that the date requirement imposes a minimal burden on voting rights, and that it does so, in part, due to its downstream consequences.

### d. The Proffered State Interests Cannot Justify the Date Requirement's Burden

At the second step of *Anderson-Burdick*, we "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. This analysis requires us to "not only determine the legitimacy and strength of each of those interests" but also "consider the extent to which those interests make it necessary to burden [constitutional] rights." *Id.* We weigh those interests against the burden that a law imposes. A law that imposes a severe burden must meet strict scrutiny while laws imposing lesser burdens "trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). We apply that "less exacting review" here because the date requirement imposes a minimal burden. Before we proceed to that analysis, though, we address

---

concluded that a signature matching law seriously burdened the right to vote because the law would cause numerous otherwise valid ballots to be rejected. 915 F.3d at 1319–21. And the Tenth Circuit determined that a law requiring proof of citizenship in order to register to vote burdened the right to vote because it prevented 31,089 applicants from registering to vote. *Fish*, 957 F.3d at 1127–28.

Appellants' contention that *Anderson-Burdick* equates to rational basis review if a law imposes a minimal burden.

A comparison between the application of *Anderson-Burdick* and rational basis review reveals that the two necessarily differ. *Anderson-Burdick* operates by weighing a burden a law imposes on relevant constitutional rights against a State's interest in applying that law. This "balancing of interests" lies "at the heart of the *Anderson-Burdick* framework." *Mazo*, 54 F.4th at 152; *see also Norman v. Reed*, 502 U.S. 279, 288–89 (1992) (*Anderson-Burdick* calls "for the demonstration of a corresponding interest sufficiently weighty to justify the limitation"). Rational basis review, meanwhile, does not call for the balancing that lies at the core of *Anderson-Burdick* but merely requires a court to examine a law to determine if that law is "rationally related to furthering a legitimate state interest." *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (internal quotation marks and citation omitted). A minimally burdensome law may pass rational basis review because its purpose relates rationally to a legitimate state interest, while flunking *Anderson-Burdick* because the legitimate state interest cannot justify the minimal burden. That difference—that distinction—convinces us that *Anderson-Burdick* is not simply another name for rational basis review, even if a law imposes only a minimal burden.

Consistent with this conclusion, our precedent counsels that we not "peg[]" *Anderson-Burdick* into the traditional tiers of scrutiny. *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006). "Rather, following *Anderson*, our scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden

43

against the precise interests identified by the [S]tate." *Id.* We would contradict that precedent were we to hold that *Anderson-Burdick* equates to rational basis review if a voting law imposes a minimal burden.[34]

That said, we recognize that the Supreme Court has not been hesitant about collapsing aspects of *Anderson-Burdick* into the traditional tiers of scrutiny when it chooses to do so. In *Timmons*, for example, the Supreme Court instructed that "[r]egulations imposing severe burdens on plaintiffs' rights *must be narrowly tailored and advance a compelling state interest*," *Timmons*, 520 U.S. at 358 (emphasis added), which is the language of strict scrutiny, *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). Most important for our

---

[34] This conclusion is also consistent with our own precedent and that of our sister Circuits. *See, e.g.*, *Mazo*, 54 F.4th at 153 (in a case involving a "minimal" burden, not using rational basis review but rather declaring that "a [S]tate must show relevant and legitimate interests that are sufficiently weighty to justify the limitation for the consent requirement to survive lesser scrutiny" (internal quotation marks omitted)); *id.* at 154 ("Because these interests are all important, they need only outweigh the minimal burden imposed by the consent requirement."); *Tedards v. Ducey*, 951 F.3d 1041, 1045, 1066 (9th Cir. 2020) (concluding that "the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review"); *Pisano v. Strach*, 743 F.3d 927, 935–36 (4th Cir. 2014) (after concluding plaintiffs' burden was "modest," engaging in *Anderson-Burdick* weighing instead of rational basis review).

purposes, however, is that the Supreme Court has never stated that minimally burdensome voting laws receive rational basis review under *Anderson-Burdick*. Indeed, immediately following *Timmons*'s articulation of what we recognize as strict scrutiny language is the Court's instruction that "[l]esser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" 520 U.S. at 358 (quoting *Burdick,* 504 U.S. at 434). If that "less exacting review" equates to rational basis review, the Supreme Court would most likely have said so.[35]

In summary, *Anderson-Burdick* is not the identical twin of rational basis review where a law has been determined to impose only a minimal burden.[36] Applying *Anderson-*

---

[35] We note that some of our sister Circuits have applied rational basis review, or something close to it, in minimal burden cases, but we decline to adopt their approach. *E.g.*, *Ohio Council 8 Am. Fed. of State v. Husted*, 814 F.3d 329, 335, 338 (6th Cir. 2016) (where the burden on plaintiffs' rights to expression and association was "minimal," characterizing its review under *Anderson-Burdick* as "a less-searching examination closer to rational basis"); *Libertarian Party of Ala. v. Merrill*, No. 20-13356, 2021 WL 5407456, at *10 (11th Cir. Nov. 19, 2021) (nonprecedential) (upholding a law that imposed a minimal burden because it "rationally served . . . important state interests").

[36] Appellants both argue that the District Court erred by weighing a lack of evidence supporting the proffered State interests because a court applying rational basis review may

*Burdick*'s second step, we look to whether the proffered State interests justify the burden the date requirement imposes, not to whether the date requirement is just rationally related to a legitimate state interest. We turn to that analysis now and examine the three State interests Appellants offer to support the date requirement: (1) facilitating election efficiency; (2) promoting solemnity; and (3) detecting and deterring voter fraud. Although each of these interests are legitimate (and even strong), they do not support the date requirement.[37]

i.

The first proffered State interest is that the date requirement facilitates the orderly administration of elections. But, as a general proposition, the date requirement does not seem to

---

not seek evidence from the State. It logically follows that their argument must fail since *Anderson-Burdick* does not equate to rational basis review.

[37] For instance, in *Burdick*, Hawaii's ban on write-in voting was "a legitimate means" of protecting the articulated state interest and "a reasonable way of accomplishing th[e] goal," and thus, on balance, outweighed the asserted burden. 504 U.S. at 439–40; *see also id.* at 441 ("[W]hen a State's ballot access laws pass constitutional muster as imposing only *reasonable* burdens on First and Fourteenth Amendment rights—as do Hawaii's election laws—a prohibition on write-in voting will be presumptively valid." (emphasis added)). Here, the date requirement is not a legitimate means or a reasonable way of accomplishing the Commonwealth's interests, and thus, on balance, does not outweigh the burden on voters.

facilitate orderly election administration in any manner. The date on a return envelope does not inform whether a voter is eligible to cast a ballot. It does not indicate when a voter completed a ballot. And it has no bearing on whether a ballot is timely. *NAACP*, 97 F.4th at 127. If anything, requiring county election boards to check the date field on return envelopes seems to hamper efficiency by foisting an additional responsibility on the boards for no apparent purpose. *See* App. 28 n.9 (citing quote from a brief filed in a separate case by the Secretary of the Commonwealth that "requiring officials to review declaration dates impedes effective election administration"); *see also* Counties Br. at 7 (asserting that the date requirement "serves no purpose in the County Boards' (or any other election board's) election administration"); Adams Cnty. Br. at 52 ("Voiding undated or misdated ballots imposes significant burdens on election staff who must scrutinize and segregate them from the pre-canvass tallies.").[38]

Appellants contend the date requirement can serve as a "backstop" that county election boards may use to determine a ballot's timeliness in the event the SURE system were to fail.

---

[38] Numerous court decisions have noted that the date requirement serves no apparent purpose. *See, e.g.*, *NAACP*, 97 F.4th at 125 ("The date requirement, it turns out, serves little apparent purpose. It is not used to confirm timely receipt of the ballot or to determine when the voter completed it."); *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022), *abrogated in part on other grounds recognized by Ritter v. Migliori*, 143 S. Ct. 297, 298 (2022) (describing the handwritten date on a return envelope as "superfluous and meaningless").

But that argument betrays a misunderstanding of Pennsylvania's election laws. A ballot's timeliness is a function of when a county election board *receives the ballot*. 25 P.S. §§ 3146.6(c), 3150.16(c). A return envelope's date reflects when a voter *completed the declaration*. No Pennsylvania law permits county election boards to use the latter date as a proxy for the former. To the contrary, the county election boards which have chosen to participate in this appeal concede that they "do not—and *indeed cannot*—use the handwritten date to verify a mail ballot's timeliness in any circumstance." Counties Br. at 9 (emphasis added); Adams Cnty. Br. at 51–52. Moreover, even if the SURE system were to fail, county election boards could continue to date stamp upon receipt and physically segregate timely and untimely mail-in ballots, as is their current practice.

ii.

The second proffered interest is that the date requirement promotes solemnity and marks "the casting of a vote as a serious and solemn act." RNC Opening Br. at 54. Appellants contend that the date requirement also pushes voters to contemplate their choices and make a considered decision about their government. *Id.*[39]

---

[39] The RNC argues that "[i]f States can require the formalities of signing and dating for wills and property transactions, then surely Pennsylvania can do the same for voting." RNC Opening Br. at 55. This is like arguing that the Commonwealth can ban handguns because it bans lots of things, like owning a polar bear. 58 PA. CODE § 137.1(a)(3). A dating requirement

48

We by no means minimize the serious and thoughtful approach that every citizen should take in filling out a ballot. That voting is a solemn act is a truth that we ascribe to without question.  But the decisions as to what candidates one will vote for and the deliberation that precedes the physical act necessary for recording those decisions is not what is at stake in the controversy that is before us.  Appellants have cited no precedent that dating a document—here, a return envelope—carries a seriousness so portentous as do the actual decisions of who to vote for.

Further, there are other aspects of the mail-in voting process that promote solemnity, including the process to acquire a mail-in ballot, *e.g.*, 25 P.S. §§ 3146.2, 3150.2, the steps required to submit a timely ballot, *e.g.*, *id.* §§ 3146.6, 3150.16, and the fact that the return envelope that accompanies a mail-in ballot features a declaration that a voter must sign. Affixing one's signature onto a legal document does indeed constitute a solemn act.  *See Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) ("[S]igning a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight."). And under Pennsylvania law, signing the return envelope has legal import and could subject someone to criminal penalties. 25 P.S. § 3553.  It is puzzling what incremental solemnity

---

for wills and property transactions does not implicate voting rights protected by the First and Fourteenth Amendments.  A requirement that voters date their mail-in ballots does.

dating a return envelope might possibly add that affixing one's signature to the document has not already accomplished.[40]

### iii.

Finally, we confront the proffered State interest in fraud detection and deterrence. That it is a legitimate interest is beyond cavil. *Crawford*, 553 U.S. at 196. But the date requirement must reasonably further that interest for us to weigh it. *Anderson*, 460 U.S. at 789; *NEOH*, 837 F.3d at 632 ("Combatting voter fraud perpetrated by mail is undeniably a legitimate concern. Yet some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh.") (Boggs, J.) (internal citation omitted).

At the outset, we are simply unable to discern any connection between dating the declaration on return envelopes and detecting and deterring voter fraud. County election boards have no means of verifying the handwritten dates on return envelopes. And the record shows that county election boards did not view the absence of a date on a return envelope's declaration or the presence of an incorrect date as a reason to

---

[40] Appellants cite numerous cases that purportedly show that dating a document carries a solemn weight, but the cases either do not support that proposition or refer to the solemnity of "signing" a document. Appellants also contend that dating a return envelope is part of the signature. But that argument contradicts the text of Act 77, which states that a voter who seeks to vote by mail shall "fill out, date *and* sign the declaration." 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added).

suspect voter fraud.  Similarly, the Department of State and several county election boards—the only Pennsylvania entities participating in this appeal that engage in administration of the Commonwealth's elections—have all written, in no uncertain terms, that the date requirement does not meaningfully further the Commonwealth's legitimate interest in detecting voter fraud.

Resisting this conclusion, Appellants argue that the date requirement can assist in, and even lead to, an investigation of voter fraud, which in itself contributes to deterrence.[41]  They

---

[41]  Separately, Appellants argue that the District Court committed reversible error by weighing that the RNC had adduced only a single example of the date requirement assisting in fraud detection.  They argue that *Crawford* established that no evidence of fraud is needed because, in *Crawford*, the Supreme Court accepted the State's fraud-prevention rationale despite the record's lacking any evidence of fraud.  That argument fails because the Supreme Court in *Crawford* credited examples of fraud around the nation that Indiana's voter-ID law would have prevented.  *Crawford*, 553 U.S. at 194–96 & nn. 10, 11.  Moreover, there is a logical and obvious connection between a requirement that voters present an ID at the polls and fraud detection, which reduced any need for evidence in *Crawford*.  By contrast, there is no intuitive connection between a requirement that a voter date a declaration such as that presented in this case and fraud detection and deterrence.  In fact, the Chief Clerk of the Lancaster County Election Board stated flatly in a deposition that a declaration with a missing or incorrect date was not an

rely heavily on *Commonwealth v. Mihaliak*, No. MJ-2202-CR-126-22 (Pa. Mag. Dist. Ct. 2022) and argue that it proves the date requirement can prompt an investigation of voter fraud in the rare instance in which a registered voter who had received a mail-in ballot dies and a fraudster completes the ballot and adds a date on the deceased voter's return envelope postdating her death.

The date requirement imposes a burden on Pennsylvanians' constitutional right to vote. And it culminates in county election boards discarding thousands of ballots each time an election is held. The date requirement will not protect against the vast majority of attempts at voter fraud. The *Mihaliak* case demonstrates that the date requirement can narrowly advance the Commonwealth's interest in fraud detection and deterrence—but only in the extremely rare instance involving a hapless fraudster who obtains a recently deceased voter's mail-in ballot, completes the ballot, and adds a date on the return envelope postdating the deceased voter's death. Over six years and across multiple elections in which thousands of

───────────

indicator of fraud. Hence, the District Court rightly considered the dearth of evidence that would have established an otherwise non-apparent connection between the date requirement and fraud detection and deterrence, as a district court would in any other context. As *Anderson* instructed, when confronted with "[c]onstitutional challenges to specific provisions of a State's election laws . . . a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation." 460 U.S. at 789 (internal citation omitted).

Pennsylvanians have voted by mail, this fact pattern has apparently manifested itself only once.

*Anderson-Burdick* is a weighing test. Even where the law imposes a minimal burden and thus invites less scrutiny in our weighing of the interests, *see Timmons*, 520 U.S. at 358, *one* bizarre instance of the date requirement helping the Commonwealth prosecute a criminal case of voter fraud—fraud that had been detected by other means—cannot justify the burden the date requirement imposes that affects *thousands* of Pennsylvania voters every election, *see League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("[S]tates cannot burden the right to vote in order to address dangers that are remote . . . ." (citation omitted)).

Finally, we note that the District Court's order only prevents county election boards from setting aside ballots enclosed in return envelopes with missing or incorrect dates. It does not affect what appears on the return envelopes or prevent future return envelopes from including a date field. The Commonwealth may continue printing return envelopes with a date field—and it may continue to utilize the date field in advancing its interest in fraud detection, however marginal its utility in furthering that goal. That county election boards no longer reject ballots in return envelopes with missing or incorrect dates will have no effect on fraud detection. Recall that this was the Commonwealth's uninterrupted practice regarding absentee ballots from 1968 to 2019. The return envelopes of absentee ballots included a date field, but absentee ballots in return envelopes with missing or incorrect

dates were not discarded.  Act of Dec. 11, 1968, Pub. L. 1183, No. 375, § 8 (amending §§ 1306(a), 1308(a)).[42]

In summary, the proffered State interests in facilitating election efficiency, promoting solemnity, and detecting and deterring voter fraud cannot, individually or in combination, bear the weight of the burden the date requirement imposes. The date requirement seems to hamper rather than facilitate election efficiency.  By its nature, it fails to add solemnity to the process of voting.  And discarding thousands of ballots every election is not a reasonable trade-off in view of the date requirement's extremely limited and unlikely capacity to detect and deter fraud.

VI.    Conclusion

In modern times, every election cycle is witness to thousands of Pennsylvania citizens deciding that they will vote by mail.  They dutifully complete their mail-in ballots carefully and to the best of their abilities.  And they drop their ballots in a mailbox, expecting their votes will be tallied and hopeful that their desired candidates will emerge victorious.  But as we have discussed, those expectations are not always met.  Because of the Commonwealth's date requirement, an inadvertent typographical error or a flipped number or even a stray pen

---

[42] *See* Pa. Dep't of State Br. at 12–13 ("[D]irecting counties not to reject ballots for date errors does not remove the date field from the declaration . . . because the instruction that voters date the declaration and the instructions to election officials about which mail ballots to canvass are governed by *different* sections of the Election Code.").

mark in the date field will remove the ballot contained within the return envelope from consideration.  And the voter may never be the wiser.

Casting a ballot and having it counted are central to the democratic process.  And while we acknowledge a State's unique role in administering elections, courts are sometimes called upon to make difficult decisions—decisions like the one at hand that seek to weigh these interests with an eye towards safeguarding the democratic process.  This case is no exception.  While the Commonwealth has raised legitimate interests related to voting, we see only tangential links, at best, between these interests and the date requirement that Pennsylvania imposes on mail-in voters.  The date requirement does not play a role in election administration, nor does it contribute an added measure of solemnity beyond that created by a signature.  And only in the exceedingly rare circumstance does it contribute to the prosecution of voter fraud.

Weighing these interests against the burden on voters, we are unable to justify the Commonwealth's practice of discarding ballots contained in return envelopes with missing or incorrect dates that has resulted in the disqualification of thousands of presumably proper ballots. We will affirm the District Court's judgment.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1644

_____

BETTE EAKIN; DSCC; DCCC; AFT PENNSYLVANIA

v.

ADAMS COUNTY BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD
OF ELECTIONS; BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD
COUNTY BOARD OF ELECTIONS; BERKS COUNTY BOARD OF ELECTIONS;
BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD COUNTY BOARD OF
ELECTIONS; BUCKS COUNTY BOARD OF ELECTIONS; BUTLER COUNTY
BOARD OF ELECTIONS; CAMBRIA COUNTY BOARD OF ELECTIONS;
CAMERON COUNTY BOARD OF ELECTIONS; CARBON COUNTY BOARD
OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER
COUNTY BOARD OF ELECTIONS; CLARION COUNTY BOARD OF
ELECTIONS; CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON
COUNTY BOARD OF ELECTIONS; COLUMBIA COUNTY BOARD OF
ELECTIONS; CRAWFORD COUNTY BOARD OF ELECTIONS; CUMBERLAND
COUNTY BOARD OF ELECTIONS; DAUPHIN COUNTY BOARD OF
ELECTIONS; DELAWARE COUNTY BOARD OF ELECTIONS;
ELK COUNTY BOARD OF ELECTIONS; FAYETTE COUNTY BOARD OF
ELECTIONS; FOREST COUNTY BOARD OF ELECTIONS; FRANKLIN
COUNTY BOARD OF ELECTIONS; FULTON COUNTY BOARD OF
ELECTIONS; HUNTINGDON COUNTY BOARD OF ELECTIONS;
INDIANA COUNTY BOARD OF ELECTIONS; JEFFERSON COUNTY BOARD
OF ELECTIONS; JUNIATA COUNTY BOARD OF ELECTIONS;
LACKAWANNA COUNTY BOARD OF ELECTIONS; LANCASTER COUNTY
BOARD OF ELECTIONS; LAWRENCE COUNTY BOARD OF ELECTIONS;
LEBANON COUNTY BOARD OF ELECTIONS; LEHIGH COUNTY BOARD OF
ELECTIONS; LUZERNE COUNTY BOARD OF ELECTIONS; LYCOMING
COUNTY BOARD OF ELECTIONS; MCKEAN COUNTY BOARD OF
ELECTIONS; MERCER COUNTY BOARD OF ELECTIONS; MIFFLIN COUNTY
BOARD OF ELECTIONS; MONROE COUNTY BOARD OF ELECTIONS;

MONTGOMERY COUNTY BOARD OF ELECTIONS; MONTOUR COUNTY
BOARD OF ELECTIONS; NORTHAMPTON COUNTY BOARD OF ELECTIONS;
NORTHUMBERLAND COUNTY BOARD OF ELECTIONS; PERRY COUNTY
BOARD OF ELECTIONS; PIKE COUNTY BOARD OF ELECTIONS;
POTTER COUNTY BOARD OF ELECTIONS; SNYDER COUNTY BOARD OF
ELECTIONS; SOMERSET COUNTY BOARD OF ELECTIONS; SULLIVAN
COUNTY BOARD OF ELECTIONS; TIOGA COUNTY BOARD OF ELECTIONS;
UNION COUNTY BOARD OF ELECTIONS; VENANGO COUNTY BOARD OF
ELECTIONS; WARREN COUNTY BOARD OF ELECTIONS; WAYNE COUNTY
BOARD OF ELECTIONS; WESTMORELAND COUNTY BOARD OF
ELECTIONS; WYOMING COUNTY BOARD OF ELECTIONS; ERIE COUNTY
BOARD OF ELECTIONS; GREENE COUNTY BOARD OF ELECTIONS;
PHILADELPHIA COUNTY BOARD OF ELECTIONS; SCHUYLKILL COUNTY
BOARD OF ELECTIONS; SUSQUEHANNA COUNTY BOARD OF ELECTIONS;
YORK COUNTY BOARD OF ELECTIONS; ARMSTRONG COUNTY BOARD
OF ELECTIONS; WASHINGTON COUNTY BOARD OF ELECTIONS


REPUBLICAN NATIONAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE;
REPUBLICAN PARTY OF PENNSYLVANIA,
(Intervenors in District Court)

Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 1:22-cv-00340
District Judge:  The Honorable Susan Paradise Baxter
_____

Argued July 1, 2025


Before: SHWARTZ, FREEMAN, and SMITH, *Circuit Judges*

2

_____

JUDGMENT

_____


This cause came on to be considered on the record from the United States District Court for the Western District of Pennsylvania and was argued on July 1, 2025.

On consideration whereof, it is now hereby ADJUDGED and ORDERED that the judgment of the District Court entered April 1, 2025, be and the same is hereby AFFIRMED.  All of the above in accordance with the opinion of this Court.

ATTEST:


s/ Patricia S. Dodszuweit
Clerk

DATED: August 26, 2025

3

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏF Aᴘᴘᴇᴀʟs
FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE

215-597-2995

August 26, 2025

Omeed Alerasool
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

Brian H. Benjet
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Adam C. Bonin
121 S Broad Street
Suite 400
Philadelphia, PA 19107

Jacob B. Boyer
Office of Attorney General of Pennsylvania
Office of General Counsel
30 North Third Street
Suite 200
Harrisburg, PA 17101

Dara Burns
Bucks County Law Department
55 E Court Street
5th Floor
Doylestown, PA 18901

Daniel J. Cohen
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

Benjamin Daus
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001

Ilana H. Eisenstein
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Ben C. Fabens-Lassen
DLA Piper
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067

Timothy J. Ford
Dilworth Paxson
1650 Market Street
Suite 1200
Philadelphia, PA 19102

John M. Gore
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001

Brett Graham
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

Daniel D. Grieser
Bucks County Law Department
55 E Court Street
5th Floor
Doylestown, PA 18901

Melissa A. Guiddy
2 N Main Street
Suite 103
Greensburg, PA 15601

John Marlatt

Montgomery County Office of Solicitor
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404

Richard A. Medina
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

Lisa G. Michel
Allegheny County Law Department
445 Fort Pitt Boulevard
3rd Floor
Pittsburgh, PA 15219

Molly R. Mudd
Adams County Office of Solicitor
117 Baltimore Street
Gettysburg, PA 17325

Daniel B. Mullen
Office of Attorney General of Pennsylvania
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Uzoma N. Nkwonta
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

J. Manly Parks
Duane Morris
30 S 17th Street
Philadelphia, PA 19103

Michael W. Pfautz
City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA 19102

Ari J. Savitzky
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Jessica L. Vanderkam
Stuckert & Yates
2 N State Street
P.O. Box 70
Newtown, PA 18940

Zachary M. Wallen
Chalmers Adams Backer & Kaufman
301 S Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241

Nicole E. Wittstein
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

RE: Bette Eakin, et al v. Adams County Board of Elections, et al
Case Number: 25-1644
District Court Case Number: 1:22-cv-00340

<u>ENTRY OF JUDGMENT</u>

Today, **August 26, 2025,** the Court entered its judgment in the above-captioned matter pursuant to Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 40, 3rd Cir. LAR 35 and 40, and summarized below.

<u>Time for Filing</u>:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

<u>Form Limits</u>:
3900 words if produced by a computer, with a certificate of compliance pursuant to Fed. R. App. P. 32(g).
15 pages if hand or type written.

<u>Attachments</u>:
A copy of the panel's opinion and judgment only.
Certificate of service, unless the petition is filed and served through the Court's electronic-filing system.
Certificate of compliance if petition is produced by a computer.
No other attachments are permitted without first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be construed as requesting both panel and en banc rehearing. A party seeking both forms of rehearing must file the petitions as a single document. Fed. R. App. P. 40(a).

A party who is entitled to costs pursuant to Fed.R.App.P. 39 must file an itemized and verified bill of costs within 14 days from the entry of judgment. The bill of costs must be submitted on the proper form which is available on the court's website.

A mandate will be issued at the appropriate time in accordance with the Fed. R. App. P. 41.

Please consult the Rules of the Supreme Court of the United States regarding the timing and requirements for filing a petition for writ of certiorari.

Very truly yours,
Patricia S. Dodszuweit, Clerk


By: s/ Tina
Case Manager
267-299-4930

# CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2025, this petition was electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in this appeal has been accomplished via notice filed through the CM/ECF system attaching a copy of this filing.

Dated: September 9, 2025

*/s/ John M. Gore*
John M. Gore
*Counsel for Appellants*